IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

APR 2 9 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

EDAR ROGLER                              :
**Plaintiff** *pro se,*

v.                                       :        CASE NO.  1:07-cv-02308(RMC)

WILLIAM BIGLOW, et al
Defendants.

_____oOo_____

### PLAINTIFF'S EMERGENCY MOTION TO EXTEND TIME TO REPLY TO DEFENDANT'S MEMORANDUM IN OPPOSITION TO MOTION FOR EXTENSION OF TIME TO EFFECT SERVICE AND SUBSTITUTE SERVICE OF PROCESS

Plaintiff pro se, Edar Rogler, hereby submits her emergency motion to extend time to reply to Defendant's memorandum in opposition to Plaintiff's motion for extension of time to effect service and substitute service of process (Paper no. 29) for the following reasons:

1. Plaintiff is indigent.  Plaintiff was not indigent before she came forward as a witness.

2. Plaintiff entered into a contingency engagement agreement with the law firm of KATORS, PARKS & WEISER, P.L.L.C., Paper no. 22, Exh. 1.  The law firm recognizes Plaintiff's indigent condition in said agreement.  Clearly according to the electronic docket of the Clerk's Office regarding the above-captioned matter, the law firm has abandoned the Plaintiff by not entering the appearance of the law firm.  The law firm notified her this last weekend that it will not represent her in the instant matter.  Plaintiff has notified the law firm that she considers the agreement is null and void due to the firm's total failure to represent her.

3. Defendants, by and through its attorney, in various filings are attacking the Court's personal jurisdiction and subject matter jurisdiction.

4. Very briefly the United States Equal Employment Opportunity Commission ("EEOC") ruled that Plaintiff was a material witness who was credible and that the U.S. Department of Health & Human Services ("US DHHS" and/or "Agency") and its pertinent employees retaliated against Plaintiff and other witnesses.  See *Rev. Henry Heffernan v. Michael O. Leavitt, Secretary DHHS*, Petiton No. 0320060079 (January  24, 2007) copy attached as Exh. "1" and

Appeal No. 0720070038 (December 4, 2007) as Exh. "2". Please take judicial notice of other opinions regarding the *Heffernan* matter at the EEOC's website, whose address is www.eeoc.gov.

5. Members of Congress have been demanding an investigation. A copy of one of several letters is attached hereto as Exh. "3".

6. This case has been the subject of newspapers reports, including the article entitled "Chaplains' Complaints of Bias Rise at NIH" by Jacqueline L. Salmon, on the front page of The Washington Post on April 14, 2007, copy attached hereto as Exh. "4".

7. Basically Defendants have acted in a conspiracy to hide the Plaintiff, bribed her, intimidated and retaliated against the Plaintiff to prevent her from testifying and/or giving affidavits for a federal proceeding at the OFO of the US EEOC in Washington, D.C. for a discrimination/reprisal matter for Rev. Heffernan (who resides in Washington, DC) and from his attorneys (whose offices are in Washington DC).

8. Defendants' actions, omissions, conspiracy, etc. violate underlying parallel criminal statutes for civil rights violations and 18 U.S.C. §1512(b), copy attached.

9. In a nutshell this Court has personal and subject matter jurisdiction, see 18 U.S.C. §1512(i). This Court has concurrent jurisdiction with the Maryland venue, because the Defendants acted in conspiracy to conceal by forcing Plaintiff to hide in a video storage closet and not speak to certain people, and not revealing or informing Rev. Heffernan of the identity of the Plaintiff as a witness in a federal proceeding that was occurring in Washington, D.C. Additionally the Defendants conspired to violate Rev. Heffernan's rights under the Privacy Act, 5 U.S.C. §552g. The Privacy Act grants the Washington, D.C. venue for both civil and criminal actions. Similarly in *Bivens* actions and civil rights actions if the Defendants acted in conspiracy to prevent the Plaintiff's testimony and/or retaliate against Plaintiff for her testimony in Washington, D.C., then this Court is an appropriate venue.

10. The Defendant's Motion to Dismiss fails to discuss the OFO location of Washington, DC and the proceeding that was in progress for Rev. Heffernan and in passing attempt to state that intimidating a witness to an EEOC hearing is not covered by the civil rights statutes, because the EEOC proceeding is not a federal court proceeding. However it is well known that the EEO process is a pre-requisite and part of the claim for Rev. Heffernan to have a federal

court action. 18 U.S.C. §1512(f) states that the proceeding need not be pending or about to be pending. Similarly the civil rights statutes understand that witnesses were prevented from traveling to their destinations in different venues from where they were intimidated, assaulted and/or killed. Both venues have jurisdiction. The venue of the starting place and also the venue of the destination wherein the federal proceeding was or would be held.

11. Plaintiff does not wish for her suit to be transferred to Maryland, however, Plaintiff has read other decisions of the Court on the Clerk's electronic computers at the Clerk's Office, which state that the Court might not keep cases that it has proper jurisdiction, if it deems another venue "should" hear the case. Plaintiff needs time to re-locate the citation.

12. Plaintiff needs additional time to respond to the Defendants' opposition (Paper no. 29) to gather affidavits, evidences and prepare a memorandum of law.

WHEREFORE Plaintiff moves for an enlargement of time to reply to Defendants' opposition.

Respectfully submitted by:

DATED: April 28, 2008

EDAR ROGLER, Plaintiff *pro se*
915 Boucher Avenue
Annapolis, Maryland 21403
(410) 280-9270
edar_rogler@yahoo.com

### CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2008 I mailed postage, pre-paid the above motion to AUSA Judith A. Kidwell, 555 Fourth Street, N.W. – Civil Division, Room E4905, Washington, District of Columbia 20530.

EDAR ROGLER, Plaintiff *pro se*

Copyright © 2008 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** CURRENT THROUGH P.L. 110-205, APPROVED 4/25/2008 ***
*** WITH GAPS OF 110-202 AND 110-204 ***

TITLE 18. CRIMES AND CRIMINAL PROCEDURE
PART I. CRIMES
CHAPTER 73. OBSTRUCTION OF JUSTICE

**Go to the United States Code Service Archive Directory**

18 USCS § 1512

§ 1512.  Tampering with a witness, victim, or an informant

(a) (1) Whoever kills or attempts to kill another person, with intent to--

(A) prevent the attendance or testimony of any person in an official proceeding;

(B) prevent the production of a record, document, or other object, in an official proceeding; or

(C) prevent the communication by any person to a law enforcement officer or judge of the

United States of information relating to the commission or possible commission of a Federal offense

or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

(2) Whoever uses physical force or the threat of physical force against any person, or attempts to

do so, with intent to--

(A) influence, delay, or prevent the testimony of any person in an official proceeding;

(B) cause or induce any person to--

(i) withhold testimony, or withhold a record, document, or other object, from an official

proceeding;

(ii) alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;

(iii) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(iv) be absent from an official proceeding to which that person has been summoned by legal process; or

(C) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

(3) The punishment for an offense under this subsection is--

(A) in the case of a killing, the punishment provided in sections 1111 and 1112 [18 USCS §§ 1111 and 1112];

(B) in the case of--

(i) an attempt to murder; or

(ii) the use or attempted use of physical force against any person;

imprisonment for not more than 30 years; and

(C) in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years.

(b) Whoever knowingly uses intimidation, threatens or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--

5

(1) influence, delay or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to--

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly--

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from--

(1) attending or testifying in an official proceeding;

6

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

(e) In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

(f) For the purposes of this section--

(1) an official proceeding need not be pending or about to be instituted at the time of the offense; and

(2) the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege.

(g) In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance--

(1) that the official proceeding before a judge, court, magistrate, grand jury, or government agency is before a judge or court of the United States, a United States magistrate [United States magistrate judge], a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or

(2) that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal

7

Government or serving the Federal Government as an adviser or consultant.

(h) There is extraterritorial Federal jurisdiction over an offense under this section.

(i) A prosecution under this section or section 1503 [18 USCS § 1503] may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred.

(j) If the offense under this section occurs in connection with a trial of a criminal case, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**EDAR ROGLER**                              :
Plaintiff *pro se*

**v.**                                         :

**WILLIAM BIGLOW, et al**              CASE NO.  1:07-cv-02308(RMC)

_____oOo_____

**EXHIBIT "1"**

9

*Case No. 1:07-CV-02308 (RMC)*



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Washington, D.C. 20507

Henry Heffernan,
Petitioner,

v.

