IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                                    :
**Plaintiff** *pro se,*

**v.**                                                         :

                                                                  **C.A. No.  1:07-cv-02308(RMC)**
**WILLIAM BIGLOW,** *et al*
**Defendants.**                                      :

...oOo...

**PLAINTIFF'S MOTION FOR JUDICIAL NOTICE IN SUPPORT FOR PLAINTIFF'S
MOTION TO TRANSFER AND ALL OTHER MOTIONS AND/OR RESPONSES PENDING
PART ONE
[FRE 201]**

Plaintiff *pro se,* Edar Rogler, moves for the Court to take judicial notice of the website of the

D.C. Bar, transcripts of the Equal Employment Opportunity Commission ("EEOC") administrative

hearing in the matter of *Rev. Henry Heffernan v. Michael O. Leavitt,* EEOC case no. 120-2005-

00226x and various EEOC decisions for the Plaintiff's motion to transfer the instant case to the

United States District Court for the District of Maryland (Paper no. 27) and all other motions and/or

responses pending for the Court's decisions and orders in all outstanding matters.  The Court has the

power and authority to take judicial notice of said proceedings pursuant to Federal Rules of

Evidence, Rule 201 and other authorities cited.  See *Concillio De Salud Integral De Loiza, Inc. v.*

*U.S. D.H.H.S.,* 538 F.Supp.2d 139, ---, 2008 U.S. Dist. LEXIS 18576, *14 (D.D.C. 2008)(citing to

*Gustave-Schmidt v. Choa,* 226 F.Supp. 191, 196 (D.D.C. 2002).


# RECEIVED

MAY 1 2 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

This motion is made in connection with the Plaintiff's motion to transfer and her future response in opposition to Defendants' motion to dismiss that is currently due on May 14th, 2008[1] and any other matters that will be decided. On the Plaintiff's motion for transfer and to be filed opposition to Defendants' motion to dismiss the Court may take judicial notice of the public record of federal administrative hearings. *Covad Comms. Co. v. Bell Atl. Corp.,* 407 F.3d 1220, 1222 (D.C.Cir. 2005). In regards to the Defendants' motion to dismiss the Court has authority to take judicial notice without converting the proceeding to a summary judgment motion. The Court can take judicial notice of documents outside of the complaint that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(d).

From August, 2005 to January, 2006 **Plaintiff Edar Y. Rogler ("Rogler")** worked as an associate chaplain at the **Spiritual Ministry Department ("SMD")** of **The National Institutes of Health ("NIH") Clinical Center ("CC")**. NIH CC is a federal clinical research organization for the United States Department of Health and Human Services ("US DHHS" or "the Agency").

    1.   Plaintiff moves for the Court to take judicial notice of transcripts of the Equal Employment Opportunity Commission ("EEOC") administrative hearing in the matter of *Rev. Henry Heffernan v. Michael O. Leavitt*, EEOC case no. 120-2005-00226x.

Plaintiff moves for the Court to take judicial notice of transcripts of the Equal Employment Opportunity Commission ("EEOC") administrative hearing in the matter of *Rev. Henry Heffernan v. Michael O. Leavitt*, EEOC case no. 120-2005-00226x. The pertinent portions[2] of said transcripts are attached hereto as Exhibit "1". See *Marshall County Health Care Auth. v. Shalala,* 300 U.S. App. D.C. 263, 988 F.2d 1221, 1222 (D.C. Cir. 1993).

---

[1] Plaintiff has served her motion to enlarge her time to respond to Defs' mtn to dismiss, but it has not been entered into the record in the instant matter.
[2] If the Court wishes to review the entire transcript of the five-day hearing, the Plaintiff will provide the entire transcript.

**Walter L. Jones ("Jones")** at all pertinent times was the Deputy Director for Management and Diversity at NIH. Hr'g Tr. 1719:1-2.[3] Jones was at all pertinent times administratively responsible for the SMD. Hr'g Tr. 1719:9-12.

**Rev. Owen[4] Ray Fitzgerald ("Fitzgerald")** at all pertinent times was the Chief of the SMD. Hr'g Tr. 1022:7-10.

Fitzgerald describes his duties as:

> Duties to supervise the functions within the department, and that includes the function of the spiritual care of the patients, families and consultation staff, involved in seeing that the educational program goes forward, and the third piece is in research at the Clinical Center.
>
> Hr'g Tr. 1022:11-18.

Fitzgerald's testimony fails to mention his duties and obligations to supervise, manage, and lead the chaplains and staff of SMD.

**Rev. Fr. Henry Heffernan, S.J. ("Heffernan")** was a contract chaplain from the mid-1990's to November of 1998. Hr'g Tr. 1014:5-11. During November of 1998 Heffernan became a full time chaplain. Hr'g Tr. 1024:8-21. Heffernan has personal knowledge about the duties, responsibilities, and treatment of "contract" chaplains and civil service chaplains. *Id.*

Prior to Rogler's employment at NIH, the Agency suspended and terminated Heffernan. Jones was the Deciding Official in the illegal suspensions and termination of Heffernan. Hr.g Tr. 1748:1-7; 1755:10-1756:3; 1757:1-1758:14; 1821:18- 1822:9; 1823:17-1827:6. Heffernan filed appeals with the Merit System Protection Board ("MSPB") and the Equal Employment Opportunity Commission ("EEOC"), entitled *Rev. Henry Heffernan v. Michael O. Leavitt*, EEOC case no. 120-2005-00226X (the "*Heffernan* matter"). On or about December 21, 2005 Rogler has Brenner leave

---

[3] Hr'g Tr. is the transcript of the hearing in the matter of *Rev. Henry Heffernan v. Michael O. Leavitt*, EEOC case no. 120-2005-00226x.

[4] Rev. Fitzgerald more commonly goes by O. Ray Fitzgerald.

Heffernan a telephone message that Rogler was a witness previously unknown to Heffernan. Heffernan and Rogler have no personal contact before her telephone call on or about December 23, 2005 and had not met before Rogler testifies in the *Heffernan* matter. Hr'g Tr. 1344:16-18.

**Rev. Dominic[5] Ashkar ("Ashkar")** was a contract chaplain at NIH SMD beginning about 2003. Hr'g Tr. 1094:21-1095:9. Fitzgerald directly supervised Ashkar when he was a contract chaplain. Jones and Fitzgerald gave Ashkar the federal civil service chaplain position that was made vacant by the illegal termination of Heffernan. Hr'g Tr. 1617:15-20; 1800:7-1801:21. It was known that Fitzgerald terminated Heffernan to hire Ashkar, because of Fitzgerald's prejudices against Roman Catholics. Hr.'g Tr. 848:20-849:1 and 75:19-876:2.

**Dr. Reeve Robert Brenner ("Brenner")** was at all pertinent times a part-time federal civil service Jewish chaplain at NIH SMD. Hr.'g Tr. 817:5-11, 818:1-2 and 1095:10-12. Fitzgerald never introduces Rogler to Brenner. Hr'g. Tr. 1363:15-1364:7. Brenner and Rogler first met the week of December 19, 2005. Fitzgerald would exhibit animosity towards Jewish religious people and Brenner. Hr'g Tr. 1359:19-1364:7. Fitzgerald refused to allow the Jewish chaplain to have a service for the Jewish patients to worship on their Sabbath (Friday sundown to Saturday sundown). Hr'g Tr. 819:5-18. Without notifying or involving the Jewish chaplain, Fitzgerald performed a Christian funeral service for a deceased Jewish scientist. Hr'g Tr. 850:10-855:20.

Rogler is a Greek Orthodox woman. Hr'g Tr. 1336:15-17 and 1286:14-17. Rogler is a lay, associate chaplain and not a full chaplain. Hr'g Tr. 1337:7-13. In the spring or summer of 2005 Fitzgerald found Rogler's expired ACPE Clinical Pastoral Education ("CPE") application for the 2004 year in the abandoned files of Rev. Karen Morrow ("Morrow") after Morrow resigned from NIH. Hr'g Tr. 1342:5-14; and Hr'g Tr. 1621:21-1622. Fitzgerald obtained Rogler's confidential

---

[5] The correct spelling of Rev. Ashkar's first name is "Dominic" without a k on the end.

information and used it to recruit Rogler to work at NIH CC as an associate chaplain. *Id.* and Hr'g

Tr. 1342:5-1343:19.

On August 12, 2005 at 17:32:04 EDT Fitzgerald emailed Rogler offering for the parties to

meet on August 14th, 2005 at The American Grill at the Bethesda Marriott for dinner to discuss the

terms of Rogler's work at NIH CC. Hr'g Tr. 1342:5-14. Fitzgerald wrote that Rogler's work would

be "processed through Human Resources." *Id.* Fitzgerald never uses the terms "contractor" or

"independent contractor." *Id.* Rogler started working at NIH on or about August 15, 2005. Hr'g Tr.

1340:2-3 and 13:43:14-1344:15. Fitzgerald alone supervised Rogler's work. Hr'g Tr. 1625:20-21.

Fitzgerald talked with Rogler about his relationship with and termination of Heffernan. Hr'g Tr.

1344:19-1347:8; 1627:6-9. Fitzgerald talked with Rogler about Heffernan's MSPB hearing. Hr'g

Tr. 1345:12-1346:10 and 1627:10-21.

In the fall of 2005 Rogler was gainfully employed by the Veteran's Administration Medical

Center ("VAMC") in Dayton, Ohio when Fitzgerald solicited and recruited Rogler to resign from

employment at the VAMC and work more for NIH CC. Hr'g. Tr. 1347:9-14 and 1349:16-19.

Rogler did not work for a temporary service and was not a sole proprietor of a business providing

chaplain services. Fitzgerald would email and telephone Rogler during the time period she worked

at the VAMC. Hr'g Tr. 1347:15-1348:14 and 1693:2-6. Fitzgerald by telephone conversations and

the exchange of email communications offered to increase Rogler's hours to twenty (20) hours per

week in addition to her working forty (40) hours per week during the holidays and Fitzgerald's

vacations. Hr'g Tr. 1347-15-1348:5.

Fitzgerald made Rogler attend a conference in Brookline, Massachusetts for the final

interview. Hr'g Tr. 1347:15-1348:1 and 1630:7-10. Fitzgerald finalized the work agreement with

Rogler in Brookline at the conference. *Id.* and *see, also*, Hr'g Tr. 1629:16-1630:10. Rogler

voluntarily resigned from the VAMC in reliance on what Fitzgerald calls Rogler's "options" given to her by Fitzgerald, but would more correctly be referred to as terms of employment. Hr'g Tr. 1623:4-13.

NIH hired Rogler for her personal services to be a part-time, associate chaplain. Hr'g Tr. 1348:2-5, 1352:17-20, and 1353:5-9. Rogler had to specifically be present and only Rogler could perform the services. Rogler could not hire someone else to perform her services. When NIH hired Rogler, Fitzgerald had not involved or included the Office of Purchases and Contracts. Fitzgerald conducted all of the negotiations with Rogler. Without any contracting officers involvement Rogler returned to work on or about November 16th, 2005. Hr'g Tr. 1353:1-2. Fitzgerald continues to make admissions to Rogler about his supervisory relationship with Heffernan and his reasons for suspending and terminating Heffernan. Hr'g Tr. 1353:14-1359:18.

From August, 2005 to December 23, 2005 Rogler performed her job functions without incident and was not disciplined or reprimanded. In fact Jones testified that he did not know Rogler was working at NIH and had not received any complaints about her work performance:

> Q. Before December 18, before December 18, what had Fitzgerald told you about Ms. Rogler?
>
> A. I didn't know anything about Ms. Rogler.
>
> Hr'g Tr. 2029:5-9.

Fitzgerald supervised Rogler's work performance. At the EEOC hearing Fitzgerald testified, "[Rogler] was not at the place where she could work without supervision []." Hr'g Tr. 1624:10b-11a. Fitzgerald testified:

> Q. Did [Rogler] work under your supervision?
>
> A. She did.

Hr'g Tr. 1625:20-21.

Associate chaplains, such as Rogler, help and assist full chaplains, such as Fitzgerald. Hr'g Tr.
1353:3-9.

Fitzgerald and Jones instruct and order chaplains to serve patients in NIH's waiting rooms.
Hr'g Tr. 1543:17-1544:1, and 1545:13-1546:10. Jones testified:

> Q. Well, what about multifaith chaplaincy?  Are you familiar with what multifaith
> chaplaincy is?
>
> A. Well its all the same—from my interpretation would be the same type of
> interaction, that regardless of faith group that a chaplain would, if they observed
> the patient in distress or even not in distress.
>
> For example, if a chaplain were to walk into an outpatient clinic, I would expect that
> they would greet and say hello and talk to any patient that might be in the room.  And
> if during the course of that interaction it appears that that person would like to talk to
> a chaplain of their faith, that that person would say "Well, I will contact rabbi so-and-
> so to talk with you." []

Hr'g Tr. 1865:13-1866:8.

Jones further testified:

> Q. That's it.  So this would happen on the floors, it wouldn't happen in the---
>
> A. It would happen anywhere.  If one of our chaplains, regardless of faith group,
> encountered someone.

Hr'g Tr. 2003:10-14.

Jones and Fitzgerald instruct the chaplains to minister to patients and their families and
friends in waiting rooms. Hr'g Tr. 1232:4-1234:20. Fitzgerald testified he wanted chaplains to visit
with patients in the waiting rooms and that, "[Fitzgerald] wanted [Emley] to see patients in the
waiting rooms as [Emley] was." Hr'g Tr. 1549:6-7.

Fitzgerald telephones Rogler when she is off work allegedly to discuss work. Fitzgerald
telephoned Rogler as early as 6:00 a.m. and up to 9:40 p.m., when Rogler was off duty. Hr'g

7

1363:9-17 (Paper no. 3-3) and 1367:9-20 and Hr'g Tr. 1639:16-1640:3. In conversations with Rogler, Fitzgerald discussed his relationship with Heffernan and his own testimony at the *Heffernan* MSPB hearing. Hr'g Tr. 1627:6-1628:9, 1655:18-1656:21, 1657:10-16 and 1344:19-21 1345;1-1347:8 and Hr'g Tr. 1353:14-1356:21 and Hr'g Tr. 1357:1-1359:18. Rogler did not personally meet Heffernan prior to her giving testimony on January 31, 2006 at the EEOC hearing. Hr'g Tr. 1344:16-18.

Jehovah Witnesses refuse to receive chaplain services form chaplains who are not Jehovah Witnesses. Jones admits that Jehovah Witnesses are "faith particular for one of their faith to see the patient." Hr'g Tr. 1240:15-19.

On December 9, 2005 Ashkar was in charge of the SMD and on call for emergencies, but Ashkar left the premises of NIH to "confirm candidates of Catholic faith in Arlington, Virginia." and was Absent Without Leave ("AWOL"). EEOC Hr'g Tr. 1661:3-7. On December 9, 2005 a patient commits suicide at NIH, but Ashkar refuses to return to NIH. *Id.*

On December 12, 2005 Rogler met with Laura Chisholm ("Chisholm") to discuss her concerns. Hr'g Tr. 1374:2-1375:1. Chisholm sent Rogler for counseling services with the Employee Assistant Program ("EAP"). EEOC Hr'g Tr.   1374:20-1375:7.

On December 18, 2005 Fitzgerald admits that he called Rogler that Sunday morning at 8:30 a.m. when she was off duty. Hr'g Tr. 1639:16-1640:13. Fitzgerald threatened Rogler with termination if she did not become his CPE student. Rogler had successfully completed all CPE requirements to be an associate chaplain and did not need to have any additional CPE units to be an associate chaplain. Hr'g Tr. 1338:1-2. According to ACPE CPE standards, rules and regulations Fitzgerald cannot force anyone to apply to become his CPE student. Hr'g Tr. 1519:19-1536. Whereas Fitzgerald instructed Brenner to take a CPE course at Shady Grove Hospital and not at

8

NIH. Hr'g Tr. 844:20-845:8 and Hr'g Tr. 2019:15-2020:4. Additionally Fitzgerald would permit Brenner to not participate in CPE every semester. Hr'g Tr. 861:6-9.

Rogler and Brenner left a message on Heffernan's telephone answering machine on December 21, 2005. EEOC Hr'g Tr. 1375:8-1376:9.

Jones had Rogler meet with him personally on December 22, 2005. Hr'g Tr. 1376:10-12 and 1876:13-19. Jones and Rogler had an extensive conversation about Rogler's concerns including the topics that Rogler testified at the *Heffernan* EEOC hearing. Hr'g Tr. 1376:10-21 and 1377:1-9

It is the Agency's position that Rogler did not know that she would be terminated on December 23, 2005. Hr'g Tr. 1481:10-11. The parties agree that prior to December 23, 2005 there were no complaints about Rogler's work performance. On December 23, 2005 Fitzgerald and Jones had a meeting with Rogler. Hr'g Tr. 1488:1-1489:10. It was Fitzgerald's and Jones' intent to discuss the future of Rogler's relationship with NIH CC. Hr'g Tr. 1479:8-15 and 1488:1-4. Fitzgerald testified that he terminated Rogler because she would not be his CPE student. Hr'g Tr. 1488:2-12. Fitzgerald also testified that Jones terminated Rogler. Hr'g Tr. 1489:3-4. Jones testified that Jones terminated Rogler without the involvement of the contract office. Hr'g Tr. 1869:21-1872:4. Jones told Rogler she was terminated for no cause and told her that she would be given a good reference if she did not tell anyone what see had seen or heard at NIH. Jones said that they were family and he would not investigate Rogler's concerns. Fitzgerald and Jones gave Rogler two weeks severance pay. Hr'g Tr. 1488:18.

Fitgerald and Jones hired Ashkar to fill the permanent chaplain position vacated by the illegal termination of Heffernan. EEOC Hr'g Tr. 1617:6-1618:2.

2. The Court can take judicial notice that Defendant Hillary J. Fitilis is a active member of the District of Columbia Bar.

9

Plaintiff moves for the Court to take judicial notice of the District of Columbia Bar's website that lists Defendant Hillary J. Fitilis as an active member of the D.C. Bar. A copy of the pertinent page of the D.C. Bar's website is attached hereto as Exh. "2".

3. The Court can take judicial notice of the decisions of the United States Equal Employment Opportunity Commission ("EEOC").

   a. The Court can take judicial notice of *Rev. Henry Heffernan v. Michael O. Leavitt, Secretary DHHS*, Petition No. 03A60015 (February 21, 2006). A copy of which is attached hereto as Exh. "3".

   b. The Court can take judicial notice of *Rev. Henry Heffernan v. Michael O. Leavitt, Secretary DHHS*, Petiton No. 0320060079 (January 24, 2007) copy attached as Exh. "1" to Plaintiff's Emergency Motion to Extend Time to Reply to Defendants' Memorandum in Opposition to Motion for Extension of Time to Effect Service and Substitute Service of Process (Paper no. 34).

   c. January 24, 2007, EEOC Appeal Decision *Rev. Henry Heffernan v. Michael O. Leavitt, Secretary DHHS*, Appeal No. 0720070038 (December 4, 2007) copy attached as Exh. "2" to Plaintiff's Emergency Motion to Extend Time to Reply to Defendants' Memorandum in Opposition to Motion for Extension of Time to Effect Service and Substitute Service of Process (Paper no. 34).

4. The Court can note of interest from Members of Congress in the instant matter by taking judicial notice of letters from Members of Congress.

The Court can note of interest from Members of Congress in the instant matter by taking judicial notice of letters from Members of Congress, such as the letter dated July 9, 2007 attached as

Exh. "3" to Plaintiff's Emergency Motion to Extend Time to Reply to Defendants' Memorandum in

Opposition to Motion for Extension of Time to Effect Service and Substitute Service of Process

(Paper no. 34). See *Howard v. Gutierrez,* 474 F. Supp. 2d 41, 47-48 (D.D.C. 2007) (citing *Stewart*

*v. Nat'l Educ. Ass'n.*, 374 U.S. App. D.C. 46, 471 F.3d 169, 173 (D.C. Cir. 2006)).

> 5.   The Court can note of public interest in the instant matter by taking judicial notice of
> newspaper articles.

The Court can take judicial notice of newspaper articles, such as the article entitled

"Chaplains' Complaints of Bias Rise at NIH" by Jacqueline L. Salmon, on the front page of The

Washington Post on April 14, 2007, copy attached as Exh. "4" to Plaintiff's Emergency Motion to

Extend Time to Reply to Defendants' Memorandum in Opposition to Motion for Extension of Time

to Effect Service and Substitute Service of Process (Paper no. 34).

WHEREFORE the Plaintiff respectfully moves for the Court to take judicial notice as stated.

Respectfully submitted by:

DATED:  May 9, 2008

EDAR ROGLER, Plaintiff *pro se*
915 Boucher Avenue
Annapolis, Maryland 21403
(410) 280-9270
edar_rogler@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2008 I mailed postage, pre-paid the above motion to AUSA
Judith A. Kidwell, 555 Fourth Street, N.W. – Civil Division, Room E4905, Washington, District of
Columbia 20530.

