## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                              :
**Plaintiff** *pro se,*

**v.**                                       :

**WILLIAM BIGLOW,** *et al*                  **C.A. No.  1:07-cv-02308(RMC)**
**Defendants.**                              :

...oOo...

## PLAINTIFF'S MOTION FOR JUDICIAL NOTICE IN SUPPORT FOR PLAINTIFF'S MOTION TO TRANSFER AND ALL OTHER MOTIONS AND/OR RESPONSES PENDING PART TWO
### [FRE 201]

Plaintiff *pro se*, Edar Rogler, moves for the Court to take judicial notice of the Defendants'

MOTION FOR EXTENSION OF TIME filed in the civil action entitled *Rogler v. Biglow, et al,*

WMN-07-1675, Defendants' RESPONSE TO PLAINTIFF'S MOTION TO MAL PROS

WITHOUT PREJUDICE, *Id.*, and the Plaintiff's MOTION TO MAL PROS WITHOUT

PREJUDICE, *Id.* and the transcript of the testimony of Edar Rogler in the Equal Employment

Opportunity Commission ("EEOC") administrative hearing in the matter of *Rev. Henry Heffernan v.*

*Michael O. Leavitt,* EEOC case no. 120-2005-00226x for the Plaintiff's motion to transfer the instant

case to the United States District Court for the District of Maryland (Paper no. 27) and all other

motions and/or responses pending for the Court's decisions and orders in all outstanding matters.

The Court has the power and authority to take judicial notice of said proceedings pursuant to Federal

Rules of Evidence, Rule 201 and other authorities cited.  See *Concillio De Salud Integral De Loiza,*

*Inc. v. U.S. D.H.H.S.*, 538 F.Supp.2d 139, ---, 2008 U.S. Dist. LEXIS 18576, *14 (D.D.C.

2008)(citing to  *Gustave-Schmidt v. Choa,* 226 F.Supp. 191, 196 (D.D.C. 2002).

**RECEIVED**

1

This motion is made in connection with the Plaintiff's motion to transfer and her future response in opposition to Defendants' motion to dismiss that is currently due on May 14th, 2008[1] and any other matters that will be decided. On the Plaintiff's motion for transfer and to be filed opposition to Defendants' motion to dismiss the Court may take judicial notice of the public record of federal administrative hearings. *Covad Comms. Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C.Cir. 2005). In regards to the Defendants' motion to dismiss the Court has authority to take judicial notice without converting the proceeding to a summary judgment motion. The Court can take judicial notice of documents outside of the complaint that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(d).

1. Plaintiff moves for the Court to take judicial notice of the Defendants' MOTION FOR EXTENSION OF TIME filed in the civil action entitled *Rogler v. Biglow, et al*, WMN-07-1675.

Plaintiff moves for the Court to take judicial notice of the Defendants' MOTION FOR EXTENSION OF TIME filed in the civil action entitled *Rogler v. Biglow, et al*, WMN-07-1675 (Paper no. 10 in said action), a true and accurate copy is attached hereto as Exhibit "1". In particular the Plaintiff wishes to draw the Court's attention to two matters. First this is one of two filings by the Defendants in this matter. Second at paragraph 7 the Defendants note that preserves arguments on service of process over the Defendants.

2. Plaintiff moves for the Court to take judicial notice of the filed in the Plaintiff's MOTION TO MAL PROS WITHOUT PREJUDICE, civil action entitled *Rogler v. Biglow, et al*, WMN-07-1675.

---

[1] Plaintiff has served her motion to enlarge her time to respond to Defs' mtn to dismiss, but it has not been entered into the record in the instant matter.

Plaintiff moves for the Court to take judicial notice of the filed in the Plaintiff's <u>MOTION</u> <u>TO MAL PROS WITHOUT PREJUDICE</u>, civil action entitled *Rogler v. Biglow, et al*, WMN-07-1675 (Paper no. 14 in said action), a true and accurate copy is attached hereto as Plaintiff's Exhibit "2". Plaintiff wishes to draw the Court's attention to the fact that the Defendants were represented by AUSA Allen Loucks and other AUSA(s). AUSA Loucks is an extremely competent attorney and an expert in federal law. Additionally at paragraph 4 the Plaintiff admits that she did not serve the United States Attorney General and/or Attorney with the complaint. Third in paragraph 6 Plaintiff does not envision any prejudice to the Defendants.

3. <u>Plaintiff moves for the Court to take judicial notice of the counting of the days between June 26, 2007 and October 24, 2007 as being 120 days.</u>

Duration calculation results

From and including: **Tuesday, June 26, 2007**
To, but **not** including : **Wednesday, October 24, 2007**
It is 120 days from the start date to the end date, but not including the end date

4. <u>Plaintiff moves for the Court to take judicial notice of the Defendants' RESPONSE TO PLAINTIFF'S MOTION TO MAL PROS WITHOUT PREJUDICE filed in the civil action entitled *Rogler v. Biglow, et al*, WMN-07-1675.</u>

Plaintiff moves for the Court to take judicial notice of the Defendants' <u>RESPONSE TO</u> <u>PLAINTIFF'S MOTION TO MAL PROS WITHOUT PREJUDICE</u> filed in the civil action entitled *Rogler v. Biglow, et al*, WMN-07-1675 (Paper no. 15 in said action), a true and accurate copy is attached hereto as Exhibit "3". Plaintiff wishes to draw the Court's attention to the fact that Defendants had "no objection to Plaintiff' Motion to dismiss this action voluntarily and without prejudice" and that Defendants reserves no rights.

5. <u>Plaintiff moves for the Court to take judicial notice of the counting of the days between December 21, 2007 and April 19, 2008 as being 120 days.</u>

**Duration calculation results**

From and including: **Friday, December 21, 2007**
To, but **not** including : **Saturday, April 19, 2008**
It is **120 days** from the start date to the end date, but not including the end date
Or 3 months, 29 days excluding the end date

6. Plaintiff moves for the Court to take judicial notice of transcript of Edar Rogler in the Equal Employment Opportunity Commission ("EEOC") administrative hearing in the matter of *Rev. Henry Heffernan v. Michael O. Leavitt*, EEOC case no. 120-2005-00226x.

Plaintiff moves for the Court to take judicial notice of transcript of the testimony of Edar Rogler in the Equal Employment Opportunity Commission ("EEOC") administrative hearing in the matter of *Rev. Henry Heffernan v. Michael O. Leavitt*, EEOC case no. 120-2005-00226x.  A true and accurate copy of said transcript is attached hereto as Exhibit "4".  See *Marshall County Health Care Auth. v. Shalala,* 300 U.S. App. D.C. 263, 988 F.2d 1221, 1222 (D.C. Cir. 1993).

WHEREFORE the Plaintiff respectfully moves for the Court to take judicial notice as stated.

Respectfully submitted by:

DATED: May 10, 2008

EDAR ROGLER, Plaintiff *pro se*
915 Boucher Avenue
Annapolis, Maryland  21403
(410) 280-9270
edar_rogler@yahoo.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2008 I mailed postage, pre-paid the above motion to AUSA Judith A. Kidwell, 555 Fourth Street, N.W. – Civil Division, Room E4905, Washington, District of Columbia  20530.

EDAR ROGLER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                                    :
**Plaintiff *pro se***

**v.**                                              :

**WILLIAM BIGLOW,** *et al*              **CASE NO.  1:07-cv-02308(RMC)**

_____oOo_____

**EXHIBIT "1"**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDAR ROGLER,                              :

      *Plaintiff,*                         :

      v.                                  :      Civil No. WMN-07-1675

WILLIAM BIGLOW, <u>et al.</u>,              :

      *Defendants.*                       :
                            :

...o0o...

## <u>MOTION FOR EXTENSION OF TIME</u>

Now come the defendants, by the undersigned counsel, and move the Court for an extension of time in which to move, answer or otherwise respond to the complaint up through and including October 26, 2007.

In support whereof, the defendant states:

1. The complaint in this case was filed on June 26, 2007.

2. Summonses for the defendants issued from the Court on August 23, 2007.

3. Returns of service were filed on September 5 for several of the defendants. Service on these defendants purports to have been made on August 26-27. The docket purports to show that the time for at least some of the defendants to answer is September 26, 2007. The docket also purports that the time for other defendants to answer is September 27.

4. Federal officers and employees sued in their individual capacity for acts occurring in connection with the performance of their duties on behalf of the United

Exhibit "1"

States are granted 60 days in which to answer or otherwise respond to the Complaint.
Fe  Rule Civ. Pro 12(a)(3)(B).

'. The earliest that any of the defendants needs to respond, according to the application fo Rule 12(a)(3)(B) is October 26, 2007.

6. Undersigned counsel has not communicated this request to the pro se plaintiff and is unable to represent to the Court what position the plaintiff may take as regards this request. As far as undersigned counsel can determine, however, no unfair prejudice to the plaintiff would attend the granting of this request.

7. Undersigned counsel for the defendants notes that in filing this motion for extension of time on behalf of all defendants, the defense intends to preserve arguments related to the manner by which service of process was accomplished. While the defense is cautiously optimistic at this early stage of evaluation of the complaint that a dispositive motion to dismiss will lie on the merits of the complaint, the defense does not hereby waive any Rule 12 motion that might arise from the manner by which service was purportedly accomplished.

WHEREFORE the defendants respectfully request that the Court extend the time for any motion, answer or other response to the complaint up through and including October 26, 2007.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:_____/s/_____
Allen F. Loucks
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

## Certificate of Service

I certify that on September 25, 2007 I caused a copy of the foregoing motion for extension of time to be mailed, first class, postage prepaid to the pro se plaintiff Edar Rogler, 915 Boucher Ave., Annapolis, Maryland 21403.

_____/S/_____
Allen F. Loucks
Assistant United States Attorney

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


**EDAR ROGLER**                              :
**Plaintiff** *pro se*


**v.**                                       :

**WILLIAM BIGLOW,** *et al*              **CASE NO.  1:07-cv-02308(RMC)**

_____oOo_____


**EXHIBIT "2"**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

EDAR ROGLER,                                )
                                            )
      Plaintiff,                      )
                                            )
v.                                          )          Civil No. WMN-07-1675
                                            )
WILLIAM BIGLOW, et al.,                     )
                                            )
      Defendants.                     )
                                            )
_____)_____

## MOTION TO MAL PROS WITHOUT PREJUDICE

Now comes the plaintiff, Edar Rogler *pro se*, and move the Court to mal pros the instant complaint without prejudice, for the following reasons:

1. The defendants have not answered the complaint and have an extension of time up to and including October 26, 2007.

2. Plaintiff has communicated by fax to Attorney Allen Loucks to obtain his position on the instant motion and will inform the Court when or if she receives a response.

3. Plaintiff has not served all the defendants with their respective summonses.

4. Plaintiff anticipates that the United States government will intervene on behalf of the defendants and then ask for a dismissal based upon the grounds that plaintiff has not served the United States with notice of her claim.

5. The Statutes of Limitations have not expired.

6. As far as plaintiff can determine, the defendants will not be prejudiced by the granting of the instant motion.

Exhibit "2"

1

7. Therefore plaintiff wishes to mal pros without prejudice the instant complaint and
   to afford her the opportunity to serve the United States with notice of her claim.

October 21, 2007

Respectfully submitted,

By: _____

Edar Rogler, Plaintiff
915 Boucher Avenue
Annapolis, Maryland  21403
(443)852-6555

Certificate of Service

To be served by the Clerk's Office.

_____
Edar Rogler

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA


**EDAR ROGLER**                                    :
**Plaintiff** *pro se*


**v.**                                             :

**WILLIAM BIGLOW,** *et al*                CASE NO.  1:07-cv-02308(RMC)

_____oOo_____


**EXHIBIT "3"**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDAR ROGLER,                          :

    *Plaintiff,*                     :

v.                                    :   **Civil No. WMN-07-1675**

WILLIAM BIGLOW, <u>et</u> <u>al.</u>,              :

    *Defendants.*                   :
                         :
**...o0o...**

## <u>DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION</u>
## <u>TO MAL PROS WITHOUT PREJUDICE</u>

Now come the defendants, by undersigned counsel, and state that they have no objection to Plaintiff's Motion to dismiss this action voluntarily and without prejudice.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:_____/s/_____
Roann Nichols
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

Exhibit "3"

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                               :
**Plaintiff** *pro se*


**v.**                                        :

**WILLIAM BIGLOW,** *et al*            **CASE NO.  1:07-cv-02308(RMC)**

_____oOo_____


**EXHIBIT "4"**

Page 1064

1        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

2 HENRY G. HEFFERNAN,        *   EEOC CASE NO.

3            Complainant,    *   120-2005-00226X

4 vs.                        *

5 U.S. DEPARTMENT OF HEALTH  *   AGENCY CASE NO.

6 AND HUMAN SERVICES,        *   CC-EEO-2004-0004

7 NATIONAL INSTITUTES OF     *

8 HEALTH,                    *   VOLUME IV

9            Agency.         *   Pages 1064 - 1438

10

11

12                 Baltimore, Maryland

13               Tuesday, January 31, 2006

14

15 The ARBITRATION in this matter began at 9:53 a.m.

16 pursuant to notice.

