IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                                    :
**Plaintiff** *pro se,*

v.                                                          :

                                                                        C.A. No.  1:07-cv-02308(RMC)

**WILLIAM BIGLOW,** *et al.*
**Defendants.**                                    :

...oOo...

## PLAINTIFF'S MOTION FOR JUDICIAL NOTICE
### PART IV
### [FRE 201]

Plaintiff, Edar Rogler, pro se hereby respectfully moves for the Court to take judicial notice

of the following documents and incorporates by reference herein her points and authorities contained

in her three other motions for judicial notice [Dkts. # 43, 44 & 47]:

A.  NIH CC's records on Edar Rogler, Exh. "1":

1. Paycheck from NIH for Edar Rogler dated 08/19/05 in the amount of $480.00

2. Letter of recommendation from Wendell K. Rome, D.Min. to Dr. Rev. O. Ray Fitzgerald

dated November 4, 2005;

3. Letter of recommendation from Vicki Wilcox, MSW, LSW to Rev Dr. O. Ray Fitzgerald

dated November 11, 2005;

4. Email from Yasmin Coates to Dana Kelley dated November 17, 2005 10:53 AM

scheduling employee Edar (Deborah) Rogler to attend Clinical Center New Employee Orientation on

November 28-29, 2005 and email from Dana Kelley to Yasmin Coates dated November 7, 2005

inquiring if employee Edar (Deborah) Rogler could be added to New Employee Orientation on

November 28 and 29, 2005;

5. Spiritual Ministry Department Orientation Checklist for Edar Y. Rogler, J.D. dated 11/18/05;

6. Memo from Dana Kelley to Edar (Deborah) Rogler dated November 22, 2005

7. Email from Yasmin Coates to Dana Kelley dated December 08, 20005 10:34 AM regarding scheduling employee Edar (Deborah) Rogler to attend the Patient Safety and Emergency Procedures training on December 13, 2005;

8. Time sheet for Edar (Deborah) Rogler;

9. Department of Spiritual Ministry On-Call List for December 2005;

10. December 5, 2005 schedule from Dana Kelley for Edar Rogler;

11. Memo from Dana Kelley to Edar Rogler dated December 20, 2005;

12. Rev. Heffernan's COMPLAINANT'S MOTION TO CALL EDAR ROGLER AS A WITNESS dated January 4, 2006; and

13. Attorney Julie S. Lu's letter to EEOC Administrative Judge David Norken dated January 5, 2006.

B. NIH FORM 2544 (Revised 11/85) entitled CERTIFICATION FOR PROFESSIONAL SERVICES ACQUISITIONS, Exh. "2".

C. EEOC Protective ORDER for Edar Rogler entered on July 17, 2007 by EEOC Administrative Judge David Norken, Exh. "3".

D. EEOC Decision, *Heffernan v. Leavitt*, EEOC No. 120-2005-00226X (EEOC A.J.Norken) dated October 5, 2006, Exh. "4".

E. Letter of Non-Compliance with EEOC decision in *Heffernan v. HHS*, Appeal No. 0720070038 from Attorney Cathy A. Harris to Bonita V. White dated February 25, 2008, Exh. "5".

2

WHEREFORE Plaintiff respectfully prays for the Court to take judicial notice of the aforementioned documents which follow.

Respectfully submitted by:

DATED:  June 8, 2008

_____/s/_____

EDAR ROGLER, Plaintiff *pro se*
915 Boucher Avenue
Annapolis, Maryland  21403
(410) 280-9270
edar_rogler@yahoo.com

### CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2008 I mailed postage, pre-paid the above reply to AUSA Judith A. Kidwell, 555 Fourth Street, N.W. – Civil Division, Room E4905, Washington, District of Columbia  20530.

_____/s/_____

EDAR ROGLER

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                                    :
Plaintiff *pro se*,

v.                                                 :

                                                   C.A. No.  1:07-cv-02308(RMC)

**WILLIAM BIGLOW**, *et al.*
**Defendants.**

...oOo...

EXHIBIT 2

1

NIH 2544

## CERTIFICATION FOR PROFESSIONAL SERVICES ACQUISITIONS

The following statements will help determine if the proposed procurement is personal in nature and could result in an employer-employee relationship. The increased frequency of "yes" response increases the possibility of the existence of an employer-employee relationship and indicates that the advice of the ICD Personnel Office should be solicited.

Yes  No  The procurement. . .

\_\_\_\_ \_\_\_\_   1. involves a guest speaker, lecturer or participant for seminar, workshop, or meeting held primarily to exchange scientific information.

\_\_\_\_ \_\_\_\_   2. involves advisory services performed by national commissions, advisory committees or groups, review panels, boards and committees.

\_\_\_\_ \_\_\_\_   3. involves review groups for contract proposals or grant applications.

(If statements 1, 2, or 3 have been answered "yes" routing to the ICD Personnel Office is not necessary.)

X \_\_\_\_   4. requires on-site performance.

X \_\_\_\_   5. requires that the principal tools and equipment be furnished by the government.

X \_\_\_\_   6. is an integral part of the assigned mission or function of NIH.

X \_\_\_\_  \* 7. is the type ordinarily performed by Civil Service personnel.

X \_\_\_\_   8. can reasonably be expected to last beyond one year.

X \_\_\_\_   9. requires government approval for hiring and removal of key contract employees.

X \_\_\_\_   10. requires the government to prepare schedules for individual contract employees.

X \_\_\_\_   11. requires the government to control the method of contract performance.

X \_\_\_\_   12. allows the contract tasks to be defined on a day-to-day basis.

X \_\_\_\_   13. provides payment for time worked rather than accomplished results (this statement should only be considered for doubtful cases).

(If any statement (4 through 13) has been answered "yes" routing to the ICD Personnel Office is necessary.)

NIH FORM 2544 (Revised 11/85)

EE 01

*If #7 is checked "yes," indicate by checking appropriate box(es) below why this work is proposed to be done by contract/purchase order. Explain briefly on the back of this form.

____ No qualified NIH employees are available to perform the work.

____ It has been determined that it would be substantially more economical, feasible, or necessary by reason of unusual circumstances to have the work performed through this contract/ purchase order. (State briefly on reverse how this was determined.)

____ Other (Explain on reverse.)

SALARY RATES

Complete this section if the daily rate to be paid to a person or persons under this contract/ purchase order exceeds the current daily rate of a GS-18 in the federal service.

I have made an administrative determination that the award of this contract/purchase order is in the best interest of the U.S. Government. The salary rate(s) contained in this contract/ purchase order is/are fully justified for the reasons stated below.

GAM 8-15 CERTIFICATION (Check One)

____ I certify that this request for consulting services has been reviewed and is in accordance with the terms and conditions of GAM 8-15.

____ The consulting service being procured is excluded from coverage of GAM 8-15.

Certifying Official's Signature

ICD PERSONNEL ADVICE (if solicited)

____ This action would not result in an employer-employee relationship.

____ This action would result in an employer-employee relationship. (If this item is checked, the action is not appropriate for procurement acquisition.)

Personnel Specialist's Signature

DISPOSITION OF ACTION

| Requisition No. | Requisitioner's Signature | Date |
|---|---|---|
| ____ Approved | ICD Approving Officer's Signature* | Date |
| ____ Disapproved | | |

*The "appropriate approving official" is either the ICD Executive Officer or Administrative Officer depending on the existing internal delegation.

NIH FORM 2544 (Revised 11/85)

EE 02

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                              :
Plaintiff *pro se*,

v.                                       :

                                              C.A. No.  1:07-cv-02308(RMC)
WILLIAM BIGLOW, *et al.*
Defendants.

                            ...oOo...

EXHIBIT 3

1

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
BALTIMORE REGIONAL OFFICE

| | |
|---|---|
| REEVE BRENNER, | ) |
| Complainant, | ) |
| | ) |
| v. | ) EEOC Docket No. |
| | ) 531-2007-00187X |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) |
| | ) Agency No. NIH-CC-06-0009 |
| Agency. | ) Date:    JUL 1 7 2007 |

## ORDER

On July 3, 2007, I held a teleconference with the parties and Edar Rogler. In consideration of the discussions held during the telephone call and the motion submitted by Ms. Rogler, I hereby order:

1.  Regarding Rabbi Brenner's pending MSPB appeal and this pending action before me, there shall be only one deposition of Ms. Rogler.

2.  The deposition of Ms. Rogler will take no more than seven hours and will be held in the State of Maryland. The parties and Ms. Rogler agreed that the deposition would be taken at NIH in Bethesda, Maryland.

3.  The deposition of Ms. Rogler will be subject to Federal Rule of Evidence 608(a) and (b). Specifically,

4.  The deposition of Ms. Rogler will not take place until after U.S. District Judge Nickerson rules on Ms. Rogler's motion for a protective order, unless there is no such ruling by August 1, 2007, in which case I will hold another teleconference call in early August 2007 to discuss scheduling of the deposition. In the event that the MSPB case becomes active and the parties would like to schedule the deposition of Ms. Rogler prior to August 1, 2007, the parties should contact me to discuss the matter.

IT IS SO ORDERED.

David Norken
Administrative Judge

"3"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                              :
**Plaintiff** *pro se*,

**v.**                                        :

                                                      C.A. No.  1:07-cv-02308(RMC)

**WILLIAM BIGLOW,** *et al.*
**Defendants.**

...oOo...

