## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                    :
Plaintiff *pro se*,

v.                                 :

                                      **C.A. No.  1:07-cv-02308(RMC)**

**WILLIAM BIGLOW,** *et al.*
**Defendants.**                    :

<div align="center">...oOo...</div>

## PLAINTIFF'S MOTION FOR JUDICIAL NOTICE
## PART V [FRE 201]

Plaintiff, Edar Rogler, pro se hereby respectfully moves for the Court to take judicial notice

of the following documents and incorporates by reference herein her points and authorities contained

in her four other motions for judicial notice [Dkts. # 43, 44, 47, & 51]:

1.) Memorandum dated January 4, 2000 from Acting Director, NIH, Ruth L. Kirschstein, M.D.

    subject:  Policy Statement on Reprisal, a true and accurate copy is attached hereto as Exhibit

    ("Exh.") 1;

2.) Findings, letter from U.S. OFFICE OF SPECIAL COUNSEL Catherine A. McMullen, Chief,

    Disclosure Unit to Rev. Gary Johnston regarding OSC File No. DI-01-0209 dated September

    23, 2002, a true and accurate copy is attached hereto as Exh. 2.

3.) Emails from Hillary Fitilis, true and accurate copies are attached hereto as Exh. 3.

4.) Memorandum From Rev. Henry Heffernan to Mr. Walter Jones, Deputy Directtor for

    Management and Operations, a true and accurate copy is attached hereto as Exh. 4.

5.) Letter to Mr. Walter Jones from Doris Clark, Rev. Gary Johnston, Rabbi Joseph Levine,

    Deacon Eugene Linehan, Chaplain Alice Stone dated February 9, 1995, a true and accurate

    copy is attached hereto as Exh. 5.

<div align="center">1</div>

6.) Transcript of testimony of Hillary Fitilis at EEOC Hearing, *Heffernan v. Leavitt, Secretary DHHS*, EEOC Case No. 120-2005-00226x, a true and accurate copy is attached hereto as Exh. 6.

7.) Transcript of testimony of Rev. Dominic Ashkar at EEOC Hearing, *Heffernan v. Leavitt, Secretary DHHS*, EEOC Case No. 120-2005-00226x, a true and accurate copy is attached hereto as Exh. 7.

8.) Transcript of testimony of Dr. Rabbi Reeve Robert Brenner at EEOC Hearing, *Heffernan v. Leavitt, Secretary DHHS*, EEOC Case No. 120-2005-00226x, a true and accurate copy is attached hereto as Exh. 8.

WHEREFORE Plaintiff respectfully prays for the Court to take judicial notice of the aforementioned documents.

Respectfully submitted by:

_____/s/_____
EDAR ROGLER, Plaintiff *pro se*
915 Boucher Avenue
Annapolis, Maryland  21403
(410) 280-9270
edar_rogler@yahoo.com

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                              :
Plaintiff *pro se*,

v.                                       :

                                                 C.A. No.  1:07-cv-02308(RMC)

WILLIAM BIGLOW, *et al.*
Defendants.                              :

                          ...oOo...

Memorandum dated January 4, 2000 from Acting Director, NIH, Ruth L. Kirschstein, M.D.
subject:  Policy Statement on Reprisal

**EXHIBIT 1**

3



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

National Institutes of Health
Bethesda, Maryland 20892

JAN   4 2000

TO:          All NIH Employees

FROM:        Acting Director, NIH

SUBJECT:     Policy Statement on Reprisal

On May 4, 1994, Chapter 2216 of the NIH Policy Manual, Processing Title VII Complaints of
Reprisal, was transmitted to all NIH employees. Chapter 2216 was written by the NIH Task
Force on Fairness in Employment Practices and was implemented to expedite the processing of
precomplaints alleging reprisal. A review of the manual issuance's effectiveness during the past
five years revealed that it has failed to satisfy its intended purpose. Because the manual issuance
has not been effective, I am rescinding Chapter 2216 and instituting this policy.

Reprisal is a form of unlawful discrimination and is a serious offense. All employees are entitled
to a work environment free of discrimination. Employees must be free to use the complaint
process without fear of retribution. Reprisal, in addition to being illegal, has a negative effect
on the quality of work life, employee well-being, morale, and productivity. Any supervisor or
manager found to have engaged in reprisal will be disciplined in accordance with the NIH Table
of Offenses and Penalties.

As an additional safeguard against reprisal, I am authorizing the Director of the Office of Equal
Opportunity (OEO) to request, when appropriate, that the IC Director stay the suspension (of
more than 14 days) or removal of an employee who requests EEO counseling and alleges
reprisal. The initial stay shall be granted for 45 days unless the IC Director determines from the
facts and circumstances that a stay would not be appropriate. The IC Director may extend the
initial stay for any period he or she determines is appropriate.

No policy statement can immediately eliminate reprisal. However, I am confident that the Equal
Employment Opportunity Commission's new emphasis on alternative dispute resolution
programs as a means to address conflict, our new Ombudsman, and the Director of OEO's new
authority to request a stay of an adverse action will promote earlier resolutions and provide
adequate safeguards against unlawful reprisal.

Ruth L. Kirschstein, M.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                                    :
Plaintiff *pro se*,

v.                                                 :

                                                   C.A. No.  1:07-cv-02308(RMC)

**WILLIAM BIGLOW,** *et al.*
Defendants.                                        :
                                 ...oOo...


**Findings, letter from U.S. OFFICE OF SPECIAL COUNSEL**
**Catherine A. McMullen, Chief, Disclosure Unit to Rev. Gary Johnston**
**regarding OSC File No. DI-01-0209**
**dated September 23, 2002**


**EXHIBIT 2**

4



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 201
Washington, D.C. 20036-4505

September 23, 2002

Mr. Gary Johnston
9 Lodge Drive
Rockville, MD 20850

    Re:   OSC File No. DI-01-0209

Dear Mr. Johnston:

    The Office of Special Counsel (OSC) has completed its review of the information you referred to the Disclosure Unit. You alleged a violation of law, rule or regulation by an employee of the U.S. Department of Health and Human Services (HHS), National Institutes of Health (NIH), Division of Spiritual Ministry (DSM), Bethesda, Maryland.

    OSC is authorized by law to refer protected disclosures to the involved agency for an investigation and report. Disclosures OSC may refer for investigation must include information that establishes a substantial likelihood of violation of law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. OSC does not have the authority to investigate disclosures and, therefore, does not conduct its own investigations.

    We forwarded your allegations that your supervisor, O. Ray Fitzgerald, Chief, DSM, violated the law when he faxed multiple copies of your time and attendance forms and leave slips, which included your social security number, to the Department of Defense, Office of Employer Support of the Guard and Reserve (ESGR) to the Office of the Inspector General (OIG) of the Department of Health and Human Services for a report.

    The OIG referred your allegations against Mr. Fitzgerald to the Philadelphia Field Office of Investigations. The investigation found that you requested annual leave for several days during October 2000, in order to perform military duty. Subsequently, Mr. Fitzgerald denied your request. According to Mr. Fitzgerald, you had a history of taking excessive annual leave to perform military duty. In preparation for a meeting with Mr. Sheeley to discuss your use of annual leave, Mr. Fitzgerald faxed the subject material to ESGR.

