# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                                                 :
**Plaintiff** *pro se,*

**v.**                                                                  :

                                                                          **C.A. No.  1:07-cv-02308(RMC)**
**WILLIAM BIGLOW,** *et al.*                        :
**Defendants.**

...oOo...

## ERRATA FOR PLAINTIFF'S MOTION FOR JUDICIAL NOTICE
### Part V, Exhs. 6-8 [DKT. #57]
6-7

Plaintiff, Edar Rogler, *pro se* hereby submits her errata for her motion for judicial notice, Part

V, Exhibits 6-8, at Dkt. #57:
6-7

6.) Transcript of testimony of Hillary Fitilis at EEOC Hearing, *Heffernan v. Leavitt, Secretary*

*DHHS*, EEOC Case No. 120-2005-00226x, a true and accurate copy is attached hereto as Exh. 6.

7.) Transcript of testimony of Rev. Dominic Ashkar at EEOC Hearing, *Heffernan v. Leavitt,*

*Secretary DHHS*, EEOC Case No. 120-2005-00226x, a true and accurate copy is attached hereto as

Exh. 7.

8.) Transcript of testimony of Dr. Rabbi Reeve Robert Brenner at EEOC Hearing, *Heffernan v.*

*Leavitt, Secretary DHHS*, EEOC Case No. 120-2005-00226x, a true and accurate copy is attached

hereto as Exh. 8.

Respectfully submitted by:


_____/s/_____
Edar Rogler
915 Boucher Avenue
Annapolis, Maryland  21403
(410) 280-9270

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**
Plaintiff *pro se*,                                    :

v.                                                     :

                                                              C.A. No.  1:07-cv-02308(RMC)

**WILLIAM BIGLOW,** *et al.*
**Defendants.**                                        :

...oOo...

**Transcript of testimony of Hillary Fitilis at EEOC Hearing,**
*Heffernan v. Leavitt, Secretary DHHS*, **EEOC Case No. 120-2005-00226x,**

Hr'g  12/15/05   pgs 319-323; 520-587

**EXHIBIT 6–A**

8

1        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

2              BALTIMORE, MARYLAND OFFICE

3                     HEARING

4

5  HENRY G. HEFFERNAN,              :

6   Complainant,                    :

7      V.                           :   EEOC Case No.

8  MICHAEL O. LEAVITT, SECRETARY:   120-2005-00226x

9  U.S. DEPARTMENT OF HEALTH    :   Agency Case No.

10  and HUMAN SERVICES,           :   CC-EEO-2004-2004

11   Agency.                        :

12          - - - - - - - - - -

13                  VOLUME II

14

15    Before:  ADMINISTRATIVE JUDGE, DAVID NORKEN

16

17     Equal Employment Opportunity Commission

18        10 South Howard Street, Suite 3000

19            Baltimore, Maryland  21201

20

21  Reported by:  Lori Goodin Mackenzie, RPR

22  Job No.  171688

Page 320

```
 1  APPEARANCES:
 2
 3  Administrative Judge:
       David Norken
 4
    For Complainant:
 5  CATHY HARRIS, Esquire
    IRVING KATOR, Esquire
 6  Kator, Parks & Weiser
    1020 19th Street, N.W., Suite 350
 7  Washington, D.C.  20036
    202-898-4800
 8  202-289-1389 (fax)
    jkator@katorparks.com
 9
    For the Agency:
10  JULIE S. LU, Esquire
    Department of Health & Human Services
11  General Law Division
    Cohen Building, Room 4760
12  330 Independence Avenue, S.W.
    Washington, D.C.  20201
13  202-619-0174
    202-619-2922 (fax)
14  julie.lu@hhs.gov
15
16  Also Present:  Nisha Bhatt, Legal Assistant
17
18
19
20
21
22
```

Page 321

```
 1                  WITNESSES
 2                      D    C   RD   RC    A
 3  FATHER HENRY G. HEFFERNAN   326  390  399
 4  FATHER ASHKAR       406 428        466
 5  DANA CHERISE KELLY   470 490  498
 6  LEONARD S. COX       503 511  515  516
 7  HILLARY FITILIS      524 588
 8  GARY JOHNSTON        636 707  715  717
 9
10                  EXHIBITS
11  COMPLAINANT'S
12  NO.    DESCRIPTION       MARKED    RECEIVED
13  64     Document            392        392
14  40     E-mail from Joan Martin  541     563
15  47     Two e-mails         563        572
16  52     E-mail dated
17         March 9th, 2004     584        636
18  1A     Document            654        688
19  10     Chaplain Johnston's
20         Affidavit           688
21
22
```

Page 322

```
 1              EXHIBITS (Continued)
 2  EEOC'S
 3  NO.    DESCRIPTION        MARKED    RECEIVED
 4  2      List                 342
 5  3      Document from Department
 6         of Veterans Affairs  363        370
 7  4      Exhibit 23 of the
 8         Complainant's opposition  454
 9  AGENCY'S
10  NO.    DESCRIPTION        MARKED    RECEIVED
11  1      Request for an Extension
12         to reply to the five-day
13         proposed suspension  332       333
14  2      Document related to
15         bi-ritual faculties  403       405
16  3      Monthly newsletter of
17         National Association of
18         Catholic Chaplains   411
19  4      Document             493       497
20  5      E-mail dated Tuesday,
21         March 16, 2004 with Notice
22         of Proposed Suspension  611     613
```

Page 323

```
 1              EXHIBITS (Continued)
 2  AGENCY'S
 3  NO.    DESCRIPTION        MARKED    RECEIVED
 4  6      E-mail dated
 5         March 29, 2004 with
 6         draft Notice of Proposed
 7         Suspension           614       615
 8  7      E-mail dated
 9         March 29, 2004 regarding
10         Proposed 14-day Suspension  615   620
11  8      E-mail dated
12         March 30th, 2004     620       622
13
14
15
16
17
18
19
20
21
22
```

2 (Pages 320 to 323)

Page 520

1            THE WITNESS:  Right.  And, in some
2 instances, people who have worked for the
3 Clinical Center and have taken the pagers to
4 wherever they have gone next and not work in the
5 Clinical Center.
6            So someone will have an NIH pager
7 that the federal government is being charged for
8 and no longer works for the federal government
9 and is still on the list as their employee that's
10 holding this pager.
11            So, we would try to shut that down
12 so it no longer is still being charged for a
13 pager that they don't even have.
14            JUDGE NORKEN:  But, ultimately, if
15 someone isn't answering their page that day,
16 they'll have their pager shut off for a while
17 until they call back and you reactivate it?
18            THE WITNESS:  Right.  If we send out
19 the message that this pager is going to be
20 canceled, or the message was sent to us to cancel
21 the pager, then we will shut it down.
22            And, if someone calls back and says,

Page 521

1 oh, my pager was shut off, we will ask who they
2 are, what department they work for.
3            And, if they tell us, then they'll
4 have to come down to our department and sign a
5 pager agreement, that way we'll have it logged in
6 as the correct person has the correct pager and
7 the correct pager number.
8            JUDGE NORKEN:  Is that what you did
9 with Father Heffernan?
10            THE WITNESS:  His pager was canceled
11 and I believe we got a call saying that it was
12 canceled and it was reactivated.
13            JUDGE NORKEN:  You got a call saying
14 it was canceled and reactivated in the same phone
15 call?
16            THE WITNESS:  No, we didn't get a
17 call saying that it was -- we got a call from
18 someone saying that their pager was canceled.
19            We checked the number, found out,
20 okay, this person works in the Spiritual Ministry
21 Department, we'll reactivate this pager.
22            JUDGE NORKEN:  Okay.  And, that was

Page 522

1 what happened with Father Heffernan?  I need an
2 oral response.
3            THE WITNESS:  Yes, I'm sorry.
4            JUDGE NORKEN:  I don't have any
5 other questions.
6            MS. HARRIS:  Nothing further.
7            MS. LU:  No more questions.
8            JUDGE NORKEN:  Okay.  Is this
9 witness going to be used in rebuttal?
10            MS. HARRIS:  No.
11            MS. LU:  No.
12            JUDGE NORKEN:  Mr. Cox, I remind you
13 that you are not to discuss this case and your
14 testimony in this case with any other witness in
15 the case until these proceedings are ended.
16            Do you understand that order?
17            THE WITNESS:  Yes, I do.
18            JUDGE NORKEN:  Okay.  I thank you
19 for your testimony.  You are excused.  Thank you
20 very much, sir.
21            THE WITNESS:  Thank you.  Have a
22 good day.

Page 523

1            (Witness excused.)
2            JUDGE NORKEN:  Hello, Ms. Fitilis.
3 If you would please raise your right-hand and
4 please state your name for the record again.
5            MS. FITILIS:  Hillary Fitilis,
6 F-I-T-I-L-I-S.
7            HILLARY FITILIS,
8 a witness called for examination, having been
9 first duly sworn, was examined and testified as
10 follows:
11            JUDGE NORKEN:  How long for this
12 witness?
13            MS. HARRIS:  Half hour.
14            JUDGE NORKEN:  You may examine.
15            MS. HARRIS:  Thank you.  Judge,
16 permission to treat this witness as an adverse
17 witness.
18            JUDGE NORKEN:  Any objection to
19 that?
20            MS. LU:  No.
21            JUDGE NORKEN:  Okay.  You may
22 proceed.

52 (Pages 520 to 523)

Page 524

1         MS. HARRIS:  Thank you.
2              DIRECT EXAMINATION
3 BY MS. HARRIS:
4    Q.    No offense.
5    A.    None taken.
6    Q.    Ms. Fitilis, I'm Cathy Harris,
7 Father Heffernan's attorney, and we've met
8 before.
9         I'm going to ask you some questions.
10        Ms. Fitilis, do you work for the
11 National Institutes of Health?
12   A.    Yes.
13   Q.    What is your position?
14   A.    I'm the special assistant for
15 employee issues.  I service as the special
16 assistant to the chief operating officer who is
17 the equivalent of the executive officer of the
18 Clinical Center.
19   Q.    Special assistant for employee
20 issues in the Clinical Center?
21   A.    Are you asking my formal title or --
22   Q.    I'm asking is that what you do?  I'm

Page 525

1 trying to understand.
2    A.    Yes.
3    Q.    And you're a special assistant to
4 who?
5    A.    The chief operator officer.
6    Q.    Who is who?
7    A.    Maureen Gormley.
8    Q.    And, when did you begin in that
9 position?
10   A.    December of 2003.
11   Q.    And, what was your position, did you
12 work for NIH before that?
13   A.    No.
14   Q.    Did you work for HHS before that?
15   A.    Yes.
16   Q.    And where?
17   A.    At the Office of General Counsel,
18 General Law Division with HHS.
19   Q.    Where Ms. Lu works?
20   A.    Correct.
21   Q.    And, in your work in the Office of
22 General Counsel, did you work on EEO cases

Page 526

1 regarding Clinical Center employees at the NIH?
2    A.    Yes.
3    Q.    So, how did it come to be that you
4 came to be the special assistant for employee
5 issues in the Clinical Center?
6    A.    I was looking to make a change, to
7 leave the General Counsel's office.  And, I was
8 applying for a position as an attorney with NASA.
9         And, I needed a third reference in
10 addition to my two supervisors, so I contacted
11 Ms. Gormley, who I had worked with for quite some
12 time.  And, she asked me if I would consider
13 coming to work for her.
14        So, she created a position, it was
15 advertised, I applied and I came to work at the
16 Clinical Center.
17   Q.    Did Ms. Gormley tell you why she
18 needed a special assistant for employee issues in
19 the Clinical Center?
20   A.    Yes.  What she was finding was that
21 most of the Clinical Center cases would end up in
22 litigation.

Page 527

1         And, she felt if there was an
2 internal advisor to counsel management officials
3 at the early stages of many of the cases
4 involving performance or conduct issues, that we
5 could address and resolve issues early on prior
6 to litigation.
7         In addition, she found the number of
8 cases at the Clinical Center, which has
9 approximately 1,800 employees, to be
10 overwhelming.
11        She serves as the settlement
12 official on cases, and found that she was called
13 upon frequently by agency counsel to make
14 decisions on cases that were ongoing and that
15 there were a number of them at any given time.
16        And so she felt that it would be
17 helpful if she had someone to serve to support
18 her as well as to support and guide the
19 management officials in addressing performance
20 and conduct issues.
21   Q.    Performance and conduct issues.
22   A.    Uh-huh.  As well as a variety of

53 (Pages 524 to 527)

Page 528

1 other issues. I advise on these accommodations
2 to ensure that the Agency is in compliance.
3    Q.    Well, we'll get to that.
4 Performance and conduct issues with employees
5 that, as you said, otherwise wound up in
6 litigation; is that correct?
7    A.    Some of them, yes.
8    Q.    And, in litigation meaning
9 discrimination cases?
10    A.    Discrimination cases, appeals to the
11 Merit Systems Protection Board. A number of
12 cases would go through the grievance process.
13    Q.    She told you, didn't she, about an
14 issue with Father Heffernan?
15    A.    She did not.
16    Q.    She never, she didn't tell you, when
17 you came in, that there was an issue regarding
18 the Catholic Chaplain at the Clinical Center?
19    A.    No.
20    Q.    Okay. But, someone told you when
21 you first started about the problems with Father
22 Heffernan when you came to your job, correct?

Page 529

1    A.    Yes.
2    Q.    Who told you?
3    A.    I don't recall specifically who
4 informed me about the issues surrounding Father
5 Heffernan.
6         I spoke with Ray Fitzgerald at one
7 point in time about this, several points in time,
8 but, initially, but I don't recall if he was, in
9 fact, the very first person that I heard about
10 this on.
11         As you are aware, I came on board in
12 December of 2003, so this is almost two years old
13 now.
14    Q.    And he told you, Dr. Fitzgerald,
15 that there was a problem with Father Heffernan?
16    A.    Yes.
17    Q.    And, that December 2000 -- of what
18 year?
19    A.    I came on board December of 2003. I
20 couldn't tell you specifically when I first
21 learned of Father Heffernan's situation, other
22 than the fact that I did not learn of it until I

Page 530

1 came on board at the Clinical Center, but it was
2 within a fairly short period of time that I came
3 on board that this issue came to my attention.
4    Q.    What did Dr. Fitzgerald want you to
5 do with respect to Father Heffernan?
6    A.    Again I don't recall specifically if
7 it was Dr. Fitzgerald who told me about the
8 problem.
9         But what I do recall, generally, of
10 what was brought to my attention was that the
11 agency had implemented a requirement, an
12 educational requirement, for all of the staff
13 chaplains to adhere to.
14         And, I learned that Father Heffernan
15 was basically refusing to comply with that
16 policy.
17         And, that several attempts had been
18 made to talk to the importance of developing a
19 plan for meeting those educational requirements,
20 and that he was refusing to cooperate.
21         And that something needed to be done
22 in order to ensure that he was in compliance.

Page 531

1    Q.    Dr. Fitzgerald told you that Father
2 Heffernan did not have these, as you call them,
3 educational requirements?
4    A.    Both that he did not have the
5 educational requirements as well as the fact that
6 he did not appear willing to obtain them by
7 presenting a plan.
8    Q.    Okay. And he said Father Heffernan
9 was refusing to put together a plan to obtain
10 these requirements?
11    A.    That was my understanding, yes.
12    Q.    That's what he told you.
13    A.    Again, I don't recall specifically
14 what he told me. This was -- and I don't mean to
15 be difficult, this almost two years ago.
16         So I don't recall exactly who first
17 told me about it. I don't recall exactly what
18 was said.
19         But, overall, this was the issue
20 that was brought to my attention, that Father
21 Heffernan was not complying with the CPE
22 requirement and Dr. Fitzgerald was seeking

54 (Pages 528 to 531)

Page 532

1 guidance on what he needed to do to ensure that

2 Father Heffernan was in compliance.

3        Q.    Okay.  Did you find out how long

4 this problem had been going on?

5        A.    Yes.

6        Q.    And, Dr. Fitzgerald told you that it

7 had been going on for quite some time; is that

8 correct?

9        A.    Yes.  And, again, I don't recall if

10 it was Father Fitzgerald specifically, I'm

11 certain that at some point in time he must have

12 told me that was going on for a very long time.

13              But, I also recall seeing documents

14 that there had been past memos and a lot of other

15 written documents that documented the fact that

16 this had been an ongoing problem.

17        Q.    Okay.  But, you're aware -- well,

18 let me ask you, it had been going on for more

19 than three months; is that fair to say?

20        A.    Oh, absolutely, yes.

21        Q.    So, but, isn't it true that the

22 Department of Spiritual Ministry only adopted a

Page 533

1 policy with respect to these educational

2 requirements in September of 2003?

3        A.    I believe that the written policy

4 came out roughly around that time.  However, they

5 had adopted the policy early on.

6              And, made a decision that they were

7 going to be consistent, to follow the requirement

8 that had been implemented by five other area

9 hospitals.

10             And, that the Clinical Center wanted

11 to be consistent with these five other area

12 hospitals.  So, that they were going to adopt

13 this policy as well.

14        Q.    Let me understand.  The policy at

15 NIH needs to be written, correct?

16        A.    No.  I'm not aware of any

17 requirement that policy per se be written or

18 requirements be written.

19        Q.    But, you're not aware that policies

20 at NIH or in the Department of Health & Human

21 Services need to be in writing?

22        A.    Every policy, every policy has to be

Page 534

1 in writing, per se?

2        Q.    I'm asking you.

3        A.    I'd like to see a policy in writing.

4        Q.    They should be in writing, shouldn't

5 they?

6        A.    If someone was to ask me how a

7 policy should be implemented, yes, I would like

8 to see it in writing.

9              Does every policy have to be

10 written?

11        Q.    Because if it's not in writing, then

12 employees might not know what the policy is,

13 correct?

14        A.    Correct.

15        Q.    And, they might not know whether it

16 applies to them, correct?

17        A.    Correct.

18        Q.    And, it could be, if it's not in

19 writing, it could be applied differently to

20 different people, correct?

21              It's possible, isn't it?

22        A.    That is possible.  Yes.

Page 535

1        Q.    So, there was no written policy that

2 you knew of prior to September of 2003 about this

3 educational requirement; is that correct?

4        A.    I was not aware of any written

5 policy prior to 2003.  However, I did see --

6        Q.    Prior to September of 2003.

7        A.    I'm sorry, September of 2003.

8 However, I did see a number of documents that

9 reference the fact that this requirement had been

10 communicated in staff meetings and otherwise to

11 the staff chaplains.

12        Q.    Okay.  But, it wasn't an official

13 Department of Spiritual Ministry written policy

14 until September of 2003, correct?

15        A.    I don't recall ever seeing a written

16 policy that was dated prior to September, 2003,

17 no.

18        Q.    Now, you're a lawyer Ms. Pitilis; is

19 that correct?

20        A.    Yes.

21        Q.    And you provide legal advice to

22 these managers?

55 (Pages 532 to 535)

Page 536

1    A.    Technically, no.

2    Q.    What do you mean technically, no?

3    A.    There's a provision within the
4 department that provides that individual ICs
5 cannot have their own legal counsel.  So --

6    Q.    What's an IC?

7    A.    An institute or center, they're
8 referred to within the NIH.

9          So, I provide a guidance on
10 employment issues that do include Federal
11 Employment Law issues.

12          But, I wouldn't say that it's
13 technically legal advice.

14    Q.    It's not legal advice, but it's
15 legal advice?  I don't understand.

16    A.    If an institute or center is
17 interested in obtaining formal legal guidance,
18 they contact the Office of General Counsel.

19          However, if they need employee
20 relations guidance or advice about general
21 employment law issues, including the disciplinary
22 process, or conduct or performance issues, then

Page 537

1 they contact either myself or the employee
2 relations specialists who service the Clinical
3 Center.

4          JUDGE NORKEN:  If you were giving
5 legal advice, you probably wouldn't be here
6 testifying today, right?

7          MS. HARRIS:  I've seen stranger,
8 Judge.

9 BY MS. HARRIS:

10    Q.    Ms. Fitilis, when you -- so, you
11 then provide advice regarding the disciplinary
12 process to managers, correct?

13    A.    Correct, among other things.

14    Q.    And, you've been in your position
15 now since, let's see, since December of 2003 and
16 you're still in the position now, correct?

17    A.    Correct.

18    Q.    And, I know you're off some time for
19 leave; isn't that right?

20    A.    Correct.

21    Q.    How long were you off?

22    A.    About 14 and a half weeks.

Page 538

1    Q.    Okay.  So, you've been there, you
2 know, two years with a little break, in that
3 time, how many disciplinary actions have you been
4 involved with at the Clinical Center where an
5 employee was terminated?

6    A.    I believe it's 38.

7    Q.    38 terminations since you came?

8    A.    Correct.

9    Q.    And, you were involved in all of
10 those terminations?

11    A.    Correct.

12    Q.    Providing advice?

13    A.    Correct.

14    Q.    Did they all go to litigation?

15    A.    No.

16    Q.    Just from the Clinical Center, 38
17 terminations?

18    A.    Correct.

19    Q.    Who was the proposing official in
20 those actions?

21          MS. LU:  Objection.  Relevance.

22          JUDGE NORKEN:  They would only be

Page 539

1 relevant if it concerned the opposing official
2 here.

3 BY MS. HARRIS:

4    Q.    I'm just curious.  Let me ask it
5 this way, different proposing officials and
6 different deciding officials in these different
7 actions?

8    A.    Yes.  Different opposing officials
9 primarily.

10    Q.    Okay.  Deciding officials were --

11    A.    Almost always my boss, Maureen
12 Gormley with a handful of exceptions.

13    Q.    How many of those proposed
14 terminations were from Dr. Fitzgerald?

15    A.    Just this one.

16    Q.    And, how many terminations were
17 decided by Mr. Jones, Walter Jones?

18    A.    Either two or three.

19    Q.    Okay.

20          JUDGE NORKEN:  Do you want to ask
21 anything about suspensions.

22          MS. HARRIS:  Yes, that's fine, I

56 (Pages 536 to 539)

Page 540

1 will. And, thank you, Judge, I appreciate that.

2 BY MS. HARRIS:

3    Q.    How about proposed, since you've

4 been there, have you been involved in any

5 suspension actions for employees at the Clinical

6 Center?

7    A.    Yes.

8    Q.    How many?

9    A.    I couldn't say. I don't track them.

10 However, a number of suspensions.

11    Q.    More than 38?

12    A.    No.

13    Q.    Less than 38?

14    A.    Less than 38. I really couldn't.

15 say, I'm sorry.

16    Q.    How many employees are there in the

17 Clinical Center?

18    A.    Approximately 1,800.

19    Q.    Now, when you came in to your job in

20 December 2003, were you involved in reviewing a

21 proposed suspension regarding Father Heffernan?

22    A.    I don't recall when I reviewed a

Page 541

1 proposal to suspend Father Heffernan. But, yes,

2 I was involved in reviewing a proposal to suspend

3 him.

4    Q.    Isn't it true that that proposal was

5 in the works when you came into your job in

6 December, 2003?

7    A.    I don't recall.

8         (Complainant's Exhibit Number 40

9              marked for identification.)

10 BY MS. HARRIS:

11    Q.    I'm going to show you what's been

12 marked as Exhibit 40 of the Complainant's

13 Exhibits.

14         If you would just take a look at the

15 cover page, just let me know if you recognize

16 this document.

17    A.    It appears to be an e-mail from Joan

18 Martin to myself.

19    Q.    Okay. And, is this an e-mail you

20 received?

21    A.    I have no reason to doubt that I

22 received it.

Page 542

1    Q.    Okay.

2    A.    I don't specifically recall seeing

3 this e-mail in February of '04.

4    Q.    Okay. But, it says in the top box

5 to you: Fitilis, Hillary, Brent Cs NIH/CC/(OD),

6 do you see that?

7    A.    Yes.

8    Q.    Is that your correct, I don't know

9 what you call it, directorate in the Clinical

10 Center?

11    A.    Yes.

12    Q.    And, the e-mail refers to, the one

13 at the bottom, if you see, from Cynthia Bolton

14 to -- who is that sent to?

15    A.    Penny Bell.

16    Q.    Okay. And, who is that?

17    A.    Prior to employee relations being

18 centralized, employee issues were handled by

19 Penny Bell and Joan Martin and several other

20 employee relations specialists.

21    Q.    And, who is Cynthia Bolton?

22    A.    I believe she is an employee

Page 543

1 relations specialist as well. In fact, her title

2 here on the e-mail states human resources

3 specialist.

4    Q.    Okay. And, this e-mail was

5 forwarded to you, looks like February 2nd, 2004;

6 is that correct?

7    A.    Correct.

8    Q.    And, it came to, from Cynthia Bolton

9 to Penny Bell and Joan Martin, December 31, 2003;

10 is that correct?

11    A.    Correct.

12    Q.    And, refers to a Proposed Suspension

13 Memo; is that correct?

14    A.    Correct.

15    Q.    Okay. Take a look at the next pages

16 of this exhibit, and let me know if you recognize

17 this draft proposal.

18    A.    It appears to be a Notice of

19 Proposed Suspension from Ray Fitzgerald to Father

20 Heffernan, and it's a proposed five-day

21 suspension.

22    Q.    Okay. And, Ms. Bolton says on

57 (Pages 540 to 543)

Page 544

1 December 31st, 2003: "I have attached the most
2 recent copy of the proposed suspension memo. The
3 comments you made were acceptable by the
4 supervisor.
5         "I have indicated in red some
6 changes that the supervisor wanted to make.
7 Please let me know if this is about ready to
8 issue to the employee."
9         Did I read that correctly?
10    A.    More or less, yes.
11    Q.    Okay. And, so is it, does this
12 refresh your recollection as to whether this
13 proposed suspension for Father Heffernan for five
14 days was in process in December 2003?
15    A.    It clearly looks like it was in
16 process in December of 2003, in light of the
17 e-mail and the attachment. Yes.
18    Q.    Okay. Now, did you review this
19 proposed suspension?
20    A.    I ultimately reviewed it. But, it
21 looks like I didn't receive a copy of it until
22 February of 2004.

Page 545

1    Q.    Okay. Do you know when --
2    A.    Just for the record, I began my
3 appointment at the Clinical Center I believe on
4 December 28th.
5    Q.    December 28th, 2003?
6    A.    Yes.
7    Q.    Okay. And, do you know -- that's
8 fine. You reviewed the five-day suspension
9 proposal before it was issued to Father
10 Heffernan?
11    A.    Yes.
12    Q.    It's your opinion, or it's your
13 understanding that, as someone who gives
14 guidance, I don't want to misstate it as someone
15 who gives guidance on employee relations, it's
16 your understanding that federal employees should
17 follow the instruction of a supervisor no matter
18 what; is that correct?
19    A.    No matter what?
20    Q.    That's right.
21    A.    I'm certain that there are some
22 exceptions to that rule.

Page 546

1    Q.    Okay. Including -- is there an
2 exception that if instruction would cause danger
3 to the employee, following instruction would
4 cause significant danger to the employee, that
5 would be reason for the employee not to follow
6 that instruction, correct?
7    A.    Yes.
8    Q.    So, there are limits on the kinds of
9 instructions supervisors can give employees,
10 correct?
11    A.    Yes.
12    Q.    And, if an instruction would cause
13 an employee to violate his religious beliefs,
14 would that be a good justification to not follow
15 an instruction?
16    A.    Not necessarily.
17    Q.    It might?
18    A.    Could you give me an example?
19    Q.    You're the one who said not
20 necessarily. I want you to --
21    A.    And, that's my response. I mean,
22 not necessarily.

Page 547

1    Q.    So, there are occasions?
2    A.    I can't think of an occasion where a
3 supervisor would give an instruction to an
4 employee.
5         I suppose there could be an
6 exception somewhere in there. I wouldn't state
7 it as a blanket rule.
8    Q.    What about, for instance, ordering a
9 Catholic priest to give communion to a
10 non-Catholic patient, is that something an
11 employee would have to follow?
12    A.    If it was a requirement of the job
13 position I would say, yes, the employee must
14 follow that instruction.
15    Q.    Okay. And, is that the kind of
16 advice you would give to Dr. Fitzgerald, for
17 instance, if he asked?
18    A.    Yes.
19    Q.    Okay. What if a Catholic priest was
20 instructed to give confession to --
21         MS. LU: Objection to the
22 hypothetical --

58 (Pages 544 to 547)

Page 548

```
1            MS. HARRIS:  She asked for an
2  example, Judge.  I'm trying to understand what
3  she means by not necessarily.
4            JUDGE NORKEN:  I'll allow it.
5  Overruled.
6            THE WITNESS:  Could you repeat the
7  question, please.
8  BY MS. HARRIS:
9       Q.    What about an order to a supervisor
10  to a Catholic priest that he should not give a
11  sacrament to a dying Roman Catholic patient?
12       A.    I want to know what the basis for
13  that instruction was before I offered guidance.
14       Q.    So, you don't know the answer?
15       A.    I wouldn't answer that question if I
16  was asked for guidance without a response to that
17  question.
18       Q.    Okay.  What about a Roman Catholic
19  priest who is ordered by his supervisor to ignore
20  the needs of Roman Catholic patients?
21            Should he do that, should the priest
22  follow that instruction.
```

Page 549

```
1       A.    You're asking me should the priest
2  follow that instruction.  I believe in this
3  instance, yes, the employee should follow the
4  instruction.
5            However, if I was asked for guidance
6  on whether that was appropriate, I would want to
7  know from the supervisor, why are you giving that
8  employee that instruction.  And if it was a
9  legitimate work-related reason, I would instruct
10  him that he was well within his right to issue
11  that instruction.
12       Q.    Okay.  You know that Father
13  Heffernan ultimately agreed to take clinical
14  pastoral education; is that correct?
15       A.    When you say ultimately, are you
16  referring to his reply in the removal process?
17       Q.    Yes.  Were you there?
18       A.    Yes.  I was there.
19       Q.    And, you heard him agree to take
20  clinical pastoral education, either him or his
21  attorney stated that he would do it, correct?
22       A.    I believe that he did reference that
```

Page 550

```
1  he would be willing to, but found that it was
2  elementary or to some respect.
3       Q.    That the training would be
4  elementary for him?
5       A.    Correct.  I knew that was his
6  reference, but he said that that if it was
7  required, that he would.
8       Q.    Didn't he also state that, Father
9  Heffernan also state that he believed he
10  qualified to be certified as a professional
11  chaplain without the clinical pastoral education
12  training?
13       A.    I believe I recall him making that
14  representation, yes.
15       Q.    Okay.
16            JUDGE NORKEN:  This was during the
17  meeting on the proposed termination?
18            THE WITNESS:  This was his oral
19  reply to the proposed removal, yes.
20  BY MS. HARRIS:
21       Q.    Okay.  Isn't it true, to your
22  understanding, that if a Chaplain has
```

Page 551

```
1  professional experience that is comparable to a
2  clinical pastoral education unit, that that
3  should be, your understanding of the policy, at
4  the Clinical Center for the Department -- let me
5  start over.
6            Isn't it true that under the
7  Department of Spiritual Ministry's policy on this
8  required clinical pastoral education, that
9  professional experience comparable to clinical
10  pastoral education units is acceptable?
11       A.    I recall that there is a provision
12  in the policy that provides that some practical
13  work experience can be substituted for the units
14  of education.
15            And, that, in fact, there were a
16  number of units that were accredited to Father
17  Heffernan, based upon his work experience.
18            However, he still had a number of
19  units to complete, because work experience did
20  not satisfy all of them.
21       Q.    Did you calculate how many units
22  Father Heffernan had accredited to him?
```

59 (Pages 548 to 551)

Page 552

1    A.    No.

2    Q.    Did Dr. Fitzgerald, to your

3 knowledge?

4    A.    Dr. Fitzgerald provided me with the

5 background information that included the

6 representation of how many units Father Heffernan

7 needed to complete.

8    Q.    And, what did he tell you?

9    A.    I don't recall specifically how

10 many.

11    Q.    You don't recall how many units

12 Father Heffernan needed to complete?

13    A.    No.  I don't.

14    Q.    Did Dr. Fitzgerald inform you as to

15 what he took into account in determining how many

16 units Father Heffernan had credit for already?

17    A.    He told me that for all of the staff

18 chaplains in the department that he had figured

19 how many hours of work experience credit was due

20 based upon something that was provided through

21 the chaplaincy organization.

22        Forgive me for not recalling the

---

Page 553

1 specific name.  And, that Father Heffernan, as

2 well as other chaplains, including the Rabbi,

3 still had educational requirements to complete --

4    Q.    Okay.

5    A.    -- despite the work experience

6 credited.

7    Q.    And the other chaplains also needed

8 this, these credits, these units?

9    A.    Yes.

10    Q.    Who?

11    A.    I don't recall specifically who,

12 other than I believe the Rabbi, and I recall

13 asking him had the Rabbi presented a training

14 plan, and he had.  And he was in the process of

15 obtaining the units and had been moving through

16 the process to obtain them.

17        But I don't recall the other

18 chaplains, whether, I know that there were other

19 chaplains in the beginning of the process

20 because, as you are well aware, this requirement

21 had been announced before the written policy that

22 there were other staff chaplains who were moving

---

Page 554

1 through the process as well to obtain their

2 credit.

3    Q.    Well, I'm not sure what you're

4 referring to.  But, let me ask you this:  isn't

5 it true you advised Dr. Fitzgerald that in order

6 to terminate Father Heffernan, Dr. Fitzgerald --

7 well, I'm sorry.

8        In order to terminate Father

9 Heffernan, Father Heffernan would need to have

10 two suspensions on his record and only then could

11 Dr. Fitzgerald propose a termination.

12    A.    I don't recall specifically advising

13 him of that.

14    Q.    You don't recall advising him of

15 that?

16    A.    I don't recall specifically telling

17 him that, no.

18    Q.    Okay.  Isn't it true that it's the

19 Clinical Center policy that you start with a

20 five-day suspension, move to a 14-day suspension,

21 and then move toward termination?

22    A.    That's correct.  It's not a rule in

---

Page 555

1 every case.  But what I generally advise managers

2 that I like to see, and employee relations

3 advises this as well, is that we like to see an

4 effort made for written and/or verbal counseling.

5        And then a suspension of a range of

6 a shorter suspension, generally roughly around

7 five days, and then the next step is a

8 medium-length suspension, often right around 14

9 days.  We almost never propose more than 14 days.

10 And, then --

11    Q.    Because then the employee would have

12 MSPB appeal rights; is that right?

13    A.    That is what -- the position that

14 employee relations has taken within the

15 department, yes.

16    Q.    Okay.

17    A.    That traditionally there is a reason

18 to propose more than 14-days that once we reach a

19 point where we have a 14-day suspension, and the

20 employee has not responded to efforts to comply

21 with the conduct requirements, that the next step

22 is to propose removal, yes.

---

60 (Pages 552 to 555)

Page 556

1    Q.    Okay.  And, then after the 14-day
2  suspension, then it would be, the next step would
3  be removal proceedings?
4    A.    In almost all of the cases, yes.  I
5  can't think of an exception.
6    Q.    Okay.
7    A.    Generally.  I'm certain there could
8  be one.  But, I can't recall one.
9    Q.    And, that's advice that you've given
10  to managers before, correct?
11    A.    Correct.  It's ultimately the
12  manager's decision.  They are the proposing and
13  there is a deciding official.
14         I don't have any authority to take
15  any action.  But, that is my advice and that's
16  consistent with the employee relations office's
17  protocol with respect to progressive discipline.
18    Q.    So, if Dr. Fitzgerald testified that
19  you advised him that in order to terminate Father
20  Heffernan you would first need to have two
21  suspensions on his record, a shorter one, then a
22  longer one, then it would be appropriate to

Page 557

1  propose termination?
2    A.    The latter part of what you said is
3  correct.  That if someone, I don't recall ever
4  telling him in order to terminate this employee,
5  you need to follow this process.
6         That's generally not the way I
7  approach giving guidance.  I offer guidance of we
8  want to make every effort, and the terms I have
9  used is to rehabilitate or remove an employee
10  with issues.
11         And so I advised them that we go
12  down the path of progressive discipline in the
13  hope that the employee will comply with whatever
14  the requirement may be, in terms of a conduct
15  issue.
16    Q.    Okay.  And, obviously, then it was
17  your advice that Father Heffernan was not able to
18  be rehabilitated, correct?
19    A.    Correct.
20    Q.    Not even if he confessed?  That's
21  just a joke, withdrawn.
22         On what did you base your advice

Page 558

1  that he was not able to be rehabilitated?
2    A.    The fact that we, that Father --
3  Dr. Fitzgerald had counseled Father Heffernan on
4  several occasions about the importance of
5  complying with the CPE requirement.
6         That that was conveyed to him
7  verbally.  I believe that it was also stated in
8  his performance plan.
9         And that I understood that Father
10  Heffernan had been pretty up front with
11  Dr. Fitzgerald about his refusal to comply with
12  the policy.
13         And then when we issued a
14  suspension, he still had not complied or given
15  any indication that he was going to comply with
16  the policy by submitting a feasible training plan
17  or otherwise.
18         And so, at that point, we made a
19  determination that removal was appropriate, in
20  addition to other factors.
21    Q.    But, now he said he would take it,
22  you didn't believe him?