Mike Leavitt,
Secretary,
Department of Health and Human Services,
Agency.

Petition No. 0320060079[1]

MSPB No. DC-0752-04-0756-I-1

### DECISION

### INTRODUCTION

On April 27, 2006, the instant petition was docketed with the Equal Employment Opportunity Commission following the March 27, 2006 Order issued by the Merit Systems Protection Board (MSPB) Administrative Judge (AJ) concerning petitioner's claim of discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.*

### ISSUE PRESENTED

The issue presented is whether the MSPB AJ correctly determined that petitioner was not subjected to discrimination on the bases of religion and/or reprisal when he was removed from his position.

### BACKGROUND

Petitioner, a Roman Catholic Priest, was a Chaplain, GS-0060-12, at the agency's Spiritual Ministry Department, Warren G. Magnusson Clinical Center at the National Institutes of Health in Bethesda, Maryland. The record indicates that petitioner has been a priest since 1962, and has had extensive experience as a hospital chaplain. Petitioner was originally under contract with the agency from 1994 to 1998 to perform chaplain services. In November 1998, petitioner became an agency employee with an excepted service appointment to the Chaplain position to provide for the spiritual care of the agency's Catholic patients. He was supervised by the Chief, Spiritual

---

[1] When originally filed, this petition was docketed as Petition No. 03A60079. Due to a new Commission data system, this case has been redesignated with the above-referenced petition number.

Ministry Department (hereinafter referred to as the "Supervisor"), who was also a Methodist minister.

Beginning in 1999, the evidence of record indicates that petitioner repeatedly raised concerns with agency management concerning what he perceived as incongruence between the practices and teachings of the Roman Catholic faith and the practices, including the concept of "generic chaplaincy," advocated by his Supervisor. In 1999 and continuing through the termination of his employment with the agency, in numerous memoranda to his Supervisor, petitioner charged that the Clinical Center's Catholic patients were being unfairly short-changed by various actions by agency management. He noted, for example, that under the generic chaplaincy concept, a non-Catholic could minister to Catholic patients. Petitioner asserted that it was his belief, according to the tenets of the Roman Catholic Church, that this type of chaplaincy would not constitute adequate spiritual care for Roman Catholic patients.

In addition to expressing his concerns to the Supervisor, petitioner also raised the issue with other agency managers and, in December 2003, expressed his concerns that Catholic patients were being short-changed at the Clinical Center to a survey team from the Joint Commission on Accreditation of Healthcare Organizations (JCAHO). Shortly afterwards, in February 2004, petitioner received a proposed five-day suspension from his Supervisor for failure to follow supervisory instructions by saying Mass during his scheduled days off (Saturday mass) despite contrary supervisory instruction. The record shows that in his response to the proposed five-day suspension, petitioner wrote that he had not followed supervisory instructions in this matter because they "infringe on the religious liberty of U.S. citizens, and… [are] imposed to demean and punish subordinates for disagreements on religious doctrine and practice."

Another point of conflict between petitioner and the Supervisor began in 2002 over the requirement that petitioner start obtaining units of Clinical Pastoral Education (CPE) training. Petitioner indicated that the requirement was initially only imposed on him and not other staff chaplains, despite his 40 years as a priest and ten years as a chaplain at the Clinical Center, in part as an attempt to advance the multi-faith generic chaplaincy concept. Petitioner argued to his Supervisor that attending the "entry level" CPE training would not advance pastoral care specifically for Catholic patients. He also indicated that attending CPE training would take him away from servicing the Catholic patients, who he believed were already lacking in support from the Department.

On this issue, the record shows that on February 28, 2002, petitioner received his performance plan which indicated, as part of Element 3, a requirement for "professional development," and did not specifically mention CPE training. Starting sometime in June 2002, the Supervisor notified petitioner that, as part of this professional development, he was required to obtain units of CPE training. Petitioner contended that the requirement was initially only imposed on him despite the fact that the rabbi, who was also a subordinate of the Supervisor, had not had CPE training. On August 5, 2002, petitioner received a memorandum from the Supervisor providing him an offer of "opportunities to work on certification," including the provision of a substitute chaplain. Then, on January 8, 2003, petitioner received another memorandum from the

3                                    0320060079

Supervisor giving him 30 days to present an action plan for acquiring CPE credits or face disciplinary action.

On February 28, 2003, the Supervisor issued a memorandum to all of his staff informing them that by their mid-year review in July 2003, they needed to have proof of acceptance into a CPE program with a start date by September 2003 or risk not being rated as "Acceptable." This is the first indication in the record that chaplains other than petitioner were notified of a mandatory CPE requirement. On the same day, the Supervisor issued petitioner and the rabbi their performance appraisals for 2002. For petitioner, as to element 3 ("professional development"), the Supervisor indicated that petitioner's performance was "unacceptable," and noted that the "issue of receiving [CPE training] has been addressed by the Rater. Further instructions will follow...."

The Supervisor, as noted, also provided the rabbi with his performance appraisal on the same day, and rated him "acceptable" for element 3. The Supervisor indicated in the appraisal that the CPE training was discussed and they were setting a time line for the rabbi to start the training. On March 10, 2003, the Supervisor issued the rabbi a memorandum in order to "follow up" on the appraisal. In the memorandum, the Supervisor asked that the rabbi provide a CPE plan by March 21, 2003. There is no indication that the rabbi provided any plan to the Supervisor. A CPE trainer at the agency noted that the rabbi applied for the agency's CPE program in July 2003. It appears that the rabbi began attending his first CPE course in September 2003.

Also in March 2003, the Supervisor proposed a five (5) day suspension for petitioner for failure to follow instructions regarding taking CPE training. The second-line supervisor (Deputy Director) approved a two-day suspension for petitioner in June 2003, for failure to follow supervisory instructions regarding the CPE training requirement. The record indicated that petitioner sought EEO counseling on the suspension.

On June 11, 2003, the Supervisor issued another memorandum to staff indicating his commitment to staff chaplains pursuing their clinical training. In the memorandum, he noted that administrative leave would be provided along with substitute chaplains and payment for the courses. Petitioner received an additional memorandum from the Supervisor requesting a submission of an action plan for the CPE by June 25, 2003.

On July 17, 2003, the Deputy Director rescinded petitioner's two (2) day suspension upon finding out that there was no written policy at the agency regarding the CPE requirement. In the rescission, the Deputy Director noted that the agency would develop a policy regarding competency in this area. The CPE training requirement was later memorialized in the agency's written policies and procedures on September 26, 2003. The Deputy Director indicated that he approved the policy to comply with "Best Practices/Industry Standards" for chaplaincy care.

Discussions continued between petitioner and the Supervisor regarding the CPE requirements. The record indicated that petitioner did investigate several programs in the area. For example, petitioner asked to take a bioethics course at Georgetown University and listed it on his CPE

4                                    0320060079

plan. However, the Supervisor rejected the course stating that he wanted petitioner to enroll in more traditional CPE courses. Petitioner argued that the course could have been part of a valid CPE plan, but it was still not approved. Petitioner also proposed doing a graduate level CPE during the summer of 2003. The Supervisor also rejected this plan and told petitioner to find another CPE program.[2]

On January 21, 2004, the Supervisor proposed suspending petitioner for five days over his failure to comply with the CPE requirements. The record indicated that petitioner served his suspension from March 15 - 19, 2004. Then, on May 10, 2004, petitioner was issued a fourteen-day suspension, for the same reason. He served that suspension from May 14 - 27, 2004. The record shows that the two suspensions were the subject of an EEO complaint filed by petitioner alleging discrimination on the bases of religion and reprisal.[3]

During the fourteen-day suspension, petitioner was instructed not to use his office facilities and to turn in his key. Petitioner turned in one key to the agency. However, the Supervisor indicated that it was not the key he wanted turned in. Therefore, the Supervisor sent petitioner a written notice to turn in his key via Federal Express. Petitioner claimed that he did not receive such a notice and therefore, failed to comply.

On June 7, 2004, the Supervisor issued a Notice of Proposed Removal for: (1) failure to document patient visits; (2) failure to comply with training requirements; and (3) failure to follow supervisory instructions. On July 28, 2004, the Deputy Director issued his decision to remove petitioner, effective July 30, 2004. Petitioner filed an appeal with the MSPB alleging that he was discriminated against on the bases of religion (Catholic) and reprisal (prior Title VII activity) when, on July 30, 2004, he was removed from his position.