EDAR ROGLER

11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


**EDAR ROGLER**                              :
Plaintiff *pro se*


**v.**                                        :

**WILLIAM BIGLOW,** *et al*          **CASE NO.  1:07-cv-02308(RMC)**

_____oOo_____


**EXHIBIT "1"**

Page 726

1          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

2  HENRY G. HEFFERNAN,          *   EEOC CASE NO.

3          Complainant,         *   120-2005-00226X

4  vs.                          *

5  U.S. DEPARTMENT OF HEALTH    *   AGENCY CASE NO.

6  AND HUMAN SERVICES,          *   CC-EEO-2004-0004

7  NATIONAL INSTITUTES OF       *

8  HEALTH,                      *   VOLUME III

9          Agency.              *   Pages 726 - 1063

10

11

12               Baltimore, Maryland

13          Tuesday, January 10, 2006

14

15  The ARBITRATION in this matter began at 9:51 a.m.

16  pursuant to notice.

17

18  BEFORE: DAVID NORKEN, ADMINISTRATIVE JUDGE

19

20  Reported by:  Carla J. Briggs, RPR, CRR, RMR

21  Job No. 8519

Exhibit "1"

| | Page 727 |
|---|---|
| 1 | |
| 2 | Tuesday, January 10, 2006 |
| 3 | 9:51 a.m. |
| 4 | |
| 5 | The ARBITRATION was held at the offices of: |
| 6 | |
| 7 | |
| 8 | U.S. Equal Employment Opportunity |
| 9 | Commission - Baltimore District Office |
| 10 | 10 S. Howard Street, Third Floor |
| 11 | Baltimore, Maryland 21201 |
| 12 | |
| 13 | |
| 14 | Pursuant to notice, before: |
| 15 | DAVID NORKEN, Administrative Judge |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |

Page 728

1 APPEARANCES:
2 On Behalf of the Complainant:
3     CATHY A. HARRIS, ESQUIRE
        IRVING KATOR, ESQUIRE
4     KATOR, PARKS & WEISER, PLLC
        1020 19th St., N.W.
5     Suite 350
        Washington, D.C. 20036
6     (202) 898-4800
7
8 On Behalf of the Agency:
9     JULIE S. LU, ESQUIRE
        DEPARTMENT OF HEALTH & HUMAN SERVICES
10    GENERAL LAW DIVISION
        330 Independence Ave., S.W.
11    Cohen Building, Room 4760
        Washington, D.C. 20201
12    (202) 619-0174
13
14
15 ALSO PRESENT:  HENRY HEFFERNAN, Complainant
16              NISHA BHATT, Paralegal
17
18
19
20
21

Page 729

1                    C O N T E N T S
2
3 WITNESSES:    DIRECT CROSS REDIRECT RECROSS
4 Hillary Fitilis      --   746   772    803
5   (Continued)              812   813
6 Reeve R. Brenner   817   881   908    --
7 Francis G. Platt   917   963   992   1004
8                          1011  1013
9 Owen R. Fitzgerald 1022   --    --     --
10
11
12         E X H I B I T S
13 COMPLAINANT HH
14 EXHIBITS:     IDENTIFIED     IN EVIDENCE
15 66          777           784
16
17 AGENCY
18 EXHIBITS:     IDENTIFIED     IN EVIDENCE
19 9           746           751
20 10          750           751
21 11          751           752

Page 730

1 12          753           756
2 13          756           758
3 14          759           760
4 15          760           761
5 16          761           766
6 17          890           --
7 18          967           968
8 19          970           971
9 20          971           973
10 21         973           976
11 22        1032          1036
12
13
14
15
16
17
18
19
20
21

2 (Pages 727 to 730)

Arbitration

Page 1019

1 the CPE requirement, did the instruction have to be,
2 I guess, reissued or redirected to the employee
3 after -- to Father Heffernan in particular upon
4 Father Heffernan's return to the Clinical Center
5 after he finished his five-day suspension, did it
6 have to be reissued or redirected to him to provide
7 a plan for CPE requirement before you could charge
8 him with that charge again for disciplinary
9 purposes?
10     A    No.
11     MS. LU:  Now you understood what I was
12 trying to ask.
13     MS. HARRIS:  We understood.  It's just you
14 weren't asking it right.
15     MS. LU:  Okay.  That's fine.  I'm
16 finished.
17     ADMINISTRATIVE JUDGE NORKEN:  Are you
18 done?
19     MS. LU:  Yes.
20     ADMINISTRATIVE JUDGE NORKEN:  Okay.
21     MS. HARRIS:  I'll let that dog lie.

Page 1020

1     ADMINISTRATIVE JUDGE NORKEN:  Is this
2 witness to be used in rebuttal?
3     MS. HARRIS:  I don't anticipate it, Judge.
4     MS. LU:  No.
5     ADMINISTRATIVE JUDGE NORKEN:  Okay.
6     Miss Platt, I will issue an order to apply
7 to you that you're not to discuss this case or your
8 testimony in this case with any other witness in
9 this case until these proceedings are ended.  Do you
10 understand that order?
11     THE WITNESS:  Yes.
12     ADMINISTRATIVE JUDGE NORKEN:  Okay.  I
13 thank you for your testimony.  You're excused.
14 Thank you.
15     THE WITNESS:  Thank you.
16     ADMINISTRATIVE JUDGE NORKEN:  Off the
17 record.
18     (Brief Recess.)
19     ADMINISTRATIVE JUDGE NORKEN:  Would you
20 please raise your right hand.  I'm David Norken.
21 I'm the Administrative Judge.  I think we have met.

Page 1021

1 I'm not sure.
2     THE WITNESS:  We have not.
3     ADMINISTRATIVE JUDGE NORKEN:  If you would
4 please state your full name for the record.
5     THE WITNESS:  May name is Owen Ray
6 Fitzgerald.
7 WHEREUPON --
8          OWEN RAY FITZGERALD,
9 a Witness, called for examination by counsel for the
10 Agency, and after having been first duly sworn by
11 the Administrative Judge, was examined and testified
12 as follows:
13     ADMINISTRATIVE JUDGE NORKEN:  Who's doing
14 this witness?
15     MS. HARRIS:  This is a joint witness, and
16 Miss Lu and I agreed she would take the direct and
17 then we will do the cross, and we just request
18 leeway to go beyond the scope.
19     ADMINISTRATIVE JUDGE NORKEN:  Yes.
20     You may examine.
21     MS. LU:  Thank you.

Page 1022

1     DIRECT EXAMINATION
2 BY MS. LU:
3     Q    Dr. Fitzgerald, I would just ask that you
4 keep your voice up when answering the questions,
5 please.
6     A    Yes.
7     Q    What is your position at the Clinical
8 Center?
9     A    Chief of the Department of Spiritual
10 Ministry.
11     Q    Okay.  And could you briefly describe your
12 duties.
13     A    Duties are to supervise the functions
14 within the department, and that includes the
15 function of the spiritual care of the patients,
16 families and consultation staff, involved in seeing
17 that the educational program goes forward, and the
18 third piece is in research at the Clinical Center.
19     Q    When you refer to educational program
20 going forward, what educational program are you
21 talking about?

75 (Pages 1019 to 1022)

Page 1023

1    A    It's a program, Clinical Pastoral
2 Education, accredited by the Association for
3 Clinical Pastoral Education.
4    Q    And then I'm sorry. I missed the -- I
5 missed what you said after the educational program.
6 I thought it was research, but is that correct?
7    A    Yes, research was after that.
8         ADMINISTRATIVE JUDGE NORKEN: You said
9 before what? Before accrediting agencies?
10        THE WITNESS: It's accredited by the
11 Association for Clinical Pastoral Education,
12 Incorporated.
13    Q    Is there anything else within your realm
14 of duties as Chief of the Spiritual Ministry
15 Department?
16    A    Involves in the educational program
17 recruitment of students, involves consultation with
18 faith communities off the campus, sometimes
19 educational organizations, usually seminaries or
20 other graduate schools.
21    Q    And in that -- well, how long have you

Page 1024

1 occupied this position?
2    A    Thirteen years today.
3    Q    And you know Father Heffernan?
4    A    I do.
5    Q    And how do you know Father Heffernan?
6    A    He came in the mid '90s as the contract
7 chaplain.
8    Q    Okay. Did Father Heffernan at some point
9 in time become the full-time chaplain at the
10 Clinical Center?
11    A    In November 1998, he became full-time.
12    Q    And who had actually hired Father
13 Heffernan to be the full-time chaplain at the
14 Clinical Center?
15    A    Made recommendation to Walter Jones.
16    Q    Who made that recommendation?
17    A    I made the recommendation.
18    Q    You did?
19    A    We had two candidates, and one there was
20 some matter of his background, and then we made the
21 selection.

Page 1025

1    Q    And you were Father Heffernan's
2 supervisor?
3    A    Yes, I was.
4    Q    And you were talking about beforehand the
5 clinical pastoral education. Can you explain to us
6 what -- well, what we refer to CPE, what CPE is?
7    A    The intention of CPE which has been going
8 for 80 years is to enable clergy and laypeople to be
9 more effective to working with people in some form
10 of crisis or development in their own spiritual
11 formation and leadership of others.
12    Q    Okay. How is usually the CPE program
13 structured?
14    A    There's several parts. There is a
15 teaching part -- the didactic part -- there is
16 working with people who are in some form of need of
17 spiritual care, there is a period of supervision,
18 there are readings, and there are writings of
19 reports we teach by case method so persons write
20 reports of their interaction with the person for
21 whom they're providing care.

Page 1026

1    Q    Is this the basic structure for any CPE
2 unit?
3    A    Yes. There's something like 600 in
4 America, and there are many settings, but for the
5 most part, if it were this or prison or a community
6 agency, that's pretty much the structure of a CPE
7 program.
8    Q    Your reference before to the 600, 600
9 what? CPE programs around the nation or --
10    A    Centers across America.
11    Q    Okay.
12    A    Now, this is only within frame of
13 reference of the Association for Clinical Pastoral
14 Education. The National Association of Catholic
15 Chaplains also has a clinical pastoral education
16 program and the National Association of Jewish
17 Chaplains also has a clinical pastoral education
18 program, so ours is one of three. Our organization
19 is one of three.
20    Q    Are the programs different depending on
21 which organization? I mean, structurewise, is the

76 (Pages 1023 to 1026)

Page 1093

1 document, and that's the reason I wrote the
2 memorandum for the record, so that we would move
3 forward in our plans for chaplains who were not yet
4 certified to have that opportunity and also that
5 requirement.
6      MS. LU: Okay. I'd like to admit this
7 document.
8      ADMINISTRATIVE JUDGE NORKEN: Any
9 objection?
10      MR. KATOR: No, no objection.
11      ADMINISTRATIVE JUDGE NORKEN: It's
12 admitted.
13      (Agency Exhibit Number 79 was admitted
14 into evidence.)
15      ADMINISTRATIVE JUDGE NORKEN: Let me
16 finish reading it, please.
17      MS. LU: Sure.
18      (Brief pause.)
19  A   If I may --
20      MR. KATOR: There's no question.
21      ADMINISTRATIVE JUDGE NORKEN: Wait.

Page 1094

1      THE WITNESS: Okay.
2      (Brief pause.)
3      ADMINISTRATIVE JUDGE NORKEN: Okay.
4 Proceed.
5      BY MS. LU:
6  Q   Thank you.
7      Dr. Fitzgerald, why did you decide that --
8 why did the Clinical Center decide to require the
9 CPE training for its chaplains?
10  A   The feedback I was getting from ones not
11 certified, there was a different level of
12 responsiveness to patient and family needs. And
13 since the faith communities had a requirement, I
14 chose to recommend to our organization to adopt the
15 requirement of the faith community for the highest
16 level of performance in a very acute care, high
17 acuity level patient care environment.
18  Q   And this would have been also part of the
19 competencies for the Clinical Center?
20  A   Yes.
21  Q   Now, in 2003, who were the chaplains at

Page 1095

1 the Clinical Center at that time?
2  A   By that time, Gary Johnston had gone on
3 military leave.
4  Q   Okay.
5  A   Chaplain Henry Heffernan, Chaplain Karen
6 Morrow, and me, and then we had a contract chaplain
7 and Chaplain Therese Stewart and there was a
8 contract chaplain that was doing outpatient work,
9 and that was Chaplain Ashkar. Dominic Ashkar.
10  Q   How about Rabbi Brenner?
11  A   And Rabbi Brenner. He was half-time.
12  Q   He was half-time.
13      ADMINISTRATIVE JUDGE NORKEN: Was Ashkar
14 part-time or full-time?
15      THE WITNESS: Ashkar was part-time. He
16 was doing 20 hours a week. And a lot of the focus
17 was on outpatient clinic work.
18  Q   Was Landis -- Chaplain Landis Vance still
19 there in 2003?
20  A   She was their part-time contract.
21  Q   How about Joan Afshar?

Page 1096

1  A   She had already finished a unit of CPE and
2 then she did come back -- I don't have the date
3 before me, but she came back and did three more
4 units of CPE, the last of which was summer of 2005.
5  Q   And what about a Father Richard? Was he
6 there in 2003?
7  A   He had -- I think he had returned to
8 Lebanon at that time. He had been there.
9  Q   Beforehand?
10  A   Beforehand.
11  Q   And what about Father Salcedo? Was he
12 there in 2003?
13  A   He was there as an area clergy. Came in
14 and met the needs of Latino patients one day a week.
15  Q   And what about Deacon Soto?
16  A   He was --
17  Q   Was he there?
18  A   He was there, also. He saw the Latino
19 patients one day a week which was about three hours.
20  Q   Okay. Was Deacon Soto also area clergy or
21 staff?

9 (Pages 1093 to 1096)

Page 1229

1 come up with some assumptions, and this was a
2 management tool passed on to me by the budget
3 office.

4    Q    Okay. So you use it sort of in terms of
5 management for the budget?

6    A    Yes.

7    Q    Besides Father Heffernan who you have said
8 raised issues about the resources for Catholic
9 patients, are you aware of any other complaints from
10 patients or staff about the resources for Catholic
11 patients?

12    A    I'm not aware of other complaints.

13    Q    Do you know what generic chaplaincy or
14 multifaith chaplaincy is?

15    A    Well, let's separate the two. Generic is
16 not in my vocabulary.

17    Q    What is generic chaplaincy?

18    A    It's not in my vocabulary. It's a term
19 that I do not use, that I will not use.

20    Q    Okay. Well, do you know what it is when
21 someone else uses it?

Page 1230

1    A    I've seen it in the literature, and the
2 literature would say that generic means what
3 generic -- like generic drug. A very common --
4 melting pot. I would say a melting pot.

5    Q    So how does that apply to chaplaincy?

6    A    It doesn't. Multifaith does, but generic
7 does not.

8    Q    Well, then what is your understanding of
9 multifaith chaplaincy?

10    A    Each patient has a statement in their
11 faith community when they're brought in to working
12 with us, and that person, with appropriate training,
13 needs to understand the background and faith of
14 others outside of their faith community, but when
15 they go, they go representing their faith
16 community -- one's own faith community. The ability
17 to triage and then make referrals to persons of
18 other -- who want another faith.

19    Q    Okay. Well, what does triage mean?

20    A    It's a French word that you use like in
21 wartime that you really look to see who has the

Page 1231

1 greatest need, and triage means that you enter an
2 area and make an assessment. One might say our
3 social worker counterparts do exactly that. They
4 decide after one visit who needs follow-up. And
5 based on our resources, then we have to decide the
6 following up. And again having made an assessment,
7 then one can make a referral to that faith
8 community. There's absolutely no way that we can
9 have coverage without making referrals with each
10 other.

11    Q    You mean coverage to -- when you say
12 "coverage," do you mean visit patients?

13    A    Yes. You can look at the math of the
14 volume of our patients, and the only way that that
15 seems to be able to be done is to have someone visit
16 and then make referrals.

17    Q    And what's the -- do you know how many
18 patients are at the Clinical Center on average
19 daily?

20    A    A thousand outpatient visits daily.

21    Q    Okay. What about the inpatient?

Page 1232

1    A    Last week the peak was 181. During the
2 holidays in December, it was down to 100, so the
3 average would be 150 to 200 daily.

4    Q    Okay. And then when you talked about
5 triage, then you were also mentioning referral. How
6 does that play into the triage?

7    A    You go to the surgery waiting room, for
8 instance, and there may be six people there, maybe
9 four different faiths. And when they want a person
10 of their faith, then that referral would be made to
11 that faith chaplain.

12    Q    Okay. When you go into a room like that
13 when there's six other -- six patients sitting
14 there, how would one know who's the Catholic patient
15 and who's the Jewish patient?

16    A    Only when they tell you.

17    Q    When you talk to them?

18      And then if they want to see a Catholic
19 chaplain or Jewish chaplain, what do you do?

20    A    Make a referral. And vice versa. If the
21 priest sees them first or the deacon sees them

43 (Pages 1229 to 1232)

Page 1237

1   Q   And then the next page, the 0512?

2   A   That's a Jewish list for that day.

3   Q   These are the lists that the chaplains
4 get?

5   A   Yes.

6   Q   Just for -- these are the inpatients for
7 that day?

8   A   Yes, the inpatients that were admitted
9 since midnight the day before.

10   Q   Okay. What about the outpatients? How do
11 they -- so for the inpatients, the chaplains get
12 these lists, locations to visit by their faith?

13   A   By their faith.

14   Q   What about those in the outpatients'
15 clinic?

16   A   We don't always print those off. As I
17 said, they run up to 28 pages, and the
18 administrative time it takes to whittle through
19 who's what, the time is better spent, in my opinion,
20 to go do the triage and then make a referral. I
21 don't have the talent to -- for instance, the

Page 1238

1 rabbi's only there two-and-a-half days a week. It
2 would not be fair if everybody else got visited and
3 his -- we just overlooked all the Jewish patients;
4 so, when we do the triage, then you can see the
5 patient and then make a referral.

6   Q   Okay. And with the outpatients on average
7 you say you get about a 28-page list. Now those
8 patients, what's the shortest amount of time that
9 they stay at the Clinical Center?

10   A   They might be there just for the day, but
11 that same patient might have an eye clinic
12 appointment, a heart appointment and a dental
13 appointment. So, in other words, there may be
14 multiple clinic visits that day.

15   Q   Okay. And then some of them stay a little
16 longer than a day?

17   A   If they're in chemotherapy, they may come
18 once a week, or in radiation therapy they will come
19 a series up to 33 working days.

20   Q   So then in order to do a list daily, would
21 you have to go back to the day before and see who's

Page 1239

1 not here anymore and who's here or who's stayed or
2 is that how you would have to look at the list?

3   A   They'd have to look at it, but in my
4 opinion, it would be counterproductive.

5      MS. LU: I'd like to admit Exhibit 65.

6      MR. KATOR: I'm not going to object.

7      ADMINISTRATIVE JUDGE NORKEN: It's
8 admitted.

9      (Agency Exhibit Number 65 was admitted
10 into evidence.)

11   BY MS. LU:

12   Q   Dr. Fitzgerald, did you ever advocate that
13 a Roman Catholic priest could give sacraments such
14 as communion or reconciliations to a nonCatholic?

15   A   I know my instructions say never use the
16 word "never," but I will violate my instructions.
17 Never. Never in my ministry do I advocate a person
18 provide a sacramental offering to a person that is
19 not in keeping with their own theology.

20   Q   Okay. So what would happen at the
21 Clinical Center if a patient who is, say, Buddhist

Page 1240

1 and -- do you have a Buddhist chaplain on staff?

2   A   We have a Buddhist resource person. I
3 would offer to the patient that we can bring this
4 resource person available.

5   Q   Okay. But this resource person is not a
6 staff chaplain?

7   A   He doesn't work in a chaplaincy. This
8 happens to be a Buddhist nun who is an oncology
9 nurse.

10   Q   So you would get someone from the
11 community to come in and see this patient?

12   A   Yes.

13   Q   Is that where this Buddhist priest comes
14 in?

15   A   Yes. And this obviously goes to other
16 faith communities. There's Mormon, Jehovah's
17 Witness. There's several faiths that are faith
18 particular for one of their faith to see the
19 patient. Muslim, Hindu.