17

18 BEFORE: DAVID NORKEN, ADMINISTRATIVE JUDGE

19

20 Reported by:  Carla J. Briggs, RPR, CRR, RMR

21 Job No. 171928


                Exhibit "4"

Arbitration

Page 1333

1 physician or a nurse, we were called back. If I
2 choose to extend my working days, comp time is
3 not -- I don't get comp time, but if I choose to
4 extend my working day, if we're called back. And
5 again, it's around a time management issue.
6     Q   Okay. So these were all -- the issues in
7 these memos that you had seen, they were ongoing
8 issues that Father Heffernan had raised before with
9 you?
10    A   In some form or another.
11    Q   In some form or another.
12        Were these issues also ones that you and
13 Father Heffernan were trying to discuss during the
14 first ombudsman process?
15        MR. KATOR: Leading, Your Honor. Leading
16 questions --
17        ADMINISTRATIVE JUDGE NORKEN: Sustained.
18        MR. KATOR: -- all over the place.
19    Q   Did you discuss these issues with the
20 ombudsman at any point in time?
21    A   If Father Heffernan brought them up, they

Page 1334

1 were discussed.
2     Q   Okay. Just one minute, but --
3         ADMINISTRATIVE JUDGE NORKEN: Well, you
4 have a minute and 10 seconds.
5         (Brief pause.)
6         MS. LU: Okay. I have no other questions.
7         ADMINISTRATIVE JUDGE NORKEN: All right.
8 Dr. Fitzgerald, we're going to have you stand down
9 for a while and have Miss Rogler testify.
10        Is she here in person?
11        MR. KATOR: Yes.
12        ADMINISTRATIVE JUDGE NORKEN: So we will
13 continue with you after her testimony. Thank you.
14        MS. HARRIS: Would you just instruct the
15 witness?
16        ADMINISTRATIVE JUDGE NORKEN: Yes. You
17 should not discuss this case or your testimony in
18 this case with any other witness in this case until
19 these proceedings are ended. In fact, you should
20 not discuss it with anyone at this point in time
21 since you're in the middle of your testimony.

Page 1335

1         THE WITNESS: And I'm to wait and then
2 come back today?
3         ADMINISTRATIVE JUDGE NORKEN: We'll see
4 what we can do today. Thank you.
5         MS. LU: You can wait in the other room,
6 Dr. Fitzgerald.
7         ADMINISTRATIVE JUDGE NORKEN: Off the
8 record.
9         (Brief Recess.)
10        ADMINISTRATIVE JUDGE NORKEN: Miss Rogler,
11 I'm David Norken. I'm the Administrative Judge.
12 Would you please raise your right hand and state
13 your full name for the record.
14        THE WITNESS: Edgar Rogler.
15        ADMINISTRATIVE JUDGE NORKEN: I'm going to
16 ask you to spell your name.
17        THE WITNESS: E-D-A-R is my first name,
18 Edar. My last name is R-O-G-L-E-R.
19 WHEREUPON --
20            EDAR ROGLER,
21 a Witness, called for examination by counsel for the

Page 1336

1 Complainant, and after having been first duly sworn
2 by the Administrative Judge, was examined and
3 testified as follows:
4         ADMINISTRATIVE JUDGE NORKEN: How long for
5 this witness?
6         MS. HARRIS: An hour.
7         ADMINISTRATIVE JUDGE NORKEN: Off the
8 record.
9         (Brief Recess.)
10        ADMINISTRATIVE JUDGE NORKEN: You may
11 examine.
12        MS. HARRIS: Thank you.
13        DIRECT EXAMINATION
14        BY MS. HARRIS:
15    Q   Miss Rogler, would you state your
16 religious affiliation or preference.
17    A   Greek Orthodox.
18    Q   And specifically, can you tell us what is
19 Greek Orthodox as compared -- and I don't want you
20 to go into the treatise -- as compared to Roman
21 Catholic? Are they different, the same?

69 (Pages 1333 to 1336)

**Arbitration**

Page 1337

1    A   Two thousand years ago, there was one
2  Christian Church for a thousand years and then in
3  about 1050-something or other, the Roman Catholic
4  Church and the Eastern Orthodox Church split and
5  equally discommunicated each other and have not come
6  back together since.
7    Q   And do you have a position within the
8  Greek Orthodox Church?
9    A   I'm a lay chaplain.
10   Q   And what does that mean in your
11 (inaudible)?
12   A   Actually, I'm a lay associate chaplain.
13 I'm not a full chaplain.
14   Q   Okay.
15   A   What it means is I have two years of
16 theological training and at least one CPE unit.
17 I've been endorsed by the bishop in charge of
18 chaplaincy for the United States. I'm the second
19 woman in the United States to be recommended to
20 become any sort of chaplain, the first associate
21 chaplain in the Greek Orthodox Church, and it means

Page 1338

1  I'm eligible to file for my certification with the
2  Association of Professional Chaplains. And after
3  getting that eligibility, then after doing one year
4  of actual chaplaincy, I'd be qualified to become
5  fully certified as an associate chaplain.
6    Q   Okay. And you said you're a lay associate
7  chaplain?
8    A   Correct.
9    Q   In the Greek Orthodox Church, women cannot
10 be clergy; is that correct?
11   A   That is correct.
12   Q   Okay. You said you had two years of
13 theological training; is that correct?
14   A   Yes.
15   Q   And where did you do your training?
16   A   At Saint Paul's School of Theology in
17 Kansas City, Missouri.
18   Q   When did you do that training?
19   A   I did it in 1990 to about 2000. Something
20 like -- 1998 to about 2000. Sorry.
21   Q   And did you receive a degree?

Page 1339

1    A   No, because I have decided to transfer
2  into a Master's of divinity program, and if I got a
3  Master's of theological studies program, I couldn't
4  transfer the credits, so I did not get a degree.
5    Q   Prior to engaging in your theological
6  studies, what was your -- what's your background?
7    A   I'm an attorney licensed to practice law
8  in the state of California. My license is currently
9  inactive. I'm also licensed to practice law in the
10 state of Texas, and that license is currently
11 inactive.
12       ADMINISTRATIVE JUDGE NORKEN:  They're both
13 inactive?
14       THE WITNESS:  Yes.
15   Q   What made you decide to turn to
16 theological studies?
17   A   I was doing -- I was a youth minister at
18 the same time I was a trial attorney, and I decided
19 to go in the direction of ministry.
20   Q   Have you served as an associate chaplain
21 in any capacity at any hospitals?

Page 1340

1    A   At NIH.
2    Q   Okay. And when did you first come to NIH?
3    A   I first came to NIH in the middle of
4  August 2005 for one or two weeks.
5    Q   Before we got into the circumstances of
6  what brought you to NIH, where were you coming from?
7  What were you doing in, say, July of 2005?
8    A   This summer I was in an intensive CPE unit
9  at Grandview Hospital in Dayton, Ohio, and I
10 successfully completed that unit and then I came to
11 NIH for a week and then I went back to Dayton, Ohio.
12   Q   Grandview Hospital, is that affiliated
13 with the government?
14   A   No. That is a Seventh-day Adventist
15 hospital.
16   Q   Were you in a program with the VA?
17   A   After my one or two weeks at NIH, I
18 started a CPE program at the Veterans Administration
19 Medical Center in Dayton, Ohio.
20   Q   Okay. So first year at Grandview Hospital
21 doing a CPE unit?

70 (Pages 1337 to 1340)

Page 1341

1    A    Yes. I successfully completed my CPE
2 unit, and then I went and did one CPE unit at the
3 VA.
4    Q    So when you -- you came to NIH in the
5 middle of your two CPE units, correct?
6    A    Right.
7    Q    Where did you go to law school?
8    A    I went to Washington College of Law
9 affiliated with American University in Washington,
10 D.C.
11    Q    And when did you graduate from law school?
12    A    1989.
13    Q    So it's fair to say between 1989 and 1998,
14 you were practicing law?
15    A    I was practicing law until 1995, and then
16 I went to theological school, and then I went to CPE
17 and other things, chaplaincy.
18    Q    Okay. So there's a period of time where
19 you were -- before you went to -- after you stopped
20 practicing law and before you went to theological
21 school?

Page 1342

1    A    Yes.
2    Q    Okay. And what did you do during that
3 time period?
4    A    I got some surgeries.
5    Q    Okay. So what circumstances brought you
6 to NIH in August 2005?
7    A    Maybe in 2004, I had applied for a CPE
8 position at NIH when Karen Morrow was there, and I
9 had decided to go instead to Grandview. And
10 sometime in May or June, I got an E-mail from
11 someone who I hadn't ever met by the name of Ray
12 Fitzgerald -- Dr. O. Ray Fitzgerald -- asking if I'd
13 be interested to do CPE in his program, and I
14 responded that -- oh, am I going on?
15    Q    Well, had you applied again to be in a CPE
16 program at NIH?
17    A    No.
18    Q    So do you know why Dr. Fitzgerald
19 contacted you?
20        MS. LU: Objection; relevance. What is
21 the relevance of her getting -- doing CPE at NIH or

Page 1343

1 how she got in?
2        MS. HARRIS: Just background how she got
3 there.
4        ADMINISTRATIVE JUDGE NORKEN: I'll
5 overrule for now.
6    A    He had found my application in an old
7 file -- you know, when it's stale or whatever you
8 call it -- that Karen had left, and he's very
9 interested in Orthodoxy, Eastern Orthodox studies,
10 and he told me he was taking classes at the Antioch
11 Orthodox Church study program in Pennsylvania and he
12 was very interested in meeting me and would I
13 substitute work at NIH.
14    Q    Okay. So the work in August 2005, what
15 was that -- what were you to be doing at NIH?
16    A    Supposedly, he had an emergency situation
17 where he needed me to come on my vacation and work
18 for him so he could take some time off
19 intermittently throughout the week.
20    Q    Okay. And did you come to NIH in
21 August 2005?

Page 1344

1    A    Yes.
2    Q    And do you recall the dates you were
3 there?
4    A    I would have to look at my records, but I
5 believe it was like in the teens -- the upper teens
6 like 16, 17, 18 or something like that, that week.
7 I'd have to look at a calendar.
8    Q    And you were there for a week or two?
9    A    I want to say one week, but I'm not too
10 sure because he had me there sometimes not being
11 paid but just observing, so for some of the times, I
12 was not paid, and I don't know if I was there a week
13 and a half or -- I know I got paid for one week and
14 I know I didn't get paid for sometime in the
15 beginning, so --
16    Q    In August 2005, did you know of or know
17 personally Father Henry Heffernan?
18    A    No.
19    Q    Okay. Did you learn about Father
20 Heffernan from anyone at NIH in August 2005?
21    A    I learned from Ray of a priest named

71 (Pages 1341 to 1344)

Page 1345

1 Henry, but I didn't know his last name.

2   Q   Okay.

3   A   A Roman Catholic priest.

4   Q   So what did you hear from Dr. Fitzgerald

5 about Henry?

6   A   That he had successfully terminated him

7 sometime before and that he had won throughout some

8 procedures, and I wasn't really following what he

9 was saying, different procedures. It was hard to

10 get his perspective on what was going on. And he

11 told me all about how he had terminated him.

12   Q   Okay. And did he tell you anything else

13 about the procedures that had gone on?

14   A   We were in his office on the 7th floor of

15 CRC and there was a white collar -- clerical

16 collar -- in the middle of his desk, which I'd never

17 seen him wear before today, and he picked up the

18 collar and he put it down on the desk and he said --

19 this part is vague because I'm not sure -- I thought

20 he said he bought this, okay, but then he -- he

21 said, "I wore this specifically to the hearing for

Page 1346

1 effect," because he knew the priests always wore a

2 white collar and he wanted to have the collar on for

3 effect to affect the hearing officer's opinion of

4 him.

5   Q   Now, did Dr. Fitzgerald in August 2005 at

6 the Clinical Center, did he wear a clerical collar?

7   A   I've never seen him in a clerical collar

8 before today.

9   Q   So the answer is?

10   A   No.

11   Q   All right. Did you learn anything else in

12 August 2005 about the man you now know of as Father

13 Heffernan?

14   A   We had a lot of conversations. A lot of

15 them, I have forgotten. The gist of what he was

16 saying, okay, was that he has a psychology degree

17 and he would study people and their behavior and he

18 would know how to manipulate and provoke them. And

19 what I remember him saying is that he would do

20 things to provoke the priest.

21   Q   Meaning Father Heffernan?

Page 1347

1   A   I didn't know his name other than Henry.

2 and I didn't know if I knew it then or later heard

3 "Henry."

4   Q   Okay. But you later inferred that

5 Dr. Fitzgerald was referring to Father Heffernan --

6   A   Yes.

7   Q   -- when he said "the priest"?

8   A   Yes. Roman Catholic priest, right.

9   Q   You finished then your temporary stay at

10 NIH and returned where? To Dayton?

11   A   Dayton, Ohio VA.

12   Q   Okay. And you did your second CPE unit

13 there; is that correct?

14   A   Correct.

15   Q   And did there come a time when you spoke

16 again with Dr. Fitzgerald about working at NIH?

17   A   We had a lot of conversations by telephone

18 from August straight through 'til December, and I

19 actually -- he actually had me meet him in Boston

20 for the final interview for employment at NIH, but

21 then he never gave me the final interview. He just

Page 1348

1 said, "You're going to be hired."

2   Q   Okay. And what were you going to be hired

3 for at NIH?

4   A   Associate chaplain. Part-time associate

5 chaplain.

6   Q   Okay. Did you have discussions in

7 October 2005 with Dr. Fitzgerald about his staff at

8 NIH?

9   A   Yes.

10   Q   What was that conversation?

11   A   That he was planning on having his dream

12 team of -- Eastern/Byzantine team of a Maronite

13 priest and a Greek Orthodox associate chaplain, and

14 when I got there, he'd have this dream team.