**EXHIBIT 4**

1

$\mathcal{L}_{4}$

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**BALTIMORE FIELD OFFICE - 531**
**10 South Howard Street, 3rd Floor**
**Baltimore, Maryland 21201**

| | |
|---|---|
| HENRY G. HEFFERNAN<br>19 Eye Street, NW<br>Washington, DC 20001<br><br>    COMPLAINANT<br><br>    v.<br><br>MICHAEL O. -LEAVITT, SECRETARY<br>U.S. DEPARTMENT OF HEALTH &<br>    HUMAN SERVICES<br>c/o Segundo Pereira, Director, ODM&EEO<br>200 Independence Avenue, SW/Mail Stop 300<br>Washington, DC 20201<br><br>    AGENCY | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

EEOC NO.
120-2005-00226X

AGENCY NO.
CC-EEO-2004-0004

## _DECISION_

APPEARANCES:

COMPLAINANT'S REPRESENTATIVE:

    Irving Kator, Esq.
    KATOR, PARKS & WEISER
    1020 19th Street, NW. Suite 350
    Washington, DC 20036

AGENCY'S REPRESENTATIVE:

    Julie S. Lu, Esq.
    D.H.H.S./Room 4760
    330 Independence Avenue, Sw
    Washington, DC 20201

BEFORE:

    DAVID NORKEN
    ADMINISTRATIVE JUDGE

## **CERTIFICATE OF SERVICE**

For timeliness purposes, it shall be presumed that the parties received the foregoing **ORDER** within five (5) calendar days after the date it was sent *via* first class mail. I certify that on October 6, 2006 the foregoing **ORDER** was sent *via* first class mail to the following:

Henry G. Heffernan
19 Eye Street, NW
Washington, DC 20001

Irving Kator, Esq.
KATOR, PARKS & WEISER
1020  19th Street, NW, Suite 350
Washington, DC 20036

Julie S. Lu, Esq.                              Faxed & mailed to (202) 619-2922
D.H.H.S./Room 4760
330 Independence Avenue, Sw
Washington, DC 20201


G. Owens
A. Viola Owens
Legal Technician

1

## I. INTRODUCTION

This matter is before the United States Equal Employment Opportunity Commission (EEOC) pursuant to § 717 Title VII of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. § 2000e-16. The procedural requirements provided in the implementing regulations at 29 CF.R. § 1614.101 et seq. were completed. A Hearing was held in this case at the offices of the EEOC at its Baltimore District Office in Baltimore, Maryland on December 14 and 15, 2005, January 10 and 31, 2006, and April 5 and 6, 2006.

## II. ISSUES

The issues in this case are whether the Agency discriminated against Complainant on the bases of his religion (Roman Catholic) and reprisal for prior EEO activity when the Agency (1) suspended him from duty for five calendar days from March 15-19, 2004, allegedly for failure to follow supervisory instructions and (2) suspended him from duty for fourteen calendar days from May 14-17, 2004, allegedly for defiance of authority and failure to follow supervisory instructions.

## III. APPLICABLE LAW

### McDonnell Douglas Matrix

In order for the complainant to prevail, the evidence of record must initially establish at least a prima facie case of discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981) (Title VII case); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (Title VII case). If a prima facie case is established, the burden shifts to the Agency to articulate a legitimate, nondiscriminatory reason for the challenged action. Burdine, 450 U.S. at 253-54; McDonnell Douglas, 411 U.S. at 802. The complainant may then show that the reason articulated by the Agency is a mere pretext for discrimination. Burdine, 450 U.S. at 256; McDonnell Douglas, 411 U.S. at 804. However, it is not enough to disbelieve the employer's articulated reason. In addition, the fact finder must believe the complainant's explanation of intentional discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 2749, 2751-54 (1993).

The ultimate burden of persuading the trier of fact that the Agency discriminated against the complainant remains at all times with the complainant. As noted by the Court, the factual circumstances vary in discrimination cases, and there are differences in the prima facie case applicable to differing factual situations.

Generally, in order to establish a prima facie case of discrimination based on religion, the Complainant must demonstrate that: (1) he is a member of a protected class; and (2) he was treated differently, with respect to some condition of employment, from others who were outside his protected classes and in a manner that creates an inference of discrimination. See Henson v.

Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995)(citing EEOC v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir. 1992)); Evans v. Technologies Application & Serv. Co., 875 F. Supp. 1115 (D. Md. 1995), aff'd, 80 F.3d 954 (4th Cir. 1996); Green v. Fairfax Cnty. School Bd., 832 F. Supp. 1032, 1037 (E.D. Va. 1993)(citing Alvarado v. Bd. of Trustees of Montgomery Community College, 928 F.2d 118, 121 (4th Cir. 1991)). See also, e.g., Harrington v. Vandalia-Butler Bd. Of Educ., 418 F. Supp. 603, 606-607 (S.D. Ohio 1976), reversed with regard to relief, 585 F.2d 192 (6th Cir. 1978), cert. denied, 441 U.S. 932 (1979) (violation found where public school teacher, serving as a girl's athletic coach, was forced to perform her duties under unequal working conditions).

　　　　To state a prima facie case of retaliation, complainant must demonstrate that (1) he engaged in protected conduct involving opposition to practices made unlawful by Title VII by making a charge, testifying, assisting or participating in any manner in a Title VII investigation, proceeding or hearing; (2) the employer's action had an adverse effect on the employee; and (3) the employer acted because of the employee's protected conduct.    42 U.S.C. § 2000e-3(a); and for example, Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491 (11th Cir. 1989); Jordan v. Clark, 847 F.2d 1368 (9th Cir. 1988); and Berger v. Ironworkers Reinforced Rodman Local 201, 843 F.2d 1395 (D.C. Cir. 1988). The closer in time the employer's knowledge is to the adverse action, the more likely an inference of causal connection will be found. See, e.g., Womack v. Munson, 619 F.2d 1292 (8th Cir. 1980), cert. denied, 450 U.S. 1881 (1981); and Hicks v. ABT Associates, 572 F.2d 960 (3rd Cir. 1978). Comparative evidence showing unequal treatment either with similarly situated employees or before and after the employer learned of the protected activity can establish element 3 of the prima facie case. Rossein, Employment Discrimination, Vol. 1 § 10:5 and cases at n. 2. The reprisal incurred must be materially adverse to a reasonable employee or job applicant so that it is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination. Burlington Northern & Santa Fe Railway v. White,126 S.Ct. 2405, 2409 (June 22, 2006).

　　　　A prima facie case is not the equivalent of a finding of discrimination. It is simply proof of actions taken by the employer from which discriminatory animus may be inferred, because experience has proven that in the absence of any other explanation, it is more likely than not that those actions were based on impermissible considerations. Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978).

　　　　If the complainant can establish a prima facie case, the burden shifts to the Agency to articulate a legitimate nondiscriminatory reason for its actions. The shifting of the burden to the Agency pertains to the burden of production, not the burden of persuasion, which remains at all times with the complainant. The Agency's burden to articulate a legitimate nondiscriminatory reason for its actions does not require the Agency to prove, by a preponderance of the evidence, the existence of nondiscriminatory reasons for its actions; rather, the Agency bears only the burden of explaining clearly the nondiscriminatory reasons for its actions. Burdine, 450 U.S. at 248, 257-58.

3

If the Agency successfully articulates a legitimate nondiscriminatory reason for its actions, the burden of production again shifts to the complainant who then has the opportunity to prove by a preponderance of the evidence that the Agency's stated reason is a mere pretext or mask for illegal discrimination. Complainant may succeed in this either directly, by persuading the fact-finder that a discriminatory reason probably motivated the Agency, or indirectly, by showing that the Agency's proffered explanation is unworthy of credence. Id. at 256. However, as stated above, it is not enough to find that the Agency's explanation is not credible. The trier of fact must also conclude that discrimination was the real reason. Hicks, 113 S. Ct. at 2749, 2751-54. See also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 2108-09 (2000) (proof of prima facie case and pretext alone usually sufficient to support a trier of fact's belief that discrimination occurred).

### Mixed Motive

Complainant may also establish discrimination through the mixed motive theory using direct or circumstantial evidence. Desert Palace, Inc. v. Costa, 123 S. Ct. 2148, 2154-55 (2003) (mixed motive can be proved through circumstantial evidence by a preponderance of the evidence).

In a mixed motive case where there are both legitimate and illegitimate motives for an employment action, the complainant bears the burden of presenting direct or circumstantial evidence of discriminatory animus constituting a substantial motivating factor in the challenged decision, thus shifting the burden of persuasion to the employer. To avoid liability, the employer must then, by a preponderance of the evidence, persuade the fact finder that it would have made the same decision absent the unlawful motivation. Price Waterhouse v. Hopkins, 490 U.S. 228, 235 (1989) (Brennan J., joined by Marshall, Blackman, and Stevens, JJ); Id. at 261 (White, J. concurring in the judgment); and Id. at 261, 278 (O'Conner, J. concurring in the judgment) (Title VII mixed motive case); Desert Palace, Inc., v. Costa, 123 S. Ct. at 2155 (employer's showing that it would have made the same decision even in the absence of discrimination is by the preponderance of the evidence).

Congress reversed part of the Price Waterhouse decision by enacting Section 107 of the Civil Rights Act of 1991 (CRA 1991). Public Law Number 102-166, 105 Statutes 1075-77, codified at 42 U.S.C. Sections 2000e-2(m) and 2000e-5(g)(B). This section provides that it is unlawful for an employer to rely upon race, sex or any other Title VII-based prohibited factor in making a job decision, even if other factors involving no illegal discrimination also justify the employer's decision. Now, under Title VII and the Rehabilitation Act, an unlawful employment practice is established if the complaining party demonstrates that a prohibited category, for example, race or reprisal, is a motivating factor for any employment practice.

Further, in a Title VII case, even where the employee demonstrates it would have taken the same action in the absence of the impermissible motivating factor, a court may now grant declaratory and injunctive relief and attorney's fees and costs directly attributable to the unlawful

4

motivating factor. See, e.g., Hill v. USPS, EEOC Appeal No. 01970305 (1998) (finding direct evidence but finding Agency would have made the same decision even in the absence of discrimination; provided for award of attorney fees and costs and issued an order requiring training for the selecting official and that the Agency consider his EEO responsibilities).