    The United States Attorney's Office for the District of Maryland declined criminal prosecution of Mr. Fitzgerald in favor of administrative remedies available to

Mr. Gary Johnston
Page 2

NIH. The results of the investigation were referred to Michael Gottesman, NIH Deputy Director of Intramural Research, for consideration of any action deemed appropriate. Dr. Gottesman referred the matter to Dr. John Gallin, Director of the Clinical Center.

Dr. Gallin conducted an additional investigation and determined that there was no malice or criminal intent on the part of Mr. Fitzgerald. Dr. Gallin made Mr. Fitzgerald aware of the Privacy Act regulations and policies with regard to the matter. It was also decided that, in an effort to eliminate further misunderstandings of this nature, all senior managers would receive formal training regarding the Privacy Act.

Accordingly, we are closing our file. As required by law, we are returning a copy of your correspondence to you. 5 U.S.C. § 1213(g)(3). Should you wish to discuss this matter, please contact me at (202) 653-6005.

Sincerely,

Catherine A. McMullen
Chief, Disclosure Unit

LMD:CAM/cam

Enclosure

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                          :
Plaintiff *pro se*,

v.                                   :

                                          C.A. No.  1:07-cv-02308(RMC)

WILLIAM BIGLOW, *et al.*
Defendants.                          :
                              ...oOo...

**Emails from Hillary Fitilis**

**EXHIBIT 3**

**Fitilis, Hillary (NIH/CC/OD)**

| | |
|---|---|
| **From:** | Fitilis, Hillary (NIH/CC/OD) |
| **Sent:** | Monday, February 09, 2004 9:51 AM |
| **To:** | Fitzgerald, Ray (NIH/CC/SM) |
| **Subject:** | follow up on Saturday mass |

Ray:

I am just following up on whether Father Heffernan complied with your letter of instruction concerning Saturday Mass. If he did not comply, we should consider taking another disciplinary action. Please contact me at your earliest convenience so that we may figure out the next step in this process.

Hillary Fitilis
(301) 496-8315

Heffernan Ex.47 pg 2

0492

10/20/2004

## Fitilis, Hillary (NIH/CC/OD)

From:      Fitilis, Hillary (NIH/CC/OD)
Sent:      Wednesday, February 11, 2004 10:31 AM
To:        Platt, Gwen (NIH/OD)
Subject:   spiritual ministry department

Just following up on our conversation yesterday. Were you able to locate the files on Father Heffernan? We should respond to the documentation, patient response time, and Saturday Mass issues as soon as possible. Please call me at your earliest convenience to discuss.

Hillary Fitilis
(301) 496-8315

Heffernan Ex.47 pg 1

0491

10/20/2004

## Fitilis, Hillary (NIH/CC/OD)

| | |
|---|---|
| **From:** | Fitilis, Hillary (NIH/CC/OD) |
| **Sent:** | Tuesday, March 09, 2004 5:13 PM |
| **To:** | Jones, Walter (NIH/CC/OD) |
| **Subject:** | HH |

Hi Walter. I talked with Maureen today about HH's request that you recuse yourself as the deciding official and my concern as shared by ER folks that this may pose problems in the future if HH appeals. Maureen feels comfortable leaving the decision up to you. Please let me know what you decide so that we can issue the decision.

Hillary

Heffernan Ex.52 pg 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                                :
Plaintiff *pro se,*

v.                                         :

                                                    C.A. No.  1:07-cv-02308(RMC)

WILLIAM BIGLOW, *et al.*
Defendants.                                :

                                        ...oOo...

**Memorandum From Rev. Henry Heffernan to Mr. Walter Jones**

**EXHIBIT 4**

6



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

                                                        National Institutes of Health
February 24, 2004                                       Bethesda, Maryland 20892

To:      Mr. Walter Jones
         Deputy Director for Management and Operations

From:    Henry Heffernan    *Henry Heffernan*

Subject:  Your clarification of the timetable

Thank you for your February 19, 2004 memorandum clarifying when you expect a reply
from me to the January 21, 2004 suspension memorandum. I intend to have a written
response on the allegations in the January 21, 2004 memorandum at your office before
close of business on Friday, February 27, 2004.

I suggest that you withdraw yourself from making the decision on the proposed
suspension, and allow some other Clinical Center official, who has not been directly
involved, to make the decision. You have a clear conflict of interest in the decision since
you already made a decision on the same matter last June that was adverse to me, and
also you have some level of responsibility for the problems that were communicated to
the Surveyors of the Joint Commission. The proposed suspension is in retaliation for
what I communicated to the Joint Commission Surveyors. The Clinical Center's decision
on the matter will be ethical and in conformity with professional propriety only if it is
made on the basis of the facts and respect for religious differences by someone who is not
a party to the disagreements. There are profound differences between Roman Catholic
doctrine and practice and the religious views and assumptions about chaplaincy that you
share with Dr. Fitzgerald. These differences have been the root cause of the
disagreements. My refusal to accept your generic 'multi-faith ministry' chaplaincy
approach is based on patients' rights to have reasonable access to pastoral care and
spiritual services that are consistent with their faith commitments and religious norms.

Dr. Gadlin, in my meeting with him last Friday afternoon, indicated that a position the
Clinical Center management might take in responding to the Joint Commission was that I
was a disgruntled, frustrated employee that did not like his job at the Clinical Center and
was being disciplined for poor performance rather than for having communicated the
problems to the Surveyors. This approach is not prudent for several reasons. First, it is
untrue; the documentation of my efforts over several years indicates that I have been
fulfilling my job responsibilities in communicating to management the religious needs of
the major faith group of Roman Catholics and other patients. Second, any disparagement
of my character exposes yourself and NIH to liabilities for defamation. Third, the Joint
Commission will readily recognize such an approach as an *ad hominem* argument, and
not as a response to the factual issues raised in my public information interview: the facts
are as I communicated them, and can be verified by the documentation that exists.

Cc:   Dr. Howard Gadlin
      Ms. Jayne Callahanhenson

                                                        Heffernan Ex.50 pg 1

                                                        0513

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                                    :
Plaintiff *pro se*,

v.                                                 :

                                               C.A. No.  1:07-cv-02308(RMC)

**WILLIAM BIGLOW,** *et al.*
**Defendants.**                                    :
                  ...oOo...

**Letter to Mr. Walter Jones from Doris Clark, Rev. Gary Johnston, Rabbi Joseph Levine,
Deacon Eugene Linehan, Chaplain Alice Stone dated February 9, 1995**

**EXHIBIT 5**

February 9, 1995

Mr. Walter Jones, NIH Clinical Center

Dear Mr. Jones:

   The undersigned employees wish to place before you our ongoing concerns about: (1) the overall direction and management of the Department of Spiritual Ministry under Chaplain Fitzgerald; (2) our concerns about the Clinical Center Streamlining initiatives as these affect the religious care and support of patients; and (3) our specific suggestions for addressing each of these concerns. Attached is a document drafted by all of the undersigned.

   This approach to you is being taken after much effort to engage these issues with Chaplain Fitzgerald on the Department level. All of these efforts have been unsuccessful. In fact, Chaplain Fitzgerald responds to our concerns about the delivery of pastoral care services with open hostility and dismissive actions. For example, at the end of a one hour Department meeting on February 28th, Chaplain Fitzgerald issued a letter to each of the chaplains of the Department proscribing (among other things) the hours and kinds of patient visitation we are to make. There had been no prior discussion concerning the matters addressed in the letter and when an attempt was made to discuss the matter at the Department meeting held on March 5th, Chaplain Fitzgerald became visibly angry and rejected all such discussion even though all chaplains present desired a discussion of the matter. This episode is representative of successive ones since his tenure at NIH began.