Page 559

1    A.    That's a decision that is up to the
2  deciding official.
3    Q.    I'm asking you.
4         Whether I personally believed Father
5  Heffernan was going to comply?
6    Q.    You said that he -- you said that
7  you didn't think he could be rehabilitated, so my
8  question to you is --
9    A.    Personally, based upon --
10    Q.    Let me finish my question.
11         You said you didn't think he would
12  be able to be rehabilitated, and so he told you
13  he finally he would take the training?  So, did you
14  think he was lying?
15         MS. LU:  Objection to this question.
16  She wasn't the deciding official in this case.
17         MS. HARRIS:  She gave advice, Judge.
18         JUDGE NORKEN:  Why are we dealing
19  with the termination?
20         MS. HARRIS:  It has to do with --
21  BY MS. HARRIS:
22    Q.    Well, let me ask you this,

61 (Pages 556 to 559)

Page 560

1 Ms. Fitilis, did you -- you got your information,
2 correct, that you had said, you testified that
3 Father Heffernan didn't propose a training plan
4 earlier; is that right?
5       A.    I recall that I was told that he, in
6 fact, at one time had proposed a training plan,
7 but that the training plan didn't include the
8 training that was even remotely related to the
9 CPE requirement.
10          And that when he was told that, he
11 failed to revise his plan and submit something
12 that was feasible.
13          And that this process went on for
14 quite some time with the instruction, and then
15 the failure to comply, and the instruction, and
16 the failure to comply.
17          And, that was the basis for my
18 advice of moving down the path of progressive
19 discipline.  In terms of your question earlier
20 about the removal, my role is not as the deciding
21 official.
22       Q.    Okay.  Did you advise Mr. Jones

Page 561

1 regarding the decision on the five-day
2 suspension?
3       A.    I'm certain that we had some
4 communication about it.  But, I don't
5 specifically recall what, if any, input I had
6 with the decision.  I recall working essentially
7 on the proposal.
8       Q.    And, you did not, though, discuss
9 with Mr. Jones whether Father Heffernan's
10 religious beliefs or religious obligations had
11 any mitigating impact on the penalty of
12 suspension, of that five-day suspension; is that
13 correct?
14       A.    I don't recall ever discussing with
15 him that issue, no.
16       Q.    Okay.  And, the 14-day suspension,
17 did you advise Dr. Fitzgerald on the proposed
18 14-day suspension --
19       A.    Yes.
20       Q.    -- for Father Heffernan?
21       A.    Yes.
22       Q.    And, did you advise Mr. Jones on the

Page 562

1 decision of the 14-day suspension?
2       A.    Again, I don't recall any specific
3 conversations that we had about it.  But, I'm
4 certain that we must have discussed it at some
5 point.
6       Q.    Okay.  And, you know, though, you
7 did not discuss the issue of Father Heffernan's
8 religious beliefs or practices mitigating the
9 14-day penalty; is that correct?
10      A.    Again, I don't recall specifically
11 discussing that.
12      Q.    Did you ever talk to Father
13 Heffernan to see what the problem was with his
14 perspective with this clinical pastoral
15 education?
16      A.    Personally with him?
17      Q.    Personally.
18      A.    No.  That's not my role.
19      Q.    Okay.  So, your role is to get your
20 information from the managers and advise
21 managers, based on the information you're
22 provided from them, correct?

Page 563

1       A.    That is correct.
2       Q.    Okay.
3          MS. HARRIS:  Judge, I want to offer,
4 I'm not sure if I did, offer Exhibit 40 into
5 evidence, that was the e-mail.
6          JUDGE NORKEN:  Any objection?
7          MS. LU:  No.
8          JUDGE NORKEN:  It is admitted.  The
9 whole exhibit?
10         MS. HARRIS:  Yes.  Thank you.
11            (Complainant's Exhibit Number 40
12            received in evidence.)
13            (Complainant's Exhibit Number 47
14            marked for identification.)
15 BY MS. HARRIS:
16      Q.    Now, Ms. Fitilis, I'm going to ask
17 you to take a look in the same book there,
18 Exhibit 47, please.
19          And, there's two pages there.  Let's
20 start with the first one.
21          Do you recognize that document,
22 Page 1 of that exhibit?

62 (Pages 560 to 563)

Page 564

1    A.    Yes.

2    Q.    And, what is that?

3    A.    It appears to be an e-mail from me

4 dated February 11, 2004, to Gwen Platt.

5    Q.    And why did you send Ms. Platt this

6 e-mail?

7    A.    It states:  "Just following up on

8 our conversation yesterday, were you able to

9 locate the files on Father Heffernan?

10         "We should respond to the

11 documentation, patient response time and Saturday

12 mass issues at as soon as possible.

13         "Please call me at your earliest

14 convenience to discuss."

15         I don't recall specifically why I

16 sent it, but it appears that I'm following up on

17 issues, conduct issues concerning Father

18 Heffernan.

19    Q.    What conversation did you have with

20 Ms. Platt on February 10th about Father

21 Heffernan?

22    A.    I don't recall specifically.

Page 565

1    Q.    What files were you asking for?

2    A.    Probably when, as I mentioned

3 earlier, the HR offices consolidated, the files

4 were transferred from, as I mentioned earlier,

5 Joan Martin, and Joan Martin and the other

6 employee relation specialists, to Gwen Platt's

7 office.

8         And, I was asking whether she ever

9 located existing files, employee relations files.

10    Q.    Okay.  And, you list three subjects

11 here, documentation.

12         Just, briefly, what did that refer

13 to?

14         MS. LU:  Objection.  Relevance.

15 It's not even the basis for a suspension.

16         JUDGE NORKEN:  Repeat the question

17 again.

18 BY MS. HARRIS:

19    Q.    You said we should respond to the

20 documentation, and I want to know what you meant

21 by that.

22         JUDGE NORKEN:  Wait a minute.  This

Page 566

1 is on the Saturday mass issue?

2         MS. HARRIS:  I don't know.  That's

3 why I'm asking.  It says documentation, patient

4 response time, and Saturday mass issue.

5         So, I think I know what Saturday

6 mass refers to.  I think I know what patient

7 response time is.  I don't know what

8 documentation is.  What is that?

9         JUDGE NORKEN:  I think I understand

10 the patient response time, that's when the

11 charges were dropped.

12         MS. HARRIS:  That's right.

13         JUDGE NORKEN:  Do you need to go

14 through that then?

15         MS. HARRIS:  No.  I'm talking about

16 response to the documentation, and I just want to

17 know the first one, documentation.

18         JUDGE NORKEN:  On that part

19 overruled.

20         THE WITNESS:  I'm sorry, I didn't

21 hear.

22         JUDGE NORKEN:  You can respond about

Page 567

1 what was meant by the documentation.

2         THE WITNESS:  Okay.  I believe that

3 that refers to Doctor or Father Heffernan's

4 refusal to document patient visits.

5 BY MS. HARRIS:

6    Q.    Okay.  And, what were you talking

7 about responding to here, "we should respond to

8 these issues."

9         Did you mean to Father Heffernan's

10 response to the proposed five-day suspension, or

11 something else?

12    A.    I'm not certain, but it appears that

13 by saying response is that these issues were

14 ongoing and a problem, and so I felt that we

15 needed to timely address them.

16    Q.    Okay.  Now, the five-day suspension

17 was proposed.  This is a stipulated fact, so you

18 can trust me on this.

19         The five-day suspension was proposed

20 on January 21, 2004.  Father Heffernan responded

21 to the five-day suspension February 27, 2004.

22    A.    Okay.

63 (Pages 564 to 567)

Page 568

1   Q.   Okay.  Your e-mail is dated
2 February 11, 2004.

3   A.   Uh-huh.

4   Q.   So, what did you want to respond to?

5       MS. LU:  Objection.  Asked and

6 answered.  She already answered what she was

7 referring to in e-mail about responding to these

8 issues.

9       JUDGE NORKEN:  I think I understand.

10 Overruled.

11 BY MS. HARRIS:

12   Q.   Go ahead.

13   A.   What I think I was referring to is

14 that we needed to address these issues, which

15 were misconduct.  So, move forward with whatever

16 the next steps were.

17   Q.   Would have been the next suspension,

18 correct?

19   A.   Could be.

20   Q.   And, in fact, it was?

21   A.   Yes.  Correct.

22   Q.   So, the next suspension contained

Page 569

1 charges similar to what you said here,

2 documentation, patient response time and Saturday

3 mass, correct?

4   A.   Is there a copy of the suspension?

5   Q.   If you could look at, it's Page 16,

6 Exhibit 16 from ROI, March 31, 2004.

7       Patient Response Time, that's Charge

8 One, right?

9   A.   Correct.

10   Q.   Saturday Mass, that's Charge Two,

11 correct?

12   A.   Yes.

13   Q.   And, documentation, that's not in

14 here, is it?

15   A.   No.

16   Q.   Okay.

17   A.   It does not appear to be.

18   Q.   Okay.  So, on February 11th, you

19 were thinking about the next suspension already;

20 is that correct?

21   A.   That appears to be the case.  I

22 can't say for certain.  But, it looks that way.

Page 570

1   Q.   Okay.  All right.  Please look at

2 Page 2 of Exhibit 47.

3       Do you recognize this document?

4   A.   It appears to be an e-mail from me

5 dated February 9th, 2004, to Ray Fitzgerald, and

6 it's entitled:  "Follow-up on Saturday Mass."

7   Q.   And, you sent this e-mail?

8       MS. LU:  I am going to object to

9 this e-mail, it's about the Saturday mass issue.

10       MS. HARRIS:  It's not about the

11 Saturday mass, Judge.  If you could give me a

12 couple of questions, I'll deal with it quickly.

13       JUDGE NORKEN:  Overruled.

14 BY MS. HARRIS:

15   Q.   You sent this e-mail to

16 Dr. Fitzgerald?

17   A.   I have no reason to doubt that I

18 did.

19   Q.   Okay.  You provided this document to

20 us in discovery; isn't that correct?

21       It's printed out from your computer;

22 isn't that right?

Page 571

1   A.   Again, I have no reason to doubt it.

2 I just don't specifically recall sending it.

3 And, I don't mean to be difficult, but I just

4 don't recall sending it, but I have no reason to

5 doubt that I sent it.  And, yes, I did provide

6 all of my e-mails to agency counsel.

7   Q.   Okay.  And, here on February 9th,

8 2004, you said, the second sentence:  "If he did

9 not comply, we should consider taking another

10 disciplinary action."

11       Did I read that correctly?

12   A.   You did, yes.

13   Q.   You also said:  "Please contact me

14 at your earliest convenience so that we may

15 figure out the next step in this process."

16       Did I read that correctly?

17   A.   You did, yes.

18   Q.   All right.  So, on February 9th, in

19 fact, you were already thinking about the next

20 step in the disciplinary process; is that

21 correct?

22   A.   Yes.

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 572

1       Q.      Okay.  And, the next suspension it
2  turned out to be, correct?
3       A.      Correct.
4       Q.      Okay.
5               MS. HARRIS:  Judge, I offer
6  Exhibit 47 in its entirety, into evidence at this
7  time.
8               JUDGE NORKEN:  Any objection?
9               MS. LU:  Well, I maintain my
10 objection, the e-mail talks about the Saturday
11 mass issue, which has already been decided.
12              JUDGE NORKEN:  Since it ended up
13 being all together in one suspension, I'm going
14 to overrule and admit it.
15              MS. HARRIS:  Thank you.
16              (Complainant's Exhibit Number 47
17              received in evidence.)
18 BY MS. HARRIS:
19      Q.      Okay.  You testified that you didn't
20 think Father Heffernan could be rehabilitated
21 with respect to taking, agreeing to take CPE,
22 correct?

Page 573

1       A.      Based upon his prior
2  representations, from what I understood which
3  were ongoing for some time, yes.
4               In my opinion, I didn't believe that
5  he could be rehabilitated.
6       Q.      And, yet, after Father Heffernan
7  agreed to take CPE, you recommended dropping the
8  CPE charge from his removal because you didn't
9  think it would be upheld; isn't that correct?
10      A.      I don't recall the specific advice
11 that I gave.  But, it's possible and sounds
12 accurate.
13      Q.      Okay.  So, if asked, you would have
14 suggested that the CPE charge not be upheld in
15 light of Father Heffernan's suggestion that he'd
16 be willing to obtain the educational requirements
17 for CPE, correct?
18      A.      My role, as I stated --
19      Q.      Just yes or no.
20      A.      Could you repeat the question?
21      Q.      If asked, you would have suggested
22 that the agency not uphold the CPE, failure to

Page 574

1  take CPE, offer a CPE plan charge, in light of
2  Father Heffernan's suggestion that he would be
3  willing to obtain the educational requirements in
4  CPE?
5               MS. LU:  Objection to that question,
6  because that deals directly with the removal.
7               JUDGE NORKEN:  Sustained.
8               MS. HARRIS:  I don't think so,
9  Judge.  I think --
10              MS. LU:  Yes, it does.
11              MS. HARRIS:  -- this goes to
12 credibility.
13              JUDGE NORKEN:  This goes to the
14 removal.
15              MS. LU:  It goes to the removal.
16              MS. HARRIS:  It goes to her
17 credibility, Judge, about rehabilitation.
18              JUDGE NORKEN:  If you would step out
19 of the room, please.
20              (Witness leaves room.)
21              JUDGE NORKEN:  At the moment, she's
22 not denying it, she's just saying she doesn't

Page 575

1  recollect it.  You have the deposition there.
2               MS. HARRIS:  Yes.
3               MS. LU:  The deposition was at the
4  removal case.
5               JUDGE NORKEN:  That's the point.
6  The offer to take the CPE, as Fitzgerald wanted
7  it done, wasn't made until June of 2004, after he
8  had already served a second suspension.  So,
9  the --
10              MS. LU:  And after the removal was
11 proposed.
12              JUDGE NORKEN:  And, after the
13 removal was proposed.  So, that the situation
14 where she would have made that recommendation
15 hadn't occurred yet.
16              MS. HARRIS:  That's not my point,
17 Judge, here.  My point is Ms. Fitilis testified
18 that she believed that Father Heffernan would not
19 be rehabilitated.
20              And, yet she advised management to
21 drop a charge regarding this CPE issue precisely
22 because he agreed to take it, and she didn't

65 (Pages 572 to 575)

Page 576

1  think it would be able to be upheld.

2        So, it goes to her credibility.  At

3  one time she's saying he can't be rehabilitated,

4  he'll never take the CPE, and on the other hand

5  she's saying, you can't charge him with this

6  because he's agreed.

7        MS. LU:  He couldn't be

8  rehabilitated as to why the suspensions kept

9  moving in progressive discipline process.

10        So, when you talk about when she is

11  going to advise him whether to drop the CPE

12  charge the situation has completely changed

13  because, at that point in time, he's already been

14  issued the proposed removal, and it wasn't at his

15  oral reply, and so that's a whole other set of

16  circumstances now.

17        JUDGE NORKEN:  I'll allow to you ask

18  questions about whether a belief in his ability

19  to rehabilitate had changed once he said he would

20  take the CPE.

21        MS. HARRIS:  Okay.  I'll do that.

22        JUDGE NORKEN:  Because frankly there

Page 577

1  is no -- frankly, there's no effective attack on

2  her credibility if, at the time of the

3  suspensions, she believed him not to be

4  rehabilitatable, but later when he agreed to take

5  them, she did.

6        So, she changed her mind when the

7  circumstances changed.

8        MS. HARRIS:  Well, I'll be glad to

9  ask her that, Judge, although I think her prior

10  testimony was that after the termination was

11  proposed, and he said that he would take the CPE,

12  she still didn't think he would be able to be

13  rehabilitated.

14        That was her earlier testimony

15  today.

16        MS. LU:  That's not what, your

17  question was did you think Father Heffernan could

18  not be rehabilitated, and you were talking all

19  along about the suspensions and the suspensions.

20        MS. HARRIS:  Well, I'll be glad to

21  ask her and clarify it.  I have no problem with

22  that, Judge.

Page 578

1        JUDGE NORKEN:  If you can make that

2  clarification, and she goes and changes her mind,

3  I mean, if she goes ahead and says I would have

4  changed my mind, then it's time to move on.

5        MS. HARRIS:  That's fine.

6        JUDGE NORKEN:  Bring the witness

7  back in.

8        (Witness returns to the room.)

9        JUDGE NORKEN:  The objection to the

10  last question -- well, was sustained.  However,

11  Ms. Harris has other questions for you.

12  BY MS. HARRIS:

13        Q.    Ms. Pitilis, did your opinion about

14  whether Father Heffernan could be rehabilitated,

15  that opinion, did it change after he stated

16  during the oral reply that he would take the CPE?

17        A.    No.  I don't believe that it did.

18        Q.    Right.  You still felt that he was

19  not able to be rehabilitated, correct?

20        A.    I personally didn't believe that he

21  was going to follow through, in light of the fact

22  that he had made past representations that had

Page 579

1  never been followed through on.  But that was my

2  personal opinion, and, again, I am not the

3  deciding official.

4        So, once the decision comes into

5  play, that decision is made by the deciding

6  official.  So, I did play a pretty big role in

7  the proposal, but, not in the decision.

8        Q.    So, I'm going to go back to my

9  question before then, Judge.

10        If asked, however, regarding the CPE

11  charge, you would have suggested that the agency

12  not uphold the charge in light of Father

13  Heffernan's suggestion that he would be willing

14  to obtain the educational requirements; isn't

15  that correct?

16        MS. LU:  Continuing objection to

17  this question.  Ms. Pitilis' response hasn't

18  changed anything, because she said it was her

19  personal belief.

20        JUDGE NORKEN:  Wait -- let's have

21  the witness step out again.

22        (Witness leaves the room.)

66 (Pages 576 to 579)

Page 580

1          MS. LU:  Ms. Fitilis testified that
2 it was her personal belief that she didn't think
3 that Father Heffernan could be rehabilitated even
4 after he agreed to take CPE.
5          That's her personal belief.  That,
6 doesn't mean that she, on the other hand, in her
7 professional aspect, is going to recommend
8 something to a manager that's based on her own
9 personal belief.
10          JUDGE NORKEN:  I mean, I see that
11 distinction as well.
12          MS. HARRIS:  Let me just read,
13 Judge, for the record.  This was my proffer,
14 Ms. Fitilis testified in her deposition:
15          "Question:  What was your
16 recommendation about Charge Two, that was the CPE
17 charge in the termination proposal?
18          "Answer:  I don't recall
19 specifically what my recommendation was.  But, I
20 would be inclined, if asked, to suggest that we
21 perhaps not uphold it in light of Father
22 Heffernan's suggestion that he would be willing

Page 581

1 to obtain the educational requirements which he
2 put forth in the oral reply."
3          And, that goes to support what I've
4 been explaining in her professional aspect,
5 she would make a sound recommendation to the
6 proposing official, regardless what her personal
7 belief is.
8          MS. LU:  Well, you can make that
9 argument, you can make that argument, but from
10 your perspective, Judge.
11          MS. HARRIS:  And --
12          JUDGE NORKEN:  One person at a time,
13 please.  You have just now made a garbled record
14 that I'm sure the court reporter couldn't pick up
15 both of them, one at a time.
16          Go ahead, Ms. Lu.
17          MS. LU:  I finished what I said
18 before, but, in addition, I want to say that
19 again, that was also at the removal stage where
20 the circumstances obviously from her perspective
21 as an advisor to management had changed.
22          MS. HARRIS:  Judge, if she made a

Page 582

1 recommendation that's inconsistent with her
2 personal belief, that goes to credibility.
3          MS. LU:  I don't see how that goes
4 to credibility.
5          JUDGE NORKEN:  I don't necessarily
6 see that, but how about if you were to ask her
7 this:  If you believed that he was not
8 rehabilitatable, then why would you have made
9 such a recommendation.
10          MS. HARRIS:  Okay.
11          JUDGE NORKEN:  I'll allow you to ask
12 that question.  Let's have the witness step in.
13          (Witness returns to the room.)
14 BY MS. HARRIS:
15          Q.    Ms. Fitilis, if you believed that
16 Father Heffernan was non-rehabilitatable, then
17 why would you have advised the agency to drop the
18 CPE charge after father Heffernan agreed to take
19 the training?
20          MS. LU:  Objection.  Lack of
21 foundation.
22          THE WITNESS:  I don't believe that I

Page 583

1 ever -- can I just clarify?
2          JUDGE NORKEN:  Overruled.  Go ahead.
3          THE WITNESS:  I don't believe that I
4 testified that I, in fact, gave that instruction.
5 I said I probably did, and it's likely, but, I
6 don't specifically recall giving that
7 instruction.
8          And I just want that to be clear.
9 In fact, I recall that being discussed.  But, I
10 don't recall what my specific opinion on that
11 was.
12 BY MS. HARRIS:
13          Q.    All right.  Then let me, if you
14 believe I --
15          JUDGE NORKEN:  With that caveat, can
16 you answer that question?
17          THE WITNESS:  Can you repeat the
18 question?
19 BY MS. HARRIS:
20          Q.    If you believe that Father Heffernan
21 was not able to be rehabilitated, then why would
22 you have likely advised the agency to drop the

67 (Pages 580 to 583)

Page 584

1  CPE charge after Father Heffernan agreed to take
2  the training?
3      A.    Because in the event of an appeal,
4  it would make the agency's action strong.
5      Q.    What do you mean in the event of an
6  appeal?
7      A.    In the event that we decided on the
8  removal, which would be what we were doing,
9  because you asked dropping the charge, and the
10  decision, my role is to ensure that the agency is
11  in the best position when it takes actions for
12  them to be defensible, in addition to ensuring
13  that the charges are appropriate and supportable.
14          JUDGE NORKEN:  It's time to move on.
15          MS. HARRIS:  Okay.
16          THE WITNESS:  May we go off the
17  record for a moment, Your Honor?
18          JUDGE NORKEN:  Off the record.
19          (Recess -- 2:11-2:12 p.m.)
20          (Complainant's Exhibit Number 52
21          marked for identification.)
22  BY MS. HARRIS:

Page 585

1      Q.    If you could look at Exhibit 52,
2  please.
3          Do you recognize this document?
4      A.    It appears to be an e-mail from me
5  dated March 9th, 2004 to Walter Jones, the
6  subject is HH and the initials are Henry
7  Heffernan.
8      Q.    And, you in this e-mail, I'm trying
9  to do this quickly for you here, in this e-mail
10  you were writing to Mr. Jones about your concern
11  that Mr. Jones recusal or not -- well, you tell
12  me.
13          Were you concerned about Mr. Jones
14  recusing himself or were you concerned about the
15  impact on the appeal if he did not recuse himself
16  as the deciding official in Father Heffernan's
17  matter?
18      A.    Neither.  Father Heffernan made a
19  request that Walter Jones recuse himself as a
20  deciding official.
21          And, we thought that it was possible
22  that Father Heffernan was going to make it an

Page 586

1  issue.  And, it may pose problems on the appeal
2  if he argued it as an issue.
3          And, again, my role is to ensure
4  that these processes go smoothly.  And, so I
5  recommended that in the interests of it not
6  causing further problems, it really didn't make a
7  difference if Ms. Gormley was the deciding
8  official, or Walter Jones was the deciding
9  official.
10          So, I conveyed to Ms. Gormley the
11  nature of the situation and asked her what she
12  thought would be best, and she said let Walter
13  decide.  Whatever he decides.
14      Q.    Okay.  But, your concern was that if
15  Mr. Jones remained as deciding official, it could
16  cause problems in the future; isn't that correct?
17      A.    I didn't necessarily think that it
18  was going to, that there was any real basis for
19  concern.
20          But, often what I do in advising in
21  these actions, and clearly I did in this case,
22  was just ensure that the process goes more

Page 587

1  smoothly.
2          And, if it doesn't make a difference
3  who the deciding official is, we might as well
4  just assuage the employee's concerns and allow
5  someone else to hear the case, if for whatever
6  reason, they don't believe that this particular
7  deciding official is objective.
8          But, I didn't feel that there was a
9  real concern.  If there was, I would have
10  conveyed that to Ms. Gormley and Ms. Gormley
11  likely would have served as the deciding
12  official.
13      Q.    It doesn't make a difference, you
14  said, who the deciding official is; isn't that
15  right?
16      A.    In terms of --
17      Q.    Yes or no.
18      A.    Yes.  I don't believe it makes a
19  difference in who the deciding official is.
20          MS. HARRIS:  Nothing further, thank
21  you.
22          JUDGE NORKEN:  Any cross?

68 (Pages 584 to 587)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                                    :
**Plaintiff** *pro se*,

**v.**                                             :

                                                         C.A. No.  1:07-cv-02308(RMC)

**WILLIAM BIGLOW,** *et al.*
**Defendants.**                                    :

                              ...oOo...

**Transcript of testimony of Hillary Fitilis at EEOC Hearing,**
*Heffernan v. Leavitt, Secretary DHHS,* EEOC Case No. 120-2005-00226x,

Hr'g 12/15/05    pgs 588-643

**EXHIBIT 6-*B***

8

Page 588

```
1          MS. LU:  Yes.  I have questions and
2  I'd like to at least treat this witness as an
3  agency witness.
4          MS. HARRIS:  Well, it's still cross,
5  Judge.  I mean --
6          JUDGE NORKEN:  Well, it means if
7  she's an agency witness then she has to ask
8  direct examination questions.
9          MS. HARRIS:  Well, nonleading
10 questions, I guess.
11         JUDGE NORKEN:  That's right.  Go
12 ahead.
13              CROSS-EXAMINATION
14 BY MS. LU:
15     Q.   Ms. Fitilis, let me see, are you
16 familiar with the ombudsman process at the
17 Clinical Center?
18     A.   Yes.
19     Q.   Have you ever been involved in the
20 ombudsman process involving Father Heffernan?
21     A.   Yes.
22     Q.   Okay.  When was that?
```

Page 589

```
1      A.   I don't recall specifically the
2  dates, but, I do know I was involved in the
3  process, yes.
4      Q.   Was it in 2004?
5      A.   Yes.
6      Q.   Okay.  And, what was your role in
7  that process?
8          MS. HARRIS:  I'm going to object,
9  Judge.  This is beyond the scope of my direct.
10 Ms. Lu did not proffer Ms. Fitilis as a witness.
11         MS. LU:  I know, but I asked to
12 treat her as an agency witness, and we reserve
13 our right to call any of complainant's witnesses
14 identified on their list as a witness.
15         MS. HARRIS:  Well, you should have
16 done that in your supplemental prehearing
17 statement that you filed.  You knew of our
18 witnesses filed.
19         MS. LU:  I did that in my witness
20 list.
21         MS. HARRIS:  No.
22         JUDGE NORKEN:  Did you list
```

Page 590

```
1  Ms. Fitilis in the witness list?
2          MS. LU:  I didn't identify her, but
3  I said that for the complainant's witnesses, we
4  reserve the right to call them as witnesses.
5          JUDGE NORKEN:  Right.  But that
6  would be generally about the proffer that the
7  other sides makes.
8          MS. LU:  No.  To call as agency
9  witnesses.  And, also --
10         JUDGE NORKEN:  I don't grant the
11 ability to testify without proffer.
12         MS. LU:  Well, in addition, too,
13 this is also, she -- do you want the witness to
14 sit in?
15         JUDGE NORKEN:  I guess she had
16 better step out.
17         THE WITNESS:  Okay.  And, excuse me,
18 before you issue your ruling, Your Honor, may I
19 confer with Ms. Lu?
20         JUDGE NORKEN:  No.
21         THE WITNESS:  After you issue your
22 ruling?
```

Page 591

```
1          JUDGE NORKEN:  You mean with respect
2  to your having to leave or with respect to --
3          THE WITNESS:  Oh, no, with respect
4  to --
5          JUDGE NORKEN:  -- the testimony?
6          THE WITNESS:  Yes.
7          JUDGE NORKEN:  No.
8          THE WITNESS:  Okay.
9          (Witness leaves the room.)
10         JUDGE NORKEN:  Go ahead.
11         MS. LU:  This evidence is also
12 important in terms of rebuttal purposes because
13 Father Heffernan testified about the ombudsman
14 process, too, and what he was told allegedly by
15 Dr. Gatling (ph.) from agency management, who
16 remains unidentified.
17         So we have no idea who in the agency
18 has supposedly offered Father Heffernan only two
19 options for Father Heffernan, whether to resign
20 or be terminated.
21         JUDGE NORKEN:  Because it was
22 conveyed through Gatling, correct.
```

69 (Pages 588 to 591)

Page 592

1        MS. LU:  Correct, but Gatling got it
2  from some agency official.  How else would he
3  come about it.  And, that's what Father Heffernan
4  testified about.
5        JUDGE NORKEN:  You knew this all
6  along.  I mean, why didn't you proffer her as a
7  witness for that?
8        MS. LU:  I did not know this all
9  along until --
10        MS. HARRIS:  Of course, you did.  We
11  stipulated to what Father Heffernan was going to
12  testify about.
13        MS. LU:  I had no idea about what
14  Ms. Fitilis knew until I talked to her.
15        MS. HARRIS:  Well, that's --
16        JUDGE NORKEN:  That's right.
17        MS. LU:  In preparation for this
18  hearing.
19        JUDGE NORKEN:  Well, then you
20  should -- I'm going to sustain the objection.
21        MS. HARRIS:  Thank you, judge.
22        JUDGE NORKEN:  Let's have the

Page 593

1  witness come back in.
2        MR. KATOR:  I'll get her.
3        (Witness returns to room.)
4        JUDGE NORKEN:  Okay.  The objection
5  to the last question was sustained, but Ms. Lu
6  has other questions for you.
7        THE WITNESS:  No other questions for
8  me?
9        MS. LU:  I do.
10        THE WITNESS:  Oh, has other
11  questions.
12  BY MS. LU:
13        Q.  Ms. Fitilis, to your knowledge did
14  the agency ever convey to anyone, Father
15  Heffernan or anybody involved in this process,
16  that Father Heffernan only had two choices and
17  that is to resign or be terminated?
18        MS. HARRIS:  Objection.  This is the
19  same line of questioning, Judge.  It's beyond the
20  scope of our direct and the agency didn't make
21  this proffer at any time with respect to this
22  witness.

Page 594

1        JUDGE NORKEN:  Wait a minute, wait a
2  minute, this does go to the sequence of events
3  and that's what she was asked to testify about.
4        So I'll overrule.  You may answer.
5  BY MS. LU:
6        Q.  Do you need me to repeat?
7        A.  Please.
8        Q.  At any time during this suspension
9  process for Father Heffernan, did the agency
10  convey to Father Heffernan or to anyone that
11  Father Heffernan only had two options, and that
12  is to resign or be terminated?
13        MS. HARRIS:  Your Honor, object.
14  This is exactly why we requested to call
15  Dr. Gatling and the stipulation, we set the
16  stipulation in place as to what Father Heffernan
17  would testify to regarding that fact.
18        And, I'm going to, what Ms. Lu is
19  asking about right now, and this is entirely
20  improper that they're asking a witness who this
21  was beyond the scope of our direct and agency
22  didn't proffer this witness as having information

Page 595

1  about this.  They had plenty of notice.
2        The agency already agreed that it
3  would not, agreed that Father Heffernan, that
4  this happened, that Father Heffernan would
5  testify about this and that they wouldn't object
6  to it.  They wouldn't present evidence about this
7  issue.
8        MS. LU:  We didn't object to, we
9  didn't agree not to present evidence about it.
10        JUDGE NORKEN:  That's not what they
11  agreed to --
12        MS. HARRIS:  Otherwise we would have
13  Dr. Gatling here.
14        MS. LU:  We agreed for Father
15  Heffernan to testify about what Dr. Gatling told
16  him, without any objection as to hearsay or
17  whatever.
18        We took it on face value that
19  Dr. Gatling told Dr. Heffernan this.
20        MS. HARRIS:  Then we're going to
21  have to have Dr. Gatling come in.
22        MS. LU:  He's going to come in and

70 (Pages 592 to 595)

Page 596

1 say what Father Heffernan said?

2          Father Heffernan already testified

3 to what Dr. Gatling told him.

4          JUDGE NORKEN: My understanding of

5 the agreement was that the parties were free to

6 testify as to what Gatling conveyed. And, that,

7 therefore, Gatling wasn't necessary as a witness.

8          MS. LU: And, that's what Father

9 Heffernan did in his direct examination.

10          MS. HARRIS: Well, Judge, I need the

11 witness to step out in order, for me -- I'm

12 sorry.

13          JUDGE NORKEN: Okay.

14          (Witness leaves the room.)

15          MS. HARRIS: I'm sorry. Judge, if

16 this witness is going to testify, and, I don't

17 know what she's going to say, but I assume that

18 she's going to testify that, no, the agency never

19 conveyed to Father Heffernan that he had two

20 choices, to be terminated or, whatever, whatever

21 the other thing is, and -- oh, to resign or be

22 terminated.

Page 597

1          And, if she's going to testify to

2 that, then we need to call Dr. Gatling on

3 rebuttal to say otherwise, because it was said to

4 Father Heffernan, there's a stipulation in the

5 record so stating.

6          JUDGE NORKEN: Wait a minute.

7 Surely you're not telling me that Dr. Fitzgerald

8 isn't going to be able to come and testify that

9 he, if he decides, I mean, I don't know if the

10 agency is going to do that.

11          But, surely you're not telling me

12 that Fitzgerald can't come and testify and say I

13 never conveyed that.

14          Is that what you're saying that the

15 agency agreed to do?

16          MS. LU: That's not what the agency

17 agreed to do.

18          JUDGE NORKEN: I mean, if Fitzgerald

19 comes and testifies.

20          MS. HARRIS: Well, if all of the

21 agency's witnesses are ponied up and say I never

22 conveyed this, I never conveyed this, then we

Page 598

1 need Dr. Gatling to come in and say who told him

2 this.

3          JUDGE NORKEN: Okay. I think the

4 only issue here is, the only serious issue

5 regarding Ms. Fitilis is whether it's beyond the

6 scope.

7          I cannot, I do, unless the parties

8 have it in writing their agreement.

9          MS. HARRIS: It is in writing.

10          MS. LU: It is in writing.

11          JUDGE NORKEN: Can I see it?

12          MS. LU: Here it is.

13          JUDGE NORKEN: The usefulness of

14 this testimony is being able to get it in at all.

15 The issue, as I recollect, was that it should not

16 be admitted at all, because it was during --

17          MS. LU: Because it was during the

18 ombudsman process, communications.

19          JUDGE NORKEN: And the parties

20 essentially, what I thought they had done was

21 agreed to allow this testimony in and both sides

22 could give their version.

Page 599

1          The agreement is as follows: "After

2 a teleconference on June 21, 2005, with the

3 Administrative Judge, the parties have agreed

4 that in lieu of calling Dr. Gatling as a witness

5 at the hearing, Father Heffernan will testify as

6 to what Dr. Gatling told him.

7          "Specifically, Father Heffernan may

8 testify that Dr. Gatling told him in February,

9 2004, that the agency intended to give

10 complainant only two options, to resign or be

11 terminated as opposed to the third option to

12 comply with the CPE requirement.

13          "Pursuant to the June 18th, 2005

14 prehearing memorandum and order, complainant's

15 witness list, the agency agreed that this may be

16 considered as proffer of evidence and agreed not

17 to object to such testimony on the grounds that

18 it is hearsay, confidential or privileged.

19          "In return complainant agrees not to

20 call Dr. Gatling as a witness."