The matter went before a MSPB AJ. During a pre-hearing conference, petitioner's attorney sought permission to present evidence at hearing of purported incidents of disparate treatment of petitioner by agency management that was allegedly based on his religion and/or prior protected activity. This evidence was proffered in support of petitioner's claim that the agency's stated reasons for the removal decision were pretext for discrimination and/or unlawful retaliation. The MSPB AJ ruled this pretext evidence as inadmissible, reasoning that it would only be relevant after petitioner made out a *prima facie* case of discrimination. The MSPB AJ concluded that, because she did not find there was evidence of similarly situated individuals who were treated

---

[2] Petitioner later distilled his graduate-level CPE plan into a plan for research on identifying successful methods chaplains should pursue when ministering to patients. Petitioner's plan has been published by a CPE newsletter in the spring of 2004.

[3] The EEO complaint was investigated by the agency. Petitioner requested a hearing which was held by an EEOC Administrative Judge (AJ) under Agency No. CC-EEO-2004-0004/EEOC Hearing No. 120-2005-00226X. The EEOC AJ issued his decision on October 5, 2006, finding discrimination had occurred. The EEOC AJ's findings and analysis will be discussed in more detail later in this decision.

5                                                    0320060079

differently with regard to the removal action, petitioner could not make a *prima facie* case of discrimination. The MSPB AJ concluded that since no *prima facie* case could be made, the proffered pretext evidence was inadmissible at hearing.

Following the hearing, the MSPB AJ issued an initial decision on January 24, 2005, in which she found that there was insufficient evidence to uphold the first charge (failure to document patient visits) advanced by the agency for the removal. However, the MSPB AJ upheld the second two charges and found that, even without the first charge, they were sufficient to sustain the removal decision. As to petitioner's claim of discrimination based on religion, the MSPB AJ found that he failed to establish a *prima facie* case of discrimination because he could not show that there were similarly situated comparators. As to petitioner's claim of reprisal, the MSPB AJ determined that petitioner did not show any nexus between the protected activity and the removal action.

Petitioner filed a petition for review with the full Board. On September 26, 2005, the Board issued its Final Order denying the petition. Petitioner then filed a petition for review with the Commission, docketed as EEOC Petition No. 03A60015. In EEOC Petition No. 03A60015, the Commission found that the MSPB AJ erroneously precluded petitioner from presenting evidence of pretext. Specifically, we found that the evidence showed that petitioner established his *prima facie* case of discrimination on both the bases of religion and reprisal. The decision also found that the agency articulated legitimate, nondiscriminatory reasons for the removal action, namely failure to comply with training requirements and failure to follow supervisory instructions. Thus, petitioner should have been provided the opportunity to present evidence to establish that the agency's proffered reasons for the removal action were actually a pretext to mask discrimination. Therefore, the decision remanded the matter back to the MSPB to take additional evidence of pretext on both bases of discrimination. *See Heffernan v. Department of Health and Human Services*, EEOC Petition No. 03A60015 (February 21, 2006).

On remand, in lieu of an additional evidentiary hearing before the MSPB, the parties jointly submitted a stipulation that the evidence and arguments on pretext in the removal action were the same as those previously offered before the EEOC AJ in the earlier EEO complaint (*Heffernan v. Department of Health and Human Services*, Agency No. CC-EEO-2004-0004, EEOC Hearing No. 120-2005-00226X) filed by petitioner concerning the two suspensions. Therefore, the parties agreed to submit the hearing transcript and exhibits from the EEO complaint before the EEOC AJ as part of the MSPB supplementary record. The MSPB AJ issued her Order on March 27, 2006, holding the record open until April 13, 2006, for receipt of additional evidence that the parties agreed to provide. The parties provided all documentation and written arguments to the MSBP. We note that the submissions by the parties consisted of nine volumes. Included was the transcript from the five-day EEOC hearing. Among the witnesses called to testify were petitioner, the Supervisor, the Deputy Director, a rabbi who worked with petitioner, and other agency officials.[4] An additional 66 exhibits were provided by petitioner and another 79 by the

---

[4] Witnesses who also testified included a Maronite priest who replaced petitioner and a contract chaplain who worked at the agency after petitioner was removed. The transcript of the EEOC

6                                                    0320060079

agency. Once the record was been supplemented, the MSPB returned the matter to the Commission for issuance of a decision on the merits.

On October 5, 2006, the EEOC AJ issued a decision on petitioner's claims of discrimination regarding the March and May 2004 suspensions, finding discrimination had occurred. The EEOC AJ included his determinations regarding the credibility of witnesses. The Commission notes that the MSPB adopted the EEOC AJ's hearing record as its own.[5]

In his decision, the EEOC AJ laid out the background facts. Among other facts of particular relevance, the EEOC AJ pointed to testimony from a contract chaplain (Eastern Orthodox), who was hired by the Supervisor after petitioner's termination. The contract chaplain testified that the Supervisor told her that he had wanted to get rid of petitioner in order to hire a Maronite priest, rather than a Roman Catholic one like petitioner. She also stated that the Supervisor told her that he would do things to provoke petitioner in order to have grounds to fire him. The EEOC AJ found the contract chaplain's testimony to be more credible than that of the Supervisor. The EEOC AJ, based on his observations during the hearing, found that the Supervisor's testimony was evasive and that the contract chaplain's demeanor was frank. The EEOC AJ also noted that the Supervisor never directly denied the contract chaplain's testimony, so he found that it was undisputed.

Based on the evidence presented by the contract chaplain, the EEOC AJ determined that petitioner had provided direct evidence of discrimination. Specifically, the EEOC AJ pointed to the comments established to have been made by the Supervisor showed a bias against Roman Catholic priests and an admission to a bias that motivated the Supervisor's decision to remove petitioner. The EEOC AJ found that petitioner established that the suspensions were two deliberate steps in the Supervisor's plan to terminate petitioner and replace him with a non-Roman Catholic priest. In addition, the EEOC AJ determined that the Supervisor indicated his intent to never hire a Roman Catholic priest again.

While the EEOC AJ determined that the agency adopted the CPE requirement absent discrimination and that the requirement was reasonable, he found that the requirement was not applied to petitioner in a non-discriminatory manner and the agency did not carry its burden to show that complainant failed to follow supervisory instructions with regard to complying with the CPE requirement. In fact, the EEOC AJ concluded that although petitioner failed to enroll in a CPE course, "it was not for lack of trying." The EEOC AJ noted that petitioner investigated several training options, including the bioethics course at Georgetown University and the graduate level CPE course, but these proposals were rejected, without explanation, by the

---

hearing was over 2,100 pages long and some witnesses were called back to supplement their testimony.

[5] However, the Commission, in the instant decision, is not adjudicating the merits of *Heffernan v. Department of Health and Human Services,* Agency No. CC-EEO-2004-0004, EEOC Hearing No. 120-2005-00226X.

15

Supervisor. Moreover, the EEOC AJ found that the Supervisor unreasonably refused to "exercise any discretion" to provide petitioner with CPE-equivalent credit for his Jesuit seminary education and his experience as a pastor at St. Elizabeth's Hospital in Washington, D.C. from 1961 to 1962. The EEOC AJ stated that, in fact, petitioner was never given the opportunity to describe these experiences and obtain corroborating forms of documentation. The EEOC AJ found the Supervisor's actions to be unreasonable and another indicator of a discriminatory intent.

The EEOC AJ turned to the issue of how the Supervisor required petitioner to comply with the CPE requirement. Petitioner had requested that, if he had to take the CPE training, he wanted to take it at the Clinical Center to reduce the time he would be away from providing pastoral care to Catholic patients. The EEOC AJ found that the Supervisor made it appear to petitioner that he should take his CPE training elsewhere. The EEOC AJ further noted that, unlike petitioner, both the rabbi and the Maronite priest who replaced petitioner were allowed to take their CPE training on-site at the Clinical Center.[6] The EEOC AJ concluded that denying petitioner the opportunity to take the CPE courses at the Clinical Center had a negative affect on petitioner's willingness and ability to comply with the CPE requirement. Specifically, petitioner was concerned with having a non-Catholic substitute chaplain who would not be able to provide the pastoral care needed by the Catholic patients. As such, the EEOC AJ determined that forcing petitioner alone to take the CPE requirement away from the Clinical Center was the type of provocation the contract chaplain talked about in her testimony.