20   Q   And if you had gone in to visit a patient
21 and the patient said, "Oh, you know, I'd like to see

45 (Pages 1237 to 1240)

**Arbitration**

Page 1285

1 policies and procedures were revised, this was a
2 background piece of information. In other words,
3 I'm not traveling just on one person's agenda. I
4 represent faith communities, I manage resources from
5 faith communities.
6        MR. KATOR: Well, I think he's made our
7 case. It's just a piece of paper that's after the
8 fact that he has put in here, he didn't use it in
9 any way, he can't show that it has any specific
10 relevance to this case. It's something that's put
11 here simply to say well, gee, look what other people
12 say about either certification, which I don't think
13 it speaks to professionalism.
14        MS. LU: That wasn't his testimony. It
15 affirmed that he wasn't just making up the CPE
16 requirement and this was a direction that these
17 faith organizations were going in, and the article
18 does talk about certification by one of these
19 organizations.
20        MR. KATOR: It doesn't -- it may refer to
21 certification, but does it tell you -- it doesn't

Page 1286

1 say you've got to have certification to be a
2 professional chaplain.
3        THE WITNESS: If I'm responding to a
4 question --
5        ADMINISTRATIVE JUDGE NORKEN: There's no
6 question pending.
7        THE WITNESS: Okay.
8        ADMINISTRATIVE JUDGE NORKEN: I'm ready to
9 rule. I'm going to overrule the objection and admit
10 the document.
11        (Agency Exhibit Number 68 was admitted
12 into evidence.)
13        BY MS. LU:
14    Q    Dr. Fitzgerald, do you know Edar Rogler?
15    A    I do.
16    Q    And who is she?
17    A    She's a Greek Orthodox layperson.
18    Q    Does she work at the Clinical Center?
19    A    She does not. She's worked there on two
20 different occasions. She's not now working there.
21    Q    What two different occasions did she work

Page 1287

1 there?
2    A    August of 2005, she worked four days as a
3 contract chaplain and then -- that's when I knew her
4 then.
5    Q    Okay. What other occasion did she work at
6 the Clinical Center? You said two occasions. You
7 mentioned one time in August.
8    A    She worked there from the 18th of November
9 to the 23rd of December.
10    Q    What year?
11    A    Of 2005.
12    Q    2005. Is she still a contract chaplain
13 there at the --
14    A    She is not.
15    Q    Okay. Was her contract terminated?
16        MR. KATOR: I'm going to object. This is
17 collateral attack on the testimony of the witness,
18 and we object to it on that basis.
19        MS. LU: This is in anticipation of
20 Miss Rogler's testimony, but --
21        MS. HARRIS: But you can't collaterally

Page 1288

1 impeach her. You can't -- that's not proper.
2        MS. LU: Well, I'd be more than happy to
3 have Dr. Fitzgerald back in rebuttal after her
4 testimony.
5        MS. HARRIS: You still can't have it
6 collaterally in sequence that's on an issue not
7 relating to her testimony.
8        I believe the witness should step out.
9        ADMINISTRATIVE JUDGE NORKEN: Yes, you
10 should step out again. Your testimony is getting a
11 bit more exciting, so there will be more objections.
12        (Witness leaves the hearing room.)
13        ADMINISTRATIVE JUDGE NORKEN: The purpose
14 is to, as far as I can understand it, is to attack
15 the credibility, essentially the character for
16 truthfulness of this witness. Now, obviously, you
17 are aware of the accusations of Rogler. You can ask
18 Mr. Fitzgerald whether those accusations are, in
19 fact, true; however, in order to impeach the
20 credibility or in order to impeach this witness in
21 terms of her character for truthfulness, you may not

57 (Pages 1285 to 1288)

Page 1439

1        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

2 HENRY G. HEFFERNAN,              *   EEOC CASE NO.

3             Complainant,         *   120-2005-00226X

4 vs.                              *

5 U.S. DEPARTMENT OF HEALTH        *   AGENCY CASE NO.

6 AND HUMAN SERVICES,              *   CC-EEO-2004-0004

7 NATIONAL INSTITUTES OF           *

8 HEALTH,                          *   VOLUME V

9             Agency.              *   Pages 1439 - 1771

10

11

12             Baltimore, Maryland

13         Wednesday, April 5, 2006

14

15 The ARBITRATION in this matter began at 10:00 a.m.

16 pursuant to notice.

17

18 BEFORE: DAVID NORKEN, ADMINISTRATIVE JUDGE

19

20 Reported by:  Carla J. Briggs, RPR, CRR, RMR

21 Job No. 173658

Page 1440

```
1
2                Wednesday, April 5, 2006
3                     10:00 a.m.
4
5  The ARBITRATION was held at the offices of:
6
7
8          U.S. Equal Employment Opportunity
9          Commission - Baltimore District Office
10         10 S. Howard Street, Third Floor
11         Baltimore, Maryland 21201
12
13
14 Pursuant to notice, before:
15         DAVID NORKEN, Administrative Judge
16
17
18
19
20
21
```

Page 1441

```
1 APPEARANCES:
2 On Behalf of the Complainant:
3      CATHY A. HARRIS, ESQUIRE
       IRVING KATOR, ESQUIRE
4      KATOR, PARKS & WEISER, PLLC
       1020 19th St., N.W.
5      Suite 350
       Washington, D.C.  20036
6      (202) 898-4800
7
8 On Behalf of the Agency:
9      JULIE S. LU, ESQUIRE
       DEPARTMENT OF HEALTH & HUMAN SERVICES
10     GENERAL LAW DIVISION
       330 Independence Ave., S.W.
11     Cohen Building, Room 4760
       Washington, D.C.  20201
12     (202) 619-0174
13
14
15 ALSO PRESENT:   HENRY HEFFERNAN, Complainant
16                 NISHA BHATT, Paralegal
17
18
19
20
21
```

Page 1442

```
1            C O N T E N T S
2
3 WITNESSES:       DIRECT  CROSS  REDIRECT RECROSS
4 Owen R. Fitzgerald  1451   1492    1673    1694
5  (Continued)                       1709    1711
6 Walter L. Jones     1718
7
8
9            E X H I B I T S
10 AGENCY
11 EXHIBITS:        IDENTIFIED        IN EVIDENCE
12 80                 1759               --
13 55                 1767               1769
14
15
16
17
18
19
20
21
```

Page 1443

```
1               P-R-O-C-E-E-D-I-N-G-S
2          ADMINISTRATIVE JUDGE NORKEN:  This is the
3  employment discrimination case of Henry G.
4  Heffernan, Complainant vs. U.S. Department of Health
5  and Human Services, National Institutes of Health,
6  the Agency, EEO Case No. 120-2005-00226X, Agency
7  Case No. CC-EEO-2004-0004.  Today is April 5, 2006.
8  We are in the fifth day of hearing and, hopefully,
9  tomorrow will be the last day of hearing in this
10 case.
11          There's been a change in the posture of
12 this case since we last heard at the last hearing
13 day in the case.  The EEOC's Office of Federal
14 Operations has reversed and remanded the MSPB
15 decision regarding Father Heffernan's termination
16 and remanded it back to the MSPB judge for a hearing
17 to take evidence on the broad claims that Father
18 Heffernan has made with respect to CPE and with
19 respect to different treatment concerning the rabbi
20 and with respect to well, essentially, a broad claim
21 very similar to the claim that he's been pursuing
```

**Page 1476**

1　　　MS. HARRIS:  We would have objected then.
2 I mean, one, they could have tried to bring it up
3 earlier and we would have objected because it's
4 extrinsic evidence that goes to -- it does not deal
5 with bias.  The suicide at NIH, even Agency counsel
6 can't articulate how that would go toward
7 Miss Rogler's bias.  Second of all, the second
8 reason is that they could have raised this before
9 and did not.
10　　　ADMINISTRATIVE JUDGE NORKEN:  Okay.
11　　　MS. HARRIS:  They're putting on rebuttal
12 evidence regarding Miss Rogler's testimony,
13 specifically about her motivation or bias, and this
14 doesn't -- it doesn't have anything to do with it.
15 It certainly has to do with her motivation to come
16 forward, but it doesn't have any motivation about
17 her bias.
18　　　ADMINISTRATIVE JUDGE NORKEN:  Okay.
19 Response from the Agency?
20　　　MS. LU:  Well, and this was also in
21 rebuttal to Miss Rogler's testimony, which the

**Page 1477**

1 Agency should be permitted to do and as I've already
2 said before, that the Agency's position on her
3 motivation and bias is in terms of the time period
4 and the incident that triggered the sort of
5 disclosure of these discussions that she allegedly
6 had with Dr. Fitzgerald and where he supposedly
7 disclosed his alleged animus towards Roman
8 Catholics.
9　　　ADMINISTRATIVE JUDGE NORKEN:  Okay.  But
10 we can figure out the time period already, right?  I
11 mean, we already know the time period.
12　　　MS. LU:  Well, the Agency's been trying to
13 present evidence to show the --
14　　　ADMINISTRATIVE JUDGE NORKEN:  You're
15 saying it's a different time period?
16　　　MS. LU:  No.  It's all in the same range
17 of time period.
18　　　ADMINISTRATIVE JUDGE NORKEN:  This is
19 getting into extrinsic evidence.  I'm going to
20 sustain the objection.  And since this has not
21 gotten into bias -- you're not claiming this gets

**Page 1478**

1 into bias, are you?
2　　　MS. LU:  I'm sorry?
3　　　ADMINISTRATIVE JUDGE NORKEN:  You're not
4 claiming this testimony gets into bias at this
5 point?
6　　　MS. LU:  Well, what he's going to testify
7 about in this incident, it would just be in terms of
8 facts as to what happened that day.
9　　　ADMINISTRATIVE JUDGE NORKEN:  I'm going to
10 sustain the objection on that point.  Let's have the
11 witness come back in.
12　　　(Witness returns to the hearing room.)
13　　　ADMINISTRATIVE JUDGE NORKEN:  All right.
14 Dr. Fitzgerald, the objection to the last question
15 was sustained.  Miss Lu has other questions for you.
16 I just want to be clear that this is on a collateral
17 matter and, therefore, the Agency can elicit
18 rebuttal evidence on noncollateral matters and also
19 on the point that we raised earlier, so you may
20 proceed, Miss Lu.
21　　　THE WITNESS:  Judge, as a nonlawyer, what

**Page 1479**

1 does "collateral" mean?
2　　　ADMINISTRATIVE JUDGE NORKEN:  I'm really
3 not explaining to you, okay?
4　　　THE WITNESS:  Sure.
5　　　ADMINISTRATIVE JUDGE NORKEN:  I'm
6 explaining for the record.
7　　　BY MS. LU:
8　　　Q　Dr. Fitzgerald, do you recall a meeting on
9 the December 23rd, 2005 with Miss Rogler?
10　　　A　A meeting in Walter Jones' office, yes.
11　　　Q　I'm sorry.  Who else was at that meeting?
12　　　A　Walter Jones.
13　　　Q　Okay.  And do you recall what was
14 discussed at this meeting?
15　　　A　Discussed the future of her relations with
16 the Clinical Center.
17　　　MR. KATOR:  Objection.  Same basis.  Now
18 she's going into exactly what you said she shouldn't
19 do.
20　　　ADMINISTRATIVE JUDGE NORKEN:  Well, let's
21 have the witness -- you'd better step out again.

11 (Pages 1476 to 1479)

**Arbitration (vol 5)**

Page 1480

```
1  It's going to be kind of frequent on this one.
2           (Witness leaves the hearing room.)
3           MR. KATOR:  I thought your ruling, Judge
4  Norken, was this kind of testimony which went --
5  which didn't go to bias was not going to be
6  permitted.
7           ADMINISTRATIVE JUDGE NORKEN:  Okay, but --
8           MS. LU:  This is different because this is
9  the December 23rd meeting where the Agency
10 terminated her contract, so this goes directly to
11 bias and motivation, and it is important and highly
12 relevant and probative as to what happened at that
13 meeting since that's the meeting where her contract
14 was terminated.
15          MR. KATOR:  But how does it show bias?  It
16 may show the reason why she came forward, but it
17 doesn't show bias.
18          ADMINISTRATIVE JUDGE NORKEN:  Well, wait a
19 minute.  I can see how it can show bias.  It can
20 show bias by saying that she made up these stories
21 because she was afraid, you know, she was near
```

Page 1481

```
1  termination and that she --
2           MS. LU:  She was terminated then at that
3  stage.
4           ADMINISTRATIVE JUDGE NORKEN:  Was she
5  fearing termination when -- are you saying she was
6  fearing termination when she went to the meeting?
7           MR. KATOR:  It was after.
8           MS. LU:  I don't know whether she had an
9  inkling as to what the -- that she was going to be
10 terminated.  I don't believe she knew when she went
11 into that meeting that she was going to be
12 terminated.
13          ADMINISTRATIVE JUDGE NORKEN:  Then how
14 could that affect bias?
15          MS. LU:  Because that's when she found out
16 and that's also at the time when she decided to
17 contact Father Heffernan's attorneys, and what she
18 told the Agency at that meeting can show her bias.
19          MS. HARRIS:  No.  Miss Rogler's
20 testimony --
21          MS. LU:  And Miss Rogler testified about
```

Page 1482

```
1  these meetings -- this meeting that she had on
2  December 23rd in addition to another meeting she
3  had, and so this is also part of the Agency's
4  rebuttal evidence, too.
5           MS. HARRIS:  No.  You can cross
6  Miss Rogler about anything she testified about, but
7  you can't -- unless it goes to her bias, you can't
8  bring in -- you can't have the testimony of another
9  witness testify about it.  And it doesn't go to her
10 bias because I think you have the time frame off.
11 This meeting, you said, was December 23rd?
12          MS. LU:  That's when she was terminated.
13          MS. HARRIS:  23rd.  Miss Rogler testified
14 that she contacted -- tried to contact counsel prior
15 to that, so that's -- I don't see how -- unless the
16 Agency can show that she had some inkling that she
17 was going to be terminated, which I don't think
18 testimony about this meeting would show.
19          ADMINISTRATIVE JUDGE NORKEN:  What is the
20 Agency claiming that she's going to -- that she said
21 at the meeting?
```

Page 1483

```
1           MS. LU:  At the meeting which -- this is
2  with the meeting where she was told that her
3  contract was going to be terminated and at the
4  meeting as she was leaving, she told the Agency that
5  she was going to get a lawyer and she would contact
6  a lawyer and she thinks she'll get the lawyer for
7  the priest.
8           ADMINISTRATIVE JUDGE NORKEN:  Okay.
9           MS. LU:  And it was a threat to the Agency
10 after her contract was terminated.
11          ADMINISTRATIVE JUDGE NORKEN:  And who
12 else -- what did she say before being told about
13 termination?
14          MS. LU:  What do you mean?
15          ADMINISTRATIVE JUDGE NORKEN:  Did she say
16 anything in a meeting prior to -- did she say what
17 are you planning to have -- is that meeting -- is
18 that the testimony you're going to elicit?
19          MS. LU:  That, and then what the Agency's
20 response was.
21          ADMINISTRATIVE JUDGE NORKEN:  Okay.
```

12 (Pages 1480 to 1483)

**Arbitration (vol 5)**

Page 1488

1   A    Walter Jones.

2   Q    Okay.  And do you recall what was

3 discussed at this meeting?

4   A    Discussed her future relations with the

5 Clinical Center.

6   Q    And what was her future with the Clinical

7 Center?

8        MR. KATOR:  Could you ask him to speak up,

9 please.

10  A    What complicated it, she came to do

11 clinical pastoral education, and then she made a

12 decision that she didn't want to do it with me,

13 which is fine.  The other piece she was there on

14 contract, and I was getting some input about her

15 performance.

16  Q    Okay.  And was her contract continued

17 after this meeting?

18  A    She was given two week's severance.  It

19 was discontinued.

20  Q    Her contract was discontinued at this

21 meeting?

Page 1489

1   A    Yes.

2   Q    Was she told this at this meeting?

3   A    Walter Jones told her that.  It was his

4 decision.

5   Q    He told her at this meeting that her

6 contract was discontinued?

7   A    And she would be getting two week's

8 severance.

9   Q    Two week's severance pay?

10  A    Yes.

11  Q    Okay.  And what did Miss Rogler say at

12 this meeting?

13  A    "I'll contact a lawyer."

14  Q    Okay.  Did she say anything else in terms

15 of what kind of lawyer?

16  A    (Shaking head no.)

17  Q    Did she mention the Catholic priest?

18  A    No.  All she mentioned, she says, "I think

19 I'll get the same lawyer that the priest had"

20 without any reference to which priest.

21  Q    She didn't say the name?

Page 1490

1   A    Did not.

2   Q    That was all she said?

3   A    That's correct.

4        ADMINISTRATIVE JUDGE NORKEN:  You mean

5 didn't name the priest?

6        THE WITNESS:  Didn't name the priest.  She

7 said, "I think I'll contact a lawyer.  I think I'll

8 get the same lawyer that the priest had."

9   Q    And did you understand who she was

10 referring to?

11  A    I had made an inference that it was Father

12 Heffernan's lawyer.

13  Q    All right.  Did Miss Rogler say anything

14 else?

15  A    Not that I remember.

16  Q    Was this the first time that Miss Rogler

17 had stated to you that she was going to contact a

18 priest -- the lawyer for the priest?

19  A    To the best of my knowledge, it was the

20 first time.

21  Q    Dr. Fitzgerald, have you ever taken

Page 1491

1 Communion from a Father Ashkar?

2   A    I've never approached the altar at -- no.

3   Q    You've never approached the altar.  What

4 does that mean?  Like have you ever taken Communion

5 then from Father Ashkar?

6   A    No.

7   Q    So you've attended Catholic Masses,

8 correct?

9   A    Yes.

10  Q    But have you ever taken Communion at a

11 Catholic Mass?

12  A    It's been years.  I was in Kentucky and I

13 sometimes did at Gesthamani Abbey.

14  Q    I'm sorry?

15  A    In years past, I was in the Louisville

16 diocese area, and I did receive Communion at the

17 Gesthamani Abbey Catholic Church.

18  Q    But not from Father Ashkar?

19  A    Right.

20        MS. LU:  Okay.  That's all the questions I

21 have.

14 (Pages 1488 to 1491)

Page 1496

```
1        ADMINISTRATIVE JUDGE NORKEN:  Did you
2 understand what the term means?
3        THE WITNESS:  Yes.
4        BY MR. KATOR:
5    Q    All right.  Dr. Fitzgerald, do you recall
6 when you installed the CPE requirement?
7    A    Well, the revision of policies and
8 procedures was signed off September 26 of 2003.
9 We'd worked on competencies for at least 18 months
10 prior to then.
11   Q    And this competency that you talked about
12 as far as the CPE, is that departmental-wide?  Is
13 that what you testified to?
14   A    Yes.
15   Q    The three levels you mentioned of the
16 competencies?
17   A    Yes.
18   Q    And so that departmental-wide is under
19 your responsibility; is that right?  Department of
20 Spiritual Ministry?
21   A    Yes.
```

Page 1497

```
1    Q    Is that correct?
2    A    That's correct.
3    Q    So, this was your judgment, you made it
4 up; is that right?
5    A    Yes, I made it --
6    Q    Okay.
7    A    I made that judgment after much prior
8 consultation.
9    Q    Yeah, I understand.  But it came from you?
10   A    It came from me.
11   Q    There was no requirement from the
12 department; is that right?  Is that right?
13   A    I'm required to establish competencies
14 within the Department of Spiritual Ministry.  That's
15 part of my task.
16   Q    I understand.  No requirement from the
17 department that you establish a CPE program?
18   A    Well, CPE program had been going since
19 1960s at NIH.
20   Q    At NIH?
21   A    Yes.
```

Page 1498

```
1    Q    Did you tell Father Heffernan when he was
2 hired that he would have to become certified?
3    A    Not when he was hired.
4    Q    Did you tell Rabbi Brenner when he was
5 hired that he would have to be certified?
6    A    Not when he was hired.
7    Q    So, this was going on, and yet you hired
8 people and you didn't tell them that they would need
9 to be certified?
10   A    The competencies and the judgment call
11 came after they were hired.
12   Q    So, it wasn't going on since 1960 then?
13   A    Well, it's been going on, yes, at NIH.
14 Since 1960, they've been offering -- '65 -- been
15 offering CPE.
16   Q    You didn't have any requirement, you
17 didn't have any policy with respect to certification
18 in 1960, did you?  Did the department have it?
19   A    The recruiting stated there is additional
20 training may be required.  That goes back to that
21 series -- federal series -- the 60 series under
```

Page 1499

```
1 which chaplains are hired that additional training
2 may be required.
3    Q    Well, let me try that again.  There was no
4 policy in your department concerning CPE training
5 prior to your installation of it in 19 -- in 2003?
6    A    The policies and procedures were written
7 in --
8    Q    Just please answer it yes or no, and then
9 if you need to explain, you may, but please answer
10 yes or no.
11   A    There was a policy from 1987 that
12 additional training may be needed.  It was a policy.
13   Q    Where was that policy?
14   A    It was the old policies and procedures.
15   Q    There was something stated?
16   A    Yes.
17   Q    That required this?
18   A    That additional training may be required.
19   Q    But there was no requirement that you have
20 CPE -- that an individual to work as a clergy in the
21 Clinical Center must have -- be certified.  You had
```