15   Q   What did you take that to mean?

16   A   Ray is extremely -- he's extremely -- I

17 don't know how to put this, but he's going to get

18 his Master's in orthodox studies, he's got a Greek

19 Orthodox spiritual father. He had me attend with

20 him the Orthodox Christian Association of Medicine,

21 Psychology, and Religion in Boston in October and

72 (Pages 1345 to 1348)

Page 1349

1 he's just overly -- the only word I can think of it
2 is like a groupie, someone who isn't orthodox, but
3 who's kind of like -- I don't know how to explain
4 it. I don't know how to explain it, you know, but
5 overly -- he recruited me, he kept calling me. You
6 know, he keeps overly favoring Eastern Christianity
7 and Byzantine Christianity. I mean, it's hard to
8 put it into word.
9    Q    Well, I think you did just fine.
10        What does it mean to be a Byzantine
11 Christian or Catholic? What does that mean, just
12 generally? Is that referring to Greek Orthodox
13 or --
14    A    Well, the first thousand years, the main
15 church was in the Middle East predominantly. It had
16 the Patriarch who led in Constantinople and, you
17 know, Lebanon, Syria, Turkey, Greece. And when the
18 split occurred, it really -- the Roman Patriarch
19 became the Roman Pope who's now the current Pope of
20 the Roman Catholic Church, and they're more Latin,
21 more western. We're more eastern, we had different

Page 1350

1 rites. They have the Latin rite, we have the Konig
2 Greek rite.
3    Q    So Byzantine refers to the Eastern
4 Orthodox?
5    A    Right, or Maronite or they're Jacobites.
6 They don't like being called Jacobites or
7 Antiochians or -- it's a very complex, long
8 2000-year history.
9    Q    Well, Byzantine doesn't refer to Roman
10 Catholics; is that correct?
11    A    No.
12    Q    Okay. And what does it mean -- you said
13 that Dr. Fitzgerald had a Greek Orthodox spiritual
14 father. What does that mean?
15    A    Well, I have a spiritual father, and he --
16 he, as a Protestant, has elected to have a spiritual
17 father which means that he has contacted a Greek
18 Orthodox priest in Los Angeles, California, and that
19 priest has agreed to help guide him spiritually and
20 they meet and they talk and they talk over the phone
21 or they give letters, and this is his spiritual

Page 1351

1 guide.
2    Q    Okay. So it's fair to say you noted that
3 Dr. Fitzgerald had a very strong interest in Greek
4 Orthodox -- in Greek Orthodoxy?
5    A    In Eastern Orthodoxy.
6    Q    Eastern Orthodoxy. Okay.
7        By the way, are you also known by a name
8 given by your church?
9    A    Debra.
10    Q    And explain what that is.
11    A    When you get chrismated, you get tonsured
12 which is -- okay. When they -- you make
13 commitment --
14        ADMINISTRATIVE JUDGE NORKEN: Did you say
15 "tonsured"?
16        THE WITNESS: Yes.
17        THE REPORTER: Excuse me?
18        ADMINISTRATIVE JUDGE NORKEN: Tonsured,
19 T-O-N-S-U-R-E-D. And what is that?
20        THE WITNESS: Okay. It's like a
21 commitment through the Holy Spirit -- it's very

Page 1352

1 sacred -- that you're making to join the church and
2 to always be a member of the church and fulfill your
3 commitments to the church, and they give you a name.
4 They have a book and you pick a name from their book
5 of names, and Debra is in the book because it's an
6 Old Testament, Hebrew Bible First Testament --
7 whatever you want to call it -- name.
8        ADMINISTRATIVE JUDGE NORKEN: Does it
9 involve shaving of the head?
10        THE WITNESS: No. They cut some of your
11 hair and they anoint you with oil.
12    Q    So tonsure doesn't -- like the monks'
13 tonsure, right?
14    A    Yeah. It's a serious commitment --
15 spiritual commitment.
16    Q    Okay. I understand.
17        So did there come a time when you returned
18 to NIH as a staff chaplain -- staff associate
19 chaplain?
20    A    Yes.
21    Q    And when was that?

73 (Pages 1349 to 1352)

Page 1353

1    A    Actually, on the property I was there
2 November 16th, 2005.
3    Q    Okay.  And your understanding was -- what
4 was your job, just briefly?  What were you to do?
5    A    Associate chaplains do work primarily with
6 a full chaplain.  They, like, help the full
7 chaplain.  They visit patients.  I was assigned to
8 the medical/surgical side, I visited the patients in
9 the hospital.
10    Q    Okay.
11    A    And I was supposed to chart on them, but I
12 never was given a computer by Dr. Fitzgerald to
13 chart on any patient.
14    Q    Okay.  Did you have any more conversations
15 when you returned in November 2005 with
16 Dr. Fitzgerald about Henry or the priest?
17    A    Yes, we had a lot of conversations.
18    Q    What do you mean "a lot of conversations"?
19 This topic came up a lot?
20    A    Ray would bring it up and actually, he
21 would dominate the conversation talking and he would

Page 1354

1 repeatedly bring it up and talk about it.
2    Q    Were you asking -- did you initiate the
3 conversations about Father Heffernan?
4    A    No, but when he would start talking about
5 it, then I would get -- would start asking questions
6 and then he'd make more statements and I'd ask more
7 questions.
8    Q    Okay.  But it wasn't something you
9 initiated?
10    A    No, because I really didn't care.
11    Q    Okay.  So what did Dr. Fitzgerald tell you
12 about Father Henry or Father Heffernan in November
13 of 2005, if anything?
14    A    One conversation sticks out.  It was on or
15 about November 21st, 2005.  I had extended Father
16 Dominic Ashkar the courtesy of coming and sitting
17 through Mass.  We don't take communion from Roman
18 Catholic priests, okay, but I sat through his Mass
19 just to be respectful.  And afterwards, Ray had
20 asked me what I had done, and I had told -- you
21 know, telling him all about my day and that I had

Page 1355

1 gone, you know, to show respect, but didn't take
2 communion.  And he said, "Well, that" -- he doesn't
3 call him "Father."  He always calls him "Dominic" or
4 "Henry."  I've never heard him say "Father Dominic"
5 or "Father Henry."  Okay.  So he said Dominic gives
6 him communion when nobody's watching and that I can
7 get communion.
8    Q    Dominic gives who communion?
9    A    Ray Fitzgerald.
10    Q    So Dr. Fitzgerald said, "Dominic gives
11 me" -- meaning Ray Fitzgerald --
12    A    Ray Fitzgerald.
13    Q    -- "communion"?
14    A    Communion when nobody's watching.  Because
15 the discretion of the Roman Catholic priest, as far
16 as I understand it, if somebody is of no religious
17 faith and they're taking lessons -- Catholic
18 lessons -- they may get communion from a Roman
19 Catholic priest before confirmation, okay, but once
20 you have become aligned with any other denomination,
21 you don't get communion.  And especially if you're

Page 1356

1 clergy, a Protestant clergy would not be allowed to
2 get communion in a Roman Catholic Church.
3    Q    Now, what is your understanding of Father
4 Dominic Ashkar's religious affiliation?
5    A    He's a Maronite priest.
6    Q    Okay.  So does that make it different with
7 respect to this giving of communion to a Protestant
8 clergyman?
9    A    As far as my understanding is they're
10 under the Pope, and these are the rules of the Pope.
11    Q    So what was your reaction when
12 Dr. Fitzgerald told you this?
13    A    Well, then he said -- I said, "My church
14 doesn't permit me to take communion from anyone but
15 somebody -- a priest under SCOBA."  And he said
16 well, it doesn't matter because he as head of the
17 department is in charge of the chapel and he's in
18 charge of all the clergy and chaplains at NIH; and,
19 therefore, he stands in the shoes of God as head of
20 the department, and I can get communion if I want
21 it.  And that that's something that Dominic

74 (Pages 1353 to 1356)

Page 1357

1 understands, that Ray stands in the shoes of God.
2 And then he said, "That is the concept that Henry
3 could not grasp."
4    Q   Meaning Father Heffernan?
5    A   Yes.
6    Q   And did Dr. Fitzgerald say anything else
7 about Father Heffernan during that conversation?
8    A   It was either -- that conversation either
9 went on or it was the next day because sometimes we
10 get interrupted and then we'd start the conversation
11 from where we left off because some of these
12 conversations were going over days, okay? But then
13 after that, he said -- I think it was the same
14 conversation, but there might have been an
15 interruption, okay? He said that to get rid of
16 Henry at NIH, he and Walter instituted that they
17 would have to take CPE, okay, and I -- this is when
18 I said to him, "Well, you know in the VA in, like,
19 1985, all the federal permanent chaplains were
20 grandfathered in and they had a decision that anyone
21 who was newly hired, then these newly hired people

Page 1358

1 that wanted to become chaplains would have to have
2 CPE, okay, and in the federal prison system, they
3 don't even require CPE." So I said, "Don't you
4 know -- I don't understand how you could do it to a
5 permanent chaplain when nobody else" -- and he said
6 he knew that nobody else in the United States
7 federal system permanent chaplain has been required
8 to do CPE or get terminated, and he had the
9 documents on his desk -- the VA documents -- and he
10 showed them to me.
11    Q   But he said that the reason he instituted
12 the CPE requirement was to?
13    A   For both to get rid of this priest and
14 hire the other priest, Dominic, because Dominic had
15 four units of CPE and that would give Dominic the
16 advantage, and that he would never hire another
17 Roman Catholic priest again. And I don't even know
18 if he interviewed another Roman Catholic priest
19 again because the whole time that he had been
20 talking to me from August to November, he had been
21 talking that Dominic was going to get the job.

Page 1359

1    Q   So either in that conversation or at any
2 other time, did Dr. Fitzgerald talk to you about his
3 opinions about Roman Catholic priests?
4    A   He exhibited throughout the conversations
5 an animosity towards the Roman Catholic Church
6 that -- that it's beyond -- he would say how they're
7 pedophiles, and snicker; they have a problem with
8 pedophiles, and snicker.
9    Q   By snicker, you mean he would laugh?
10    A   He would be snickering. It was like --
11 and it's not a joking matter. It's not really --
12 it's something that is a problem with everybody who
13 wants to be a clergy to reach a higher standard of
14 moral standard.
15    Q   But Dr. Fitzgerald --
16    A   He was fixated on it.
17    Q   He talked about it more than once?
18    A   Yes.
19    Q   Did Dr. Fitzgerald at any time exhibit --
20 what word did you use -- "animosity" -- animosity
21 toward any other religious affiliation?

Page 1360

1    A   Jewish.
2        MS. LU: Objection; relevance.
3        MS. HARRIS: Judge, it goes to his
4 religious animus and bias against any faith but his
5 own. It's directly relevant here.
6        ADMINISTRATIVE JUDGE NORKEN: Overruled.
7    Q   So your answer was yes. What faith was
8 that?
9    A   Jewish.
10    Q   Okay. And what did Dr. Fitzgerald do or
11 say that led you to feel that he was exhibiting
12 animosity?
13    A   The week in August that I worked there, my
14 father was in the hospital at Johns Hopkins and I
15 was done with the day. He was leaving. He was
16 leaving me to cover for him, like it was either
17 Thursday or Friday I'd be covering for him, and as
18 we were walking out the door, he said, "Can you
19 carry the pager for me?"
20    Q   What does that mean?
21    A   "Carry the pager" means I'd be on call and

75 (Pages 1357 to 1360)

Page 1361

1 if an emergency happened, the minister officer of
2 the day would call and say, "There's this emergency.
3 Can you come in and deal with it?" And I'd come
4 back and deal with it. So it would be from Thursday
5 'til Monday.
6    Q    Okay.
7    A    And it means you can't do anything that
8 you just can't drop and leave and you can't be far
9 from the hospital. So I said, "I can't because I'm
10 going to be in Baltimore at Johns Hopkins visiting
11 my dad." And then I said, "Don't you have any other
12 chaplains that can carry the pager?" And he says he
13 has a rabbi. And then all of a sudden he's like,
14 "But that Jew! That Jew (Indicating)! I'm not
15 going to let him get the money! That Jew! That
16 pager hardly ever goes off, and he'd be at home
17 enjoying himself and then he'd get the money for the
18 weekend. I'm not going to give that Jew that
19 money!" And then he changed back and said, "You can
20 understand that, can't you?"
21    Q    All right. But -- so when -- what was

Page 1362

1 Dr. Fitzgerald's -- when you were testifying, you
2 were stamping your foot. Did Dr. Fitzgerald stamp
3 his foot when he was talking?
4    A    Yes. He exhibited signs of a propensity
5 to violence several times. He would do things that
6 are like --
7    Q    Let's just talk about this incident.
8    A    It was like he was stamping this person
9 (Indicating).
10    Q    Stamping his foot on the ground?
11    A    Stamping and rubbing (Indicating).
12    Q    Right. And you're making facial gestures.
13 Are you imitating his face?
14    A    I'm serious. Yes.
15    Q    Okay. So how would you describe his face
16 when he was doing that?
17    A    Like angry. I mean, like, angry.
18    Q    And then you said he switched at the end.
19 What do you mean by that?
20    A    Then he'd go -- he has, like, personas and
21 he has this nice, gentle, sweet, soft-spoken

Page 1363

1 persona, and he went back to that. It was like a
2 switch.
3    Q    And what did you -- what was your reaction
4 to this?
5    A    You know what? I had just gotten off of
6 an intensive summer with no vacation, this was
7 supposed to be my vacation, my dad was in the
8 hospital, I was walking out the door, and I just
9 really could not react. I mean, it was like so
10 shocking that it -- it's something that I just
11 didn't take enough notice of.
12    Q    Okay. So when you said he was talking
13 about that Jew, that Jew, what was his tone?
14    A    Angry.
15    Q    And do you know to whom he was referring,
16 who was "that Jew"?
17    A    Well, he didn't want to introduce me to
18 him, and we didn't have staff meetings, so the first
19 time I met this person was December, like, 20, 21st
20 from being hired in mid-November.
21        ADMINISTRATIVE JUDGE NORKEN: Of 2000

Page 1364

1 what?
2        THE WITNESS: Of 2005.
3        ADMINISTRATIVE JUDGE NORKEN: Okay.
4    A    I introduced myself to Rabbi Reeve
5 Brenner.
6    Q    Was there another rabbi at the NIH?
7    A    No. He's the one and only rabbi.
8    Q    All right. So did Dr. Fitzgerald talk to
9 you at any time about any plan he had for the
10 department? I'm sorry. Any plan he had with Walter
11 Jones for the department?
12    A    He has a plan he calls "clean sweep." Is
13 that what you're talking about?
14    Q    Well, you tell me. What's clean sweep and
15 how did you learn about this plan?
16    A    He's --
17    Q    Who's "he"?
18    A    Ray.
19    Q    Ray Fitzgerald?
20    A    Right.
21    Q    Okay.