### Reasonable Accommodation

Once Complainant has a bona fide religious belief which conflicts with an employment requirement and makes the Agency aware of his belief and the conflict, and the Agency enforces the requirement against him, he has made out a prima facie case. See, e.g., Partridge v. USPS, EEOC Appeal No. 01943980 (April 11, 1996). Once a prima facie case is established, the burden is on the Agency to offer a reasonable accommodation or show undue hardship. Madison v. USPS, EEOC Appeal No. 01930081 (December 14, 1993). In a religious accommodation Title VII case, an "undue hardship" occurs where the cost which the employer would have to bear is anything more than a de minimis monetary or efficiency cost. Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84 (1977). A showing of undue hardship cannot be merely hypothetical, but must instead include evidence of an actual imposition on co-workers or disruption of work schedules or routines. Tooley v. Martin Marietta, 648 F.2d 519, 521 (4th Cir 1987).

It is not an undue hardship to expect an employer to ask other employees to voluntarily swap schedules with the employee requesting reasonable accommodation. Pursuant to EEOC Regulation 29 C.F.R. § 1605.2(d)(1), alternatives for accommodating an employee's religious practices include, but are not limited to, voluntary substitutes and swaps, flexible scheduling, and lateral transfers and job changes. The reasonableness of an employer's attempts at accommodation must be determined on a case-by-case basis, taking into account the unique circumstances of a particular employer-employee relationship. Smith v. Pyro Mining Co., 827 F.2d 1081, 1085 (6th Cir. 1987); see e.g., Opuku-Boateng v. California, 95 F.3d 1461, 1471-72 (9th Cir. 1996), cert. denied, 117 S.Ct. 1819 (1997) (employer held liable for failing to create schedule and system for voluntary swaps). Administrative costs which, for example, include those costs involved in rearranging schedules and recording substitutions for payroll purposes are not more than de minimis costs. 29 C.F.R. § 1605.2(e).

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      The Complainant, Henry G. Heffernan (Roman Catholic), was a Chaplain, GS-060-12, in the Spiritual Ministries Department (SMD), of the Clinical Center (CC) of the National Institutes of Health (NIH) of the U.S. Department of Health and Human Services (Agency) at its facilities in Bethesda, Maryland from his hire on November 8, 1998 until his termination on July 30, 2004. At all relevant times in this matter, Complainant's first-line supervisor was Dr. O. Ray Fitzgerald (United Methodist), Chief Chaplain, SMD, CC, NIH, and his second-line supervisor was Walter Jones (Baptist), Deputy Director for Management and Diversity, CC, NIH.

2.      Complainant, a Jesuit Roman Catholic priest since 1962, had extensive prior experience as a hospital chaplain. He had one year of clinical training as part of Jesuit studies equivalent to pastoral education called a Tertian year in the early 1960's. He also worked a unit (400 hours) of clinical pastoral education as a chaplain for St. Elizabeth's Hospital in Washington, D.C. during 1961 or 1962. At an unknown time, he worked several months in a leper solarium. From 1994 to 1998, Complainant was a contract chaplain three to four days per week at the Naval Medical Center in Bethesda, Maryland and one day per week at NIH. Compl. Test., Tr. 29-38, 129, 346-48; Compl. Aff., ROI Ex. 7, p.38.

3.      Clinical Pastoral Education (CPE) is a program where members of the clergy and lay people receive instruction intended to make them more effective in working with people in some form of crisis or development in their own spiritual formation and leadership of others. A CPE program consists of a didactic part (classroom training), a period of supervision, readings, writings and interactions with patients. The substance of each CPE program differs depending on the CPE supervisor. Fitzgerald Test., Tr. 1035, 1027, 1074-75; Fr. Ashkar Test., Tr. 425-28, 907.

4.      The main certifying body for Catholics concerning CPE is the National Association of Catholic Chaplains (NACC). To be certified, NACC required 4 units of CPE amounting to 400 hours each. NACC and other certifying organizations will waive one unit of CPE for seminary education. Waiver of more than one unit is possible upon application from the chaplain. Fitzgerald Test., Tr. 1052-54, 1145, 1669-70; NACC Equivalency Policy, Agency Ex. 29.

5.      CPE frequently operates through the implementation of multifaith chaplaincy, which involves the chaplain visiting with patients of many different faiths and attempting to provide spiritual support to each patient. If the patient then requests a chaplain of his or her own faith or requests the performance of a ritual, such as, for example, anointing the sick or communion, which can only be properly performed by a priest or minister of the patient's faith, the chaplain would then make a referral to the chaplain of the patient's faith. Fitzgerald and Jones were proponents and supporters of multifaith chaplaincy. Emley Test., Tr. 253-56, 261; Johnston Test., Tr. 711-14 (multifaith chaplaincy addressed in CPE and some CPE programs are heavily oriented toward multifaith chaplaincy); Ashkar Test, Tr. 455-57, 464-6; May 29, 2001 Fitzgerald Memorandum, Compl.'s Ex. 6; Jones Test., Tr. 1866.

6.      Complainant opposed multifaith chaplaincy. He testified he was a Roman Catholic chaplain with authority from the Archdiocese of Washington, D.C. to minister to Roman Catholic faithful by providing them pastoral care and that his role and function as a Roman Catholic priest was to fulfill that mission. He thought that multifaith chaplaincy deterred him from his primary mission to minister to Roman Catholic faithful. He objected to chaplains of other faiths ministering to Roman Catholics because they failed to approach problems from a Roman Catholic sensibility concerning such things as, for example, death and dying, and they could not immediately provide such important sacraments as anointing of the sick and

communion. He also viewed ministering to patients of other faiths as an improper form of proselytizing. Complainant also opposed multifaith chaplaincy because he believed it reduced the amount of time Catholic chaplains could devote to Roman Catholic patients since they would also be ministering to non-Roman Catholic patients as well. Complainant raised these issues and these objections frequently with his supervisors, Fitzgerald and Jones. Memoranda, Compl. Exs. 15, 27, 35, 39; Compl. Test., Tr. 65-71, 109, 113-16; Canon 564, Compl. Ex. 1 ("a chaplain is a priest to whom is entrusted in a stable manner the pastoral care, at least in part, of some community or particular group of Christian faithful"); Pellegrino Test., Tr. 189-92; Mosley Test., Tr. 232-33; February 27, 2004 Response to proposal to suspend, ROI Ex. 15, p. 5.

7.    Based on FOFCL Nos. 5 and 6, I find that Complainant's opposition to multifaith chaplaincy is a sincere bona fide religious belief based on his interpretation of the foundations of his Roman Catholic faith.

8.    Complainant's belief system regarding his opposition to multifaith chaplaincy is not inconsistent with his Position Description. Under Factor 2, Supervisory Controls it states that:

> The supervisor assigns work in terms of "Major Faith Groups" (i.e., Protestant, Roman Catholic, Jewish) and in terms of overall Departmental objectives.

Position Description, ROI Ex. 14, p. 3.

9.    Fitzgerald thought that Complainant's approach to chaplaincy was 35 years out of date and did not take into account multifaith chaplaincy. Beginning in 2002 and early 2003, Fitzgerald began to direct Complainant and another chaplain, Rabbi Reeve Brenner, to formulate a plan to commence CPE in order to be certified by the major chaplaincy associations for their respective faiths. However, Fitzgerald failed during this time period to issue any written policy requiring CPE credits and chaplaincy association accreditation. Compl. Test., Tr. 286; Jones Test., Tr. 1748-49, 1941; August 5, 2002 Memorandum to Complainant, ROI Ex. 17a; January 8, 2003 Fitzgerald Memorandum to Complainant, ROI Ex. 17b; February 28, 2003 Fitzgerald Directive to Staff Chaplains to give evidence of acceptance in a CPE program by the mid-year review, ROI Ex. 17c; June 9, 2003 Fitzgerald Memorandum to Staff, ROI Ex. 17e; June 11, 2003 Fitzgerald Memorandum to Complainant, ROI Ex. 17f.

10.    Fitzgerald's justification for adopting the CPE requirement was that in 2001, the SMD was audited and Fitzgerald was told that the staff, chaplains and contract chaplains needed clinical training. Further, in 2001, the CC developed a three-tiered competency structure that applied to all CC employees comprised of specific competencies, department competencies and job specific competencies. Fitzgerald contacted other area hospitals and the national certifying organizations to determine what kind of CPE training they were requiring to certify the competency of their chaplains. Most required four unit of CPE of 400 hours each. Fitzgerald

Test., Tr. 1031-34, 1043, 1081, 1044-52, 1052-54, 1070-73, 1079-80; Competency: A Shared Vision, Agency Ex. 22.

11.     On March 21, 2003, before the due date for giving evidence of acceptance into a CPE program had expired, _i.e._, by the July mid-year review, Fitzgerald gave Complainant a Notice of Proposed Suspension for five days for failure to follow supervisory instructions when Complainant did not enroll in a CPE program. On June 11, 2003, Jones upheld the suspension for failure to follow supervisory instructions but reduced the suspension to two days. Shortly thereafter, Complainant sought EEO counseling. The Counselor discussed the suspension with Fitzgerald and Jones. On July 17, 2003, Jones rescinded the suspension decision because SMD had failed up to that time to issue a policy in writing requiring that all SMD chaplains develop a plan and make progress toward completing four units of CPE. March 21, 2003 Notice of Proposed Suspension, ROI Ex. 20, pp. 4-6; June 11, 2003, Notice of Decision to Suspend, ROI Ex. 20, pp. 7-9; July 17, 2003 Cancellation of Decision to Suspend, ROI Ex. 20, p. 11; Compl. Test., Tr. 143-45; Jones Test., Tr. 1748-49, 1941.[1]

12.     Fitzgerald gave Complainant a supervisory instruction to complete the CPE requirement in Complainant's July 2003 progress review.  The instruction was to "enroll in and make successful progress in an accredited Clinical Pastoral Education Course with goal of becoming a Certified Health Care Chaplain. However, since this note was written a substantial time period after the progress review, Fitzgerald was unable to give a specific date for when the July 2003 progress review occurred. Since Fitzgerald could not remember when the progress review occurred, I find that the review occurred and Fitzgerald gave Complainant the instruction before the July 17, 2003 rescission letter withdrawing the 2-day suspension. 2003 Appraisal Document, ROI Ex. 21, pp. 9, 15; Fitzgerald Test., Tr. 1643-50.