   This week, Father Eugene Linehan was prompted to speak with you directly concerning many of these issues. The co-signors of this document wish to underscore that Father Linehan's expressed concerns are only a reflection of what each of us consider to be a significant and on-going problem with respect to Chaplain Fitzgerald. His stewardship of our Department's resources as well as his inability to interact professionally and appropriately with us as colleagues have united us in this effort to involve you. There are no regularly scheduled Department meetings, no minutes of meetings that do occur, and the Department secretary is excluded. Also attached is the Memo from Chaplain Fitzgerald that advised us of EPMS evaluations. There was no follow through by Chaplain Fitzgerald with regard to scheduling appointments. We believe our ideas for streamlining and economizing are meritorious and deserving of consideration. Further, we believe that streamlining and economizing can best be accomplished by focusing upon our *core business activity*: chaplains visiting patients and patient families.

   It was our hope and expectation that your visit to the Department today would provide a forum in which we might discuss these issues with you (with Chaplain Fitzgerald and all members of the Department present). However, Chaplain Fitzgerald has transformed your visit to our Department today into a social and "reception-type" event. [Note the attached copy of Memorandum from Chaplain Fitzgerald dated March 2nd in which we were encouraged, among other things, "to ask your questions about change". It was in good faith that we anticipated meeting with you to discuss these issues today. However, Chaplain Fitzgerald has now structured your time with us in such a way as to very nearly eliminate this possibility.] Given the manner in which Chaplain Fitzgerald has curtailed our input and suggestions we feel no opportunity exists for us to surface these issues with you except in the context of the attached document. Our preference would be to discuss all of these issues openly and candidly with all the persons involved. It is indicative, again, of Chaplain Fitzgerald's disregard for our concerns that he makes such a discussion difficult, if not impossible, to schedule.

Signed:

Doris Clark      Gary Johnston      Joseph Levine      Eugene Linehan      Alice Stone

copy:  Chaplain Fitzgerald

Arbitration

Page 815

1    Q    In his reply?
2    A    Correct, at which point my recommendation
3 may have been to pull back that charge and not
4 uphold it to the deciding official.
5        MS. LU:  That's all the questions I have.
6        MS. HARRIS:  Nothing further.
7        ADMINISTRATIVE JUDGE NORKEN:  Is this
8 witness going to be used in rebuttal?
9        MS. HARRIS:  I don't think so.
10       MS. LU:  I don't believe so.
11       ADMINISTRATIVE JUDGE NORKEN:  Miss Fitilis,
12 I remind you you're not to discuss this case or your
13 testimony in this case with any other witness in the
14 case until these proceedings are ended.  My previous
15 order that you not speak to anyone about the case is
16 now expired, and I thank you for your testimony.
17 You're excused.  Thank you.
18       THE WITNESS:  Thank you.
19       ADMINISTRATIVE JUDGE NORKEN:  Next
20 witness.
21       MS. LU:  It will be Rabbi Brenner, but

Page 816

1 could we take a short break?
2        ADMINISTRATIVE JUDGE NORKEN:  Yes.  We'll
3 take a 10-minute break?
4        MS. LU:  Yes, that would be fine.
5        ADMINISTRATIVE JUDGE NORKEN:  Off the
6 record.
7        (Brief Recess.)
8        ADMINISTRATIVE JUDGE NORKEN:  Rabbi
9 Brenner, I'm David Norken.  I'm the Administrative
10 Judge.  If you would please raise your right hand
11 and state your full name for the record.
12       THE WITNESS:  Reeve Robert Brenner.
13 WHEREUPON --
14       REEVE ROBERT BRENNER,
15 a Witness, called for examination by counsel for the
16 Complainant, and after having been first duly sworn
17 by the Administrative Judge, was examined and
18 testified as follows:
19       ADMINISTRATIVE JUDGE NORKEN:  How long for
20 this witness?
21       MS. HARRIS:  Forty-five minutes.

Page 817

1        ADMINISTRATIVE JUDGE NORKEN:  You may
2 examine.
3             DIRECT EXAMINATION
4        BY MS. HARRIS:
5    Q    Good afternoon, Rabbi Brenner.  Are you
6 currently employed at the National Institutes of
7 Health?
8    A    I am.
9    Q    And what is your position there?
10   A    Rabbi or the Jewish chaplain of the
11 Clinical Center.
12   Q    How long have you worked at the Clinical
13 Center?
14   A    Six years.
15   Q    Okay.  So that means you began in what
16 year?
17   A    Oh, my.  Well, I had in '98, I want to
18 say, quite a number of visitations on an unofficial
19 basis, and then sometime in '98, I guess it was,
20 that I was asked to submit an application to come on
21 staff, which I did.

Page 818

1    Q    Do you currently work full-time at NIH?
2    A    Half-time.
3    Q    And has that been the case since 1998?
4    A    It has.
5    Q    Are there other Jewish chaplains at NIH
6 Clinical Center?
7    A    No.
8    Q    And so during this whole period 1998 'til
9 now, you've been the only Jewish chaplain?
10   A    Yes.
11   Q    And what are your -- generally, when you
12 come to NIH on a half-time basis, what do you do?
13   A    I visit patients -- Jewish patients.
14 That's my stated objective.  I'm also -- I've also
15 been at CPE now at the Shady Grove Hospital where
16 I'm visiting other types of patients.
17   Q    Okay.  I'll get back to CPE in a minute,
18 but what days do you work at the NIH Clinical Center
19 currently?
20   A    Monday, Wednesdays, and Fridays.
21   Q    Has that been the case since 1998?

24 (Pages 815 to 818)

Page 807

1  record.

2      (Witness leaves the hearing room.)

3      (Discussion off the record.)

4      (Witness returns to the hearing room.)

5      ADMINISTRATIVE JUDGE NORKEN: I have a

6  question. Father Heffernan finished serving his

7  suspension on the 19th of March, right?

8      THE WITNESS: If that's what's been

9  stipulated to, but I don't have any firsthand

10  knowledge of that.

11      ADMINISTRATIVE JUDGE NORKEN: That's what

12  was stipulated to.

13      THE WITNESS: Okay.

14      ADMINISTRATIVE JUDGE NORKEN: And

15  normally, you suspend people for a work week, right?

16      THE WITNESS: Calendar days. So we do

17  suspend over weekends and days the employee does not

18  work.

19      ADMINISTRATIVE JUDGE NORKEN: But for a

20  five-day suspension, it would be a Monday through

21  Friday, right?

Page 808

1      THE WITNESS: Correct. They're

2  consecutive days.

3      ADMINISTRATIVE JUDGE NORKEN: So he would

4  have returned on the 22nd of March?

5      THE WITNESS: That sounds about right.

6      ADMINISTRATIVE JUDGE NORKEN: On Monday,

7  the 22nd?

8      THE WITNESS: Assuming he works on

9  Mondays, yes.

10      ADMINISTRATIVE JUDGE NORKEN: The decision

11  to add the CPE charge a second time for the 14-day

12  suspension, the decision to add that was made one

13  week later on the 29th, correct?