21          Now, are you telling me then that

22 the agreement is just for Dr. -- just for Father

71 (Pages 596 to 599)

Page 600

1 Heffernan to testify and no one else, is that
2 what you are saying?
3          MS. HARRIS:  Yes.
4          JUDGE NORKEN:  Okay.  Then, I'm
5 going to rule that this agreement opens the door
6 for the agency to provide counter testimony, if
7 it wishes to.
8          MS. HARRIS:  Over our objection.
9          JUDGE NORKEN:  Over your objection.
10 Let me decide whether it's beyond the scope, and
11 why isn't it beyond the scope with regard to this
12 witness.
13          MS. LU:  With regard to this
14 witness, she was called to testify about the
15 timing of all of this, and this was all within
16 the timing of the suspensions, in terms of the
17 actions of the agency during the time of the
18 suspensions were occurring.
19          And, I do have to say again, though,
20 that I did reserve our right to call any of their
21 witnesses as our witnesses.
22          JUDGE NORKEN:  Well, within their

Page 601

1 proffer.
2          MS. LU:  Well, that's not what --
3          JUDGE NORKEN:  I don't expect people
4 to be able to be allowed to testify just
5 willy-nilly about anything that was beyond
6 proffers that they've made.
7          MS. LU:  And this isn't just
8 willy-nilly testimony, because it goes directly
9 towards an issue that has been brought up by the
10 complainant in his direct testimony and the
11 agency should be given the opportunity to present
12 its evidence to it.
13          MS. HARRIS:  Well, Judge, our
14 proffer was specific:  "Hillary Fitilis, a
15 personnel advisor to the Department of Ministry,
16 will testify that management had a plan to
17 terminate Father Heffernan through the imposition
18 of successive disciplinary actions after Father
19 Heffernan raised concerns about the level of
20 services for Roman Catholic patients.
21          "She will also testify as to her
22 role in drafting and editing the disciplinary

Page 602

1 actions at all stages in the process and her
2 advice to the proposing and deciding officials."
3          JUDGE NORKEN:  May I see it?
4          MS. HARRIS:  Sure.  It's Paragraph
5 18 of our witness list, which I believe is
6 April 29th, 2005.
7          JUDGE NORKEN:  Okay.  I'm ready to
8 rule.  I'm going to rule it's not beyond the
9 scope and have the witness testify.
10          MS. LU:  May I say, too, then, this
11 would also go to their management that had a
12 plan.
13          JUDGE NORKEN:  Yes.
14          MS. LU:  Okay.  I just wanted to put
15 that on the record.
16          JUDGE NORKEN:  Okay.
17          MS. HARRIS:  Again, Judge, it's over
18 our objection.
19          JUDGE NORKEN:  Understood.
20          MS. HARRIS:  Thank you, I guess
21 everything is over our objection.  I don't have
22 to keep reciting it.

Page 603

1          JUDGE NORKEN:  Not everything.
2          MS. HARRIS:  Not everything, not the
3 things that go our way, I guess.
4          [Witness returns to room.]
5          JUDGE NORKEN:  The last objection
6 was overruled.  You may answer and Ms. Lu will
7 pose a question for you.
8 BY MS. LU:
9     Q.    Okay.  Ms. Fitilis, during this
10 process, the suspensions involving Father
11 Heffernan, did you or are you aware that the
12 agency had told Father Heffernan or anyone else
13 that Father Heffernan only had two options, to
14 resign or to be terminated?
15     A.    I'm not specifically aware as to
16 whether anyone would have made that statement.
17          However, I do recall that I was
18 engaged in resolution efforts through
19 Dr. Gatling's office, and at points in time
20 actually communicated directly with Mr. Kator
21 about settlement options.
22          And, these went on for several

Page 604

1 months, early on, during the suspensions as well
2 as later.
3          And, it's very likely that at some
4 point in time I communicated either directly with
5 Mr. Kator or to Dr. Gatling that the options for
6 resolution included removal or resignation.
7          In addition, it's possible that I
8 may have represented to Dr. Gatling, and/or
9 Mr. Kator that, look, either your client needs to
10 comply with these instructions and CPE
11 requirements, et cetera, basically to improve his
12 conduct, or we will continue to move through the
13 progressive discipline process, at which time we
14 will remove your client.
15          So, if your client has no intention
16 of complying with the CPE requirements, which was
17 the representation, through communications and
18 settlement discussions, then we will likely end
19 up removing your client from federal service, and
20 removing Father Heffernan from federal service,
21 and, so if he has no intention of complying, one
22 resolution effort that was discussed early on was

Page 605

1 the possibility of him deciding to resign and/or
2 retire, and resolving this issue.
3          And, so, there were several drafts
4 of settlement agreements and several discussions
5 over the course of several months.
6     Q.    Okay.  You had also talked about
7 before, there was some documents shown to you, it
8 was Exhibit 60 -- oh, no, 47.  Excuse me.
9          These e-mails where you talk about
10 these three issues, the documentation and patient
11 response time, Saturday mass issues, and it was
12 in February 11, 2004.
13          Do you recall when the decision for
14 the five-day proposal was issued?
15          THE WITNESS:  I don't.
16          MS. HARRIS:  This is stipulated,
17 Judge, why don't we move on.
18          MS. LU:  Oh, yes, that's true.
19          JUDGE NORKEN:  I believe she did
20 testify to that.
21 BY MS. LU:
22     Q.    Okay.  So, the five-day decision is

Page 606

1 stipulated by the parties.
2     A.    To the best of my memory.
3     Q.    Yes.  It was issued on March 12th,
4 2004 and this e-mail is dated February 11th.
5          So, you were, it seems here you were
6 talking about responding to these issues.  Okay,
7 while the five-day proposed suspension was still
8 out there, undecided.
9          That's the time frame, am I correct
10 on that?
11          MS. HARRIS:  Objection.  Compound.
12 Leading.
13          JUDGE NORKEN:  Sustained.
14 BY MS. LU:
15     Q.    The decision for the five-day
16 proposal was issued on March 12th, and your
17 e-mail here is February 11th, dated
18 February 11th.
19          That's before the March 12th
20 decision.
21     A.    That sounds right, yes.
22     Q.    Now, why were you talking about

Page 607

1 these issues at that time then when the five-day
2 decision was still out undecided?
3     A.    There's an interest in responding
4 promptly to misconduct.  So, when an employee
5 engages in misconduct, we have an interest in
6 addressing it quickly.
7          These issues, as I recall, were
8 ongoing, they affected patient care, directly,
9 and we felt a need to address them.
10     Q.    Did these issues then occur after
11 the five-day proposal was issued?
12     A.    I don't recall.
13     Q.    Let me show you the document at ROI
14 Exhibit 16, Page 1 through 10.  It's the Notice
15 of Proposed Suspension for the 14-day.
16          If you take a look at that in the
17 charges, in the dates for the charges, the
18 charge, and in particular, Charge One and Charge
19 two?
20          MS. HARRIS:  I'm sorry, what are you
21 looking at, what document?
22          MS. LU:  ROI Exhibit 16, Page 1.

73 (Pages 604 to 607)

Page 608

1 The five-day -- the 14-day Notice of Proposed
2 Suspension.
3          MS. HARRIS:  Okay.
4 BY MS. LU:
5          Q.    And the dates for Charges One and
6 Two, the Notice of Proposed Suspension for the
7 five-day as stipulated was issued January 21,
8 2004.
9          A.    Okay.
10         Q.    The incidents described in the
11 14-day suspension, Charge One and Two only,
12 because Three deals with CPE, did they occur
13 after the five-day proposed suspension was
14 issued?
15         MS. HARRIS:  Judge, the document
16 speaks for itself.  Why don't we move on.
17         MS. LU:  That is --
18         JUDGE NORKEN:  Overruled, you can
19 answer.
20         THE WITNESS:  I'm sorry, could you
21 repeat the question?  Sorry, I'm a sleep-deprived
22 new mom.

Page 609

1 BY MS. LU:
2          Q.    That's okay.  The five-day proposed
3 suspension was issued on January 21, 2004.
4          A.    Uh-huh.
5          Q.    That's been stipulated.
6          A.    Right.
7          Q.    If you look at the incidents
8 described in the Notice of Proposed Suspension
9 for the 14-day, which you have in front of you --
10         A.    Correct.
11         Q.    -- charges One and Two.  Did those
12 incidents occur after the January 21, 2004 date
13 when the five-day proposed suspension was issued,
14 on or after?
15         JUDGE NORKEN:  Are they new charges?
16 Are they new charges since the first suspension
17 was proposed?
18         THE WITNESS:  Are these charges new?
19         JUDGE NORKEN:  Yes.
20         THE WITNESS:  Yes.
21         MS. LU:  Thank you.
22         THE WITNESS:  Thank you.

Page 610

1          JUDGE NORKEN:  You're welcome.
2 BY MS. LU:
3          Q.    Maybe it's getting late.  I'm not
4 making any sense.
5          So then what is generally the
6 procedure when the new incidents occur after a
7 proposed disciplinary action has already been
8 issued?
9          Do you just not deal with these new
10 incidents and let it go?
11         A.    No.  We work on addressing them, as
12 I stated, promptly and quickly.  So that the
13 disciplinary action is timely.
14         And, we don't like to see a lapse
15 between the misconduct and the disciplinary
16 action.  In addition, we have an interest in
17 seeing the misconduct stop.
18         So, for example, here if we had a
19 situation where Father Heffernan is interfering
20 with the contract priest's ability to present
21 Saturday mass and it's creating a problem for
22 operation of the department, we want to see that

Page 611

1 conduct stop.
2          And, in order to do that, we issue a
3 disciplinary action in the hope that it will send
4 the message to the employee that this is
5 inappropriate conduct and that the employee will
6 stop that behavior.
7          Q.    Okay.  Let me just show you this
8 document.
9          JUDGE NORKEN:  This will be Agency
10 Exhibit 5.
11         (Agency Exhibit Number 5
12         marked for identification.)
13 BY MS. LU:
14         Q.    Take a look at that document,
15 Ms. Fitilis.  This is an e-mail, it looks like
16 from Gwen Platt, who is Gwen Platt?
17         A.    Gwen Platt is the employee relations
18 specialist who serves all areas of the Clinical
19 Center other than housekeeping, nutrition and
20 nursing.
21         Q.    Okay.  And this e-mail is to you
22 dated Tuesday, March 16, 2004, do you recognize

74 (Pages 608 to 611)

Page 612

1 this e-mail?

2     A.     Again, I don't specifically recall

3 having received this e-mail, but I have no doubt

4 that I received it.

5     Q.     Okay.

6     A.     No reason to doubt that I received

7 it.

8     Q.     Okay.  And, in this e-mail the

9 attachment, if you look at the attachment, it's a

10 Notice of Proposed Suspension.  It looks like

11 it's for 14 days.

12                Is that what it says?

13     A.     Yes.

14     Q.     Am I reading it correctly?

15     A.     Yes.

16     Q.     Okay.  And, in looking at this

17 draft, you tell us what the charges were for this

18 proposed 14-day?

19     A.     Charge One is violation of

20 recognized professional standards of patient

21 care.  Charge Two is defiance of authority.

22     Q.     Are those the only charges set out

Page 613

1 there in that draft?

2     A.     Yes.

3     Q.     Okay.

4          MS. LU:  I'd like to admit this as

5 evidence, please.

6          JUDGE NORKEN:  Any objection.

7          MS. HARRIS:  Well, I'm not, I don't

8 think it's relevant, Judge.  The agency hasn't

9 laid a foundation here.

10          MS. LU:  It is relevant and she

11 identified it.

12          MS. HARRIS:  Well, there's got to be

13 more than just identifying it for it to be

14 relevant.

15          JUDGE NORKEN:  It was apparently one

16 of the documents considered in the development of

17 the suspensions, and that's what the parties have

18 been presented as witnesses to.

19          So, I will overrule it and admit it.

20          (Agency Exhibit Number 5

21          received in evidence.)

22 BY MS. LU:

Page 614

1     Q.     Okay.  Let me show you another

2 e-mail.

3          JUDGE NORKEN:  This would be

4 Agency's Exhibit 6.

5          (Agency Exhibit Number 6

6          marked for identification.)

7 BY MS. LU:

8     Q.     Take a look at that e-mail

9 Ms. Fitilis.  Do you recognize this e-mail?

10     A.     It appears to be an e-mail from Ray

11 Fitzgerald sent on March 29, 2004, to me.

12     Q.     Okay.  And attached is a draft that

13 says Notice of Proposed Suspension, that's for 14

14 days.

15     A.     Yes.

16     Q.     Okay.  And, in this draft what are

17 the charges for this proposed 14-day?

18     A.     Charge One is violation of

19 recognized professional standards of patient

20 care, and Charge Two, defiance of authority.

21     Q.     Okay.  And those are the only

22 charges?

Page 615

1     A.     Correct.

2     Q.     Okay.

3          MS. LU:  I would like to admit this

4 into evidence please.

5          JUDGE NORKEN:  Any objection?

6          MS. HARRIS:  Nope.

7          JUDGE NORKEN:  It is admitted.

8          (Agency Exhibit Number 6

9          received in evidence.)

10          MS. HARRIS:  This is six?

11          JUDGE NORKEN:  Yes.

12          MS. LU:  Yes.  Sorry, bear with me,

13 we don't have the resources for this amount of

14 exhibits.

15          JUDGE NORKEN:  Yes, you do.

16          MS. LU:  If they would just allow

17 us.

18          (Agency Exhibit Number 7

19          marked for identification.)

20 BY MS. LU:

21     Q.     If you would take a look at exhibit,

22 it will be Agency 7.

75 (Pages 612 to 615)

Page 616

1           Do you recognize this e-mail,

2 Ms. Fitilis?

3      A.    It appears to be an e-mail from me

4 sent March 29, 2004 to Gwen Platt and the subject

5 is HR Proposed 14-day Suspension.

6      Q.    Okay. And, what is it --

7           MS. HARRIS: I'm sorry, Ms. Lu, I'm

8 missing a page here.

9           JUDGE NORKEN: Yes, at least one

10 page.

11           MS. LU: Really?

12           JUDGE NORKEN: Yes, 416, I believe.

13           MS. LU: Well, I apologize. All

14 right. All right, I'll pass around 416. Is 416

15 in yours?

16           THE WITNESS: I'm looking.

17 BY MS. LU:

18      Q.    If you would take a look at that

19 e-mail, Ms. Fitilis, you state in there -- well,

20 why don't you tell me what you told Ms. Platt in

21 that e-mail?

22           JUDGE NORKEN: Do you want to give

Page 617

1 her 416?

2           THE WITNESS: Thank you. It says:

3 "Gwen, attached is a revised draft of the 14-day

4 suspension that includes reference to the

5 five-day suspension and Charge One and the charge

6 for failure to follow supervisory instructions to

7 comply with training requirements. Please let me

8 know your thoughts."

9 BY MS. LU:

10      Q.    Okay. And, if you would look at the

11 document that's attached, the draft.

12           Now, tell us what the charges are

13 for this, it looks like it's a Notice of Proposed

14 Suspension for 14 Days.

15      A.    Charge One is violation of

16 recognized professional standards of patient

17 care.

18           Charge Two is defiance of authority

19 and Charge Three is failure to follow supervisory

20 instructions to comply with training

21 requirements.

22      Q.    Okay. Now, in the previous e-mails

Page 618

1 with regard to the notice of a 14-day proposed

2 suspension, a few days earlier, actually, there

3 was no charge for the training requirement.

4      A.    That's correct.

5      Q.    Correct, okay. And, here there,

6 it's been included in.

7           Why was it, do you know why it was

8 included?

9      A.    We generally don't like to, in the

10 interests of progressive discipline, issue a

11 second disciplinary action, in this case, another

12 suspension, without allowing the employee the

13 opportunity to have, as I stated earlier, been

14 rehabilitated.

15           So, for example, in this case if we

16 issued a five-day suspension for Father

17 Heffernan's failure to comply with the training

18 requirements, we are not going to then in turn

19 rush to issue a 14-day suspension before he has

20 even had an opportunity to come back to work and

21 say to his supervisor, okay, you've taken

22 disciplinary against me, I have every intention

Page 619

1 of complying with your requirement.

2      Q.    So, in this case, why was the

3 suggestion made to include this CPE training on

4 the 14-day, too?

5      A.    I would have to look at the dates.

6 But, probably because we felt he had enough time

7 to have returned to the office and complied with

8 the CPE requirement, basically demonstrating that

9 he had been, received the five-day suspension,

10 recognized the penalty, and intended to comply.

11           JUDGE NORKEN: He was suspended from

12 the 15th to the 19th. I assume the 19th was a

13 Friday. So, that means that the 20th, 21st and

14 22nd, he would have been back to work on the

15 22nd.

16           So, you essentially gave him one

17 week?

18           THE WITNESS: That sounds about

19 right, yes.

20           MS. LU: I would like to admit that

21 into evidence?

22           MS. HARRIS: No objection.

76 (Pages 616 to 619)

Hearing 12/15/05

Page 620

1    JUDGE NORKEN:  Admitted.

2         (Agency Exhibit Number 7

3         received in evidence.)

4         (Agency Exhibit Number 8

5         marked for identification.)

6  BY MS. LU:

7    Q.    Let me show you this other e-mail,

8  Ms. Fitilis, if you take a look at that, an

9  e-mail dated March 30th, 2004.

10   A.    It's from me.

11   Q.    It will be marked, I'm sorry,

12  Agency 8.

13   A.    It's from me to Ray Fitzgerald, the

14  subject is HH 14-day Suspension Proposal.

15   Q.    And, what do you, what did you say

16  to Dr. Fitzgerald?

17   A.    "Ray, attached is a proposal letter

18  with an additional section addressing failure to

19  follow instruction to meet training requirements.

20         "Please review the additions and

21  confirm that the information is correct.

22         "I will be available today to

Page 621

1  discuss or you may return the letter to me via

2  e-mail with your comments.

3         "Once we have approved the final

4  version of the letter, you may sign it and

5  present it to HH."

6    Q.    And, basically what were you doing

7  here, just giving Dr. Fitzgerald the latest

8  draft?

9    A.    Correct.  The process is that

10  employee relations generally draft the letters, I

11  review them, and then they are drafted clearly

12  with the input of the proposing official as well

13  as the deciding official, if it's a decision

14  letter.

15         And, then we incorporate any changes

16  or recommendations that they have, to arrive at a

17  final draft, which is then issued by the

18  supervisor.

19   Q.    Okay.

20         MS. LU:  I would like to admit this

21  into evidence.

22         JUDGE NORKEN:  Any objection?

Page 622

1         MS. HARRIS:  This is 8?

2         JUDGE NORKEN:  Yes.

3         MS. HARRIS:  No objection.

4         JUDGE NORKEN:  It is admitted.

5         (Agency Exhibit Number 8

6         received in evidence.)

7  BY MS. LU:

8    Q.    Now, Ms. Fitilis, after the time in

9  question before, the Judge had concluded or asked

10  you that there was a week, you pretty much gave

11  Father Heffernan a week once he finished his

12  five-day proposed suspension to comply.

13   A.    Yes.  And, that sounds about right.

14  I don't have a calendar in front of me.  I

15  haven't really looked at it.

16         And, that's a week from the date

17  that he actually returned to the office.

18   Q.    And, you felt that that was.

19  sufficient time for him to have been

20  rehabilitated and submit a plan?

21   A.    To have at least indicated to his

22  supervisor that he intended to comply.  Didn't

Page 623

1  necessarily have to have, in my opinion,

2  submitted a full package.

3         But, to at least have gone to his

4  supervisor and indicated that he intended to

5  comply.  I personally would have liked to have

6  seen the actual plan as well, but --

7    Q.    Prior to the oral reply to Father

8  Heffernan's proposed removal, to your knowledge,

9  had Father Heffernan agreed to take CPE training?

10   A.    No.  And, in fact, through the

11  course of settlement discussions, it was made

12  very clear to me that Father Heffernan had no

13  intention of --

14         MS. HARRIS:  Objection as to what --

15  I'm going to move to strike, because what she

16  learned through settlement discussions is not

17  appropriate.

18         MS. LU:  Well, can you clarify and

19  see, because I wasn't clear as to when she

20  learned it.

21         JUDGE NORKEN:  I am going to sustain

22         MS. HARRIS:  Settlement

77 (Pages 620 to 623)

Page 624

1 communications with Mr. Kator I believe she is

2 referring to.

3          JUDGE NORKEN:  In fact, I had

4 researched and written and was ready to sign an

5 entire decision on this, when the parties made an

6 agreement on Dr. Gatling for our positions.  Go

7 ahead.

8          THE WITNESS:  I'm sorry, so is that

9 entire statement going to be struck, or just the

10 latter part of my statement referencing

11 settlement discussions?

12 BY MS. LU:

13      Q.    It would be any reference to

14 settlement discussions.

15      A.    Right.  But, the prior part of my

16 testimony didn't reference settlement

17 discussions.

18          JUDGE NORKEN:  You can testify, so

19 long as it doesn't reference the settlement

20 discussions.

21          MS. LU:  Do you want to.

22          THE WITNESS:  And, I believe that I

Page 625

1 did.  Can the court reporter read back my

2 statement.

3          MS. HARRIS:  Let's move on.

4          MS. LU:  Do you want to answer it

5 again?

6          JUDGE NORKEN:  Why don't you just

7 ask your question again?

8 BY MS. LU:

9      Q.    Oh, prior to the oral reply to

10 Father Heffernan's proposed removal, had Father

11 Heffernan, to your knowledge, agreed to take CPE

12 training?

13      A.    No.

14      Q.    During the suspension process, you

15 stated you were involved in reviewing drafts,

16 advising management.

17          Did you also undertake efforts on

18 your own with regard to having Father Heffernan

19 comply with CPE training?

20      A.    Yes.

21      Q.    What did you do?

22      A.    Prior to my coming on board with the

Page 626

1 Clinical Center, Walter Jones had met with

2 Monsignor Mosley.

3          MS. HARRIS:  Object.  This is beyond

4 the scope of the direct.

5 BY MS. LU:

6      Q.    My question was what did you do not

7 what someone else did.

8      A.    Sorry.

9          JUDGE NORKEN:  Okay.

10          THE WITNESS:  I was providing

11 background before I answered Ms. Lu's question.

12 But, I will just get to the point.

13          JUDGE NORKEN:  Please.

14          THE WITNESS:  Yes, I did.  I met

15 with Monsignor Mosley and Howard Gatling.

16          MS. HARRIS:  Beyond the scope of the

17 direct.

18          JUDGE NORKEN:  That's beyond the

19 scope.  Sustained.

20          MS. LU:  Well, I would have to

21 disagree, because, again, it goes through the

22 whole, their proffer that the agency had a plan

Page 627

1 to go through all of these suspensions, to

2 terminate --

3          JUDGE NORKEN:  Mosley was a long

4 time ago, a long time ago before this suspension

5 process.

6          MS. LU:  No, it wasn't.  That's the

7 point is that that's why I asked her, because she

8 didn't start with the Clinical Center until

9 November.

10          MS. HARRIS:  Objection.  You know

11 what, she's got to step out.

12          MS. LU:  Yes, that's true.

13          (Witness leaves the room.)

14          JUDGE NORKEN:  You say this was

15 before she joined the Clinical Center?

16          MS. LU:  No.

17          JUDGE NORKEN:  This was after she

18 joined the Clinical Center.

19          MS. LU:  Yes.  That's why my

20 question is during the whole suspension time

21 period, when you're going through in this

22 process, did she undertake anything to try to get

78 (Pages 624 to 627)

Page 628

1  Father Heffernan to comply and that's what she
2  was going to testify about.
3          It wasn't about the meeting that
4  Monsignor Mosley had with Dr. Fitzgerald and
5  Mr. Jones. And, it goes directly to their
6  allegation that the agency had a plan, through
7  all of the suspensions and the whole timing
8  process, that they had a plan to just suspend,
9  suspend and terminate.
10         And, boom, then that's it. But,
11 that's not, but the agency is offering that
12 that's not what our intent was.
13         JUDGE NORKEN: Are you saying that
14 the agency went to Mosley twice?
15         MS. LU: Yes, and Monsignor Mosley
16 testified, when I asked him, you never initiated
17 a meeting with the Clinical Center, did you. He
18 said, no, I met with him twice or two times.
19         MS. HARRIS: I don't recall that
20 testimony.
21         MS. LU: It's on, that's on the
22 record.

Page 629

1          MS. HARRIS: He testified about one
2  meeting.
3          MS. LU: He testified in detail
4  about one meeting.
5          JUDGE NORKEN: My concern here is
6  that, frankly, we've got a witness that has told
7  us she needs to go. Should we recall her another
8  time?
9          MS. LU: Oh. I would leave it up
10 to -- I mean, let me see, because you probably
11 have questions, too, right?
12         JUDGE NORKEN: For sure.
13         MS. LU: For sure, right
14         MS. HARRIS: I think so. Yes.
15         MS. LU: It probably would be best,
16 because then we can't, I don't want to limit·
17 their time. And, I don't want to limit --
18         JUDGE NORKEN: She needs to.
19         MS. LU: And she needs to go feed
20 the baby.
21         MS. HARRIS: Judge, I would just
22 like that you issue an order that she not consult

Page 630

1  with counsel or anyone else while her testimony
2  is pending.
3          MS. LU: Pending, yes. I'm happy to
4  agree to that. And, I would abide by it anyways,
5  but, go ahead.
6          JUDGE NORKEN: Let's have her come
7  back in.
8          (Witness returns to room.)
9          JUDGE NORKEN: Ms. Fitilis, we
10 perceive that we're getting deeper and deeper and
11 your testimony is getting longer and longer and
12 we've decided to recall you and let you go at
13 this time, if that is okay with you.
14         And Ms. Lu will tell you when the
15 next hearing is, when the next hearing day is,
16 and we'll just put you back on, unless you want
17 to stay.
18         But, we think that this is going to
19 take longer so.
20         THE WITNESS: Do you have any idea
21 how much longer?
22         JUDGE NORKEN: I can perceive this

Page 631

1  taking another 40 minutes.
2          MS. LU: Or to an hour.
3          THE WITNESS: Oh, okay, is there any
4  possibility that I can testify telephonically for
5  the remainder of my testimony?
6          MS. HARRIS: We wouldn't agree to
7  that, Judge.
8          JUDGE NORKEN: No. So, what I'm
9  going to do is excuse you now and you can deal
10 with your personal matters.
11         I'm directing you not to discuss
12 your testimony since you are in the middle of
13 your testimony.
14         Not only have I ordered you not to
15 talk about your testimony or this case with any
16 other witness in the case, but you may not talk
17 about this case to anyone, including Ms. Lu,
18 until you testify again, is that understood?
19         THE WITNESS: Yes.
20         JUDGE NORKEN: Thank you, you're
21 excused.
22         THE WITNESS: Thank you.

79 (Pages 628 to 631)

Page 632

1         (Witness excused.)

2              MS. LU:  Can we go off the record

3 for a minute?

4              JUDGE NORKEN:  I might as well rule

5 on the issue.  When did you proffer that she

6 spoke to Monsignor Mosley?

7              MS. LU:  She spoke to him in 2004.

8              JUDGE NORKEN:  When?

9              MS. LU:  Oh, what time of the month?

10 I can't remember.

11              JUDGE NORKEN:  What month

12 approximately?

13              MS. LU:  I don't recall, but it was

14 during the suspension time period, when the

15 ombudsman process was still ongoing, which would

16 have been at least in early 2004 because at that

17 time the ombudsman was still communicating.

18              JUDGE NORKEN:  And, did anyone go

19 with her to Mosley?

20              MS. LU:  Yes.

21              JUDGE NORKEN:  Who?

22              MS. LU:  Dr. Gatling.

Page 633

1              JUDGE NORKEN:  Anyone else?

2              MS. LU:  That was it.

3              JUDGE NORKEN:  And, this was part

4 of, was this part of the mediation, was this part

5 of the resolution process?

6              MS. LU:  I'm not certain about that

7 in terms of why they went to see Mosley, because

8 he would have no authority to settle anything for

9 Father Heffernan.

10              MS. HARRIS:  Right.  But,

11 Ms. Fitilis was for the agency.

12              MS. LU:  For the agency, but --

13              MS. HARRIS:  And, Dr. Gatling was

14 conducting the settlement discussions.

15              JUDGE NORKEN:  And, what's your

16 proffer going to be as to what the meeting was?

17              MS. LU:  Just why they went to see

18 him and what was discussed.

19              MS. HARRIS:  But, what --

20              MS. LU:  What?

21              MS. HARRIS:  What's your proffer

22 about why they went to see them and what was

Page 634

1 discussed?

2              MS. LU:  They went to see him to try

3 to see if Monsignor Mosley can assist in getting

4 Father Heffernan to comply with the CPE training,

5 and if there is anything he can do to help them

6 along.

7              JUDGE NORKEN:  And Monsignor Mosley

8 did what?

9              MS. LU:  Monsignor Mosley supposedly

10 told them, well, you need to follow the rules, or

11 the procedure, or whatever he had stated.  I

12 don't know the exact words.

13              JUDGE NORKEN:  Okay.  I believe

14 we're getting extremely far afield of the

15 original testimony.  So, I'm going to sustain the

16 objection.

17              MS. LU:  Okay.  But, the agency

18 would just like its objection noted, because it's

19 relevant and it goes to Father Heffernan's

20 allegations and his testimony that the agency had

21 a plan to just move through the suspension and

22 terminate him.

Page 635

1              And the agency had no such plan and

2 that this goes to show that the agency made

3 efforts, efforts they did not have to undertake,

4 to get Father Heffernan to comply, because there

5 was no, nothing to compel them to go see

6 Monsignor Mosley in the first place.

7              JUDGE NORKEN:  Okay.  Let's go off

8 the record.

9              (Recess -- 5:06-5:19 p.m.)

10              JUDGE NORKEN:  On the record.

11 Reverend Johnston, I am David Norken.  I'm an

12 Administrative Judge.

13              If you would please raise your right

14 hand and state your full name for the record.

15              MR. JOHNSTON:  Gary Johnston.

16              GARY JOHNSTON,

17 a witness called for examination, having been

18 first duly sworn, was examined and testified as

19 follows:

20              JUDGE NORKEN:  How long for this

21 witness?

22              MS. HARRIS:  An hour?

Page 636

```
1              JUDGE NORKEN:  You may proceed.
2              MS. HARRIS:  Thank you, Judge,
3  before you do that, I would like to offer
4  Exhibit 52 into evidence.
5              MS. LU:  No objection.
6              JUDGE NORKEN:  It is admitted.
7              (Complainant's Exhibit Number 52
8              received in evidence.)
9              MS. HARRIS:  Thank you.
10             DIRECT EXAMINATION
11 BY MS. HARRIS:
12      Q.     Good evening, Chaplain Johnston.
13      A.     Good evening.
14      Q.     I'm Cathy Harris.  We've met before,
15 and I'm Father Heffernan's attorney and I'm going
16 to ask you some questions.
17             Are you currently employed by the
18 federal government?
19      A.     Yes, I am.
20      Q.     And where are you currently working?
21      A.     My place of work right now is at the
22 U.S. Army Office of the Army Chief of Chaplains.
```

Page 637

```
1      Q.     In?
2      A.     In Alexandria, Virginia.
3      Q.     In what capacity are you working
4  there?
5      A.     I am the director of reserve
6  components integration for the Army Chief
7  Chaplains.
8      Q.     Are you on active duty now?
9      A.     Yes, I am, full-time active duty.
10      Q.     How long have you been on full-time
11 active duty with the Army?
12      A.     Since approximately February 24,
13 2003.
14      Q.     And, what is your religion?
15      A.     Baptist.
16      Q.     And, are you a minister?
17      A.     Yes, I am.
18      Q.     Okay.  And, are you serving in a
19 chaplain capacity currently with the Army?
20      A.     Yes, I am.
21      Q.     Okay.  Before being placed on active
22 duty, were you employed at the -- full-time at
```

Page 638

```
1  National Institutes of Health?
2      A.     Yes, I was.
3      Q.     And in what capacity?
4      A.     As a full-time chaplain.
5      Q.     You're still employed by NIH, is
6  that correct.
7      A.     That is correct.
8      Q.     So, you are appointed a full-time
9  chaplain for Baptist patients, correct -- I'm
10 sorry, a full-time Baptist chaplain, correct?
11      A.     Yes, that is correct.
12      Q.     And, how long did you -- or when did
13 you come to NIH as a Baptist chaplain?
14      A.     August 6th, I think, 1984.
15      Q.     Okay.  Were you continuously
16 employed as the Baptist chaplain from August 1984
17 until you went on active duty in 2003?
18      A.     Yes.  Except for a brief period of
19 mobilization time in approximately January --
20 December 1990 to I believe June of 1991.
21             I can't remember the years of the
22 first Gulf war, I was mobilized as a Army Reserve
```

Page 639

```
1  Chaplain for the first Gulf war.
2      Q.     And, where did you serve during the
3  first Gulf war?
4      A.     At Ft. Bragg, but mostly in Riyadh,
5  Saudi Arabia.
6      Q.     And, during that time, you served as
7  a chaplain?
8      A.     That is correct.
9      Q.     Okay.  First of all, do you know
10 Father Heffernan?
11      A.     Yes, I do.
12      Q.     You've worked had him?
13      A.     Yes, I have.
14      Q.     And, when did you work with Father
15 Heffernan at NIH?
16      A.     From the time that he was first
17 employed on a contract, which, again, I don't
18 have any notes with that, I believe it was
19 approximately 1994, if I recall correctly.
20             I don't recall the month, since that
21 time.
22      Q.     Until you left on your active duty
```

81 (Pages 636 to 639)

Page 640

1 in 2003, correct?

2    A.    Yes, that is correct.

3    Q.    And, what opportunities did you have

4 to observe him in his work as a chaplain at the

5 Clinical Center?

6    A.    Every day that he and I were on duty

7 at the same times, covering the patient care

8 units and in staff meetings, and other

9 administrative activities or functions that were

10 participated in.

11    Q.    Okay.  And, so you had an

12 opportunity to observe his performance?

13    A.    Yes, I did.

14    Q.    And, how was his performance?

15    MS. LU:  Objection.  Relevance.  His

16 performance as a chaplain?

17    MS. HARRIS:  I think it's relevant,

18 Judge.

19    MS. LU:  That's not even a charge

20 for any of the suspensions.

21    JUDGE NORKEN:  I think it's just a

22 background, overruled.

Page 641

1 BY MS. HARRIS:

2    Q.    How was Father Heffernan's

3 performance.

4    A.    Exceptional.

5    Q.    And how so?

6    A.    He was always extremely tending to

7 the needs of Roman Catholic patients

8 specifically, but patients generally.

9    Very cooperative and congenial when

10 was working with me and other chaplains of the

11 department and with the other professional staff

12 on the clinical side.

13    Q.    Okay.  In your time as a chaplain at

14 the Clinical Center, did you have, did there come

15 a time when you were involved in the redesign of

16 position descriptions for the various staff

17 chaplain positions at the Clinical Center?

18    A.    Yes.  I was the project officer and

19 shortly after I was hired under Chaplain Leroy

20 Kearney, who was the chief of the Department of

21 Spiritual Ministry at that time.

22    And, in cooperation with him, and at

Page 642

1 his request, I became the project officer for

2 rewriting the position descriptions, admissions

3 and functions statement for the Department of

4 Spiritual Ministry.

5    That was approximately in the

6 beginning late 1984 and continuing for about a

7 year or 18 months until the project came to a

8 completion.

9    Q.    So, between 1984 and sometime in

10 1985?

11    A.    Approximately, yes.

12    Q.    Okay.  And, did you -- describe the

13 position descriptions that you developed.

14    MS. LU:  Objection.  Relevance.

15    JUDGE NORKEN:  Why is it relevant?

16    MS. HARRIS:  It's relevant as to

17 specifically how the Clinical Center developed

18 position descriptions for each particular

19 chaplaincy.

20    So, for each, rather than one

21 position description for all chaplains.

22    MS. LU:  But, Father Heffernan's

Page 643

1 position description is in the report of

2 investigation already.

3    And there has been no dispute as to

4 whether that's his position description.

5    JUDGE NORKEN:  And, it's also not

6 just for Catholics.

7    MS. LU:  The position title is

8 chaplain.

9    MS. HARRIS:  That's not correct,

10 Judge.  If you look at Father Heffernan's

11 position description, Exhibit 14, Page 1 through

12 4, at the top it says, very top right-hand

13 corner, it says "Catholic Priest."

14    And, then I'm going to specifically

15 ask him about --

16    MS. LU:  Yes.  It is handwritten on

17 top.  But, the position is titled Chaplain and

18 his position description and duties follow.

19    JUDGE NORKEN:  And, it doesn't

20 specifically focus on any particular group, it

21 says on factor --

22    MS. HARRIS:  Well, it does, Judge.

82 (Pages 640 to 643)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                              :
Plaintiff *pro se*,

v.                                       :

                                                    C.A. No.  1:07-cv-02308(RMC)

WILLIAM BIGLOW, *et al.*
Defendants.                              :

                            ...oOo...

Transcript of testimony of Hillary Fitilis at EEOC Hearing,
*Heffernan v. Leavitt, Secretary DHHS*, EEOC Case No. 120-2005-00226x,

Hr'g   01|10|06 , pgs 726-782

EXHIBIT 6—C

8

Page 726

1          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

2 HENRY G. HEFFERNAN,          *   EEOC CASE NO.

3          Complainant,        *   120-2005-00226X

4 vs.                          *

5 U.S. DEPARTMENT OF HEALTH    *   AGENCY CASE NO.

6 AND HUMAN SERVICES,          *   CC-EEO-2004-0004

7 NATIONAL INSTITUTES OF       *

8 HEALTH,                      *   VOLUME III

9          Agency.             *   Pages 726 - 1063

10

11

12               Baltimore, Maryland

13          Tuesday, January 10, 2006

14

15 The ARBITRATION in this matter began at 9:51 a.m.

16 pursuant to notice.