The EEOC AJ then turned to the issue of the suspensions and determined first that after the initial suspension was rescinded because there was no formal policy requiring CPE training, after the policy was adopted in September 2003, agency management never gave petitioner another instruction until *after* the new proposed notice of suspension (proposed in January 2004, served in March 2004) had been issued. The EEOC AJ found that it was reasonable for petitioner to expect a new instruction before the agency disciplined him again for failure to follow supervisory instructions. Moreover, the EEOC AJ concluded that the disparate treatment petitioner received in not being allowed to take the CPE courses at the Clinical Center also colored this suspension with discriminatory motivation.

With regard to the May 2004 fourteen-day suspension, the EEOC AJ also determined that the agency would not have imposed it in absence of discrimination. The EEOC AJ noted that the Supervisor issued the proposal for this suspension on March 31, 2004, only eight days after complainant returned to work from serving the five-day suspension. Moreover, the Supervisor was on vacation for five of the eight days. Based on this evidence, the EEOC AJ found that it was unreasonable to suggest that complainant could have formulated a CPE plan in such a short period of time, especially because he needed the Supervisor's feedback and consent in order to move forward, and the Supervisor had already rejected all of petitioner's prior proposals.

---

[6] In fact, the rabbi testified that the Supervisor "directed" him to take his CPE training at the Clinical Center. The Supervisor denied this, but the EEOC AJ found the rabbi to be the more credible witness.

8                                        0320060079

Accordingly, the EEOC AJ concluded that petitioner established that the agency's suspensions were discriminatory.[7]

### ANALYSIS AND FINDINGS

EEOC regulations provide that the Commission has jurisdiction over mixed case appeals on which the MSPB has issued a decision that makes determinations on allegations of discrimination. 29 C.F.R. § 1614.303 *et seq.* The Commission must determine whether the decision of the MSPB with respect to the allegation of discrimination constitutes a correct interpretation of any applicable law, rule, regulation or policy directive, and is supported by the evidence in the record as a whole. 29 C.F.R. § 1614.305(c).

In general, disparate treatment claims are examined under the three-part analysis first enunciated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). For petitioner to prevail, he must first establish a *prima facie* case of discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination, *i.e.*, that a prohibited consideration was a factor in the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Furnco Construction Corp. v. Waters*, 438 U.S. 567 (1978). The burden then shifts to the agency to articulate a legitimate, nondiscriminatory reason for its actions. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Once the agency has met its burden, the petitioner bears the ultimate responsibility to persuade the fact finder by a preponderance of the evidence that the agency acted on the basis of a prohibited reason. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).

In the instant matter, the Commission, in its prior decision in Petition No. 03A60015, has already found that petitioner established his *prima facie* case of discrimination based on religion and reprisal.[8] Therefore, we shall proceed directly to whether the agency has articulated a legitimate, nondiscriminatory reason for the personnel action at issue, and the ultimate issue of whether petitioner has shown, by a preponderance of the evidence, that the agency's actions were actually motivated by discrimination.

*Agency's Articulated Legitimate, Nondiscriminatory Reasons*

The evidence of record indicates that the agency articulated legitimate, nondiscriminatory reasons for its removal decision. The notice of removal states that petitioner was removed based on the charges of: (1) failure to document patient visits; (2) failure to comply with training

---

[7] The EEOC AJ did find that there was support for an unrelated charge in the suspension concerning defiance of the instruction not to conduct Saturday mass, but that the penalty for this offense would have been less than a fourteen-day suspension.

[8] The Commission notes that, at a minimum, the record establishes that complainant engaged in prior protected activity by participating in the EEO complaint process to challenge the proposed suspension in March 2003, and the two subsequent suspensions in 2004.

0320060079

requirements; and (3) failure to follow supervisory instructions. The MSPB AJ, however, determined that the agency failed to provide sufficient evidentiary support for the first charge of failure to document patient visits and that charge cannot be sustained. With regard to the charge concerning the training requirement, the agency asserts that petitioner was required to complete CPE training, and had been informed of this requirement since 2002. However, petitioner never enrolled in an approved CPE training program. Based on the charge that he was failing to comply with the CPE training requirements, petitioner was issued a five-day suspension, which he served from March 15 - 19, 2004. Shortly thereafter, petitioner was issued a fourteen-day suspension, which he served from May 14 - 27, 2004, for the same reason.

As for the remaining charge in his removal of failing to follow supervisory instructions, the record indicates that during petitioner's fourteen-day suspension, he was observed entering his office. On May 20, 2004, the Supervisor met with petitioner to tell him not to perform work while on his suspension. The following day, the Supervisor sent petitioner a Letter of Instruction directing petitioner to return his office keys via an enclosed postage paid, self-addressed envelope. However, petitioner did not return the key. On this basis, the Supervisor charged petitioner with failure to follow supervisory instructions.

Based on the above, we find that the agency articulated legitimate, nondiscriminatory reasons for the removal action, namely petitioner's failure to comply with the agency's training requirements and the failure to follow supervisory instructions concerning returning the office key.

*Pretext*

Although finding the agency articulated legitimate, non-discriminatory reasons for the removal decision, for the reasons stated below, we find that petitioner has met his burden of showing that it is more likely than not that the agency's proffered reasons for his termination were pretext for discrimination on the bases of both religion and reprisal.

First, the record casts doubts on the Supervisor's insistence that the certification was made mandatory of healthcare chaplains in order for the medical center to receive a favorable rating by the JCAHO. *EEOC Hearing Transcript (EEOC HT)* at 1510. The evidence shows that the agency was surveyed in 2003 by the JCAHO. At the time of the survey, the department had no policy regarding the CPE certification requirement. Despite the lack of a policy, the facility "received essentially the highest grades of any hospital they had surveyed using [their] criteria." *EEOC HT* at 1846. Therefore, the evidence supports petitioner's claim that the facility's rating by the JCAHO was not dependent on the requirement of CPE certification. *EEOC HT* at 1923. We also note that petitioner's coworker, the rabbi, testified that he was not informed that he needed to take CPE courses until almost a year after the requirement was first imposed on petitioner.

We also note that the subsequent agency decision to institute a written policy regarding the CPE certification is suspect. Petitioner was initially issued a two-day suspension in June 2003 for failure to enroll in a CPE course. The record indicates that the rabbi, who also had not taken any

10                                    0320060079

CPE courses at the time of petitioner's June 2003 suspension, was not issued any discipline. The record indicated that the suspension was then rescinded because the department lacked a written policy in order to base its suspension action. *EEOC HT* at 1941. When a written policy was issued requiring CPE certification, without further instruction to comply with the new policy, petitioner was issued a five-day suspension and, within days, a subsequent fourteen-day suspension, and the removal action. It appears likely that the agency instituted the written policy, at least in part, in order to issue progressive discipline against petitioner with the final goal of removing him.

Petitioner contends that the Supervisor should have credited him with the required CPE units based on his prior training and experience. Petitioner testified that he had one CPE unit from St. Elizabeth's Hospital in Washington D.C. Further, petitioner testified that he should have been given credit for his tertianship year with the Society of Jesus. Petitioner testified that he made inquiries with the Department of Veterans' Affairs (VA) and, at that agency, the tertianship fulfilled two CPE units. *EEOC HT* at 50. The Supervisor claimed he did not learn of petitioner's CPE unit from St. Elizabeth's Hospital until the hearing, (*EEOC HT* at 1269 – 1271), but also testified that while petitioner might have been offered one unit for this education, he would not have been awarded CPE credit for the tertianship experience. *EEOC HT* at 1142. Again, the evidence raises questions regarding the Supervisor's "judgment call" in determining that the definition of "equivalent experience" and requiring petitioner to obtain two new units of CPE. *See EEOC HT* at 1514.