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 1516

```
1    Q    She took training at the Clinical Center
2 for CPE.  There's Miss Vance; is that true?
3    A    Yes.  She was formerly contract and did
4 take training.
5    Q    She took training at the Clinical Center.
6 Rabbi Brenner, he took training at the Clinical
7 Center; isn't that right?
8    A    That's correct.
9    Q    The only person who didn't take training
10 at the Clinical Center of the clergy is Father
11 Heffernan; is that right?
12   A    Yes.
13   Q    You never told him to.  You never asked
14 him to; is that right?
15   A    I gave him that as an option.
16   Q    You gave him that option?
17   A    When they passed out the six papal
18 training centers around the Beltway where you could
19 apply for training, Reverend Morrow talked with
20 Father Heffernan about training.
21   Q    Did you ever offer Father Heffernan --
```

Page 1517

```
1 once you installed the policy on certification, did
2 you ever offer the opportunity to Father Heffernan
3 to serve the training at the Clinical Center?
4    A    He was offered with the six options.
5    Q    Subsequent to your adoption of the
6 program -- the policy -- did you tell Dr. -- did you
7 offer the opportunity as you had done for Rabbi
8 Brenner?
9    A    I didn't offer him the opportunity.  He
10 sought it with Reverend Morrow.  I said he had to be
11 involved in training.
12   Q    Isn't it a fact that you directed him --
13 Rabbi Brenner -- to take the training at the
14 Clinical Center?
15   A    I did not.  I was not a part of that
16 discussion.
17   Q    Okay.  Did you tell Father Heffernan to
18 take the training at the Clinical Center?
19   A    I did not tell him, but I gave him the
20 option of one of six places around the Beltway.
21   Q    When did you do this?
```

Page 1518

```
1    A    There are memorandum that it was published
2 in the summer of 2003 in staff meetings and it
3 was --
4    Q    And one place was the Clinical Center?
5 Can you refer me to that memo?
6         ADMINISTRATIVE JUDGE NORKEN:  Well, we
7 know the memo exists.
8         MS. LU:  I can find it for you if you
9 want, but don't ask the witness to.
10        Okay.  On Agency Exhibit 25 after the
11 second page.  Dr. Fitzgerald, if you take the blue
12 book, book No. 1, Exhibit 25, the second page.  Flip
13 over.
14        ADMINISTRATIVE JUDGE NORKEN:  Third page.
15        MS. LU:  Well, yeah.
16        MR. KATOR:  Which page?  That memo is
17 before.  My question was subject to the policy
18 itself.
19   A    Provided 2003 for Chaplains Heffernan and
20 Brenner places to apply for clinical pastoral
21 education.
```

Page 1519

```
1         MS. HARRIS:  What page is that?  I don't
2 see that.
3         THE WITNESS:  It's 0313.
4         MS. HARRIS:  Provided 2003.
5         ADMINISTRATIVE JUDGE NORKEN:  The ACPE
6 directory.
7         BY MR. KATOR:
8    Q    When was this in 2003, Dr. Fitzgerald?
9    A    The summer of 2003, because the issue had
10 come up with mid-term evaluation about CPE and --
11   Q    And that's before you put the policy into
12 effect; is that right?
13   A    The option was there before the policy --
14 yes, sir.
15   Q    Okay.
16   A    But the option at the Clinical Center was
17 there.  And the Clinical Center appears on 0316 at
18 the top of the page.
19   Q    Subsequent to the policy, Dr. Fitzgerald,
20 did you have the opportunity to tell Father
21 Heffernan to take the training at the Clinical
```

21 (Pages 1516 to 1519)

**Arbitration (vol 5)**

Page 1540

1 or accurate information or testimony?

2          THE WITNESS:  If he said that, that would

3 not be accurate.

4          ADMINISTRATIVE JUDGE NORKEN:  Okay.

5          MS. LU:  And I still object to that as I

6 don't believe that that's what Father Ashkar

7 testified to.

8          ADMINISTRATIVE JUDGE NORKEN:  It seems I

9 do recollect that.

10          THE WITNESS:  There's background of this,

11 but I'm not at liberty --

12          MR. KATOR:  There's no question pending.

13     Q     Take a look at -- you have the Agency

14 exhibits in front of you, Dr. Fitzgerald.  Look at

15 Agency 42.  Do you have that in front of you?

16     A     I do have it.

17     Q     Do you know what this is?

18     A     Yes.

19     Q     Okay.  And it's from you, it's not signed,

20 but I presume that you did sign it at some point; is

21 that correct?

Page 1541

1     A     That's correct.

2     Q     Okay.  And this is a request for -- in the

3 first paragraph -- a request for a service contract

4 for a part-time Roman Catholic chaplain for the time

5 period August 1 through September 2001 on an

6 as-needed basis; is that right?

7     A     That's correct.

8     Q     Okay.  And would you read the

9 justification to yourself and let me ask you a

10 question concerning it.  Have you read it?

11     A     Yes.

12     Q     Okay.  It's a fact that you told the

13 purchasing people that you wanted a contract to

14 provide additional services to Roman Catholic

15 patients; isn't that correct?

16     A     Yes.

17     Q     And that wasn't true, was it?  You didn't

18 want Father Ashkar to serve Roman Catholic patients?

19     A     I did.

20     Q .    Then you assigned him to the incoming

21 patients.  That's where he met -- that's where he

Page 1542

1 served, the outpatient clinic?

2     A     He served the outpatient clinic as --

3     Q     Isn't that true?

4     A     Yes, he did.

5     Q     And he served all patients.  He did a

6 multifaith chaplaincy; isn't that correct?

7     A     That's correct.

8     Q     So, this is not truthful.  This statement

9 that you wrote --

10     A     The Catholic patients are served well --

11     Q     Let me finish.  This statement that you

12 wrote and sent forward to get money for a priest to

13 do work for Catholic patients was not correct, not

14 truthful?

15     A     It is serving them by serving the people

16 in the same waiting room with him.

17     Q     But it wasn't truthful?  It was not

18 truthful?

19     A     I'm not owning to an untruth.

20     Q     I'm sorry?

21     A     I'm not acknowledging an untruth.

Page 1543

1     Q     It's not -- you're not acknowledging it's

2 not truthful?

3     A     There was no intention of --

4     Q     But you acknowledge that he was in the

5 outpatient clinic and not serving Roman Catholic

6 patients?

7     A     He was serving Roman Catholic -- they were

8 in the outpatient clinic.

9     Q     Sure.  And he was serving most other

10 patients, though, wasn't he?  Most of his time was

11 being spent with other faiths other than Roman

12 Catholics.  That's true, isn't it?  So this

13 statement --

14          ADMINISTRATIVE JUDGE NORKEN:  Wait a

15 minute.  You've got to let him answer.

16          MR. KATOR:  All right.

17     Q     Answer it.

18     A     He is serving others as all of us at

19 outpatient clinic serve others.

20     Q     Yeah.

21     A     And the surgery waiting room, we serve

27 (Pages 1540 to 1543)

Page 1544

1 others.

2    Q    But you did statistics on Roman Catholic
3 patients.  You said well, maybe 25 percent, 23 might
4 be Roman Catholics; is that right?

5    A    It ranges --

6    Q    So, if Father -- okay?  Is that right?

7    A    (Nodding head yes.)

8    Q    Say yes or no.

9    A    Yes.

10    Q    All right.  So, if Father Ashkar is
11 serving in the outpatient clinic, only 25 percent of
12 his time would go toward Catholic patients, right?

13    A    Yes.

14    Q    And 75 percent would go to other patients
15 of other faiths?

16    A    Yes, or consult with staff who may be --

17    Q    Yeah.  So, the statement you wrote to get
18 additional help for Roman Catholic patients is
19 simply not true?

20    A    It is true because carrying the beeper was
21 20 hours a week, was -- was 20 hours -- whatever the

Page 1545

1 math is -- 20 days a month.

2    Q    All right.  Now --

3    A    40 hours --

4         ADMINISTRATIVE JUDGE NORKEN:  Wait.  Let
5 him answer.

6    A    Carrying the beeper 40 hours --

7         MR. KATOR:  I didn't ask this question.  I
8 just asked him, Judge Norken, whether it was true or
9 not.  That's all.

10         ADMINISTRATIVE JUDGE NORKEN:  Okay.
11 Proceed.

12         MR. KATOR:  Okay.

13         ADMINISTRATIVE JUDGE NORKEN:  Well, I'm
14 going to allow you to answer because you've asked to
15 do an explanation.  Go ahead.

16    A    There's no way that we have the resources
17 to see everybody.  Yesterday in the waiting room --
18 surgery waiting room -- Father Ashkar was somewhere
19 else.  There was, like, ten, eight family members in
20 there.  And in the absence of anybody else, I
21 ministered to everybody in the room.  When Father

Page 1546

1 Ashkar is there in my absence or the rabbi's
2 absence, what we're -- what's at stake here is what
3 is a professional chaplain, and that's what I'm
4 trying to manage the department around, carrying out
5 the ministries of a professional chaplain, and
6 that's what a professional chaplain does:  Does
7 triaging and then makes referral.  That's how I get
8 my resources.  They will never give me resources to
9 see only Jewish patients, only Catholic patients,
10 only Presbyterian patients.

11    Q    But that's what your request asks for.
12 Look at Agency 43.  Is it a fact that you were
13 trying to hire -- or on a contract basis -- Father
14 Ashkar again; is that correct?  It's Exhibit 43.

15    A    Yes.

16    Q    Okay.  And look at your justification,
17 Dr. Fitzgerald.  Doesn't that talk about visits to
18 Roman Catholic patients?

19    A    It does.

20    Q    Isn't this whole thing related to Roman
21 Catholic patients?  It is, is it not?  It is?

Page 1547

1    A    It is.  And he has the Roman Catholic
2 chaplain credentials and can serve a lot of people.

3    Q    And the fact is Father Ashkar didn't serve
4 Roman Catholic patients, only incidentally?

5    A    Oh, no, no, no, no.  He served them very
6 well.

7    Q    Okay.  Now, let me ask you do you recall
8 Deacon Emley?

9    A    I do.

10    Q    He was a -- what was he?

11    A    He was a second-career deacon, he'd been
12 an Air Force colonel, he'd been a Ph.D in math, he'd
13 been a --

14    Q    No, no.  I don't care about that.  What
15 was he when he worked for you?  He worked at the
16 Clinical Center; is that right?

17    A    Yes.

18    Q    What was he?

19    A    He was a contract chaplain.

20    Q    What faith?

21    A    Catholic.

Page 1548

1    Q    Roman Catholic?

2    A    (Nodding head yes.)

3         ADMINISTRATIVE JUDGE NORKEN:  Is that a

4 yes?

5    A    Yes.

6    Q    And he was supervised by Father Heffernan,

7 wasn't he?

8    A    He was.

9    Q    And did there come a time when you

10 determined that Deacon Emley should leave?

11    A    There came a time for contract renewal at

12 the end of the fiscal year and -- yes.

13    Q    And you said to -- you were not going

14 to -- you determined you were going to terminate him

15 at that point?

16    A    He was given an option again to work

17 towards competency, and his statement was -- I can't

18 use it because of ageism, but he says, "I'm 68 years

19 old, I've had a career as an Air Force colonel, I've

20 served as a mathematician, teacher.  I don't want

21 anymore training."

Page 1550

1 chaplaincy"?

2    A    He told me that.

3    Q    And then you let him go after that?

4    A    I gave him an option for training.

5    Q    You let him go after that?

6    A    I did not renew his contract.

7    Q    Right.  After he told you that?

8    A    We had priests that were doing that, that

9 were doing the outpatient clinic work.

10    Q    I'm sorry.  Say that again.

11    A    There were priests on contract.  Both

12 Father Ashkar and Father Richard Moussa were doing

13 what -- they are doing the outpatient clinic in

14 subsequent months.

15    Q    My question was that you did fire him

16 after he'd told you he did not want to serve

17 other patients?

18    A    Well, you keep using that word.

19    Q    You don't like the word "fire"?

20    A    I don't like the word "fire."

21    Q    All right.  We'll use the word

Page 1549

1    Q    The fact is, though, that you asked him to

2 take a multifaith chaplaincy, did you not, and

3 that's what he resisted?  Did you not ask him to

4 undertake services to patients other than Roman

5 Catholics?

6    A    I wanted him to see patients in the

7 waiting rooms as he was.  We do not have the

8 talent -- they will never give us resources for one

9 chaplain to service only brand X.  That's just the

10 way the world is in 2006.

11    Q    But when you asked for money for these

12 people, you say it's brand X I want them for.

13 That's correct, isn't it?

14    A    That's correct.  There was no intent to

15 have subterfuge.

16    Q    Okay.  But with Deacon Emley, let me

17 understand.  He did tell you, did he not, in fact,

18 "I was here to serve Roman Catholic patients"?

19    A    He told me that.

20    Q    He did tell me that.  "And I don't feel

21 it's right for me to try to do a multifaith

Page 1551

1 "terminate."

2    A    Well, his contract was not renewed.

3 There's a difference between terminating -- his

4 contract was --

5         ADMINISTRATIVE JUDGE NORKEN:  If you want

6 to use the word "not renewed," that's fine.

7    A    Sure.  He was not renewed.

8    Q    He was not renewed.  Okay.  Indulge me one

9 second.

10         Do you know Miss Fitilis?

11    A    I do.

12    Q    Did you have occasion to speak to

13 Miss Fitilis in connection with Father Heffernan?

14    A    Yes.  She works in employee relations, so

15 the answer is yes.

16    Q    Did she give you advice with respect to

17 Father Heffernan?

18    A    Since I'm not an expert in employee

19 relations, the answer is yes, she did give me

20 advice.

21    Q    And isn't it that fact that you discussed

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

## Page 1616

1 Ethical Culture Center on 16th Street in Washington,
2 D.C.
3     Q     But you knew the widow?
4     A     After she came in off the street.  I mean
5 she came in wanting to plan for a memorial service,
6 and I said the option -- looked at the chapel, that
7 was turned down.  The Navy, there was some rhubarb
8 in the last testimony about that.
9     Q     Just answer the question.  She came in to
10 see you; is that right?
11     A     She did.
12     Q     And she said her spouse was Jewish?  The
13 deceased was Jewish?
14     A     She did.
15     Q     And you did not tell Rabbi Brenner that --
16 about this incident so that he could have offered
17 some services.  That's correct, is it not?
18     A     She was my client, he was not.  She was a
19 client that came --
20     Q     You didn't tell -- she was a client?
21     A     She came asking for a service.  Basically,

## Page 1617

1 I'd just be the middle person in arranging to have a
2 place for a service.  Nothing else asked.
3     Q     Did you suggest to her that she might want
4 to see Rabbi Brenner?
5     A     I don't remember the conversation.
6     Q     Was Father Ashkar at the present time a
7 contract -- continued on a contract?
8     A     He was contract through the last pay
9 period.  The answer is yes, through the last pay
10 period.
11          ADMINISTRATIVE JUDGE NORKEN:  Does that
12 mean he's no longer a contract chaplain?
13          THE WITNESS:  There's something in
14 transition to another status.
15     Q     Is he going to be an employee?
16     A     Yes.
17     Q     He's going to take Father Heffernan's
18 place?
19     A     Well, position filled by Catholic
20 chaplain.  But this, after all, has been 20 months.
21 I've been waiting in the wings for 20 months for

## Page 1618

1 some resolution and -- I mean, this has been going
2 on for 20 months now, a vacancy.
3     Q     Now, Father Ashkar is Eastern Orthodox; is
4 that right?
5     A     No, no.  He's Eastern rite of the Catholic
6 Church.  He's a --
7     Q     Catholic Church.
8     A     Is Maronite Catholic Church.
9     Q     That's right.  That's different than Roman
10 Catholicism.  The practices are a little different?
11     A     He has biritual faculties.
12     Q     I understand he does, but the practices
13 are different; is that correct?
14     A     There are some differences.
15     Q     The patients at the hospital -- at the
16 Clinical Center -- are they Roman Catholic primarily
17 or are they Eastern rite?
18     A     I don't ask.
19     Q     You don't ask?
20     A     They just list as Catholic.
21     Q     Do you have any idea?

## Page 1619

1     A     Well --
2     Q     What would you guess?
3     A     A large number of them are Roman Catholic.
4 I mean, they have Maronite, they have other orders
5 that are Eastern rite.
6     Q     So you're providing a Maronite priest for
7 patients who are primarily Roman Catholic; is that
8 correct?
9     A     Sir, I go to his Mass.  He prays for the
10 Cardinal, he uses the Mass book that's a Western
11 rite Mass book.
12     Q     I understand.  But you are providing a
13 Maronite priest for patients who are primarily Roman
14 Catholic?
15     A     Yes, because he's approved by the
16 Cardinal.
17     Q     Could you not find a Catholic priest?
18     A     We tried.
19     Q     A Roman Catholic priest?
20     A     We tried.
21     Q     I'm sorry?

46 (Pages 1616 to 1619)

**Arbitration (vol 5)**

Page 1620

1    A    We tried.

2    Q    You couldn't find one?

3    A    And Victor General says, "I have no
4 diocese priest to give you."

5    Q    Are you comfortable with Father Ashkar?

6    A    I am.

7    Q    And he does the multifaith procedure with
8 you?

9    A    Well, we -- all of us see patients and
10 make referrals to others. There's just absolutely
11 no way to cover without somebody making referrals to
12 somebody else.

13    Q    Now, when you -- now that you're hiring --
14 appears that you will be hiring Father Ashkar as a
15 replacement of Father Heffernan, was that a decision
16 you made at the time you were firing or removing
17 Father Heffernan?

18    A    Absolutely not. Absolutely not. There
19 was no heir apparent.

20    Q    Did you tell anybody that --

21    A    We advertised for a chaplain, and there's

Page 1621

1 a priest that I did see who has to do a year of CPE
2 before he would be qualified, and so he's not even
3 waiting in the wings. Father Ashkar did have
4 certification as a Catholic chaplain in a hospital,
5 National Association of Catholic Chaplains, so --

6        MR. KATOR:  Judge Norken, if you'll give
7 me a few minutes, we'll see whether we have anymore
8 questions. Do you want to go off the record for
9 just a minute?

10        ADMINISTRATIVE JUDGE NORKEN:  Off the
11 record.

12        (Brief Recess.)

13        ADMINISTRATIVE JUDGE NORKEN:  How much
14 longer?

15        MR. KATOR:  No more than half an hour.

16        ADMINISTRATIVE JUDGE NORKEN:  Please
17 proceed.

18        BY MR. KATOR:

19    Q    Okay. Dr. Fitzgerald, just a few more
20 questions that we have for you.

21        Do you know a Miss Rogler?

Page 1622

1    A    Miss Edar Rogler?

2    Q    Edar Rogler.

3    A    Yes.

4    Q    You do know her?

5    A    Yes.

6    Q    How do you know her?

7    A    She applied for CPE in summer of 2005 I
8 believe it was, and Reverend Morrow looked over the
9 applicants and she was turned down, then she worked
10 four days in August after CPE was over in 2005 and
11 was going back to Dayton, Ohio to do more clinical
12 pastoral education, more CPE.

13    Q    Did you encourage her to take CPE at
14 the --

15    A    Well, I had a letter --

16    Q    -- Clinical Center?

17    A    I didn't --

18    Q    Did you encourage her to take CPE at the
19 Clinical Center?

20    A    I did not. She wrote a letter in October
21 of 2005 wanting to apply, and we talked on the

Page 1623

1 phone. I said, "Well, you've just gotten where you
2 are. You've only been there like six weeks," and
3 wanted to leave the VA in Dayton, Ohio.

4    Q    So, did you advise her not to?

5    A    Well, I told her I didn't have any
6 residency; that the only way that she could do it
7 would be to do some contract work and CPE. She had
8 her residency paid for offered by the VA which she
9 voluntarily terminated at the VA.

10    Q    But in the meantime, you were in
11 discussion with her concerning her choices here; is
12 that right?

13    A    What the options were.

14    Q    Yeah.

15    A    My counsel was for her to get her
16 theologic education finished.

17    Q    All right.

18    A    I mean, if you're raising a question, I
19 can give you the information.

20    Q    All I'm asking is that you were in touch
21 with her by telephone and otherwise during this

47 (Pages 1620 to 1623)

## Arbitration (vol 5)

Page 1624

1 period of time, and then she ultimately came to the
2 Clinical Center?

3    A    She came after mid November.

4    Q    Right.

5    A    I think about 18th of November.

6    Q    Uh-huh.  And you gave her a contract?

7    A    Gave her a contract --

8    Q    And that was your decision?

9    A    Gave her a contract, but she would also be
10 involved in CPE.  She was not at the place where she
11 could work without supervision, so the only option
12 to staying on contract was to be under supervision.
13 That's correct.

14    Q    And she was taking CPE at the Clinical
15 Center?

16    A    Well, she was and she wasn't.  She wrote
17 me a letter and said she wanted to stop and not
18 start again until mid January of 2006, and then she
19 says, "I have other places I can apply to, but the
20 residency, I think I'll do that."  So, there was
21 different discussions.