76 (Pages 1361 to 1364)

Page 1365

1    A   We were in the office -- not in the CRC
2  site. There's another office that's up on, like,
3  the 14th floor. It's the old office -- and we were
4  standing near Dana Kelly's desk, and he says -- he
5  told me they have an operation clean sweep that, you
6  know, they're going to sweep clean all these people
7  that have testified or will testify or -- and he
8  took his hand and he, like, goes like this
9  (Indicating) right where Dana Kelly's head would be
10 over her chair, and he goes bam (Indicating).
11   Q   So sweeping his hand across?
12   A   And bam (Indicating), "And she'll be out
13 of here," and the rabbi is going to be out of there,
14 and then --
15     ADMINISTRATIVE JUDGE NORKEN: You're
16 saying Dana. Was Dana Kelly in there during that
17 conversation?
18     THE WITNESS: No. It's the empty chair
19 where Dana sits.
20     ADMINISTRATIVE JUDGE NORKEN: She has her
21 own --

Page 1366

1      THE WITNESS: She has her own desk and her
2  own chair, and he was standing behind the chair like
3  this (Indicating). And where Dana Kelly's head
4  would be, he said (Indicating). "And she'll be out
5  of here."
6      ADMINISTRATIVE JUDGE NORKEN: Doing a
7  sweeping motion over her head?
8      THE WITNESS: Right through her head
9  without stopping.
10     ADMINISTRATIVE JUDGE NORKEN: If she had
11 been sitting there?
12     THE WITNESS: If she had been sitting
13 there.
14     ADMINISTRATIVE JUDGE NORKEN: Okay.
15   A   And that Gary is eligible to retire
16 February 2007 and they expect him back from his
17 deployment I'd say January 2007 and that they're
18 going to ask Gary to retire because he's going to
19 become eligible to retire, and that they can't force
20 him to retire, but they're going to give him an
21 offer that they think he's going to retire.

Page 1367

1      BY MS. HARRIS:
2    Q   Okay. And what did he -- so he mentioned
3  Dana Kelly, Gary Johnston. Any others did he say?
4    A   Rabbi Reeve. They have them ordered.
5  They're not going to take them down at the same
6  time. It's one at a time.
7    Q   And did Dr. Fitzgerald tell you that?
8    A   Yeah.
9    Q   And how did it happen that you had all
10 these conversations and meetings with
11 Dr. Fitzgerald?
12   A   I couldn't get him to stop calling me. He
13 would call me at 6:00 in the morning. He would call
14 me at 9:40 at night. He would call me as I went
15 around the hospital. He would call me on Sunday
16 morning, he'd call me on Saturday, he'd call me --
17 he called me so much and it's --
18   Q   Were these conversations on the telephone
19 or in person, the ones that you've related to us?
20   A   On the telephone and in person.
21   Q   Okay. Well, obviously, the one you had

Page 1368

1  about the sweeping motion, was that --
2    A   That was in person.
3    Q   Okay. And how about the conversation in
4  August about that Jew, that Jew?
5    A   That was in person.
6    Q   Okay. And what about the conversation
7  where he said that he had successfully terminated
8  Henry?
9    A   That was ongoing, the conversations of how
10 he did it.
11   Q   More than once?
12   A   More than once.
13   Q   Okay. And how about the conversation that
14 you said you specifically remembered from
15 November 21st, 2005? Was that --
16   A   Face-to-face. We were in the conference
17 room on the 7th floor CRC section near the chapel.
18   Q   Okay. And you said these conversations
19 were ongoing from -- did they -- did conversations
20 cease at any time?
21   A   They dramatically changed   something

77 (Pages 1365 to 1368)

Page 1369

1 happened. I could tell something happened because
2 he stopped bragging, okay? All of a sudden, he
3 stopped bragging.
4    Q    When was this?
5    A    Around the time Julie Lu started calling
6 the office.
7    Q    And when was that?
8    A    I want to say the beginning of December.
9    Q    Okay. Right before the hearing; do you
10 know?
11    A    Well, I knew they were going somewhere
12 from Father Dominic -- from statements Father
13 Dominic was making and from that tirade about clean
14 sweep (Indicating), that everybody who was making
15 these -- I'm sure he said testimony. I couldn't
16 figure out is it deposition, is it a trial, you
17 know, because everything was supposed to be done.
18 And as a matter of fact, I even went on the Internet
19 to try to figure out if it's a federal trial.
20    Q    So --
21        ADMINISTRATIVE JUDGE NORKEN: I trust you

Page 1370

1 didn't find anything?
2        THE WITNESS: I didn't find anything. I
3 couldn't --
4        MS. HARRIS: I'm glad because otherwise,
5 I'd be mad at Father Heffernan doing it in two
6 different forums. No. I'm just kidding.
7        ADMINISTRATIVE JUDGE NORKEN: Go ahead.
8        MS. HARRIS: Ignore that.
9    Q    So the conversations changed in early
10 December of 2005?
11    A    And then he started talking to me about,
12 "I hope you're never going to tell anybody about
13 everything I've told you."
14    Q    Okay. When was that?
15    A    December.
16    Q    Right.
17    A    He said, "Because you're like an
18 amphibian. You're a lay chaplain and you have no
19 clergy/layperson confidentiality to anything I've
20 told you."
21    Q    Okay.

Page 1371

1    A    Because lay chaplains have no -- anything
2 you say to a lay chaplain is -- unless the hospital
3 protects it for the patients, any person who would
4 come up and say something to a lay chaplain, unless
5 they were your patient covered by some other
6 confidentiality, it's all nonconfidential.
7    Q    So there's no, like, priest/penitent --
8    A    If he had been telling Dominic or Henry
9 all of this, he could say priest/penitent
10 confidentiality.
11    Q    Assuming he was a penitent, but in any
12 event -- okay. But he expressed --
13    A    So he said I'm an amphibian, quote,
14 unquote.
15    Q    Meaning you?
16    A    Uh-huh.
17    Q    That's a yes?
18    A    Yes.
19    Q    Okay.
20    A    Layperson chaplain.
21    Q    All right. And did he -- all this time

Page 1372

1 November 2005, December 2005, were you doing a CPE
2 unit at NIH?
3    A    I have 11 reasons why I was not doing the
4 CPE.
5    Q    Okay. Well, I just wanted a yes or no
6 answer, but --
7    A    I had expressed an interest in doing CPE
8 and I had tried it out. I had attended one CPE
9 class on November 30th.
10    Q    Okay.
11    A    But I had not submitted a 2005
12 application, I had not submitted my former CPE
13 supervisor evaluations, I had not --
14    Q    All I want -- thank you. So the answer is
15 no, you were not --
16    A    I was not a student.
17    Q    Okay. But you were --
18    A    I was trying it out.
19    Q    Trying it out?
20    A    It was a trial period. One day.
21    Q    So did there come a time when

Page 1373

1 Dr. Fitzgerald offered you a position to do CPE at
2 NIH?

3    A    Yes.

4    Q    And when was that?

5    A    He sent me an E-mail.

6    Q    When?

7    A    Wasn't it in December?

8    Q    I don't know. I'm asking you.

9    A    It was around mid-December, I think.

10    Q    Okay. And did you decide to do -- what
11 kind of CPE? Was it a special kind or was there a
12 certain level?

13        MS. LU: Objection to this line of
14 questioning. She wasn't proffered to talk about her
15 CPE experience, just the alleged statements.

16        MS. HARRIS: It's background. I just want
17 to -- this is going to something, Judge. It's not
18 about the CPE.

19        ADMINISTRATIVE JUDGE NORKEN: I'll
20 overrule. You can continue.

21    A    He offered me a Level II CPE position.  I

Page 1374

1 am a Level I CPE position currently.

2    Q    Okay. After this offer was made to you
3 about the CPE, did there come a time when you
4 decided to report what Dr. Fitzgerald had told you
5 about Father Heffernan, about Rabbi Brenner?

6    A    I started reporting on December 12th.
7 December 12th, I met with Laura Chisholm.

8    Q    Who is that?

9    A    She was on the orientation team, something
10 to do with human resources personnel. She's the
11 person training you how to be appropriate NIH,
12 whatever.

13    Q    Okay. Did you tell her about, for
14 instance, what Dr. Fitzgerald had said about Rabbi
15 Brenner, "that Jew"?

16    A    Okay. I started talking with her --

17    Q    Just yes or no.

18    A    Yes, but not about everything.

19    Q    Okay.

20    A    I started a conversation with her, and she
21 referred me to counseling at the employment -- the

Page 1375

1 EPA or -- they paid for my counseling.

2    Q    Employee Assistance Program?

3    A    Yeah.

4    Q    Okay.

5    A    And she had me meet with him that day, and
6 I met with him three or four times to discuss all of
7 this.

8    Q    All right. And did there come a time when
9 you met with Rabbi Brenner about this?

10    A    Yes.

11    Q    When was that?

12    A    It was either the week before
13 December 21st or it was December 21st.

14    Q    And at that time, what did you tell
15 Rabbi Brenner?

16    A    I introduced myself and he introduced
17 hisself, and I told him, "I'm having really big
18 problems with what Ray has told me, you know,
19 because ethically, you know, I should be doing" -- I
20 mean, I can't -- my conscious was bothering me,
21 counseling was not helping, you know, and that I

Page 1376

1 wanted to contact Father Heffernan's attorney and
2 tell him or her what I knew.

3    Q    Okay. And that was when; do you think?
4 December --

5    A    No later than December 21st.

6    Q    Okay.

7    A    It was either the week before or it was --
8 it was either the Wednesday before that Wednesday,
9 December 21st.

10    Q    And did there come a time when you met
11 with Walter Jones to discuss your concerns?

12    A    Yes, on December 22nd.

13    Q    What did you tell Mr. Jones?

14    A    We had an extensive conversation about
15 everything --

16    Q    Did you tell --

17    A    -- that we were talking about today.

18    Q    Okay. You told him about --

19    A    Including that I don't want to do CPE with
20 Dr. Fitzgerald.

21    Q    Okay. And what did Mr. Jones say in

79 (Pages 1373 to 1376)

Page 1377

1 response, if anything?

2   A   He said it was horrible, that no one is

3 allowed to call him at home, that he thinks that

4 it's wrong that people call other people at home.

5 And I had all my telephone bills that I showed him

6 because I only have a cell phone. And he said he

7 was going to talk to Ray about it the next day and

8 that I wasn't to talk to Ray, I was to meet with him

9 at 1:00 p.m. the next day.

10   Q   And did you meet with him the next day,

11 Mr. Jones?

12   A   I went at 1:00, and he said come back at,

13 like, 2:00. I came back at 2:00, and Walter and Ray

14 were both there.

15   Q   Okay. And what did Mr. Jones say, if

16 anything, during that meeting?

17   A   He said that NIH is a big family and

18 they've all known each other for years, and that he

19 is not going to take the time to sort through all

20 this confusion, and that he can terminate my

21 contract for the convenience of the government which

Page 1378

1 is for no cause and that my contract was terminated,

2 but I could get a good reference and two weeks pay

3 if I let bygones be bygones and never tell anybody

4 anything about what I heard or saw at NIH.

5   Q   What did you say?

6   A   That I'm still contacting the attorney for

7 Father Heffernan and I was probably going to get my

8 own attorney.

9   Q   And is there anything else that

10 Dr. Fitzgerald told you about that you took as

11 animosity toward Roman Catholics?

12   A   You know, he told me so much. And at the

13 time, he was telling me the case he told me had been

14 over, I didn't even know the person's name, and all

15 I know is he exhibited a lot of comments and

16 statements including he never wanted to have another

17 Roman Catholic priest working at NIH.

18     ADMINISTRATIVE JUDGE NORKEN: It was okay

19 to have, though, a Maronite priest that had dual --

20 had the ability to do a Roman Catholic Mass?

21     THE WITNESS: Right, because he grasped

Page 1379

1 the concept that Ray stood in the shoes of God. Ray

2 told me that Dominic understands that he stands in

3 the shoes of God, but Henry could not grasp that

4 concept. As head of the department in charge of the

5 chapel and in charge of the chaplains, he stands in

6 the shoes of God.