13.     In July 2003, Fitzgerald wrote a SMD policy requiring CPE. However, he did not distribute the new policy to the SMD staff until a staff meeting in August 2003, a few months in advance of a JCAHO inspection.[2] Policy, Agency Ex. 78; Fitzgerald Test., Tr. 1183. Then, in September 2003, Fitzgerald and the CC issued a written SMD policy requiring four 400 hour credits of CPE. The policy stated that "any equivalency must be agreed to by the Spiritual Ministry Department in consultation with Judicatory/Ecclesiastical Endorsing bodies." CC Policy, ROI Ex. 17g, p. 15. I find, based on this policy and my examination of Fitzgerald, that, as SMD Director, Fitzgerald was the main decision maker on whether to grant any equivalency. Fitzgerald Test., Tr. 1665-71.

[1]Although the Agency argues that Complainant was still expected to comply with the CPE requirement despite the rescission of the 2-day suspension, as of July 17, 2003 (Agency Closing, p. 9), there was no new supervisory instruction and no policy in place.

[2]JCAHO is the Joint Commission on the Accreditation of Health Care Organizations. It is a private organization which performs inspections, issues reports and gives accreditation to hospitals and other health care organization. Compl. Test., Tr. 146; Fitzgerald Test., Tr. 1125.

8

14.    On January 21, 2004, Fitzgerald gave Complainant another Notice of Proposed
Suspension for five days. The basis for the suspension was again failure to follow supervisory
instructions since Complainant had still not enrolled in a CPE course. The main problem with
this Notice was that neither Fitzgerald, Jones or any other manager at the Agency had given
Complainant any new supervisory instructions either orally or in writing since the Jones
rescinded the first decision to suspend on July 17, 2003. The proposal to suspend does not
reference any instruction after the CPE policy was finally adopted and distributed in August and
September 2003 and neither Fitzgerald or Jones ever identified a document or conversation
where such an instruction was given Complainant. January 21, 2004 Notice of Proposed
Suspension, ROI Ex. 15; Jones Test., Tr. 1738, 1977-84.

15.    The closest the Agency came to giving Complainant a supervisory instruction
after August 17, 2003 was on February 2, 2004, when Fitzgerald gave Complainant his 2003
performance appraisal which still had in it the July 2003 progress report telling Complainant to
enroll in and make successful progress in an accredited CPE course. However, I note that
Fitzgerald gave Complainant this instruction, if it was such, _after_ the January 21, 2004 Notice of
Proposed suspension was issued, for failure to follow supervisory instructions. 2003 Appraisal,
ROI Ex. 21, pp. 9, 15.

16.    Although Complainant failed to enroll in a CPE course, it was not for lack of
trying. Instead, Complainant investigated several programs in the area. He was looking for a
CPE program which took into account his many years of experience as a chaplain. This lead him
to offer to take a bioethics course at Georgetown University in Washington, D.C. This was part
of a CPE plan. Before enrolling, he presented the plan to Fitzgerald and Fitzgerald rejected it,
telling Complainant he had to take CPE not a bioethics course. However, this course could have
been part of a valid CPE plan that he had been inquiring into at Georgetown. CPE is different
from most educational programs in that the first step is defining a goal with the instructor and the
bioethics course could have been part of that plan. Also, during the summer of 2003,
Complainant proposed doing graduate level CPE. Without explanation, Fitzgerald rejected the
plan, again telling Complainant to just take CPE. Complainant distilled his graduate level CPE
plan into a plan for research on identifying successful methods chaplains should pursue when
ministering to patients and published the plan in a CPE newsletter in the Spring of 2004. What
Fitzgerald was telling Complainant (without stating it directly) was that he would only approve a
plan where Complainant took beginner's level CPE, not advanced courses commensurate with
his experience. Compl. Test., Tr. 335-37, 373-75, 394, 396-98; Article, Compl. Ex. 51;
Fitzgerald Test., Tr. 1112-13; Jones Test., Tr. 1736-37.

17.    On March 12, 2004, Jones issued a Decision on the Notice of Proposed
Suspension upholding the suspension. Complainant served the suspension from March 15-19,
2004. Jones testified that Complainant should have devised a CPE plan during his suspension.
However, Fitzgerald proposed and Jones upheld Complainant's termination in part because
Complainant came to work during the second suspension in this case. Moreover, personnelist
Francis Platt testified that an employee should not be performing any work while on non-pay

9

status during a suspension. Stipulations, Tr. 9; Jones Test., Tr. 1975, 2037-41; Platt Test., Tr. 990.

18.    Fitzgerald was away on vacation during the entire first week after Complainant returned from the March suspension. Fitzgerald and Jones testified that Complainant should have E-Mailed a plan to Fitzgerald during that time or given a plan to Jones or Karen Morrow, who was acting SMD director in Fitzgerald's absence. Fitilis Test., Tr. 800-801, 814; Platt Test., Tr. 954-58, 983; Fitzgerald Test., Tr. 1150-53, 1582-83; Fitilis E-Mails, Agency Exs. 6 and 10. However, I find that this expectation was unreasonable. Fitzgerald had already rejected two CPE proposals and it made prudent sense for Complainant to speak directly to Fitzgerald in presenting and formulating any plan.

19.    Just two days after Fitzgerald returned from vacation, on March 31, 2004, he gave Complainant a Notice of Proposed Suspension for 14 days. The charges were for (a) an alleged deficiency in patient care; (b) defiance of authority for conducting a Roman Catholic mass on Saturdays on his days off when he was repeatedly ordered not to do so; and (c) failure to follow supervisory instructions for failure to comply with the CPE requirement. On May 10, 2004, Jones issued a Decision on the Proposed Notice upholding the items b and c of the suspension. Complainant served the suspension from May 14-27, 2004. Stipulations, Tr. 9; Notice, ROI Ex. 16, pp. 1-4; Decision, ROI Ex. 16, pp. 8-10.

20.    Edar Rogler (Eastern Orthodox), a former lay associate chaplain at NIH CC SMD testified that she worked for and befriended Fitzgerald. She testified that over the course of their friendship during the latter half of 2005 that Fitzgerald told Rogler that the reason the CPE requirement was instituted was to "get rid of the priest [meaning Complainant] and to hire the other priest, Dominic [Ashkar]." He also told her that he would do things to provoke Complainant. Fitzgerald admitted that he had conversations with Rogler. Fitzgerald did not specifically deny this testimony; thus, it is undisputed. Rogler Test., Tr. 1286-97, 1346, 1358; Fitzgerald Test., Tr. 1626-28.

21.    Rogler also testified that Fitzgerald told her that he would never hire another Roman Catholic priest and that he deliberately fired Complainant in order to hire Fr. Ashkar, a Maronite priest. Rogler testified that Fitzgerald told her that he spent hours figuring out how to fire Complainant. In fact, Fitzgerald has recently hired Ashkar to fill Complainant's place and has not hired any other Roman Catholic priests. Rogler also said Fitzgerald told her he thought that Roman Catholic priests were pedophiles. Rogler Test., Tr. 1356-58, 1419; Fitzgerald Test., Tr. 1617-18. Fitzgerald denies he made these particular statements Rogler attributes to him but admits he had conversations with Rogler about Complainant. Fitzgerald Test., Tr. 1286-99, 1656-63.

22.    The Agency argued that Rogler was biased because, on December 23, 2005, Fitzgerald and Jones had just terminated her and she never raised anything about the conversations Rogler had with Fitzgerald, as set forth in FOFCL Nos. 20 and 21, until after her

10

termination. Agency Closing, pp. 32-24. However, I find Rogler more credible than Fitzgerald. First, Fitzgerald never directly denied the statements contained in FOFCL No. 20. Second, Rogler's demeanor was frank, was not evasive and appeared credible. In contrast, it was frequently difficult to get a straight answer out of Fitzgerald. He was evasive. See, e.g., Fitzgerald Test., Tr. 1522-25, 1528-33, 1552-55 1586, 1592-94. At one point he even refused to admit that Fr. Ashkar's principal assignment to practice multifaith chaplaincy by serving all patients at out-patient clinics was inconsistent with the contract Fitzgerald wrote hiring Fr. Ashkar to serve Catholic patients. Id. at 1541-42. Third, Rogler was more concerned with difficulties directly facing her, such as her having to deal with a suicide when it should have been Ashkar's responsibility and Fitzgerald's insistence that she begin CPE with him at NIH. Nonetheless, she briefly mentioned that Fitzgerald was in litigation with the "Catholic priest" when setting forth her concerns in writing five days before her termination. See E-Mail, Agency Ex. 69. Fourth, the fact that Rogler said she would contact the priest's lawyer to tell him what she knew, immediately after Jones told her, on December 23, 2005, that he was terminating her contract, is not evidence of bias for two reasons. The first reason is that making the statement then causes me to infer it was not "made-up" after-the-fact. She was willing to confront Jones and Fitzgerald with what she knew. The second reason is that Rogler had no reason to lie. Rogler's termination originally was without cause. It was only after Rogler contacted Complainant's counsel that Rogler received a January 5, 2006 termination letter stating that the termination was for cause. Further, Rogler got nothing of value for her testimony except the trouble of coming forward and testifying. Rogler Test., Tr. 1377-78, 1410-24; Termination Letter, Agency Ex. 44.[3] In comparison, Fitzgerald is an interested party facing the possibility of Complainant eventually being reinstated as a chaplain with SMD NIH.