14      THE WITNESS: That sounds correct, yes.

15      ADMINISTRATIVE JUDGE NORKEN: Now, the

16  decision to add the charge, was that based upon his

17  failure to act during that one week or was it based

18  upon his failure to act from the point in time of

19  the proposed suspension, the first one?

20      THE WITNESS: Frankly, I don't recall

21  specifically what ran through my mind at that time,

Page 809

1  but I can tell you in thinking about it my

2  recommendation and my gut reaction sitting here now

3  is my thoughts would be that the employee —

4      MS. HARRIS: Move to strike. Her thoughts

5  now aren't — that's not responsive. You asked her,

6  Judge, whether — what she thought at the time.

7      ADMINISTRATIVE JUDGE NORKEN: Sustained.

8      You just don't recollect. Is that what

9  you're saying?

10      THE WITNESS: I don't recollect

11  specifically —

12      ADMINISTRATIVE JUDGE NORKEN: Do you have

13  a general policy that you use?

14      THE WITNESS: The general policy is my

15  guidance and advice and personal overall opinion

16  which was what I was about to convey to you, but we

17  don't have anything written or concrete. A lot of

18  our guidance and advice that we offer in these

19  situations is based on the table of penalties

20  clearly and other policies and regulations, but also

21  on just a basic element of what we believe is

Page 810

1  fairness and opportunity coupled with information

2  that we receive from the supervisor.

3      ADMINISTRATIVE JUDGE NORKEN: What general

4  policy do you follow with regard to a second

5  suspension on a failure to comply? Do you set the

6  time period from the point in time of the notice of

7  proposed first suspension or do you set it from the

8  point in time that the employee comes back from the

9  first suspension?

10      THE WITNESS: I wish, Judge Norken, that I

11  could tell you that every time, this is exactly how

12  we do it and we apply it consistently, but

13  unfortunately, it's a case-by-case basis and we

14  don't have anything. And my reaction to these

15  situations is what is fair? Did the employee have

16  sufficient period of time to comply? If the

17  suspension is based upon a conduct issue that took

18  place in the workplace, I would want to give the

19  employee ample time to demonstrate compliance. Is a

20  week sufficient time to do it? Sometimes yes,

21  sometimes no. In this case, I can tell you that if

22 (Pages 807 to 810)

Page 799

1 Dr. Fitzgerald regarding when you added the charge
2 to the 14-day suspension?
3    A    I don't recall specifically when, but I
4 certainly would have done it prior to moving forward
5 with the recommendation to impose the 14-day
6 suspension. We will often work on drafting
7 documents well before the issue date, and then right
8 before we issue them, we will confirm that all the
9 information is still correct and accurate. And the
10 reason for this is that prior to my coming on board,
11 many of the actions moved very slowly, there was
12 time lapse, and part of my role was to provide close
13 oversight and keep on top of these.
14    Q    I appreciate that, Miss Fitilis, but my
15 question is when did Dr. Fitzgerald tell you
16 regarding the 14-day suspension that Father
17 Heffernan hadn't complied with the CPE requirements?
18    A    And again, I don't recall the specific
19 date now.
20    Q    Okay. Thank you.
21        And isn't it true that -- and you can take

Page 800

1 a look at Agency Exhibit 10, please -- on
2 March 16th, 2004, you mention that Dr. Fitzgerald
3 was leaving the next day for an extended absence
4 from the office; isn't that correct?
5    A    That's correct. That's what it states.
6    Q    So when did he return?
7    A    I don't recall.
8    Q    Was he gone for more than a week?
9    A    I don't recall.
10    Q    Isn't it true that he didn't return until
11 close to the end of the month?
12    A    I'm sorry. I don't recall.
13    Q    Okay. Well, if you take a look at Agency
14 Exhibit 6, Dr. Fitzgerald's --
15    A    Well, can you hold on one second? I don't
16 believe I have Agency Exhibit 6. I've got 9 through
17 16.
18    Q    Okay.
19    A    And I've got Complainant's Exhibit 66.
20    Q    I'll give you my copy. Agency Exhibit 6
21 is an E-mail from Dr. Fitzgerald to you dated

Page 801

1 March 29th, 2004; isn't that correct?
2    A    Correct.
3    Q    Regarding his responses to your
4 recommended changes and corrections to the 14-day
5 suspension?
6    A    Correct. That's what it appears to be.
7    Q    And is it fair to say between March 16th
8 when you E-mailed a draft to Dr. Fitzgerald and his
9 response on March 29th, he didn't respond to you
10 regarding the proposed suspension letter; isn't that
11 correct?
12    A    I'm sorry. Can you repeat that?
13    Q    Between March 16th when you E-mailed
14 Dr. Fitzgerald and March 29th when he responded to
15 you, there was no communication from Dr. Fitzgerald
16 to you regarding the 14-day suspension?
17    A    I don't know that to be true. I can tell
18 you that I turned over all of the E-mails in
19 response to discovery requests, and if there is no
20 E-mail in between March 16th and March 29th, then it
21 would appear that no, he didn't respond, but it's

Page 802

1 possible that we communicated via telephone.
2 Anything's possible. Frankly, I apologize. It's
3 almost two years ago, and I just simply don't
4 recall.
5    Q    You don't need to apologize. Just answer
6 the question the best you can. If you don't recall,
7 just say so.
8        Okay. So he E-mailed you, looking at
9 Agency Exhibit 6, on March 29th, 2004. Did
10 Dr. Fitzgerald include a charge for failure to
11 comply with CPE in that draft?
12    A    No.
13    Q    Okay. But you added it on March 30th.
14 Look at Agency Exhibit 8.
15    A    I don't have that, either. I have 9
16 through 16.
17        Yes, it appears to be.
18        MS. HARRIS: Nothing further, Judge.
19        ADMINISTRATIVE JUDGE NORKEN: Any recross?
20        MS. LU: I think I have a couple of
21 questions.

20 (Pages 799 to 802)

Page 791

1 you?

2    A    No.  I would -- I can't say that it would

3 never happen, but as a general rule, I would almost

4 never advise Employee Relations to respond to an

5 employee directly concerning an issue such as this,

6 complaints that appear to relate to ongoing work

7 issues.

8    Q    Well, who would be the appropriate person

9 to respond if not Employee Relations?

10    A    It would depend on who the letter was sent

11 to.  If it was sent to the supervisor with a copy to

12 Employee Relations, I would recommend that Employee

13 Relations work with the supervisor to draft a

14 response to the employee that came from the

15 supervisor.

16    Q    That didn't happen here, though, did it?

17    A    Not that I'm aware of.  No one ever

18 consulted me and said "Would you please assist us in

19 drafting our response," no.  If someone took it on

20 their own and went ahead and did it and never told

21 me, that's possible; but no, I was not involved in

Page 792

1 drafting a response.

2    Q    Okay.  The Judge asked you whether -- or

3 what specifically Dr. Fitzgerald told you that

4 Father Heffernan needed to do in order to comply

5 with the CPE training requirements, and let me

6 follow up on that.  Did Dr. Fitzgerald tell you that

7 Father Heffernan could take CPE at the NIH Clinical

8 Center's CPE unit?

9    A    I don't recall.

10    Q    He didn't tell you that that was an

11 option, did he?

12    A    I don't recall.  As I explained to Judge

13 Norken, the focus of my communications with Ray

14 Fitzgerald were concerning how many hours Father

15 Heffernan had to complete, direct communications

16 about the fact that several hundred of those hours

17 could be satisfied based upon his prior work

18 experience.