17

18 BEFORE: DAVID NORKEN, ADMINISTRATIVE JUDGE

19

20 Reported by:  Carla J. Briggs, RPR, CRR, RMR

21 Job No. 8519

Page 727

1
2      Tuesday, January 10, 2006
3          9:51 a.m.
4
5 The ARBITRATION was held at the offices of:
6
7
8      U.S. Equal Employment Opportunity
9      Commission - Baltimore District Office
10     10 S. Howard Street, Third Floor
11     Baltimore, Maryland 21201
12
13
14 Pursuant to notice, before:
15     DAVID NORKEN, Administrative Judge
16
17
18
19
20
21

Page 729

1          C O N T E N T S
2

3 WITNESSES:    DIRECT CROSS REDIRECT RECROSS
4 Hillary Fitilis    --    746    772    803
5   (Continued)              812    813
6 Reeve R. Brenner    817    881    908    --
7 Francis G. Platt    917    963    992    1004
8                     1011    1013
9 Owen R. Fitzgerald    1022    --    ...    --
10
11
12          E X H I B I T S
13 COMPLAINANT HH
14 EXHIBITS:      IDENTIFIED      IN EVIDENCE
15 66        777              784
16
17 AGENCY
18 EXHIBITS:      IDENTIFIED      IN EVIDENCE
19 9        746          751
20 10        750          751
21 11        751          752

Page 728

1 APPEARANCES:
2 On Behalf of the Complainant:
3      CATHY A. HARRIS, ESQUIRE
       IRVING KATOR, ESQUIRE
4      KATOR, PARKS & WEISER, PLLC
       1020 19th St., N.W.
5      Suite 350
       Washington, D.C. 20036
6      (202) 898-4800
7
8 On Behalf of the Agency:
9      JULIE S. LU, ESQUIRE
       DEPARTMENT OF HEALTH & HUMAN SERVICES
10     GENERAL LAW DIVISION
       330 Independence Ave., S.W.
11     Cohen Building, Room 4760
       Washington, D.C. 20201
12     (202) 619-0174
13
14
15 ALSO PRESENT:  HENRY HEFFERNAN, Complainant
16         NISHA BHATT, Paralegal
17
18
19
20
21

Page 730

1  12        753          756
2  13        756          758
3  14        759          760
4  15        760          761
5  16        761          766
6  17        890          --
7  18        967          968
8  19        970          971
9  20        971          973
10 21        973          976
11 22        1032          1036
12
13
14
15
16
17
18
19
20
21

Page 731

1      P-R-O-C-E-E-D-I-N-G-S
2      ADMINISTRATIVE JUDGE NORKEN: This is the
3 employment discrimination case of Henry G.
4 Heffernan, Complainant vs. the U.S. Department of
5 Health and Human Services, EEOC Case No.
6 120-2005-00225X, Agency Case No. CC-EBO-2004-0004.
7 We're in the middle of Hillary Fitilis's testimony,
8 but I understand there's two preliminary matters I
9 have to deal with first.
10      On January 4, 2006, Complainant filed a
11 motion to call Edar Rogler as a witness. On
12 January 5th, the Agency filed an opposition to the
13 motion, then on -- and then on January 6th -- wait a
14 minute. Yes, on January 6th, the Complainant filed
15 a reply to the opposition to calling Edar Rogler as
16 a witness. The reply was unauthorized, and I have
17 neither read nor considered it. On January 6, the
18 Agency filed a motion to call Dr. Ann Berger as a
19 witness, and on that same day, the Complainant filed
20 an opposition to Agency's motion to call Dr. Ann
21 Berger as a witness.

Page 732

1      Now, I have just one question of the
2 Complainant, and then the Agency can make a reply to
3 that or comment. The purpose of this witness is to
4 show that the Complainant -- that the Agency's
5 reason for imposing the policy was not true and,
6 therefore, pretextual?
7      MS. HARRIS: That's one reason we want to
8 call Miss Rogler, yes.
9      ADMINISTRATIVE JUDGE NORKEN: What's the
10 other reason?
11      MS. HARRIS: The other reason is to show
12 also that Dr. Fitzgerald has expressed bias towards
13 Roman Catholics and religions other than his own,
14 and specifically regarding Father Heffernan, that he
15 has animus towards Father Heffernan because he's a
16 Roman Catholic priest.
17      ADMINISTRATIVE JUDGE NORKEN: And also
18 reprisal?
19      MS. HARRIS: And also reprisal. That's
20 right.
21      ADMINISTRATIVE JUDGE NORKEN: What way was

Page 733

1 there reprisal?
2      MS. HARRIS: Well, the witness,
3 Miss Rogler, will testify that Dr. Fitzgerald told
4 her that he planned to fire everyone who took part
5 in this EBO proceeding. And I think it's a fair
6 statement if he planned to take retaliatory actions
7 for anybody who was involved in this EEO proceeding
8 that involved -- that could relate back to when
9 Father Heffernan filed his first complaint, if
10 Dr. Fitzgerald is acting retaliatory now towards
11 other witnesses, it's a fair conclusion to state
12 that he would have retaliated against Father
13 Heffernan because he engaged in the EBO process.
14      ADMINISTRATIVE JUDGE NORKEN: Now, am I
15 correct that what I said earlier about the Agency's
16 reasons being pretextual, that would go for both the
17 bias as well as the reprisal?
18      MS. HARRIS: That's correct.
19      ADMINISTRATIVE JUDGE NORKEN: Any comment
20 from the Agency?
21      MS. LU: Just one point of clarification

Page 734

1 to you when you're going through the motions that
2 were filed just to note that on January 9th, the
3 Agency did file a reply to the Complainant's
4 opposition to the Agency's motion to call Dr. Ann
5 Berger as a witness, but I don't recall you saying
6 that, so --
7      ADMINISTRATIVE JUDGE NORKEN: I didn't
8 find it, but in any event, did you put in there any
9 particular request for -- to hear the reply?
10      MS. LU: I did not put in a motion to hear
11 the reply.
12      ADMINISTRATIVE JUDGE NORKEN: So,
13 therefore, that would similarly be unauthorized and
14 obviously was neither read nor considered.
15      MS. HARRIS: Judge, and I apologize for
16 not making a request in the reply or separate motion
17 asking for that to be considered for our reply to
18 the Agency's opposition to calling Miss Rogler as a
19 witness, but I would like to make that motion now.
20      ADMINISTRATIVE JUDGE NORKEN: Well,
21 denied.

3 (Pages 731 to 734)

Page 735

1    MS. LU: I was going to follow up on that,
2 too, but I suppose I know what the answer is to my
3 motion now seeing as how you didn't see my
4 January 9th reply. I was going to ask if I could
5 submit it, but --
6        ADMINISTRATIVE JUDGE NORKEN: Okay. I'm
7 ready to rule on the motions.
8        MS. LU: Oh, the Agency didn't get a
9 chance to respond on the record, I guess, but we'll
10 incorporate --
11       ADMINISTRATIVE JUDGE NORKEN: Oh. Well,
12 wait.
13       MS. LU: We'll incorporate what we stated
14 in our opposition to Complainant's motion to call
15 Miss Rogler as a witness.
16       ADMINISTRATIVE JUDGE NORKEN: I asked
17 whether you wanted to -- did you have any comment
18 on -- did you have any comment on what Miss Harris
19 just said with respect to my questions?
20       MS. LU: Oh, just that the Agency does not
21 believe that conclusion could be drawn that

Page 736

1 (inaudible) because assuming allegedly if
2 Dr. Fitzgerald did say that he was going to
3 terminate everyone who participated in these EEO
4 proceedings, that there should be a conclusion drawn
5 that he would retaliate against Father Hefferman.
6        ADMINISTRATIVE JUDGE NORKEN: Okay. I've
7 taken the comments of the parties into account and
8 I've reviewed the motions. With respect to the
9 Complainant's motion to call Edgar Rogler as a
10 witness --
11       MS. HARRIS: Judge, it's actually Edar
12 Rogler. E-D-A-R, last name Rogler.
13       ADMINISTRATIVE JUDGE NORKEN: With respect
14 to the Complainant's motion to call Edar Rogler as a
15 witness, the motion is granted for the reasons set
16 forth in the motion. With respect to the Agency's
17 opposition -- no, let me check that. With respect
18 to the Agency's motion to call Dr. Ann Berger as a
19 witness, the Agency's motion is denied for the
20 reason set forth in the Complainant's motion.
21       MS. LU: Judge, just since you denied the

Page 737

1 Agency's motion to call Dr. Ann Berger as a witness,
2 the Agency would like to either make a proffer as I
3 state in my January 9th reply which you're not
4 considering, but we'd like to make a proffer of
5 Dr. Berger's testimony or to submit a declaration
6 she has signed as part of the record.
7        ADMINISTRATIVE JUDGE NORKEN: You can make
8 a proffer of what she would have testified to.
9        MS. LU: Sure.
10       ADMINISTRATIVE JUDGE NORKEN: You may do
11 so now.
12       MS. LU: Okay. Dr. Ann Berger would have
13 testified as follows: Dr. Berger is the Chief of
14 the Pain and Palliative Care Service, which is the
15 PPCS, at the Clinical Center at the National
16 Institutes of Health. She has been in her current
17 position for approximately five years, she has a
18 staff of seven individuals who were with her on the
19 PPCS team, and the team also consists of the liaison
20 members such as chaplains who are from other
21 departments of the Clinical Center. She is familiar

Page 738

1 with Miss Edar Rogler as Miss Rogler was a chaplain
2 at the Clinical Center, and she interacted with
3 Miss Rogler in December of 2005, and her staff also
4 interacted with Miss Rogler during their what's
5 called clinic.
6        Miss Rogler had gone to see the patients
7 in the PPCS clinic. Both inpatients and outpatients
8 are seen by the PPCS, and the patients seen by PPCS
9 are often the sickest and have the most problems.
10 While they are in the PPCS clinic, the PPCS team
11 determine what kind of treatment the patient should
12 receive, and treatments may include, but are not
13 limited to, providing medical care, emotional
14 counseling, spiritual counseling, physical therapy
15 or massage therapy. And usually during these PPCS
16 team meetings, the chaplain would participate and
17 they would all decide which patients need what kind
18 of treatment that day and who should go see the
19 patient.
20       And her staff was present at clinic one
21 time when Miss Rogler was a chaplain servicing the

4 (Pages 735 to 738)

Page 739

1 PPCS clinic and her staff was able to -- her staff
2 say that Miss Rogler had started to visit with each
3 patient in the waiting room and to talk with the
4 patients about spiritual assessment while they were
5 in the waiting room, which they thought was
6 inappropriate because while in the waiting room,
7 there is no privacy and there would be
8 confidentiality concern. The other concern was that
9 not all the patients needed or wanted a spiritual
10 evaluation done. In addition, no other chaplain who
11 had worked with the PPCS clinic had visited with
12 patients and engaged in such discussions with them
13 in the waiting room.
14        Dr. Berger herself had interacted with
15 Miss Rogler during one clinic. At that time,
16 Dr. Berger had found a note written by Miss Rogler
17 about a patient that was placed in the wrong chart,
18 so Dr. Berger had told Miss Rogler it was a mistake,
19 and Miss Rogler had responded in a snappish manner
20 and had asked Dr. Berger what she should do, and
21 Dr. Berger responded that she needs to fix the

Page 740

1 mistake and put the note in the correct chart.
2        On that same day, another nurse and
3 Dr. Berger had agreed that a particular patient had
4 needed spiritual assessment and the patient had
5 emotional issues so that they thought that the
6 spiritual assessment was a proper course of
7 treatment, and the nurse had asked Miss Rogler to
8 see the patient. And Dr. Berger had observed
9 Miss Rogler go into the patient's room and then
10 leave the patient's room approximately two minutes
11 later, and Dr. Berger was concerned because usually
12 when a chaplain sees a patient, the chaplain is in
13 the room with the patient for at least, like, 30
14 minutes to an hour.
15        She is aware -- Dr. Berger is aware of one
16 other incident where Miss Rogler had entered a PPCS
17 team meeting prior to the start of clinic where
18 discussions about the patients were already
19 underway, and despite the discussions that were
20 occurring, Miss Rogler had started to pass out a
21 piece of paper to the team members without stating

Page 741

1 what the paper was and why she was passing it out.
2 The team members with this paper realized that it
3 was a write-up about a patient, but it was -- the
4 patient was not in the PPCS clinic. The team
5 members informed Miss Rogler this was not a patient
6 of PPCS clinic and returned the papers to her.
7 Miss Rogler then apparently asked the team for
8 coffee, which the team found was -- her behavior was
9 unusual in the way it all started when she entered
10 the room.
11        Dr. Berger would have also testified that
12 Jacques Bole -- it's J-A-C-Q-U-E-S and the last name
13 B-O-L-E -- a psychosocial nurse on the PPCS team
14 received a complaint from a patient's mother about
15 Miss Rogler with regard to some comment Miss Rogler
16 made to the patient, and the mother thought the
17 comment was inappropriate. Based on a report sheet
18 Dr. Berger received from her staff and her own
19 observation, she had contacted Dr. Fitzgerald and
20 Dr. Berger relayed the incidents to Dr. Fitzgerald,
21 stated that she did not want Miss Rogler to see the

Page 742

1 PPCS clinic patients anymore, and Dr. Berger had
2 never made such a request before with regard to any
3 chaplain at the Clinical Center.
4        Subsequently, Walter Jones also asked
5 Dr. Berger about Miss Rogler because he had heard
6 that there were complaints from the PPCS service,
7 and Dr. Berger relayed the incidents about
8 Miss Rogler to Mr. Jones. Jacques Bole was also
9 present at that time and confirmed some of the
10 incidents, especially the meeting where Miss Rogler
11 passed out the paper with another patient -- about
12 another patient and the complaint received from a
13 patient's mother.
14        Dr. Berger would have also testified that
15 after that, she had no further contact with
16 Dr. Fitzgerald or Mr. Jones about Miss Rogler, nor
17 has she had any further contact with Miss Rogler.
18        ADMINISTRATIVE JUDGE NORKEN: When did you
19 file that?
20        MS. LU: I'm sorry?
21        ADMINISTRATIVE JUDGE NORKEN: When did you

5 (Pages 739 to 742)

Arbitration

Page 743

1 file your reply?

2      MS. LU: January 9th.

3      MS. HARRIS: Miss Lu's reply doesn't

4 contain that proffer.

5      ADMINISTRATIVE JUDGE NORKEN: The Agency

6 reply doesn't contain it?

7      MS. HARRIS: Doesn't contain that.

8      ADMINISTRATIVE JUDGE NORKEN: But

9 nonetheless, that's the Agency's proffer?

10     MS. HARRIS: Yes.

11     MS. LU: Correct. I just want to reply I

12 asked in the alternative if Dr. Berger was denied as

13 a witness that we be allowed to submit a declaration

14 or a proffer of the letter.

15     ADMINISTRATIVE JUDGE NORKEN: Well, a

16 proffer is simply -- it's not going to be in

17 evidence because the witness is not going to be

18 allowed to testify, but the Agency has made its

19 proffer what the evidence would have testified to

20 had the witness have been allowed to testify.

21     Now, let me be clear with regard to this

Page 744

1 witness. You are free to attempt to impeach the

2 witness through your questioning, not through the

3 extrinsic evidence.

4      Okay. Are we prepared to go forward now?

5      MS. HARRIS: We are. I think, Judge, for

6 the record, one more matter. You had asked us to

7 bring you a copy of the videotape of Chaplain

8 Morrow's trial deposition, and I said I would do so

9 today. My office informs me that that -- we had

10 made two copies of the videotape, one which we sent

11 to Miss Lu which she received and one which was sent

12 to you soon after the deposition was taken.

13 Apparently, you don't have it, and I just found out

14 yesterday that that was, in fact, the case that it

15 had been sent soon after; so, what I'm having done

16 is having another copy of the videotape made, and

17 Miss Lu has no objection to us submitting it to you

18 as soon as it's made. It should be a week.

19     ADMINISTRATIVE JUDGE NORKEN: I'm pretty

20 sure I do not have it because I've got -- I've had

21 collected two tapes from two other cases and not

Page 745

1 from this case. With respect to the reply, the

2 reason I haven't gotten a reply obviously is because

3 we just got it yesterday and they haven't

4 distributed it yet.

5      MS. LU: One other sort of administrative

6 matter, previously the Agency's Exhibit A7 was

7 missing a page, so I have a complete copy of that

8 exhibit with that missing page.

9      MS. HARRIS: Was that 416?

10     MS. LU: 416.

11     ADMINISTRATIVE JUDGE NORKEN: Okay. Let's

12 have the witness come in.

13     (Brief recess.)

14     ADMINISTRATIVE JUDGE NORKEN: Good

15 morning, Miss Fitilis.

16     THE WITNESS: Good morning.

17     ADMINISTRATIVE JUDGE NORKEN: I remind you

18 you're still under oath.

19     Is the -- where are we?

20     MS. HARRIS: The Agency was still

21 conducting its cross examination.

Page 746

1      ADMINISTRATIVE JUDGE NORKEN: Okay. You

2 may proceed. About how much longer?

3      MS. LU: Probably another half hour. I

4 just have some documents I want to show

5 Miss Fitilis.

6      ADMINISTRATIVE JUDGE NORKEN: Okay.

7 WHEREUPON --

8      HILLARY FITILIS,

9 a Witness, called for examination by counsel for the

10 Complainant, and after having been previously duly

11 sworn by the Administrative Judge, was examined and

12 testified further as follows:

13     CROSS EXAMINATION

14 BY MS. LU:

15 Q    Okay. Good morning, Miss Fitilis.

16 A    Good morning.

17 Q    To continue your testimony, I'm going to

18 show you this E-mail that's going to be marked

19 Agency Exhibit I think it's 9.

20     (Agency Exhibit Number 9 was marked for

21 identification.)

6 (Pages 743 to 746)

Arbitration

Page 747

BY MS. LU:

Q Would you take a look at that E-mail.

A (Witness complies.)

Q If you look at that bottom E-mail, Miss Fitilis, it's dated March 10, 2004 at 10:19 a.m. It's an E-mail from you to Gwen Platt?

A Yes.

Q And who is Gwen Platt?

A Gwen Platt is the Employee Relations Specialist that services all departments in the Clinical Center with the exception of nursing, housekeeping, and the nutrition department.

Q Okay. And in your E-mail, you talk about Walter. Is that Mr. Jones?

A Walter Jones, yes.

Q Okay. And that he was going to remain the deciding official in the HH -- is that in reference to Father Heffernan?

A That's correct.

Q -- five-day suspension. Did Mr. Jones tell you that he was going to remain the deciding

Page 748

official for the suspension?

A I don't recall how I learned of it. I had communication with Maureen Gormley who is the Chief Operating Officer of the Clinical Center and with Mr. Jones concerning who would be the deciding official and ultimately, a decision was made that Walter would remain the deciding official.

Q And here you were relaying that to a Miss Platt?

A That's correct.

Q And why were you telling her, Miss Platt?

A Both to keep her involved as we worked collaboratively on these cases, and it also appears that I was telling her because I felt it was relevant to perhaps address the concerns that Father Heffernan had had about Walter Jones serving as the deciding official in the decision letter.

Q In the actual decision letter?

A Correct.

Q Was Miss Platt the one who drafted the decision letter?

Page 749

A It looks like a draft may have already been in the works. In the last sentence I state "Or if you would like, I could update the dates in the final draft letter." I'm not certain, frankly, where we were in the drafting process. It looks like in the next E-mail she's recommending to her team leader, Linda Tarlow, that we do include some type of reference to retaining Walter Jones as a deciding official in the final decision round.

MS. HARRIS: Objection, Judge. Move to strike as nonresponsive to the question.

ADMINISTRATIVE JUDGE NORKEN: What was the question?

MS. HARRIS: The question was did Miss Platt draft the decision letter.

MS. LU: And she was explaining her answer. It just was very long.

ADMINISTRATIVE JUDGE NORKEN: Overruled.

BY MS. LU:

Q Okay. Miss Fitilis, I'm going to show you another E-mail. It will be marked Agency 10.

Page 750

(Agency Exhibit Number 10 was marked for identification.)

BY MS. LU:

Q Can you take a look at that.

A (Witness complies.)

Q Do you recognize this E-mail, Miss Fitilis?

A It appears to be two E-mails: One from me to Ray Fitzgerald dated March 16th, 2004, that includes a copy of the proposed 14-day suspension and below that is an E-mail from Gwen Platt to me same date that includes the draft proposed 14-day suspension.

Q Okay. And then the attachment to this E-mail, is that the draft of the proposed 14-day that's referenced in the E-mail?

A It appears to be.

Q Okay. And in this draft, what are the charges?

A Charge 1 is violation of recognized professional standards of patient care, Charge 2 is

Page 751

1  defiance of authority.

2        MS. LU: Okay. I'd like to admit this.

3        ADMINISTRATIVE JUDGE NORKEN: Both of

4  them?

5        MS. LU: I'm sorry?

6        ADMINISTRATIVE JUDGE NORKEN: 9 and 10?

7        MS. LU: Yes, please.

8        ADMINISTRATIVE JUDGE NORKEN: Any

9  objection?

10       MS. HARRIS: No.

11       ADMINISTRATIVE JUDGE NORKEN: It's

12  admitted. Both of them.

13       MS. LU: Thank you.

14       (Agency Exhibit Numbers 9 and 10 were

15  admitted into evidence.)

16       BY MS. LU:

17    Q   I'm going to show you this document. It's

18  going to be marked Agency 11.

19       (Agency Exhibit Number 11 was marked for

20  identification.)

21       BY MS. LU:

Page 752

1    Q   If you could please take a look at the

2  document.

3    A   (Witness complies.)

4    Q   Do you recognize this E-mail,

5  Miss Fitilis?

6    A   It appears to be an E-mail from me dated

7  March 17th, 2004 to Gwen Platt regarding the draft

8  letter suspending -- frankly, I'm not certain if

9  it's a proposal or a decision letter. It doesn't

10  indicate.

11    Q   Well, if you look at the attachment, what

12  does the attachment to that E-mail say?

13    A   It appears to be a notice of proposed

14  suspension for 14 calendar days.

15       MS. LU: Okay. I'd like to enter this

16  into evidence.

17       MS. HARRIS: No objection.

18       ADMINISTRATIVE JUDGE NORKEN: It's

19  admitted.

20       (Agency Exhibit Number 11 was admitted

21  into evidence.)

Page 753

1        MS. LU: I'm sorry. One moment. I'm

2  trying to locate a document.

3        (Brief pause.)

4        BY MS. LU:

5    Q   Miss Fitilis, I'm going to hand you

6  another document that will be marked as Agency 12.

7        (Agency Exhibit Number 12 was marked for

8  identification.)

9        BY MS. LU:

10    Q   Do you recognize these chain of E-mails?

11    A   It appears to be the first at the top of

12  the page an E-mail from Gwen Platt dated April 7,

13  2004 to me with a copy to Linda Tarlow and the

14  subject is the Heffernan proposed 14-day suspension,

15  and below that is an E-mail from me dated April 6,

16  2004 to Gwen Platt regarding the Heffernan proposed

17  14-day suspension.

18    Q   Okay. And the E-mail, the one at the

19  bottom that's dated April 6, 2004 at 5:19 p.m., what

20  was the issue in that E-mail?

21    A   The fact that Father Heffernan had

Page 754

1  requested an extension of time to reply to the

2  proposed suspension and --

3    Q   Which proposed suspension? The five-day

4  or the 14-day?

5    A   It appears to be the 14-day, as that's the

6  subject of the E-mail.

7    Q   Okay.

8    A   And that the basis for his request was

9  that he wasn't able to gain access to the supporting

10  materials for the proposal and --

11    Q   And was Father Heffernan's request for

12  extension granted?

13    A   Frankly, I don't recall.

14       MS. LU: Okay. I'd like to admit this

15  into evidence, please.

16       MS. HARRIS: Objection, Your Honor. I

17  don't see the relevance of this to the matters in

18  the case.

19       MS. LU: It is relevant. It's with regard

20  to one of his suspensions.

21       MS. HARRIS: Well, it doesn't go to -- it

8 (Pages 751 to 754)

Page 755

1 doesn't go to prove anything material in this case.

2 Just because it relates to the suspension doesn't

3 mean that it's something material.

4     ADMINISTRATIVE JUDGE NORKEN: Would you

5 step out of the room, please.

6     (Witness leaves the hearing room.)

7     ADMINISTRATIVE JUDGE NORKEN: Your purpose

8 here is to show that you've made an appropriate and

9 regular process in terms of going through the

10 suspension?

11     MS. LU: Sure, the whole timing, the whole

12 disciplinary process. And also, it explains sort

13 of, I suppose, the time gaps between the proposal,

14 the reply, and the final decision because there were

15 extensions in between.

16     ADMINISTRATIVE JUDGE NORKEN: Any response

17 to that?

18     MS. HARRIS: I just don't know what it

19 goes to prove. I mean, we know that it's already in

20 the record and, in fact, I think it's been

21 stipulated to that Father Heffernan got the notice,

Page 756

1 he responded to the proposal, and then there was a

2 decision. I don't think the fact that when the

3 supporting documentation was delivered to Father

4 Heffernan or whether he asked for an extension in

5 time to respond to it is material in any way.

6     ADMINISTRATIVE JUDGE NORKEN: I'm ready to

7 rule. Overruled. It's admitted. Let's have the

8 witness come back in.

9     (Agency Exhibit Number 12 was admitted

10 into evidence.)

11     (Witness returns to the hearing room.)

12     ADMINISTRATIVE JUDGE NORKEN: The

13 objection was overruled and the document admitted

14 into evidence. Miss Lu has some additional

15 questions for you.

16     MS. LU: Thank you.

17     BY MS. LU:

18   Q  Miss Fitilis, let me show you what's going

19 to be marked as Agency 13.

20     (Agency Exhibit Number 13 was marked for

21 identification.)

Page 757

1     BY MS. LU:

2   Q  Do you recognize this document?

3   A  It appears to be a letter from me to Joe

4 Martin dated February 2nd, 2004.

5   Q  Okay. Earlier -- well, the other time you

6 were testifying, Miss Harris had shown you this

7 document which is in their Complainant's exhibit

8 book, Exhibit 40. Take a look at it.

9   A  (Witness complies.)

10   Q  Okay. If you look at the Agency

11 Exhibit A13 that is there, you had asked Joe

12 Martin -- so I guess yours -- of one sentence was

13 "can you" I guess "FWD" -- is that "forward"?

14   A  Yes.

15   Q  -- "me a copy of the proposed suspension

16 letter in the spiritual ministry matter." And

17 exhibit in the Complainant's book 40, is that

18 Mr. Martin's response to this E-mail of yours dated

19 February 2nd, 2004 at 4:54 p.m.?

20   A  It appears to be.

21     MS. HARRIS: Objection; leading. This

Page 758

1 is --

2     ADMINISTRATIVE JUDGE NORKEN: Sustained.

3   Q  Miss Fitilis, this E-mail that's

4 identified as Agency Exhibit 13, did Mr. Martin

5 respond to your request?

6   A  It appears that he did. My E-mail

7 requesting a copy of the proposed suspension letter

8 was February 2nd, 2004 at 4:54 p.m., and it looks

9 like Mr. Martin sent me a response on that same day

10 at 4:58, and it says "Here you go." So it would

11 appear that this was a copy of the draft letter.

12     MS. LU: I'd like to admit A13.

13     ADMINISTRATIVE JUDGE NORKEN: Any

14 objection?

15     MS. HARRIS: No.

16     ADMINISTRATIVE JUDGE NORKEN: It's

17 admitted.

18     (Agency Exhibit Number 13 was admitted

19 into evidence.)

20     BY MS. LU:

21   Q  I'm going to show you another document

9 (Pages 755 to 758)

Page 759

1 that's marked Agency Exhibit 14.

2       (Agency Deposition Exhibit Number 14 was

3 marked for identification.)

4       BY MS. LU:

5    Q   Do you recognize this document which is an

6 E-mail that's dated March 31, 2004 at 9:09 a.m.?

7    A   It appears to be from Ray Fitzgerald to

8 myself, and the subject is "Heffernan suspension

9 revised 4 final," and it appears to include a copy

10 of the revised final version of the Heffernan

11 suspension letter with changes made by Ray addressed

12 to me.

13    Q   Okay. And which suspension letter is it?

14    A   It's a notice of proposed suspension for

15 14 calendar days.

16       MS. LU: Okay. I'd like to admit this,

17 please.

18       ADMINISTRATIVE JUDGE NORKEN: Any

19 objection?

20       MS. HARRIS: No.

21       ADMINISTRATIVE JUDGE NORKEN: It's

Page 760

1 admitted.

2       (Agency Exhibit Number 14 was admitted

3 into evidence.)

4       BY MS. LU:

5    Q   I'll show you another document that's

6 going to be marked Agency Exhibit 15.

7       (Agency Exhibit Number 15 was marked for

8 identification.)

9       BY MS. LU:

10    Q   Do you recognize this document,

11 Miss Fitilis?

12    A   It's a chain of E-mails. On the bottom,

13 it's the E-mail that we just discussed of March 31st

14 at 9:09 a.m. that included a revised version of the

15 proposed 14-day suspension, and that's from Ray to

16 me. And above it is an E-mail from me that same

17 date at 10:14 a.m., and it's to Ray, and it

18 indicates that I made some minor edits to the

19 proposal. I'm letting him know that it's ready to

20 be issued and he can deliver it to Father Heffernan,

21 and also advising him that if he needs any other

Page 761

1 assistance, to let me know.

2    Q   Which proposal was attached?

3    A   14-day suspension.

4    Q   Okay. The 14-day proposed suspension?

5    A   Correct.

6       MS. LU: I'd like to admit this, please.

7       ADMINISTRATIVE JUDGE NORKEN: Any

8 objection?

9       MS. HARRIS: No.

10       ADMINISTRATIVE JUDGE NORKEN: Admitted.

11       (Agency Exhibit Number 15 was admitted

12 into evidence.)

13       MS. LU: I'll show you a document that's

14 going to be Agency Exhibit 16.

15       (Agency Exhibit Number 16 was marked for

16 identification.)

17       ADMINISTRATIVE JUDGE NORKEN: Who's Joe

18 Martin?

19       THE WITNESS: Joe Martin is -- was -- one

20 of the individuals who served as the employee

21 relations point of contact for the Clinical Center.

Page 762

1 In February of 2004, there was -- consolidation of

2 HR services was effectuated at least for the

3 Clinical Center, and so prior to February of '04,

4 Joe Martin, Cynthia Bolton and we also saw Penny

5 Dale, those were the individuals who serviced the

6 Clinical Center and provided the employee relations

7 support. After February of 2004, Gwen Platt and

8 some other individuals became responsible for

9 handling the Clinical Center employee relations

10 matters.

11       ADMINISTRATIVE JUDGE NORKEN: And Joe

12 Martin was out in terms of providing services to the

13 clinical staff?

14       THE WITNESS: For employee relations

15 matters, correct; however, Joe Martin's shop began

16 to handle, along with Barbara Lang, began to handle

17 personnel issues such as classifications, hiring,

18 processing of within grade, so the focus on the

19 processing element of personnel. And then Gwen

20 Platt and Carolyn Clemms became responsible for --

21 and Linda Tarlow -- became responsible for employee

10 (Pages 759 to 762)

Page 763

1 relations, so there was a split.

2     ADMINISTRATIVE JUDGE NORKEN: So why did

3 you cc Joe Martin here?

4     THE WITNESS: It looks like the original

5 E-mail came from Barbara Lang to myself, Gwen Platt,

6 and Tom Reed who is the HR liaison for the Clinical

7 Center, and Joe Martin was copied on that E-mail, so

8 that came from Barbara Lang. So when I replied to

9 Barbara Lang's E-mail -- and my reply is at the top

10 of the document -- I replied to everyone and it

11 included Joe Martin.

12     ADMINISTRATIVE JUDGE NORKEN: Okay. You

13 just included him because he was included in the

14 original?

15     THE WITNESS: Correct. I just clicked

16 "bid peers" and reply to all.

17     BY MS. LU:

18   Q  So, Miss Fitilis, I take it you recognize

19 this document?

20   A  Again, as I stated before, I have no

21 reason to doubt any of the legitimacy of any of

Page 764

1 these E-mails, but I don't specifically recall the

2 bulk of them because it was so long ago.

3   Q  And you had from the Administrative

4 Judge's questioning identified some of these people,

5 but who is Thomas Reed?

6   A  Tom Reed serves as the HR liaison for the

7 Clinical Center, and prior to the whole

8 reorganization when each IC had their individual

9 Human Resources offices, that included employee

10 relations such as these types of disciplinary and

11 performance issues as well as classification and

12 processing, he headed up that office. Then once the

13 centralization took place which was actually prior

14 to 2004 February, but it was actually implemented

15 within the Clinical Center in February of '04 due to

16 some types of arrangements, at that point in time or

17 a little bit prior to then, Tom Reed was brought in

18 to serve as basically the HR liaison, so he was

19 removed from his position of overseeing a large

20 office of 30-some-odd staff members and then made

21 into an HR liaison. And that's pretty consistent

Page 765

1 what happened across the board at the majority of

2 the ICs when HR services were decentralized.

3   Q  Now, in the E-mail from Barbara Lang dated

4 April 30th, 2004, she references some letters from

5 Father Heffernan?

6   A  Uh-huh.

7   Q  Do you recall receiving those letters?

8   A  I don't specifically recall receiving

9 these letters. I do recall that Father Heffernan

10 wrote a lot of memos and letters to Clinical Center

11 staff members and that there were -- there was quite

12 a bit of documentation that he generated after each

13 and every incident or action that was taken, but I

14 don't recall specifically receiving these letters.

15   Q  The memos that you were referring to from

16 Father Heffernan, did you ever get a copy of those

17 memos or you just knew they existed?

18   A  Frankly, I don't recall what I did and

19 didn't receive, but any documents that I had with

20 respect to the Heffernan case I turned over in

21 discovery.

Page 766

1     MS. LU: Okay. I'd like to admit this

2 Exhibit A16.

3     MS. HARRIS: No objection.

4     ADMINISTRATIVE JUDGE NORKEN: It's

5 admitted.

6     (Agency Exhibit Number 16 was admitted

7 into evidence.)

8     MS. LU: Those are the questions that I

9 have for Miss Fitilis.

10     ADMINISTRATIVE JUDGE NORKEN: You're done

11 with your cross?

12     MS. LU: Yes.

13     ADMINISTRATIVE JUDGE NORKEN: Okay. Off

14 the record.

15     (Witness leaves the hearing room.)

16     (Brief discussion off the record.)

17     (Witness returns to the hearing room.)

18     ADMINISTRATIVE JUDGE NORKEN: Did

19 Mr. Fitzgerald tell you what would have been an

20 appropriate training time?

21     THE WITNESS: We discussed in general, I

11 (Pages 763 to 766)

Page 767

1 I recall, a training plan that Father Heffernan had
2 submitted and some issues concerning his
3 noncompliance with the request to submit a plan. I
4 don't recall specific details about what exactly
5 constituted a plan, but we did talk about the fact
6 that why it was there were only a certain number of
7 the CPE credits could be obtained through prior
8 professional work experience, and we talked in
9 general about how many hours he had to obtain and
10 what he would have to do in order to achieve that
11 requirement.
12      ADMINISTRATIVE JUDGE NORKEN: Did he make
13 it clear that essentially Father Heffernan would
14 have to obtain a beginner's -- would have to take
15 beginner's courses?
16      THE WITNESS: No.
17      ADMINISTRATIVE JUDGE NORKEN: What kind of
18 courses did he say had to be taken?
19      THE WITNESS: We didn't get into that much
20 specific detail about the exact nature of the
21 courses. We were more -- my attention was focused

Page 768

1 on what was it that Father Heffernan was not doing
2 with respect to this instruction to obtain training
3 requirements, when was he notified, how was he
4 notified, what amount of time had he had to comply
5 with this request, how clear were these objectives
6 conveyed to Father Heffernan, but we never got down
7 to the specific detail of the exact nature of the
8 classes, what the content would be or anything of
9 that nature. My goal was really focused on ensuring
10 that the employee had been adequately advised of the
11 requirements and given an opportunity to comply with
12 those requirements and then it was clear that the
13 employee was not complying with those requirements
14 and then what we would do to move forward with steps
15 to try to get the employee to comply.
16      ADMINISTRATIVE JUDGE NORKEN: Was there
17 any discussion about whether Father Heffernan's past
18 courses and past experience obtained could be
19 credited?
20      THE WITNESS: Yes. In fact, when Father
21 Heffernan and I first met, he told me that there

Page 769

1 were a specified number of CPE credits that Father
2 Heffernan had to obtain and that there were a
3 certain number of credits that Father Heffernan
4 could use or be credited toward because of his prior
5 work experience and that that number of credits was
6 determined by this organization that oversaw the CPE
7 requirement.
8      ADMINISTRATIVE JUDGE NORKEN: Was there
9 any discussion about whether -- okay. What did he
10 tell you?
11      THE WITNESS: He told me that he had been
12 instructed that I believe it was approximately three
13 to four hundred of the units could be credited to
14 Father Heffernan because of his prior work
15 experience, but that Father Heffernan still had to
16 obtain this remaining number. And I don't recall
17 specifically how many, but I'm tempted to say that
18 perhaps there was overall maybe 1600 hours and
19 that -- or 1200 hours -- something along those
20 lines -- and that he had 3 to 400 of them could be
21 credited because of prior work experience. I

Page 770

1 apologize. I don't recall specifically the number
2 of hours.
3      ADMINISTRATIVE JUDGE NORKEN: Was there
4 any discussion about whether Dr. Fitzgerald could or
5 would support requesting the certifying agency to
6 give Father Heffernan more credit than that?
7      THE WITNESS: No. My understanding was
8 that Father Heffernan had received a directive or
9 instruction or guidance from this outside
10 organization that this was the amount of credit that
11 could be given for prior work experience and that
12 this was the standard. And that in my conversations
13 with Father Heffernan, I understood that this was
14 done for other staff chaplains as well, that there
15 was a limit on the number of credits that could be
16 obtained from prior work experience, but then that
17 the staff chaplains needed to obtain current CPE
18 credits.
19      ADMINISTRATIVE JUDGE NORKEN: Yet you're
20 saying you based your understanding on that probably
21 with discussions with Father Heffernan as to what --

12 (Pages 767 to 770)

Page 771

1    THE WITNESS: I'm sorry. I keep saying
2 Father Heffernan and I'm referring to Ray
3 Fitzgerald. I apologize. I didn't have any
4 communications with Father Heffernan. I apologize.
5 Each time I'm referring to Father Heffernan, I've
6 meant to say Ray Fitzgerald. I apologize.
7    ADMINISTRATIVE JUDGE NORKEN: You didn't,
8 therefore, discuss it with Father Heffernan?
9    THE WITNESS: No, no. I had no
10 communications with Father Heffernan concerning this
11 at any time. This was Ray Fitzgerald who I was
12 communicating with concerning the requirements for
13 Father Heffernan.
14    ADMINISTRATIVE JUDGE NORKEN: I don't have
15 any other questions.
16    Miss Harris, was this your witness?
17    MS. HARRIS: Yes.
18    ADMINISTRATIVE JUDGE NORKEN: Do you have
19 any questions due to the scope of my questions or
20 the scope of Miss Lu's questions?
21    MS. HARRIS: I do.