The Supervisor also provided no reason for why the rabbi was treated differently from petitioner. The Supervisor imposed the requirement on petitioner nearly a year before the rabbi, and gave the petitioner an "unacceptable" rating on the element of professional development in February 2003 for his lack of CPE credits, while rating the rabbi, who also lacked CPE credits, an "acceptable" in the same element. In addition, the record shows that in March 2003, the Supervisor finally directed the rabbi to submit a plan to meeting the CPE requirement. However, when he did not submit such a plan, there was no consequence. On the other hand, also during March 2003, the Supervisor proposed suspending the petitioner for failure to develop a plan to comply with the CPE requirements. This suspension was the one that was eventually rescinded by the Deputy Director because there was no written policy on the CPE requirements. Petitioner and the rabbi were also treated differently with regard to how they were allowed to meet their CPE requirements. The record establishes that the Supervisor led petitioner to believe that he could take the courses at the Clinical Center where he worked. Petitioner raised concerns over taking the training outside of the agency's clinical center because this would entail less time to provide chaplain services to the center's Catholic patients, a group he already perceived as neglected. *EEOC HT* at 159. The Supervisor testified that it would have been counterproductive to allow petitioner to take the CPE courses at his own facility. *EEOC HT* at 1520. However, the rabbi, and later the Maronite priest, testified that the Supervisor allowed, and even assisted, them in getting accepted into the CPE program at the Clinical Center. *EEOC HT* at 893.

Therefore, based on all the evidence discussed above, we find that a preponderance of the evidence establishes that the Supervisor's decision to discharge complainant based on the failure

19

to comply with the training certification requirement was motivated by discriminatory and retaliatory animus. This conclusion is further supported by the testimony of a former contract chaplain with the agency, who provided particularly troubling evidence regarding the Supervisor's motivation. The contract chaplain was a Greek Orthodox lay associate chaplain, who worked at the agency in August 2005, and again from November 2005 and January 2006. She testified that sometime in August 2005, the Supervisor boasted to her about how he had successfully removed petitioner and won a challenge to the decision before the MSPB.[9] *EEOC HT* at 1344-1345. She said that the Supervisor told her that he had a degree in psychology and that he had done things to provoke the petitioner in order to get rid of him. *EEOC HT* at 1346. The contract chaplain said that the Supervisor told her that, as the head of the department, he "stands in the shoes of God . . . [t]hat is the concept that [petitioner] could not grasp." *EEOC HT* at 1357. She also testified that the Supervisor specifically told her that he wore his clerical collar to the MSPB hearing "for effect to affect the hearing officer's opinion of him." *Id.*

The contract chaplain testified she and the Supervisor had additional telephone discussions about the staff in October 2005. During that conversation, she said the Supervisor expressed his plan to have a "dream team" composed of a Maronite priest and a Greek Orthodox associate chaplain, which would be the slot for the contract chaplain. *EEOC HT* at 1348. We note that the record indicated that the Maronite priest replaced petitioner.[10]

The contract chaplain also provided testimony of the Supervisor's animosity towards Roman Catholics. *EEOC HT*, at 1419. For example, the contract chaplain stated that the Supervisor would joke about Roman Catholic priests being pedophiles. *EEOC HT* at 1359. She also testified about a conversation in which the Supervisor stated he "would never hire another Roman Catholic priest again" and had the Maronite priest ready to take over petitioner's position when petitioner was removed. *EEOC HT* at 1358.

In addition, the contract chaplain said the Supervisor told her that he instituted the CPE requirement "to get rid of [petitioner]." *EEOC HT* at 1357-1358. The contract chaplain stated that she told the Supervisor that all Veterans' Administration (VA) medical facilities grandfathered in all federal permanent chaplains when they implemented the CPE requirement. They only required CPE for new hires as chaplains. *EEOC HT* at 1358. She testified that the Supervisor knew that nobody else in the federal system of permanent chaplains had been required to do CPE or get terminated. She even averred that the Supervisor had documents to that effect on his desk from the VA. *EEOC HT* at 1358.

---

[9] The contract chaplain did not know petitioner, but testified that the Supervisor referred to him by name.

[10] The record provides testimony that a Maronite priest is a priest of an Eastern Catholic church, rather than the Roman Catholic church, and can perform any ceremony and can carry out bi-ritual faculties, namely the Maronite Eastern rite and the Roman rite. *EEOC HT* at 402, 404.

0320060079

It is noted that the EEOC AJ found that the Supervisor did not specifically deny the contract chaplain's testimony. Therefore, the EEOC AJ found the contract chaplain's testimony on her conversations about the Supervisor trying to "get rid of the priest" was undisputed. We also note that the agency attempted to discredit the contract chaplain's testimony by stating that she was biased against the Supervisor. The agency argued that it was only after her contract was terminated by the agency that the contract chaplain contacted petitioner's attorney. The agency contended that the contract chaplain had been an attorney before she became a chaplain and, as such, was aware that she had little recourse against the agency for the termination of her contract. Further, the agency questions the contract chaplain's credibility based on the short time she knew the Supervisor and that the Supervisor would "open up" to her so quickly. The agency noted that the contract chaplain's testimony was not corroborated. The EEOC AJ noted in crediting the contract chaplain's testimony that the Supervisor was an interested party facing the possibility of petitioner being reinstated. In addition, the EEOC AJ found the Supervisor was evasive during his testimony and reluctant to admit to facts he provided in the record. Therefore, the EEOC AJ, based on his assessment of the witnesses, found the contract chaplain to be a more credible witness than the Supervisor.

The Commission is not convinced by the agency's arguments regarding the bias of the contract chaplain. Initially, we note that it was the Deputy Director who facilitated the termination of her contract, not the Supervisor. *EEOC HT* at 1870. In addition, we note there was testimony that the contract chaplain was terminated only after she raised concerns over the Supervisor's leadership over his department. We find the decision intriguing particularly based on petitioner's removal following his memoranda challenging the Supervisor and asserting that the multi-faith or generic chaplaincy negatively affected Catholic patients. We also note that another witness, the rabbi who also worked for the Supervisor, provided corroborating testimony that the Supervisor was trying to get rid of the petitioner in order to hire the Maronite priest. *EEOC HT* at 862. In addition, the rabbi stated that the Supervisor did not like Roman Catholics and he wanted to get someone who was non-Roman Catholic. *EEOC HT* at 876. As such, we find that petitioner has provided corroborating testimony to show that the supervisor was biased against Roman Catholics.

Based on our review of the record as a whole, the Commission concludes that petitioner has established that the agency's primary proffered reason for the termination decision, namely petitioner's failure to comply with the agency's training requirement, was pretext for unlawful retaliation and discrimination based on religion. *See Reeves v. Sanderson Plumbing Products, Inc.*, 120 S. Ct. 2097 (2000) (finding that a *prima facie* case of discrimination, combined with evidence to find that an employer's reasoning is false, is sufficient to support a finding of discrimination). The MSPB has already found that the agency failed to produce sufficient evidence to support its first charge of failure to document patient visits. Moreover, we find that the issue of petitioner failing to turn in the key during his suspension is directly related to the training dispute, and would not have occurred had the Supervisor not manipulated the training issue in order to get rid of petitioner. There is also no evidence to support a finding that the key incident alone would have resulted in petitioner's removal. Accordingly, we conclude that

13                                        0320060079

petitioner has met his burden of establishing that the agency's action was unlawful retaliation for his prior protected activity and discrimination on the basis of his religion.

## CONCLUSION

Based upon a thorough review of the record, it is the decision of the Commission to differ with the final decision of the MSPB finding no discrimination. The Commission finds that the MSPB's decision constitutes an incorrect interpretation of the laws, rules, regulations, and policies governing this matter and is not supported by the evidence in the record, including the supplemental record, as a whole.

## PETITIONER'S RIGHT TO FILE A CIVIL ACTION (V0900)

Your case is being referred back to the Merit Systems Protection Board for further consideration and the issuance of a new decision. You will have the right to file a civil action in the appropriate United States District Court, based on the new decision of the Board:

1.  **Within thirty (30) calendar days** of the date that you receive notice of the decision of the Board to concur in this decision of the Commission; or,

2.  If the Board decides to reaffirm its original decision, **within thirty (30) calendar days** of the date you receive notice of the final decision of the Special Panel to which your case will then be referred.