Page 1625

1    Q    Now, but you were in -- I'm just trying to
2 point out, if I'm right, that you were -- that it
3 was back-and-forth conversations with you and Rogler
4 'til she ultimately came to the Clinical Center?

5    A    She did.

6    Q    In which you gave her a contract; is that
7 correct?

8    A    She did.

9    Q    And she began working either under
10 supervision or not and that she was -- she planned
11 to take CPE, was that it, at the Clinical Center?

12    A    She was supposed to have started mid
13 November and then by December said, "Well, I want to
14 stop and not do it until January."

15    Q    All right.  So, that was it.  All right.

16    So, once she came to the Clinical Center,
17 what was your relationship with her at that point?

18    A    Well, she worked on contract.  She did
19 services, she saw patients, rarely was she on call.

20    Q    Did she work under your supervision?

21    A    She did.

Page 1626

1    Q    So, you had occasion to talk to her from
2 time to time?

3    A    I did.

4    Q    And did you talk to her in your office or
5 other places or what?

6    A    Well, there's a consult office there.
7 That's where we talked.

8    Q    I'm sorry?

9    A    There's a consult office in the new
10 Clinical Center.  We talked in the office.

11    Q    All right.  Now, did you at any time
12 discuss with Miss Rogler Father Heffernan?

13    A    She brought the subject up.  She talked
14 about what she heard in Dayton, Ohio about what's
15 going on with the priest at NIH, and it's vague what
16 she brought.

17    Q    I'm sorry.  She's vague?

18    A    It's vague about what she brought.

19    Q    I'm sorry.  Is that word "vague"?

20    A    Vague.  Vague.

21    Q    Vague.

Page 1627

1    A    Uh-huh.  She brought information that she
2 said she got from her supervisor -- her one in
3 Dayton, Ohio -- and somehow, the story of Father
4 Heffernan had reached Dayton, Ohio, so she brought
5 those data with her.

6    Q    I see.  So, you straightened her out,
7 though, and you told her what the facts were; is
8 that right?

9    A    Very few facts.

10    Q    Yeah, but you did discuss Father Heffernan
11 with her?

12    A    That there had been a hearing.

13    Q    That there'd been a hearing and that
14 you -- and that the final determination had been
15 made and he was terminated; is that right?  You told
16 her that?

17    A    That did come up.

18    Q    Okay.  And you had other conversations
19 with her concerning Father Heffernan; is that right?

20    A    Very few and very scanty details.  As I
21 said, she brought a lot of that with her from

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 1628

1 Dayton, Ohio.

2    Q    Right.  And you didn't want her to be
3 misled, so you straightened her out on these
4 details?

5    A    I don't know if that's the motive, but --

6    Q    Well, but I mean you -- if she gave you
7 misinformation, you'd tell her what the right
8 information was, would you not?  Would you not?

9    A    Yes.

10    Q    All right.  Now, you talked, obviously,
11 about the termination of Father Heffernan -- you
12 said you did -- with Miss Rogler?

13    A    But she'd already brought those data with
14 her.

15    Q    Right.  I understand.  But did you tell
16 her anything more about how it came about?

17    A    No.

18    Q    Nothing at all?

19    A    (Shaking head no.)

20        MS. LU:  You need a verbal answer.

21    A    No.

Page 1629

1    Q    You didn't tell her that -- about the
2 nature of the suspensions and the ultimate outcome?

3    A    Well, she already knew -- she already knew
4 about that, so I didn't add anything to what she
5 already knew.

6    Q    Did you tell her that you were glad that
7 you had succeeded in this issue?

8    A    No.  It still pains me to this day.  I'm
9 terribly pained by it.

10    Q    Did you tell her that you had worked out a
11 plan for getting rid of -- I'm sorry -- for removing
12 Father Heffernan?

13    A    No.

14    Q    You didn't tell her that?

15    A    No.

16    Q    Did you have any general conversations
17 with Miss Rogler generally about God and religion?

18    A    I knew that -- yes.  I knew that she
19 wanted to be certified as a Greek Orthodox hospital
20 chaplain, and I put her in touch with a woman who is
21 certified -- she's in Denver -- and they met at a

Page 1630

1 conference in Brooklyn, Massachusetts last October.
2 So, I knew what her intention was, but I said,
3 "You've got to fill in the blank.  You've got to get
4 your theological education finished."  She still had
5 a year to go, and I recommended that she take that
6 route.

7    Q    Well, was there an occasion where she was
8 supposed to go to Boston?  Are you aware of that, a
9 meeting in Boston?

10    A    She did go to Boston.

11    Q    She did?  What was that for?

12    A    The Eastern Orthodox Church more than
13 Greek Orthodox -- the whole Eastern Orthodoxy --
14 they were looking at issues of healing within their
15 faith tradition.  It is a group called the Society
16 for Medicine, Religion and Psychology.

17    Q    Uh-huh.  And was she working at -- was she
18 on contract with NIH at that time?

19    A    She went on her own.  No, no, she was not
20 on contract.  She was still in Dayton, Ohio.

21    Q    Did you ever talk to Rogler about any

Page 1631

1 other employees of the Clinical Center, any of the
2 clergy specifically?

3    A    Not to my knowledge.

4    Q    Did you talk to Miss Rogler about Rabbi
5 Brenner?

6    A    Not to my knowledge.

7    Q    Well, what do you mean not to your
8 knowledge?  You mean it's possible you did?

9    A    Well, she'd seen the staff there.  And by
10 this time, he was involved in CPE over at Shady
11 Grove, so he was not there a lot of the time that
12 she was there.  He was doing 25 hours a week at
13 Shady Grove away from our hospital.

14    Q    Well, did you have conversations with her
15 about on call situations?

16    A    Of course, I got that call.  I was away.
17 And when that -- the death of the young man on the
18 12th of -- on the 9th of December, we talked about
19 that.

20    Q    Uh-huh.  What did you tell her in
21 connection with that when she called you up?

49 (Pages 1628 to 1631)

Page 1636

1 German soldier, so I have a lot of truck about how
2 people were treated during the Holocaust time. My
3 brother died defending our right to be here today.
4      Q    Did you tell Rogler that you plan to fire
5 anyone who testified at this hearing?
6      A    I absolutely did not. I'm offended that
7 that's brought up again. I did not. I'm not
8 punitive.
9      Q    Dr. Fitzgerald, you're wearing a collar
10 now. That's -- that's an indication of the
11 Methodist faith?
12      A    I bought it at a Methodist store.
13      Q    Clergyman?
14      A    Yes. Our clergy in public -- we're
15 encouraged when we're in public places to wear a
16 collar.
17      Q    You don't at work?
18      A    I do on Sunday.
19      Q    When you're at the Clinical Center?
20      A    I do on Sunday and at ceremonies.
21      Q    But on visiting patients at the Clinical

Page 1637

1 Center --
2      A    No, I don't.
3      Q    -- serving them, you don't wear a collar,
4 but you wear it for a hearing or --
5      A    I go to jails, I go to hospitals, go to
6 courts. I've done that for 40 years.
7      Q    Okay.
8      A    Over 40 years.
9      Q    Look with me, would you, please, at
10 exhibit ROI Exhibit 15.
11      MS. LU:    What page?
12      MR. KATOR:    15.
13      MS. LU:    15 what page?
14      MS. HARRIS:    Exhibit 15, Page 8. The
15 decision. March 12th decision.
16      Q    Do you have that, Dr. Fitzgerald?
17      A    I do.
18      Q    You do?
19      A    Yes.
20      Q    Okay. Now, this is the decision by Walter
21 Jones on the earlier decision -- on your proposal

Page 1638

1 for suspending Father Heffernan; is that right?
2      A    Yes, yes.
3      Q    Now, you're familiar with it, and there's
4 nothing in here that says anything that Father
5 Heffernan is supposed to do other than stay away
6 from work; is that right? You're not giving him an
7 order to do anything, it just says you're suspended?
8      A    Yes.
9      Q    Okay. And then if you look with me on
10 Exhibit 16, it's dated March 31, 2004, which is a
11 notice of proposed suspension.
12      A    Yes.
13      Q    You do have that?
14      A    Yes.
15      Q    Okay. You testified, I believe, that you
16 got back maybe on the 29th, is that right, from your
17 vacation?
18      A    Somewhere around the 25th, I think. The
19 15th through 25th.
20      Q    So, not having given Father Heffernan an
21 order of any kind in this decision of March 12th,

Page 1639

1 there is a notice of proposed suspension on
2 March 31st; is that right?
3      A    Yes. Now, which one of these paragraphs
4 do you have concern about so that I can follow you?
5      Q    Well, it's not a matter of concern.    I
6 just want to understand that you suspended -- or
7 Father Heffernan was suspended based on your
8 proposal on March 12th, and he was to take time off
9 out of work expected to return to work on
10 March 22nd?
11      A    Uh-huh.
12      Q    And on March 31 with nothing intervening,
13 with nothing intervening, he gets another notice of
14 proposed suspension; isn't that correct?
15      A    Yes.
16      Q    Now, did you ever call Miss Rogler in the
17 evening?
18      A    I called about -- well, she'd send
19 E-mails, and I don't sit down and type a lot, so --
20 she'd send an E-mail about something and I would
21 phone her if there were a need to call her about

Page 1640

1 scheduling of coverage.

2    Q    Well, the answer is yes then?

3    A    The answer is yes.

4    Q    Okay. Did you have occasion to call her

5 on a weekend?

6    A    I called her on a Sunday morning. She had

7 sent me two E-mails, and again, I was going in to

8 worship to -- to conduct a service. I called her at

9 8:30 to make some response to E-mail that we could

10 schedule appointment to meet the following week. I

11 remember that call at 8:30.

12    Q    So, you did call her? The answer is yes?

13    A    Yes, in response to her E-mails.

14    Q    Okay. Now, let me understand this. You

15 indicated that -- or you stated, testified that you

16 couldn't find a qualified Roman Catholic priest to

17 take over for Father Heffernan; is that correct?

18 You searched?

19    A    Yes.

20    Q    Is that your testimony? It was, as I

21 remember. You didn't find anybody as qualified as

Page 1641

1 Ashkar. Isn't that what you said?

2    A    Well, to be certified or to be making

3 satisfactory progress.

4    Q    Yeah. But the fact is that you gave

5 Ashkar CPE training at the Clinical Center. Why

6 couldn't you have taken a Catholic priest and given

7 him the same training at the Clinical Center?

8    A    The issue is choice. He chose to apply --

9    Q    No, no, no. Just answer me. Just answer.

10 You could have done that, could you not?

11    A    I could have done it based on their

12 choice.

13    Q    You could have had a Roman Catholic

14 chaplain hired who could then take, as the other

15 chaplains all did, CPE at the Clinical Center;

16 that's correct, is it not?

17    A    Yes.

18    Q    Now, you have a practice as a supervisor

19 of rating employees, their performance?

20    A    I'm required by --

21    Q    You're required to do so?

Page 1642

1    A    Yes.

2    Q    And you do so, do you not?

3    A    Yes.

4    Q    Okay. Now, I want to discuss with you the

5 2002 performance evaluation. And I gave you -- just

6 a moment. I'll give you the reference to that. I'm

7 trying to find the right one.

8         ADMINISTRATIVE JUDGE NORKEN: 21? Is that

9 what we're looking for? That's 2002-2003.

10        MS. LU: Exhibit 21.

11        MS. HARRIS: Agency exhibit?

12        ADMINISTRATIVE JUDGE NORKEN: No. ROI

13 Exhibit 21.

14        MS. LU: ROI. It's Page 1, correct? 1

15 through whatever?

16        MS. HARRIS: (Nodding head yes.)

17        (Witness reviews the document.)

18        BY MR. KATOR:

19    Q    All right. Dr. Fitzgerald, do you have

20 the employee performance enhancement program plan

21 before you for Henry Heffernan?

Page 1643

1    A    Yes.

2    Q    And it's for 2002; is that correct?

3    A    Yes.

4    Q    Performance period 2002.

5         Now, I notice when you look under "Plan

6 Development," the date is 2-28-0 -- it looks like a

7 2, but it was a 3, wasn't it, and you changed it to

8 2?

9    A    It was developed in '02 and the progress

10 review in '02 and final review in '03.

11    Q    But the fact is you never really gave

12 those reviews -- you never had a progress review

13 with Father Heffernan, did you?

14    A    There was a question of -- the answer is

15 it was given in a blanket -- when I set it up, I

16 said to all the chaplains we'll use the same plan as

17 the prior year.

18    Q    Let me say this: You did not -- my

19 question was the fact, is it not, that you did not

20 discuss with Father Heffernan his progress --

21 performance progress as stated here by your

Page 1660

1 authority. And many bishops in many orders, the
2 Maronite priest himself has -- he does his service
3 in the Armenian rite, the top one in Rome; so, in
4 other words, there's collegiality, there's variety.
5 There's no -- the central thing is that they respect
6 the authority of the bishop of Rome -- of the Pope.
7         ADMINISTRATIVE JUDGE NORKEN:  Well, the
8 Maronite Church is in communion with the Roman
9 Catholic Church; is that right?
10        THE WITNESS:  Yes.  And as a matter of
11 fact, their head is a cardinal of the Catholic
12 Church.  The head of the Maronite Church is also a
13 cardinal in the Roman Catholic Church.
14        ADMINISTRATIVE JUDGE NORKEN:  So that
15 someone with dual faculties like Father Ashkar was
16 empowered to give -- to do both the Maronite and the
17 Roman Catholic rite?
18        THE WITNESS:  That's right.  And one
19 further thing he was able to do, he does
20 confirmations for the Episcopal from the Catholic
21 bishop of Arlington, Virginia.

Page 1661

1         ADMINISTRATIVE JUDGE NORKEN:  For a period
2 of five years, he was given that option?
3         THE WITNESS:  But he was invited -- as a
4 matter of fact, the date of his death on the 9th of
5 December of 2005, when the death happened in NIH, he
6 was en route to confirm candidates of Catholic faith
7 in Arlington, Virginia.
8         ADMINISTRATIVE JUDGE NORKEN:  And Father
9 Heffernan had that dual faculties for a period of
10 five years; is that right?
11        MS. LU:  You mean Father Ashkar?
12        ADMINISTRATIVE JUDGE NORKEN:  Father
13 Ashkar, correct.
14        THE WITNESS:  Well, it's renewable.  It's
15 stated for five years, but he's been in the U.S.
16 probably almost two decades, and so it does get
17 renewed.
18        ADMINISTRATIVE JUDGE NORKEN:  But I need
19 to ask you, though, I asked you a question about
20 what Rogler said about Father Heffernan, and why did
21 you respond to me talking about her not wanting to

Page 1662

1 take Communion from a Roman Catholic priest?
2         THE WITNESS:  I offered it up because she
3 was positioning -- that was her own position, which
4 she volunteered.  I was not seeking any consultation
5 with her about the Catholic faith.  There's plenty
6 of experts I can go to that know about the Catholic
7 faith, so I didn't need -- I'd need no consultation
8 with a nonCatholic.
9         ADMINISTRATIVE JUDGE NORKEN:  Okay.  Is
10 there anything else you told Miss Rogler about
11 Father Heffernan?  Did you at least tell her that he
12 wasn't suspended, he was terminated?
13        THE WITNESS:  She did know.  Now, how she
14 knew it, I don't know, but she did know that he was
15 terminated.
16        ADMINISTRATIVE JUDGE NORKEN:  Well, what,
17 if anything, did she say that was appropriate --
18 what, if anything, did she say that caused you to
19 comment?
20        THE WITNESS:  I don't know.  I could have
21 said well, that's information and made no comment,

Page 1663

1 but she brought the information to me that she'd
2 heard in Dayton, Ohio.  And one approach, I could
3 have said that I have no comment.
4         ADMINISTRATIVE JUDGE NORKEN:  What you're
5 saying is you don't recollect what you said?
6         THE WITNESS:  Other than a priest had been
7 suspended at NIH.
8         ADMINISTRATIVE JUDGE NORKEN:  So, you
9 don't recall one way or another what you told her?
10        THE WITNESS:  No.
11        ADMINISTRATIVE JUDGE NORKEN:  Okay.
12        THE WITNESS:  She at one time had been a
13 Catholic herself.
14        MR. KATOR:  That's a nonresponsive answer.
15 Judge Norken, I move to strike it.
16        ADMINISTRATIVE JUDGE NORKEN:  That she was
17 a Catholic previously?  I don't care whether she was
18 a Catholic previously.  Denied.
19        MR. KATOR:  All right.
20        THE WITNESS:  She'd been a Methodist
21 previously, she'd been a Baptist previously.

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 1692

1 O'Brien to Father Heffernan.

2    Q    So you didn't even know Father O'Brien was

3 going to be absent sometimes?

4    A    That's correct.

5    Q    Okay.

6    A    And I -- yes.

7    Q    So you would find out afterwards that

8 Father O'Brien wasn't there?

9         MR. KATOR:  I'm going to object.

10        ADMINISTRATIVE JUDGE NORKEN:  Sustained.

11   Q    Now, what about the times when you knew

12 beforehand that Father O'Brien was going to be

13 absent?  What would you -- what was your practice?

14   A    The plan was in place that Father

15 Heffernan could locate a Catholic priest.  I mean,

16 he could hire somebody else to do the Saturday Mass.

17 I mean, that was an option.

18   Q    Dr. Fitzgerald, before Miss Rogler, I

19 guess, returned to the Clinical Center in

20 November 2005, about how many times did you have a

21 conversation with her?

Page 1693

1    A    I don't remember.

2    Q    Okay.  Well, was it a lot of times?

3    A    Could have been a half a dozen times that

4 she was calling from Dayton, Ohio, or I had reason

5 to respond to her.  Sometimes she'd send an E-mail

6 and I'd just pick up the phone and call.

7    Q    Okay.  And these conversations, what were

8 they about?

9    A    About the prospects of doing CPE and about

10 the prospects of being a contract chaplain.

11   Q    Okay.  Were any of these conversations

12 dealing with what she heard about Father Heffernan?

13   A    Not to my knowledge, no.

14   Q    Okay.  Now, I just wanted to clarify

15 something.  When did you tell or offer to Father

16 Heffernan that you would be willing to meet with his

17 Jesuit superior to talk about some issues?

18   A    It was in those mid-term evaluations.  I

19 believe it was in, like, July of 2002.

20   Q    Okay.  That's when you --

21   A    That's my best recollection.

Page 1694

1    Q    Now, in cross examination, Mr. Kator asked

2 you with regard to the notice of suspension -- the

3 two notices of suspension that you issued, that

4 there was no instruction in there for Father

5 Heffernan, and you had mentioned that there was a

6 standing instruction.  What was the standing

7 instruction?

8    A    To apply for and make successful progress

9 in CPE.

10        MS. LU:  I don't have any further

11 questions.

12        ADMINISTRATIVE JUDGE NORKEN:  Do you have

13 any recross?

14        MR. KATOR:  Yes.

15        ADMINISTRATIVE JUDGE NORKEN:  About how

16 long?

17        MR. KATOR:  Fifteen minutes.

18        ADMINISTRATIVE JUDGE NORKEN:  You may

19 examine.

20             RECROSS EXAMINATION

21        BY MR. KATOR:

Page 1695

1    Q    Dr. Fitzgerald, you were asked by Judge

2 Norken whether there was any conversation with

3 Miss Rogler about your unwillingness to hire a

4 Catholic priest.  Do you recall that question?

5    A    Yes, I recall the question.

6    Q    And the fact of the matter is you haven't

7 hired any Catholic priest, have you, since Father

8 Heffernan?  Roman Catholic?

9    A    No.  We didn't have a vacancy, no.

10   Q    You haven't?

11   A    We didn't have a vacancy.

12   Q    Well, you contracted with Rogler?

13   A    She's Eastern Greek Orthodox.  She's not

14 in the Catholic tradition.

15   Q    I understand.  I said you did not hire a

16 Roman Catholic or contract with a Roman Catholic

17 priest?