7     ADMINISTRATIVE JUDGE NORKEN: Similar to

8 some Episcopals in the New Testament or what --

9     THE WITNESS: He can overrule what our

10 churches tell us. See, as an associate chaplain,

11 the only way I'm an associate chaplain is because my

12 bishop endorses me, which means my bishop believes

13 that I'm going to obey the tenets of the Orthodox

14 faith 24 hours a day, 7 days a week no matter what.

15 If it's my job or what he, the Patriarch, says, I go

16 with the Patriarch, okay?

17     The tenets of my religion, the Roman

18 Catholic religion, and most religions override the

19 hospital. When they hire you, they are hiring you

20 with the understanding and the endorsement of your

21 church. Even to become -- if you look on the

Page 1380

1 Internet under professional chaplains, to get

2 certified, the first thing they have to have is your

3 letter of endorsement from your endorsing body.

4 Mine is the bishop, okay? My bishop has recommended

5 and endorsed me with the understanding that I will

6 not ever breach the tenets of my faith in the

7 hospital.

8     Ray's position is that he stands in the

9 shoes of God, and if he tells me I can take

10 communion from Dominic, it doesn't matter that the

11 Patriarch says that I cannot take communion from

12 Dominic.

13     BY MS. HARRIS:

14   Q   Miss Rogler, one other matter, though, I

15 wanted to cover. Did you observe a conversation

16 between Dominic Ashkar and Dr. Fitzgerald about

17 Father Heffernan?

18   A   Right.

19   Q   What happened?

20   A   Okay. It was like the beginning of

21 December, sometime that first week or so, Father

80 (Pages 1377 to 1380)

Page 1381

1 Dominic came up to Ray and I. We were standing in
2 the hallway in front of the chapel talking, and he
3 had just come back either from a deposition or a
4 hearing, and it seemed to me from what he was saying
5 that he had just come back from a meeting with the
6 Roman Catholic Church. And he said to Ray, "The
7 Roman Catholic Church is not going to -- the Roman
8 Catholic Church is not going to allow you to do this
9 to any of their priests." And he said, "I recommend
10 you reverse everything you've done." And that they
11 were having a go-away party for the other chaplain,
12 Katherine Sullivan, and when we walked by the door,
13 there were doctors and nurses, and we had not been
14 invited and they slammed the door in Father
15 Dominic's face. And he said that the -- there is
16 deep -- a lot of bad feelings about what Ray's
17 doing.
18    Q   Okay. And did Dr. Fitzgerald tell you
19 about a conversation that he had with Karen Morrow
20 about this matter involving Father Heffernan?
21    A   He told me that he had done so much for

Page 1382

1 Karen Morrow. He had helped get her everything
2 where she was today and that Karen Morrow had
3 somehow confronted him about being a horrible
4 manager of the Spiritual Ministry Department and led
5 him to believe that all of his staff was complaining
6 about his capabilities as a head of a department.
7    Q   Okay.
8    A   And then she said to him -- oh, I
9 remember. Then she said, "When are you going to
10 retire?" Or that, "You should retire because" --
11 something to the effect that he was a horrible
12 administrator. And I can't remember now exactly
13 what he said.
14    ADMINISTRATIVE JUDGE NORKEN: Who told who
15 to retire?
16    THE WITNESS: Ray told me that Karen
17 Morrow -- I don't know what year -- confronted Ray
18 that he was ineffective as managing the head of the
19 department and that he had problems with all of his
20 staff and that he should retire. And I think what
21 he said was that they were confronting him that he

Page 1383

1 had Alzheimer's and dementia.
2    Q   And what did Dr. Fitzgerald say to you
3 about whether he was going to retire or not?
4    A   He's not going to retire until he fires
5 all these people and replaces them.
6    Q   And I think you mentioned earlier in your
7 testimony that Dr. Fitzgerald talked about his
8 psychology degree and he knew how to manipulate
9 people. Did he use a particular phrase from a book
10 or something about how he manipulated people?
11    A   The book was -- I think the title is "The
12 Games People Play," and his favorite quote from it
13 is "Now, I've got you, you son of a bitch."
14    Q   Okay.
15    A   And there was a write-up in the book about
16 the games people play, and that's the name of one
17 particular game.
18    Q   And what did that mean? What did you take
19 that phrase to mean?
20    A   From all of these conversations, what I
21 saw and heard from Ray was he's spent a lot of time

Page 1384

1 planning all of this, and his final conclusion to
2 all of this is, "Now, I've got you, you son of a
3 bitch."
4    MS. HARRIS: Okay. I have nothing
5 further.
6    ADMINISTRATIVE JUDGE NORKEN: Cross exam?
7    MS. HARRIS: Yes.
8    MS. HARRIS: About how long?
9    MS. LU: Probably 40, 45 minutes.
10    ADMINISTRATIVE JUDGE NORKEN: You may
11 examine.
12    MS. LU: Thank you.
13    CROSS EXAMINATION
14 BY MS. LU:
15    Q   Hi, Miss Rogler. Isn't it true,
16 Miss Rogler, that your contract with the Clinical
17 Center was terminated on December 23rd, 2005?
18    A   Yes and no, because I received a letter
19 dated January 5th that was the termination notice;
20 so, yes, verbally it was terminated on December 23rd
21 and it was officially terminated by letter

81 (Pages 1381 to 1384)

Page 1385

1 January 5th.

2    Q   Well, okay. This letter you're referring

3 to then, if you look at the --

4        MS. HARRIS: Objection. It's collateral.

5        MS. LU: She brought it up.

6        MS. HARRIS: It doesn't matter. It's

7 impeachment on a collateral matter. It's precisely

8 at point, Judge.

9        MS. LU: And it goes to credibility.

10 Let's take a look at the letter.

11       MS. HARRIS: You can't impeach on a

12 collateral matter. I don't know how many times we

13 can say this objection, but, Judge, this -- she can

14 ask her about it, she can talk to her about it, but

15 she can't use a document to impeach her on a

16 collateral matter.

17       ADMINISTRATIVE JUDGE NORKEN: Let's have

18 the witness please step out of the room.

19       THE WITNESS: Thank you.

20       ADMINISTRATIVE JUDGE NORKEN: Don't leave

21 us.

Page 1386

1        THE WITNESS: I may get a drink of water.

2        (Witness leaves the hearing room.)

3        MS. HARRIS: Judge, when she was

4 terminated or what the termination letter said is --

5 she can't use an outside document to impeach her on

6 that.

7        ADMINISTRATIVE JUDGE NORKEN: How is

8 credibility here any different from her propensity

9 or her character for truthfulness?

10       MS. LU: Well, she said that she -- yes

11 and no, she was terminated on December 23rd and the

12 termination letter -- well, she believes that

13 formally she was terminated then when she received

14 the termination letter, but the termination letter

15 is clear that she was released on December 23rd,

16 2005.

17       MS. HARRIS: First of all, I don't think

18 that's different from what she testified about; and

19 second, she can't use a document to impeach her

20 about it.

21       ADMINISTRATIVE JUDGE NORKEN: What you can

Page 1387

1 do -- once again, how is this -- I'm giving you an

2 opportunity. How is this any different from her

3 character for truthfulness?

4        MS. LU: It goes to her credibility. She

5 says one thing, but if there is evidence out there

6 to suggest otherwise, then it goes to her

7 credibility and some of it goes to her motivation

8 and bias.

9        ADMINISTRATIVE JUDGE NORKEN: Okay.

10 Doesn't that all go to her character for

11 truthfulness?

12       MS. LU: Yes, but we ask to be able to

13 prove that and to, you know, prove that with her

14 besides going back and forth with her on this.

15       ADMINISTRATIVE JUDGE NORKEN: Well, you

16 can ask her plain questions from the document itself

17 without showing her the document.

18       MS. LU: Without showing her the document.

19 Fine.

20       ADMINISTRATIVE JUDGE NORKEN: Okay.

21       MS. HARRIS: Fine.

Page 1388

1        ADMINISTRATIVE JUDGE NORKEN: Okay. Let's

2 have the witness come back in.

3        (Witness returns to the hearing room.)

4        ADMINISTRATIVE JUDGE NORKEN: Okay.

5 Miss Lu has questions for you.

6        THE WITNESS: Okay. Thank you.

7        BY MS. LU:

8    Q   Miss Rogler, isn't it true that in that

9 termination letter you referred to that it states

10 that you were released on December 23rd, 2005 from

11 the Clinical Center?

12    A   Do you have a copy of that? I don't want

13 to get technical, but my understanding was -- my

14 understanding was on the 23rd, Walter and Ray told

15 me that they're revoking my contract. On like the

16 29th, I met with the administrative officer who said

17 my contract was not revoked until she says it's

18 revoked, and they had a discussion with Walter, and

19 then she had me come in and she said that my

20 contract was going to be revoked, to turn in my ID

21 and my keys. And on like the 29th of December, I

Esquire Deposition Services

DC 1-800-441-3376        MD 1-800-539-6398        VA 1-800-752-8979

Page 1389

1 turned in my IDs and my keys, and then on

2 January 5th, I got the notice of termination.

3    Q    Okay.  But before January 5th when you see

4 that letter, you basically were not working at the

5 Clinical Center anymore; isn't that correct?

6    A    On December 29th, I met with the

7 administrative officer who told me I wasn't

8 terminated yet, that she had to approve the

9 termination.

10    Q    But didn't you just say that that's when

11 you also turned in your ID and your keys at the --

12    A    But in the end, I had to wait --

13        ADMINISTRATIVE JUDGE NORKEN:  Wait, wait.

14 One person at a time.

15    Q    Isn't that when you also turned in your

16 IDs and keys at the Clinical Center?

17        MS. HARRIS:  Objection; lack of

18 foundation.  When?  Isn't that when -- isn't what

19 when?  What day?

20        ADMINISTRATIVE JUDGE NORKEN:  You mean on

21 December 23rd?

Page 1390

1        MS. LU:  Well, she said December 29th, she

2 met with the administrative officer.

3        ADMINISTRATIVE JUDGE NORKEN:  Okay.  So I

4 sustain because not clear of the date.

5        MS. LU:  Fine.

6    Q    Isn't it true that on December 29th, you

7 had turned in your IDs and your keys at the Clinical

8 Center?

9    A    Yes.

10    Q    Isn't it true that you had contacted

11 Father Heffernan's attorneys, Mr. Kator and

12 Miss Harris, on December 23rd, 2005?

13    A    I think we called them on December 21st,

14 but we couldn't get through, and I think that I

15 finally called them on December 23rd and got

16 through.

17        ADMINISTRATIVE JUDGE NORKEN:  Called who?

18        THE WITNESS:  The attorneys, Kator,

19 Weiser.

20        ADMINISTRATIVE JUDGE NORKEN:  Okay.

21        MS. HARRIS:  Good enough.

Page 1391

1    Q    And are you currently represented by

2 Kator, Parks & Weiser?

3    A    No.

4    Q    Okay.  Are you currently represented by

5 any other law firm?

6    A    No.

7    Q    And you are currently unemployed; is that

8 correct?

9    A    Yes.

10    Q    Okay.  Isn't it true then that you were

11 the one who had contacted Dr. Fitzgerald in

12 October 2005 asking him to come and work at NIH?

13    A    After extensive conversations and E-mails,

14 Dr. Fitzgerald have me write a letter after it was

15 already established that I'd be coming, and the

16 letter -- I wrote a letter, yes, pursuant to his

17 instructions and mailed it to NIH.

18    Q    And isn't it true that in this letter you

19 had also -- it was an application for the position

20 of a part-time associate chaplain and for the

21 position in the CPE program?

Page 1392

1        MS. HARRIS:  Objection.  Your Honor, I

2 don't see how this is relevant, what position she

3 applied for.  How does this go to her character for

4 truthfulness or anything?

5        MS. LU:  She testified about it in her

6 direct.

7        ADMINISTRATIVE JUDGE NORKEN:  Well, it's

8 part of -- it's part of the scope of the testimony

9 that you asked about, so I'll overrule.

10    A    The technical term "application" is

11 defined on the ACPE website.  There is an

12 application that you must fill out.  The letter --

13    Q    My question was --

14        MS. HARRIS:  Let the witness finish.

15        MS. LU:  She's not even answering my

16 question.

17    A    The letter --

18        MS. HARRIS:  She's trying to answer your

19 question.

20        ADMINISTRATIVE JUDGE NORKEN:  Stop, stop.

21 Reask your question.

83 (Pages 1389 to 1392)

Arbitration

Page 1393

1    MS. LU: Thank you.
2    Q   My question was: Didn't your letter say
3 that this was an application for the position of
4 part-time associate chaplain and for the position in
5 the CPE program?
6    A   The letter speaks for itself, yes.
7    Q   And didn't you write handwritten on that
8 letter in October of 2005 "Thank you so very, very
9 much" to Dr. Fitzgerald?
10   A   Yes.
11   Q   And you were thanking him for --
12   A   But there is another document that is an
13 application that you have to fill out. It's many
14 pages long --
15       MS. LU: There is no question pending. I
16 would object to her continuation on that.
17       ADMINISTRATIVE JUDGE NORKEN: Just go
18 ahead and ask your question.
19       MS. LU: Thank you.
20   Q   Now, according to your testimony,
21 Dr. Fitzgerald began making these alleged statements

Page 1394

1 to you in August 2005 and continued in October and
2 November of 2005; is that correct?
3    A   Yes.
4    Q   Okay. And even though Dr. Fitzgerald had
5 started making these alleged statements to you in
6 August 2005 and October 2005, you still submitted
7 the application to work at NIH; isn't that correct?
8    A   Yes.
9    Q   And even though Dr. Fitzgerald made those
10 alleged statements to you in August and
11 October 2005, isn't it true that you still agreed to
12 come and work at NIH?
13   A   Yes.
14   Q   And you had testified that it was
15 mid-December 2005 when you started to contact
16 someone at the Clinical Center supposedly about
17 these statements that Dr. Fitzgerald made to you?
18   A   It was December 12th -- on or about
19 December 12th, 2005.
20   Q   On or about December 12?
21   A   Yes.