23.    For the foregoing reasons, I find that Fitzgerald made the comments to Rogler set forth in FOFCL nos. 20 and 21. These comments constitute direct evidence of discrimination. In Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), the Fourth Circuit described what was direct evidence of discrimination. It is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." 67 F.3d 1142. See also EEOC Enforcement Guidance on Recent Developments in Disparate Treatment Theory (July 14, 1992) (direct evidence of discrimination may include "any written or verbal policy or statement made by a respondent or respondent official that on its face demonstrates a bias against a protected group and is linked to the complained of adverse action"). In this case, Fitzgerald's comments constitute direct evidence of discrimination because they identify a bias against Roman Catholic priests that is directly linked to and is an admission that

---

[3]The termination was for "concerns raised by Pain and Palliative Care Leadership" because that unit was uncomfortable with how she interacted with patients and did not want her to interact with their patients in the future. However, it is not clear what those concerns were or what made that unit's leaders uncomfortable. Rogler was not even assigned to Pain and Palliative care and all she admitted to was, on November 21, 2005, visiting there and hearing a patient complain--about Fitzgerald, not herself. Rogler Test., Tr. 1417; Termination Letter, Agency Ex. 44; Jones Test., Tr. 1871.

11

this bias motivated and was at least one of his reasons for acting to terminate Complainant. The suspensions are two deliberate steps in Fitzgerald's plan to terminate Complainant and replace him with a non-Roman Catholic Maronite priest and to never hire a Roman Catholic priest again.[4] Compelling evidence that the suspensions are part of a single plan to terminate Complainant is the fact that all of the suspensions and the termination include a charge that Complainant failed to enroll in CPE.

24.    The direct evidence in this case turns it into a mixed motive case. Fitzgerald's reasons for pursuing suspension are both failure to enroll in CPE and his bias against Roman Catholic priests. As set forth in the Applicable Law section, the burden of proof now shifts to the Agency and it must now establish by the preponderance of the evidence that it would have imposed the suspensions anyway even in the absence of discrimination. Based on the following, the Agency has failed to carry its burden regarding the charges that Complainant failed to follow supervisory instructions by failing to comply with the CPE requirement:

25.    First, although Fitzgerald imposed the CPE requirement in part to arrange to terminate Complainant and replace him with a Maronite priest, I find that he would have adopted the CPE requirement when he did even in the absence of discrimination. As set forth at FOFCL No. 10, in 2001, SMD was audited and told to adopt CPE and then the CC directed all departments to adopt competencies for its employees. Fitzgerald investigated and learned that most other area hospitals and certifying bodies were adopting 4 units of CPE as a requirement for its chaplains. In order to maintain appropriate standards of competency through certification, Fitzgerald decided he needed to require CPE. I find that this requirement is eminently reasonable especially since a JCAHO inspection was due to occur just a few months later. Standards of education and of practice are commonplace and there is no reason chaplains should not be bound by similar requirements. The SMD had already been told that adoption of some clinical standard requirements were necessary and the ones Fitzgerald adopted made sense and were reasonable. They even provided that Fitzgerald, as SMD Director, could, in consultation with the certifying associations, give credit for equivalent experience. See FOFCL No. 13. This is reasonable as long as Fitzgerald exercised his discretion in a nondiscriminatory manner. Accordingly, I find that Fitzgerald would have adopted the CPE requirement as it was and when he did even in the absence of discrimination. Thus, Complainant was bound to comply with the requirement.

26.    However, an indicator of Fitzgerald's pretextual and discriminatory intent was

---

[4]Maronites are Eastern Rite Catholics in full communion with the Roman Catholic Church, however, there are differences in ritual and practice. Ashkar had dual faculties in that he could perform both a Maronite and Roman Catholic mass. Fitzgerald Test., Tr. 1617-19, 1659-60; Grant of bi-ritual faculties, Agency Ex. 2. To the extent that Fitzgerald preferred a Maronite to a Roman Catholic, the dual faculties enabled him to employ a Maronite instead of a Roman Catholic. Fitzgerald's "dream team" was to hire an Eastern/Byzantine team of a Maronite priest and Greek Orthodox associate chaplain. It is undisputed that Fitzgerald is pursuing his master's degree in orthodox studies. Rogler Test., Tr. 1348.

that he refused to exercise his discretion reasonably in determining whether Complainant was entitled to any additional equivalent credit for his CPE-like past experience. Complainant was entitled to one credit of CPE for his seminary education but may have been entitled to additional equivalent credit. Fitzgerald knew about Complainant's 1961 or 1962 pastoral care experience at St. Elizabeth's Hospital in D.C. Complainant performed this pastoral care work before the NACC was even formed. Fitzgerald Test., Tr. 1269-70. However, there is no evidence he ever gave Complainant an opportunity to describe the course and obtain corroborating forms of documentation.[5] Complainant told Fitzgerald that "all I needed to know about Pastoral Care I learned in Seminary." February 28, 2003 Fitzgerald Memorandum, Agency Ex. 25. However, Fitzgerald never asked Complainant about his 40 years of experience as a Jesuit Roman Catholic priest or even considered the fact that, in consultation with the NACC, he could have given Complainant credit for this experience. Instead, Fitzgerald refused to exercise any discretion whatever. He insisted that Complainant's prior experience be nothing less than certified CPE and called Complainant's pastoral care experience 35 years behind the times. Compl. Test., Tr. 286; Fitzgerald Test., Tr. 1665-71, 1699-1701. Fitzgerald did not even know about Complainant's Tertian year which he might have accredited with an appropriate description and documentation. Fitzgerald Test., Tr. 1666, 1700-1701, 1841-42. This refusal to work with Complainant to give him at least some equivalent credit for his vast pastoral care experience was unreasonable and another indicator of Fitzgerald's discriminatory intent.

27.    Fitzgerald also treated Complainant disparately on the basis of religion in how he required Complainant to comply with the CPE requirement. Fitzgerald allowed, in fact, directed that the Jewish chaplain, Brenner, take CPE at NIH. He also allowed Ashkar, the Maronite priest, to take all four CPE credits at NIH. In contrast, Fitzgerald insisted that Complainant take CPE outside of NIH. A September 3, 2002 memorandum told Complainant that CPE was available at Catholic University and Washington Hospital Center and a January 8, 2003 memorandum talks about pursuing CPE in the Washington Area while on paid duty status and that provision would be made for a substitute chaplain in Complainant's absence. A substitute would not have been necessary if Complainant could have taken CPE at the NIH CC. Moreover, Fitzgerald admitted he never gave Complainant the option of taking CPE at NIH and could not remember one way or the other whether he had ever told Complainant that it was preferable that Complainant take CPE somewhere else than at NIH. Compl. Test., Tr. 159-64, 280-81; Brenner Test., Tr. 843-45; Ashkar Test., Tr. 409; Fitzgerald Test., Tr. 1275, 1671-72, 1698. Expressing such a preference would be the same thing as giving Complainant an order stating that Complainant not attend CPE at NIH. Since Complainant was certain that Fitzgerald required that he take CPE outside of NIH, and Fitzgerald could not recollect one way or the other whether he ever told Complainant he preferred that he take CPE elsewhere, I find that Fitzgerald did state such a preference and Complainant reasonably interpreted the statement as an order.

---

[5]After Complainant's termination, Fitzgerald called St. Elizabeth's Hospital and learned there was no record he had performed pastoral care there. Id. However, that is not unexpected given the length of time involved.

13

28.    Denying Complainant CPE at NIH had a major effect on his willingness and ability to comply with the CPE requirement. If Complainant had done CPE at the CC, he would not have had to worry that Fitzgerald was going to replace him with a chaplain who would pursue a multifaith ministry instead of focusing on Roman Catholic patients. Such a concern was justified since Ashkar, although hired to provide pastoral care to Catholic patients, was first employed primarily at out-patient clinics where he provided pastoral care to all patients irrespective of faith.[6] This meant that the Agency was offering fewer hours of pastoral care services to Catholic patients that it claimed.[7] Further, Ashkar's pastoral care CPE assignments were all multifaith assignments. Agency Closing, pp. 26-28; Ashkar Test., Tr. 464-67, 455-57. Forcing Complainant to take CPE outside of NIH while letting Brenner and Ashkar take it at NIH was the kind of provocation Rogler was talking about.

29.    Although Fitzgerald testified that he did not direct Brenner to take CPE at the CC, Brenner was the more credible witness. Fitzgerald Test., Tr. 1108-1110, 1517. Brenner's testimony was plainspoken and credible. Also, unlike Complainant, Brenner had nothing at stake when he testified. Further, contrary to the Agency's argument (Agency Closing, p. 14), there is no logical conflict with the testimony of Morrow, who led CPE at the CC. Morrow said that she invited Brenner to take his first credit of CPE at the CC. Morrow Dep., Tr. 11-12, 20.[8] However, this does not impeach Brenner or make his testimony on this point less credible since I find both occurred. Fitzgerald directed Brenner to take CPE at the CC <u>and</u> Morrow invited him. In any event, the fact that Fitzgerald allowed Brenner and Ashkar to take CPE at the CC and told Complainant to apply elsewhere is disparate treatment on the basis of religion. Further,

---

[6]Prior to Complainant's termination, Ashkar received a copy each day a list of Catholic patients but I find, based on his testimony, that during this time period he performed multifaith chaplaincy in the out-patient clinics exclusively and that the list was for patients attending out-patient clinics. He was not visiting patients on the wards. <u>Compare</u>, Ashkar Test., Tr. 418-19; <u>with</u> <u>Id.</u> at 455-57, 464-67.

[7]Fitzgerald admitted that much of the numbers he presented represented services by Catholics (including multifaith chaplaincy) as opposed to services to Catholics. <u>See</u> Agency Ex. 35; Fitzgerald Test., Tr. 1559-65; Agency Exs. 31-33.

[8]In contrast, the last time Morrow invited Complainant to take CPE at the CC was during the late 1990's before Fitzgerald started his campaign to require that all chaplains take CPE. She said she did not offer CPE to Complainant because Fitzgerald told her Complainant did not want to take CPE because it was too elementary for him. However, had Complainant been allowed to take CPE at the CC, he could have negotiated a more advanced course with Morrow. Morrow Dep., Tr. 15-16, 22; Compl. Test., Tr. 334 (CPE is different from other educational programs in that the first step is defining a goal, the student and supervisor agree on a goal).