19    Q    Okay.  That wasn't my question.  My

20 question is whether Dr. Fitzgerald told you that

21 father -- whether Father Heffernan could take the

Page 793

1 CPE unit at NIH Clinical Center?

2    A    And I said I don't recall having that

3 discussion.

4    Q    Are you aware that NIH Clinical Center

5 offers clinical pastoral education courses?

6    A    I've heard something about the fact that

7 some staff chaplains are allowed to do some CPE

8 training at the Clinical Center.  That's the extent

9 that I know about it.

10    Q    Okay.  But Dr. Fitzgerald didn't tell you

11 that Father Heffernan could do that at the Clinical

12 Center, correct?

13    A    I don't recall him mentioning anything

14 about Father Heffernan being able to take CPE

15 training -- work training at the Clinical Center.  I

16 just understand that his prior work experience,

17 which I understood to be at the Clinical Center,

18 could satisfy several hundred of the CPE

19 requirements.

20    Q    Okay.  Thank you.

21        If, in fact, there were clinical pastoral

Page 794

1 education courses offered at the Clinical Center,

2 Dr. Fitzgerald could have simply directed Father

3 Heffernan to start attending that course, couldn't

4 he?

5        MS. LU:  Objection; speculative.

6        ADMINISTRATIVE JUDGE NORKEN:  Overruled.

7    A    I don't know.  Again, the focus of

8 my conversation --

9    Q    No, no.  My question is if there was a

10 clinical pastoral education course at the Clinical

11 Center, could Dr. Fitzgerald have simply directed

12 Father Heffernan to take that course at the Clinical

13 Center?

14    A    I don't know.  My understanding is that

15 there are specific requirements for the CPE

16 training.  Some can be satisfied by ongoing work

17 experience and others have to be satisfied through

18 courses, and so I don't know the specific

19 circumstances surrounding Father Heffernan's --

20    Q    No, that's not my question, Miss Fitilis.

21 If there was a course at the Clinical Center --

18 (Pages 791 to 794)

Arbitration

Page 783

1    Q   It's fair to say you actually drafted that
2 additional charge sometime before March 29th; isn't
3 that correct?
4    A   It's possible or it's possible that this
5 was my first draft. As I mentioned before, this
6 E-mail appears that it's the first draft and then I
7 drafted it and sent it to Gwen for review on
8 March 29th, but as I stated, we worked pretty
9 collaboratively together and so it's possible that
10 she sent me a draft and I sent her a revised one.
11 We go back and forth to work on these documents
12 together.
13    Q   Certainly, it's fair to say that prior to
14 March 29th, you had decided that the charge for
15 failure to comply with the training requirements
16 should be added to the proposed 14-day suspension;
17 isn't that correct?
18    A   No. I'm comfortable saying that as of
19 March 29th, the time that I sent this E-mail, that I
20 had made this decision. I can't state whether I
21 made it prior to that time. I don't recall.

Page 784

1       MS. HARRIS: Okay. I would like to offer
2 Exhibit 66 into evidence.
3       ADMINISTRATIVE JUDGE NORKEN: Any
4 objection?
5       MS. LU: No.
6       ADMINISTRATIVE JUDGE NORKEN: It's
7 admitted.
8       MS. HARRIS: Thank you.
9       (Complainant's HH Exhibit Number 66 was
10 admitted into evidence.)
11       BY MS. HARRIS:
12    Q   So when you recommended on -- let's see
13 Agency 11. Is Agency 11 in front of you?
14    A   Again, the documents in front of me are
15 not labeled with exhibit numbers. I just have Bates
16 stamps.
17    Q   It would be the March 17th, 2004 E-mail
18 from you to Miss Piatt.
19    A   At what time?
20    Q   12:44 p.m.
21    A   I have that.

Page 785

1    Q   You suggested on that date adding five
2 days addressing the -- I mean adding a reference in
3 the Douglas Factors the fact that Father Heffernan
4 had served a five-day suspension, correct?
5    A   Correct.
6    Q   Okay. And that was to bolster the 14-day
7 suspension, correct?
8    A   Correct.
9    Q   But isn't it true the Agency had
10 previously decided to recommend a 14-day suspension
11 even prior to the decision Father -- I'm sorry --
12 even prior to issuing the decision to Father
13 Heffernan on the five-day suspension?
14    A   I don't know that to be true.
15    Q   Okay. Please take a look back at
16 Complainant's Exhibit 66 which is March 4th, 2004.
17    A   Again, my exhibits aren't numbered.
18    Q   I'm telling you which date it is. It's
19 March 4th, 2004 from you to Gwen Piatt.
20    A   At what time?
21    Q   9:59 a.m.

Page 786

1    A   Okay. I have that one.
2    Q   And this is on March 4th, 2004.
3       ADMINISTRATIVE JUDGE NORKEN: From now on,
4 any exhibits that are shown to the witness should be
5 properly marked. In fact, why don't we go off the
6 record and do that. Off the record.
7       (Off the record.)
8       ADMINISTRATIVE JUDGE NORKEN: Back on the
9 record.
10       BY MS. HARRIS:
11    Q   All right. Miss Fillis, when we were off
12 the record, you asked if you could take some notes
13 regarding the dates. Have you done so?
14    A   I've just started, yes.
15    Q   Okay. So my question to you was before
16 the decision on the five-day suspension was even
17 issued, you had decided to -- that the next
18 disciplinary action would be a 14-day suspension;
19 isn't that correct?
20    A   That appears to be the case based on this
21 E-mail, yes.

16 (Pages 783 to 786)

Page 775

1  A  I don't recall a specific date.
2  Q  Okay. Go ahead and take a look.
3  (Witness reviews the document.)
4  A  It looks like I drafted the original -- or
5  someone drafted -- and we were reviewing the
6  original proposed 14-day suspension that included
7  Charge 1 which is violation of recognized
8  professional standards of patient care and Charge 2,
9  defiance of authority, on or about March 17th which,
10 you are correct, is while Father Heffernan was on --
11 serving his suspension. However, it also looks like
12 I did not -- we were still working on the draft on
13 March --
14  Q  That answers my question. Thank you.
15  If you'd look at -- do you have Agency
16 Exhibit 10 in front of you?
17  A  The exhibits that I have in front of me
18 are not labeled.
19  Q  Okay. At the top it's Tuesday, it's an
20 E-mail from you to Ray Fitzgerald, March 16th, 2004.
21 The time is 12:51 p.m. I have Bates stamp 423 on

Page 776

1  the first page.
2  A  Okay. Yes.
3  Q  That's Agency Exhibit 10. The date of
4  that E-mail is March 16, 2004; isn't that correct?
5  A  Uh-huh.
6  Q  And -- that's a yes?
7  A  Yes.
8  Q  Okay. And that was while Father Heffernan
9  was serving his five-day suspension, correct?
10 A  Correct.
11 Q  Okay. And you had received that E-mail
12 from Miss Platt on March 16, 2004, correct?
13 A  Correct.
14 Q  With a draft 14-day suspension letter?
15 A  Correct.
16 Q  And so she had been -- it's fair to say
17 she had been working on that suspension letter prior
18 to March 16th, 2004?
19 A  Correct.
20 Q  Okay. And isn't it true that you knew
21 that there would be a proposed 14-day suspension as