Page 772

1    ADMINISTRATIVE JUDGE NORKEN: About how
2 long?
3    MS. HARRIS: No more than a half hour.
4    ADMINISTRATIVE JUDGE NORKEN: You may
5 examine.
6    MS. HARRIS: Thank you.
7    RE-DIRECT EXAMINATION
8 BY MS. HARRIS:
9    Q    Miss Fillis, let me first ask you during
10 the intervening break, have you had any -- between
11 the last hearing date December 15th and now, have
12 you had any discussions with Miss Lu regarding your
13 testimony?
14    A    Regarding my testimony, no.
15    Q    And have you reviewed documents in between
16 your -- regarding this case in between your last
17 testimony and now?
18    A    No.
19    Q    Okay. Now, originally when the drafts
20 were going back and forth regarding the 14-day
21 suspension, there was no charge for failure to

Page 773

1 comply with the CPE requirements; is that correct?
2    A    I believe so, yes.
3    Q    Okay. And at some point, that charge was
4 added to the 14-day suspension, correct?
5    A    Correct.
6    Q    And you were involved in advising
7 management as to whether charges should be added or
8 not, correct?
9    A    Yes.
10    Q    And isn't it true you didn't advise them
11 to add that CPE charge until after Father Heffernan
12 had had a sufficient time to comply with
13 requirements after he returned from the suspension;
14 is that correct?
15    A    That's correct.
16    Q    You didn't -- it wouldn't have been fair
17 for you to add the CPE charge before he had a chance
18 to comply with requirements after his five-day
19 suspension, correct?
20    A    I wouldn't recommend that, no.
21    Q    Okay. But you agree, do you not, that you

Page 774

1 had decided to do the 14-day suspension before
2 Father Heffernan had returned from his serving his
3 five-day suspension, correct?
4    A    Frankly, I don't recall a specific
5 chronology.
6    Q    Well, you were exchanging drafts of the
7 14-day suspension without the CPE charge before
8 Father Heffernan returned from his suspension; isn't
9 that correct?
10    A    I don't recall when Father Heffernan
11 returned from his suspension.
12    Q    Okay. It's stipulated that Father
13 Heffernan served his suspension from -- he served
14 his suspension -- his five-day suspension from
15 March 15th, 2004 to March 19th, 2004. Now that I've
16 told you those dates, isn't it true that you had
17 drafted the 14-day suspension before Father
18 Heffernan served his five-day suspension; isn't that
19 correct?
20    A    May I consult these documents?
21    Q    You don't recall?

13 (Pages 771 to 774)

Page 775

1    A    I don't recall a specific date.

2    Q    Okay. Go ahead and take a look.

3         (Witness reviews the document.)

4    A    It looks like I drafted the original -- or

5    someone drafted -- and we were reviewing the

6    original proposed 14-day suspension that included

7    Charge 1 which is violation of recognized

8    professional standards of patient care and Charge 2,

9    defiance of authority, on or about March 17th which,

10   you are correct, is while Father Heffernan was on --

11   serving his suspension. However, it also looks like

12   I did not -- we were still working on the draft on

13   March --

14   Q    That answers my question. Thank you.

15        If you'd look at -- do you have Agency

16   Exhibit 10 in front of you?

17   A    The exhibits that I have in front of me

18   are not labeled.

19   Q    Okay. At the top it's Tuesday, it's an

20   E-mail from you to Ray Fitzgerald, March 16th, 2004.

21   The time is 12:51 p.m. I have Bates stamp 423 on

Page 776

1    the first page.

2    A    Okay. Yes.

3    Q    That's Agency Exhibit 10. The date of

4    that E-mail is March 16, 2004; isn't that correct?

5    A    Uh-huh.

6    Q    And -- that's a yes?

7    A    Yes.

8    Q    Okay. And that was while Father Heffernan

9    was serving his five-day suspension, correct?

10   A    Correct.

11   Q    Okay. And you had received that E-mail

12   from Miss Platt on March 16, 2004, correct?

13   A    Correct.

14   Q    With a draft 14-day suspension letter?

15   A    Correct.

16   Q    And so she had been -- it's fair to say

17   she had been working on that suspension letter prior

18   to March 16th, 2004?

19   A    Correct.

20   Q    Okay. And isn't it true that you knew

21   that there would be a proposed 14-day suspension as

Page 777

1    early as before the five-day suspension decision

2    letter was even given to Father Heffernan?

3    A    I don't specifically recall. It's

4    possible, but I don't recall.

5    Q    Okay. I'm going to show you an exhibit

6    that will be Complainant's Exhibit 66.

7         (Complainant's HH Exhibit Number 66 was

8    marked for identification.)

9         MS. HARRIS:  And it's not in our book,

10   Judge.

11        BY MS. HARRIS:

12   Q    Okay. If you look at the bottom of this

13   E-mail, Miss Platt sent you an E-mail March 3rd,

14   2004 with a draft five-day suspension memo; is that

15   correct?

16   A    Correct.

17   Q    And that's the decision on the five-day

18   suspension; isn't that correct?

19   A    It appears to be as the subject says "HH

20   suspension decision," yes.

21   Q    Okay. And you responded on March 4th,

Page 778

1    2004 to Miss Platt, correct?

2    A    Correct.

3    Q    And in your response on March 4, 2004, you

4    stated "Once we issue the five-day suspension, we

5    will have to move on to the 14-day suspension."

6    Isn't that correct?

7    A    Correct. And so it --

8    Q    And on March 4th, 2004, you also suggested

9    including the continuing failure to prepare a

10   training plan as one of the charges on March 4,

11   2004, correct?

12   A    Depending on how much time passes between

13   the suspensions, yes.

14   Q    Okay. So, before Father Heffernan even

15   served his -- before he even received the decision

16   on his five-day suspension, you were prepared to

17   move on to a 14-day suspension, correct?

18   A    It appears that way, correct.

19   Q    Okay. It appears that way or that's

20   correct? Which one?

21   A    That's correct, based upon this E-mail,

14 (Pages 775 to 778)

Arbitration

Page 779

1 yes.

2    Q    Okay. And so you had already decided that

3 a 14-day suspension would be appropriate for the

4 next disciplinary action before Father Heffernan

5 served his five-day suspension, correct?

6    A    Traditionally, we move from a five-day, if

7 the employee doesn't respond, we will move on to a

8 14-day in the event that there are any new or

9 ongoing conduct issues.

10    Q    So your answer is yes?

11    A    Yes.

12    Q    And when was the failure to comply with

13 CPE requirements added -- when was that charge added

14 to the 14-day suspension proposal? And you can look

15 through those documents if you don't recall.

16    A    I'm working with a limited number of

17 documents here on the table, but --

18    MS. LU:    Yeah. There were some others,

19 I'm sorry, that were admitted during her testimony.

20    Q    If you don't recall, let me know, but go

21 ahead and look through them.

Page 780

1    A    I don't specifically recall, but based on

2 the documents that are in front of me, there's one

3 that is an E-mail from Ray Fitzgerald to me dated

4 March 31st, 2004, and the title is "Heffernan

5 suspension revised 4 final" and it states that

6 "Attached is a revised final version of the

7 Heffernan suspension letter," and this one includes

8 a third charge that was not included in prior drafts

9 and it's Charge 3, failure to follow supervisory

10 instructions to comply with training requirements.

11 But in light of the fact that this E-mail is a

12 response from Ray to me, it would lead me to believe

13 that I sent this to him prior to March 31st, but I

14 don't recall when.

15    Q    And I'm going to show you what's been

16 previously admitted as Agency Exhibit 7. Isn't it

17 true that you drafted the additional charge for

18 failure to comply with training requirements and you

19 E-mailed it to others on March 29th, 2004, correct?

20    A    I don't specifically recall drafting it,

21 but based upon this E-mail, it appears that I did.

Page 781

1 It says that I've revised the 14-day suspension and

2 included a five-day suspension and prior discipline,

3 and a charge for failure to follow supervisory

4 instructions to comply with the training

5 requirements, and please let me know your thoughts.

6 So that leads me to believe I made the initial draft

7 here, but it is possible, as I mentioned, Gwen Platt

8 and Linda Tarlow at the time and I worked in

9 collaboration, that they may have sent me an initial

10 draft and I made changes and sent it back.

11    Q    And if you look at Page 416, that includes

12 the charge regarding the failure to comply with

13 training requirements; is that correct?

14    A    Correct.

15    Q    So that was --

16    ADMINISTRATIVE JUDGE NORKEN:    I don't have

17 a Page 416.

18    MS. HARRIS:    I think the Agency gave you a

19 newer copy with the missing page. Do you have that,

20 Judge?

21    ADMINISTRATIVE JUDGE NORKEN:    Yes.

Page 782

1    Q    Okay. If I could have that back,

2 Miss Fitilis, because that's my only copy of 416. I

3 just wanted you to take a look at it.

4    A    (Witness complies.)

5    Q    Thank you.

6    So Father Heffernan had returned from his

7 suspension on March 19th, 2004, correct?

8    A    That's what you stipulated, yes.

9    Q    And you were drafting -- it's fair to say

10 you were drafting the included charge of failure to

11 follow supervisory instructions to comply with

12 training requirements certainly on March 29, 2004,

13 correct?

14    A    Is that the date on the --

15    Q    Yes.

16    A    Let me see.

17    Q    (Complies.)

18    A    Yes.

19    Q    And it's likely this E-mail is -- the time

20 it's sent is 12:10 p.m. on March 29th, 2004?

21    A    That's correct.

15 (Pages 779 to 782)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**
**Plaintiff** *pro se,*                                          :

**v.**                                                          :

                                                                            C.A. No.  1:07-cv-02308(RMC)

**WILLIAM BIGLOW,** *et al.*
**Defendants.**                                                  :

                                                     ...oOo...

**Transcript of testimony of Hillary Fitilis at EEOC Hearing,**
*Heffernan v. Leavitt, Secretary DHHS,* **EEOC Case No. 120-2005-00226x,**

Hr'g  01/10/06;  pgs. 783-818

**EXHIBIT 6-0**

Page 783

1    Q   It's fair to say you actually drafted that
2 additional charge sometime before March 29th; isn't
3 that correct?
4    A   It's possible or it's possible that this
5 was my first draft. As I mentioned before, this
6 E-mail appears that it's the first draft and then I
7 drafted it and sent it to Gwen for review on
8 March 29th, but as I stated, we worked pretty
9 collaboratively together and so it's possible that
10 she sent me a draft and I sent her a revised one.
11 We go back and forth to work on these documents
12 together.
13    Q   Certainly, it's fair to say that prior to
14 March 29th, you had decided that the charge for
15 failure to comply with the training requirements
16 should be added to the proposed 14-day suspension;
17 isn't that correct?
18    A   No. I'm comfortable saying that as of
19 March 29th, the time that I sent this E-mail, that I
20 had made this decision. I can't state whether I
21 made it prior to that time. I don't recall.

Page 784

1       MS. HARRIS: Okay. I would like to offer
2 Exhibit 66 into evidence.
3       ADMINISTRATIVE JUDGE NORKEN: Any
4 objection?
5       MS. LU: No.
6       ADMINISTRATIVE JUDGE NORKEN: It's
7 admitted.
8       MS. HARRIS: Thank you.
9       (Complainant's HH Exhibit Number 66 was
10 admitted into evidence.)
11       BY MS. HARRIS:
12    Q   So when you recommended on -- let's see
13 Agency 11. Is Agency 11 in front of you?
14    A   Again, the documents in front of me are
15 not labeled with exhibit numbers. I just have Bates
16 stamps.
17    Q   It would be the March 17th, 2004 E-mail
18 from you to Miss Piatt.
19    A   At what time?
20    Q   12:44 p.m.
21    A   I have that.

Page 785

1    Q   You suggested on that date adding five
2 days addressing the -- I mean adding a reference in
3 the Douglas Factors the fact that Father Heffernan
4 had served a five-day suspension, correct?
5    A   Correct.
6    Q   Okay. And that was to bolster the 14-day
7 suspension, correct?
8    A   Correct.
9    Q   But isn't it true the Agency had
10 previously decided to recommend a 14-day suspension
11 even prior to the decision Father -- I'm sorry --
12 even prior to issuing the decision to Father
13 Heffernan on the five-day suspension?
14    A   I don't know that to be true.
15    Q   Okay. Please take a look back at
16 Complainant's Exhibit 66 which is March 4th, 2004.
17    A   Again, my exhibits aren't numbered.
18    Q   I'm telling you which date it is. It's
19 March 4th, 2004 from you to Gwen Piatt.
20    A   At what time?
21    Q   9:59 a.m.

Page 786

1    A   Okay. I have that one.
2    Q   And this is on March 4th, 2004.
3       ADMINISTRATIVE JUDGE NORKEN: From now on,
4 any exhibits that are shown to the witness should be
5 properly marked. In fact, why don't we go off the
6 record and do that. Off the record.
7       (Off the record.)
8       ADMINISTRATIVE JUDGE NORKEN: Back on the
9 record.
10       BY MS. HARRIS:
11    Q   All right. Miss Fitilis, when we were off
12 the record, you asked if you could take some notes
13 regarding the dates. Have you done so?
14    A   I've just started, yes.
15    Q   Okay. So my question to you was before
16 the decision on the five-day suspension was even
17 issued, you had decided to -- that the next
18 disciplinary action would be a 14-day suspension;
19 isn't that correct?
20    A   That appears to be the case based on this
21 E-mail, yes.

16 (Pages 783 to 786)

Arbitration

Page 787

1    Q    Okay.
2         THE WITNESS:    May I ask a question
3 concerning the dates of the proposed suspensions,
4 the actual date that the proposed suspension was
5 issued and the date the suspensions were upheld
6 for the --
7         MS. HARRIS:    I don't think that's
8 appropriate, Judge.
9         ADMINISTRATIVE JUDGE NORKEN:    If it comes
10 up --
11        THE WITNESS:    They're stipulated, correct?
12        ADMINISTRATIVE JUDGE NORKEN:    If it comes
13 up during the -- if it becomes necessary during your
14 testimony, it can be pointed out to you.
15        THE WITNESS:    Okay.
16    BY MS. HARRIS:
17    Q    If you could look at Agency Exhibit 13,
18 please.
19    A    Okay.
20    Q    What caused you to request a copy of the
21 proposed suspension letter in the spiritual ministry

Page 788

1 matter on February 2nd, 2004?
2    A    I don't recall specifically when all this
3 transpired, but shortly after I was hired, I became
4 aware of some ongoing communications between Father
5 Heffernan and the Employee Relations Office, which
6 at that time consisted of Barbara Lang and Joe
7 Martin and Cindy Bolton, concerning a proposed
8 suspension. And, as you know, I had just come on
9 board the end of December, and my responsibility
10 included tracking these matters closely, being
11 apprised of all of the employee relations issues
12 that were going on at the Clinical Center, and I
13 became aware that this matter was going on and
14 wanted to find out in detail what exactly was being
15 proposed and what the basis was for the proposal, so
16 I communicated with Joe Martin and asked for a copy
17 of the proposed suspension letter that I had not
18 seen prior to this date.
19    Q    Who made you aware of this matter? Was it
20 Mr. Martin?
21    A    I don't recall specifically who. I

Page 789

1 believe that it was someone in the Employee
2 Relations Office.
3    Q    Was it Dr. Fitzgerald who made you aware
4 of it?
5    A    I don't recall specifically, but I don't
6 recall that -- that it was. I believe that I first
7 heard about it from the employee relations
8 individuals that this was going on. I was new to
9 the Clinical Center, I started the very end of
10 December, I didn't know many of the management
11 officials, I actually believe I took leave in
12 January, so I really wasn't incorporated yet into
13 the culture and knew everyone. It's possible that I
14 heard from him, but I don't believe so. I believe
15 that I did hear about it from the employee relations
16 people.
17    Q    Okay. Please take a look at Agency
18 Exhibit 16, the E-mail from Miss Lang which you were
19 copied.
20    A    Uh-huh.
21    Q    Miss Lang stated that she did not plan on

Page 790

1 responding to the letters from Father Heffernan
2 addressed to the -- addressed to her.
3    A    Right.
4    Q    And did you respond to the letters from
5 Father Heffernan?
6    A    I don't recall, no, responding to any
7 letters from Father Heffernan.
8    Q    Did anyone at the Agency, to your
9 knowledge, respond to those letters from Father
10 Heffernan?
11    A    I don't know for certain, but I don't
12 recall anyone drafting a letter of response to
13 Father Heffernan that I'm aware.
14    Q    You didn't advise Miss Lang that -- I mean
15 she says "If, in your opinions, I should rethink
16 this approach" meaning that she's not going to
17 respond to the letters, if she should rethink the
18 approach, to let her know?
19    A    Correct.
20    Q    You didn't let her know that she should
21 rethink her approach and respond to the letters, did

17 (Pages 787 to 790)

Esquire Deposition Services

Page 791

1 you?

2    A    No. I would -- I can't say that it would
3 never happen, but as a general rule, I would almost
4 never advise Employee Relations to respond to an
5 employee directly concerning an issue such as this,
6 complaints that appear to relate to ongoing work
7 issues.

8    Q    Well, who would be the appropriate person
9 to respond if not Employee Relations?

10    A    It would depend on who the letter was sent
11 to. If it was sent to the supervisor with a copy to
12 Employee Relations, I would recommend that Employee
13 Relations work with the supervisor to draft a
14 response to the employee that came from the
15 supervisor.

16    Q    That didn't happen here, though, did it?

17    A    Not that I'm aware of. No one ever
18 consulted me and said "Would you please assist us in
19 drafting our response," no. If someone took it on
20 their own and went ahead and did it and never told
21 me, that's possible; but no, I was not involved in

Page 792

1 drafting a response.

2    Q    Okay. The Judge asked you whether -- or
3 what specifically Dr. Fitzgerald told you that
4 Father Heffernan needed to do in order to comply
5 with the CPE training requirements, and let me
6 follow up on that. Did Dr. Fitzgerald tell you that
7 Father Heffernan could take CPE at the NIH Clinical
8 Center's CPE unit?

9    A    I don't recall.

10    Q    He didn't tell you that that was an
11 option, did he?

12    A    I don't recall. As I explained to Judge
13 Norken, the focus of my communications with Ray
14 Fitzgerald were concerning how many hours Father
15 Heffernan had to complete, direct communications
16 about the fact that several hundred of those hours
17 could be satisfied based upon his prior work
18 experience.

19    Q    Okay. That wasn't my question. My
20 question is whether Dr. Fitzgerald told you that
21 father -- whether Father Heffernan could take the

Page 793

1 CPE unit at NIH Clinical Center?

2    A    And I said I don't recall having that
3 discussion.

4    Q    Are you aware that NIH Clinical Center
5 offers clinical pastoral education courses?

6    A    I've heard something about the fact that
7 some staff chaplains are allowed to do some CPE
8 training at the Clinical Center. That's the extent
9 that I know about it.

10    Q    Okay. But Dr. Fitzgerald didn't tell you
11 that Father Heffernan could do that at the Clinical
12 Center, correct?

13    A    I don't recall him mentioning anything
14 about Father Heffernan being able to take CPE
15 training -- work training at the Clinical Center. I
16 just understand that his prior work experience,
17 which I understood to be at the Clinical Center,
18 could satisfy several hundred of the CPE
19 requirements.

20    Q    Okay. Thank you.

21        If, in fact, there were clinical pastoral

Page 794

1 education courses offered at the Clinical Center,
2 Dr. Fitzgerald could have simply directed Father
3 Heffernan to start attending that course, couldn't
4 he?

5        MS. LU:    Objection; speculative.

6        ADMINISTRATIVE JUDGE NORKEN:    Overruled.

7    A    I don't know. Again, the focus of
8 my conversation --

9    Q    No, no. My question is if there was a
10 clinical pastoral education course at the Clinical
11 Center, could Dr. Fitzgerald have simply directed
12 Father Heffernan to take that course at the Clinical
13 Center?

14    A    I don't know. My understanding is that
15 there are specific requirements for the CPE
16 training. Some can be satisfied by ongoing work
17 experience and others have to be satisfied through
18 courses, and so I don't know the specific
19 circumstances surrounding Father Heffernan's --

20    Q    No, that's not my question, Miss Fidlis.
21 If there was a course at the Clinical Center --

18 (Pages 791 to 794)

Page 795

1 clinical pastoral education course at the Clinical
2 Center, could Dr. Fitzgerald have directed Father
3 Heffernan to attend that course at the Clinical
4 Center?
5    A    To satisfy his CPE requirements or just to
6 take the course, period?
7    Q    Just to take the course, period, could he
8 have directed him to do that?
9    A    I suppose he could, but I don't know
10 anything about whether there is an actual course at
11 the Clinical Center offered or whether that would
12 satisfy training.
13    Q    I'm asking you to assume that there was
14 one at the Clinical Center. Assuming that there is
15 a course --
16    A    And the question is simply could Ray
17 Fitzgerald direct Father Heffernan to attend a CC
18 course? If he wanted to do that and there was no
19 violation of other Agency policy, sure, he could.
20    Q    Okay. And, in fact, isn't it true that
21 Rabbi Brenner attended a clinical pastoral education

Page 796

1 course at the NIH Clinical Center?
2    A    I don't know.
3    Q    You don't know. Dr. Fitzgerald didn't
4 tell you that Rabbi Brenner did that?
5    A    No. We discussed other staff chaplains.
6 I wanted to know how it was conveyed to the staff
7 chaplains that there were CPE requirements and I --
8    Q    But my question was whether you knew that
9 Rabbi Brenner took the clinical pastoral education
10 course at the Clinical Center?
11    A    No, I did not know that.
12    Q    You said Dr. Fitzgerald told you that
13 Father Heffernan had between three and four
14 hundred -- well, you said units, but did you mean
15 hours of clinical pastoral education that could be
16 credited?
17    A    My understanding is that they're hours or
18 units. However you want to refer to it.
19    Q    Okay. And Dr. Fitzgerald didn't tell you,
20 did he, that Father Heffernan had, in fact, taken
21 clinical pastoral education units previously, did

Page 797

1 he?
2    A    I believe that it came up that there were
3 some -- there was some prior education, there was
4 some issue about the time frame of it, but I don't
5 recall again the specifics. The focus was on how
6 many hours needed to be taken and why only a certain
7 number of hours could be credited for work
8 experience.
9    Q    Okay. Regarding the 14-day proposed
10 suspension, who did you receive information from
11 regarding the failure to -- that, for instance,
12 Father Heffernan had not complied with the training
13 requirements when you added the clinical pastoral
14 education charge?
15    A    Ray Fitzgerald.
16    Q    What did he tell you?
17    A    He told me that he had instructed all the
18 staff chaplains that they needed to comply with his
19 training requirements, he explained the
20 circumstances surrounding the Clinical Center's
21 decision to impose the CPE requirement which was to

Page 798

1 be consistent with all the other area hospitals. I
2 discussed with him exactly how this had been
3 conveyed to the staff chaplains, what each of the
4 responses were.
5    Q    Okay. I'm specifically asking about when
6 you added the charge to the 14-day suspension.
7    A    Oh, oh. I'm sorry.
8    Q    What did Dr. Fitzgerald tell you regarding
9 Father Heffernan's failure to comply with the
10 training requirements?
11    A    I don't recall the specific conversation,
12 but our interest was finding out had Father
13 Heffernan presented a proposal to obtain CPE credits
14 and had he conveyed to Dr. Fitzgerald that he
15 intended to now comply with these training
16 requirements. And again, I don't recall exactly
17 what was said, but my understanding when I came away
18 from the conversation was that it was clear that
19 Father Heffernan had, through his actions, conveyed
20 that he did not intend to follow this requirement.
21    Q    When did you discuss this with

19 (Pages 795 to 798)

Page 799

1 Dr. Fitzgerald regarding when you added the charge
2 to the 14-day suspension?
3     A   I don't recall specifically when, but I
4 certainly would have done it prior to moving forward
5 with the recommendation to impose the 14-day
6 suspension. We will often work on drafting
7 documents well before the issue date, and then right
8 before we issue them, we will confirm that all the
9 information is still correct and accurate. And the
10 reason for this is that prior to my coming on board,
11 many of the actions moved very slowly, there was
12 time lapse, and part of my role was to provide close
13 oversight and keep on top of these.
14     Q   I appreciate that, Miss Fitilis, but my
15 question is when did Dr. Fitzgerald tell Father
16 Heffernan hadn't complied with the CPE requirements?
17 regarding the 14-day suspension that Father
18     A   And again, I don't recall the specific
19 date now.
20     Q   Okay. Thank you.
21         And isn't it true that -- and you can take

Page 800

1 a look at Agency Exhibit 10, please -- on
2 March 16th, 2004, you mention that Dr. Fitzgerald
3 was leaving the next day for an extended absence
4 from the office; isn't that correct?
5     A   That's correct. That's what it states.
6     Q   So when did he return?
7     A   I don't recall.
8     Q   Was he gone for more than a week?
9     A   I don't recall.
10     Q   Isn't it true that he didn't return until
11 close to the end of the month?
12     A   I'm sorry. I don't recall.
13     Q   Okay. Well, if you take a look at Agency
14 Exhibit 6, Dr. Fitzgerald's --
15     A   Well, can you hold on one second? I don't
16 believe I have Agency Exhibit 6. I've got 9 through
17 16.
18     Q   Okay.
19     A   And I've got Complainant's Exhibit 66.
20     Q   I'll give you my copy. Agency Exhibit 6
21 is an E-mail from Dr. Fitzgerald to you dated

Page 801

1 March 29th, 2004; isn't that correct?
2     A   Correct.
3     Q   Regarding his responses to your
4 recommended changes and corrections to the 14-day
5 suspension?
6     A   Correct. That's what it appears to be.
7     Q   And is it fair to say between March 16th
8 when you E-mailed a draft to Dr. Fitzgerald and his
9 response on March 29th, he didn't respond to you
10 regarding the proposed suspension letter; isn't that
11 correct?
12     A   I'm sorry. Can you repeat that?
13     Q   Between March 16th when you E-mailed
14 Dr. Fitzgerald and March 29th when he responded to
15 you, there was no communication from Dr. Fitzgerald
16 to you regarding the 14-day suspension?
17     A   I don't know that to be true. I can tell
18 you that I turned over all of the E-mails in
19 response to discovery requests, and if there is no
20 E-mail in between March 16th and March 29th, then it
21 would appear that no, he didn't respond, but it's

Page 802

1 possible that we communicated via telephone.
2 Anything's possible. Frankly, I apologize. It's
3 almost two years ago, and I just simply don't
4 recall.
5     Q   You don't need to apologize. Just answer
6 the question the best you can. If you don't recall,
7 just say so.
8         Okay. So he E-mailed you, looking at
9 Agency Exhibit 6, on March 29th, 2004. Did
10 Dr. Fitzgerald include a charge for failure to
11 comply with CPE in that draft?
12     A   No.
13     Q   Okay. But you added it on March 30th.
14 Look at Agency Exhibit 8.
15     A   I don't have that, either. I have 9
16 through 16.
17         Yes, it appears to be.
18     MS. HARRIS: Nothing further, Judge.
19     ADMINISTRATIVE JUDGE NORKEN: Any recross?
20     MS. LU: I think I have a couple of
21 questions.

20 (Pages 799 to 802)

Arbitration

Page 803

1    ADMINISTRATIVE JUDGE NORKEN: Okay. About
2 how long?
3        MS. LU: Just about five minutes, then
4 I'll be done.
5        ADMINISTRATIVE JUDGE NORKEN: Okay.
6        RECROSS EXAMINATION
7    BY MS. LU:
8    Q    Miss Fidlis, if you'd look at the exhibit
9 marked C66.
10    A    Yes.
11    Q    And in the second paragraph, the sentence
12 that was read that "We might also include the
13 continuing failure to prepare a training plan to
14 meet the educational requirements depending on how
15 much time passes between the suspensions," do you
16 see that sentence?
17    A    Yes.
18    Q    What did you mean by "depending on how
19 much time passes between the suspensions"?
20    A    As I believe I touched on earlier, ideally
21 what we like to see when we move forward with

Page 804

1 progressive discipline is allowing an employee an
2 opportunity to remedy whatever the conduct
3 deficiencies are before we move forward to the next
4 step in terms of level of disciplinary action; so,
5 rather than moving forward from a five-day
6 suspension to a 14-day suspension for failure to
7 comply with the CPE requirements, first I wanted to
8 know, you know, is Father Heffernan responding. Did
9 he in some way convey to Dr. Fitzgerald that he was
10 willing or interested in complying with this. And
11 then if, in fact, that that was the case, obviously
12 we wouldn't move forward with the 14-day suspension.
13        But as I stated, we are prepared and have
14 kind of a process that we follow in addressing
15 employee actions, and at this point, we are planning
16 ahead for the next disciplinary action, and in this
17 case, there were other issues that were going on.
18 We knew we were getting ready to move on the next
19 level of discipline for these ongoing conduct issues
20 and new conduct issues, and if the CPE requirement
21 was still an outstanding issue and Father Heffernan

Page 805

1 hadn't indicated that he was going to comply, then I
2 felt it was important that we add that to the 14-day
3 suspension.
4    Q    And when the five-day suspensions and
5 14-day suspensions were occurring, being proposed
6 and decided, were you aware of any indication or
7 statement from Father Heffernan that he was willing
8 to take CPE training?
9    A    No, I was not. In fact, I recall — and
10 I'm not certain where this fell in the time frame —
11 but ongoing communication with Dr. Fitzgerald in
12 which he had conveyed to me Father Heffernan's
13 ongoing blatant refusal to follow his instructions,
14 and my concern --
15        MS. HARRIS: Objection. Move to strike as
16 nonresponsive. This isn't regarding the CPE issue.
17        ADMINISTRATIVE JUDGE NORKEN: Restate the
18 question.
19        MS. LU: I had asked her if during the
20 five-day suspension time period and 14-day
21 suspension time period was being proposed and

Page 806

1 decided, was there any indication or statement she
2 was aware of or intent on the part of Father
3 Heffernan that he would comply with the CPE
4 training.
5        MS. HARRIS: And she responded no and then
6 she went on a tangent, and I'm moving to strike as
7 nonresponsive. The answer to the question is yes or
8 no.
9        ADMINISTRATIVE JUDGE NORKEN: Overruled.
10 You may proceed.
11    A    So, again, I don't recall the specific
12 dates and when the conversations took place, but I
13 recall that there was ongoing communication that I
14 had with Ray Fitzgerald in which I would check on
15 the status of the working relationship between he
16 and Father Heffernan, and what he conveyed to me led
17 me to believe that we were not dealing with an
18 individual that was willing to what we refer to as
19 rehabilitate.
20        MS. LU: That's all the questions I have.
21        ADMINISTRATIVE JUDGE NORKEN: Off the

21 (Pages 803 to 806)

Page 807

1 record.

2 (Witness leaves the hearing room.)

3 (Discussion off the record.)

4 (Witness returns to the hearing room.)

5 ADMINISTRATIVE JUDGE NORKEN: I have a

6 question. Father Heffernan finished serving his

7 suspension on the 19th of March, right?

8 THE WITNESS: If that's what's been

9 stipulated to, but I don't have any firsthand

10 knowledge of that.

11 ADMINISTRATIVE JUDGE NORKEN: That's what

12 was stipulated to.

13 THE WITNESS: Okay.

14 ADMINISTRATIVE JUDGE NORKEN: And

15 normally, you suspend people for a work week, right?

16 THE WITNESS: Calendar days. So we do

17 suspend over weekends and days the employee does not

18 work.

19 ADMINISTRATIVE JUDGE NORKEN: But for a

20 five-day suspension, it would be a Monday through

21 Friday, right?

Page 808

1 THE WITNESS: Correct. They're

2 consecutive days.

3 ADMINISTRATIVE JUDGE NORKEN: So he would

4 have returned on the 22nd of March?

5 THE WITNESS: That sounds about right.

6 ADMINISTRATIVE JUDGE NORKEN: On Monday,

7 the 22nd?

8 THE WITNESS: Assuming he works on

9 Mondays, yes.

10 ADMINISTRATIVE JUDGE NORKEN: The decision

11 to add the CPE charge a second time for the 14-day

12 suspension, the decision to add that was made one

13 week later on the 29th, correct?

14 THE WITNESS: That sounds correct, yes.

15 ADMINISTRATIVE JUDGE NORKEN: Now, the

16 decision to add the charge, was that based upon his

17 failure to act during that one week or was it based

18 upon his failure to act from the point in time of

19 the proposed suspension, the first one?

20 THE WITNESS: Frankly, I don't recall

21 specifically what ran through my mind at that time,

Page 809

1 but I can tell you in thinking about it my

2 recommendation and my gut reaction sitting here now

3 is my thoughts would be that the employee --

4 MS. HARRIS: Move to strike. Her thoughts

5 now aren't -- that's not responsive. You asked her,

6 Judge, whether -- what she thought at the time.

7 ADMINISTRATIVE JUDGE NORKEN: Sustained.

8 You just don't recollect. Is that what

9 you're saying?

10 THE WITNESS: I don't recollect

11 specifically --

12 ADMINISTRATIVE JUDGE NORKEN: Do you have

13 a general policy that you use?

14 THE WITNESS: The general policy is my

15 guidance and advice and personal overall opinion

16 which was what I was about to convey to you, but we

17 don't have anything written or concrete. A lot of

18 our guidance and advice that we offer in these

19 situations is based on the table of penalties

20 clearly and other policies and regulations, but also

21 on just a basic element of what we believe is

Page 810

1 fairness and opportunity coupled with information

2 that we receive from the supervisor.

3 ADMINISTRATIVE JUDGE NORKEN: What general

4 policy do you follow with regard to a second

5 suspension on a failure to comply? Do you set the

6 time period from the point in time of the notice of

7 proposed first suspension or do you set it from the

8 point in time that the employee comes back from the

9 first suspension?