You may also file a civil action if you have not received a final decision from either the Merit Systems Protection Board or the Special Panel **within one hundred and eighty (180) days** of the date you filed this Petition for Review with the Commission. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in

14                                    0320060079

which to file a civil action.  Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

Stephen Llewellyn
Acting Executive Officer
Executive Secretariat

1/24/07
Date

23

15                           0320060079

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.** I certify that this decision was mailed to the following recipients on the date below:

Henry G. Heffernan
19 Eye Street, NW
Washington, DC 20001

Irving Kator, Esq.
Kator, Parks & Weiser
1020 19th Street, NW, Suite 350
Washington, DC 20036

Bonita V. White, Assistant Secretary
Management/Budget/EEO
Department of Health and Human Services
200 Independence Avenue, SW, #514-G
Washington, DC 20201

Merit Systems Protection Board
Director, EEO
1615 M Street, NW
Washington, DC 20419


JAN **2 6** 2007
_____
Date


_____
Equal Opportunity Assistant

24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                          :
**Plaintiff** *pro se*


**v.**                                   :

**WILLIAM BIGLOW, et al**        **CASE NO.  1:07-cv-02308(RMC)**

_____oOo_____



# EXHIBIT "2"

25



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P. O. Box 19848
Washington, D.C.  20036

Henry G. Heffernan,
Complainant,

v.

Michael O Leavitt,
Secretary,
Department of Health and Human Services,
Agency.

Appeal No. 0720070038

Hearing No. 120200400226X

Agency No. CCEEO20040004

## DECISION

Following its March 22, 2007 final order, the agency filed a timely appeal which the Commission accepts pursuant to 29 C.F.R. § 1614.405(a).  On appeal, the agency requests that the Commission affirm its rejection of an EEOC Administrative Judge's (AJ) finding of discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.*  The agency also requests that the Commission affirm its rejection of the relief ordered by the AJ.

At the time of the events giving rise to this complaint, complainant worked as a Chaplain, GS-060-12, with the National Institutes of Health.   Complainant filed an EEO complaint alleging that he was discriminated against on the bases of religion (Catholic) and reprisal for engaging in prior protected EEO activity when:

1.    He was suspended for five calendar days from March 15-19, 2004, for alleged failure to follow supervisory instructions; and

2.    He was suspended from duty for fourteen calendar days from May 14 - 27, 2004, for alleged defiance of authority and failure to follow supervisory instructions.

2                                    0720070038

At the conclusion of the investigation into his claims, complainant was provided with a copy of the report of investigation and notice of his right to request a hearing before an EEOC Administrative Judge (AJ). Complainant timely requested a hearing and the AJ held a hearing on December 14-15, 2005, January 10 and 31, 2006, and April 5-6, 2006.

In a decision issued on February 5, 2007, the AJ found that complainant was discriminated against as alleged, but noted that a portion of the second claim included a mixed motive defense. To that extent, the AJ found that the agency would have made the same decision to uphold the defiance of authority charge even in the absence of discrimination. Thus, the AJ overturned the first suspension and determined that complainant could only recover for one week of the second suspension. Accordingly, complainant was awarded two weeks of back pay with interest, $6,000 in non-pecuniary compensatory damages, and other equitable relief. In a separate opinion dated January 22, 2007, the AJ awarded $165,263.26 for attorney's fees and costs.

The agency subsequently issued a final order rejecting the AJ's finding that complainant proved that he was subjected to discrimination as alleged. The agency argued that the AJ's credibility findings were flawed, that the AJ erred in his factual findings, that his legal conclusions were erroneous, and that the relief ordered was not warranted. This appeal followed.

To prevail in a disparate treatment claim such as this, complainant must satisfy the three-part evidentiary scheme fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Complainant must initially establish a *prima facie* case by demonstrating that he or she was subjected to an adverse employment action under circumstances that would support an inference of discrimination. *Furnco Construction Co. v. Waters*, 438 U.S. 567, 576 (1978). Proof of a *prima facie* case will vary depending on the facts of the particular case. *McDonnell Douglas*, 411 U.S. at 804 n. 14. The burden then shifts to the agency to articulate a legitimate, nondiscriminatory reason for its actions. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To ultimately prevail, complainant must prove, by a preponderance of the evidence, that the agency's explanation is pretextual. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519 (1993).

Pursuant to 29 C.F.R. § 1614.405(a), all post-hearing factual findings by an AJ will be upheld if supported by substantial evidence in the record. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 477 (1951) (citation omitted). A finding regarding whether or not discriminatory intent existed is a factual finding. *See Pullman-Standard Co. v. Swint*, 456 U.S. 273, 293 (1982). An AJ's conclusions of law are subject to a *de novo* standard of review, whether or not a hearing was held. An AJ's credibility determination based on the demeanor of a witness or on the tone of voice of a witness will be accepted unless documents or other objective evidence so contradicts the

testimony or the testimony so lacks in credibility that a reasonable fact finder would not credit it. *See* EEOC Management Directive 110, Chapter 9, § VI.B. (November 9, 1999).

Based on a thorough review of the record and the contentions on appeal, including those not specifically addressed herein, we find no basis to disturb the findings of the AJ. The Commission further notes that the findings of the AJ and matters raised at the hearing were previously addressed by the Commission in Petition No. 0320060079 (January 26, 2007), which concerned complainant's subsequent removal.[1]  As noted in that decision, the agency and complainant agreed to submit the instant hearing transcript and exhibits as part of the record in that case. While that decision made it clear that it was not adjudicating the instant matters, the Commission relied on statements and evidence presented during the hearing to make its determination in that case, including the AJ's credibility determinations.

Accordingly, the agency's decision regarding the findings of discrimination and relief is reversed.

ORDER (D0403)

The agency is ordered to take the following remedial action:

I.    The agency shall pay complainant two weeks of back pay for the suspensions, with applicable interest.  The agency shall determine the appropriate amount of back pay, with interest, and other benefits due complainant, pursuant to 29 C.F.R. § 1614.501, no later than sixty (60) calendar days after the date this decision becomes final. The complainant shall cooperate in the agency's efforts to compute the amount of back pay and benefits due, and shall provide all relevant information requested by the agency.  If there is a dispute regarding the exact amount of back pay and/or benefits, the agency shall issue a check to the complainant for the undisputed amount within sixty (60) calendar days of the date the agency determines the amount it believes to be due. The complainant may petition for enforcement or clarification of the amount in dispute. The petition for clarification or enforcement must be filed with the Compliance Officer, at the address referenced in the statement entitled "Implementation of the Commission's Decision."

---

[1] In *Heffernan v. Dept. of Health and Human Services,* Petition No. 0320060079 (January 26, 2007), the Commission found that the evidence established that the agency's decision to discharge complainant was a pretext for religious discrimination and reprisal. On February 23, 2007 the MSPB issued an Opinion and Order concurring with and adopting the findings of the Commission.

4                                    0720070038

II.    Complainant shall be allowed to take the four units of Clinical Pastoral Education (CPE) credits at the Clinical Center (CC). The agency shall also provide reasonable assistance and support in granting complainant, in consultation with the National Association of Catholic Chaplains, equivalency credits for complainant's prior CPE-like experience. The agency shall consider whether it can grant equivalent credit for complainant's CPE-like experience at St. Elizabeth's hospital and for complainant's Tertian year. The complainant shall provide the agency with written descriptions of what he did during those assignments along with corroborating evidence that he served and completed the assignments he claims. If the agency declines to give complainant credit for such experiences, it shall explain why.

III.   The agency shall accommodate complainant's opposition to multifaith care to patients on wards and while performing CPE at the CC, and must allow him to provide such care exclusively to Catholics, except in emergencies. Complainant is required to comply with any multifaith requirement regarding out-patient clinics unless the agency is able to schedule other chaplains on a continuing basis to take on the out-patient clinic function.

IV.    Not later than sixty (60) days from the date this decision becomes final, the agency shall expunge from all official and unofficial files all documents referencing the suspensions at issue herein.

V.     The agency shall pay complainant $6,000 in compensatory damages within sixty (60) days of the date this decision becomes final.

VI.    The agency shall pay complainant $165,263.26 for attorney's fees and costs within sixty (60) days of the date this decision becomes final.

VII.   The agency shall provide training to the relevant management officials regarding their responsibilities with respect to eliminating discrimination in the federal workplace. The training must place a special emphasis on the agency's obligations under Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq*. The agency shall complete the training within sixty (60) calendar days from the date this decision becomes final.

VIII.  The agency shall consider taking appropriate disciplinary action against the management official involved in this case, as identified in the AJ's decision. If the agency decides to take disciplinary action, it shall identify the action taken. If the agency decides not to take disciplinary action, it shall set forth the reason(s) for its decision not to take disciplinary action.

5                                    0720070038

The agency is further directed to submit a report of compliance, as provided in the statement entitled "Implementation of the Commission's Decision." The report shall include supporting documentation of the agency's calculation of backpay and other benefits due complainant, including evidence that the corrective action has been implemented.