18   A    I did not.

19   Q    That's correct, is it not?

20   A    Yes.  I did not.

21   Q    And it's not your testimony that there's

**Arbitration (vol 5)**

Page 1716

1 not today, so you may go home.  And I remind you not
2 to discuss this case or your testimony in this case
3 with any other witness in the case until these
4 proceedings are ended.  Do you understand that?
5        THE WITNESS:  I do.
6        ADMINISTRATIVE JUDGE NORKEN:  Thank you
7 for your testimony, and you're excused.  Thank you,
8 sir.
9        THE WITNESS:  So, rebuttal, any time
10 frame?  Days, months?
11        ADMINISTRATIVE JUDGE NORKEN:  I mean,
12 hopefully -- I don't know how -- we're not going
13 very fast, but I hope by tomorrow.
14        THE WITNESS:  So, I should be available to
15 be called tomorrow?
16        ADMINISTRATIVE JUDGE NORKEN:  It's
17 possible.
18        THE WITNESS:  But do I stay in Bethesda or
19 come to Baltimore?
20        MS. LU:  Stay in Bethesda.
21        ADMINISTRATIVE JUDGE NORKEN:  Yes, stay in

Page 1717

1 Bethesda.  Thank you.
2        THE WITNESS:  Thank you.
3        MS. HARRIS:  Judge, can you instruct the
4 witness not to discuss his testimony?
5        ADMINISTRATIVE JUDGE NORKEN:  I've already
6 done that.
7        MS. HARRIS:  Oh.  You did?
8        ADMINISTRATIVE JUDGE NORKEN:  I just did.
9        MS. HARRIS:  I'm sorry.
10        ADMINISTRATIVE JUDGE NORKEN:  I did tell
11 you not to discuss this case with any other witness
12 until these proceedings are ended, right?
13        THE WITNESS:  Yes.  I've heard this three
14 times, so the message is to me.
15        ADMINISTRATIVE JUDGE NORKEN:  Okay.
16        THE WITNESS:  Yes, sir.
17        MS. HARRIS:  Thank you.  Sorry.
18        ADMINISTRATIVE JUDGE NORKEN:  Off the
19 record.
20        (Brief Recess.)
21        ADMINISTRATIVE JUDGE NORKEN:  Mr. Jones,

Page 1718

1 I'm David Norken.  I'm the Administrative Judge.  If
2 you would please raise your right hand.
3 WHEREUPON --
4              WALTER L. JONES,
5 a Witness, called for examination by counsel for the
6 Agency, and after having been first duly sworn by
7 the Administrative Judge, was examined and testified
8 as follows:
9        ADMINISTRATIVE JUDGE NORKEN:  About how
10 long for this witness?
11        MS. LU:  The rest of the time we're here
12 tonight, and so I would say total maybe like
13 three-and-a-half hours.
14        ADMINISTRATIVE JUDGE NORKEN:  Total?
15        MS. LU:  Yes.
16        ADMINISTRATIVE JUDGE NORKEN:  Okay.  We'll
17 try to go about an hour and 15 minutes.
18              DIRECT EXAMINATION
19        BY MS. LU:
20    Q    Mr. Jones, what is your position at the
21 Clinical Center?

Page 1719

1    A    I'm Deputy Director for Management and
2 Diversity.
3    Q    Okay.  And would you briefly describe your
4 duties.
5        MR. KATOR:  Miss Lu, would you please keep
6 your voice up.  I really can't hear very well.
7        MS. LU:  Okay.  I'm sorry.
8        MR. KATOR:  Thank you.
9    Q    Will you briefly describe your duties.
10    A    Sure.  I have multidepartmental
11 administrative responsibilities.  That includes
12 providing leadership to the Spiritual Ministry, the
13 Department of Social Work, and our Patient
14 Recruitment Department.
15    Q    And what?
16    A    Patient Recruitment.
17    Q    And what do you mean you have
18 administrative responsibilities for these
19 departments?
20    A    I work with the department heads who are
21 the lead managers for those respective areas and

71 (Pages 1716 to 1719)

Page 1752

1 not have to comply with the CPE requirement anymore?

2    A    No.   It just indicated that I was

3 rescinding that decision because of the technical

4 irregularities that are referenced here, the fact

5 that there wasn't a policy.

6    Q    So, even though you rescinded a two-day

7 suspension, Father Heffernan still had to comply

8 with the CPE requirement?

9    A    That's correct.

10    Q    Okay.  Now, I'm going to show you the

11 Report of Investigation Exhibit 17.  I believe it's

12 17G.  There's a copy.

13    A    Okay.

14    Q    Take a look at that document.

15       MS. HARRIS:  What page, Julie?

16       MS. LU:  It's 17G, so it would be --

17       MS. HARRIS:  It's a couple of pages.

18       MS. LU:  It starts on Page 10.

19    A    Okay.

20    Q    Okay.  Do you recognize this document?

21    A    Yes.

Page 1753

1    Q    Okay.  If you'd turn to Page 19 of the

2 document.

3    A    Okay.

4       MR. KATOR:  Did you say 19?

5       MS. LU:  Yeah, 19.

6       MR. KATOR:  Just a minute.

7    Q    Is that your signature?

8    A    Yes, it is.

9    Q    And what is the date that you had signed

10 this?

11    A    9-26-03.

12    Q    And what is this document that you signed?

13    A    This is essentially the policy -- well,

14 this is for the department.  It talks about the

15 overall -- how the Spiritual Ministry Department

16 will be organized.  And specifically, this talks

17 about towards the end of the document the -- how

18 performance appraisals will be reviewed and talks

19 about the training requirements and the competencies

20 that are required for the staff.

21    Q    And the training requirements, you're

Page 1754

1 referring to CPE?

2    A    That's correct.

3    Q    On this document on Page 19, there is a

4 signature for a David K. Henderson?

5    A    That's correct.

6    Q    Who is Mr. Henderson?

7    A    Dr. Henderson is my counterpart on the

8 clinical side of things where at this time we were

9 organized in terms of the management and operation

10 and the clinical areas, and David supervises the

11 clinical areas such as the OR, radiology, laboratory

12 services; but in that role, he reviews and maintains

13 the policy and procedure manual and helps the

14 organization prepare for the Joint Commission

15 survey.  So, his signature on this indicates that he

16 has reviewed this for format and content.

17    Q    So, does he sign off on all policies and

18 procedures of the Clinical Center?

19    A    Yes.

20    Q    Now, I'm going to show you a document

21 that's in the Report of Investigation at Exhibit 15,

Page 1755

1 Page 8.  I'll give you a copy.  Take a look at that

2 document.

3    A    Okay.

4    Q    Okay.  Do you recognize this document?

5    A    Yes.

6    Q    Okay.  What is it?

7    A    A decision to suspend for five days.

8    Q    Issued to Father Heffernan from you?

9    A    That's correct.

10    Q    And what is the basis for this five-day

11 suspension?

12    A    Failure to follow supervisory

13 instructions.

14    Q    And what were the supervisory instructions

15 that Father Heffernan failed to follow?

16    A    The training -- fulfilling or developing a

17 plan of action for the training -- CPE training.

18    Q    And why did you decide to uphold this

19 proposed five-day suspension?

20    A    Well, he had been given -- well, at that

21 point it was clear to me that we needed to commence

Page 1756

1 documentation.  No amount of counseling was

2 productive as it relates to resolving this issue,

3 and I just felt we had to move in this direction.

4       Q    Now, when you talk about the amount of

5 counseling, what are you referring to?

6       A    Well, as I said earlier, there had been

7 numerous discussions between Henry and myself.  He

8 had had numerous discussions with Ray Fitzgerald.

9 At this point, we had already met with the

10 Monsignor, and it just seemed to me we had no other

11 recourse.

12       Q    Okay.  Let me show you another document in

13 the Report of Investigation at Exhibit 15, Page 1.

14            MR. KATOR:  The same exhibit, Julie?

15            MS. LU:  Yes, Exhibit 15 except it's

16 Page 1.

17       Q    Take a look at this document.

18       A    Okay.

19       Q    Do you recognize this document?

20       A    Yes, I do.

21       Q    Okay.  What is this?

Page 1757

1       A    This is the notice of proposed suspension

2 dated January 21, 2004.

3       Q    Okay.  Is this to Father Heffernan?

4       A    Yes, it is.

5       Q    From Ray Fitzgerald?

6       A    That's correct.

7       Q    What is the basis for this?  Is this the

8 notice --

9       A    Well, this documents that the reason for

10 the proposed action is failure to follow supervisory

11 instructions.  And specifically, Ray references that

12 on June 11th, he gave Henry a memorandum which

13 talked about the standards of care for -- within the

14 faith community referencing from the -- I guess the

15 national Catholic chaplaincy organization, but also

16 documents on September 26th that new policies and

17 procedures that were signed off by Dr. Henderson and

18 myself were approved for use in the Clinical Center

19 and that in order to meet these requirements, that

20 he was going to need to complete 400 hours of

21 supervised accredited training.  So, it just

Page 1758

1 documents that.  And it states further that that

2 would leave three additional units of 400 hours each

3 for him to complete.  And, of course, it references

4 the fact that he's been working for four years with

5 the Clinical Center.

6       Q    Well, did you review this proposed

7 five-day suspension notice in making your decision

8 to suspend Father Heffernan for five days?

9       A    Uh-huh.

10       Q    I'm sorry.  You need to verbally answer.

11       A    Yes, yes.

12       Q    And did you feel that the penalty of five

13 days was appropriate for this charge?

14       A    Yes, I did.

15       Q    And why did you feel that the five-day

16 suspension was appropriate?

17       A    Well, it was consistent with the

18 guidelines that we had at NIH for something like

19 this, and I didn't feel that it was excessive.  And,

20 hopefully, it would give Henry the message that we

21 were serious about this and that, you know, his

Page 1759

1 failure to follow up now could result in further

2 action.

3       Q    Okay.  What guidelines are you referring

4 to?

5       A    Well, there are a table of penalties -- a

6 suggested table of penalties at NIH for corrective

7 actions.

8       Q    Let me show you a document which we're

9 going to have to I guess mark.  I don't -- it's not

10 in the book, so this would be A79, I believe.  No.

11 Agency Exhibit 80.

12            (Agency Deposition Exhibit Number 80 was

13 marked for identification.)

14            BY MS. LU:

15       Q    Take a look at that document, Mr. Jones.

16       A    Uh-huh.

17       Q    Do you recognize this document?

18       A    Yes, I do.

19       Q    Okay.  And what is this document?

20       A    It's the NIH Table of Penalties.

21       Q    Okay.  Is this the document you were

81 (Pages 1756 to 1759)

Page 1797

1 chaplain at NIH, you didn't believe you needed

2 to take any orders from him, correct?

3    A.    That's not true, ma'am.

4    Q.    That's not true?

5    A.    It's not true when you say -- you

6 phrase it that way.

7    Q.    Okay.  So you --

8    A.    And there was asked --

9    Q.    Is it true that Father Heffernan was

10 the Catholic chaplain at NIH?

11    A.    Yes, ma'am.

12    Q.    And is it true that you believed he

13 did not have any ecclesiastical authority over

14 you in your position at NIH?

15        MS. LU:  Objection.  Asked and

16 answered.

17        MS. HARRIS:  Well, I don't think he

18 has directly answered it, Judge.

19        ADMINISTRATIVE JUDGE NORKEN:  "Asked

20 and answered" is not an appropriate objection

21 on cross.

Page 1798

1        Overruled.

2        THE WITNESS:  Can you define the

3 word "ecclesiastical"?

4        BY MS. HARRIS:

5    Q.    In the hierarchy of the Church,

6 Father Heffernan did not have -- you believed

7 Father Heffernan did not have any religious

8 authority over you?

9    A.    I know that he was the Catholic

10 chaplain and I think I said it before, that I

11 tried to communicate with him on two or three

12 occasions regarding some patients.  And anyway,

13 I was ignored.  He was the main Catholic

14 chaplain.

15    Q.    And as the main Catholic chaplain,

16 isn't it true that you needed to follow his

17 directions regarding the delivery of services

18 to Catholic patients at NIH?

19    A.    Directly, no.

20    Q.    Because you believe that the one who

21 pays you, that's who you follow the orders?

Page 1799

1    A.    Yes, ma'am.

2    Q.    Regardless of Father Heffernan's

3 ecclesiastical position and authority in the

4 Church, correct?

5    A.    That has --

6    Q.    Okay.  I will move on.

7        MS. HARRIS:  The record will reflect

8 that the witness hasn't answered the question.

9        BY MS. HARRIS:

10    Q.    And you stated during your direct

11 examination that you don't look and see who

12 comes up to get communion on a general basis,

13 correct?

14    A.    Yes.

15    Q.    So you might have given

16 Dr. Fitzgerald communion at some point; is that

17 correct?

18    A.    When I say "I don't look," I don't

19 look.

20    Q.    So it's possible you might have

21 given him communion?

Page 1800

1    A.    I cannot answer yes or no to this

2 question, ma'am.

3    Q.    Well, is it possible?

4    A.    I don't know.

5    Q.    You don't know whether it's

6 possible?

7    A.    No, I don't.

8    Q.    Okay.  What is your status now at

9 NIH, your employment status?

10        MS. LU:  Objection.  Relevance.

11        MS. HARRIS:  This goes to bias,

12 Judge.

13        ADMINISTRATIVE JUDGE NORKEN:

14 Overruled.

15        THE WITNESS:  As of the 2nd of this

16 month, which is April, I was sent to training

17 and I was asked to be an employee of the

18 institution.

19        BY MS. HARRIS:

20    Q.    And what is your position -- well,

21 did you accept the position?

8 (Pages 1797 to 1800)

**Arbitration (vol 6)**

Page 1801

1    A.    It is up to them to accept it or to
2  refuse it.
3    Q.    Okay.  And what is the position to
4  be?  What's the title?
5    A.    As a Catholic chaplain.
6    Q.    Catholic chaplain.  So you are in a
7  position that -- you are going to be full-time
8  in this position?
9    A.    I think so.
10    Q.    And is it your understanding that
11 this is the position Father Heffernan formerly
12 filled -- excuse me, formerly held?
13    A.    I never saw the job description that
14 he had.
15    Q.    Okay.  But Father Heffernan was the
16 full-time Catholic chaplain previously,
17 correct?
18    A.    I think so.
19    Q.    And now you are going to be the
20 full-time Catholic chaplain, correct?
21    A.    Yes.

Page 1802

1    Q.    And you will be making more money
2  now as a full-time Catholic chaplain than you
3  did during your part-time contract work at NIH,
4  correct?
5    A.    No.
6    Q.    No?
7    A.    No.
8    Q.    What is your salary going to be?  Do
9  you know what grade it will be?
10    A.    I think it will be -- what do they
11 call it?  T-42.
12    Q.    Is it a GS-12?
13    A.    I don't know, ma'am.
14    Q.    You don't know?
15    A.    Once they said T-42.
16    Q.    D-42?
17    A.    T, like in the "Tom."
18    Q.    T-42.  Okay.
19           And how much were you making as a
20 contract chaplain?
21    A.    It depends how many hours I work,

Page 1803

1  ma'am.
2    Q.    Okay.  Recently you have been
3  working how many hours at NIH?
4    A.    Quite a few.
5    Q.    Forty?
6    A.    Could be 40.  It could be more.  It
7  could be 30.  It depends on the attendance.
8    Q.    When Father Heffernan was the
9  full-time Catholic chaplain, you were paid for
10 20 hours on call, correct?
11    A.    Yes.
12    Q.    And some additional days, one
13 additional day; is that correct?  You worked
14 one day at NIH?
15    A.    Yes.
16    Q.    So -- I'm sorry, 20 nights on call,
17 and then one day at NIH; is that right?
18    A.    Yes.
19    Q.    So now as a full-time Catholic
20 chaplain, you would be guaranteed 40 hours a
21 week, correct?

Page 1804

1    A.    That's true.
2         MS. HARRIS:  Nothing further.
3         ADMINISTRATIVE JUDGE NORKEN:  I have
4  no questions.
5         Ms. Lu, do you have any questions in
6  the scope of the complainant's questions?
7         MS. LU:  Yes.
8         ADMINISTRATIVE JUDGE NORKEN:  About
9  how long?
10        MS. LU:  Probably 15 minutes.
11        ADMINISTRATIVE JUDGE NORKEN:  You
12 may examine.
13           REDIRECT EXAMINATION
14        BY MS. LU:
15    Q.    Father Ashkar, in your cross you
16 were shown an excerpt from your deposition in
17 November 2004 and where you were asked about --
18 you said there never were any exchange of words
19 between you and Father Heffernan?
20    A.    Yes.
21    Q.    What did you mean by that?

9 (Pages 1801 to 1804)

## Arbitration (vol 6)

Page 1821

1 process?

2    A.    Well, first of all, making sure that

3 what I was proposing was appropriate.

4 Secondly, to make sure that it's the

5 appropriate format and consistent with the

6 guidelines that we use for suspensions.

7        MS. LU:    I would like to admit

8 Exhibit 58.

9        ADMINISTRATIVE JUDGE NORKEN:    Any

10 objections?

11       MR. KATOR:    No objection.

12       ADMINISTRATIVE JUDGE NORKEN:    It's

13 admitted.

14       BY MS. LU:

15    Q.    Mr. Jones, I am also going to next

16 show you what is in the report of investigation

17 at Exhibit 16, page 1.    Take a look at that.

18       Do you recognize this document?

19    A.    Yes, I do.

20    Q.    What is it?

21    A.    This is a notice of proposed

Page 1822

1 suspension for Henry Heffernan.

2    Q.    For how many days?

3    A.    For 14 days.

4    Q.    Were you the deciding official in

5 this proposed 14-day suspension?

6    A.    Yes, I am, or yes, I was.

7    Q.    Did you review this proposed notice

8 when you made your decision?

9    A.    Yes, I did.

10    Q.    Now, I'm going to direct your

11 attention to an exhibit in the report of

12 investigation at Exhibit 16, page 8.    Take a

13 look at that.

14    A.    Okay.

15    Q.    Do you recognize this document?

16    A.    Yes, I do.

17    Q.    What is it?

18    A.    This is the decision on the proposed

19 suspension for 14 days.

20    Q.    And in your decision letter, did you

21 uphold all three of the proposed charges?

Page 1823

1    A.    Hold on one second.

2        No.  I dismissed Charge 1.

3    Q.    What was Charge 1?

4    A.    Violation of recognized professional

5 standards.

6    Q.    And why did you dismiss this charge?

7    A.    As I recall, this was an issue

8 surrounding -- this was a patient care issue

9 where there wasn't clear documentation that --

10 in fact, that Henry had not provided the

11 response that he needed to provide communion to

12 the patient.  So there was some questions about

13 that and I decided not to uphold Charge 1.

14    Q.    And why did you decide to -- but you

15 upheld the other two charges?

16    A.    That's correct.

17    Q.    Why did you decide to uphold

18 Charge 2, defiance of authority?  Why did you

19 decide to uphold that charge?

20    A.    Okay.  This second charge dealt with

21 his coming in when we had a mass schedule.

Page 1824

1 Actually, there was -- this was his normal day

2 off and we had made provisions for the contract

3 chaplain to come in to cover for Father O'Brien

4 who was ill on that day.  And Henry informed

5 the contract chaplain, came in, caused some

6 confusion, and informed him not to conduct mass

7 that day.

8        We had previously talked to -- he

9 had been previously talked to, Henry had been,

10 about not giving direction to the contract

11 chaplains.  Not causing confusion in terms of

12 coverage.

13        Now, keep in mind the whole issue

14 with the contract chaplains was in response to

15 his initial some time ago concerns regarding

16 having to work seven days a week.  And so we

17 had put in place contract coverage to cover not

18 only his absences but any other absences that

19 would be needed for chaplains to cover for

20 Catholic chaplains.

21    Q.    And what happened on this particular

14 (Pages 1821 to 1824)

**Arbitration (vol 6)**

Page 1825

1 instance with the charge?

2    A.    In this particular instance, I guess
3 this was on Saturday, and he in fact told the
4 chaplain that was scheduled to come in to
5 leave.  And that was in direct opposition to
6 what Ray Fitzgerald indicated should happen
7 that day.

8    Q.    Now, how did you -- you were not
9 present at this Saturday mass, were you?

10    A.    No.

11    Q.    And Charge 3 is failure to follow
12 supervisory instructions to comply with
13 training requirements.  Why did you decide to
14 uphold that charge?

15    A.    Because he still at this point had
16 not provided a training plan to complete or to
17 start the CPE training, and I had no other
18 choice.

19    Q.    Back to a follow-up for the second
20 charge.  Who has the responsibility to make
21 sure that there is coverage if the -- if a

Page 1826

1 Catholic -- if the Catholic chaplain is not
2 available to do that Saturday mass?

3    A.    Well, ultimately it is the -- I hold
4 the department head, Ray Fitzgerald,
5 accountable for providing that coverage for not
6 only Catholic chaplains but for all chaplains.

7        He has the responsibility to manage
8 the budget.  He has responsibility to manage
9 personnel.  And he is the person that I hold
10 accountable to make sure we have the
11 appropriate coverage.

12        He is the person not only with the
13 contract but whenever we need any special
14 provisions for any type of coverage for any
15 type of faith group, he is the person that
16 coordinates that.

17    Q.    Did you feel that the proposed
18 penalty of 14 days was appropriate?

19    A.    Yes.

20    Q.    And why is that?

21    A.    Well, there seemed to be -- well,

Page 1827

1 first of all, it's consistent with the table of
2 penalties.  But secondly, this was just --
3 these two actions were, from my perspective,
4 just a further example of Henry defying
5 authority of the department head and refusing
6 to take direction as required.