Page 1395

1    Q   Okay. So, basically, then you say that it
2 wasn't until December 12th -- even though a period
3 of time had passed in August 2005, more statements
4 made in October 2005 and then November 2005, it
5 wasn't until the mid-December 2005 that your
6 conscious, as you talked about, started to bother
7 you about these alleged statements --
8        MS. HARRIS: Objection.
9    Q   -- because that is when you contacted
10 someone to talk to them about it?
11       MS. HARRIS: Objection.
12       ADMINISTRATIVE JUDGE NORKEN: What's the
13 objection?
14       MS. HARRIS: Compound.
15       ADMINISTRATIVE JUDGE NORKEN: Overruled.
16   A   I can answer that question. On
17 December 9th, 2005, there was a suicide at NIH, and
18 the conduct of Dr. Fitzgerald and Father Dominic was
19 so abominable that finally, it was more than I could
20 take, and that I went in on Monday, December 12th,
21 and talked with Laura Chisholm about it. And the

Page 1396

1 same day, she sent me to be counseled by the
2 employee -- whoever's paid for -- NIH pays for this
3 counselor, and I saw him three or four times before
4 I spoke with Rabbi Brenner. Yes, there was an
5 incident that took the cake.
6    Q   So, basically, these alleged statements
7 made by Dr. Fitzgerald didn't bother you enough, but
8 that one particular incident and their alleged
9 reaction to the incident bothered you enough, but
10 you were okay with the alleged --
11       MS. HARRIS: Objection; compound,
12 badgering the witness.
13       MS. LU: Fine. I'll move on.
14       MS. HARRIS: It's compound.
15       ADMINISTRATIVE JUDGE NORKEN: Sustained.
16 Sustained.
17       THE WITNESS: Argumentative, too.
18       MS. LU: I will move on.
19   Q   Miss Rogler, you talked about a meeting
20 with Mr. Jones on I believe you said December 22nd,
21 2005; is that correct?

Page 1397

1    A   Yes.

2    Q   Wasn't that meeting in response to an

3   E-mail you had sent to Maureen Gormley which did not

4   contain anything with regard to Father Heffernan or

5   any alleged statements made?

6    A   Can I see the E-mail --

7        MS. HARRIS:  Hold on.  Objection;

8   compound.

9        MS. LU:  That wasn't compound.

10       MS. HARRIS:  It was.  Judge, she said in

11  response to an E-mail you sent that said this and

12  this and this, and then she said that you -- that

13  you didn't mention this, it's compound.  And then

14  she went on and said another clause.

15       ADMINISTRATIVE JUDGE NORKEN:  I got --

16  I -- the import of it is one thought.  It's not

17  compound.  Overruled.

18   A   At the end of the E-mail, I mention that

19  the department's a mess and in litigation with a

20  priest.

21   Q   That's it though?

Page 1398

1    A   No, because I wanted a meeting with her to

2   talk about the conversations.  I was complaining

3   about the number of conversations, but I didn't talk

4   about the contents of the conversations because I

5   wanted to talk to her --

6    Q   You didn't mention --

7        MS. HARRIS:  Let the witness finish.

8        ADMINISTRATIVE JUDGE NORKEN:  Go ahead.

9    A   I wanted to meet with her and talk to her

10  about the contents of the conversations that were

11  bothering me that I was being sent to counseling for

12  that was paid for by NIH.

13   Q   Isn't it true that in that E-mail you

14  mentioned nothing about any conversations or

15  contents of conversations with Dr. Fitzgerald and

16  you; isn't that true?

17   A   I'd have to review the E-mail.

18   Q   Uh-huh.

19   A   I mean, I really don't need sarcasm and

20  argument.  If you want me to answer the question, I

21  need to review the E-mail.

Page 1399

1    Q   Okay.  Thank you.  There's no question

2   pending.

3        MS. HARRIS:  She can't show it to you,

4   Miss Rogler.

5        ADMINISTRATIVE JUDGE NORKEN:  Off the

6   record.

7        (Brief discussion off the record.)

8        ADMINISTRATIVE JUDGE NORKEN:  Back on the

9   record.

10       Can you step out?

11       THE WITNESS:  Yes.

12       (Witness leaves the hearing room.)

13       ADMINISTRATIVE JUDGE NORKEN:  Now off the

14  record.

15       (Brief discussion off the record.)

16       (Witness returns to the hearing room.)

17       ADMINISTRATIVE JUDGE NORKEN:  Okay.  Are

18  you ready to proceed?

19       MS. LU:  Yes.

20       ADMINISTRATIVE JUDGE NORKEN:  Okay.

21       BY MS. LU:

Page 1400

1    Q   Miss Rogler, isn't it true that in this

2   E-mail you sent to Miss Gormley, that nowhere do you

3   mention any conversation or discussion you had with

4   Dr. Fitzgerald?

5    A   To the best of my memory, I do not

6   remember discussing the contents of the telephone

7   conversations or the personal conversations, but I'd

8   have to review the memo to be sure.

9    Q   Okay.  If you want to take a look at

10  Exhibit 69 in the blue book No. 2.  69.  Do you see

11  that E-mail from you to Maureen Gormley dated

12  December 18, 2005?

13   A   Yes.

14       MS. HARRIS:  Hold on a second.

15       ADMINISTRATIVE JUDGE NORKEN:  Now, you may

16  only -- you may look at it and then you just set it

17  aside.

18       MS. LU:  Right.  Just review it and then

19  put it away.

20       ADMINISTRATIVE JUDGE NORKEN:  No questions

21  will be asked of you until you review it

Page 1401

1    THE WITNESS: Thank you, Your Honor.

2    (Witness reviews the document.)

3    ADMINISTRATIVE JUDGE NORKEN: Now, which

4 E-mail are we talking about?

5    MS. LU: Oh, I said the E-mail at the

6 bottom from Miss Rogler to Maureen Gormley dated

7 December 18, 2005, 2:57 p.m.

8    ADMINISTRATIVE JUDGE NORKEN: I don't even

9 need to see this, do I?

10    MS. LU: No.

11    MS. HARRIS: No.

12    ADMINISTRATIVE JUDGE NORKEN: Okay.

13    (Witness reviews the document.)

14    BY MS. LU:

15    Q    When you're done, set it aside.

16    A    (Witness complies.)

17    Q    Now, Miss Rogler, isn't it true that in

18 your E-mail to Miss Gormley --

19    ADMINISTRATIVE JUDGE NORKEN: You need to

20 ask her whether it refreshes her recollection.

21    Q    Oh. Does that refresh your recollection

Page 1402

1 with regard to that E-mail?

2    A    Yes.

3    Q    Okay. Now, isn't it true that nowhere in

4 that E-mail do you make reference or talk about any

5 discussions or conversations that you had where

6 Dr. Fitzgerald allegedly made these statements? Yes

7 or no?

8    A    No, it is not true. If I understand the

9 question right, are you saying anywhere in this

10 E-mail do I talk about conversations?

11    Q    No. That's not my point.

12    Nowhere in this E-mail do you talk about

13 these alleged statements that you testified about in

14 your direct that Dr. Fitzgerald made with regard to

15 Father Heffernan in that E-mail; is that correct?

16 You make no reference to those statements?

17    A    I say in the last paragraph that I talked

18 to Laura Chisholm about the problems I was having

19 with Ray, and the next sentence says he's in

20 litigation with a Catholic priest.

21    Q    And that's it. That's all you state,

Page 1403

1 correct?

2    MS. HARRIS: Objection.

3 Mischaracterizes --

4    A    I'd have to read it again because I think

5 you're mischaracterizing my E-mail. My E-mail's I

6 want to talk to her because I'm having problems with

7 Ray, I'm getting all these conversations, I was

8 talking about the conversations with Laura Chisholm,

9 and he's in litigation with the Catholic priest, and

10 he's terminated another associate chaplain, and he's

11 done all these other things, and I need to know how

12 NIH wants me to deal with him.

13    Q    Okay. Miss Rogler, let's see. You had

14 stated that -- oh. You went to see Laura Chisholm

15 in December -- early December; is that correct?

16    A    On or about December 12th, 2005.

17    Q    December 12, 2005.

18    Isn't it true, Miss Rogler, that even on

19 December 15th, 2005 at like 4:49 p.m., you are

20 sending E-mail to Dr. Fitzgerald saying "Dear Ray:

21 I want to thank you for everything" --

Page 1404

1    MS. HARRIS: Objection.

2    Q    -- "that you have done for me" --

3    MS. HARRIS: Objection. She needs to stop

4 reading from the document. It's improper.

5    ADMINISTRATIVE JUDGE NORKEN: You need to

6 ask questions, not to read from a document.

7    MS. HARRIS: Move to strike her question.

8    MS. LU: I'll rephrase.

9    ADMINISTRATIVE JUDGE NORKEN: Sustained

10 and granted.

11    MS. HARRIS: Thank you.

12    BY MS. LU:

13    Q    Isn't it true, Miss Rogler, that even as

14 late as December 15th, 2005, you had stated in

15 writing to Dr. Fitzgerald how much you admire his

16 capabilities as a chaplain?

17    A    On December 9th, Laura Chisholm and I --

18    Q    Please answer --

19    A    -- had a discussion on how to handle Ray.

20    MS. LU: I would instruct the witness to

21 just answer my question.

Page 1405

1    MS. HARRIS: The witness is trying to

2 answer.

3    ADMINISTRATIVE JUDGE NORKEN: No, no.

4    MS. LU: No.

5    ADMINISTRATIVE JUDGE NORKEN: This is a

6 yes or no question. You need to answer it yes or

7 no.

8    A  I wrote that memo based on a conversation

9 I had with Laura Chisholm and the counselor.

10    ADMINISTRATIVE JUDGE NORKEN: So the

11 answer is yes?

12    THE WITNESS: Yes.

13    ADMINISTRATIVE JUDGE NORKEN: Okay.

14    The attorney for the Complainant, if they

15 wish, can ask further questions later.

16    THE WITNESS: All right. Thank you.

17    Q  Isn't it true, Miss Rogler, that even as

18 late as December 17th, 2005, you had stated in

19 writing to Dr. Fitzgerald that you had appreciated

20 what he had done for you and you wanted to learn

21 from him? Isn't that true?

Page 1406

1    A  I'd have to look at the memo. There is a

2 lot that I can learn from Dr. Fitzgerald and there's

3 a lot that I don't want to learn from

4 Dr. Fitzgerald.

5    Q  And let me see. And you had testified

6 before that you went to law school; is that correct?

7    A  Yes.

8    Q  And you practiced as a trial attorney?

9    A  Yes.

10    Q  From what? 1989 to 1995? Is that the --

11    A  No. I was a law clerk and other things.

12    Q  Okay. Isn't it true, Miss Rogler, that in

13 these discussions and conversations you had with

14 Dr. Fitzgerald where he allegedly made these

15 statements to you that you testified about on your

16 direct, that there were no other witnesses or

17 persons around at the time when he made the

18 statements?

19    A  Dr. Fitzgerald wouldn't introduce me to

20 anyone or have anybody else around; so, yes.

21    Q  I would just --

Page 1407

1    A  I mean, the majority of them, nobody's

2 around.

3    Q  Thank you. She's already answered my

4 question.

5    Now, you had testified on your direct that

6 these alleged conversations had ceased sometime in

7 the beginning of December; is that correct?

8    A  They changed.

9    Q  I thought you said that they stopped.

10    A  Well, some of the --

11    MS. HARRIS: Objection. Mischaracterizes

12 her testimony and it's not in the form of a

13 question.

14    ADMINISTRATIVE JUDGE NORKEN: You may --

15 I'll just let her answer whether it stopped or not.

16    THE WITNESS: Now I forget the question.

17    ADMINISTRATIVE JUDGE NORKEN: The question

18 is whether they stopped or not -- the conversations

19 with Ray stopped or not.

20    A  I still had conversations with Ray.

21    Q  Okay. But --

Page 1408

1    A  Ongoing conversations with Ray. I noticed

2 a change in him sometime in December.

3    Q  Okay. And you had stated that it was

4 around the time that I had called the office as you

5 mentioned my name in your direct testimony; is that

6 correct?

7    A  Yes.

8    Q  How did you know that, that I had

9 called --

10    A  I answered the phone.

11    Q  Okay. And at that time, why was it that

12 you did not -- well, did you know who I was?

13    A  Before you called?

14    Q  No. When I called.

15    A  You said "Julie Lu calling for Dana

16 Kelly."

17    Q  And did you know that I represented the

18 Agency?

19    A  You had told me that you never tell

20 anybody who you represent.

21    Q  But did you know that I was a

**Page 1409**

1 representative for the Agency? I'm not asking you
2 what I told you. Did you know?
3     A    I was pretty sure after talking with you
4 that you told me you represented the Agency.
5     Q    Then at that time, why was it that you did
6 not bring to the Agency's attention about these --
7 or to my attention about these alleged statements
8 that Dr. Fitzgerald made to you in August 2005 and
9 October and November?
10    A    Because Laura Chisholm told me that Ray is
11 so paranoid, not to discuss it with anyone but her
12 and the counselor and a person named Maureen who was
13 her mentor.
14    Q    Okay.
15    A    And that I was going to her, the
16 counselor, and a person named Maureen, and it was
17 our agreement that he's so paranoid, that I'd be
18 fired immediately if I told anybody else anything
19 about what I knew.
20    Q    Okay. Except for you said that you didn't
21 talk to Laura Chisholm until December 9th, 2005.