14

Fitzgerald gave no explanation for this different treatment.[9]

30.    As set forth at FOFCL Nos. 10-19, Jones rescinded the first suspension, the June 11, 2003 Suspension Decision, for failure to follow supervisory instructions because no written policy was in place requiring that SMD chaplains take CPE. Although the Agency adopted written CPE requirements in August and September 2003, it never gave Complainant another supervisory instruction to enroll in CPE until after Fitzgerald issued the second proposed suspension letter, the January 21, 2004 Notice of Proposed Suspension for failure to follow supervisory instructions. FOFCL Nos. 14-15. It has long been held that the agency's failure to follow its own regulations can be evidence of pretext. Fischback v. D.C. Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996); and Krodel v. Young, 748 F.2d 701, 708 (D.C. Cir. 1984). Complainant argued that the Agency had to issue a new supervisory instruction once it rescinded the first suspension decision, citing Eichner v. USPS, 83 MSPR 202 (1999). Eichner cites the proposition that:

> Where an agency has imposed disciplinary or adverse action because of an employee's misconduct, it is barred from subsequently taking another adverse action for the same reason.

83 MSPR at 210. While not directly on point because the first suspension was rescinded, the failure to give a new supervisory instruction is an additional indicator of pretext. Circumstances had changed. The first suspension had been rescinded. A new written policy had been issued. If the Agency would have imposed the second suspension even in the absence of discrimination, the least it would have done before attempting to suspend Complainant again would be to give him a new instruction. Although the Agency claims the old supervisory instructions remained in place, the rescission of the first suspension and the issuance of a new policy would have reasonably caused Complainant to expect a new instruction before the Agency would discipline him for failing to follow supervisory instructions. The Agency should have known this. Moreover, it is necessary to understand the underlying circumstances. The Agency was at least motivated in part by discrimination on the basis of religion in imposing the second suspension, Fitzgerald did not consider crediting Complainant for equivalent experience and the CPE requirement itself was imposed on Complainant in a disparate manner because Fitzgerald did not let him take CPE at the CC. Given these findings and the fact that no new supervisory instruction was ever issued causes me to conclude that the Agency would not have imposed the second suspension in the absence of discrimination.

31.    For similar reasons, the Agency would not have suspended Complainant for failure to follow supervisory instructions in the absence of discrimination concerning the third

---

[9]Fitzgerald claimed that it was preferred that chaplains take CPE away from the CC so they had more freedom to "pursue issues." Fitzgerald Test., Tr. 1110-11. However, Fitzgerald gave no explanation for why he told and/or allowed Brenner and Ashkar to take CPE at the CC and then told Complainant the opposite, to take CPE outside the CC.

suspension. Fitzgerald gave Complainant only eight work days after his suspension to comply with the CPE requirement. He never gave Complainant a new supervisory instruction to comply after the suspension and was on vacation the first five days of Complainant's return from the suspension. It was unreasonable to expect Complainant to present a plan to anyone other than Fitzgerald because he had already rejected two proposals and Complainant needed Fitzgerald's consent and feedback to move forward. It was also unreasonable for Jones to suggest that Complainant complete a plan during his suspension. FOFCL Nos. 17-19; Fitzgerald Test., Tr. 1582-83. Fitzgerald gave Complainant so little time to formulate a plan (eight work days) and present it (2 work days) after his suspension that issuing the third failure to follow instruction charge was unreasonable given the series of discriminatory acts Fitzgerald had already committed against Complainant. Again, I rule that Fitzgerald, Jones and the Agency would not have suspended Complainant regarding the third failure to follow instructions charge in the absence of discrimination on the basis of religion.

32.     As described at FOFCL No. 19, the March 31, 2004 Notice of Proposed Suspension involved a second charge, defiance of authority for conducting a Roman Catholic mass on Saturdays on Complainant's days off when he was repeatedly ordered not to do so. On May 10, 2004, Jones upheld this charge and Complainant served the suspension from May 14-27, 2004. Complainant has already established direct evidence of discrimination, that this suspension was part of a plan to fire Complainant, replace him with a Maronite priest, and never hire another Catholic chaplain. The question then becomes, would Fitzgerald and Jones have suspended Complainant on the charge of defiance of authority even in the absence of discrimination? I find that they would have so suspended him, but, as discussed below, not for 14 days. In making this finding, I adopt the relevant findings of fact and analysis set forth in the December 13, 2005 Bench Decision in this case. See Tr. 4.

33.     To summarize: Complainant had complained repeatedly that he was always on call, could not take vacations and was entitled to overtime. In order to alleviate this problem, Fitzgerald engaged the services of Our Lady of Lebanon Catholic Church, a Maronite church, which included the services of Ashkar and Fr. Richard Moussa. Ashkar and Moussa did not actually fill in for Complainant on his day off. Instead, they performed multifaith chaplaincy at the out-patient clinics. Fr. Vincent O'Brien normally performed Saturday mass but was in the hospital in February 2004 with a broken hip. However, Ashkar was available to fill in for O'Brien. To avoid the problem of Complainant working overtime, Fitzgerald directed Complainant several time in writing that he not perform the Saturday masses in O'Brien's place. He told Complainant he had arranged for Ashkar to perform the Saturday mass. There was nothing wrong with this arrangement. Ashkar had dual faculties and was fully qualified to conduct a Roman Catholic mass. Despite this, Complainant defied Fitzgerald's order four times during February 2004, conducted the mass and caused the Agency to waste money by having to pay Ashkar for arriving but not performing the mass.

34.     Complainant claimed it was important that he perform the Saturday mass because it was a special mass involving volunteers and arranged to maximize comfort to patients.

16

However, Complainant made no effort to contact Ashkar and alert him about the special mass and determine whether he would consent to conduct the special mass. Compl. Test., Tr. 2061-62, 2066-67, 2094-97; Agency Closing and citations, pp. 15-18; Bench Decision. Fitzgerald acted reasonably here and there was no infringement of Complainant's religious practices. Accordingly, the Agency would have upheld this charge even in the absence of discrimination.

35.    Based on the foregoing, the defiance of authority charge would have been the only charge upheld against Complainant in the absence of discrimination. Recognizing this, Fitzgerald testified that if this charge were the only one proposed, he would have requested only a seven day suspension. Jones said he would have thought that a 14-day suspension proposal was reasonable but would have reduced the suspension to seven days. Fitzgerald Test., Tr. 1165-66, 1709; Jones Test., Tr. 1840. I credit Fitzgerald's testimony on this point. Since defiance of authority is more serious than failure to follow supervisory instructions, I find that Jones would have upheld the defiance of authority charge without any reduction of penalty. Thus, in the absence of discrimination, the Agency would have imposed one seven day (five work day) suspension for the defiance of authority charge.

36.    Complainant also engaged in prior EEO activity of which his supervisor was keenly aware. Complainant sought EEO counseling on the rescinded suspension and the January 2004 suspension which he served in March 2004. In addition, since 1999, Complainant has continuously expressed to his supervisor and others the belief that many management decisions have negatively affected those of the Catholic faith. As of December 2003, Complainant expressed his concerns that Catholic patients were being short changed at the CC to a survey team from the JCAHO and immediately afterwards received a notice of proposed suspension for failure to follow supervisory instructions to engage in CPE. Complainant wrote in his response to the proposed five day suspension that the instructions "infringe on the religious liberty of U.S. citizens and . . . [are] imposed to demean and punish subordinates for disagreements on religious doctrine and practice." FOFCL No. 11; Compl. Exs. 4, 7, 9, 10, 15, 19, 27, 43, 47; Compl. Test., Tr. 146-48; Precomplaint Intake Form, ROI Ex. 3; Compl.'s response to January 2004 proposed suspension, ROI Ex. 15, p. 5. Therefore the record is clear that Complainant had engaged in protected activity by both opposing what he perceived to be unlawful discriminatory employment practices and by participating in the EEO process by seeking EEO counseling. The record is also clear that his supervisor was acutely aware of Complainant's oppositional activities as well as his EEO counseling. Thus Complainant easily establishes a prima facie case. See also Heffernan v. DHHS, EEOC Petition No. 03A60015 (Feb. 21, 2006) (Complainant's termination case) for its discussion concluding that Complainant had established a prima facie case of reprisal.

37.    For all the reasons set forth in this Decision regarding disparate treatment and pretext, Complainant has established that the Agency's reasons for imposing the failure to follow supervisory instructions charges are pretextual while the Complainant failed to show that the Agency's reasons for imposing the defiance of authority charge was pretextual. See FOFCL Nos. 11, 14, 18, 19, 26-34. I also note that Complainant's comparators, Brenner and Ashkar, did not engage in prior EEO activity. Moreover, pursuant to Hicks and Sanderson, I draw an inference

17

of reprisal discrimination from the pretexual nature of the Agency's articulated reasons for its conduct regarding the failure to follow supervisory instructions charges. However, the Agency established it would have upheld the defiance of authority charge even in the absence of discrimination with the burden of proof squarely on the Agency. It therefore follows that Complainant has failed to establish the pretextual nature of the Agency's reasons for imposing the defiance of authority charge since he retained the burden of proof concerning his reprisal claim.

## V. DECISION

For the foregoing reasons, Complainant has established by the preponderance of the evidence that the Agency discriminated against Complainant on the bases of his religion and reprisal for prior EEO activity when (1) the Agency suspended him from duty for five calendar days from March 15-19, 2004, allegedly for failure to follow supervisory instructions and (2) suspended him from duty for fourteen calendar days from May 14-17, 2004, allegedly for defiance of authority and failure to follow supervisory instructions.

For the foregoing reasons, Complainant has not established by the preponderance of the evidence that the Agency discriminated against Complainant on the bases of his religion and reprisal for prior EEO activity when the Agency upheld the charge of defiance of authority.