Page 777

1  early as before the five-day suspension decision
2  letter was even given to Father Heffernan?
3  A  I don't specifically recall. It's
4  possible, but I don't recall.
5  Q  Okay. I'm going to show you an exhibit
6  that will be Complainant's Exhibit 66.
7  (Complainant's HH Exhibit Number 66 was
8  marked for identification.)
9  MS. HARRIS: And it's not in our book,
10 Judge.
11  BY MS. HARRIS:
12  Q  Okay. If you look at the bottom of this
13 E-mail, Miss Platt sent you an E-mail March 3rd,
14 2004 with a draft five-day suspension memo; is that
15 correct?
16 A  Correct.
17 Q  And that's the decision on the five-day
18 suspension; isn't that correct?
19 A  It appears to be as the subject says "HH
20 suspension decision," yes.
21 Q  Okay. And you responded on March 4th,

Page 778

1  2004 to Miss Platt, correct?
2  A  Correct.
3  Q  And in your response on March 4, 2004, you
4  stated "Once we issue the five-day suspension, we
5  will have to move on to the 14-day suspension."
6  Isn't that correct?
7  A  Correct. And so it --
8  Q  And on March 4th, 2004, you also suggested
9  including the continuing failure to prepare a
10 training plan as one of the charges on March 4,
11 2004, correct?
12 A  Depending on how much time passes between
13 the suspensions, yes.
14 Q  Okay. So, before Father Heffernan even
15 served his -- before he even received the decision
16 on his five-day suspension, you were prepared to
17 move on to a 14-day suspension, correct?
18 A  It appears that way, correct.
19 Q  Okay. It appears that way or that's
20 correct? Which one?
21 A  That's correct, based upon this E-mail,

14 (Pages 775 to 778)

Page 767

recall, a training plan that Father Heffernan had submitted and some issues concerning his noncompliance with the request to submit a plan. I don't recall specific details about what exactly constituted a plan, but we did talk about the fact that why it was there were only a certain number of the CPE credits could be obtained through prior professional work experience, and we talked in general about how many hours he had to obtain and what he would have to do in order to achieve that requirement.

ADMINISTRATIVE JUDGE NORKEN: Did he make it clear that essentially Father Heffernan would have to obtain a beginner's -- would have to take beginner's courses?

THE WITNESS: No.

ADMINISTRATIVE JUDGE NORKEN: What kind of courses did he say had to be taken?

THE WITNESS: We didn't get into that much specific detail about the exact nature of the courses. We were more -- my attention was focused

Page 768

on what was it that Father Heffernan was not doing with respect to this instruction to obtain training requirements, when was he notified, how was he notified, what amount of time had he had to comply with this request, how clear were these objectives conveyed to Father Heffernan, but we never got down to the specific detail of the exact nature of the classes, what the content would be or anything of that nature. My goal was really focused on ensuring that the employee had been adequately advised of the requirements and given an opportunity to comply with those requirements and then it was clear that the employee was not complying with those requirements and then what we would do to move forward with steps to try to get the employee to comply.

ADMINISTRATIVE JUDGE NORKEN: Was there any discussion about whether Father Heffernan's past courses and past experience obtained could be credited?

THE WITNESS: Yes. In fact, when Father Heffernan and I first met, he told me that there

Page 769

were a specified number of CPE credits that Father Heffernan had to obtain and that there were a certain number of credits that Father Heffernan could use or be credited toward because of his prior work experience and that that number of credits was determined by this organization that oversaw the CPE requirement.

ADMINISTRATIVE JUDGE NORKEN: Was there any discussion about whether -- okay. What did he tell you?

THE WITNESS: He told me that he had been instructed that I believe it was approximately three to four hundred of the units could be credited to Father Heffernan because of his prior work experience, but that Father Heffernan still had to obtain this remaining number. And I don't recall specifically how many, but I'm tempted to say that perhaps there was overall maybe 1600 hours and that -- or 1200 hours -- something along those lines -- and that he had 3 to 400 of them could be credited because of prior work experience. I

Page 770

apologize. I don't recall specifically the number of hours.

ADMINISTRATIVE JUDGE NORKEN: Was there any discussion about whether Dr. Fitzgerald could or would support requesting the certifying agency to give Father Heffernan more credit than that?

THE WITNESS: No. My understanding was that Father Heffernan had received a directive or instruction or guidance from this outside organization that this was the amount of credit that could be given for prior work experience and that this was the standard. And that in my conversations with Father Heffernan, I understood that this was done for other staff chaplains as well, that there was a limit on the number of credits that could be obtained from prior work experience, but then that the staff chaplains needed to obtain current CPE credits.

ADMINISTRATIVE JUDGE NORKEN: Yet you're saying you based your understanding on that probably with discussions with Father Heffernan as to what --

Page 759

1 that's marked Agency Exhibit 14.

2          (Agency Deposition Exhibit Number 14 was

3 marked for identification.)

4          BY MS. LU:

5     Q    Do you recognize this document which is an

6 E-mail that's dated March 31, 2004 at 9:09 a.m.?

7     A    It appears to be from Ray Fitzgerald to

8 myself, and the subject is "Heffernan suspension

9 revised 4 final," and it appears to include a copy

10 of the revised final version of the Heffernan

11 suspension letter with changes made by Ray addressed

12 to me.

13    Q    Okay. And which suspension letter is it?

14    A    It's a notice of proposed suspension for

15 14 calendar days.

16         MS. LU: Okay. I'd like to admit this,

17 please.

18         ADMINISTRATIVE JUDGE NORKEN: Any

19 objection?

20         MS. HARRIS: No.

21         ADMINISTRATIVE JUDGE NORKEN: It's

Page 760

1 admitted.

2          (Agency Exhibit Number 14 was admitted

3 into evidence.)

4          BY MS. LU:

5     Q    I'll show you another document that's

6 going to be marked Agency Exhibit 15.

7          (Agency Exhibit Number 15 was marked for

8 identification.)

9          BY MS. LU:

10    Q    Do you recognize this document,

11 Miss Fitllis?

12    A    It's a chain of E-mails. On the bottom,

13 it's the E-mail that we just discussed of March 31st

14 at 9:09 a.m. that included a revised version of the

15 proposed 14-day suspension, and that's from Ray to

16 me. And above it is an E-mail from me that same

17 date at 10:14 a.m., and it's to Ray, and it

18 indicates that I made some minor edits to the

19 proposal. I'm letting him know that it's ready to

20 be issued and he can deliver it to Father Heffernan,

21 and also advising him that if he needs any other

Page 761

1 assistance, to let me know.

2     Q    Which proposal was attached?

3     A    14-day suspension.

4     Q    Okay. The 14-day proposed suspension?

5     A    Correct.

6          MS. LU: I'd like to admit this, please.

7          ADMINISTRATIVE JUDGE NORKEN: Any

8 objection?

9          MS. HARRIS: No.

10         ADMINISTRATIVE JUDGE NORKEN: Admitted.

11         (Agency Exhibit Number 15 was admitted

12 into evidence.)

13         MS. LU: I'll show you a document that's

14 going to be Agency Exhibit 16.

15         (Agency Exhibit Number 16 was marked for

16 identification.)

17         ADMINISTRATIVE JUDGE NORKEN: Who's Joe

18 Martin?

19         THE WITNESS: Joe Martin is -- was -- one

20 of the individuals who served as the employee

21 relations point of contact for the Clinical Center.