10 THE WITNESS: I wish, Judge Norken, that I

11 could tell you that every time, this is exactly how

12 we do it and we apply it consistently, but

13 unfortunately, it's a case-by-case basis and we

14 don't have anything. And my reaction to these

15 situations is what is fair? Did the employee have

16 sufficient period of time to comply? If the

17 suspension is based upon a conduct issue that took

18 place in the workplace, I would want to give the

19 employee ample time to demonstrate compliance. Is a

20 week sufficient time to do it? Sometimes yes,

21 sometimes no. In this case, I can tell you that if

22 (Pages 807 to 810)

Arbitration

Page 811

1 I didn't feel a week was appropriate, that I would
2 have expressed that and I would hope that this
3 14-day suspension would not have been proposed.
4           ADMINISTRATIVE JUDGE NORKEN: Well, was a
5 week sufficient?
6           THE WITNESS: In my opinion, if the
7 employee was suspended for five days and could have
8 thought about it or given some thought in the one
9 week, yes, because if Ray Fitzgerald had come to me
10 and said when I contacted him or come to me and
11 said, "Father Heffernan has indicated that he wants
12 to comply with the CPE training requirement and has
13 come with a legitimate proposal, but we need more
14 detail and it's going to take some time," that to me
15 would have been an indication that this employee
16 clearly intended to comply with this policy, and I
17 would not say, "Oh, it's been one week and he hasn't
18 come up with a concrete policy or idea of how he's
19 going to meet these objectives and, therefore, we're
20 going to move forward with a 14-day suspension." I
21 simply would not do that. I would really be gauging

Page 812

1 it based upon what the employee had communicated and
2 did the employee get the message that he or she --
3 in this case he -- needed to comply with this
4 instruction and this requirement.
5           ADMINISTRATIVE JUDGE NORKEN: I don't have
6 any other questions.
7           Do you have any questions due to my scope
8 or Miss Lu's questions?
9           MS. HARRIS: I do have one, Judge.
10           ADMINISTRATIVE JUDGE NORKEN: Okay.
11           RE-DIRECT EXAMINATION
12 BY MS. HARRIS:
13    Q   Miss Fitilis, obviously, Dr. Fitzgerald
14 would have to be on duty during that week when
15 Father Heffernan returned in order for Father
16 Heffernan to be able to contact him and talk to him
17 about his plan, correct?
18    A   Not necessarily. Actually, Ray Fitzgerald
19 does a lot of communication from outside the office.
20 In fact, recently he was out and he was hospitalized
21 in surgery and --

Page 813

1           MS. HARRIS: Move to strike. That's
2 nonresponsive, Judge.
3           ADMINISTRATIVE JUDGE NORKEN: The answer,
4 you just want a yes or no, right?
5           MS. HARRIS: Yes.
6           ADMINISTRATIVE JUDGE NORKEN: So the
7 answer was no?
8           THE WITNESS: Is no.
9 BY MS. HARRIS:
10    Q   So you expected Father Heffernan to
11 contact Dr. Fitzgerald even if Dr. Fitzgerald was on
12 leave?
13    A   Yes.
14           MS. HARRIS: Nothing further.
15           ADMINISTRATIVE JUDGE NORKEN: Anything
16 else due to the scope of my questions?
17           MS. LU: Yes, one follow-up.
18           RECROSS EXAMINATION
19 BY MS. LU:
20    Q   Couldn't Father Heffernan also have left a
21 note in Dr. Fitzgerald's box while he was out saying

Page 814

1 "I'll do CPE" so that it will be there when
2 Dr. Fitzgerald came back?
3    A   Or sent an E-mail, yes.
4    Q   Or sent an E-mail.
5    A   Yes.
6    Q   There's other ways to convey his --
7           ADMINISTRATIVE JUDGE NORKEN: Sent who an
8 E-mail?
9           THE WITNESS: Sent Ray Fitzgerald an
10 E-mail.
11           ADMINISTRATIVE JUDGE NORKEN: Okay.
12    Q   Just other ways to convey his intent to
13 comply other than verbal person-to-person contact?
14    A   Correct. And keep in mind that this was a
15 proposed 14-day suspension.
16    Q   Okay. Why did you say that?
17    A   Because it's a proposal, meaning that
18 Father Heffernan had an opportunity to reply.
19    Q   Oh, right. And which he did.
20    A   And could have conveyed that he intended
21 to comply with the requirements, which he did not.

23 (Pages 811 to 814)

Page 815

1    Q    In his reply?

2    A    Correct, at which point my recommendation

3  may have been to pull back that charge and not

4  uphold it to the deciding official.

5        MS. LU:  That's all the questions I have.

6        MS. HARRIS:  Nothing further.

7        ADMINISTRATIVE JUDGE NORKEN:  Is this

8  witness going to be used in rebuttal?

9        MS. HARRIS:  I don't think so.

10       MS. LU:  I don't believe so.

11       ADMINISTRATIVE JUDGE NORKEN:  Miss Fitilis,

12 I remind you you're not to discuss this case or your

13 testimony in this case with any other witness in the

14 case until these proceedings are ended.  My previous

15 order that you not speak to anyone about the case is

16 now expired, and I thank you for your testimony.

17 You're excused.  Thank you.

18       THE WITNESS:  Thank you.

19       ADMINISTRATIVE JUDGE NORKEN:  Next

20 witness.

21       MS. LU:  It will be Rabbi Brenner, but

Page 816

1  could we take a short break?

2        ADMINISTRATIVE JUDGE NORKEN:  Yes.  We'll

3  take a 10-minute break?

4        MS. LU:  Yes, that would be fine.

5        ADMINISTRATIVE JUDGE NORKEN:  Off the

6  record.

7        (Brief Recess.)

8        ADMINISTRATIVE JUDGE NORKEN:  Rabbi

9  Brenner, I'm David Norken.  I'm the Administrative

10 Judge.  If you would please raise your right hand

11 and state your full name for the record.

12       THE WITNESS:  Reeve Robert Brenner.

13 WHEREUPON --

14       REEVE ROBERT BRENNER,

15 a Witness, called for examination by counsel for the

16 Complainant, and after having been first duly sworn

17 by the Administrative Judge, was examined and

18 testified as follows:

19       ADMINISTRATIVE JUDGE NORKEN:  How long for

20 this witness?

21       MS. HARRIS:  Forty-five minutes.

Page 817

1        ADMINISTRATIVE JUDGE NORKEN:  You may

2  examine.

3        DIRECT EXAMINATION

4        BY MS. HARRIS:

5    Q    Good afternoon, Rabbi Brenner.  Are you

6  currently employed at the National Institutes of

7  Health?

8    A    I am.

9    Q    And what is your position there?

10   A    Rabbi or the Jewish chaplain of the

11 Clinical Center.

12   Q    How long have you worked at the Clinical

13 Center?

14   A    Six years.

15   Q    Okay.  So that means you began in what

16 year?

17   A    Oh, my.  Well, I had in '98, I want to

18 say, quite a number of visitations on an unofficial

19 basis, and then sometime in '98, I guess it was,

20 that I was asked to submit an application to come on

21 staff, which I did.

Page 818

1    Q    Do you currently work full-time at NIH?

2    A    Half-time.

3    Q    And has that been the case since 1998?

4    A    It has.

5    Q    Are there other Jewish chaplains at NIH

6  Clinical Center?

7    A    No.

8    Q    And so during this whole period 1998 'til

9  now, you've been the only Jewish chaplain?

10   A    Yes.

11   Q    And what are your -- generally, when you

12 come to NIH on a half-time basis, what do you do?

13   A    I visit patients -- Jewish patients.

14 That's my stated objective.  I'm also -- I've also

15 been at CPE now at the Shady Grove Hospital where

16 I'm visiting other types of patients.

17   Q    Okay.  I'll get back to CPE in a minute,

18 but what days do you work at the NIH Clinical Center

19 currently?

20   A    Monday, Wednesdays, and Fridays.

21   Q    Has that been the case since 1998?

24 (Pages 815 to 818)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                                    :
Plaintiff *pro se*,

v.                                             :

                                                          C.A. No.  1:07-cv-02308(RMC)

WILLIAM BIGLOW, *et al.*
Defendants.                                    :
                                        ...oOo...

Transcript of testimony of Rev. Dominic Ashkar at EEOC Hearing,
*Heffernan v. Leavitt*, Secretary DHHS, EEOC Case No. 120-2005-00226x

Hr'g 12/15/05     pgs 319-323; 400-431

EXHIBIT 7—A

Page 319

1          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

2                  BALTIMORE, MARYLAND OFFICE

3                          HEARING

4

5  HENRY G. HEFFERNAN,                    :

6   Complainant,                          :

7        V.                               :   EEOC Case No.

8  MICHAEL O. LEAVITT, SECRETARY:   120-2005-00226x

9  U.S. DEPARTMENT OF HEALTH      :   Agency Case No.

10  and HUMAN SERVICES,            :   CC-EEO-2004-2004

11   Agency.                               :

12                  - - - - - - - - - -

13                         VOLUME II

14

15     Before:  ADMINISTRATIVE JUDGE, DAVID NORKEN

16

17       Equal Employment Opportunity Commission

18          10 South Howard Street, Suite 3000

19               Baltimore, Maryland  21201

20

21  Reported by:  Lori Goodin Mackenzie, RPR

22  Job No.  171688

Page 320

```
 1  APPEARANCES:
 2
 3  Administrative Judge:
      David Norken
 4
    For Complainant:
 5  CATHY HARRIS, Esquire
    IRVING KATOR, Esquire
 6  Kator, Parks & Weiser
    1020 19th Street, N.W., Suite 350
 7  Washington, D.C.  20036
    202-898-4800
 8  202-289-1389 (fax)
    jkator@katorparks.com
 9
    For the Agency:
10  JULIE S. LU, Esquire
    Department of Health & Human Services
11  General Law Division
    Cohen Building, Room 4760
12  330 Independence Avenue, S.W.
    Washington, D.C.  20201
13  202-619-0174
    202-619-2922 (fax)
14  julie.lu@hhs.gov
15
16  Also Present:  Nisha Bhatt, Legal Assistant
17
18
19
20
21
22
```

Page 321

```
 1                    WITNESSES
 2                         D    C    RD   RC   A
 3  FATHER HENRY G. HEFFERNAN   326  390  399
 4  FATHER ASHKAR              406  428       466
 5  DANA CHERISE KELLY         470  490  498
 6  LEONARD S. COX            503  511  515  516
 7  HILLARY FITILIS           524  588
 8  GARY JOHNSTON             636  707  715  717
 9
10                    EXHIBITS
11  COMPLAINANT'S
12  NO.   DESCRIPTION       MARKED   RECEIVED
13  64    Document           392      392
14  40    E-mail from Joan Martin  541   563
15  47    Two e-mails        563      572
16  52    E-mail dated
17        March 9th, 2004    584      636
18  1A    Document           654      688
19  10    Chaplain Johnston's
20        Affidavit          688
21
22
```

Page 322

```
 1              EXHIBITS (Continued)
 2  EEOC'S
 3  NO.   DESCRIPTION           MARKED   RECEIVED
 4  2     List                   342
 5  3     Document from Department
 6        of Veterans Affairs    363      370
 7  4     Exhibit 23 of the
 8        Complainant's opposition  454
 9  AGENCY'S
10  NO.   DESCRIPTION           MARKED   RECEIVED
11  1     Request for an Extension
12        to reply to the five-day
13        proposed suspension    332      333
14  2     Document related to
15        bi-ritual faculties    403      405
16  3     Monthly newsletter of
17        National Association of
18        Catholic Chaplains     411
19  4     Document               493      497
20  5     E-mail dated Tuesday,
21        March 16, 2004 with Notice
22        of Proposed Suspension  611      613
```

Page 323

```
 1              EXHIBITS (Continued)
 2  AGENCY'S
 3  NO.   DESCRIPTION           MARKED   RECEIVED
 4  6     E-mail dated
 5        March 29, 2004 with
 6        draft Notice of Proposed
 7        Suspension             614      615
 8  7     E-mail dated
 9        March 29, 2004 regarding
10        Proposed 14-day Suspension  615   620
11  8     E-mail dated
12        March 30th, 2004       520      622
13
14
15
16
17
18
19
20
21
22
```

2 (Pages 320 to 323)

Page 400

1   Q.    And, you told him this in June of
2 2004, you stated here, correct?
3   A.    Was the meeting.
4        MR. KATOR:   What was the question?
5 I'm sorry.
6 BY MS. LU:
7   Q.    You told Mr. Jones that you would be
8 willing to take CPE, you stated here in your
9 testimony in June of 2004; is that correct?
10        JUDGE NORKEN:   You can't ask your
11 lawyer questions.
12        MR. KATOR:   Just answer it.
13        THE WITNESS:   The answer is yes.
14        MS. LU:   That's all.
15        JUDGE NORKEN:   One moment.   I don't
16 have any other questions.
17        MR. KATOR:   I have no further
18 questions.
19        JUDGE NORKEN:   Okay.   You may stand
20 down.
21        (Witness excused.)
22        JUDGE NORKEN:   Your next witness.

Page 401

1        MS. HARRIS:   Could we take a quick
2 break?
3        JUDGE NORKEN:   Sure.   We will take a
4 10-minute break.   Off the record.
5        (Recess -- 11:29-11:43 a.m.)
6        JUDGE NORKEN:   I am David Norken,
7 the administrative judge.   I would like each of
8 you to state your name for the record.
9        MR. JOHNSTON:   Gary Johnston.
10        JUDGE NORKEN:   I have issued an
11 order that applies to all witnesses not to
12 discuss this case or their testimony in this case
13 with any other witness in this case, is that
14 clear and understood?
15        FR. ASHKAR:   Yes.
16        MS. KELLY:   Yes.
17        MR. JOHNSTON:   Yes.
18        JUDGE NORKEN:   Okay.   I think we are
19 going to continue with you, Father Ashkar, so, if
20 you would take the stand.   The rest can go back
21 to the witness room for now.
22        Father Ashkar, if you would raise

Page 402

1 your right hand.   Please state your full name
2 again for the record.
3        FR. ASHKAR:   Dominic Ashkar.
4        FATHER DOMINIC ASHKAR,
5 a witness called for examination, having been
6 first duly sworn, was examined and testified as
7 follows:
8        JUDGE NORKEN:   You may examine.   How
9 long for this witness?
10        MS. LU:   I'll try to keep it to 30
11 minutes.
12        JUDGE NORKEN:   Okay.
13        DIRECT EXAMINATION
14 BY MS. LU:
15   Q.    Hi, Father Ashkar.   Just some
16 background information.
17        Are you a Maronite Catholic priest?
18   A.    Yes, ma'am.
19   Q.    What is a Maronite Catholic priest?
20   A.    It's an Eastern Catholic church, the
21 only Catholic church that does not have an
22 orthodox counterpart.

Page 403

1   Q.    An orthodox counterpart?
2   A.    It does not have an orthodox
3 counterpart.
4   Q.    What does that mean?
5   A.    All of the eastern churches split
6 from the west, beginning with the ninth century.
7 And then, when they started coming back in union
8 with Rome there was Catholic, Byzantine Catholic,
9 Byzantine Orthodox, Coptic Catholic, Coptic
10 Orthodox, Armenian Catholic, Armenian Orthodox.
11        So the Maronite church does not have
12 an orthodox counterpart, meaning it has been
13 always in union with Rome.
14   Q.    And are you able to perform the
15 Roman Catholic liturgy?
16   A.    For the past 42 years, I have been
17 doing it, yes.
18   Q.    Okay.   Let me just show you this
19 document which will be entered as Agency 2.
20        (Agency Exhibit Number 2
21        marked for identification.)
22        JUDGE NORKEN:   Okay.   This, yes.

22 (Pages 400 to 403)

Page 404

1 Agency Exhibit 2.

2 BY MS. LU:

3      Q.    Do you recognize that document

4 father?

5      A.    Yes ma'am.

6      Q.    Can you tell us what it is?

7      A.    Every time we have to perform any

8 ceremonies in a different rite, we ask the local

9 bishop to write a letter in agreement with my own

10 bishop, and they would send this to Rome, and

11 they will give what you see on the second page.

12           The permission that is good for five

13 years, and every five years it is renewed.

14      Q.    Okay.

15      A.    That is what we call the bi-ritual

16 faculties, that means you can celebrate in two

17 different rites.

18      Q.    In which two rites can you celebrate

19 in?

20      A.    In our Maronite Eastern rite and the

21 Roman rite.

22           MS. LU:  I would like to admit this

Page 405

1 exhibit.

2           JUDGE NORKEN:  Any objection?

3           MR. KATOR:  I note, Judge Norken,

4 the second page is in Latin.  I won't object to

5 the notion that Father Ashkar has testified that

6 this gives him a right to carry out bi-ritual

7 faculties.

8           But, I do point out, for the record,

9 that it's truly his testimony and not this

10 particular record that shows that.

11           JUDGE NORKEN:  Well, are you

12 objecting?

13           MR. KATOR:  No.  With that caveat, I

14 won't object to it.

15           JUDGE NORKEN:  It is admitted.

16           (Agency Exhibit Number 2

17           received in evidence.)

18 BY MS. LU:

19      Q.    And, Father Ashkar, how long have

20 you been a priest?

21      A.    I was ordained in 1962.  That makes

22 it what, 43 years.

Page 406

1      Q.    And, are you currently a contract

2 Chaplain at the Clinical Center?

3      A.    Yes.  I have been helping for the

4 past four years, and they call it contract

5 Chaplain, that's what they call it.

6      Q.    You have been there for four years?

7      A.    I think that's, yes, I started in

8 2001, I think.

9      Q.    Okay.  Did you -- where did you work

10 before the Clinical Center?

11      A.    I worked for 13 years in Walter Reed

12 Army Medical Center.

13      Q.    As a Chaplain?

14      A.    As a Chaplain, yes, Catholic

15 Chaplain.

16      Q.    When you started at the Clinical

17 Center, what was your schedule?

18      A.    I started as a CPE student, and the

19 CPE student has to do some visitation work, and

20 report on different cases.

21           And, my work consisted on visiting

22 the outpatient, outpatients, they come and they

Page 407

1 go every day.  There are hundreds of them.

2      Q.    Well, when you were hired as a

3 contract Chaplain, I would like to know what you

4 were hired, what your schedule was going to be

5 when you were hired as a contract Chaplain.

6      A.    First, it was to relieve Father

7 Heffernan on his day off to say mass on Thursday,

8 and to hold the beeper for 20 nights.

9           Because each Chaplain had the beeper

10 for 10 days and 20 other nights, myself or

11 another priest from our community will keep the

12 beeper, and we say mass on Thursday.

13      Q.    Okay.  When you say keep the beeper,

14 does that mean being on-call?

15      A.    On-call for the night.

16      Q.    Okay.  And, when you performed mass

17 at the Clinical Center, do you perform the Roman

18 Catholic liturgy?

19      A.    Always, yes.

20      Q.    And, are you familiar with the

21 clinical pastoral education, or CPE?

22      A.    Yes.  I have five units.

23 (Pages 404 to 407)

## Page 408

1    Q.    Okay.  We'll get there.  You have

2 taken CPE courses then?

3    A.    Yes, ma'am.

4    Q.    Okay.  And, you, how many units of

5 CPE do you have?

6    A.    I took four at NIH and the National

7 Association of Catholic Chaplains granted me the

8 equivalency of one unit for past experiences.

9    Q.    And, are you a certified healthcare

10 Chaplain?

11    A.    By the National Association of

12 Catholic Chaplains for five years, and it has to

13 be renewed every five years, and you have to take

14 so many hours also every year to be certified.

15    Q.    And, when did you start CPE courses?

16    A.    I started looking in the year 2000

17 because they kept saying, and everybody has been

18 announcing it again and again that every Chaplain

19 needs to have the CPE, it began at Walter Reed.

20         I looked all over from Baltimore to

21 Washington and the first time I applied at NIH I

22 received a call, and they said you look

## Page 409

1 overqualified for us, but we have enough students

2 for this year, we couldn't take you.

3    Q.    So, you started to look into taking

4 CPE while you were still at Walter Reed?

5    A.    Yes.

6    Q.    Okay.  And, why did you start doing

7 that again?

8    A.    Because the Chief Chaplain there

9 informed me that all Chaplains need to have the

10 CPE.

11         And, he suggested that himself, me,

12 and two other chief chaplains would have a

13 special session at Walter Reed, because they have

14 the CPE program.

15         And, when I applied there, they said

16 it's only for military, we cannot take you, you

17 are a civilian.

18    Q.    So, for the CPE programs, you have

19 to apply to these programs and be accepted?

20    A.    Yes.  The NIH doesn't charge.  Most

21 of the other institutions they charge you.

22    Q.    Okay.  And, when you were at Walter

## Page 410

1 Reed and they told you you had to take CPE and

2 you had also just testified about more and more

3 hospitals wanting CPE, or requiring CPE, can you

4 explain that?

5    A.    That's what I -- every time I read

6 announcements for, in advertisements looking for

7 Chaplains, almost every announcement included a

8 minimum of two units of CPE.

9         But, most of them they ask for four

10 units and to be certified by one of the five

11 major institutions, such as National Association

12 of Catholic Chaplains, the Professional

13 Chaplains, the Jewish Chaplains, ACPE.

14         And they put a letter all together

15 making the distinct definition between a Chaplain

16 who was certified and the others they call them

17 the clergy, the local clergy, so they make a

18 difference between the two.

19         And they sign this letter, the five

20 of them about, if I'm not mistaken, a year or two

21 ago.

22    Q.    Okay.  Let me show you this document

## Page 411

1 which I guess will be Agency 3.

2              (Agency Exhibit Number 3

3              marked for identification.)

4 BY MS. LU:

5    Q.    Do you recognize this document?

6    A.    Sure, and they pay for it.  That is

7 the magazine of the National Association of

8 Catholic Chaplains.

9    Q.    When you talk about

10 advertisements --

11         MR. KATOR:  Ms. Lu, may I ask Judge

12 Norken to find out where this is from, what it's

13 a part of.

14         MS. LU:  I'm sorry?

15         JUDGE NORKEN:  He already said it

16 was from the National Association of Catholic

17 Chaplain's magazine.

18         MS. HARRIS:  What exhibit was this

19 of your prehearing, that's my question.

20         MS. LU:  Oh.

21         MS. HARRIS:  Is this something that

22 you proffered as an exhibit before?

24 (Pages 408 to 411)

Page 412

1          MS. LU:  I never submitted a proffer
2 for, I submitted exhibits for my motion, but, I
3 didn't submit a full proffer of exhibits I would
4 use at trial.
5          MS. HARRIS:  Well, where was this,
6 was this a part of your motion?
7          JUDGE NORKEN:  Yes.
8          MS. LU:  I think it was.
9          MS. HARRIS:  I just want to know
10 which one, so I can find it.
11          MS. LU:  Okay.  Well, I don't have
12 that on hand, but maybe --
13          JUDGE NORKEN:  It is -- let me make
14 sure.  It's Motion Exhibit J.
15          MS. HARRIS:  Thank you.
16          MS. LU:  Thank you.
17          JUDGE NORKEN:  Okay.
18          THE WITNESS:  This is the monthly
19 newsletter.
20 BY MS. LU:
21     Q.    This is monthly newsletter.
22     A.    Of the National Association of

Page 413

1 Catholic Chaplains.
2     Q.    When you were talking about looking
3 at advertisements --
4     A.    You want to see them at the end, the
5 few last pages.
6     Q.    Okay.  This is what you were
7 referring to --
8     A.    Yes.
9     Q.    -- in terms of requirements.
10     A.    Yes.
11     Q.    Well, now this particular one is
12 dated April 2005, correct?
13     A.    Uh-huh.
14     Q.    Have you seen --
15          JUDGE NORKEN:  Was that a yes?
16          THE WITNESS:  Yes.  Yes, sir.
17 BY MS. LU:
18     Q.    Had you seen prior newsletters from
19 Vision, like in 2000, 2001, 2002, 2003?
20     A.    Yes.  Because I had other Chaplains
21 working at Walter Reed and that's how I get
22 introduced to the National Association of

Page 414

1 Catholic Chaplains.  So, I will see their
2 magazine.
3     Q.    You would see their copy of the
4 submission?
5     A.    Their copy, yes.
6     Q.    And, you would also look at the
7 announcements, job announcements there?
8     A.    Yes.  Yes, ma'am.
9     Q.    And, they would also state what was
10 required with regards to CPE?
11     A.    Yes, ma'am.  Most of them they do
12 specify to be, to have four units of CPE and be
13 certified by one of the agencies.
14     Q.    How about in training, is that okay,
15 someone who --
16     A.    In training, some of them would say
17 if you are in training, we will accept you.
18     Q.    How about like if you're willing to
19 take it?
20          You're not in training, you're not
21 certified, but, if you're willing to take CPEs?
22     A.    This I never paid attention to it.

Page 415

1     Q.    Okay.
2     A.    But, there are some announcements
3 insisting on either having, being certified or in
4 the process of that.
5     Q.    Okay.
6          MS. LU:  I would like to admit this
7 into evidence.
8          JUDGE NORKEN:  Any objection?
9          MR. KATOR:  I would object on the
10 basis it's outside.  This is April of 2005, it
11 was pointed out, which is outside of the time
12 frame.
13          It has no relevance, really, to what
14 Father Ashkar is testifying to.
15          MS. LU:  And he testified also about
16 that in terms of prior editions that he had seen.
17          JUDGE NORKEN:  You had another one,
18 didn't you, that was a similar exhibit?
19          MS. LU:  We probably --
20          JUDGE NORKEN:  Exhibit K.
21          MS. LU:  Uh-huh.
22          JUDGE NORKEN:  What's the date of

25 (Pages 412 to 415)

Page 416

1 that?

2          MS. HARRIS:  April 2005.

3          MS. LU:  This was also 2005.

4          THE WITNESS:  May I add this, these

5 announcements also are on the internet every

6 month, and they change.  If you go to National

7 Association of Catholic Chaplains, positions

8 wanted, you would find it.

9          JUDGE NORKEN:  Let me ask you this,

10 are these, are the job announcements that are

11 contained in Agency Exhibit 3 similar job

12 announcements in earlier issues of Vision?

13          THE WITNESS:  They are being

14 improved.  The whole magazine is being improved.

15 It started less than that.

16          JUDGE NORKEN:  In the time period of

17 2002, 2003, 2004, were similar job announcements

18 contained in Vision?

19          THE WITNESS:  Yes.

20          JUDGE NORKEN:  Did you go, did you

21 look at those?

22          THE WITNESS:  I have the latest one,


Page 417

1 this month.

2          JUDGE NORKEN:  We're not interested

3 in the latest one, we're interested in the ones

4 time period 2002 to 2004.

5          THE WITNESS:  Yes, sir.

6          JUDGE NORKEN:  Do you know whether

7 they said anything about CPE units in previous

8 editions?

9          THE WITNESS:  I wasn't paying that

10 much attention that time.  But, they were, the

11 priests worked with me, most of them were

12 certified.

13          And, they talked about it and they

14 said you can do, in the future you can do without

15 being certified without having the units of CPE.

16          That's when they started talking

17 about it, and my interest started growing.

18          Unless you go inside a system, you

19 cannot really judge it.  Unless you take the CPE,

20 you cannot criticize it or say it s not needed.

21 That was my approach to it.

22          JUDGE NORKEN:  I'm going to sustain


Page 418

1 the objection.  You may continue.

2 BY MS. LU:

3          Q.    Father Ashkar, when you started at

4 the Clinical Center, did Dr. Fitzgerald tell you

5 about the CPE requirement at the Clinical Center?

6          A.    Yes, ma'am.

7          Q.    And, what did he tell you?

8          A.    That every Chaplain should have the

9 CPE, four units of CPE.

10          Q.    Okay.  And, did he say anything

11 about being certified?

12          A.    That was included in the program.

13 If, I don't recall, if he said it, about the

14 certification.

15          But, when you go and start searching

16 in these mainstream groups, they all ask for

17 certification.

18          Q.    At the Clinical Center, do you get a

19 list of the Catholic patients to visit?

20          A.    Every day.

21          Q.    Okay.  And, have you been receiving

22 these lists of Catholic patients since you


Page 419

1 started at the Clinical Center?

2          A.    Yes, ma'am.  Every morning.

3          Q.    Do you also see other patients,

4 other than non-Catholic patients?

5          A.    Every day.  Like --

6          JUDGE NORKEN:  I'm not sure I

7 understand your question.  Are you saying does he

8 visit --

9 BY MS. LU:

10          Q.    Do you visit with patients who are

11 non-Catholics, too.

12          A.    When I visit the outpatients, I

13 never ask about their religion unless I know, and

14 there you see all different religions.  Yes.

15          Q.    Okay.  With the outpatients that you

16 visit, so, what would your visit with the

17 outpatient be like?

18          A.    To say good morning.  If I had seen

19 them before, welcome them again.  If they know

20 me, they will stand up and come and talk to me.

21          They are of different religions.  I

22 have a Rabbi who always tells me, hey, you know


26 (Pages 416 to 419)

Page 420

1  I'm Jewish, but, sit down, I'd like to talk to
2  you, in front of everybody.
3           Another one, I'm an atheist, but I'd
4  like to talk to you. I cannot refuse those
5  people, but I don't try to impose my religion on
6  them.
7           And most of them now know that I
8  have a, one of my doctorates is in Islam, minors,
9  the two minors, Judaism and Buddhism, and they
10  like to talk about their own religion.
11           And I don't try to sell my religion
12  to any of them.
13      Q.    And what would happen if one of the
14  non-Catholic patients you see would like to see
15  someone of their own faith, what would you do?
16           MR. KATOR:  Let me object to this
17  line of questioning. I understood that his
18  testimony was just to be for the CPE requirements
19  and we are going much beyond that.
20           Can you state what the purpose is?
21  That was a proffer was simply for the CPE, as I
22  understood it, or as we understood it.

Page 421

1           JUDGE NORKEN:  I'm going to
2  overrule. You may continue.
3           THE WITNESS:  May I respond?
4  BY MS. LU:
5      Q.    Go ahead, answer the question that I
6  asked you.
7           JUDGE NORKEN:  You can answer.
8  BY MS. LU:
9      Q.    What would happen if a non-Catholic
10  patient asked not to see you, but to see someone
11  of their own faith? What would you do?
12      A.    There is always the referral. And
13  during the CPE classes we insist always on that.
14           MR. KATOR:  This is a hypothetical
15  and I object on that basis.
16           JUDGE NORKEN:  Sustained. Why don't
17  you just ask him what he does.
18           MS. LU:  I thought that's what I
19  did.
20           JUDGE NORKEN:  You threw a bunch of
21  ifs in it. What does he do.
22  BY MS. LU:

Page 422

1      Q.    Father Ashkar, what do you do you
2  say when a non-Catholic patient doesn't want to
3  talk to you?
4      A.    I ask their religion.
5           MR. KATOR:  Foundation. I object on
6  that basis.
7           JUDGE NORKEN:  Overruled.
8  BY MS. LU:
9      Q.    Go ahead. You can answer the
10  question father.
11      A.    I always ask them, like many times
12  it happens that there are two patients in one
13  room, one Catholic and one non-Catholic.
14           I give communion to one, to the
15  Catholic. And the other one said, oh, I want
16  communion, too. Sir, or ma'am, what is your
17  religion?
18           I'm a Protestant, Father. Okay, I
19  will send the Protestant Chaplain to attend to
20  your needs.
21      Q.    Has Dr. Fitzgerald ever asked you to
22  give a sacrament to a non-Catholic?

Page 423

1      A.    No.
2      Q.    Would you ever do that if he asked
3  you?
4      A.    To give Catholic --
5      Q.    To give the sacrament, a Catholic
6  sacrament to a non-Catholic?
7      A.    Now, there are some people who come
8  to the chapel when I am saying mass, how would I
9  know if they are Catholic or not, if they come
10  and receive without my knowledge.
11      Q.    Father Ashkar, do you know father
12  Heffernan?
13      A.    Sure, I do.
14      Q.    How do you know Father Heffernan?
15      A.    Few days after, I think they had a
16  meeting and Father Heffernan was objecting that
17  he has no relief, and that day I received a phone
18  call to Walter Reed Hospital.
19           They asked to talk to a Catholic
20  Chaplain, and I happened to be there.
21           And, Ray Fitzgerald was looking for
22  a priest to say mass there on Thursday. And he

27 (Pages 420 to 423)

Page 424

1 came to see me at the hospital, Ray Fitzgerald.

2          Then two days or three days later

3 Father Heffernan called me and I invited him to

4 come and have dinner with me.

5          And he came with a stack of paper

6 and talking about the hospital, and about the

7 CPE, and many other things.

8          And, then he called a few days later

9 again.  I asked him to come and have dinner with

10 me because it's the best time to talk.

11          Again, he came with another stack of

12 paper and was talking to me about different

13 issues in the hospital.  And, I said I was called

14 to do, to say the mass on Thursday and to hold

15 the beeper 20 nights, all of the rest, I have

16 nothing to do with it.

17          I cut it short, not because I have

18 anything against my brother priest, Father

19 Heffernan, but because the one who calls me to do

20 the work, I try to do it and be done with it.

21          I don't have any time to go into

22 what was going on in the NIH, or to read stacks

Page 425

1 and stacks of papers that do not pertain to my

2 work.

3          Q.      Now, in the CPE programs that you

4 have taken, can you explain to us what that

5 program is like?

6          Is there a structure to that

7 program?

8          A.      There is structure and all over the

9 industry it is almost the same program.  First,

10 there are conferences, talks, then you go visit

11 patients and you are supervised and you are asked

12 to give verbatims.

13          And, these verbatims, without

14 putting the name of the patient, these verbatims

15 are discussed in a group which will give you the

16 capability to see if you are doing things for

17 yourself or to help the patient.

18          And the total of every unit of CPE

19 is about 400 hours work between classes and

20 discussions and visitation, verbatims and writing

21 other subjects that are assigned to each one.

22          So, that's in a nutshell.  It

Page 426

1 doesn't mean that I agree with everything that

2 the program gives, like every student who goes to

3 anywhere.

4          Some things I have experience, and I

5 see that it was a waste of time, but, unless you

6 go inside and take it, how can you realize what

7 it is.  It is very weak to fight things from the

8 outside.

9          Q.      What about the first unit of CPE,

10 that program, is it a basic program, how is that

11 program structured?

12          A.      They are all structured almost the

13 same way.  But, they don't give you the same

14 thing.  The first unit is like it's an

15 introduction.

16          And it's tough, because it makes you

17 think who you are and what your vocation is.

18          I personally tell every student when

19 they come and I have to talk to them as a

20 Catholic Chaplain, I give them instruction how to

21 be attentive to the Catholics, and how to refer

22 them to the Catholic Chaplain, because they are

Page 427

1 very sensitive issues.

2          Q.      And what about the other units after

3 the first unit, what about the second unit of

4 CPE, what is that like?

5          A.      It's almost the same, you write the

6 verbatims, you discuss, you have the discussions

7 and you take topics that you didn't take in the

8 first one.

9          Q.      And, then the third unit --

10          A.      The third, the same, but, there are

11 different --

12          Q.      Different topics, too?

13          A.      Yes.

14          Q.      And, then the fourth?

15          A.      The same.

16          JUDGE NORKEN:  Are they all beginner

17 units?  I mean, are they all essentially for

18 beginners, all four units?

19          THE WITNESS:  The four units, not

20 only for beginners.  I was in my 60s when I took

21 them or my 50s.

22          And, the reason, as I said, Your

28 (Pages 424 to 427)

Page 428

1 Honor, I took them, because I don't want to be
2 out of the, what is expected, more and more.
3          They are better for young people,
4 less experienced. For me, some of them were
5 tough to swallow, because I had in the '60s like
6 three years, a full program called pastoral
7 theology in Paris.
8          And it included how to deal with
9 people of different ages, different places,
10 including the sick, including the mentally sick,
11 including the retarded.
12          MS. LU:  That's all of the questions
13 I have.
14          JUDGE NORKEN:  Cross-examine and
15 also be sure you don't go beyond the scope on
16 direct.
17               CROSS-EXAMINATION
18 BY MR. KATOR:
19     Q.    Father Ashkar --
20          JUDGE NORKEN:  About how long?
21          MR. KATOR:  20 minutes.
22          JUDGE NORKEN:  Okay.

Page 429

1 BY MR. KATOR:
2     Q.    Father Ashkar, let me understand,
3 when you came to receive this phone call from
4 Fitzgerald, Dr. Fitzgerald, you were at Walter
5 Reed?
6     A.    Yes, sir.
7     Q.    And, did you have a particular
8 schedule working at Walter Reed?
9     A.    Yes, sir.  I was in charge of the
10 Catholic patients with other priests.
11     Q.    But, you have a schedule where you
12 were working all week, or what was your schedule
13 at Walter Reed?
14     A.    It wasn't totally all week, because
15 we were three priests and first we were five, and
16 then we were reduced to four, to three, and then
17 to two.  So, I would divide the work between
18 myself and the other priests.
19     Q.    But, you would have been available
20 to work more if they wanted you; is that right?
21     A.    Yes, sir.
22     Q.    You didn't, other than Walter Reed,

Page 430

1 did you have other employment at that time?
2     A.    I am the pastor of my parish which
3 was, it is still across the street from Walter
4 Reed.  It's like living in Walter Reed.  It's the
5 street that divides us.
6     Q.    So, your schedule was such that you
7 could work on Thursdays?
8     A.    It was only to say mass on Thursday.
9     Q.    No, no.  I mean, let me make sure
10 you understand.  You were able to do mass on
11 Thursdays?
12     A.    Yes.
13     Q.    You could have given it on
14 Wednesdays?
15     A.    Yes.
16     Q.    You could have given it on any one
17 of the days?
18     A.    Yes.  Because we were more than one
19 priest and I had another priest in my community.
20     Q.    Yes.  But, you were available that's
21 all I'm saying.  And you could have given it
22 other days.