## POSTING ORDER (G0900)

The agency is ordered to post at its National Institutes of Health facility copies of the attached notice. Copies of the notice, after being signed by the agency's duly authorized representative, shall be posted by the agency within thirty (30) calendar days of the date this decision becomes final, and shall remain posted for sixty (60) consecutive days, in conspicuous places, including all places where notices to employees are customarily posted. The agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material. The original signed notice is to be submitted to the Compliance Officer at the address cited in the paragraph entitled "Implementation of the Commission's Decision," within ten (10) calendar days of the expiration of the posting period.

## ATTORNEY'S FEES (H0900)

If complainant has been represented by an attorney (as defined by 29 C.F.R. § 1614.501(e)(1)(iii)), he/she is entitled to an award of reasonable attorney's fees incurred in the processing of the complaint. 29 C.F.R. § 1614.501(e). The award of attorney's fees shall be paid by the agency. The attorney shall submit a verified statement of fees to the agency -- **not** to the Equal Employment Opportunity Commission, Office of Federal Operations -- within thirty (30) calendar days of this decision becoming final. The agency shall then process the claim for attorney's fees in accordance with 29 C.F.R. § 1614.501.

## IMPLEMENTATION OF THE COMMISSION'S DECISION (K0501)

Compliance with the Commission's corrective action is mandatory. The agency shall submit its compliance report within thirty (30) calendar days of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. The agency's report must contain supporting documentation, and the agency must send a copy of all submissions to the complainant. If the agency does not comply with the Commission's order, the complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. *See* 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File A Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. § 2000e-16(c)

(1994 & Supp. IV 1999). If the complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated. *See* 29 C.F.R. § 1614.409.

## STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

1. The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2. The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. *See* 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. *See* 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. *See* 29 C.F.R. § 1614.604(c).

### COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0900)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you

7                                        0720070038

work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint.**

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*
_____
Carlton M. Hadden, Director
Office of Federal Operations

DEC 0 4 2007
_____
Date

32

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.** I certify that this decision was mailed to the following recipients on the date below:

Henry G. Heffernan
c/o I.Kator #350
1020 19th St NW
Washington, DC 20036

Irving Kator, ESQ
1020 19th St NW #350
Washington, DC 20036

Bonita V. White, Assistant Secretary
Management/Budget/EEO
Department of Health and Human Services
200 Independence Ave., SW #514-G
Washington, DC 20201

_____DEC 0 4 2007_____
Date


Equal Opportunity Assistant



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION.**
**Washington, D.C. 20507**

# NOTICE TO EMPLOYEES
## POSTED BY ORDER OF THE
## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### An Agency of the United States Government

This Notice is posted pursuant to an order by the United States Equal Employment Opportunity Commission dated _____ which found that a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. has occurred at the Department of Health and Human Services' National Institutes of Health facility (hereinafter this facility).

Federal law requires that there be no discrimination against any employee or applicant for employment because of the person's RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, or DISABILITY with respect to hiring, firing, promotion, compensation, or other terms, conditions or privileges of employment.

This facility was found to have discriminated against a Chaplain on the basis of religion and reprisal. The facility was ordered to pay compensatory damages, attorney's fees and costs, and provide other equitable relief. This facility will ensure that officials responsible for personnel decisions and terms and conditions of employment will abide by the requirements of all federal equal employment opportunity laws and will not retaliate against employees who file EEO complaints.

This facility will comply with federal law and will not in any manner restrain, interfere, coerce, or retaliate against any individual who exercises his or her right to oppose practices made unlawful by, or who participates in proceedings pursuant to, federal equal employment opportunity law.

Date Posted: _____

Posting Expires: _____

29 C.F.R. Part 1614

34

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                                 :
**Plaintiff** *pro se*

**v.**                                          :

**WILLIAM BIGLOW, et al**              **CASE NO.  1:07-cv-02308(RMC)**

_____oOo_____

## EXHIBIT "3"

35

Congress of the United States
Washington, DC 20515

July 9, 2007

The Honorable Michael Leavitt
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

Dear Secretary Leavitt:

We are writing to express our serious concern about allegations of religious discrimination and systemic mismanagement within the National Institutes of Health Clinical Center's Spiritual Ministry Department. The former Director of the Department, the Reverend O. Raymond Fitzgerald, has been accused of anti-Catholic and anti-Semitic practices in his capacity as chief chaplain and leader of this department. Intolerance has no place at the National Institutes of Health, especially within the Spiritual Ministry Department. We are not convinced that NIH is treating the allegations with the appropriate degree of urgency. We strongly urge you to call upon the Department of Health and Human Services' Inspector General to investigate all allegations of impropriety and mismanagement in the NIH chaplain's office.

While he was director of the Spiritual Ministry Department, Rev. Fitzgerald reportedly instituted policies that were biased against Catholics and Jews. He organized schedules so that the Catholic chaplain could not minister to all of the Catholic patients in the hospital and he limited access to religious services for Orthodox Jewish patients. It is our understanding that when chaplains in the office protested his actions, Rev. Fitzgerald simply had them fired.

One victim of these retaliatory practices is the Reverend Henry Heffernan S.J., a Catholic priest, who was fired from the Spiritual Ministry Department in 2004. This past January, the Equal Employment Opportunity Commission (EEOC) confirmed that Rev. Heffernan was the target of "discriminatory and retaliatory animus." In February, the Merit Systems Protection Board (MSPB) ordered NIH to reinstate the Catholic chaplain. Two other chaplains, a Jewish Rabbi and a Greek Orthodox lay minister, have since come forward claiming that they were also wrongfully terminated by Rev. Fitzgerald as retaliation for their testifying in defense of Reverend Heffernan.

These same chaplains have testified that Rev. Fitzgerald is "very anti-Catholic and anti-Semitic." It has been reported that he told other chaplains he did not want Catholic priests or Jewish rabbis in the Department; others have reported that he has made derogatory comments towards the Catholic and Jewish chaplains at the hospital.

This type of discrimination against and mistreatment of colleagues of different faiths cannot be abided. While Rev. Fitzgerald has been replaced as Director of the Spiritual Ministry Department, we were distressed to learn that he is still employed by NIH as a chaplain.

PRINTED ON RECYCLED PAPER

36

Page 2
July 9, 2007

We do not believe that the NIH management has acted sufficiently to remedy this serious matter. Even after the EEOC verified acts of discrimination and retaliation by Rev. Fitzgerald, the NIH appealed another decision of the Commission with respect to prior suspensions of Rev. Heffernan. The EEOC and MSPB decisions reversing Rev. Heffernan's termination and issuing findings of discrimination and retaliation were final as of February 2007. Now, nearly four months later, NIH has neither launched an investigation of Rev. Fitzgerald's egregious behavior, nor has it taken disciplinary actions against him or any other individuals responsible for this misconduct. Moreover, we are unaware of any procedures that NIH has implemented to ensure that this does not happen again.

It is our understanding that an ad hoc working group assembled under the NIH Advisory Board for Clinical Research will be reviewing the operation of the Spiritual Ministry Department. However, there have been no assurances from NIH that this group will examine the serious issues of religious discrimination and retaliation by the former head of the Spiritual Ministry, and the reasons for his continued employment by NIH. We also do not have any guarantees that this group has the authority to compel action on the part of the Spiritual Ministry Department.

This is a matter of personnel mismanagement -- one involving great insensitivity. The Spiritual Ministry Department serves terminally ill patients at the NIH Clinical Center. For these individuals, many of whom are at the very end of their lives, spiritual ministry is vitally important. To have someone manipulate and interfere with that process and exhibit intolerance toward critically ill patients and their family members is unacceptable. The NIH administration must ensure that this situation, which involves appalling prejudice, is dealt with swiftly and firmly and not simply tolerated as it appears to have been to date.

We strongly urge you to call upon the Inspector General's office to lead an investigation into the accusations of severe mismanagement and evaluate standards of conduct within NIH's Spiritual Ministry Department. Pending the results of such an investigation, we call on you to take the appropriate actions and, if warranted, punitive measures to ensure that religious tolerance is promoted and protected at NIH.

The National Institutes of Health should not only care for the physical and mental health of its patients, but seek to improve their emotional and spiritual health as well. But first, they must do no harm. As part of the federal government, NIH should reflect American values and morals by promoting tolerance and acceptance among all races, cultures, and faiths. It is unacceptable for employees of NIH to cultivate prejudice and intolerance.