7    Q.    If you would take a look in the blue
8 book 2 at Agency Exhibit 51.

9        Do you recognize this document?

10        Oh, 59.

11    A.    59?

12    Q.    Yes.

13    A.    Yes.

14    Q.    Do you recognize this document?

15    A.    Yes.

16    Q.    And what are these e-mail exchanges
17 about?

18    A.    Essentially it's confirming what we
19 just talked about, where I indicated that I
20 wanted to uphold Items 2 and 3, and for -- I am
21 instructing Gwen Platt in our employee

Page 1828

1 relations area to delete the first charge.

2    Q.    This is your decision for the 14-day
3 suspension?

4    A.    That's correct.

5        MS. LU:  I would like to admit this,
6 please.

7        ADMINISTRATIVE JUDGE NORKEN:  Any
8 objection?

9        MR. KATOR:  No objection.

10        ADMINISTRATIVE JUDGE NORKEN:  It's
11 admitted.

12    BY MS. LU:

13    Q.    Mr. Jones, I am going to show you an
14 exhibit in the report of investigation at
15 Exhibit 15, page 5.  Take a look at that
16 document.

17    A.    Yes.  Okay.

18    Q.    Do you recognize this document?

19    A.    Yes, I do.

20    Q.    What is this document?

21    A.    This is Henry Heffernan's response

15 (Pages 1825 to 1828)

Page 1865

1    A.    In a broad sense.

2    Q.    What is your understanding of that?

3    A.    I think there is an interpretation

4  that generic chaplaincy is an expectation --

5  well, that regardless of faith group, if a

6  chaplain were to encounter a patient that is in

7  some type of distress that they would try to

8  provide them with some words of comfort and

9  then point them in the appropriate direction if

10  that person was not of their faith group to --

11  if they wanted to talk to a chaplain of their

12  faith group.

13    Q.    Well, what about multifaith

14  chaplaincy?  Are you familiar with what

15  multifaith chaplaincy is?

16    A.    Well, it's the same -- from my

17  interpretation would be the same type of

18  interaction, that regardless of faith group

19  that a chaplain would, if they observed the

20  patient in distress or even not in distress.

21         For example, .if a chaplain were to

Page 1866

1  walk into an outpatient clinic, I would expect

2  that they would greet and say hello and talk to

3  any patient that might be in the room.  And if

4  during the course of that interaction it

5  appears that that person would like to talk to

6  a chaplain of their faith, that that person

7  would say "Well, I will contact rabbi so-and-so

8  to talk with you."

9         So perhaps in that realm that is how

10  I would interpret multifaith chaplaincy.

11    Q.    Do you know whether that is -- is

12  that how you would want the chaplains of

13  spiritual ministry department to work or do you

14  know if that's what they do?

15    A.    That is how they work and that's

16  what they do.  In fact, I was talking just the

17  other day to the Catholic chaplain and he was

18  sharing with me how he interacts with all of

19  them.

20         Many of our patients, many of our

21  staff and often just in passing provides words

Page 1867

1  of encouragement.  If someone seems to have a

2  frown on their face will say something that

3  will kind of brighten their day and move on.

4         ADMINISTRATIVE JUDGE NORKEN:  You

5  mean Father Ashkar?

6         THE WITNESS:  Yes.

7         BY MS. LU:

8    Q.    Now, would it be your expectation,

9  though, that a Roman Catholic priest would

10  provide a sacrament such as communion and

11  reconciliation to a non-Catholic person?

12         MR. KATOR:  Leading question.

13  Objection.

14         ADMINISTRATIVE JUDGE NORKEN:  What

15  was the -- I'm sorry, can you step out.

16         (The witness was excused from the

17  hearing room.)

18         ADMINISTRATIVE JUDGE NORKEN:  Can

19  the court reporter repeat the question?

20         (The record was read as requested.)

21         MR. KATOR:  I have to think about

Page 1868

1  that one.

2         ADMINISTRATIVE JUDGE NORKEN:  That

3  is kind of leading.

4         Sustained.  I mean some leeway has

5  to be given for changing subjects, but that

6  gets right into it.

7         MS. LU:  Then I will rephrase it.

8         ADMINISTRATIVE JUDGE NORKEN:  The

9  objection to the last question was sustained.

10         Ms. Lu will rephrase the question.

11         BY MS. LU:

12    Q.    How do you expect a chaplain, a

13  Roman Catholic chaplain to service patients

14  that are non-Catholic?

15    A.    I would expect that -- I will use

16  the example of a waiting room.  That if a Roman

17  Catholic chaplain were to walk into a waiting

18  room that if he should see any patient that

19  appears to be under some type of emotional

20  distress, that he would encounter that patient

21  and try to provide some words of encouragement.

**Arbitration (vol 6)**

Page 1869

1        And then, since the example you are
2 giving, the patient is not Roman Catholic, then
3 ask if the patient would like to speak to a
4 chaplain of their faith group.
5        And if the person indicated they
6 would, then he would contact that appropriate
7 chaplain to facilitate that.  If the person
8 decided that he didn't want to talk to anyone,
9 then that's fine.
10     Q.    And that is what your expectation
11 would be in that situation?
12     A.    Yes.
13     Q.    Mr. Jones, do you know Edar Rogler?
14     A.    Yes.
15     Q.    Who is she?
16     A.    She was a contractor that worked
17 briefly at the Clinical Center.
18     Q.    Is she still a contract chaplain at
19 the Clinical Center?
20     A.    No, she is not.
21     Q.    Do you know about when she was

Page 1870

1 working at the Clinical Center?
2     A.    I think from approximately sometime
3 early November until the end of December.
4        ADMINISTRATIVE JUDGE NORKEN:  Last
5 year?
6        THE WITNESS:  Yes.  2005.
7        BY MS. LU:
8     Q.    Do you know why she is no longer at
9 the Clinical Center?
10     A.    Yes, I do.  In fact, to a great
11 degree I was the person that facilitated
12 terminating her contract.
13        Around the --
14     Q.    Do you know when her contract was
15 terminated, the dates?
16     A.    Well, I informed her that we were
17 terminating her contract sometime just before
18 Christmas, around the 22nd, 23rd of December.
19 Sometime around that time frame.  And --
20     Q.    Did you have a meeting to tell her
21 this?

Page 1871

1     A.    Yes.
2     Q.    And was there anybody else at the
3 meeting?
4     A.    Ray Fitzgerald was at the meeting.
5     Q.    And what did you tell Ms. Rogler at
6 this meeting?
7     A.    At the meeting -- initially -- well,
8 what I informed her at the meeting was that I
9 received feedback from the -- our pain and
10 palliative care department that they were
11 uncomfortable how they observed her interacting
12 with patients and in fact, didn't want her to
13 interact with patients.
14        Once I was informed of that, and
15 this was by the leadership of that department,
16 I informed her that we are going to terminate
17 her contract because when we contract for
18 contract services for the chaplain, it is my
19 expectation they can provide a full scope of
20 services to our various departments.
21        And certainly in the area of pain

Page 1872

1 and palliative care, which is similar to
2 hospice, it would not be unusual for a patient
3 utilizing that service to want to have
4 interactions with a chaplain.
5     Q.    And what was Ms. Rogler's response
6 in this meeting when you told her about her
7 contract?
8     A.    Of course she was disappointed and
9 it was really interesting.  Once I informed her
10 that I was terminating her contract, she
11 indicated she was going to contact Mr. Kator to
12 either engage his services or to somehow -- she
13 made it very clear to me that she was going to
14 contact Mr. Kator.
15     Q.    What was your response to that
16 comment?
17     A.    I said she could contact whoever she
18 would like.
19     Q.    Did you -- at that meeting where you
20 terminated her contract, did you also offer her
21 a severance package?

26 (Pages 1869 to 1872)

Page 1873

1    A.    Yes.  Perhaps because it was during

2  the holiday time, it was Christmas, but I felt

3  that it would not be --

4         MR. KATOR:  Objection.  This is

5  irrelevant.  It has nothing to do

6  with severance.

7         ADMINISTRATIVE JUDGE NORKEN:  I

8  don't think it hurts anything.

9         Overruled.

10        THE WITNESS:  I'm sorry.

11        BY MS. LU:

12    Q.    Go ahead.  You can finish.  The

13  offer of the severance package.

14    A.    I recognized that this was happening

15  very quickly to her, and it seemed appropriate

16  to me to provide kind of a cushion, a small

17  transition.  So I authorized I believe it was

18  another two weeks of payment in lieu of the

19  fact that I was terminating her contract that

20  day.

21    Q.    The day of the meeting?

Page 1874

1    A.    The day of the meeting.

2    Q.    Did you ever say at that meeting

3  where her contract was terminated that "let

4  bygones be bygones"?

5    A.    I don't use that particular

6  terminology, no.

7         ADMINISTRATIVE JUDGE NORKEN:  Did

8  anyone say it at the meeting?

9         THE WITNESS:  No.  That's the first

10  I heard that.

11        BY MS. LU:

12    Q.    Did Ms. Rogler say anything else to

13  you at that meeting?

14    A.    No.  Once I informed her of the

15  feedback that I received from pain and

16  palliative care and the fact that I was

17  terminating her contract, no.

18         As I said, the only response I

19  recall was her referring to the fact that she

20  was going to contact Mr. Kator.

21    Q.    Did she use Mr. Kator's name?

Page 1875

1    A.    Yes.

2    Q.    Do you know whether Ms. Rogler

3  received a termination letter?

4    A.    She would have received a letter

5  from our procurement area terminating the

6  contract.

7    Q.    And does this termination letter

8  come out of your office?

9    A.    No.  That would come out of the

10  procurement because it's really a contractual

11  activity.

12    Q.    If you take a look at the agency

13  exhibit book, Exhibit 44, do you recognize this

14  document, Mr. Jones --

15    A.    Yes.

16    Q.    -- Exhibit 44?

17    A.    Yes.

18    Q.    What is this document?

19    A.    This is the notice of termination.

20  This is the formal notice of termination issued

21  by our procurement office.

Page 1876

1    Q.    And this is terminating who?

2    A.    Terminating Edar Rogler.

3    Q.    Okay.  Her contract?

4    A.    Yes.

5         MS. LU:  I would like to admit this,

6  please.

7         ADMINISTRATIVE JUDGE NORKEN:  Any

8  objection?

9         MR. KATOR:  No objection.

10        ADMINISTRATIVE JUDGE NORKEN:

11  Admitted.

12        BY MS. LU:

13    Q.    Did you have any other meetings with

14  Ms. Rogler prior or before this meeting where

15  you terminated her contract?

16    A.    Yes.  It may have been in fact the

17  day before.  What had happened, I -- earlier

18  that week I was out and when I returned I

19  received an e-mail from Maureen Gormley, our

20  chief operating officer.

21         And evidently Ms. Rogler had sent

27 (Pages 1873 to 1876)

Page 1877

1  her an e-mail sharing some concerns that she
2  had regarding Ray Fitzgerald and management
3  issues within the department. And
4  Ms. Gormley's response to her with a copy to me
5  was that you should discuss these issues with
6  Walter Jones, deputy director who overseas that
7  particular area.
8          So since a day or two had elapsed
9  from her initially sending that e-mail, I
10  decided to call Ms. Rogler -- I may have
11  e-mailed or may have called but I contacted
12  her -- had her contacted right away because I
13  wanted to hear the nature of her concerns.
14          So she came by the office and shared
15  with me several things. One, she conveyed to
16  me her concern. What happened, Ms. Rogler was
17  on duty the day that we had a tragic accident
18  at the hospital.
19          She -- we had a patient commit
20  suicide from our mental health unit and after
21  that event we asked -- she asked to go to

Page 1878

1  the unit as a chaplain to speak with the other
2  patients or also the staff.
3          When she -- I guess after doing that
4  she contacted Ray Fitzgerald because Ray was on
5  the West Coast attending a meeting. And he
6  initially chastised her because she had not
7  been oriented to go to the mental health unit
8  but he was unaware of the emergency that had
9  taken place.
10          And I guess when it happened she may
11  have at that particular time been the only
12  chaplain in the house. So certainly it was a
13  dramatic event for her and for all of the
14  staff.
15          But she -- so she complained about
16  that interaction about Ray. And then she made
17  some reference to her discomfort with having
18  CPE training under his supervision, and so we
19  talked about that.
20          And she made some kind of reference
21  to -- it was really kind of unusual. She made

Page 1879

1  some reference to, she said "I don't want him
2  involved with my training because there are
3  issues in there regarding sexual preference,"
4  or something like that. And so I was a bit
5  baffled by that.
6          I said "Well, I tell you what, Ray
7  is due back tomorrow." And she shared with me
8  she was scheduled to have a meeting with him
9  first thing in the morning, and I had no idea
10  what that meeting was going to be about but I
11  wanted to have a chance to talk to him before
12  him talking to her. And if in fact she had
13  concerns about training, I was going to
14  instruct him to make provisions for her to have
15  training elsewhere.
16          So that was the nature of the
17  conversation, but it was -- as a result of
18  that, the question surfaced regarding the --
19  she made some question about the application
20  process for CPE training and that there was
21  something on there that asked about sexual

Page 1880

1  preference or something to do with sex.
2          And which I found unusual. I had
3  never seen the application form, but I was
4  determined to see if I could find one after
5  that because it seemed a bit unusual to me.
6          So the next day when Ray returned,
7  and he had no idea why I wanted to meet with
8  him, I asked him to share with me a copy of the
9  form. When he came to my office, he had a copy
10  of the form.
11          And as it turns out, it was just a
12  generic form with name, perhaps age. I don't
13  even know if age is on there and denomination
14  and just very generic types of questions.
15  Nothing at all to do with any type of sexual
16  preference or anything.
17  Q.    Did Ms. Rogler mention any types of
18  conversation she had had with Dr. Fitzgerald
19  where he allegedly made some discriminatory
20  statements?
21  A.    No.

28 (Pages 1877 to 1880)

**Arbitration (vol 6)**

1 contract being terminated or his employment

2 being terminated?

3    A.    I was aware of his employment being

4 terminated when it was determined that he was

5 unwilling to go through his CPE training or,

6 more importantly, to interact with other than

7 Catholic patients.

8    Q.    He wanted to serve Catholic patients

9 an he was being asked to do a generic

10 chaplaincy, right?

11    A.    Well, yes.

12    Q.    Is that right?

13    A.    That's -- well, as we talked about

14 earlier, there was expectation that with the

15 resources that we had that if any person

16 functioning in a chaplaincy capacity observes a

17 patient or a family member of a patience that

18 could benefit from words of a patient that

19 appears that they could benefit from words of

20 encouragement from a person of a spiritual

21 background, that regardless of their faith

1 appropriate faith group will follow up.

2    Q.    Okay.  But that happens so that

3 Father Heffernan could go visit Methodist in

4 the clinic staff and talk to them on a daily

5 basis and then say only those that need a

6 Methodist chaplain should have one, and he

7 would refer them to a -- or ask the Methodist

8 chaplain to come; is that the idea?

9    A.    That's the idea.

10    Q.    That's it.  So this would happen on

11 the floors, it wouldn't happen just in the --

12    A.    It would happen anywhere.  If one of

13 our chaplains, regardless of faith group,

14 encountered someone.

15    Q.    Let me make sure that you understand

16 my question.  It's not that they're walking

17 through the halls.  I'm saying that they are

18 serving a particular ward or floor on the

19 clinic -- wait, let me finish -- on the clinic

20 center.  They are Methodist and they go in and

21 they talk to the patients and that's their job,

1 group, that someone would have a brief

2 encounter with them and say, would you like to

3 talk a chaplain.

4    Q.    Mr. Jones, I'm going to -- I'm

5 limited in time by Judge Norken, so I do want

6 to move on as quickly as I can and finish it.

7 So I want to ask questions to the extent that

8 you give me yes or no answers.  I would really

9 appreciate that.

10        Let me go on as fast as I can.

11        The multi-faith or generic

12 chaplaincy that you described is, you know, hey

13 fellow, you ought to see a -- I will get the

14 Catholic chaplain for you, is that the notion?

15    A.    Well, that's your interpretation.

16    Q.    You just see people and say, you

17 know, you offer whatever help you can and then

18 you say --

19    A.    If that --

20    Q.    Is that the notion?

21    A.    Yes, with the notion that the

1 talk a Roman Catholic, they talk to a

2 Methodist, they talk to Jews, they talk to them

3 all, and then they make a determination then

4 whether someone else is needed of a faith of

5 that individual; isn't that what you're saying?

6    A.    No.  What I'm suggesting is, using

7 the example you just gave, you walk into a

8 patient room and what happens all the chaplains

9 have a listing of patients for their faith

10 group.  So if you walk into a room and they're

11 two patients in the room, you go in to visit

12 your Catholic patient, and you counsel your

13 patient, you do whatever, you know, you do

14 appropriately, and then you -- on your way out

15 you notice that the patient in the bed right

16 next to that person appears to be in need of

17 some spiritual counseling.  If -- rather than

18 just having a priest walk out and ignore them,

19 you say, hello, sir, how are you doing.

20    Q.    Of course not.  Mr. Jones, you would

21 do the same thing and I would do the same thing

59 (Pages 2001 to 2004)

Page 2025

1    ADMINISTRATIVE JUDGE NORKEN:  Which
2 ones did you take off?
3    MR. KATOR:  Took off the outpatient
4 because they don't serve Catholic patients.
5
6    ADMINISTRATIVE JUDGE NORKEN:  57
7 hours, is that what you're saying.
8    MR. KATOR:  Well, that one is
9 reduced even more.
10    MS. HARRIS:  This is on 33.
11    MR. KATOR:  33.  It was reduced to
12 the 25 hours if the hourly figures are correct.
13    THE WITNESS:  So that's still 35
14 percent, though, of the resources of the
15 staffing.
16    MS. HARRIS:  There is no question
17 pending.
18 BY MR. KATOR:
19    Q.    Mr. Jones, you met -- you know Ms.
20 Rogler and you indicated that you had a meeting
21 with her.  Now, prior to that meeting that you

Page 2026

1 had with her you had discussed this matter, of
2 course, with Dr. Fitzgerald?
3    A.    I had two meetings with her.
4    Q.    I'm sorry?
5    A.    I had two meetings with Ms. Rogler.
6    Q.    Two meetings?
7    A.    Yes.
8    Q.    Okay.
9    A.    The first one in which she informed
10 me of her concerns, and then the second meeting
11 is when I met with her and Dr. Fitzgerald
12 jointly.
13    Q.    Okay.  But you knew about this
14 matter of her concerns?
15    A.    As a result of the first meeting,
16 yes.
17    Q.    And that first meeting came about
18 because of the memo she sent to Maureen
19 Gormley?
20    A.    That's correct.
21    Q.    On the December 18?

Page 2027

1    A.    That's correct.
2    Q.    So you indicated that you, I
3 believe, on your direct examination said that
4 she had some -- that you released her or fired
5 her or terminated her because of an indication
6 from the pain center?
7    A.    Right.
8    Q.    Is that right?
9    A.    That's correct.
10    Q.    That's not really right.  The real
11 truth is, is it not, Mr. Jones, the reason that
12 you and -- the reason that you decided to let
13 her go was because she had made these
14 complaints?
15    A.    Not at all.
16    Q.    To Maureen Gormley.  Those
17 complaints didn't make any difference to you,
18 did they?
19    A.    Not a all.
20    Q.    Not a bit.  Not a bit.
21    A.    The --

Page 2028

1    Q.    It was only the one -- let me
2 finish.  There was only one complaint from the
3 pain center and you decided, by golly, we're
4 going to fire this woman?
5    A.    Essentially, yes.
6    Q.    That's it.  Okay.
7    Was she assigned to the pain center,
8 do you know?
9    A.    She has --
10    Q.    Was she assigned there?
11    A.    She must have had some involvement
12 there because they were very adamant about
13 that.
14    Q.    Who did you talk to?
15    A.    The director of the pain center.
16    Q.    Who is that?
17    A.    Dr. Ann Berger and the number two
18 person there, a Dr. Jacque Bowles.
19    Q.    And this is one time they said, boy,
20 she's not doing good there?
21    A.    Well, it was more than that.  I

65 (Pages 2025 to 2028)

Page 2029

1 mean, it was one encounter, but they were very

2 descriptive in their reservations of ever

3 having her have any interactions with those

4 patients at all.

5    Q.    Before December 18, before December

6 18, what had Fitzgerald told you about Ms.

7 Rogler?

8    A.    I didn't know anything about Ms.

9 Rogler.

10    Q.    You found out about her on the 18th;

11 is that right?

12    A.    When I received her e-mail was the

13 first that I even knew Ms. Rogler was

14 affiliated with our organization.

15    Q.    So this bad vibe from the pain

16 center came up after she went to Miss Gormley;

17 is that right?

18    A.    It was after her e-mail.

19    Q.    After her e-mail?

20    A.    Right.

21    Q.    Okay.

Page 2030

1            Do you recall there was a suicide?

2    A.    Yes.

3    Q.    At the Clinical Center?

4    A.    Uh-huh.

5    Q.    And Dr. Fitzgerald wasn't there?

6        MS. LU:    Object to this line of

7 questioning about suicide.