**Page 1410**

1     A    I talked to her --
2     Q    That's what you had said.
3     A    I don't know when I talked to you.
4     Q    Okay. Well, I can assure you that it was
5 before that.
6     MS. HARRIS: Objection. Move to strike.
7     ADMINISTRATIVE JUDGE NORKEN: Sustained.
8 Granted. Unless you're going to --
9     MS. HARRIS: And I'd be glad to put her on
10 the stand.
11    ADMINISTRATIVE JUDGE NORKEN: Unless
12 you're going to withdraw as counsel.
13    MS. LU: No. I will withdraw that
14 comment, but it's already been stricken.
15    MS. HARRIS: Could you please instruct
16 Miss Lu not to -- I mean, if you're going to --
17    ADMINISTRATIVE JUDGE NORKEN: I hope that
18 she knows enough not to do that.
19    BY MS. LU:
20    Q    Isn't it true, Miss Rogler, that in the
21 December 23rd, 2005 meeting you had with Mr. Jones

**Page 1411**

1 and Dr. Fitzgerald, that you had stated to them that
2 you would -- you were going to contact a lawyer and
3 that you were going to get the one that the priest
4 has?
5     A    I was going to contact the priest's lawyer
6 and get a lawyer.
7     Q    So you did make a statement like that?
8     A    "I'm getting a lawyer and I'm contacting
9 the priest's lawyer," I think; so, yes. But I know
10 enough to know that the priest's lawyer can't be my
11 attorney.
12    ADMINISTRATIVE JUDGE NORKEN: What did you
13 say?
14    THE WITNESS: I know enough as an attorney
15 that an attorney representing the priest cannot also
16 represent me. I mean, that's a given. But I had
17 already tried to make contact on December 21st with
18 Rabbi Reeve.
19    Q    Just one minute. Let me see if I have
20 anything else.
21    You had stated that you went on the

**Page 1412**

1 Internet to see if this case was a federal case --
2 in federal court; is that correct?
3     A    Yes.
4     Q    Okay. When did you do that?
5     A    I don't remember.
6     Q    Was it in November?
7     A    No. I think it was December.
8     Q    Was it before you met with Rabbi Brenner?
9     A    If I had to place it, I'd place it between
10 the time Father Dominic was talking about a
11 deposition or something and before I met with Rabbi
12 Brenner. Somewhere in there, I think I did it.
13    MS. LU: Okay. I think that's all the
14 questions I have for her.
15    ADMINISTRATIVE JUDGE NORKEN: I have
16 questions for you. Did the NIH terminate your
17 contract?
18    THE WITNESS: Yes.
19    ADMINISTRATIVE JUDGE NORKEN: When did
20 that occur?
21    THE WITNESS: Okay. Like I told you,

38 (Pages 1409 to 1412)

Arbitration

Page 1413

1 there was a spread. On December 23rd, they said
2 they don't have to have a reason, that they can just
3 do it for the convenience of the government, and
4 that was Walter and Ray. On the 29th, I called the
5 administrative officer and she said, "Your contract
6 is not terminated. They have just verbally told you
7 that, and they can't do it without the approval of
8 the administrative officer." And then I went in and
9 met with Angela Kenny and Nyna Konishi on
10 December 29th, and they said, "Your contract" -- we
11 had several conversations, first by phone, and then
12 they were going to talk to Walter Jones and get back
13 with me. They said come on into their office. So I
14 came into their office, and they said they talked to
15 Walter Jones. "Your contract is being terminated
16 without cause for the convenience of the
17 government," and they cited a specific clause.
18      ADMINISTRATIVE JUDGE NORKEN: Did they
19 give you any reasons?
20      THE WITNESS: No. They said they don't
21 have to have a reason, and she wrote a confirming

Page 1414

1 E-mail to their attorney F-I-T-I-L-I-S.
2      ADMINISTRATIVE JUDGE NORKEN: Fitilis?
3      THE WITNESS: Fitilis. And I have a copy
4 of that confirming E-mail that I was being
5 terminated for the convenience of the government
6 without cause. Then after they received notice that
7 I was coming in here as a witness through Cathy
8 Harris --
9      MS. LU: Objection; lack of foundation to
10 that.
11      MS. HARRIS: What? That's not a proper
12 objection.
13      MS. LU: Well, to her testimony as to
14 after they found out that they were -- she was
15 coming to testify. How did she know that?
16      ADMINISTRATIVE JUDGE NORKEN: First, do
17 you know -- how do you know that?
18      THE WITNESS: I know that because I'd read
19 the motion that asked -- go ahead.
20      ADMINISTRATIVE JUDGE NORKEN: Go ahead.
21 There's no objection. Go ahead.

Page 1415

1      THE WITNESS: Okay. I read a motion that
2 said January 4th, I was being motioned for me to
3 testify, and on January 5th Express Mail, I got by
4 Express Mail a letter dated January 5th that was
5 attached to their motion I heard.
6      ADMINISTRATIVE JUDGE NORKEN: Okay. One
7 moment.
8      THE WITNESS: And that January 5th letter
9 changes the cause of my termination.
10      ADMINISTRATIVE JUDGE NORKEN: Oh. It
11 changed the cause of your termination?
12      THE WITNESS: Yes, after they found out I
13 was definitely coming in here, because the agreement
14 Walter was offering me, the proposition he said
15 quote, unquote, "I will give you a good
16 recommendation if bygones be bygones and you don't
17 tell anybody anything you saw or heard at NIH." On
18 the 29th, the administrative officer told me I was
19 being terminated for the convenience of the
20 government, and she said the clause. I've got a
21 confirming E-mail on it. On the 29th,

Page 1416

1 administrative officer E-mailed the Attorney Fits,
2 whatever, I was being terminated for cause for the
3 convenience of the government. On January 5th, they
4 sent me a letter after having received notice that I
5 was coming here to testify, and they changed the
6 whole clause. It's now "In the interest of the
7 government, the pain and palliative care leadership
8 has concerns about your interaction with the
9 patients." So they changed the cause and clause and
10 everything.
11      ADMINISTRATIVE JUDGE NORKEN: Okay. Well,
12 tell me about that. Did such an issue ever come up
13 during your tenure there?
14      THE WITNESS: Not with me. And I have
15 documents that I can show you.
16      ADMINISTRATIVE JUDGE NORKEN: I don't need
17 to see the documents.
18      THE WITNESS: Okay. On December 16th
19 before I had a contract period, okay, when I just
20 came into the thing, said hello, met the students,
21 Ray gave me the pager. He said, "Here's the pager.

89 (Pages 1413 to 1416)

Page 1417

1 Can you come and work tomorrow?" I said, "Yes."
2 Then I got a memo from Dana saying he wanted me to
3 go to pain and palliative care as a volunteer, okay,
4 so I went there one time as a volunteer and I met,
5 not officially, with a patient who is also an
6 employee. I just said "hello" to her. Then he had
7 me come in Monday because he was going to be late,
8 okay? And on Monday, I saw three patients: Two
9 with Ray and one by myself. The one patient
10 complained about Ray, and this is December -- this
11 is November 21st, 2005 before my contractual period.
12 The patient complained about Ray, not about me. And
13 I've never been back to the Pain and Palliative Care
14 Clinic because I wasn't assigned there. I'm
15 assigned to the medical/surgical side as an
16 associate chaplain. The clinic is for outpatients'
17 pastoral counseling. Clinical pastoral counseling
18 requires a pastoral counseling degree that I don't
19 have. Ray has all kinds of counseling degrees.
20 Katherine Sullivan had all kinds of counseling
21 degrees.

Page 1418

1        MS. HARRIS: I think the witness has gone
2 beyond your question, Judge.
3        ADMINISTRATIVE JUDGE NORKEN: Okay. Were
4 you -- did at any point in time someone from the
5 clinical and palliative care perception, to your
6 knowledge, say that you should not come back?
7        THE WITNESS: No. The first and only time
8 I've heard that is in that January 5th, 2005 letter
9 because I was never to be assigned to that clinic.
10 Father Dominic's not assigned there, Therese
11 Stewart's not assigned there, Rabbi Reeve's not
12 assigned there. None of the staff chaplains or
13 contract chaplains are assigned there.
14        MS. HARRIS: Judge, this -- I'm sorry.
15        THE WITNESS: And I'm not assigned there.
16 I was not to be assigned there.
17        ADMINISTRATIVE JUDGE NORKEN: Let me see
18 if I have any other questions.
19        MS. HARRIS: It was a yes or no question.
20        ADMINISTRATIVE JUDGE NORKEN: I was
21 satisfied with the witness.

Page 1419

1        MS. HARRIS: Okay. That's fine. No
2 problem. I don't want to -- if you feel she's
3 answering your question, that's great.
4        ADMINISTRATIVE JUDGE NORKEN: Did
5 Mr. Fitzgerald say why he didn't -- is it true that
6 you testified that Mr. Fitzgerald said that he
7 didn't like Catholics?
8        THE WITNESS: He has a deep-seeded
9 animosity towards the entire Roman Catholic Church.
10        ADMINISTRATIVE JUDGE NORKEN: Well, how do
11 you know that?
12        THE WITNESS: Through extensive
13 conversations over months. And the only predominant
14 ones I remember is that he's never going to have
15 another Roman Catholic priest hired there again,
16 that he deliberately fired Father -- he doesn't call
17 him "Father" -- Henry to hire Dominic, that he spent
18 hours figuring out how to fire him, that Roman
19 Catholics don't understand that concept that he
20 stands in the shoes of God, and he doesn't like
21 rabbis, either, or Jews.

Page 1420

1        ADMINISTRATIVE JUDGE NORKEN: Okay. Did
2 he say why he wasn't -- well, I think you've
3 answered the question.
4        How long did your contract -- how long did
5 you actually work for NIH?
6        THE WITNESS: One or two weeks in August,
7 and I was scheduled to come back Christmas,
8 December, and then he asked me to come back earlier
9 mid-November, so I actually came back mid-November
10 and I was to work through December of 2006, of this
11 year.
12        ADMINISTRATIVE JUDGE NORKEN: Okay. And
13 when -- okay. And you worked from mid-November
14 until December 23rd; is that right?
15        THE WITNESS: Right.
16        ADMINISTRATIVE JUDGE NORKEN: And was that
17 doing CPE or not?
18        THE WITNESS: No. Ray said, "You can" --
19 he cannot offer me the CPE position for a unit that
20 has already begun unless all of the students agree,
21 and that I could try it. And I actually attended

90 (Pages 1417 to 1420)

Page 1421

1 one CPE class day November 30th, okay? One day.

2 And it was so horrible. He was calling me at 7:00

3 in the morning, okay? And after that day and

4 everything else that happened, I told him that I do

5 not want to take CPE. I never -- I never filled out

6 and submitted the ACPE application, I never signed

7 the contract for training at NIH, my name was never

8 included on the student list. I have 11 things. I

9 never turned in my former CPE supervisor

10 evaluations, I never executed the NIH agreement for

11 training, I never received a letter of acceptance

12 into CPE --

13      MS. LU: I would object that she's reading

14 off of a notepad there that she has some notes on.

15      ADMINISTRATIVE JUDGE NORKEN: Can you turn

16 your notes around.

17      THE WITNESS: I never received a CPE ID

18 badge, I never wrote a letter accepting an offer to

19 be in CPE, I was never given a letter of

20 disciplinary for not going back to CPE, I was never

21 given a letter terminating me as a CPE student, so I

Page 1422

1 was never given an acceptance letter. And when they

2 terminated me on the 23rd or the 29th or

3 January 5th, if I was in CPE, they would have had to

4 bring me up on charges in CPE and also terminate me

5 from CPE, which they have not done because I was

6 never in CPE. And I have the student list in my

7 pocketbook if you want to see it. My name's not on

8 it.

9      ADMINISTRATIVE JUDGE NORKEN: You're

10 currently unemployed, right?

11      THE WITNESS: Correct.

12      ADMINISTRATIVE JUDGE NORKEN: Have you

13 been offered anything of value for you to come and

14 testify here today?

15      THE WITNESS: Nothing. Nothing. Not even

16 a parking -- my parking fees. Today I got a

17 sandwich and a Pepsi.

18      MS. HARRIS: Which we, for the record,

19 offered to you, Miss Lu, and the court reporter,

20 Judge.

21      THE WITNESS: And I have no personal

Page 1423

1 interest in the outcome of this case.

2      ADMINISTRATIVE JUDGE NORKEN: And they did

3 not take you up on it?

4      MS. HARRIS: Which I find too bad.

5      MR. KATOR: We're disappointed.

6      MS. HARRIS: We're disappointed, yeah.

7      THE WITNESS: I would have been in far

8 better position if I hadn't come in here and

9 testified because on the 29th, what they gave me was

10 they'd let me go for no cause; now they've got me as

11 letting me go for cause as having a problem with the

12 patients, that they put that on January 5th.

13      ADMINISTRATIVE JUDGE NORKEN: Well, let me

14 ask you this. When they gave you the letter, the

15 termination without cause --

16      THE WITNESS: For the convenience of the

17 government.