## VI. CORRECTIVE ACTION

### A. Equitable Relief

#### i. Backpay

Prior to the passage of the Civil Rights Act of 1991 (set forth below), relief in discrimination cases filed under Title VII was equitable in nature, that is, it was meant to place the injured party in the position he or she would have occupied, but for discrimination. Albermarle Paper Co., v. Moody, 422 U.S. 405 (1975); 29 C.F.R. Section 1614.501. Title VII specifically provides that back pay shall be reduced either by what the claimant actually earned elsewhere or by "amounts earnable with reasonable diligence." 42 U.S.C. § 2000e-5(g). Title VII therefore imposes a duty on those discriminated against to be "reasonably diligent in seeking and accepting . . . other suitable employment." See, e.g., Brady v. Thurston Motor Lines, Inc., 753 F.3d 1269, 1273 (4th Cir. 1985); and Ford Motor Co. v. EEOC, 458 U.S. 219 (1982).

This case concerns only the two suspensions and not the termination. Consequently, the only backpay at stake concerns the two suspensions. Since I have already ruled that the Agency would have issued only one five day suspension for the defiance of authority charge, Complainant is due backpay for the two weeks of suspension which was the product of the Agency's religious and reprisal discrimination. Since only two weeks of backpay are at issue, there is was never an opportunity on Complainant's part to mitigate damages by seeking other

18

work. Accordingly, the Agency shall pay Complainant two weeks of backpay.

### ii. Pre-Judgment Interest

Under EEOC regulations, interest on back pay is to be included in the back pay computation where sovereign immunity has been waived. 29 C.F.R. § 1614.501(c)(1). In this case, Complainant has prevailed with respect to Title VII. The 1987 amendments to the Back Pay Act (5 U.S.C. §5596(b)) provided a limited waiver of sovereign immunity against the payment of prejudgment interest on back pay awards in Title VII cases where the employee meets other requirements of the Act. Accordingly, Complainant is entitled to an award of pre-judgment interest. The Agency is hereby directed to make a compound interest calculation based on the prevailing Internal Revenue Service Penalty rate in effect during the periods since Complainant's suspensions at issue to the present and to pay the amount calculated to Complainant.

### iii. Reinstatement

Complainant is not entitled to reinstatement in this case, since the issue of reinstatement must be decided in the termination case. This case removes the five-day suspension and reduces the 14-day suspension to a seven day (five work day) suspension. This may have an impact on whether the termination is supportable in terms of progressive discipline.

### iv. Other Equitable Relief

In order to put Complainant where he would have been in the absence of the discrimination occurring in this case, the Agency is hereby ORDERED to comply with the following requirements, provided he is reinstated:

As set forth in the liability portion of this Decision, the Agency subjected Complainant to disparate treatment when Fitzgerald required that Complainant take CPE away from the CC even though he allowed Brenner and Ashkar to take CPE at the CC. In Ashkar's case, he took all four units of CPE at the CC. Consequently, the Agency is hereby ORDERED to allow Complainant to take all four units of CPE at the CC. Also, Fitzgerald undertook another discriminatory practice when he unreasonably refused to consider and credit Complainant for experience equivalent to CPE. Accordingly, the Agency shall provide all reasonable assistance and support in granting Complainant, in consultation with the NACC, equivalency credits for Complainant's prior CPE-like experience. In considering the grant of equivalent credit, the Agency shall consider whether it can grant equivalent credit for Complainant's CPE-like experience with St. Elizabeth's Hospital and for Complainant's Tertian year. Complainant shall provide the Agency written descriptions of what he did during those assignments along with corroborating evidence that he served and completed the assignments he claims.

Complainant's opposition to multifaith chaplaincy is squarely grounded in a bona fide

19

religious belief and he made Fitzgerald and Jones aware of that opposition. He has stated that he does not want to practice multifaith chaplaincy in any form. FOFCL Nos. 5-7. Complainant's stated opposition and discussions with Fitzgerald and Jones constituted requests for religious reasonable accommodation. Upon Complainant's expected return to the Agency as a chaplain, the Agency is obliged to accommodate Complainant's belief if it can do so without undue hardship. Complainant is opposed to having to practice multifaith chaplaincy regarding in his job and while providing CPE-based pastoral care. The Agency can reasonably accommodate Complainant's religious belief in most respects without any undue hardship. First, Complainant believes that when he provides pastoral care to patients on the wards, that he should provide care exclusively to Catholics, except in emergencies. The Agency can easily accommodate this desire by rearranging schedules and assignment of patients and providing Complainant with lists of Catholic patients. Thus, the Agency must reasonably accommodate Complainant in this respect. Also, there is no undue hardship in allowing Complainant to direct CPE-based pastoral care exclusively to Catholic patients on the wards. CPE is not inherently multifaith. I note that when Brenner took CPE at the CC, his assignment was not multifaith. Instead, his assignment was to provide pastoral care to Jewish patients on the wards. Brenner Test., Tr. 867, 901-902. Similarly, the Agency cannot offer any proof of undue hardship in Complainant limiting his CPE-based pastoral care to patients on the wards to Catholic patients. The only barrier to providing the requested accommodation is purely administrative, involving assignments, schedules and lists, something which the Agency can provide with de minimis cost. Accordingly, the Agency shall accommodate Complainant's opposition to providing multifaith care to patients on the wards and must allow him to provide such care exclusively to Catholics, except in emergencies.

However, the Agency has proven undue hardship with respect to Complainant's desire to serve only Catholic patients at out-patient clinics. Fitzgerald testified that the out-patient situation was more problematic than providing pastoral care to patients on the wards because there are hundreds of out-patients on a daily basis. It would be administratively burdensome for someone to go through pages of outpatients on a daily basis and to divide such patients by their faith group. Further, it would be difficult for a chaplain to identify a particular out-patient short of asking the CC staff where the patient was and/or asking the patients themselves for their names, because they do not stay in permanently assigned rooms. Such an approach would be time consuming and ineffective in terms of trying to visit with as many out-patients as possible while they are there for the day. Fitzgerald Test., Tr. 1235-39. Thus, with regard to out-patients, Fitzgerald sought to have a triage system whereby a chaplain would visit the out-patient clinic and then make referrals to the respective faith chaplain if the patient requests to speak to a chaplain from his or her own faith. Id. at 1229-35, 1239-41; May 29, 2001 Fitzgerald Memorandum, Agency Ex. 6. This approach is not unreasonable because the federal government will not approve the hiring of enough full-time equivalent positions (FTE) to have particular chaplains only serve patient of their own faith. Thus, the Agency has proven undue hardship concerning out-patient clinics. Complainant must comply with any multifaith requirement regarding out-patient clinics unless the Agency is able to schedule other chaplains on a continuing basis to take on the out-patient clinic function.

20

### B. Posting

The Agency is hereby further ORDERED to post copies of the attached notice. Copies of the notice, after being signed by the Agency's duly authorized representative, shall be posted and maintained for 90 consecutive days, in conspicuous places, including all placed where notices to employees and applicants for employment are customarily posted. The Agency shall take reasonable steps to ensure that said notices are not altered, defaced or covered by any other material.

### C. Compensatory Damages

Section 102(a) of the Civil Rights Act of 1991, 105 Stat. 1071, Pub. L. No. 102-166, codified as 42 U.S.C. §1981a, authorizes an award of compensatory damages as part of make-whole relief for intentional discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended. Section 1981a(b)(2) indicates that compensatory damages do not include backpay, interest on backpay, or any other type of equitable relief authorized by Title VII. Section 1981a(b)(3) limits the total amount of compensatory damages that may be awarded each complaining party for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, according to the number of individuals employed by the respondent. The limit for a respondent who has more than 500 employees is $300,000. 42 U.S.C. §1981a(b)(3)(D). Roundtree v. U.S. Department of Agriculture, EEOC Appeal No. 01941906 (July 7, 1995).

Compensatory damages are recoverable in the administrative process. West v. Gibson, 119 S.Ct. 1906 (1999). Thus, if a complainant has alleged that he is entitled to compensatory damages and the agency or the Commission enters a finding of discrimination, the complainant must be given an opportunity to submit evidence establishing his or her claim. To receive an award of compensatory damages, a complainant must demonstrate that he has been harmed as a result of the Agency's discriminatory action; the extent, nature and severity of the harm; and the duration or expected duration of the harm. Rivera v. Department of the Navy, EEOC Appeal No. 01934157 (1994); see, also Compensatory and Punitive Damages Available Under Section 102 of the Civil Rights Act of 1991, EEOC Notice No. N 915.002 (July 14, 1992), at 11-12, 14.

Compensatory damages may be awarded for past pecuniary losses, future pecuniary losses, and non-pecuniary losses which are directly or proximately caused by the agency's discriminatory conduct. Id. at p. 8. Pecuniary losses are out-of-pocket expenses incurred as a result of the employer's unlawful action, including job-hunting expenses, moving expenses, medical expenses, psychiatric expenses, physical therapy expenses, and other quantifiable out-of-pocket expenses. Id. Past pecuniary losses are pecuniary losses that are incurred prior to the resolution of a complaint via a finding of discrimination, the issuance of a full-relief offer, or a voluntary settlement. Id. at 8-9. Future pecuniary losses are losses that are likely to occur after resolution of a complaint. Id. at 9. Non-pecuniary losses are losses that are not subject to precise quantification including emotional pain, suffering, inconvenience, mental anguish, loss of

21

enjoyment of life, injury to professional standing, injury to character and reputation, injury to credit standing, and loss of health. Id.

"[C]ompensatory damage awards must be limited to the sums necessary to compensate [a complainant] for actual harm, even if the harm is intangible." Id. at 13. Thus, a compensatory damages award should reimburse a complainant for proven pecuniary losses, future pecuniary losses, and non-pecuniary losses. A complainant has a duty to mitigate his or her pecuniary damages. Id. at 9. If a respondent can prove that a complainant failed to exercise reasonable diligence to mitigate pecuniary damages, the damages award should be reduced to reflect all losses that could have been avoided with reasonable diligence. Id. at 9-10. There are no precise formulas for determining the amount of damages for non-pecuniary losses. Damages awards for nonpecuniary losses that have been assessed by juries and courts have varied significantly. Id. at 13. However, an award of compensatory damages for non-pecuniary losses, including emotional harm, should reflect the extent to which the respondent directly or proximately caused the harm and the extent to which other factors also caused the harm. Id. at 11-12. An award of compensatory damages for non-pecuniary losses should also reflect the nature and severity of the harm and the duration or expected duration of the harm. Id. at 14.