Page 762

1 In February of 2004, there was -- consolidation of

2 HR services was effectuated at least for the

3 Clinical Center, and so prior to February of '04,

4 Joe Martin, Cynthia Bolton and we also saw Penny

5 Dale, those were the individuals who serviced the

6 Clinical Center and provided the employee relations

7 support. After February of 2004, Gwen Platt and

8 some other individuals became responsible for

9 handling the Clinical Center employee relations

10 matters.

11         ADMINISTRATIVE JUDGE NORKEN: And Joe

12 Martin was out in terms of providing services to the

13 clinical staff?

14         THE WITNESS: For employee relations

15 matters, correct; however, Joe Martin's shop began

16 to handle, along with Barbara Lang, began to handle

17 personnel issues such as classifications, hiring,

18 processing of within grade, so the focus on the

19 processing element of personnel. And then Gwen

20 Platt and Carolyn Clemms became responsible for --

21 and Linda Tarlow -- became responsible for employee

10 (Pages 759 to 762)

Page 751

1 defiance of authority.

2    MS. LU: Okay. I'd like to admit this.

3    ADMINISTRATIVE JUDGE NORKEN: Both of

4 them?

5 ·   MS. LU: I'm sorry?

6    ADMINISTRATIVE JUDGE NORKEN: 9 and 10?

7    MS. LU: Yes, please.

8    ADMINISTRATIVE JUDGE NORKEN: Any

9 objection?

10    MS. HARRIS: No.

11 ·   ADMINISTRATIVE JUDGE NORKEN: It's

12 admitted. Both of them.

13    MS. LU: Thank you.

14    (Agency Exhibit Numbers 9 and 10 were

15 admitted into evidence.)

16    BY MS. LU:

17    Q   I'm going to show you this document. It's

18 going to be marked Agency 11.

19    (Agency Exhibit Number 11 was marked for

20 identification.)

21    BY MS. LU:

Page 752

1    Q   If you could please take a look at the

2 document.

3    A   (Witness complies.)

4    Q   Do you recognize this E-mail,

5 Miss Fitilis?

6    A   It appears to be an E-mail from me dated

7 March 17th, 2004 to Gwen Platt regarding the draft

8 letter suspending -- frankly, I'm not certain if

9 it's a proposal or a decision letter. It doesn't

10 indicate.

11    Q   Well, if you look at the attachment, what

12 does the attachment to that E-mail say?

13    A   It appears to be a notice of proposed ·

14 suspension for 14 calendar days.

15    MS. LU: Okay. I'd like to enter this

16 into evidence.

17    MS. HARRIS: No objection.

18    ADMINISTRATIVE JUDGE NORKEN: It's

19 admitted.

20    (Agency Exhibit Number 11 was admitted

21 into evidence.)

Page 753

1    MS. LU: I'm sorry. One moment. I'm

2 trying to locate a document.

3    (Brief pause.)

4    BY MS. LU:

5    Q   Miss Fitilis, I'm going to hand you

6 another document that will be marked as Agency 12.

7    (Agency Exhibit Number 12 was marked for

8 identification.)

9    BY MS. LU:

10    Q   Do you recognize these chain of E-mails?

11    A   It appears to be the first at the top of

12 the page an E-mail from Gwen Platt dated April 7,

13 2004 to me with a copy to Linda Tarlow and the

14 subject is the Heffernan proposed 14-day suspension,

15 and below that is an E-mail from me dated April 6,

16 2004 to Gwen Platt regarding the Heffernan proposed

17 14-day suspension.

18    Q   Okay. And the E-mail, the one at the

19 bottom that's dated April 6, 2004 at 5:19 p.m., what

20 was the issue in that E-mail?

21    A   The fact that Father Heffernan had

Page 754

1 requested an extension of time to reply to the

2 proposed suspension and --

3    Q   Which proposed suspension? The five-day

4 or the 14-day?

5    A   It appears to be the 14-day, as that's the

6 subject of the E-mail.

7    Q   Okay.

8    A   And that the basis for his request was

9 that he wasn't able to gain access to the supporting

10 materials for the proposal and --

11    Q   And was Father Heffernan's request for

12 extension granted?

13    A   Frankly, I don't recall.

14    MS. LU: Okay. I'd like to admit this

15 into evidence, please.

16    MS. HARRIS: Objection, Your Honor. I

17 don't see the relevance of this to the matters in

18 the case.

19    MS. LU: It is relevant. It's with regard

20 to one of his suspensions.

21    MS. HARRIS: Well, it doesn't go to -- it

8 (Pages 751 to 754)

Page 743

1 file your reply?

2      MS. LU: January 9th.

3      MS. HARRIS: Miss Lu's reply doesn't

4 contain that proffer.

5      ADMINISTRATIVE JUDGE NORKEN: The Agency

6 reply doesn't contain it?

7      MS. HARRIS: Doesn't contain that.

8      ADMINISTRATIVE JUDGE NORKEN: But

9 nonetheless, that's the Agency's proffer?

10     MS. HARRIS: Yes.

11     MS. LU: Correct. I just want to reply I

12 asked in the alternative if Dr. Berger was denied as

13 a witness that we be allowed to submit a declaration

14 or a proffer of the letter.

15     ADMINISTRATIVE JUDGE NORKEN: Well, a

16 proffer is simply -- it's not going to be in

17 evidence because the witness is not going to be

18 allowed to testify, but the Agency has made its

19 proffer what the evidence would have testified to

20 had the witness have been allowed to testify.

21     Now, let me be clear with regard to this

Page 744

1 witness. You are free to attempt to impeach the

2 witness through your questioning, not through the

3 extrinsic evidence.

4      Okay. Are we prepared to go forward now?

5      MS. HARRIS: We are. I think, Judge, for

6 the record, one more matter. You had asked us to

7 bring you a copy of the videotape of Chaplain

8 Morrow's trial deposition, and I said I would do so

9 today. My office informs me that that -- we had

10 made two copies of the videotape, one which we sent

11 to Miss Lu which she received and one which was sent

12 to you soon after the deposition was taken.

13 Apparently, you don't have it, and I just found out

14 yesterday that that was, in fact, the case that it

15 had been sent soon after; so, what I'm having done

16 is having another copy of the videotape made, and

17 Miss Lu has no objection to us submitting it to you

18 as soon as it's made. It should be a week.

19     ADMINISTRATIVE JUDGE NORKEN: I'm pretty

20 sure I do not have it because I've got -- I've had

21 collected two tapes from two other cases and not

Page 745

1 from this case. With respect to the reply, the

2 reason I haven't gotten a reply obviously is because

3 we just got it yesterday and they haven't

4 distributed it yet.

5      MS. LU: One other sort of administrative

6 matter, previously the Agency's Exhibit A7 was

7 missing a page, so I have a complete copy of that

8 exhibit with that missing page.

9      MS. HARRIS: Was that 416?

10     MS. LU: 416.

11     ADMINISTRATIVE JUDGE NORKEN: Okay. Let's

12 have the witness come in.

13     (Brief recess.)

14     ADMINISTRATIVE JUDGE NORKEN: Good

15 morning, Miss Fitilis.

16     THE WITNESS: Good morning.

17     ADMINISTRATIVE JUDGE NORKEN: I remind you

18 you're still under oath.

19     Is the -- where are we?

20     MS. HARRIS: The Agency was still

21 conducting its cross examination.