Page 431

1     A.    Yes.
2          JUDGE NORKEN:  That's on Friday.
3          THE WITNESS:  Yes, sir.  When you
4 are two or three priests, you can, you can switch
5 things very easy.
6 BY MR. KATOR:
7     Q.    Now, when you came to work on a
8 contract basis, was it at NIH, the Clinical
9 Center?
10     A.    Yes.
11     Q.    With Dr. Fitzgerald?
12     A.    Yes, sir.  And, when I started,
13 after the CPE, it was to work with the
14 outpatients.  If I recall maybe two or three
15 hours or four hours maximum every morning.
16     Q.    Okay, fine.  And when you came,
17 Dr. Fitzgerald asked you to come on Thursday for
18 the Thursday mass?
19     A.    Yes, sir
20     Q.    Now, when you did come to work at
21 the Center, you were not certified as a Chaplain;
22 is that right?

29 (Pages 428 to 431)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**
Plaintiff *pro se*,                                    :

v.                                                      :

                                        C.A. No.  1:07-cv-02308(RMC)

**WILLIAM BIGLOW,** *et al.*
Defendants.                                            :

                          ...oOo...

**Transcript of testimony of Rev. Dominic Ashkar at EEOC Hearing,**
**Heffernan v. Leavitt, Secretary DHHS, EEOC Case No. 120-2005-00226x**

Hr'g  12|15|05  pgs. 432-471

**EXHIBIT 7-B**

9

Page 432

1          You had not been certified by the
2 time you came to NIH?
3     A.    I was starting in the program.
4     Q.    You had started in the program?
5     A.    Yes, but I haven't, they went almost
6 together within a few weeks, between his call and
7 the beginning of the program.
8     Q.    And, where were you taking the
9 program?
10    A.    At NIH.
11    Q.    When you started you were taking it
12 at NIH?
13    A.    Yes.
14    Q.    That is before you were hired at
15 NIH, you were taking the CPE program at NIH, is
16 that what you're saying?
17    A.    When I was hired, and the name of
18 the church took the contract, I sent another
19 priest, Father Richard, to say mass there.
20          And, he had a couple of the, in
21 Ireland, a couple of courses in the CPE.
22    Q.    But, let me understand, though.    If

Page 433

1 I'm not making myself clear I apologize.    Let me
2 try again.
3          You said you took CPE, started
4 CPE --
5     A.    Yes.
6     Q.    -- before you came to the Clinical
7 Center; am I right on that?
8     A.    Yes.    As a contract Chaplain to see
9 the patients, yes, I had started CPE.
10    Q.    At the Clinical Center?
11    A.    Yes.
12    Q.    With Dr. Fitzgerald?
13    A.    No, the first session was with Karen
14 Morrow.
15    Q.    She was your mentor, is that what
16 they're called?
17    A.    She is, she was the, not the
18 educator, they call her the leader of the group,
19 and the group consists of five or six people.
20    Q.    Sure, yes.    And, who else was in the
21 group besides you?
22    A.    There were, if I recall, about six

Page 434

1 people.    They don't take more.    Nobody, that's
2 the average.
3     Q.    These are all priests?
4     A.    No.    I was the only priest.
5     Q.    So, there were other ministers?
6     A.    There were ministers.    Most of them,
7 if I recall, were ladies in the ministry.
8     Q.    And, ministers, lay ministers you
9 are saying?
10    A.    Female ministers, either ordained or
11 to be ordained.
12    Q.    These were people who had served in
13 a church a long time, or younger people?
14    A.    Both.
15    Q.    Both.
16    A.    Some were ready to go into the
17 ministry, and others were ministers already.
18    Q.    Okay.    Now, let me just make sure I
19 understand.
20          The CPE program that you were, that
21 you said you were just starting at the time you
22 came, you had started that, was that independant

Page 435

1 of Dr. Fitzgerald's call to you to come to work?
2     A.    Yes, sir.
3     Q.    You had started there?
4     A.    Yes, sir.    Because I had inquired
5 different places, yes.
6     Q.    Yes.    And, when you started and met
7 with Dr. Fitzgerald, you did meet with him, I
8 presume, before you reported?
9     A.    Yes.
10    Q.    And, he knew then that you were not
11 certified as a Chaplain at that time?
12    A.    Yes, sir.
13    Q.    Okay.    And, did you talk to him
14 about certification?
15    A.    I told him that I was taking the,
16 that I had first approached his institution, and
17 then I was refused.
18          They didn't have room the first
19 time, and I told him about the different places
20 and he was happy that I was admitted the second
21 time.
22    Q.    Now, as a part of this program you

30 (Pages 432 to 435)

Page 436

1 had visitations, you say, to the patients?

2     A.    This is part of the program, yes.

3     Q.    And, that's part of your job, too;

4 is that right?

5     A.    Explain, please, what, make it

6 clearer?

7     Q.    Yes.  You are a Chaplain at the NIH

8 Medical Center?

9     A.    And in the CPE program, I am a

10 student.

11     Q.    No, I understand.  Let's back off.

12 You are a Chaplain hired on a contract basis by

13 NIH at the Clinical Center.

14     A.    Sir, it wasn't, when I was hired the

15 first time it was only to say mass on Thursday

16 and hold the beeper for 20 nights.

17     Q.    Okay, fine.

18     A.    That's what I was hired for.

19     Q.    Okay.  And, then the visits that you

20 made, were these the patients at NIH?

21     A.    To patients, but they were part of

22 the CPE.

Page 437

1     Q.    And, they were at NIH?

2     A.    Yes.

3     Q.    And, that's where you were taking

4 your training?

5     A.    Yes, sir.

6     Q.    Now, did there come a time when you

7 spent more time at NIH, you were employed for

8 longer periods of time than just the mass on

9 Thursday?

10     A.    I don't recall.

11     Q.    Let me try it this way.  You're

12 still employed at NIH, but at the Clinical Center

13 now?

14     A.    Yes, sir.

15     Q.    Okay.  How many hours a week do you

16 work now?

17     A.    Probably around 30.

18     Q.    30 hours?

19     A.    Around 30 hours.

20     Q.    Okay.

21     A.    On a temporary basis, I'm not

22 definite.  I'm not an employee of the government.

Page 438

1     Q.    I'm sorry?

2     A.    I'm not an employee,.

3     Q.    You're contract, I see.

4     A.    I'm a contract.

5     Q.    Not an employee, but you worked at

6 the center.

7     A.    Okay.  If I can, I can send somebody

8 else.

9     Q.    Okay.  How long when you -- do you

10 have something that you're reading from?

11     A.    No, I'm playing with them, that is

12 all.  Sorry.

13     Q.    You stated that you took Thursday

14 mass when you first came to the Center.

15     A.    Yes, sir.

16     Q.    That changed later and you were

17 there more hours?

18     A.    Yes, sir.

19     Q.    Okay.  Now, when you were there more

20 hours, when did that begin?

21         How much after you came to work

22 there, do you remember?

Page 439

1     A.    I don't know.

2     Q.    Let me ask it this way, when you

3 started your additional hours at NIH, were you

4 still in the CPE program?

5     A.    No.

6     Q.    You had finished the CPE program?

7     A.    The CPE program took one full year.

8     Q.    One year?

9     A.    One full year.

10     Q.    Uh-huh.  Okay.

11     A.    With one unit that went all over the

12 whole year, and three units with more extensive

13 work.

14         This, to understand it, sir, you

15 have to know the system, like, you see

16 announcements, in hospitals you can be there for

17 one year and have the four units of CPE.

18         You would be working at the

19 hospital, they will use your energy, and in the

20 meantime, they have the four units in one year.

21     Q.    Okay.  All right.  That's what I was

22 getting at.

31 (Pages 436 to 439)

Page 440

1          So, you can work in the organization
2 as a Chaplain and earn credits for CPE at that
3 same institution.
4       A.    Yes, sir.
5       Q.    Is that correct?
6       A.    Yes, sir.  And, it has to be made
7 clear.
8       Q.    Yes, yes.
9             JUDGE NORKEN:  Were you paid during
10 that year?
11            THE WITNESS:  For the CPE, I didn't
12 pay and I didn't get paid.
13 BY MR. KATOR:
14      Q.    But, were you paid as you worked?
15      A.    After the CPE, yes.
16      Q.    But, in a program that you mentioned
17 that I asked you about, and you said you earned
18 the credits while you were working, you get paid
19 for the work?
20      A.    You get paid, but not as a certified
21 Chaplain.
22      Q.    No.  But, as a Chaplain?

Page 441

1       A.    But, they announce it in different
2 hospitals they would tell you, you work for the
3 whole year, an internship, it is like an
4 internship, you would get your four units of CPE
5 and you will get paid between 20 and 22, or
6 24,000.
7       Q.    But, not all -- you're talking about
8 institutions, not all institutions require CPE;
9 is that right?
10      A.    More and more I think now they are.
11 Even the --
12      Q.    But, there are many that don't; is
13 that right?
14      A.    I'm not aware of it.  I know that
15 Walter Reed, they want it, at NIH, it's
16 specified.  The hospitals I saw in this Vision,
17 most of them.
18      Q.    Well, there are some in the Vision
19 that was not entered into evidence that indicate
20 that they didn't require it.
21      A.    Very few.  And, it depends, but,
22 they require two, like Veterans, they require

Page 442

1 two, some hospitals.
2       Q.    Two what?
3       A.    Two units.
4       Q.    Two units of CPE.  And, you can make
5 those units up partially by experience?
6       A.    If they have it at the institution.
7 Like Walter Reed and NIH, they have it.  There
8 are four or five places in Washington that they
9 have the program.
10      Q.    Uh-huh.
11      A.    Not every hospital has the CPE
12 program.
13      Q.    I understand.  But, if you're
14 working in that hospital, you can earn your
15 credits working there?
16      A.    Yes.
17      Q.    Okay.  Now, when you came to the
18 NIH, I think you testified that you were dealing
19 with outpatients.
20      A.    Yes.
21      Q.    Serving out patients?
22      A.    At the beginning, yes.

Page 443

1       Q.    And, so you -- and doing the mass on
2 Thursday.
3       A.    Yes, sir.
4       Q.    And -- well, let me make clear, when
5 you first came all you did was the mass on
6 Thursday?
7       A.    The mass on Thursday and the
8 nights --
9       Q.    And, the nights on-call?
10      A.    And, the nights on-call.
11      Q.    And, then subsequently, when you
12 were given additional hours, you began to work
13 with the outpatients?
14      A.    Say that again.
15      Q.    Initially when you came at the
16 beginning, when you came to the Center, you did
17 Thursday mass and on-call 20 nights a week (sic)?
18      A.    Yes, sir.
19      Q.    That's it, right?  And, at some
20 point that changed and you gave more hours.
21      A.    After the CPE.
22      Q.    After your, after the first year,

32 (Pages 440 to 443)

Page 444

1 all right?

2    A.    Yes, sir.

3    Q.    So, after the first year, you began

4 to work more often, more hours?

5    A.    Yes, sir.

6    Q.    Okay. And, I think you said, and

7 you correct me if I am wrong, that you worked

8 with the outpatients?

9    A.    At the beginning, yes.

10    Q.    So, you were not them just serving

11 Catholic patients?

12    A.    No. Except also on Thursday when

13 the Chaplain who was coming on Thursday didn't

14 come, I would be in charge to -- it was like a

15 few, few times.

16    Q.    Yes. You would give the mass?

17    A.    The mass and see the Catholic

18 Chaplain's, the Catholic patients on Thursday.

19    Q.    If the other chaplain was not there,

20 is that right?

21    A.    Yes, sir.

22    Q.    And, at that time who was the other

Page 445

1 chaplain?

2    A.    Therese Stewart. She is still

3 working there.

4    Q.    And, she's Catholic?

5    A.    Yes, sir.

6    Q.    Okay. She's not a priest, though?

7    A.    No, no, no. It's a lady minister.

8    Q.    She's a lady and not a priest,

9 that's for sure.

10    A.    Yes.

11    Q.    But, she is not able to give the

12 sacraments and those sorts of thing?

13    A.    Communion only.

14    Q.    Nothing else?

15    A.    Confession and the rest, no. These

16 are ministers who are allowed to give communion.

17    Q.    Okay. Now, again, let me premise

18 this that you didn't serve, you served

19 outpatients, these are people of all religions

20 who come in on an outpatient basis to the

21 Clinical Center.

22    A.    Yes, sir.

Page 446

1    Q.    And, you are there to help them in

2 one way or another, and then you would

3 periodically go and serve Catholics?

4    A.    Yes, sir.

5    Q.    As necessary. Do you know the

6 terminology generic chaplaincy?

7          Is that something that you're

8 familiar with?

9    A.    No. There is generic, the term

10 generic is for everything, not only for

11 chaplaincy.

12    Q.    But, do you know how it is referring

13 to chaplaincy?

14    A.    I think I do. I think I do.

15    Q.    Is that what you were doing at the

16 Clinical Center?

17    A.    I haven't -- no, that's different.

18 When you say generic, my understanding, and I

19 might be wrong, it's allowing, maybe a chaplain

20 who is not even Catholic to give the sacraments

21 to Catholics, too.

22          And, that is personally I never was

Page 447

1 in a hospital that accepted this.

2    Q.    Okay. That's your notion of generic

3 chaplaincy?

4    A.    Or to, when you say generic, I

5 personally don't like the term generic because,

6 what does it mean? Specify it.

7          JUDGE WORKEN: Why don't you try

8 multifaith chaplaincy, that's better.

9          THE WITNESS: That's different. The

10 multifaith is different. You see everyone,

11 and --

12 BY MR. KATOR:

13    Q.    What is your understanding of

14 multifaith chaplaincy?

15    A.    You respect the faith of everyone

16 and you try to bring a certain peace to those

17 people who are sick without influencing them with

18 your own faith.

19    Q.    Without regard to their religion; is

20 that right?

21    A.    No. With respect to their religion.

22    Q.    Without regard, respecting their

33 (Pages 444 to 447)

Page 448

1  religion, is that what you're saying?

2      A.    Respecting their religion.

3      Q.    Oh, yes, respecting it.  But,

4  without, you do people who are Protestants,

5  Catholics, Methodists.

6      A.    They remain what they are.

7      Q.    Yes.  But, you try to help them in

8  any way you can?

9      A.    Yes, sir.

10     Q.    But, not on a, not just, you don't

11 limit yourself to Catholics, you serve everybody?

12     A.    I have two Muslims now, patients,

13 and they ask for me, because I can speak their

14 language.  I can speak their religion, and if you

15 call that generic, or respecting, it's

16 multifaith.

17     Q.    They ask for you?

18     A.    It is interfaith, yes.

19     Q.    But, lots of patients that you serve

20 don't ask for you, you're there and you serve

21 them.

22     A.    For the Catholics, yes.  I appear

Page 449

1  every day, I ask if they need anything.

2      Q.    Okay.  But, on multifaith it's clear

3  you don't limit yourself to Catholic patients?

4      A.    That's true.

5      Q.    Okay.

6      A.    And, we shouldn't, in a place like

7  NIH, we shouldn't, they come from all over the

8  world with all religions.

9      Q.    Would it be fair for me to say,

10 Father Ashkar, that prior to your working or

11 beginning the CPE program, you probably had 35,

12 40 years as a priest?

13     A.    Yes.

14     Q.    Something like that.  And, I guess

15 you feel that you are a better priest now because

16 of that training you took, you're a better priest

17 now than before you took the training?

18     A.    Better priest?  I won't say better

19 priest, but more informed, yes.

20     Q.    More informed.  You don't give the

21 sacraments any differently --

22     A.    No.

Page 450

1      Q.    -- than you did before?

2      A.    The CPE does not teach me how to

3  conduct myself as a priest in a way in giving the

4  sacraments.  That's not the job of the CPE.

5      Q.    Well --

6      A.    It gives you ways and --

7      Q.    But, you are sitting at the feet of

8  Karen Morrow, who is not a Catholic priest?

9      A.    True.

10     Q.    So, you were not getting any kind of

11 religion, religious training.

12     A.    In the verbatim, sometimes the

13 religion appears and we all discuss it.  And I

14 think they learned more from me than I learn from

15 them.

16     Q.    All right.  Now, you spoke of your

17 meetings with Father Heffernan, he came to see

18 you.

19     A.    Twice, yes.

20     Q.    Twice.  And, this was in connection

21 with when you were taking over the mass on

22 Thursday --

Page 451

1      A.    Yes, sir.

2      Q.    -- is that right.  Now, I'm correct,

3  am I not, that you didn't coordinate your work

4  with Father Heffernan?

5      A.    In the beginning, he is the one who

6  showed me and other priests the whole place.

7      Q.    I understand.  He took you around

8  and introduced you and things like that?

9      A.    Yes.  But, then later things kind of

10 changed, if I say something, he didn't even stop

11 to talk about it.

12        So, I respected his feeling, and I

13 continue to respect him.

14     Q.    But, you -- I want to make sure I

15 understand.  Initially he showed you around.

16        But, you, your superior in this case

17 was Dr. Fitzgerald, you took orders from him?

18     A.    He didn't give me any orders.

19     Q.    Well, you took --

20     A.    He told me what is to be done.

21     Q.    He told you what to do.

22     A.    And, the one who calls you, and who

34 (Pages 448 to 451)

Page 452

1 pays you, I think.

2     Q.    That who pays the Piper calls the

3 tune?

4     A.    Whatever.

5     Q.    But, let me understand.  He

6 coordinated your work or he had told you what to

7 do, Father Heffernan didn't tell you what to do.

8     A.    No, because when I was there, Father

9 Heffernan was on his day off, unless I was called

10 for other duties that had nothing to do with the

11 Catholics, but, with the whole population.

12    Q.    You, from time to time, would serve,

13 would go to Catholic patients and provide

14 services to them, sacraments, for example?

15    A.    When Father Heffernan was in charge

16 there, I don't think so.  And, every once in a

17 while if someone wanted the sacrament, I will

18 tell him, unless it was at night, and I was

19 on-call, I will give them the sacraments.

20    Q.    Now, in the multifaith approach to

21 chaplaincy, is it your belief that this is a more

22 efficient way of providing services to patients?

Page 453

1     A.    Can you repeat the question.

2     Q.    The multifaith, that we spoke about,

3 is that a better way of providing services to

4 patients?

5          Is it more efficient, does it save

6 money?

7     A.    I don't think so.  I would be

8 against it because they are in, the Catholic

9 patients would be suffering on that, number one.

10         But, the multifaith is anyone can

11 live it.  But, that's not the only way to go.

12         I can be multifaith without denying

13 my faith.  I can see multifaith people without

14 ignoring the Catholics or any other religion.

15    Q.    I understand, but you would not

16 agree, as I believe you indicated, that

17 non-Catholics can provide sacraments to

18 Catholics.  They can't do that.

19    A.    They can't.  I personally I am

20 against it, and the church is -- doesn't allow

21 it.

22    Q.    Would not allow that.

Page 454

1          MR. KATOR:  All right.  Indulge me

2 one moment, Judge Norken.

3          I have no further questions.

4          JUDGE NORKEN:  I have questions.

5          I'm going to show you, I'm going to

6 mark it EEOC Exhibit 4.

7          (EEOC Exhibit Number 4

8          marked for identification.)

9          JUDGE NORKEN:  Have you ever seen

10 this document before, EEOC Exhibit 4, which is

11 Exhibit 23 of the Complainant's opposition?

12         THE WITNESS:  I don't recall this,

13 because I don't know if I even received the copy.

14 It would be in my file.

15         JUDGE NORKEN:  You don't remember

16 ever seeing this document?

17         THE WITNESS:  I'm telling you, I

18 cannot say I've seen it.  But, as of now, I don't

19 remember, because it's not addressed directly to

20 me.

21         JUDGE NORKEN:  Okay.  Okay.

22         THE WITNESS:  This is between them

Page 455

1 inside.

2          JUDGE NORKEN:  Okay.

3          THE WITNESS:  But, I might have

4 received something and I don't recall it, sir.  I

5 have to check my files.  But, I don't recall

6 having seen it.

7          JUDGE NORKEN:  The multi, I mean,

8 the CPE units you took, did they emphasize

9 multifaith chaplaincy?

10         THE WITNESS:  They normally call the

11 one like a Protestant minister, a Jewish Rabbi,

12 the Catholic Priest, they bring them in and let

13 them talk to their students so that the students

14 would be sensitive to what the needs of the

15 Protestants, or the Catholics, or the Jews, or

16 the Muslims, what these needs are.

17         Does it answer your question?

18         JUDGE NORKEN:  I don't know.  Well,

19 perhaps you can answer my question this way.

20         When you would visit with patients

21 as part of the CPE training, did you visit with

22 just Catholics or did you visit all patients?

35 (Pages 452 to 455)

Page 456

1              THE WITNESS:  When I was in the CPE,
2 it was all patients.
3              JUDGE NORKEN:  Okay.  And, that was
4 true with all four units that you took?
5              THE WITNESS:  Yes.  As I recall,
6 yes.  When you write a verbatim, you cannot write
7 a verbatim on every one you see, because in one
8 morning you may see maybe 20 patients.
9              But, you choose one or the other to
10 write a verbatim so that you can be criticized
11 and your knowledge will grow with this.
12             JUDGE NORKEN:  When did you finish
13 your CPE training, the four units?
14             THE WITNESS:  Either 2001 or 2002, I
15 can't recall.  But, I have it in my file.
16             JUDGE NORKEN:  Did you begin as a
17 contract chaplain for NIH in about September of
18 2001?
19             THE WITNESS:  To say mass and for
20 the night calls, that might sound right.
21             JUDGE NORKEN:  Okay.  And, some time
22 in 2002 or 2003 you began doing somewhat more

Page 457

1 than visit patients as well; is that right?
2              THE WITNESS:  When I was asked, yes.
3 And, when Father Heffernan wasn't there, or was
4 no longer there, I was asked to specifically take
5 care of the Catholic patients.
6              JUDGE NORKEN:  During the time, I'm
7 more interested in the time that Father Heffernan
8 was still there, you would fill in, you would
9 fill in on Thursday when he had his day off; is
10 that right?
11             THE WITNESS:  Most of the Thursdays,
12 I will say mass.  And, if the other Chaplain
13 wasn't there, I will see the Catholic patients.
14             JUDGE NORKEN:  During the time that
15 Father Heffernan was there, did you ever, on a
16 regular basis, see patients?
17             THE WITNESS:  Outpatients and it
18 wasn't every day at the beginning.
19             JUDGE NORKEN:  And, did you, would
20 you get a list of Catholic outpatients?
21             THE WITNESS:  With the outpatients,
22 there is a different list that you see in every

Page 458

1 unit, because you never know who is going to be
2 there.  They go from one unit to the other.
3              So, you had 14, 13 floors and you go
4 to these clinics and people that sometimes you
5 see them two or three times a day because they
6 are in two or three different clinics, like one
7 for the blood, one for this, one for that.
8              It's hard to keep track of the
9 outpatients, but it is a beautiful ministry.
10             JUDGE NORKEN:  You said that the
11 CPE, taking the CPE was sometimes hard to take.
12 What parts were hard to take?
13             THE WITNESS:  Some parts for me
14 personally were like the things for beginners,
15 okay, respect the faith of everyone, or you have
16 to be attentive to, if the person is Catholic or
17 Protestant, or Jew, make the right reference, or
18 speak their language.
19             Personally, all of this, you know,
20 having had a doctorate in Islam and Judaism and
21 Buddhism, to me was like going back to
22 kindergarten.  You haven't taken CPE.

Page 459

1              JUDGE NORKEN:  I don't think anyone
2 here has taken CPE other than you.
3              MS. LU:  And Father Heffernan.
4              JUDGE NORKEN:  That's correct.  He
5 has taken CPE in other dioceses.
6              THE WITNESS:  Your Honor, there is a
7 confusion between CPE and supervised ministry.
8              JUDGE NORKEN:  Okay.
9              THE WITNESS:  They ask now in many
10 of the seminaries, the people, the Catholic
11 seminarians who are studying to be priests, they
12 ask them to have a supervised ministry.
13             That means they go visit in
14 different hospitals, they visit the sick, they
15 give kind of a verbatim.
16             But, they don't get a unit of CPE.
17 That is a supervised ministry.
18             JUDGE NORKEN:  Okay.  Is it true
19 that CPE begins with an agreement between the
20 leader and the participant on what they intend,
21 on what the participant intends to accomplish?
22             THE WITNESS:  Can you make it more

36 (Pages 456 to 459)

Page 460

1 understandable.
2          JUDGE NORKEN: Is there some sort of
3 an agreement on -- well, Father Heffernan
4 testified that there was an, that he would have
5 to make an agreement with the leader on what he
6 intended to accomplish with the CPE; is that
7 accurate?
8          THE WITNESS: Normally, at the
9 beginning of every session you write something
10 like that, you know, to say what you expect.
11          And, then later on you write
12 something to see if you achieved it. You set a
13 goal.
14          JUDGE NORKEN: But, in actuality,
15 the course is more structured than an agreement
16 on what the person wants?
17          THE WITNESS: Oh, yes.
18          JUDGE NORKEN: It's a much more
19 structured course.
20          THE WITNESS: Much more structured,
21 yes.
22          JUDGE NORKEN: In what way is it

Page 461

1 more structured?
2          THE WITNESS: With openness and
3 this, you know, normally what's spoken there,
4 stays there.
5          There is a very strict, like, they
6 call it, they open up. They are in a circle and
7 everyone will talk about the different problems,
8 either with the patients, or with the program, or
9 with themselves.
10          And, these are, it is meetings of
11 total confidentiality. You cannot go and relate.
12 There are the verbatim. The verbatim is
13 something hard to write.
14          And, to put it into words sometimes
15 you spend half an hour or an hour with the
16 patient, how much can you recall.
17          You can't write the verbatim and
18 give it, give copies to everyone. You read it
19 and you are criticized and helped on the weak
20 points.
21          Maybe you could have done better on
22 this, have done better on that.

Page 462

1          JUDGE NORKEN: What were the focuses
2 for each of the CPE courses you took?
3          I mean, each CPE course is
4 different, right?
5          THE WITNESS: The structure is the
6 same. The material, and it depends who is taking
7 it. Now, if you have beginners, that's one
8 thing.
9          But, if you have people who have
10 experience, you can say let's concentrate now
11 these few months on the spirituality.
12          And, each one can give, you have
13 it's like in every course you take in a
14 university, you know, you give kind of a term
15 papers and they are discussed.
16          It's a whole program. I don't say
17 that I fell in love with all of the whole system,
18 no.
19          JUDGE NORKEN: Well, what were the
20 focus of the four units that you took for each of
21 the four units?
22          THE WITNESS: The first one it was

Page 463

1 the structure as it is for beginners.
2          The second one, we studied a book on
3 the spirituality, and this did not exclude the
4 verbatims, and the discussions and all of this.
5          JUDGE NORKEN: And visitations? And
6 the visitations?
7          THE WITNESS: Visitations, sure.
8          JUDGE NORKEN: Continue.
9          THE WITNESS: And the one was on the
10 different Eastern, Far Eastern religions and
11 compare with the western mind, like Buddhism,
12 Hinduism, Islam, Judaism.
13          JUDGE NORKEN: Something you have
14 had some experience with?
15          THE WITNESS: But, it wasn't me who
16 decided it, you know, it's the whole group.
17          You have to be, like if you have a
18 group of priests who are already experienced,
19 they are experienced on one side, but not on the
20 technical part, and this seems to many older
21 people who think it, what am I doing here, you
22 know.

37 (Pages 460 to 463)

Page 464

1          But, there is a training, you cannot
2 be a doctor without training, you cannot be a
3 teacher without being trained.
4          JUDGE NORKEN:  And what was the
5 fourth unit focused in on?
6          THE WITNESS:  I don't know, I should
7 have brought some more material.  Mostly I think
8 on western spirituality.  And, every time there
9 would be one main book that everybody would read,
10 we would discuss, give an account.
11          JUDGE NORKEN:  When you contracted
12 with NIH, you would only visit patients when
13 another chaplain was not available or you would
14 visit outpatients; is that right?
15          THE WITNESS:  Yes, sir.
16          JUDGE NORKEN:  Okay.  So, during the
17 time that Father Heffernan was there, you never
18 really visited patients on a regular basis,
19 inpatients on a regular basis?
20          THE WITNESS:  No.
21          JUDGE NORKEN:  And, for outpatients,
22 it's much more difficult to limit yourself to

Page 465

1 just Catholic patients, right?
2          THE WITNESS:  That's true.
3          JUDGE NORKEN:  Because you don't
4 know who you're talking to?
5          THE WITNESS:  You go into the room
6 and you don't know if you should say good morning
7 or not, because it's a whole different
8 experience.
9          They might welcome you, you might
10 say, good morning, they might say good morning,
11 and they go back reading the newspaper.  But, I
12 would not call this generic.
13          JUDGE NORKEN:  I don't have any
14 other questions.
15          Do you have any questions within the
16 scope of my questions, and the scope of
17 Mr. Kator's questions?
18          She goes first.
19          MS. LU:  No.
20          MR. KATOR:  Yes.
21          JUDGE NORKEN:  About how long?
22          MR. KATOR:  A few minutes, five

Page 466

1 minutes.
2          RECROSS EXAMINATION
3 BY MR. KATOR:
4          Q.   With respect, Father Ashkar, to the
5 CPE training that you were taking, there is no
6 syllabus or anything for this particular course
7 that you were taking when you were meeting with
8 Ms. Morrow?
9          A.   There is a program, a set program.
10         Q.   There is a program?
11         A.   Set.
12         Q.   And, it has books that you're
13 supposed to read, is that what it is?
14         A.   Books, they come at every talk you
15 give or something new comes or every speaker, you
16 have many other speakers.
17         JUDGE NORKEN:  Let's go off the
18 record.
19         (Recess -- 1:03-1:14 p.m.)
20         JUDGE NORKEN:  Back on the record.
21 BY MR. KATOR:
22         Q.   Let me show you, Father Ashkar, the

Page 467

1 EEO 4, which Judge Norken showed you.  I just
2 want to ask you one question about that.
3          Look at Paragraph Number 5 it talks
4 about contractor tasks, just read that, if you
5 would, to yourself.
6          A.   Yes, sir.
7          Q.   You have read that.  That's not what
8 you did when you first came to the Clinical
9 Center?
10         A.   This was not to apply to me.
11         Q.   It did not apply to you.  That's
12 what I had in mind.  That's all.  Let me see,
13 just one other question.
14         At the end of your CPE program, when
15 you have gone through this 400 credits, was there
16 some kind of an examination you take to see
17 whether you have learned anything?
18         A.   There is an evaluation, an
19 evaluation by the one who gives it, sir.
20         And this evaluation and certificates
21 are a part of you sending them to the, in my
22 case, the National Association of Catholic

38 (Pages 464 to 467)

Page 468

1 Chaplains, you make it all fine for --

2    Q.   So, the Reverend Morrow evaluated

3 you, the Catholic Priest, on the CPE, and she

4 said that you were okay?

5    A.   Yes, not only her.  But, also the

6 other people who attend.  At the end they

7 evaluate each other.

8    Q.   Oh, they evaluate each other?

9    A.   Each one evaluates the whole people

10 in front of them out loud.

11    Q.   I wish they had done that with me in

12 law school, that would be good.  All right.

13        JUDGE NORKEN:  Anything further,

14 Ms. Lu?

15        MS. LU:  No.

16        JUDGE NORKEN:  Father Ashkar, I

17 remind you not to discuss this case, your

18 testimony in this case with any other witness in

19 the case until these proceedings are ended.

20        You understand that order, right.

21        THE WITNESS:  I understand that, and

22 I have no time to discuss it.

Page 469

1        JUDGE NORKEN:  Thank you for your

2 testimony.  You are excused.

3        THE WITNESS:  Thank you.

4        (Witness excused.)

5        (Recess -- 1:17-1:21 p.m.)

6        JUDGE NORKEN:  On the record, during

7 Father Ashkar's testimony, we had Dinesh Tripati

8 (ph.) who is an attorney from Nepal who the

9 parties have agreed to allow him to observe,

10 you'll get his name later.

11        And, you are?

12        MS. KELLY:  Dana Kelly.

13        JUDGE NORKEN:  Ms. Kelly, I'm David

14 Norken.  I am an Administrative Judge.  If you

15 would please raise your right hand and state your

16 full name for the record.

17        MS. KELLY:  Dana Cherise Kelly.

18        DANA CHERISE KELLY,

19 a witness called for examination, having been

20 first duly sworn, was examined and testified as

21 follows:

22        JUDGE NORKEN:  Whose witness?

Page 470

1        MS. HARRIS:  Ours.

2        JUDGE NORKEN:  How long for this

3 witness?

4        MS. HARRIS:  I think about 15

5 minutes, maybe 20.

6        DIRECT EXAMINATION

7 BY MS. HARRIS:

8    Q.   Good afternoon, Ms. Kelly, I'm Cathy

9 Harris.  I am one of Father Heffernan's attorneys

10 and I'm going to be asking you some questions.

11        What is your position -- well, are

12 you currently employed at NIH?

13    A.   Yes.

14    Q.   What is your position?

15    A.   Program assistant.

16    Q.   And, specifically, where do you work

17 in?

18    A.   In the Spiritual Ministry Department

19 at the Center.

20    Q.   And, who is your supervisor?

21    A.   Ray Fitzgerald.

22    Q.   As a program assistant generally,

Page 471

1 and briefly, what are your duties?

2    A.   Maintain the administrative portion

3 of the office of the staff.

4    Q.   You do administrative work for

5 Dr. Fitzgerald?

6    A.   Yes.

7    Q.   Okay.  And, how closely do you work

8 with Dr. Fitzgerald?

9    A.   Fairly close.

10    Q.   What kinds of tasks do you do for

11 him?

12    A.   Typing, scheduling of meetings and

13 events pertaining to the office, personnel,

14 documentation for the staff, travel arrangements.

15    Q.   For the record, what is your

16 religious affiliation, if any?

17    A.   Methodist.

18    Q.   And, you say you do typing for

19 Dr. Fitzgerald.

20        Does he, how does that work, does he

21 dictate to you, or some other way?

22    A.   Normally he gives me a handwritten

39 (Pages 468 to 471)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                                    :
Plaintiff *pro se*,

v.                                             :

                                                        C.A. No.  1:07-cv-02308(RMC)

WILLIAM BIGLOW, *et al.*
Defendants.                                    :

...oOo...

Transcript of testimony of Rev. Dominic Ashkar at EEOC Hearing,
Hef*fernan v. Leavitt*, Secretary DHHS, EEOC Case No. 120-2005-00226x

Hr'g 04/06/06, pgs. 1772 - 1796

EXHIBIT 7-C

Page 1772

1

2      EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

3 HENRY HEFFERNAN            )EEOC CASE NO.

4    Complainant            )120-2005-00226X

5         vs.               )

6 U.S. DEPARTMENT OF HEALTH )AGENCY CASE NO.

7 AND HUMAN SERVICES,       )CC-EEO-2004-0004

8 NATIONAL INSTITUTES OF    )

9 HEALTH,                   )      VOLUME VI

10         Agency            )

11

12          Baltimore, Maryland

13         Thursday, April 6, 2006

14

15 The ARBITRATION in this matter began at 9:41

16 a.m. pursuant to notice.

17

18 BEFORE:  DAVID NORKEN, ADMINISTRATIVE JUDGE

19

20 Reported by:  Bonnie L. Russo

21 JOB NO. 173659

Arbitration (vol 6)

Arbitration (vol 6)

Page 1773

1

2

3         Thursday, April 6, 2006

4                 9:41 a.m.

5

6 The ARBITRATION was held at the offices of:

7    U.S. Equal Employment Opportunity Commission

8    Baltimore District Office

9    10 S. Howard Street, Third Floor

10   Baltimore, Maryland

11

12 Pursuant to notice, before:

13   DAVID NORKEN, Administrative Law Judge

14

15

16

17

18

19

20

21

---

Page 1774

1 APPEARANCES:

2 On Behalf of the Complainant:

3       CATHY A. HARRIS, Esq.

4       IRVING KATOR, Esq.

5       KATOR, PARKS & WEISER, PLLC

6       1020 19th Street, N.W.

7       Washington, D.C. 20026

8       202-898-4800

9

10 On Behalf of the Agency:

11      JULIE S. LU, Esq.

12      DEPARTMENT OF HEALTH & HUMAN SERVICES

13      GENERAL LAW DIVISION

14      330 Independence Avenue, S.W.

15      Cohen Building, Room 4760

16      Washington, D.C. 20201

17      202-619-0174

18

19

20 Also Present:  Henry Heffernan, Complainant

21                Nisha Bhatt, Paralegal

---

Page 1775

1                 C O N T E N T S

2 WITNESS              DIR   CROSS   RED    REC

3 Dominic Ashkar      1779  1789    1804   1810

4 Walter Jones        1819  1922    2056   ----

5 Henry Heffernan     2058  2085    2100   ----

6

7

8 EXHIBITS

9 81      Memorandum                         2092

10

11

12

13

14

15

16

17

18

19

20

21

---

Page 1776

1

2         ADMINISTRATIVE JUDGE NORKEN:  On the

3 record.