We look forward to your prompt reply.

Sincerely,

Steven R. Rothman
Member of Congress

Mark Steven Kirk
Member of Congress

Gary L. Ackerman
Member of Congress

37

Page 3
July 9, 2007

Chris Van Hollen
Member of Congress

Sam Farr
Member of Congress

Lois Capps
Member of Congress

Dan Burton
Member of Congress

Tammy Baldwin
Member of Congress

Tom Lantos
Member of Congress

Robert Wexler
Member of Congress

Steve Cohen
Member of Congress

Shelley Berkley
Member of Congress

Steve Israel
Member of Congress

Eric Cantor
Member of Congress

cc: Mr. Daniel Levinson
   Inspector General
   U.S. Department of Health and Human Services
   Room 5541 Cohen Building
   330 Independence Avenue, S.W.
   Washington, D.C. 20201

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                          :
Plaintiff *pro se*

v.                                       :

**WILLIAM BIGLOW, et al**          **CASE NO.  1:07-cv-02308(RMC)**

_____oOo_____

## EXHIBIT "4"

39

# Chaplains' Complaints Of Bias Rise At NIH

By *Jacqueline L. Salmon*
Washington Post Staff Writer
Saturday, April 14, 2007; Page A01

The spiritual ministry department of the National Institutes of Health, which serves patients being treated in the nation's premier research hospital, is in disarray and battling a lawsuit and discrimination complaints that allege bias against Jewish and Catholic chaplains.

In February, a federal panel ordered the hospital to reinstate a Catholic priest who was wrongfully fired in 2004. In January, the Equal Employment Opportunity Commission had found that he was the target of "discriminatory and retaliatory animus." Three other former chaplains have said that they also were wrongfully terminated.

They have accused O. Ray Fitzgerald, a Methodist minister and the former head of the spiritual ministry department, of anti-Semitism and anti-Catholicism. They say that NIH retaliated against them when they spoke up and invented reasons for terminating them.

Fitzgerald was demoted from the chief chaplain's post two weeks ago after the EEOC, which cited the "animus," and the Merit Systems Protection Board ordered the rehiring of and back pay for the priest, the Rev. Henry Heffernan.

NIH officials "endorsed intolerance, and they reinforced intolerance with intolerance," said Rabbi Reeve Brenner, who testified last year in support of the priest and was fired as a hospital chaplain in February. He has filed a complaint with the Merit Board, an agency that hears federal personnel disputes, saying that he was removed by NIH as retribution for his testimony.

Another ousted chaplain, Greek Orthodox lay minister Edar Rogler, is suing the Department of Health and Human Services, NIH's parent agency, saying that she also was removed for testifying in support of Heffernan. In her lawsuit, filed last month in U.S. District Court in Maryland, and in her testimony in Heffernan's case, she says NIH officials hatched a plan, "Operation Clean Sweep," to purge staff members who cooperated in the priest's complaint.

Rogler alleges that Fitzgerald made frequent anti-Semitic comments about Brenner. In her lawsuit, she says that Fitzgerald referred to Brenner as "the butthead Jew" and "the crass Jew."

"He would not refer to the rabbi ever by his name," Rogler said in an interview. "It was always 'that Jew, that Jew.' " She was fired from her part-time chaplain's job in 2005 after she said she informed NIH officials that she planned to testify before the EEOC on behalf of Heffernan. The EEOC called her testimony more credible than Fitzgerald's.

NIH spokesman Don Ralbovsky confirmed that the clinical center has replaced Fitzgerald as chief chaplain. Fitzgerald's boss -- Walter Jones, deputy director of diversity management at NIH -- is running the department temporarily, Ralbovsky said. Fitzgerald continues to work as an NIH chaplain.

Ralbovsky would not comment on the allegations. Fitzgerald did not return calls to his office and his home.

But in letters to Rogler and in filings with the EEOC, NIH officials say that they fired Rogler for poor performance and that she didn't come forward with her complaints about Fitzgerald until after she was terminated.

The hospital's chief operating officer, Maureen Gormley, said in a letter to Brenner that he was being terminated for several infractions, including commingling his job as a federal employee with outside activities and being absent without leave for a day.

The former chaplains say that tensions have simmered in the department for years under Fitzgerald. The hospital, a clinical research center, employs about a half-dozen chaplains of various faiths, but in recent years turnover has been unusually high. At least seven have been ousted or have left voluntarily because they were unhappy with Fitzgerald's management style, said several former members of the department.

The Rev. Gary Johnston, who worked there for 18 years before leaving in 2002 to become a Protestant military chaplain, said in an interview that Fitzgerald told him he didn't want rabbis and Catholic priests in the department.

"I considered him to be very anti-Catholic
and anti-Semitic," Johnston said.

The chaplains tend to the spiritual needs of patients in the two adjacent
buildings on the Bethesda campus which make up the hospital -- the 14-
story Warren Grant Magnuson Clinical Center and the Mark O. Hatfield
Clinical Research Center.

Patients from all over the world are treated as part of clinical studies related
to a variety of issues, including weight loss, allergies, substance abuse, heart
disease and cancer. The center has about 7,000 inpatient admissions and
100,000 outpatient visits each year.

In testimony and in an interview, Heffernan, who joined the department in
1994, said he protested that the hospital's Catholic patients were being
unfairly short-changed because Fitzgerald demanded that Heffernan minister
to non-Catholic patients.

He said this left him with not enough time to minister to all of his Catholic
patients. Heffernan also was concerned with what he called Fitzgerald's
"generic chaplaincy" approach, because non-Catholic chaplains are unable to
perform the Catholic sacraments, such as hearing confessions and
performing last rites.

Fitzgerald, the EEOC said, retaliated by suspending Heffernan for five days
in early 2004 for coming in on his days off, despite Fitzgerald's order not to.
Heffernan held Mass for a priest who fell ill. Fitzgerald also demanded that
Heffernan take entry-level training in hospital chaplaincy, despite his 40
years of experience in the field and the fact that other chaplains were not
required to do so.

In July 2004, Heffernan was fired. At Heffernan's EEOC hearing last year,
Brenner and Rogler testified that they had heard Fitzgerald express anti-
Catholic sentiments against the priest. Rogler testified that Fitzgerald told
her that Catholic priests are pedophiles.

"They singled out Father Heffernan . . . so they could get him out of there,"
Brenner said. "That was the most offensive thing -- this 75-year-old man
who had more wisdom and integrity in his fingertips than his superiors had
in all their lives."

42

In February, the Merit Board ordered Heffernan reinstated. In a separate ruling, the EEOC ordered NIH to accommodate the priest's desire to see only Catholics, except in emergencies.

The EEOC said that Fitzgerald's testimony was evasive and that statements by Rogler and Brenner at the hearing provided "corroborating testimony" to show that Fitzgerald was biased against Roman Catholics.

Rogler said Jones and Gormley fired her after she informed Jones that she would testify on behalf of Heffernan.

In a letter terminating Brenner, Gormley acknowledged that Brenner had an acceptable job performance record during his five years at NIH. But, among other complaints, she accused him of mixing private and clinical work by forming a temple to which he improperly transported Jewish patients for services.

But Brenner, who has appealed his removal to the Merit Board, said that NIH officials never objected to his activities until he testified at Heffernan's hearing.

Heffernan, Rogler and Brenner have won praise from patients.

Howie Appel, whose wife, Marla, has kidney cancer, said that Brenner has visited them twice during Marla's stays and that Brenner performed Friday night religious services in their room.

"He was our only connection to our religion up here," said Appel, who lives with his wife in Lake Mary, Fla. "I admire the guy, and I'm so glad we met him."

Benjamin Rubin, an NIH doctor and a rabbi who occasionally filled in for Brenner, said he was informed that his physician's contract would not be renewed last month.

Rubin said he had complained about the NIH hospital's treatment of observant Jewish patients. Among other problems, he said, an NIH official brushed off his concerns about the lack of worship facilities for Jews on NIH's campus by saying that they could be transported to services off

campus. But Orthodox Jews do not drive on the Sabbath because they believe it violates Torah prohibitions against Sabbath work.

Heffernan returned to work in late March and has since been working 12-hour days to catch up. The chaplains' office is struggling, he said.

"It was a sad situation then," he said, "and it's a sad situation now."