8        MR. KATOR:    I'm sorry?

9        MS. LU:    I object to this suicide

10 incident.

11        MR. KATOR:    You want more

12 specific --

13        MS. LU:    It is a collateral matter

14 and we weren't allowed to go into it and now

15 you are asking questions about it.

16        MS. HARRIS:    You raised it on

17 direct.

18        MS. LU:    I didn't ask him about that

19 on direct.

20        MS. HARRIS:    Yes, you did.

21        MR. KATOR:    I've got the notes on it

Page 2031

1 that you did.

2        MS. HARRIS:    He testified about it

3 so the door is open.

4

5        ADMINISTRATIVE JUDGE NORKEN:    He did

6 testify.

7        MS. LU:    As what, background

8 information to set up his answer?

9        ADMINISTRATIVE JUDGE NORKEN:    That's

10 correct.    It was only background information.

11        MR. KATOR:    Well, all we're going to

12 ask him about is background information.

13        MS. LU:    Well, he already --

14        MR. KATOR:    I just wanted to set the

15 stage.    The reason I wanted to put the time

16 frame at the time of that incident.

17        ADMINISTRATIVE JUDGE NORKEN:    Okay.

18 BY MR. KATOR:

19    Q.    And at that time Ms. Rogler did have

20 some conversations with Dr. Fitzgerald; is that

21 right?    She had a telephone call?

Page 2032

1    A.    It's my understanding they had a

2 telephone conversation.

3    Q.    Where was Ashkar at that time?

4    A.    It was my understanding that he may

5 have --

6        ADMINISTRATIVE JUDGE NORKEN:    This

7 is getting into the substance.    I will sustain.

8        MR. KATOR:    Well, let me move on

9 then.

10 BY MR. KATOR:

11    Q.    Let me just ask you one question

12 with respect to that.    Ms. Rogler did act on

13 that issue; is that right?

14        MS. LU:    Objection to that question.

15 Same basis.

16

17        ADMINISTRATIVE JUDGE NORKEN:    I'm

18 sorry.    What was the question again.

19        MR. KATOR:    I'm going to drop the

20 question.    I withdraw it.

21 BY MR. KATOR:

66 (Pages 2029 to 2032)

**Arbitration (vol 6)**

Page 2033

1    Q.    At the meeting when you terminated
2  the contract --

3    A.    Yes.

4    Q.    -- for Ms. Rogler you said that she
5  was going to go see a lawyer; is that right?

6    A.    No.  She said very specifically she
7  was going to contact you.

8    Q.    Uh-huh.  Did she tell you she was
9  going to contact Ms. Lu, too?

10   A.    No.

11   Q.    She didn't say if she needed to --
12 she tried to contact the lawyers?

13   A.    No.  At that point she said she was
14 going to.

15   Q.    She hadn't?

16   A.    That's right.

17   Q.    Is that it?

18   A.    She was going to contact
19 specifically you.

20   Q.    And she said it why, because you
21 were terminating her? .

Page 2034

1    A.    That was the connection that I made.

2    Q.    And that was then -- that played
3  into your action in removing her then?

4    A.    No.  That was after I informed her
5  that she was being removed.

6    Q.    Let me ask you just one more
7  question, I think.

8          MR. KATOR:  Mr. Norken, let me ask
9  the witness one more.

10         BY MR. KATOR:

11   Q.    You talked about the issue of
12 control in the organization; is that right?

13   A.    (Witness nodding head.)

14   Q.    And you would agree, do you not,
15 that the employees are entitled and, in fact,
16 have an obligation to follow first their
17 personnel position descriptions?  They work
18 under a position description; is that right?

19   A.    We all have position descriptions.

20   Q.    Yes.  Yes.

21   A.    And we all have supervisors.

Page 2035

1    Q.    Yeah.  And they should follow the
2  position description?

3    A.    And they should follow the direction
4  of their supervisor.

5    Q.    Right.  Now, if a supervisor says,
6  no, don't do what it says in the job.
7  description he's got a right to do that; is
8  that right?

9    A.    The supervisor -- the buck stops
10 with the supervisor as long as it's not illegal
11 or immoral.

12   Q.    Right.

13         Did you know that Dr. Fitzgerald was
14 telling Dr. -- Father Heffernan that he could
15 not follow a job description?

16   A.    I did not know that.

17   Q.    Did you know that he --

18         ADMINISTRATIVE JUDGE NORKEN:  You
19 have one minute left.

20         MR. KATOR:  Let me just finish this
21 one question.

Page 2036

1          BY MR. KATOR:

2    Q.    That in terms of control, in terms
3  of control which you spoke about, that
4  Father Heffernan was not permitted to control
5  the provision of Catholic services or services
6  to Catholic patients, chaplain services to
7  Catholic patients as his job description
8  provided, as he had authority to do that, do
9  you know that Fitzgerald didn't let him do
10 that?

11   A.    I don't know that.  But I know that
12 ultimately Fitzgerald had responsibility for
13 the entire department.

14   Q.    I understand.  No further questions.

15         ADMINISTRATIVE JUDGE NORKEN:  When
16 did you say you needed to leave.

17         THE WITNESS:  Quarter to 5:00.

18         ADMINISTRATIVE JUDGE NORKEN:  Okay.
19 Let me do my questions.

20         MS. LU:  Can we take a two-minute
21 break, then?

67 (Pages 2033 to 2036)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


**EDAR ROGLER**                                    :
Plaintiff *pro se*


**v.**                                              :

**WILLIAM BIGLOW,** *et al*                    CASE NO.  1:07-cv-02308(RMC)

_____oOo_____


**EXHIBIT "2"**

# DC BAR

*Service • Integrity • Leadership*

▶ **For Lawyers**

▶ **For the Public**

▶ **Inside the Bar**



## Search Results

Search again.

Records matching your search criteria: 1

1. **Hillary J Fitilis**
   National Institutes of Health
   10 Center Dr
   Building 10 CRC
   Rm 6-3523
   Bethesda MD 20892-1504

   Email: **hfitilis@cc.nih.gov**
   Phone: 301-496-8315
   Fax: 301-915-0709

   Membership Status: Active
   Disciplinary history: No
   Date of admission: July 9, 1999

   [ Save contact ]

**AVIS.** DC Bar Members Save 10% Plus A Free Weekend Day! **DCBAR**

The District of Columbia Bar | 1250 H Street NW, sixth floor | Washington DC 20005-5937 | 202-737-4700 | **Directions/Pa**
©2008 District of Columbia Bar. **Restrictions on Use** All rights reserved. **Privacy Policy** | **Disclaimer** | **Author guideline**

www.dcbar.org

Exhibit "2"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


**EDAR ROGLER**                                      **:**
Plaintiff *pro se*


**v.**                                                      **:**

**WILLIAM BIGLOW,** *et al*                    **CASE NO.  1:07-cv-02308(RMC)**

_____**oOo**_____


**EXHIBIT "3"**

Henry Heffernan,
Petitioner,

v.

Mike Leavitt,

Secretary,

Department of Health and Human Services,
Agency.

Petition No. 03A60015

MSPB No. DC-0752-04-0756-I-1

DECISION

INTRODUCTION

On October 27, 2005, petitioner filed a timely petition with the Equal Employment Opportunity Commission asking for review of a Final Order issued by the Merit Systems Protection Board (MSPB) concerning his claim of discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq.

BACKGROUND

Petitioner, a Chaplain, GS-0060-12, at the agency's Spiritual Ministry Department, Warren G. Magnusson Clinical Center at the National Institutes of Health in Bethesda, Maryland, alleged that he was discriminated against on the bases of religion (Catholic) and reprisal (prior Title VII activity) when, on July 30, 2004, he was removed from his position. The agency's removal decision based its action on the charges of: (1) failure to document patient visits; (2) failure to comply with training requirements; and (3) failure to follow supervisory instructions.

The matter went before a MSPB Administrative Judge (MSPB AJ). During a pre-hearing conference, petitioner's attorney sought permission to present evidence at hearing of purported incidents of disparate treatment of petitioner by agency management that was allegedly based on his religion and/or prior protected activity. This evidence was proffered in support of petitioner's claim that the agency's stated reasons for the removal decision were pretext for discrimination. The MSPB AJ ruled this pretext evidence as inadmissible, reasoning that it would only be relevant after petitioner made out a prima facie case of discrimination. The MSPB AJ concluded that because she did not believe there was evidence of similarly situated individuals who were treated differently with regard to the removal action, petitioner could not make a prima facie case of discrimination. As such, the MSPB AJ concluded that since no prima facie case could be made, the proffered pretext evidence was inadmissible at hearing.

Following the hearing, the MSPB AJ issued an initial decision on January 24, 2005, in which she found that there was insufficient evidence to uphold the first specification (failure to document patient visits) advanced by the agency for the removal. However, the MSPB AJ upheld the second two specifications and found that, even without the first specification, they were sufficient to sustain the removal decision. As to petitioner's claim of discrimination based on religion, the MSPB AJ found that he failed to

Exhibit "3"

establish a prima facie case of discrimination because he could not show
that there were similarly situated comparators. As to petitioner's claim
of reprisal, the MSPB AJ determined that petitioner did not show any nexus
between the protected activity and the removal action.

Petitioner filed a petition for review with the Board.   On September 26,
2005, the Board issued its Final Order denying the petition.   Petitioner
filed the instant petition challenging the decision of the Board.

### ANALYSIS AND FINDINGS

EEOC regulations provide that the Commission has jurisdiction over mixed
case appeals on which the MSPB has issued a decision that makes
determinations on allegations of discrimination. 29 C.F.R. § 1614.303 et
seq. The Commission must determine whether the decision of the MSPB with
respect to the allegation of discrimination constitutes a correct
interpretation of any applicable law, rule, regulation or policy directive,
and is supported by the evidence in the record as a whole.   29 C.F.R. §
1614.305(c). After considering petitioner's contentions and thoroughly
reviewing the record, the Commission finds that the case is not in posture
for a decision.

Establishing a Prima Facie Inference of Discrimination

The MSPB AJ ruled that evidence offered by petitioner to prove pretext was
inadmissible because she did not believe that petitioner could establish a
prima facie case of discrimination because he did not proffer any
comparators who were similarly situated with regard to the removal action.
In the transcript of the pre-hearing conference at 12-13, the MSPB AJ
discussed her ruling in the following exchange:

JUDGE:  Comparison employees are people in the same work unit charged
with the   same three things who were treated less harshly, and there are
no such employees.

ATTORNEY FOR PETITIONER:  We intend to present [evidence of ] Rabbi
[name],   who engaged in the same type of conduct as the-

JUDGE:  But not all three, things. Correct?

. . .

JUDGE:  And, of course, first of all, he [the Rabbi] wasn't
disciplined at all for any of this.  Right?

. . .

ATTORNEY FOR PETITIONER:  He wasn't.  That's the point.

JUDGE:   --he's not a comparison employee.

The MSPB AJ concluded that because petitioner could provide no comparator
evidence, as she defined it, he could not establish a prima facie case of
discrimination.

The Commission finds that the MSPB AJ erred in several respects in her
analysis of petitioner's prima facie burden in this case.   First, she
incorrectly determined that the only way petitioner could establish a prima
facie case of discrimination was through comparator evidence.   In general,
disparate treatment claims are examined under the three-part analysis first

enunciated in McDonnell Douglas Corporation v. Green, 411 U.S.  792  (1973).
For petitioner to prevail, he must first establish a  prima  facie  case  of
discrimination by presenting facts that,  if  unexplained,  reasonably  give
rise  to  an  inference  of  discrimination,   i.e.,  that  a   prohibited
consideration was a factor in  the  adverse  employment  action.   McDonnell
Douglas, 411 U.S. at 802;  Furnco Construction Corp.  v.  Waters,  438  U.S.
567 (1978).    The precise requirements of  a  prima  facie  case  can  vary
depending on the context and were "never intended to be  rigid,  mechanized,
or ritualistic."  Furnco, 438 U.S. at 576.  It  is  not  necessary  for  the
petitioner to rely strictly on comparative evidence in  order  to  establish
an inference of discriminatory  motivation  necessary  to  support  a  prima
facie case.  O'Connor v. Consolidated Coin Caterers Corp.,  116  S.Ct.  1307
(1996); Enforcement Guidance on  O'Connor  v.  Consolidated  Coin  Caterers
Corp., EEOC Notice No.  915.002, n.4 (September  18,  1996);  Carson  v.
Bethlehem Steel Corp., 82 F.3d 157 (7th Cir. 1996).    This  is  particularly
true when an employee occupies a somewhat unique position like  the  one  at
issue where there are few, if any, potential comparators.  Therefore,  while
comparator evidence is one method of establishing an  initial  inference  of
discrimination, it is not the only way.

In applying this flexible standard, we find that petitioner established  his
prima facie case of discrimination based  on  religion  and/or  retaliation.
Petitioner may establish a prima facie case of discrimination based  on  his
religion by demonstrating: 1) that he is a member of a protected  group;  2)
that he was subjected to an adverse employment action;  3)  and  that  there
appears to be a connection between  his  protected  group  and  the  adverse
action.

In the case at hand, the evidence of record  clearly  establishes  that  the
central point of contention between petitioner and  agency  management  that
led to the events at issue was what  petitioner  perceived  as  incongruence
between  the  practices  and  teachings  of  his  Catholic  faith  and   the
practices, including the concept of "generic chaplaincy," advocated by  his
supervisor, a Methodist minister.    Petitioner argued that  beginning  in
1999, he had repeatedly expressed his  belief  that  the  Clinical  Center's
Catholic patients were unfairly shortchanged based on management's  actions.
 He noted, for example, that under the "generic chaplaincy" concept, a  non-
Catholic clergy member could minister to Catholic patients.    Petitioner
asserted that it was his belief that, according to the tenets of  the  Roman
Catholic church, this type of  chaplaincy  would  not  constitute  adequate
spiritual care for Roman Catholic patients, and the evidence shows  that  he
raised this issue frequently with his supervisor.

Petitioner asserted that his supervisor, in an attempt to advance the multi-
faith generic chaplaincy concept  at  the  Clinical  Center,  had  required
petitioner, despite his 40 years as a priest and ten years at  the  Clinical
Center, to take "entry-level" pastoral care training.  One  of  the  reasons
provided for the removal action by his supervisor was  petitioner's  failure
to fully comply with these  training  requirements.    Petitioner  apparently
argued to his supervisor that  the  training  was  unnecessary  because  the
Archdioceses of Washington had already certified him as fully  qualified  to
perform  Catholic  rituals  and  provide  spiritual  guidance  to   Catholic
patients.  In addition, petitioner argued  that  the  training  requirement,
which would have  necessitated  petitioner  being  away  from  the  Clinical
Center, further reduced the  time  he  was  able  to  minister  to  Catholic
patients, who he believed were already under-served.  As a result  of  these
conflicts, petitioner was issued a fourteen-day suspension and  the  removal
action at hand for failure to comply with the  training  requirements.
During his fourteen-day suspension, his supervisor  directed  petitioner  to
turn in his office key.  His failure to do so was used as the basis  of  the

third charge in the removal action.  Therefore, based  on the  totality  of
the evidence of record, we find that  petitioner  has  established  a  prima
facie inference of discrimination based on religion.

Moreover, we note that petitioner did attempt to introduce  some  comparator
evidence, at least on the training issue, by offering to prove that a  rabbi
under the same supervisor was treated more favorably than petitioner.   The
MSPB AJ, however, discounted this proffer of evidence because the rabbi  was
not subjected to disciplinary action at all and was  not  charged  with  the
exact same three charges as petitioner.  With regard to the rabbi not  being
charged with any disciplinary action, we agree  with  petitioner's  argument
that this very  lack  of  discipline  would  be  highly  probable  of
discriminatory disparate treatment if he could establish  that  he  and  the
rabbi were similarly situated.   The  MSPB  AJ,  however,  did  not  afford
petitioner the opportunity to provide that proof.   In addition,  to  be
similarly situated, a comparator does not have to be charged with the  exact
same three charges.  Petitioner can  attack  each  charge  individually  as
discriminatory even  if  he  has  different  evidence,  including  different
comparators, to support his claims.

Petitioner also alleged that  he  was  subjected  to  unlawful  retaliation.
Specifically, in a reprisal claim, and in accordance with  the  burdens  set
forth in McDonnell  Douglas,  Hochstadt  v.   Worcester  Foundation  for
Experimental Biology, 425 F. Supp. 318, 324 (D. Mass.), aff'd, 545 F.2d  222
(1st Cir. 1976), and Coffman v. Department of Veteran Affairs, EEOC  Request
No. 05960473 (November 20, 1997), a petitioner may establish a  prima  facie
case of reprisal by showing that: (1) he or  she  engaged  in  a  protected
activity; (2) the agency  was  aware  of  the  protected  activity;  (3)
subsequently, he or she was subjected to adverse treatment  by  the  agency;
and (4) a nexus exists  between  the  protected  activity  and  the  adverse
treatment. Whitmire  v.   Department  of  the  Air  Force,  EEOC  Appeal  No.
01A00340 (September 25, 2000).

The record is clear that petitioner engaged in protected activity of  which
his supervisor was keenly aware.  Petitioner sought EEO counseling on  both
the May 2004  suspension  and  an  earlier  January  2004  suspension.    In
addition,  as  petitioner  indicated,  since  1999,  he  has  continuously
expressed to his supervisor and  others  the  belief  that  many  management
decisions have negatively affected those of the Catholic faith.  The  record
shows that as recently as December 2003, petitioner expressed  his  concerns
that Catholic patients were being short-changed at the Clinical Center to  a
survey team from the  Joint  Commission  on  Accreditation  of  Healthcare
Organizations (JCAHO), and immediately afterwards (January 2004) received  a
5-day suspension from his  supervisor  for  failure  to  follow  supervisory
instructions by saying Mass during his scheduled days off despite  contrary
supervisory instruction. The record  shows  that  in  his  response  to  the
proposed 5-day  suspension,  petitioner  wrote  that  he  had  not  followed
supervisory instructions in this matter because they "infringe  on  the
religious liberty of U.S. citizens, and.[are] imposed to demean  and  punish
subordinates for  disagreements  on  religious  doctrine  and  practice."
Therefore, the  record  is  clear  that  petitioner  engaged  in  protected
activity by both opposing what he perceived to be  unlawful  discriminatory
employment practices and by participating in the EEO process by seeking  EEO
counseling.  The record also establishes that  his  supervisor  was  acutely
aware  of  petitioner's  oppositional  activities  as  well  as  his  EEO
counseling. Petitioner was issued the proposed Notice of Removal on June  7,
2004, and the final decision to remove petitioner was  issued  on  July  28,
2004.  Factoring in, among other things,  the  proximity  in  time  between
petitioner's protected activity and the proposed removal, we find  that  the
evidence of record is sufficient to establish an inference that there was  a

nexus between those protected activities and the removal action sufficient to establish a prima facie case of unlawful retaliation.

Pretext Evidence Admissibility

Since the Commission finds that petitioner established his prima facie case of discrimination based on religion and his protected EEO activity and the record shows that the agency articulated legitimate, non-discriminatory reasons for its actions, the final burden shifts to petitioner to show that the agency's proffered reasons were pretext for discrimination. Petitioner argues that the MSPB AJ erred in finding that evidence he sought to introduce to establish pretext was inadmissible. We agree. Petitioner should have been provided the opportunity to persuade the fact finder, by a preponderance of the evidence, that the agency acted on the basis of a prohibited reason. In particular, since the MSPB AJ only upheld two of the three justifications for the removal action, petitioner should have been allowed to present evidence that those two reasons were pretextual. For example, petitioner sought to show that a rabbi at the Clinical Center, under the same supervisor, was allowed more latitude and granted more exceptions from the training requirements than he was. Petitioner also sought to introduce as background evidence other examples of disparate treatment that he asserted were relevant to establishing his supervisor's discriminatory animus towards him. As such, we find that a remand for the taking of additional evidence on the issue of pretext on both the religious discrimination and reprisal claims is warranted.

CONCLUSION

Based upon a thorough review of the record, and pursuant to 29 C.F.R. § 1614.305(d), it is the decision of the Commission to refer the matter back to the Board for the taking of additional evidence regarding pretext. Upon completion, the Board, without issuing a decision, shall forward the supplemental record to the Commission for review and a decision on the merits.

PETITIONER'S RIGHT TO FILE A CIVIL ACTION (X0900)

The Commission has referred your case back to the Merit Systems Protection Board so that it can take additional evidence. Upon receipt of that evidence, the Commission will issue a decision on the merits of your case. You may have the right to file a civil action in an appropriate United States District Court after one hundred and eighty (180) calendar days from the date on which you filed your Petition for Review with the Commission, even if there has been no decision by the Commission on the merits of your case. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). The grant or denial of the request is

within the sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:


_____
Carlton M. Hadden, Director
Office of Federal Operations

February 21, 2006


_____
Date