18      ADMINISTRATIVE JUDGE NORKEN: -- for the

19 convenience of the government, had you made any

20 agreement with the Agency about not saying anything

21 about this today?

Page 1424

1      THE WITNESS: What I did, I didn't accept

2 the offer or reject the offer. They got the

3 rejection through her notice that I was coming as a

4 witness on the 4th of January, and they Express

5 Mailed me a letter dated January 5th changing all

6 the things that is going to severely damage my

7 career as a chaplain.

8      MS. LU: And just note for the record that

9 Miss Rogler was pointing at Miss Harris when

10 referring to "her."

11      THE WITNESS: Miss Harris notified you

12 that I was coming to testify. And according to the

13 E-mails that I received from NIH --

14      MS. HARRIS: Miss Rogler, she's just doing

15 it for the record.

16      ADMINISTRATIVE JUDGE NORKEN: Okay. I

17 don't have any other questions.

18      THE WITNESS: So I'd be far better off had

19 I never came here.

20      MS. HARRIS: I have a few.

21      ADMINISTRATIVE JUDGE NORKEN: Re-direct.

91 (Pages 1421 to 1424)

Page 1425

1    MS. HARRIS:  Thank you.

2    ADMINISTRATIVE JUDGE NORKEN:  About how
3 long?

4    MS. HARRIS:  About 15 or 20 minutes.

5    ADMINISTRATIVE JUDGE NORKEN:  Let's try
6 and finish.

7        RE-DIRECT EXAMINATION

8    BY MS. HARRIS:

9    Q    Miss Rogler, you mentioned that there was
10 an incident on thereabout December 12th about a
11 suicide at NIH that you felt that Dr. Fitzgerald and
12 Father Ashkar's actions were so abominable, that it
13 put you over the edge.  What happened?

14    MS. LU:  Objection to that question as to
15 the relevance.

16    MS. HARRIS:  It was brought up in
17 Miss Lu's cross examination.

18    MS. LU:  I didn't ask her about that.

19    MS. HARRIS:  Right, but it was elicited
20 through testimony.

21    MS. LU:  It's not still not relevant what

Page 1426

1 happened to that patient at the Clinical Center at
2 that time.

3    MS. HARRIS:  I'm not asking about the
4 patient, I'm asking about -- and I'm glad to clarify
5 it -- about what actions of Dr. Fitzgerald and
6 Father Ashkar.

7    ADMINISTRATIVE JUDGE NORKEN:  I'm
8 interested in her motivation, so overruled.

9    THE WITNESS:  Thank you, because it
10 brought back something else that I had forgotten.

11    BY MS. HARRIS:

12    Q    Okay.  Well, first, I'd like you to
13 answer -- we can get to that, but listen to my
14 question.

15    A    Yes. I know.  What happened, what did
16 they do.

17    Q    Okay.  Let me restate it.

18    A    It's December 9th.

19    Q    Okay.  December 9th.  What actions were
20 there of Dr. Fitzgerald and Father Ashkar that you
21 felt were so abominable?  That's my question.

Page 1427

1    A    Okay.  I was very sick and I was supposed
2 to come in on Friday, and Dr. Fitzgerald was in
3 California, okay?  He left Father Dominic in charge
4 of the spiritual care -- Spiritual Ministry
5 Department, and he left Father Dominic with the
6 Protestant pager and the Catholic pager, so Father
7 Dominic was in charge of everything.  And so I
8 called him and I said, "I'm not coming in.  I'm sick
9 as a dog."  He said, "Well, I'm running late, too.
10 I probably will be in like 11:00," or whatever.

11    Q    In the morning or in the evening?

12    A    In the morning.

13    Q    Okay.

14    A    And then I started feeling better, so I --
15 like 2:30, I started heading back towards NIH.  I
16 was still sick, but I was going to just try to see
17 if there was anything that I needed to do.  So I
18 called Father Dominic around 3:00 p.m., and he
19 didn't answer his cell phone.  And I got to NIH and
20 a little bit later, he called me.  He said, "I've
21 left NIH."  And I said. "Okay.  Well, I wanted to

Page 1428

1 get updated from you about the Protestant patients
2 because you were supposed to visit them today."  And
3 he said, "I don't have time to visit the Protestant
4 patients.  I only visit the Roman Catholic patients,
5 and I'm out of the office."

6        Okay.  So then about 4:00 p.m., the pager
7 started -- the overhead announcement started going
8 off; codes, you know, "All heads of departments come
9 to the 7th floor atrium," and a patient had
10 committed suicide by jumping off the 7th floor
11 atrium and landing on the bottom floor, and it was
12 all bloody and the people -- doctors and people were
13 working on the patient and they were getting him
14 taken out of there.  And then Dr. Gallin and the
15 heads of all the departments were supposed to meet
16 on the 7th floor, okay, and they were all gathering
17 there, and I knew Father Ashkar had left, so I
18 called him and I said, "Your presence is urgently
19 needed back at NIH.  We have a suicide, and it was
20 witnessed by these patients.  Everybody's upset."
21 And he said, "I'm already in Virginia and I'm not

92 (Pages 1425 to 1428)

Page 1429

1 coming back to NIH." And this is at 4:00 in the
2 afternoon. So he had gotten there about 11:00, he
3 left around 2:00-something, was supposed to be
4 there, then he was supposed to be on call and he
5 refused to come back, and then he said, "You handle
6 it."
7        Okay. So then I went to the triage team
8 and they sent me into the psych unit to talk with
9 the patients who had witnessed the suicide, so I
10 called Ray and left a message on his phone that
11 there was a suicide and that I was talking to the
12 patients on the psych unit. And he calls me back
13 and he said, "I'll give you 60 seconds. I'm going
14 to talk to you for 60 seconds. You get off that
15 ward right now." And hung up on me.
16        ADMINISTRATIVE JUDGE NORKEN: Get off
17 what?
18        THE WITNESS: That unit right now, and he
19 hung up on me.
20    Q    Ward?
21    A    Unit.

Page 1430

1    Q    Okay.
2    A    But Dr. Gallin had asked me to be there --
3 the director of the hospital -- the psychiatrist had
4 asked me to be there, and I was doing it, okay? So
5 then I call him back and I left him a message and I
6 said, "I want you to know why I'm not getting off
7 this unit, because I'm not sure that's what you
8 said, number one. I'm not sure if we lost contact
9 or whether you hung up on me, but Father Dominic
10 refused to come back and he told me to handle it and
11 so did the psychiatrist and Dr. Gallin," or
12 something like that. So a little bit later, Ray
13 calls me back and he says -- I said to him, "I just
14 wanted you to know why I'm on this unit." I said,
15 "Did you hang up on me?" He said, "Yes, I hung up
16 on you. I went back to the conference." He waited
17 'til the conference was over to call me back, okay?
18 So when the conference was over, he called me back,
19 and then he said -- I said, "Well, I just want you
20 to know why I stayed on the unit; that Father
21 Dominic told me to stay here, Dr. Gallin told me to

Page 1431

1 stay here, and the psychiatrist told me to stay
2 here." And he says, "Yes, I know. I've talked to
3 Father Dominic and he admitted that he refused to
4 come back to the NIH, that he was scheduled to do a
5 Mass in Virginia and he did the Mass in Virginia."
6 Instead of -- see, he was working two jobs at the
7 same time. And he said, "Don't tell anyone. Don't
8 tell anyone. You can understand why he would go to
9 that Mass, can't you?" And I said, "No, I can't."
10        So then a little while later, Father
11 Dominic calls me and he says, "Well, I've completed
12 Mass and I've gone home, but I'm not coming back to
13 the hospital." So then he -- then come Sunday, he
14 still hadn't visited the Roman Catholic patients who
15 had witnessed the suicide and that were upset. So,
16 Sunday Mass, there's a different Roman Catholic
17 priest, and I went to him and I said, "Look.
18 There's a Roman Catholic patient on the psych unit
19 who needs to see a Roman Catholic priest. Will you
20 please go over and see him?" And he said, "Yes."
21    Q    Okay. So were those the actions of Ray

Page 1432

1 and Dominic that upset you so much?
2    A    Right, because part of the reason why I
3 could stomach all of that was because Ray kept
4 saying to me what a great priest Father Dominic was,
5 and then what I was seeing was totally different.
6 And then finally on Friday, that was not a great
7 priest as far as patient care is concerned.
8    Q    Okay. So --
9    A    And I kind of knew then that this whole
10 thing was -- that there was no saving grace in this
11 whole thing that happened over all these years or
12 whatever.
13    Q    All right. Now, the fact that your
14 contract was terminated, does that affect the
15 truthfulness of your testimony here today?
16    A    No.
17    Q    And why not?
18    A    Because I've tried to be as truthful as I
19 can. And there's a lot more that I could say that
20 I'm not going to say because, you know, I'd have
21 to -- I'm not a doctor. There's a lot more I could

93 (Pages 1429 to 1432)

Page 1433

1 say that I think, but as a lay -- not as a medical

2 person, I can't say.

3    Q    And it's your testimony that the

4 management at NIH gave you one reason at first for

5 terminating your contract, and then changed that

6 after your belief is that management learned you

7 were coming here to testify?

8    A    Uh-huh.

9    Q    Is that yes?

10    A    Yes.  I have the documents that shows

11 that, plus I have my own personal memory of what

12 happened.  And I also remembered something else I

13 was going to say on your other question.  If you

14 have any doubt --

15        MS. LU:  Well, objection to this.

16    A    As a further answer, there was one other

17 thing I wanted to say.

18    Q    Let me ask you is there something else

19 you'd like to ask?

20    A    About the truthfulness of my testimony.

21    Q    Okay.

Page 1434

1        ADMINISTRATIVE JUDGE NORKEN:  What

2 question?

3        MS. HARRIS:  She said --

4    A    If the termination is changing my

5 testimony.  And I can say this to you:  That I went

6 to that counselor.  I release any confidentiality

7 with that counselor.  If you want to call him and

8 ask him what was I saying on December 12th, what was

9 I saying when I met with him thereafter, you are

10 more than welcome to ask him.

11    Q    Okay.  It would be collateral, but in any

12 event, I appreciate that, Miss Rogler.

13        MS. HARRIS:  I have nothing further.

14 Thank you for your testimony here today.

15        ADMINISTRATIVE JUDGE NORKEN:  Recross?

16        MS. LU:  Yes.

17        ADMINISTRATIVE JUDGE NORKEN:  How long?

18        MS. LU:  Five minutes.

19            RECROSS EXAMINATION

20 BY MS. LU:

21    Q    Miss Rogler, when you were talking about

Page 1435

1 the CPE and being in the CPE program at NIH, isn't

2 it true that over the span of a couple of days in

3 mid-December that you had E-mail exchanges with

4 Dr. Fitzgerald about the conditions where you would

5 be participating in the CPE program and his

6 affirmation or confirmation that you were accepted

7 into the CPE program?

8        MS. HARRIS:  Objection.  The question is

9 not clear, it's vague and --

10        ADMINISTRATIVE JUDGE NORKEN:  I don't

11 think it's vague.  Overruled.

12        MS. HARRIS:  I don't understand it, but --

13    A    It is true that Ray wanted me in the

14 program and I did not want to be in the program.  It

15 is true there was negotiation going back and forth,

16 yes.  And I was trying to limit my exposure to Ray.

17        MS. LU:  Okay.  I think that's all the

18 questions I have.

19        MS. HARRIS:  Nothing further, Judge.

20        ADMINISTRATIVE JUDGE NORKEN:  Miss Rogler,

21 I have issued an order that applies to all the

Page 1436

1 witnesses and applies to you that you're not to

2 discuss this case or your testimony in this case

3 with any other witness in the case until these

4 proceedings are ended.

5        Is this witness going to be used in

6 rebuttal?

7        MS. HARRIS:  No.

8        ADMINISTRATIVE JUDGE NORKEN:  Is this

9 witness going to be used in rebuttal, Miss Lu?

10        MS. LU:  No.

11        MS. HARRIS:  I guess I don't know at this

12 point, but I don't think so.

13        ADMINISTRATIVE JUDGE NORKEN:  It does not

14 appear as though you're going to be called back as a

15 rebuttal witness.  I thank you for your testimony.

16 You're excused.  Thank you.

17        THE WITNESS:  Thank you.

18        ADMINISTRATIVE JUDGE NORKEN:  Off the

19 record.

20        (Brief discussion off the record.)

21        ADMINISTRATIVE JUDGE NORKEN:  We'll need

94 (Pages 1433 to 1436)

Page 1437

1 two days in order to finish this case. We will
2 search for that two back-to-back days. Until
3 then -- we'll do that off the record in the next
4 couple of days to a week. Until then, we're
5 adjourned. Off the record.
6        (The hearing recessed at 6:23 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 1438

1        CERTIFICATE OF REPORTER
2        I, CARLA J. BRIGGS, Court Reporter, do
3 hereby certify that the testimony that appears in
4 the foregoing transcript is the testimony of said
5 witnesses, were taken by me in shorthand and
6 thereafter reduced to computerized transcription
7 under my direction; that said transcript is a true
8 record of the testimony given by said witnesses; do
9 hereby certify that the foregoing transcript is a
10 true and correct record of the statements of
11 counsel; that I am neither counsel for, related to,
12 nor am employed by any of the parties to the action;
13 and further, that I am not a relative or employee of
14 any attorney or counsel employed by the parties
15 thereto, nor financially or otherwise interested in
16 the outcome of the action.
17
18

        Carla J. Briggs, RPR-RMR-CRR
19        Notary Public
20
21 My commission expires: August 1, 2009

95 (Pages 1437 to 1438)