### Nonpecuniary Damages

The only compensatory damages to which Complainant would be entitled as a direct consequence of the finding of discrimination are those arising from the discriminatory action. When a party has a pre-existing emotional condition which deteriorates as a result of the discriminatory conduct, the additional harm may be attributed to the respondent. Terrell v. HUD, EEOC Request No. 05970336 (Nov. 20, 1997); and Wallis v. USPS, EEOC Appeal No. 01950510 (Nov. 13, 1995), citing, Williamson v. Handy Button Machine Co., 817 F.2d 1290, 1294 (7th Cir. 1987). However, where a complaining party's emotional harm is due in part to personal difficulties which were not caused or exacerbated by the discriminatory conduct, the employer is liable only for the harm resulting from that conduct. EEOC Notice No. N-915.002 at 12, citing, Vance v. Southern Bell Telephone and Telegraph Co., 863 F.2d 1503 (11th Cir. 1989).

Complainant requested that he be awarded nonpecuniary damages in the amount of $75,000. Compl. Closing, p. 32. Complainant established that the Agency discriminated against him on the bases of his religion (Roman Catholic) and reprisal for prior EEO activity when the Agency twice suspended him for failing to follow supervisory instructions. Thus, Complainant established his entitlement to provable compensatory damages.

Complainant suffered some but not a great deal of stress. In testifying, he showed little emotion. He testified that he felt unhappy that he could not fulfill his responsibilities to the patients because he was suspended. Compl. Test., Tr. 298-99. He also said he was:

> [A]ngry, but a controlled anger, all right, because as a
> Christian, I'm supposed to forgive those who anger me. I mean,

22

> that's – so there was a tension there between my animal instinct and
> my religious commitment.

Id. at 299. Complainant said he suffered stress but did not provide any further description of how it affected him. Id. at 300. Complainant's reputation and professional standing were also affected by the suspensions. His E-Mail communications with other chaplains were cut off and it took him some months thereafter to reestablish his professional connections. Also, the archdiocese was unhappy about the suspensions. They asked him what he did to incur the suspensions. It did not "help him within his province, his fellow Jesuits." It affected Complainant with his fellow Jesuits because "the natural thing is you must have done something wrong." Thus, it hurt his reputation to some extent with the people important in his life. Id. at 302-303. However, Complainant failed to provide any more detail as to any lasting consequences concerning his reputation.

With respect to stress damages, Complainant has proven that due to the discrimination he suffered some anger from the suspensions, unhappiness due to interference with his pastoral care responsibilities and humiliation due to questions from the archdiocese and fellow Jesuits. This constitutes proof of some damages. Consequently, I find that Complainant has proven nonpecuniary damages for stress in the amount of $1,000. See Galos v. USPS, EEOC Appeal No. 01A04409 (Sep. 12, 2002) (partial nexus between back pain, insomnia, financial difficulties and resultant stress, depression and marital problems merited only a $1,000 award); Adesanya v. USPS, EEOC Petition No. 04980016 (Feb. 19, 1999) ($1,389 in nonpecuniary damages awarded where as a result of discriminatorily not being provided work within her restrictions while pregnant, the complainant sustained a lack of sleep, had constant headaches, was irritable, and short-tempered for a compensable period of about four months); Partridge v. USPS, EEOC Appeal No. 01966191 (August 13, 1998) ($1,000 in nonpecuniary damages where as a result of not reasonably accommodating the complainant's religious belief by adjusting his schedule so he could attend a religious convention, the complainant lost biblical guidance and sustained anguish and emotional pain).

Complainant also suffered damage to his reputation, but he did not provide a great amount of detail on this either. Nonetheless, the suspensions placed a considerable amount of stress on his relationship with the people who mattered most in his life, those in the archdiocese and fellow Jesuits. They asked him what he did wrong and were unhappy with him. This damaged Complainant's reputation. Based on the foregoing, I find that an award of $5,000.00 for damage to reputation is reasonable.

Thus, the total award of nonpecuniary damages is $6,000.00.

## Pecuniary Damages

Complainant offered no evidence of having suffered any pecuniary damages. Accordingly, a pecuniary damages award is hereby DENIED.

23

### D. ATTORNEY'S FEES AND COSTS

Complainant shall have 30 calendar days from receipt of this Decision to submit her attorney's fee petition, including her personal costs of litigation. The Agency shall have 30 calendar days to respond.

### VII. NOTICE

The parties are notified that this Decision is not a final decision in this case since no determination has yet been made regarding attorney's fees. Accordingly, the Agency may not issue a Final Order in this case and the case is <u>not</u> ripe for either party to appeal this Decision to EEOC's Office of Federal Operations.

FOR THE COMMISSION:

_10/5/06_
Date

David Norken
Administrative Judge

24

## NOTICE TO EMPLOYEES

This notice is posted pursuant to regulations of the Equal Employment Opportunity Commission (29 C.F.R. §1614.501) following a finding that a violation of Title VII of the Civil Rights Act of 1964, as amended, had occurred with respect to the Agency's discipline of an employee at this facility.

Federal law requires that there be no discrimination against any employee because of the person's RELIGION or PRIOR EEO ACTIVITY with respect to discipline and suspension.

The Department of Health and Human Services and National Institutes of Health will comply with such Federal law and will not take action against individuals because they have exercised their rights under the law.

The Department of Health and Human Services and National Institutes of Health will ensure that officials responsible for personnel decisions and terms and conditions of employment will abide by the requirements of all Federal equal employment opportunity laws.

The Department of Health and Human Services and National Institutes of Health will not in any manner restrain, interfere, coerce, or retaliate against any individual who exercises his or her right to oppose practices made unlawful by, or who participates in proceedings pursuant to Federal equal employment opportunity law.

———————————

Date Posted:_____
Posting Expires:_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                    :
**Plaintiff** *pro se*,

**v.**                             :

                                          C.A. No.  1:07-cv-02308(RMC)

**WILLIAM BIGLOW,** *et al.*
**Defendants.**

...oOo...

**EXHIBIT 5**

1

February 25, 2008

<u>VIA CERTIFIED U.S. MAIL</u>
Bonita V. White, Esq., Director
Hubert H. Humphrey Bldg. - Mail Stop 310 E
200 Independence Avenue S.W.
Washington, D.C. 20201
Fax: 202-690-7321

Re: Non-compliance with EEOC decision in *Heffernan v.
HHS*, Appeal No. 0720070038.

Dear Ms. White:

Pursuant to 29 C.F.R. 1614.504, the Agency is not in compliance with the decision in
*Heffernan v. HHS*, Appeal No. 0720070038. On December 4, 2007, the EEOC rendered a
decision in the above-captioned case. The decision became final on January 3, 2008. As part of
the decision, the Agency was ordered to post notices within 30 days of the date on which the
decision became final. The notices were supposed to be placed in "conspicuous places,"
including "all places where notices to employees are customarily posted." It had come to my
attention that the Agency has not fully complied with this provision of the decision.

After seeing no notices posted whatsoever, Father Heffernan, by and through counsel
inquired of Agency counsel, Julie Lu, on February 4, 2008, and Ms. Sonia Gaskin, EEO
Specialist, on February 5, 2008 regarding the status of the posting. On February 7, 2008, Ms.
Gaskin replied, attaching a photograph of one notice posted on February 5, 2008. The notice was
posted next to the employee mailboxes in the Department of Spiritual Ministry at NIH.
However, the notice was inappropriately placed as there is a copier and boxes of supplies (to the
left of the copier) that prevent a person from getting close enough to the notice to actually read it.
In addition, that location on the wall is not "in all places where notices to employees are
customarily posted." No notice to employees has ever been posted in that position on that wall in
the office before, and therefore no one would look for any notice to employees in that location
because it is not a bulletin board. Further, this work area in the Department of Spiritual Ministry
Office is not a place that NIH Clinical Center employees visit or pass through normally. At best,
chaplains would be the only persons who would become familiar with that notice. Thus, the
Agency's posting of this sole notice does not comply with the EEOC's order.

Complainant searched for other notices on regular employee bulletin boards within NIH
where one would expect to find notices to employees posted. As of February 12, 2007,

"5"

Bonita V. White
February 25, 2008
Page 2

Complainant had checked nearly all of the official bulletin boards in the very large Magnuson-Hatfield Building 10 at NIH. The boards are labeled: "Clinical Center Communications - Official Use Only" and "Clinical Center Notices". He also checked many of the departmental and nursing unit bulletin boards. None of them had the EEOC notice posted, as of Tuesday, February 12, 2008.

According to the EEOC's order in this case, there should be "copies," plural, of the notice posted "in all places where notices to employees are customarily posted." Also, the notices should be conspicuously posted, according to the order. On February 7, 2008, I requested that Ms. Gaskin take action to remedy this problem but she did not respond, and apparently, no action was taken. The Agency has not complied with the EEOC's order and we request that you undertake immediate action to remedy this situation. For your convenience, I have attached my correspondence with Ms. Lu and Ms. Gaskin, and a copy of the EEOC's decision. I would appreciate your prompt response in accordance with 29 C.F.R. 1614.504.

Sincerely,

Cathy A. Harris

Enclosures

cc: Lawrence N. Self, Director
2 Center Drive, MSC 3W05
Bethesda, MD 20892
Fax: 301-402-0994

Julie Lu
U.S. Department of Health and Human Services
Office of the General Counsel
General Law Division
Cohen Building, Room 4760
330 Independence Ave., S.W.
Washington, D.C. 20201
(202) 619-2922 (Fax)