Page 746

1      ADMINISTRATIVE JUDGE NORKEN: Okay. You

2 may proceed. About how much longer?

3      MS. LU: Probably another half hour. I

4 just have some documents I want to show

5 Miss Fitilis.

6      ADMINISTRATIVE JUDGE NORKEN: Okay.

7 WHEREUPON --

8      HILLARY FITILIS,

9 a Witness, called for examination by counsel for the

10 Complainant, and after having been previously duly

11 sworn by the Administrative Judge, was examined and

12 testified further as follows:

13     CROSS EXAMINATION

14 BY MS. LU:

15 Q     Okay. Good morning, Miss Fitilis.

16 A     Good morning.

17 Q     To continue your testimony, I'm going to

18 show you this E-mail that's going to be marked

19 Agency Exhibit I think it's 9.

20     (Agency Exhibit Number 9 was marked for

21 identification.)

6 (Pages 743 to 746)

Page 735

1      MS. LU: I was going to follow up on that,
2 too, but I suppose I know what the answer is to my
3 motion now seeing as how you didn't see my
4 January 9th reply. I was going to ask if I could
5 submit it, but --
6      ADMINISTRATIVE JUDGE NORKEN: Okay. I'm
7 ready to rule on the motions.
8      MS. LU: Oh, the Agency didn't get a
9 chance to respond on the record, I guess, but we'll
10 incorporate --
11      ADMINISTRATIVE JUDGE NORKEN: Oh. Well,
12 wait.
13      MS. LU: We'll incorporate what we stated
14 in our opposition to Complainant's motion to call
15 Miss Rogler as a witness.
16      ADMINISTRATIVE JUDGE NORKEN: I asked
17 whether you wanted to -- did you have any comment
18 on -- did you have any comment on what Miss Harris
19 just said with respect to my questions?
20      MS. LU: Oh, just that the Agency does not
21 believe that conclusion could be drawn that

Page 736

1 (inaudible) because assuming allegedly if
2 Dr. Fitzgerald did say that he was going to
3 terminate everyone who participated in these EEO
4 proceedings, that there should be a conclusion drawn
5 that he would retaliate against Father Heffernan.
6      ADMINISTRATIVE JUDGE NORKEN: Okay. I've
7 taken the comments of the parties into account and
8 I've reviewed the motions. With respect to the
9 Complainant's motion to call Edgar Rogier as a
10 witness --
11      MS. HARRIS: Judge, it's actually Edar
12 Rogler. E-D-A-R, last name Rogler.
13      ADMINISTRATIVE JUDGE NORKEN: With respect
14 to the Complainant's motion to call Edar Rogler as a
15 witness, the motion is granted for the reasons set
16 forth in the motion. With respect to the Agency's
17 opposition -- no, let me check that. With respect
18 to the Agency's motion to call Dr. Ann Berger as a
19 witness, the motion is denied for the
20 reason set forth in the Complainant's motion.
21      MS. LU: Judge, just since you denied the

Page 737

1 Agency's motion to call Dr. Ann Berger as a witness,
2 the Agency would like to either make a proffer as I
3 state in my January 9th reply which you're not
4 considering, but we'd like to make a proffer of
5 Dr. Berger's testimony or to submit a declaration
6 she has signed as part of the record.
7      ADMINISTRATIVE JUDGE NORKEN: You can make
8 a proffer of what she would have testified to.
9      MS. LU: Sure.
10      ADMINISTRATIVE JUDGE NORKEN: You may do
11 so now.
12      MS. LU: Okay. Dr. Ann Berger would have
13 testified as follows: Dr. Berger is the Chief of
14 the Pain and Palliative Care Service, which is the
15 PPCS, at the Clinical Center at the National
16 Institutes of Health. She has been in her current
17 position for approximately five years, she has a
18 staff of seven individuals who were with her on the
19 PPCS team, and the team also consists of the liaison
20 members such as chaplains who are from other
21 departments of the Clinical Center. She is familiar

Page 738

1 with Miss Edar Rogler as Miss Rogler was a chaplain
2 at the Clinical Center, and she interacted with
3 Miss Rogler in December of 2005, and her staff also
4 interacted with Miss Rogler during their what's
5 called clinic.
6      Miss Rogler had gone to see the patients
7 in the PPCS clinic. Both inpatients and outpatients
8 are seen by the PPCS, and the patients seen by PPCS
9 are often the sickest and have the most problems.
10 While they are in the PPCS clinic, the PPCS team
11 determine what kind of treatment the patient should
12 receive, and treatments may include, but are not
13 limited to, providing medical care, emotional
14 counseling, spiritual counseling, physical therapy
15 or massage therapy. And usually during these PPCS
16 team meetings, the chaplain would participate and
17 they would all decide which patients need what kind
18 of treatment that day and who should go see the
19 patient.
20      And her staff was present at clinic one
21 time when Miss Rogler was a chaplain servicing the

4 (Pages 735 to 738)

Page 727

```
 1
 2            Tuesday, January 10, 2006
 3                 9:51 a.m.
 4
 5 The ARBITRATION was held at the offices of:
 6
 7
 8         U.S. Equal Employment Opportunity
 9         Commission - Baltimore District Office
10         10 S. Howard Street, Third Floor
11         Baltimore, Maryland 21201
12
13
14 Pursuant to notice, before:
15         DAVID NORKEN, Administrative Judge
16
17
18
19
20
21
```

Page 728

```
 1 APPEARANCES:
 2 On Behalf of the Complainant:
 3        CATHY A. HARRIS, ESQUIRE
          IRVING KATOR, ESQUIRE
 4        KATOR, PARKS & WEISER, PLLC
          1020 19th St., N.W.
 5        Suite 350
          Washington, D.C. 20036
 6        (202) 898-4800
 7
 8 On Behalf of the Agency:
 9        JULIE S. LU, ESQUIRE
          DEPARTMENT OF HEALTH & HUMAN SERVICES
10        GENERAL LAW DIVISION
          330 Independence Ave., S.W.
11        Cohen Building, Room 4760
          Washington, D.C. 20201
12        (202) 619-0174
13
14
15 ALSO PRESENT:  HENRY HEFFERNAN, Complainant
16        NISHA BHATT, Paralegal
17
18
19
20
21
```

Page 729

```
 1              CONTENTS
 2
 3 WITNESSES:        DIRECT CROSS REDIRECT RECROSS
 4 Hillary Fitilis  --  746  772   803
 5  (Continued)             812   813
 6 Reeve R. Brenner  817  881   908   --
 7 Francis G. Platt  917  963   992   1004
 8                        1011  1013
 9 Owen R. Fitzgerald  1022  --    --    --
10
11
12            EXHIBITS
13 COMPLAINANT HH
14 EXHIBITS:      IDENTIFIED      IN EVIDENCE
15 66        777              784
16
17 AGENCY
18 EXHIBITS:      IDENTIFIED      IN EVIDENCE
19 9        746          751
20 10       750          751
21 11       751          752
```

Page 730

```
 1  12          753              756
 2  13          756              758
 3  14          759              760
 4  15          760              761
 5  16          761              766
 6  17          890              --
 7  18          967              968
 8  19          970              971
 9  20          971              973
10  21          973              976
11  22          1032             1036
12
13
14
15
16
17
18
19
20
21
```

2 (Pages 727 to 730)

**Esquire Deposition Services**