4         This is the employee discrimination

5 case of Henry Heffernan versus U.S. Department

6 of Health and Human Services Agency.  EEOC

7 Case No. 120-2005-00226 X.  Agency Case

8 No. CC-EEO-2004-0004.

9         Today is April 6, 2006.  We are here

10 today at the offices of the Equal Employment

11 Opportunity Commission.  I am David Norken.

12 I'm the administrative judge.

13         We are here today for the last day

14 of the hearing.  When I say the "last day," I

15 have emphasize the need for us to finally

16 finish this case on the sixth day and,

17 therefore, I am -- by agreement of the parties

18 prior to going on record I am going to enforce

19 time limits.

20         We are going to be very strict about

21 time limits today and I will give the parties

---

2 (Pages 1773 to 1776)

Page 1777

1 fair warnings on their time. But once the time
2 is up, I will cut the parties off. There is no
3 other way we will finish today with Mr. Jones
4 as a witness.
5          Also, the parties have agreed on a
6 briefing schedule. That schedule is -- when
7 are they?
8          MS. HARRIS: April 27.
9          ADMINISTRATIVE JUDGE NORKEN: No. I
10 mean when are the transcripts due?
11          MS. LU: April 11 we should receive
12 both days.
13          ADMINISTRATIVE JUDGE NORKEN: Both
14 transcripts are due on an expedited basis on
15 April 11 and the parties then have until
16 April 27 to do their closing arguments.
17          The parties have agreed that those
18 closing arguments are to be just one time
19 without opportunity for rebuttal to do
20 simultaneously and also to be no more than 30
21 pages double-spaced.

Page 1778

1          With that done, let's have Father
2 Ashkar come in.
3          Off the record.
4          (Discussion off the record.)
5          ADMINISTRATIVE JUDGE NORKEN:
6 Parties ready?
7          MS. LU: Yes.
8          ADMINISTRATIVE JUDGE NORKEN: On the
9 record.
10          Father Heffernan, I remind you you
11 are still under -- I'm sorry, Father Ashkar, I
12 remind you you are still under oath.
13          Ms. Lu, are you going to do
14 questioning?
15          MS. LU: Yes.
16          ADMINISTRATIVE JUDGE NORKEN: How
17 long for this witness?
18          MS. LU: Thirty minutes.
19          ADMINISTRATIVE JUDGE NORKEN: You
20 may proceed.
21 DOMINIC ASHKAR,

Page 1779

1 was called for examination by counsel and,
2 after having been previously sworn, was
3 examined and testified as follows:
4          EXAMINATION BY COUNSEL FOR THE AGENCY
5                  DIRECT EXAMINATION
6          BY MS. LU:
7          Q.   Father Ashkar, was there a time in
8 February 2004 that you were asked to perform
9 Saturday mass at the Clinical Center?
10          A.   Yes, ma'am.
11          Q.   And who asked you to perform
12 Saturday mass during that time?
13          A.   The head of the department,
14 Dr. Fitzgerald.
15          Q.   I'm sorry?
16          A.   Dr. Fitzgerald.
17          Q.   Do you know why Dr. Fitzgerald asked
18 you to perform Saturday mass?
19          A.   He informed me that the priest who
20 was saying the Saturday mass was sick and if I
21 can come and say Saturday mass until the priest

Page 1780

1 who was saying mass recovers.
2          Q.   Did you show up to perform mass on
3 the first Saturday in February of 2004?
4          A.   The exact date I don't remember, but
5 when I was asked I was coming every Saturday to
6 say mass.
7          Q.   And what happened when you showed up
8 to perform mass on these Saturdays that you
9 showed up?
10          A.   When I would arrive and see that
11 Father Heffernan was preparing for mass, I
12 would step aside very quietly.
13          Q.   And so did you do anything when you
14 saw Father Heffernan prepare for mass?
15          A.   I think once I asked him the
16 question "Are you saying mass," and his
17 response was "Yes."
18          Q.   Do you talk to Father Heffernan any
19 other time when you saw him at the Clinical
20 Center on Saturdays?
21          A.   I don't think so. I don't recall.

3 (Pages 1777 to 1780)

Page 1781

1    Q.    Did you tell Dr. Fitzgerald about
2 what happened when you showed up to perform
3 Saturday mass?
4    A.    Yes, I did.
5    Q.    What did you say to Dr. Fitzgerald?
6    A.    I said "Father Heffernan is here.
7 There is no need for me to be here" and I would
8 leave.
9    Q.    So the times when you showed up on
10 Saturday to perform mass at this time and
11 Father Heffernan was there, you just left?
12    A.    I waited until few minutes after the
13 time of the mass, like five minutes or ten
14 minutes, and they would leave, yes.
15    Q.    When you informed Dr. Fitzgerald
16 about the fact that Father Heffernan was there,
17 what did Dr. Fitzgerald say?
18    A.    If I recall, he would say "Go home."
19 That's my recollection.
20    Q.    Did you see Dr. Fitzgerald go talk
21 to Father Heffernan?

Page 1782

1          MS. HARRIS:  Objection.  Time frame.
2          BY MS. LU:
3    Q.    Did you see Dr. Fitzgerald talk to
4 Father Heffernan during these Saturdays in
5 February 2004?
6    A.    In all honesty, I can't recall that.
7 He may have, but I can't recall.
8    Q.    Do you recall how many times this
9 happened in February 2004 where you were asked
10 to perform mass on Saturday and Father
11 Hetfernan was there instead?
12    A.    Probably three to four times.
13    Q.    During this time in February 2004,
14 did Father Heffernan ever make a comment to you
15 about not getting in trouble with the
16 archdiocese?
17          MS. HARRIS:  Objection.  Leading.
18 Move to strike.
19          ADMINISTRATIVE JUDGE NORKEN:  Well,
20 you should let her finish her question.
21          MS. HARRIS:  Well, I didn't want to.

Page 1783

1 Maybe she can finish it with the witness not
2 present.
3          ADMINISTRATIVE JUDGE NORKEN:  Okay.
4 Can you step out of the room, please.
5          (The witness was excused from the
6 hearing room.)
7          ADMINISTRATIVE JUDGE NORKEN:  Go
8 ahead.
9          MS. LU:  My question was going to be
10 whether Father Heffernan made a comment to him
11 about not getting in trouble with the
12 archdiocese.  I am just asking whether that0.
13          MS. HARRIS:  It is leading.  She can
14 ask what, if anything, Father Heffernan said to
15 him.
16          ADMINISTRATIVE JUDGE NORKEN:  About
17 what?
18          MS. HARRIS:  About the Saturday mass
19 issue.  But she can't feed him what he -- what
20 she wants him to say.  "Oh, yes, he said that
21 to me."

Page 1784

1          MS. LU:  Then what would be the
2 basis for -- what if this comment wasn't
3 related to a Saturday mass issue?
4          MS. HARRIS:  Then you shouldn't be
5 asking him.  Then it is beyond the scope.
6          MS. LU:  We have to create the basis
7 for that, though.
8          ADMINISTRATIVE JUDGE NORKEN:  If I
9 recollect, this was with respect to when Father
10 Ashkar was first hired that this conversation
11 took place.  Am I correct?
12          MS. LU:  No.
13          ADMINISTRATIVE JUDGE NORKEN:  Has
14 this got anything to do with the Saturday mass
15 issue?
16          MS. LU:  I believe it was during
17 this time period, February of 2004.
18          ADMINISTRATIVE JUDGE NORKEN:  I will
19 allow it but let's see if we can -- see what
20 kind of wording we can come up with.
21          MS. LU:  I can leave the phrase out

4 (Pages 1781 to 1784)

Page 1785

1 and I will ask it another way or try to see.

2          ADMINISTRATIVE JUDGE NORKEN:  Okay.

3 Let's have him come back in.

4          (The witness returned to the hearing

5 room.)

6          ADMINISTRATIVE JUDGE NORKEN:  Ms. Lu

7 will rephrase the question.

8          Go ahead.

9    BY MS. LU:

10    Q.    Okay.  Father Ashkar, during this

11 time period of February 2004, did you have any

12 other conversations with Father Heffernan?

13    A.    If I recall, he called me once

14 saying "Don't come to say the mass on Saturday

15 because you will be in trouble with the

16 archdiocese."

17    Q.    And --

18    A.    That's my recollection.

19    Q.    What was your response to that?

20    A.    Exactly I don't know what I

21 responded but I -- to rephrase what I said, I

Page 1786

1 said "They will handle any trouble with the

2 archdiocese but I don't take orders from you,"

3 something in that line.  Exactly, I don't

4 recall what I said.

5    Q.    And do you know what he meant by not

6 getting in trouble with the archdiocese?

7    A.    No.

8    Q.    Did you have any other conversations

9 with Father Heffernan during this February 2004

10 time period?

11    A.    I don't recall except that one time

12 that I said I was saying mass and I don't think

13 I approached him more than that.

14    Q.    And when you asked him that time

15 whether he was doing mass, what did he respond?

16    A.    He said "You see, I was preparing."

17 He was preparing for saying so --

18    Q.    Father Ashkar, have you ever given

19 communion to Dr. Fitzgerald?

20          MS. HARRIS:  Objection.

21          Judge, this is beyond the scope of

Page 1787

1 what Father Ashkar is here to testify about,

2 the Saturday mass.  And they haven't indicated

3 they were going to call him on rebuttal.

4          ADMINISTRATIVE JUDGE NORKEN:  If

5 they don't ask it, I'm going to ask it.

6          MS. HARRIS:  Over our objection.

7 Yesterday, Judge, we asked them who they were

8 calling for the purpose of rebuttal regarding

9 the testimony and they said Mr. Jones and

10 Mr. Fitzgerald.

11          ADMINISTRATIVE JUDGE NORKEN:  I

12 always figured -- I always thought that we

13 would bring Father Ashkar back to ask him about

14 this area.  And if the agency doesn't ask I

15 will ask, so you might as well go ahead.

16          Overruled.

17    BY MS. LU:

18    Q.    Do you need me to repeat the

19 question?

20    A.    Please.

21    Q.    Have you ever given communion to

Page 1788

1 Dr. Fitzgerald?

2    A.    I think I answered this question

3 last time when I was asked if I give communion

4 to non-Catholics.  As a principle, no, we are

5 not allowed.  But when they come in a crowd in

6 the church, I am saying mass, I don't even look

7 who is there and I don't refuse anyone.

8          So if he had come at any time, I

9 have no knowledge of that.  I don't ask

10 questions when they are in a community and

11 during mass.  Whoever comes in the line

12 receives communion.

13    Q.    Well, have you ever seen

14 Dr. Fitzgerald come through the communion line?

15    A.    He comes every Saturday, I think,

16 and he does come in the line.

17    Q.    He goes to mass but does he go

18 through the communion line?

19    A.    No.

20    Q.    Does he go through the communion

21 line?

5 (Pages 1785 to 1788)

Page 1789

1    A.    No.

2    Q.    But he is just there at mass?

3    A.    Because on Saturday it's a very

4 small crowd and he doesn't come to communion.

5    Q.    He does not come to communion?

6    A.    No.

7    Q.    Father Ashkar, the Saturdays in

8 February 2004 when you were contracted to go

9 say mass on Saturday but you left because

10 Father Heffernan was there, were you paid for

11 the time that you were supposed to be there

12 anyways on Saturday?

13    A.    Yes.

14         MS. LU:    That's all the questions I

15 have.

16         ADMINISTRATIVE JUDGE NORKEN:

17 Cross-examine?

18         MS. HARRIS:    Yes.    Thank you, Judge.

19         ADMINISTRATIVE JUDGE NORKEN:    About

20 how long?

21         MS. HARRIS:    About 15 minutes.

Page 1790

1         ADMINISTRATIVE JUDGE NORKEN:    You

2 may examine.

3              CROSS-EXAMINATION

4         BY MS. HARRIS:

5    Q.    Father Ashkar, isn't it true that

6 during the Saturday -- during these times when

7 you came in the Saturday masses in February

8 2004, you never had any exchange of words with

9 Father Heffernan?

10    A.    What do you mean by "exchange of

11 words"?

12    Q.    Well, did you ever exchange any

13 words whatsoever with Father Heffernan during

14 the Saturday masses in February 2004?

15    A.    During the Saturday masses, no,

16 because what I said once I asked him, "What,

17 are you saying mass," and I got a response.

18 But besides the phone call that I received from

19 him, no.

20    Q.    Do you recall your deposition being

21 taken by Mr. Kator in November of 2004?

Page 1791

1    A.    I think so, yes.

2    Q.    During that deposition, you swore to

3 tell the truth?

4    A.    Yes.

5    Q.    And do you recall being asked the

6 question --

7         ADMINISTRATIVE JUDGE NORKEN:    Any

8 idea what --

9         MS. HARRIS:    I'm not sure this is in

10 the record.

11         ADMINISTRATIVE JUDGE NORKEN:    Part

12 of Father Ashkar's deposition is in the record?

13         MS. HARRIS:    It is.    This would be

14 page 12 of the November 2004 deposition.

15         BY MS. HARRIS:

16    Q.    If you could take a look at this.

17 You see the first page here is November 2004,

18 November 29, 2004, you see that date?

19    A.    Yes, ma'am.

20    Q.    And reflects that you were called as

21 a witness on that day, page 4.    See that there?

Page 1792

1 And you were sworn to tell the truth that day,

2 correct?

3    A.    Yes, ma'am.

4    Q.    Okay.    And if you take a look on

5 page 12 of the deposition, flip the page, it

6 will be over here, you stated starting at

7 line 8:

8         "Question:  And you would show up at

9 the mass and the chaplain would be there.  Who

10 do you mean?

11         "Answer:  Father Henry Heffernan.

12         "Question:  -- "

13         MS. LU:    I'm sorry, Cathy, what

14 page?  It's not 12.

15         MS. HARRIS:    12.

16         ADMINISTRATIVE JUDGE NORKEN:    Of

17 Ashkar's deposition?

18         MS. HARRIS:    Right.    November 2004.

19         MS. LU:    Yes.  But that is not

20 what -- can you just -- this is what my 12

21 reads.

6 (Pages 1789 to 1792)

Page 1793

1         MS. HARRIS:  The pagination might be

2 slightly off.

3         MS. LU:  Okay.  Thank you.

4         MS. HARRIS:  In the large print it

5 looks to be on 13, but it extends to page 12.

6         BY MS. HARRIS:

7    Q.    "Question:  Father Heffernan, were

8 you there?

9         "Answer:  Yes.

10        "Question:  And to not create any

11 hard feelings you would go home?

12        "Answer:  Never were any exchange of

13 words."

14        Did I read that correctly?

15   A.    Okay.

16   Q.    I did?  I read it correctly?

17   A.    Yeah.

18   Q.    Thank you.

19   A.    There is one --

20   Q.    There is no question pending.

21   A.    Ma'am if you are trying to say --

Page 1794

1    Q.    There is no question pending.

2    A.    Sir -- okay.

3    Q.    Okay.  Father Ashkar, you don't

4 recall Dr. Fitzgerald speaking with Father

5 Heffernan during those mass services in

6 February 2004, correct?

7    A.    I don't.

8    Q.    So you don't recall any instructions

9 by Dr. Fitzgerald telling Father Heffernan to

10 stop doing the mass and go home, correct?

11   A.    I think I have received a copy of

12 what the memo that was sent to him.

13   Q.    Okay.  But you didn't see

14 Dr. Fitzgerald give Father Heffernan any

15 instruction to stop doing the mass and go home?

16   A.    I don't recall that.

17   Q.    Okay.  And when you told

18 Dr. Fitzgerald in February 2004 "Father

19 Heffernan is here.  I don't need to do the

20 mass," Dr. Fitzgerald said "Okay," right, "go

21 home"?

Page 1795

1    A.    I think so.

2    Q.    Okay.  And when Father Heffernan

3 called you and said "Don't come to the mass on

4 Saturday because you will get in trouble with

5 the archdiocese," you said in sum and substance

6 "I don't take orders from you," correct?

7    A.    I recall.  That's what I recall,

8 yes.

9    Q.    Because you take orders from the

10 person who pays you, correct?

11   A.    Yes, ma'am.

12   Q.    And you didn't believe that Father

13 Heffernan was in any position of authority over

14 you, correct?

15   A.    He was not the one who hired me and

16 he was not the one who was paying me.

17   Q.    Right.  So in your view, Father

18 Heffernan had no ecclesiastical authority over

19 what you did in your position at NIH, correct?

20        MS. LU:  Object to the phrase

21 "ecclesiastical authority."  It is ambiguous.

Page 1796

1         ADMINISTRATIVE JUDGE NORKEN:  I

2 think he might understand it.

3         Overruled.

4         THE WITNESS:  The NIH is not an

5 ecclesiastical place.

6         BY MS. HARRIS:

7    Q.    Right.  But my question is you

8 didn't believe that Father Heffernan had any

9 ecclesiastical authority over you in your

10 position at NIH, correct?

11   A.    I said NIH is not an ecclesiastical

12 place, ma'am.

13   Q.    And therefore, you need to answer my

14 question directly.

15   A.    I need to say the one who calls me,

16 the one who pays me, I take orders from him.

17   Q.    And you didn't take orders from

18 Father Heffernan, correct?  He wasn't the one

19 paying you, correct?

20   A.    That's true.

21   Q.    And even though he was the Catholic

7 (Pages 1793 to 1796)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                                    :
Plaintiff *pro se*,

v.                                             :

                                         C.A. No.  1:07-cv-02308(RMC)

WILLIAM BIGLOW, *et al.*
Defendants.                                    :
                       ...oOo...

Transcript of testimony of Rev. Dominic Ashkar at EEOC Hearing,
*Heffernan v. Leavitt*, Secretary DHHS, EEOC Case No. 120-2005-00226x

Hr'g  12/15/05   pgs 1797- 1820

EXHIBIT 7 ~ 10

9

Page 1797

1 chaplain at NIH, you didn't believe you needed

2 to take any orders from him, correct?

3    A.    That's not true, ma'am.

4    Q.    That's not true?

5    A.    It's not true when you say -- you

6 phrase it that way.

7    Q.    Okay.  So you --

8    A.    And there was asked --

9    Q.    Is it true that Father Heffernan was

10 the Catholic chaplain at NIH?

11    A.    Yes, ma'am.

12    Q.    And is it true that you believed he

13 did not have any ecclesiastical authority over

14 you in your position at NIH?

15         MS. LU:  Objection.  Asked and

16 answered.

17         MS. HARRIS:  Well, I don't think he

18 has directly answered it, Judge.

19         ADMINISTRATIVE JUDGE NORKEN:  "Asked

20 and answered" is not an appropriate objection

21 on cross.

Page 1798

1         Overruled.

2         THE WITNESS:  Can you define the

3 word "ecclesiastical"?

4         BY MS. HARRIS:

5    Q.    In the hierarchy of the Church,

6 Father Heffernan did not have -- you believed

7 Father Heffernan did not have any religious

8 authority over you?

9    A.    I know that he was the Catholic

10 chaplain and I think I said it before, that I

11 tried to communicate with him on two or three

12 occasions regarding some patients.  And anyway,

13 I was ignored.  He was the main Catholic

14 chaplain.

15    Q.    And as the main Catholic chaplain,

16 isn't it true that you needed to follow his

17 directions regarding the delivery of services

18 to Catholic patients at NIH?

19    A.    Directly, no.

20    Q.    Because you believe that the one who

21 pays you, that's who you follow the orders?

Page 1799

1    A.    Yes, ma'am.

2    Q.    Regardless of Father Heffernan's

3 ecclesiastical position and authority in the

4 Church, correct?

5    A.    That has --

6    Q.    Okay.  I will move on.

7         MS. HARRIS:  The record will reflect

8 that the witness hasn't answered the question.

9         BY MS. HARRIS:

10    Q.    And you stated during your direct

11 examination that you don't look and see who

12 comes up to get communion on a general basis,

13 correct?

14    A.    Yes.

15    Q.    So you might have given

16 Dr. Fitzgerald communion at some point; is that

17 correct?

18    A.    When I say "I don't look," I don't

19 look.

20    Q.    So it's possible you might have

21 given him communion?

Page 1800

1    A.    I cannot answer yes or no to this

2 question, ma'am.

3    Q.    Well, is it possible?

4    A.    I don't know.

5    Q.    You don't know whether it's

6 possible?

7    A.    No, I don't.

8    Q.    Okay.  What is your status now at

9 NIH, your employment status?

10         MS. LU:  Objection.  Relevance.

11         MS. HARRIS:  This goes to bias,

12 Judge.

13         ADMINISTRATIVE JUDGE NORKEN:

14 Overruled.

15         THE WITNESS:  As of the 2nd of this

16 month, which is April, I was sent to training

17 and I was asked to be an employee of the

18 institution.

19         BY MS. HARRIS:

20    Q.    And what is your position -- well,

21 did you accept the position?

8 (Pages 1797 to 1800)

Page 1801

1    A.    It is up to them to accept it or to
2 refuse it.
3    Q.    Okay.  And what is the position to
4 be?  What's the title?
5    A.    As a Catholic chaplain.
6    Q.    Catholic chaplain.  So you are in a
7 position that -- you are going to be full-time
8 in this position?
9    A.    I think so.
10    Q.    And is it your understanding that
11 this is the position Father Heffernan formerly
12 filled -- excuse me, formerly held?
13    A.    I never saw the job description that
14 he had.
15    C.    Okay.  But Father Heffernan was the
16 full-time Catholic chaplain previously,
17 correct?
18    A.    I think so.
19    Q.    And now you are going to be the
20 full-time Catholic chaplain, correct?
21    A.    Yes.

Page 1802

1    Q.    And you will be making more money
2 now as a full-time Catholic chaplain than you
3 did during your part-time contract work at NIH,
4 correct?
5    A.    No.
6    Q.    No?
7    A.    No.
8    Q.    What is your salary going to be?  Do
9 you know what grade it will be?
10    A.    I think it will be -- what do they
11 call it?  T-42.
12    Q.    Is it a GS-12?
13    A.    I don't know, ma'am.
14    Q.    You don't know?
15    A.    Once they said T-42.
16    Q.    D-42?
17    A.    T, like in the "Tom."
18    Q.    T-42.  Okay.
19          And how much were you making as a
20 contract chaplain?
21    A.    It depends how many hours I work,

Page 1803

1 ma'am.
2    Q.    Okay.  Recently you have been
3 working how many hours at NIH?
4    A.    Quite a few.
5    Q.    Forty?
6    A.    Could be 40.  It could be more.  It
7 could be 30.  It depends on the attendance.
8    Q.    When Father Heffernan was the
9 full-time Catholic chaplain, you were paid for
10 20 hours on call, correct?
11    A.    Yes.
12    Q.    And some additional days, one
13 additional day; is that correct?  You worked
14 one day at NIH?
15    A.    Yes.
16    Q.    So -- I'm sorry, 20 nights on call,
17 and then one day at NIH; is that right?
18    A.    Yes.
19    Q.    So now as a full-time Catholic
20 chaplain, you would be guaranteed 40 hours a
21 week, correct?

Page 1804

1    A.    That's true.
2          MS. HARRIS:  Nothing further.
3          ADMINISTRATIVE JUDGE NORKEN:  I have
4 no questions.
5          Ms. Lu, do you have any questions in
6 the scope of the complainant's questions?
7          MS. LU:  Yes.
8          ADMINISTRATIVE JUDGE NORKEN:  About
9 how long?
10          MS. LU:  Probably 15 minutes.
11          ADMINISTRATIVE JUDGE NORKEN:  You
12 may examine.
13          REDIRECT EXAMINATION
14          BY MS. LU:
15    Q.    Father Ashkar, in your cross you
16 were shown an excerpt from your deposition in
17 November 2004 and where you were asked about --
18 you said there never were any exchange of words
19 between you and Father Heffernan?
20    A.    Yes.
21    Q.    What did you mean by that?

9 (Pages 1801 to 1804)

Page 1805

1    A.    What I mean that there was never any
2 fighting. When you exchange words back and
3 forth, is it like fighting with someone. And
4 there is a difference between an exchange of
5 words and the simple question asked.
6    Q.    So that is what you meant by never
7 any exchange of words?
8    A.    Yes. Exchange of words, the way I
9 understand it it means I am kind of fighting
10 with someone. You do it, you don't do it. I
11 do it, you don't do it. And that is when there
12 is this exchange of words.
13    Q.    You were also asked on
14 cross-examination a question about
15 ecclesiastical authority. Do you know what
16 that is?
17    A.    I think you better ask those who are
18 using it.
19    Q.    So did you even know what that term
20 means when you were asked that question?
21    A.    I know what the term means, but that

Page 1806

1 is not the way --
2    Q.    What do you think the term means?
3 What did you take it to mean?
4    A.    It is within the Church.
5 ecclesiastical.
6    Q.    You meaning within the Catholic
7 Church?
8    A.    Within the Church, yes.
9    Q.    What do you mean by that?
10    A.    With the authority. The echelon of
11 the authority.
12    Q.    You mean with the Pope and the
13 bishops and the cardinals?
14    A.    Yes. I take orders from my bishop
15 or any bishop I work with. And they work with
16 five of the bishops and the cardinals.
17        I work with the cardinal of
18 Baltimore here. I work with the cardinal of
19 Washington. I work with the bishop of
20 Arlington. I work with the military
21 archdiocese. And I work with my own bishop.

Page 1807

1        And when I am under any of these
2 authorities, I have to -- if I am saying mass
3 in Arlington, I say the name of the bishop of
4 Arlington. If I am saying mass in here, I say
5 the name of this archbishop. In the military
6 places I use the name of the military
7 archbishop. And when I am doing something in
8 their territory, they are the ones from whom I
9 take orders.
10    Q.    Now, so in a setting like the
11 Clinical Center, does the ecclesiastical
12 authority -- does that apply in a setting like
13 the Clinical Center?
14        I mean you testified in
15 cross-examination that the NIH is not
16 ecclesiastical. What did you mean by that?
17    A.    It is not an institution that
18 belongs of the Church --
19    Q.    Okay. I just wanted to understand
20 what you meant by that.
21    A.    -- but we keep informing the local

Page 1808

1 bishop. Like now I am under the archdiocese of
2 Washington. Anything that happens I have to
3 inform them. They are the authority.
4    Q.    You had also testified on cross that
5 you have now become a full-time chaplain at
6 NIH. Has that affected your testimony at all
7 here today?
8    A.    Can you explain what you mean by
9 this?
10    Q.    Well, does the fact that you are now
11 a full-time chaplain at NIH, full-time
12 employee, does that --
13    A.    Maybe because they are in the
14 process of --
15    Q.    Does that make your testimony
16 today -- does that affect your testimony today?
17    A.    It doesn't affect my testimony and
18 it doesn't -- what is really bothering me is
19 some of the questions that were asked that
20 makes me feel kind of I am pushing a brother
21 priest out to take his place. And that's not

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 1809

1  the case, but it will not affect anything.

2      Q.      Do you recall when you testified

3  here in December of 2005 when you came to

4  testify the first time for this case?

5      A.      Yes.

6      Q.      At that time were you still a

7  contract chaplain at NIH?

8      A.      Yes.  And if I may add, I didn't

9  even --

10     Q.      There is no other question pending.

11     A.      Okay.  Can I have a drop of water?

12             ADMINISTRATIVE JUDGE NORKEN:  Sure.

13 We will take a two-minute break.

14             MS. LU:  Can you give me one second

15 because I think I am done.

16             Yes, I am done.

17             ADMINISTRATIVE JUDGE NORKEN:  Okay.

18 We will take a five-minute break.

19             THE WITNESS:  All I need is a drop

20 of water.

21             MS. HARRIS:  There is a water

Page 1810

1  fountain in the hallway.

2             THE WITNESS:  I know, ma'am.

3             ADMINISTRATIVE JUDGE NORKEN:  Off

4  the record.

5             (A short recess was taken.)

6             ADMINISTRATIVE JUDGE NORKEN:  Any

7  recross?

8             MS. HARRIS:  Yes.

9             ADMINISTRATIVE JUDGE NORKEN:  About

10 how long?

11             MS. HARRIS:  No more than 10

12 minutes.

13             ADMINISTRATIVE JUDGE NORKEN:  Within

14 the scope?

15             MS. HARRIS:  Yes.

16             ADMINISTRATIVE JUDGE NORKEN:  Go

17 ahead.

18             RECROSS-EXAMINATION

19 BY MS. HARRIS:

20     Q.      Father Ashkar, on the redirect you

21 were asked about ecclesiastical authority and

Page 1811

1  you said the authority -- the hierarchy of

2  authority within the Church, correct?

3      A.      Yes, ma'am.

4      Q.      And you mentioned the Pope -- the

5  archbishop, the bishop, et cetera, correct?

6      A.      Yes.

7      Q.      And isn't it true that the hospital

8  chaplain, the head hospital chaplain -- I'm

9  sorry, the head hospital Catholic chaplain has

10 certain authorities under the Roman Catholic

11 Canon law?

12     A.      In a civil institution when a

13 Catholic chaplain is hired in an institution, a

14 civil -- a government institution, he becomes

15 an employee.  What kind of authority the

16 institution gives him, that is the authority.

17     Q.      I see.  So it's your testimony that

18 as a Catholic chaplain, Father Heffernan had no

19 ecclesiastical authority in his position as the

20 head Catholic chaplain at the NIH Clinical

21 Center?  That is your testimony?

Page 1812

1      A.      I didn't say that.

2             MS. LU:  Objection.

3  Mischaracterization of testimony.

4             ADMINISTRATIVE JUDGE NORKEN:  Stop.

5             Overruled.  He has already answered.

6  BY MS. HARRIS:

7      Q.      So then he did have ecclesiastical

8  authority in his position as head Catholic

9  chaplain at NIH?  Yes or no?

10     A.      Over whom?

11     Q.      Over other -- over you.

12     A.      That depends when I was hired.  If I

13 am hired only directly to be under him.

14     Q.      I see.  And didn't Dr. Fitzgerald

15 tell you that you were not to take orders from

16 Father Heffernan?

17             MS. LU:  Objection.  Outside the

18 scope.

19             MS. HARRIS:  I think it directly

20 follows, Judge.

21             ADMINISTRATIVE JUDGE NORKEN:  I will

11 (Pages 1809 to 1812)

Page 1813

1 allow it.

2          Overruled.

3          THE WITNESS: No.

4          BY MS. HARRIS:

5    Q.    Dr. Fitzgerald didn't tell you that?

6 He didn't say "You are not to take orders from

7 Father Heffernan"?

8    A.    I don't recall, but I think he never

9 said that to me. That's my recollection.

10   Q.    What did Dr. Fitzgerald tell you

11 about your relationship with Father Heffernan?

12        MS. LU: Objection. It's outside

13 the scope of recross.

14        ADMINISTRATIVE JUDGE NORKEN: No. I

15 believe it is still within it.

16        Overruled.

17        THE WITNESS: I don't recall that he

18 ever told me not to deal with Father Heffernan.

19        ADMINISTRATIVE JUDGE NORKEN: I'm

20 sorry, I didn't hear you.

21        THE WITNESS: As I recall, he --

Page 1814

1 Dr. Fitzgerald never told me not to deal with

2 Father Heffernan.

3          ADMINISTRATIVE JUDGE NORKEN: Not

4 to?

5          THE WITNESS: Not to deal with

6 Henry.

7          BY MS. HARRIS:

8    Q.    What did he tell you? What did he

9 tell you about your relationship with Father

10 Heffernan?

11   A.    I don't recall him having said

12 anything that -- to stop any relationship or to

13 affect any relationship. I don't recall any

14 orders like that.

15   Q.    Isn't the head Catholic chaplain

16 akin to and have the authority of a parish

17 priest in a civilian setting?

18   A.    Not necessarily.

19   Q.    Not necessarily?

20   A.    No.

21   Q.    So it's your opinion, then, that

Page 1815

1 Father Heffernan did not have the same

2 authority that a parish priest would have in

3 his position as head chaplain -- head Catholic

4 chaplain?

5    A.    Ma'am, a parish is one thing and it

6 goes directly under the authority of the

7 bishop. And the hospital is directed by the

8 government.

9    Q.    Well, isn't the chaplain appointed

10 by the local ordinary just as a parish priest

11 would be appointed or don't you know?

12   A.    I don't know.

13   Q.    You don't know?

14   A.    With the permission, maybe.

15   Q.    And isn't it true you don't really

16 know what the ecclesiastical authority of a

17 head chaplain is? You don't know the answer to

18 that, do you? Yes or no?

19   A.    I never was given any instruction in

20 writing or in -- verbally.

21   Q.    I am not asking whether you were

Page 1816

1 given any instruction. I am just --

2    A.    Ma'am, when you don't get anything,

3 you don't go fishing in the air like that to

4 find any rules.

5    Q.    Okay. So the answer is you don't

6 know. You never looked, you never inquired,

7 you just don't know?

8    A.    I never received, I said.

9    Q.    Well, my question is do you know

10 what ecclesiastical authority a head Catholic

11 chaplain has in a hospital setting? Do you

12 know?

13        You told me you never received any

14 instruction, you never received anything in

15 writing, you didn't go looking. So my question

16 is do you know? It doesn't sound like it.

17   A.    It doesn't come directly here from

18 the Church, ma'am. It is coming from an

19 institution.

20   Q.    Right.

21   A.    They decide.

12 (Pages 1813 to 1816)

Page 1817

1    Q.    You don't know what the Church says

2  about this issue, do you?  If you do, tell me.

3    A.    Yes, I do.

4    Q.    Okay.  So what does the Church say

5  about the ecclesiastical authority of a

6  Catholic chaplain?

7    A.    Ma'am, I need my books to be able to

8  respond directly to these.

9        MS. HARRIS:  Nothing further.

10       ADMINISTRATIVE JUDGE NORKEN:  Okay.

11  Any response to that?

12       MS. LU:  I have no further

13  questions.

14       ADMINISTRATIVE JUDGE NORKEN:  Okay.

15  I assume this witness is not going to be used

16  in rebuttal by either side; is that right?

17       MS. LU:  No.

18       ADMINISTRATIVE JUDGE NORKEN:  Is

19  that correct?

20       MS. HARRIS:  Not by us, Judge.

21       ADMINISTRATIVE JUDGE NORKEN:  Father

Page 1818

1  Ashkar, I remind you not to discuss this case

2  or your testimony in this case with any other

3  witness in this case until these proceedings

4  are ended.

5        I thank you for your testimony.  You

6  are excused.  You will not have to testify in

7  this case anymore.  Thank you.

8        THE WITNESS:  That is a promise?

9        ADMINISTRATIVE JUDGE NORKEN:  That's

10  a promise.

11       THE WITNESS:  I hope so.

12       ADMINISTRATIVE JUDGE NORKEN:  Thank

13  you.  Off the record.

14       (A short recess was taken.)

15       ADMINISTRATIVE JUDGE NORKEN:  On the

16  record.

17       How much longer for this witness?

18       MS. LU:  Well, I need two and a

19  half.

20       ADMINISTRATIVE JUDGE NORKEN:  Okay.

21       MS. LU:  I will move it along.

Page 1819

1        ADMINISTRATIVE JUDGE NORKEN:  I will

2  hold you to that.

3  WALTER JONES,

4  was called for examination by counsel and,

5  after having been previously sworn by, was

6  examined and testified as follows:

7    EXAMINATION BY COUNSEL FOR AGENCY

8        DIRECT EXAMINATION (Cont'd)

9    BY MS. LU:

10   Q.    Mr. Jones, after Father Heffernan

11  served his five-day suspension, did Father

12  Heffernan present a plan to pay PCE?

13       You need to speak up.

14   A.    No.

15   Q.    Take a look at in the blue book

16  No. 2 at Exhibit 58, the Agency Exhibit 58.

17  Take a look at that exhibit.

18   A.    Okay.

19   Q.    Do you recognize this e-mail and the

20  attachment?

21   A.    Yes, I do.

Page 1820

1    Q.    And this e-mail references a final

2  version of a suspension.  Which suspension is

3  this in reference to?

4    A.    This is the suspension for five days

5  due to --

6    Q.    Sorry?

7    A.    Five days for failure to follow

8  supervisory instructions.

9    Q.    This e-mail was from Hillary Fitilis

10  to you and there is a CC to Gwen Platt.

11       Who is Ms. Fitilis?

12   A.    She is our internal employee

13  relations consultant.

14   Q.    And who is Gwen Platt?

15   A.    She works in employee relations for

16  NIH.

17   Q.    Did you seek assistance from

18  Ms. Fitilis and Ms. Platt on the five-day and

19  14-day suspension decisions?

20   A.    Yes, I did.

21   Q.    And how did they assist you in this

13 (Pages 1817 to 1820)