IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                                    :
Plaintiff *pro se*,

v.                                             :

                                                        C.A. No. 1:07-cv-02308(RMC)
WILLIAM BIGLOW, *et al.*
Defendants.

                          ...oOo...


**PLAINTIFF'S MOTION FOR JUDICIAL NOTICE SUBMITTING DECLARATIONS INTO THE RECORD TO SUPPORT HER VARIOUS MOTIONS AND RESPONSES, PART VI**

Plaintiff, Edar Rogler, *pro se* hereby respectfully submits into the instant record true and accurate copies of the following uncontested declarations that were submitted in other related matters and incorporates by reference herein here legal arguments in her previous motions for judicial notice:

Exhibit 1, AFFIDAVIT OF ANGELA KINNEY, dated 12/11/2006 submitted in *Rabbi Reeve Robert Brenner v. Michael Leavitt, Secretary DHHS*, EEOC;

Exhibit 2, AFFIDAVIT OF FATHER HENRY HEFFERNAN, dated 04/27/2007 submitted in *Rogler v. Michael Leavitt, Secretary, DHHS,* 07-00726(WMN);

Exhibit 3, (Second) AFFIDAVIT OF FATHER HENRY HEFFERNAN, dated 07/28/2007 submitted in *Rogler v. Michael Leavitt, Secretary, DHHS,* 07-00726(WMN);

Exhibit 4, AFFIDAVIT OF EDAR ROGLER, dated 05/07/2007 submitted in *Rogler v. Michael Leavitt, Secretary, DHHS,* 07-00726(WMN);

1

Exhibit 5, AFFIDAVIT OF RABBI REEVE ROBERT BRENNER, dated 05/07/2007 submitted in *Rogler v. Michael Leavitt, Secretary, DHHS,* 07-00726(WMN);

Exhibit 6, SECOND AFFIDAVIT OF RABBI REEVE ROBERT BRENNER, dated 08/01/2007 submitted in *Rogler v. Michael Leavitt, Secretary, DHHS,* 07-00726(WMN);

Exhibit 7a-b, SECOND AFFIDAVIT OF RABBI REEVE ROBERT BRENNER, dated 08/01/2007 submitted in *Rogler v. Michael Leavitt, Secretary, DHHS,* 07-00726(WMN); and

Exhibit 8, email from Defendant O.Ray Fitzgerald to Plaintiff dated August 12, 2005 regarding "Catching up 2";

WHEREFORE, Plaintiff respectfully prays for an Order taking judicial notice of the above uncontested declarations and email submitted in other matters.

Respectfully submitted by:

_____/s/_____
Edar Rogler
915 Boucher Avenue
Annapolis, Maryland  21403
(410) 280-9270

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                                    :
Plaintiff *pro se*,

v.                                             :

                                                        C.A. No.  1:07-cv-02308(RMC)
WILLIAM BIGLOW, *et al.*
Defendants.

...oOo...

EXHIBIT 1

## <u>AFFIDAVIT OF ANGELA KINNEY</u>

I.    I, Angela Kinney (not Jewish (Baptist); with 1 prior EEO activity), Administrative Officer, GS-11, Spiritual Ministry Center, Clinical Center, National Institutes of Health (NIH), U.S. Department of Health and Human Services (HHS), do hereby solemnly swear or affirm:

I am submitting this affidavit in connection with a complaint of discrimination that was filed by Rabbi Reeve Brenner on June 5, 2006 against the NIH with an amendment to the complaint added in late October 2006.

The EEO Investigator, Anne J. King, has informed me that Rabbi Brenner has alleged discrimination based on his religion (Jewish) and reprisal (prior EEO activity) when he was subjected to a hostile working environment as evidenced by a number of incidents. I have been informed that the following allegations were accepted for investigation but that Rabbi Brenner's complaint also concerns other allegations that he has raised in connection with his claim of a hostile environment:

   (1) since January 20, 2006, Rabbi Brenner has been denied a tour of duty that would enable him to provide Shabbat services for Jewish patients at the Clinical Center and denied the use of the Clinical Center Chapel for daily & week-end Shabbat services;

   (2) In December 2005 through April 2006, he was subjected to derogatory comments by his supervisor regarding his Jewish faith and practice;

Page 1 of 12

Exhibit 1

(3) In February 2006, he was not allowed to perform his duties as the Jewish Chaplain for a

Jewish traditional funeral service at the Clinical Center Chapel;

(4) Since February 2006, he has been denied back-pay to cover all mandatory Clinical Pastoral

Education training and has previously been denied back-pay for on-call services rendered

at the Clinical Center;

(5) In March 2006, he was subjected to a hostile working environment when his supervisor lost

his temper and threw a book at him during a meeting; the supervisor apologized to him but

lied to the investigator that it had ever happened;

I understand as well that Rabbi Brenner has raised claims concerning (1) the agency's recent

construing of its ethics rules which have negatively affected Rabbi Brenner's ability to provide

religious services to Jewish patients in a variety of ways and his ability to provide certain literature

and materials of a religious liturgy nature to patients; (2) his discovery that prayers for the

conversion of Jews were being openly recited during public Catholic services at the NIH;  (3)

letters and memos he has received from his supervisors since he initiated his EEO complaint which

have been threatening in character, clearly intended to intimidate and to provoke, creating an ever

increasing atmosphere of hostility and mounting physical and mental distress; (4) members of the

Bet Chesed quorum, where he serves as a part-time Rabbi and the members/regulars of the "14th

floor Minyan" have been met with ongoing hostility and obstructions -- and service cancellations

-- in their efforts to serve as volunteers to Jewish patients at the Clinical Center who need the

spiritual support of a quorum for the daily, Sabbath, and High Holyday worship services that they

Initials AK

Exhibit 1 p. 2

need to meet their obligations; (5) his discovery that Dr. Fitzgerald put in the trash the Jewish prayer books that were used daily and were essential for Jewish religious worship; also, under Dr. Fitzgerald's purview, the High Holiday prayer books disappeared suddenly (both acts were reported to the campus police); (6) Dr. Fitzgerald's consistent refusal to allow him to have designated space for Jewish religious practices within the chapel, and religious services space controlled by the Spiritual Ministry Department. By contrast, Roman Catholics, Muslims, and Protestants, have devoted space whereas the largest cohort – the daily Jewish quorum/congregation – has none; (7) Continuous campaign to once again eliminate the Jewish chaplaincy (which had been previously eliminated); Dominick Ashkar being the most recent to voice to others in a derogatory and hurtful manner that the Jewish chaplaincy should be eliminated.

I understand as well that Rabbi Brenner recently amended his EEO complaint to include a claim of religious and reprisal discrimination with regard to a Notice of Proposed Removal that he received on October 24, 2006.

I have personally met with and been interviewed by the Investigator and will answer the following questions for the record to the best of my ability.

Initials ᴀᴋ

Exhibit 1 p. 3

## Discussion

**Q.     Mrs. Kinney, please state your position and office/or Division with the agency and the length of time that you have held the position. What are the essential duties of your job?**

A.     I am the Administrative Officer for the Spiritual Ministry Department. I have been an Administrative Officer (AO) for 5 years and have worked for the Spiritual Ministry Department (SMD) as the department's AO for one year. In my capacity as the Administrative Officer, I am responsible for providing direct support to departments within the Clinical Center of NIH, which include the Office of the Director and the Spiritual Ministry Department. My responsibilities include providing direct administrative and financial support to the Clinical Center departments. I provide daily oversight of all the departments' administrative activities in such areas as administrative and personnel management, finance, budget and acquisitions management. I work closely and directly with department heads and others to satisfy the administrative support requirements of each department and its employees. I also act as a liaison between the departments and their department heads.

**Q.     In what capacity do you know Rabbi Brenner?**

A.     I meet Rabbi Brenner after becoming the Administrative Officer for the Spiritual Ministry Department.

Page 4 of 9

Initials AK


Exhibit 1 p. 4

Q. Ms. Kinney, as noted above, Rabbi Brenner has alleged that his efforts to obtain back-pay to cover time he spent in Clinical Pastoral Education (CPE) training were denied/delayed. What was your role, from an administrative standpoint, in processing Rabbi Brenner's request for back pay? Do you have any reason to believe that there was any intention on the part of either Dr. Ray Fitzgerald or Mr. Walter Jones to deny (or delay) any back-pay that Rabbi Brenner may have been entitled to? Has Rabbi Brenner received any back pay that he requested? Please discuss.

A.    I became involved when Rabbi Brenner gave me an invoice for $650 from Sibley Memorial Hosp. for his CPE training. This training was required for him to take from September 2005 and was completed in December 2005, with the verbal agreement between Ray Fitzgerald and Rev. Glen Calkins that the tuition would be paid upon completion. My understanding after meeting with Ray Fitzgerald, Rabbi Brenner and Rev. Glen Calkins was that Rabbi Brenner was informed by the Chief of the Department of Spiritual Ministry Department of the mandatory requirement to have 400 hours of Clinical pastoral Education (CPE) training. Payment was made to Sibley Hospital on 05/18/06. There was also a verbal agreement between Ray Fitzgerald, Rabbi Brenner and Rev. Glen Calkins on how Rabbi Brenner was to be reimbursed for the time off for taking the required CPR training. My understanding after researching and talking to Ray Fitzgerald, Rabbi Brenner and Rev. Glen Calkins was that Rabbi Brenner was to work a 20hr work week spit between NIH and Shady Grove, and also to be paid for any extra hours that were required from him so that he could complete the mandatory CPE training. There were a lot of meetings concerning this issue of

Page 5 of 9

Initials ____



payment for the total of 267 hr to Rabbi Brenner. Rabbi Brenner was required to resubmit his hours several times, so that the he could receive his payment. After he submitted the additional 267 hrs. of CPE training, I (Angela Kinney) created a signature sheet for Ray Fitzgerald, Rabbi Brenner, Rev. Glen Calkins and Walter Jones the Director of the SMD, so that this process of payment could be forwarded to the timekeeper for payment. Rev. Calkins signed the agreement and provided me with the total hours that were completed by Rabbi Brenner:  Clinical Hours =255 hrs, Didactic Class Hours =170 hrs, Hospital Orientation =8 hrs, Physical = 4 hrs. a total of 437 hrs.

Below is my timeline on when he received his payment.

### 06/06
I requested signatures from the following persons approving the memorandum dated 2/22/06 requesting reimbursement in the amount of 255 hrs:

Ray Fitzgerald – 06/05/06
Rev. Glen Calkins – 06/07/06
Walter Jones –
Reeve Brenner – 06/07/06

Rev. Glen Calkins agreed with the memo requesting reimbursement and added additional hours totaling 437 hrs. With an explanation see below:

### 06/15/06
A memo was given to Rabbi Reeve Brenner from Walter Jones asking him to include the dates and the total number of hours.

### 06/26/06
Final updated version was received from Rabbi Brenner.

Based on the final version and looking at Rabbi Brenner's tour of duty, I subtracted 255 hrs. as his tour of duty and came up with a reimbursable 167 hours. I was under the impression that Rabbi Brenner's tour of duty needed to be subtracted from the requested amount as stated by Dr. Ray Fitzgerald

Rabbi Brenner called me and informed me that he received an email and that he would like to help me understand where I calculated the hours incorrectly and that his tour of duty agreement has already been deducted from the 437 hours.

Page 6

Initials **NK**


Exhibit  1  p.  6

I informed Walter Jones of the information and showed him the requested signature.

Walter Jones sent an email asking me to process the appropriate paper work so that payment for 267 hours would be accomplished.

## 9/13/2006
I met with Kevin Harrell and gave him the final updated memorandum requesting reimbursement with the dates so that payment could be processed.

**Kevin Harrell timeline (Timekeeper)**

## 09/13/2006
During the week of 8/11/2006 I was given the results of Rabbi Brenner's time calculations. Angela Kinney informed me that I needed to review the approved time for Rabbi Brenner and make the following adjustments to his records in ITAS. Nyna Konishi asked me to place a deadline of 9/19/2006 as the deadline.

## 09/19/2006
I completed the supplement in ITAS by COB 9/19/2006

## 09/20/2006
I forwarded an e-mail addressed to Walter Jones, Angela Kinney and Nyna Konishi stating I had completed the entering of the supplements in ITAS. I spoke with Walter Jones and informed him he would have to approve the actions. Nyna reviewed the steps in viewing the transactions and Walter provided a print out of total supplemental hours entered.

## 09/22/2006

I received an irate phone call from Rabbi Brenner as he was expressing his displeasure with the way his hours were calculated. Rabbi Brenner mentioned his hours should have been calculated by using a 20hr work week split between NIH and Shady Grove. After I got the Rabbi to calm down I informed him that I did not do the calculations and that his tour of duty is 20hrs a week at NIH.

## 10/06

Walter approved that it was confirmed that the correct number of hours worked beyond Brenner's normal work schedule for the period 10/05 thru 2/06 is 267.

## 11/06
Kevin, entered 4 hours every Tuesday & Thursday until it equals the 37.50 hours remaining to equal the 267 that was agreed upon. Complete payment was made thru ITAS

Page 7

Initials 𝒟𝒦

Exhibit ____ p. 7

Q.  Ms. Kinney, Rabbi Brenner has claimed that there has not been appropriate space allocated to the Jewish prayer group (Minyan) while special spaces in the Spiritual Center have been set aside for Catholics and Muslims. What is your knowledge of this situation? To your knowledge, have there been any efforts made to find an appropriate space for the Jewish prayer group – if not, do you know why this is?

A. SMD has a Catholics Sacrament Chapel (7-2521) and a Consultation room (7-2523) for the Catholics. Ft. Ashkar has a private cabinet located in the Consultation room for his religious items and to prepare for his Daily 11:30 services. SMD has a Muslims Purification (Men-7-2481) and Muslims Purification (Woman, 7-2481) for the Muslims. To my knowledge the SMD did not preplan or make any efforts to find appropriate space for the Jewish prayer group. SMD has the Jewish prayer group meeting on the 14th Floor in the old space were Dana Kelly used to sit over in the old SMD area. Here is all the area in the new space for the SMD located in the CRC-7-2533.

- Dana's Office              7-2533
- Ray's Office               7-2525
- Consultation room         7-2523
- Catholics Sacrament Chapel     7-2521
- Auxiliary Chapel               7-1480
- Muslims Purification      Men-7-2481
- Muslims Purification      Woman, 7-2481

Page 8 of

Initials DK

Exhibit 1 p. 8

- CPE Lounge          7-2541
- Copy Room           7-2561
- Chapel              7-2553

**Q. Rabbi Brenner has alleged that he has never been asked to carry the Spiritual Center pager while Dr. Fitzgerald and non-Jewish chaplains have had this responsibility. Do you have any information with regard to this allegation? To your knowledge, what are the general rules with regard to payments to spiritual center staff members for carrying the pager on off-hours?**

A.      I don't have any information about his allegation, but I do know that Rabbi Brenner has never carried the SMD pager.

**Q. Ms. Kinney, Rabbi Brenner has been accused of violating certain agency ethics rules with regard to his outside activities as a Rabbi. Have you been involved in any discussions with Rabbi Brenner regarding outside activities or any other ethics-related policies at NIH? If so, please discuss. Do you have any reason to believe that Rabbi Brenner has been discriminated against in the way that the ethics rules have been applied to him?**

A. I have not been involved or included in any discussions regarding Rabbi Brenner's outside activities by the Ethics dept. I have had discussions with Rabbi Brenner regarding outside

Page 9

Initials _____



activities and ethics-related policies at NIH.   Rabbi Brenner's letters and other related documents were given to me by Rabbi Brenner to be put into his personnel file and to make sure that his memos were getting to his supervisor, director and the Ethics Department.

**Q. Ms. Kinney, as noted above, one of Rabbi Brenner's allegations involves an incident in which prayer books used by the Jewish Minyan (prayer group) were thrown away.  Do you have any knowledge regarding this incident – if so, please discuss, being as specific as possible. Do you have any reason to know what might have happened to the prayer books?**

A. I am aware of the issues by Rabbi Brenner but do not have any personal knowledge regarding this incident.

**Q. Ms. Kinney, Rabbi Brenner has alleged that he has been discriminated against based on his religion but also because he chose to testify (December 05/January 06 timeframe), in the EEO hearing involving Father Henry Heffernan, who was terminated previously by Dr. Fitzgerald. In your capacity as an administrative officer for the Spiritual Center have you observed any treatment of Rabbi Brenner by Dr. Fitzgerald (or by Mr. Jones) that would lead you to believe that Rabbi Brenner has been retaliated against for his EEO activity?**

A. Yes, but I don't feel comfortable with discussing them in this affidavit.

Page 10

Initials _NK_

Exhibit _H_ p. _10_

**Q. Ms. Kinney, do you have any reason to believe that Rabbi Brenner has been treated differently by Dr. Fitzgerald because of his Jewish faith with regard to any other allegations he has raised in his complaint or in any other ways?**

A. Yes, but I don't feel comfortable with discussing them in this affidavit

**Q. Were you involved in the recent Proposal to remove that was issued to Rabbi Brenner by Mr. Jones? If so, please discuss.**

A.    No

**Q. Do you have any further information that you would like to add at this time that may not have been covered above?**

A.    My experience as AO of the SMD during the past 12 months compares with my AO experience with other departments as a GS 11 AO, my administrative judgments I can honestly make the judgment that this whole series of events in the running of the SMD has been abnormal. My experience indicates that the level of disagreements and conflicts within the SMD has not been normal. The decision to remove Dr. Fitzgerald from his position indicates that the Clinical Center leadership judged that his management of the SMD was not normal and that he should have been removed years ago.  The level of conflict has become noticed throughout the higher levels of management and the judgment was that he had to go. This observation was also recognized by the pervious Administrative Officer for the SMD .

Page 11

Initials _AK_

Exhibit 1 a 12

OATH

I have reviewed this statement, which consists of __12__ pages, and hereby solemnly __X__ swear __X__ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.


_Angela Wright-Kinney_                    12-11-06
(Signature of Deponent)                    (Date)


Signed before me at
On this _____ day of _____, 2006.


Investigator    _Anne King_  12/16/08


Page 12 of 12

Initials _AK_

Exhibit ___ p. 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                              :
Plaintiff *pro se*,

v.                                       :

                                                    C.A. No.  1:07-cv-02308(RMC)

WILLIAM BIGLOW, *et al.*
Defendants.

...oOo...

EXHIBIT 2

COPY

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

U. S. DIST. COURT
DISTRICT OF MARYLAND

2007 MAY -3  A 9: 31

| | |
|---|---|
| EDAR Y. ROGLER, | ) |
| Plaintiff, *pro se,* | ) |
| | ) |  **Case No. 07-cv-0726** |
| versus | ) |  **Hon. William M. Nickerson** |
| | ) | |
| MIKE LEAVITT, | ) | |
| Secretary, DHHS, | ) | |
| Defendant. | ) | |

CLERK'S OFFICE
AT GREENBELT

BY _____ DEPUTY

### AFFIDAVIT OF FATHER HENRY HEFFERNAN
### IN SUPPORT OF PLAINTIFF'S COMPLAINT

NOW COMES Plaintiff Edar Y. Rogler, and hereby respectfully submits her

"AFFIDAVIT OF FATHER HENRY HEFFERNAN IN SUPPORT OF PLAINTIFF'S

COMPLAINT." The true original affidavit dated April 27, 2007 of Father Henry

Heffernan is attached hereto.

Respectfully submitted by:

/s/

DATED:  May 3, 2007          EDAR ROGLER, Plaintiff *pro se*
915 Boucher Avenue
Annapolis, Maryland  21403
(443) 852-6553
No fax number available

### Proof of Service

Service should be performed electronically by the Clerk's Office.

/s/

EDAR ROGLER

## AFFIDAVIT OF FATHER HENRY HEFFERNAN

I, Father Henry Heffernan am a Catholic Priest and have served both as a contract chaplain and as a civil service FTE staff chaplain in the Spiritual Ministry Department of the NIH Clinical Center.

I am submitting this affidavit to clarify factual matters concerning the practice of the Department of Spiritual Ministry of the NIH Clinical Center with respect to the responsibilities, assignments, and supporting services provided by the Department for chaplains employed under contracts.

1 - From the summer of 1994 to November of 1998 I was employed by contract as a part time Chaplain (Catholic Priest) in the Spiritual Ministry Department of the NIH. My contract specified that I was to provide full Catholic pastoral care and religious services to Catholic patients and their family members when Father Eugene Linehan, the civil service GS12 FTE Catholic staff chaplain, was on leave. My services, as his, were performed under the supervision of Dr. Owen Ray Fitzgerald, long-time (until recently) chief chaplain of the Department.

2 - In November of 1998 I was appointed to the civil service FTE position of Father Linehan after he retired. I was a civil service FTE chaplain from November of 1998 until July 2004. In March of this year, 2007, I was reemployed in the Catholic staff chaplain FTE position and currently am a civil service GS 12 employee at the NIH Clinical Center in the Department of Spiritual Ministry.

3 - As a contract chaplain from 1994 to 1998, I took Father Linehan's place each week in providing Catholic pastoral care for Catholic patients and their family members when Father Linehan's tour of duty provided him with days off. I also took his place during his annual leave days and his annual vacation and professional development programs, and other days such as for his jury duty, and also on miscellaneous other occasions. My responsibilities were the same as his during those contract duty days. The other days of the week during these years I was employed under contract as a Catholic chaplain at the National Naval Medical Center in Bethesda, Maryland.

4 - When Father Linehan retired in the fall of 1998 I was hired to take his place as the civil service FTE staff chaplain with responsibility for all pastoral care services for the major faith group of Catholics. In this civil service position, there was no change in my daily chaplain responsibilities for providing pastoral care and religious services for Catholic patients and their family members.

5 - During the years I was a contract chaplain at the Clinical Center (1994-1998) I was provided with the same types and level of support for fulfilling my responsibilities as were the civil service FTE chaplains in the Department of Spiritual Ministry. I had an office, keys to the office and to the workroom for access to the photocopier, the fax

machine, and the computer terminal for the Clinical Center's Medical Information System. I had access to the chaplains' information on patients in the Medical Information System. I had an NIH Clinical Center identification badge that was indistinguishable from that of civil service employee chaplains at the Clinical Center, and a Clinical Center paging device. I had the same authorization to check books out of the Clinical Center medical library as the civil service chaplains.

6 - In the office assigned me as a contract chaplain, in addition to the desk and chair, I had the use of a personal computer and a telephone, no different from the facilities provided to civil service chaplains. The arrangements for parking an automobile on the NIH campus were the same as for the civil service employees. When I became a civil service chaplain employee in November of 1998, I do not remember any new services provided me for supporting my pastoral care and religious services for patients that were different from those I had during the previous four years when I was a contract chaplain.

7 - During the years I was a contract chaplain (1994 – 1998) on a few occasions I was assigned by the chief chaplain to represent him in meetings with other staff persons in the Clinical Center. Also, in the discussions within the Department, my views were sought on a variety of practical matters and particularly for planning chaplain workshops.

8 - As a contract chaplain at the NIH Clinical Center, the chief chaplain assigned me responsibility for coordinating the planning of annual conferences and workshops for chaplains employed in the health services of the federal agencies: the Army, Navy, Air Force, Coast Guard, Department of Veterans Affairs, Federal Bureau of Prisons, and the Department of Health and Human Services. I was given the role of developing the programs for the annual workshops in 1997 and 1998 in coordination with lead chaplains in the other federal agencies. I continued to have this responsibility as a civil service chaplain for the workshops conducted in 1990, 1991 and 2000.

9 - As a contract chaplain (1994-1998) I did not attend the Spiritual Ministry Department's staff meetings. The reason for this was that the staff meetings were scheduled to assure that Father Linehan, the Catholic staff chaplain, would be available for those meetings, and I was not present at the Clinical Center on the days that Father Linehan was present. After I was appointed as the full-time Roman Catholic staff chaplain in November of 1998, I attended the department staff meetings, and the contract chaplains during that time (1998-2004) also attended all department staff meetings and took full part in the discussions and decision making. Since returning as a civil service staff chaplain in the spring of 2007, I observe that the contract chaplains are expected to attend department staff meetings and participate fully in the discussions and decision-making processes, and have access to the same support services as the staff chaplains.

10 - The characteristics of chaplaincy work are such that each chaplain, whether on contract or in civil service employment, must individually provide full spiritual and religious care to individual patients and their family members. For this reason, the support services for contract chaplains need to be equivalent to those provided FTE staff chaplains. For this same reason, the support services provided me as a contract chaplain

chaplain at the National Naval Medical Center (NNMC). At the NNMC I also had an office assigned me for use on my contract duty days, a personal computer, a telephone, identification badge similar to that of the Navy staff chaplains, etc. I do not remember any significant differences between the services provided contract chaplains at the NNMC and those provided contract chaplains the NIH Clinical Center; and these common support services for contract chaplains did not differ from those provided the commissioned officer Navy chaplains and the DHHS civil service FTE chaplains at the NIH Clinical Center.

I have reviewed this statement, which consists of 4 pages, and affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record.

*Henry G. Hefferan S.J.*                                    April 27, 2007

Henry G. Heffernan, S.J.

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                          :
Plaintiff *pro se*,

v.                                   :

                                                C.A. No.  1:07-cv-02308(RMC)

WILLIAM BIGLOW, *et al.*
Defendants.

...oOo...

EXHIBIT 3

## AFFIDAVIT OF FATHER HENRY HEFFERNAN

I, Father Henry Heffernan, currently am the Roman Catholic staff chaplain in the Spiritual Ministry Department of the NIH Clinical Center. I was reinstated in this position by order of the Merit System Protection Board in March of this year (2007).

I am submitting this affidavit to clarify factual matters concerning my knowledge of and experience with the practices of the Spiritual Ministry Department of the NIH Clinical Center and of its first and second level supervisors since the early 1990s, Chief Chaplain Rev. O. Ray Fitzgerald and Deputy Director Mr. Walter N. Jones. Mr. Jones currently is the Acting Chief Chaplain, and chaplain Fitzgerald is his principal advisor.

1 - The Pain and Palliative Care Service of the NIH Clinical Center was established in the year 2000, at the time when the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) was introducing standards for pain control and palliative care into its Comprehensive Accreditation Manual for Hospitals. In August of 2000, Dr. Ann Berger accepted the position in the Clinical Center to be the founder and developer of the Clinical Center's Pain and Palliative Care Service. In September of 2000, the Spiritual Ministry Department of the Clinical Center conducted a morning workshop on the chaplain's role in palliative care services. Chief Chaplain Fitzgerald and the other staff chaplains of the department recognized the importance of this dimension of chaplain services at the Clinical Center.

2 - Chief Chaplain Fitzgerald established a personal working relationship with the staff of the Pain and Palliative Care Service. He had been unsuccessful in gaining approval from any of the Clinical Center's Institutional Review Boards (IRB) for his research proposals, and subsequently focused on having his research projects inserted as an adjuvant component into the research projects of the Pain and Palliative Care Service. Chaplain Fitzgerald personally cultivated a close working relationship with the Pain and Palliative Care Service, and may even have redefined his approach to spiritual care to be that of a complementary and alternative medical treatment. But he did not include the

1

other staff chaplains, with the possible exception of chaplain Karen Morrow, in his working relationship with the Pain and Palliative Care Service. He did not allow the other staff chaplains to participate in whatever services he and his clinical pastoral education students provided to the patients who were provided palliative care.

3 - None of the other chaplains in the Department of Spiritual Ministry had regular assignments to work with the Pain and Palliative Care Service, or to visit patients in the Pain and Palliative Care clinic. All working arrangements and interactions of the staff chaplains or contract chaplains with the Pain and Palliative Care Service were directed by and were understood to need the approval of Chief Chaplain Fitzgerald.

4 - Currently as of August 2007, the chaplains employed under contract have the same scope of responsibilities as the staff chaplains who hold civil service positions. All the chaplains are treated equally, and are interchangeable in assignments to nursing units. The contract chaplains attend department staff meetings and participate fully in the discussions and whenever the chaplains are allowed any participation in decisions. The contract chaplains in the weekly staff meetings have equal voice in discussing department issues, and the contract chaplains' suggestions are given the same attention as those of the staff chaplains. Contract chaplains have the same access to the computer support services as the staff chaplains. There is no difference in daily chaplain responsibilities for providing pastoral care and religious services for patients and their family members between the staff chaplains with civil service positions and the contract chaplains.

5 - The April 11, 2007 Guidelines that have been provided as supplements to 2003 policies and procedures apply equally to civil service chaplains and contract chaplains. The characteristics of chaplaincy work are such that each chaplain, whether on contract or in civil service employment, must individually provide full spiritual and religious care to individual patients and their family members. For this reason, the support services for contract chaplains need to be equivalent to those provided for the staff chaplains.

6 - On Wednesday December 21, 2005 when I returned home late in the evening, I had a

2

voice-mail message left on my home phone by Rabbi Reeve Brenner. He had called from his office at the NIH Clinical Center during that day. His message was that he had information for me relating to my EEOC case from someone I had never met. The next day, Thursday, which was my day-off from my volunteer chaplaincy services at Sibley Memorial Hospital in Washington, DC, I did not return the call of Rabbi Brenner because he normally was not at the Clinical Center on Thursdays, and I had much last-minute Christmas shopping to do.

7 - On Friday of that week, December 23, Rabbi Brenner called again in the afternoon while I was at home. He mentioned that he had tried to reach me on Wednesday to introduce me to chaplain Edar Rogler. He said that she had information relevant for my EEOC case, and then turned the phone over to her.

8 - In the brief phone conversation with chaplain Rogler that afternoon, she stated that chaplain Fitzgerald had explained to her how he had engineered my removal from employment at the NIH Clinical Center, and stated that the information she had received directly from chaplain Fitzgerald was relevant for my EEOC case and that my lawyers should have this information. She asked for contact information with my lawyers, and I gave her the names and phone numbers of my lawyers. I told her that I would contact them the next week and give them information on how they could contact her. The next week, after the Christmas weekend, I sent my lawyers an e-mail containing the contact information for Edar Rogler.

9 - During my years as a chaplain at the NIH Clinical Center, first as a contract chaplain (from 1994 until the November of 1998) and then in the civil service position (November of 1998 until I was fired in July of 2004), I witnessed a pattern of reprisals meted out by the chief chaplain, Dr. O. Ray Fitzgerald, to the other chaplains of the department. These reprisals were condoned and supported by his supervisor, Deputy Director Walter N. Jones.

10 - When I was hired as a part-time contract chaplain in 1994, to take the place of

3

Roman Catholic staff chaplain, Father Eugene Linehan, on his Friday day-off each week and on other occasions when he could not be present, Father Linehan instructed me to keep out of the "controversies" in the department. When I asked him "what controversies?" he told me to not ask questions about the controversies, and to keep focused on the pastoral care of Catholic patients. In response to these instructions, I avoided asking questions about the department, and found ways of changing the subject whenever chief chaplain Fitzgerald began to make derogatory comments about the other staff chaplains. He consistently had disparaging remarks about their performance and their views about how chaplaincy should be conducted.

11 - When Father Linehan retired from his position as the Catholic staff chaplain at the Clinical Center in the fall of 1998, I was appointed to take his place as the full-time Catholic staff chaplain. For the first time I was present at the Clinical Center throughout each week, and was in the Spiritual Ministry Department staff meetings. I then learned that in early 1995 all of the experienced chaplains had signed a joint memorandum to Mr. Jones, recounting the arbitrary and autocratic mismanagement of the Spiritual Ministry Department that they had witnessed during the previous two years. The chief chaplain followed with reprisals when he had opportunities. I learned some of the details of the reprisals that the chief chaplain had taken against the staff chaplains Linehan and Johnston for their role in the 1995 memorandum and their criticism of his mismanagement, and saw the evidence of these reprisals.

A - The chief chaplain Fitzgerald explained to me that he had refused to provide Father Linehan contract chaplain support after chaplain Stone had retired in the summer of 1998 because of his disagreements with Father Linehan on management issues. He stated that Father Linehan would not practice Catholic chaplaincy the way that chief chaplain Fitzgerald wanted him to; but he had stated to Father Linehan that there was no money in the department budget for contract chaplains.

B - Chief chaplain Fitzgerald retaliated against chaplain Johnston by ordering the removal of a prototype web site describing the services of the Spiritual Ministry Department for patients. Chaplain Johnston had developed this web site in response to requests from nurses. Although chaplain Fitzgerald had the SMD website eliminated

4

from the Clinical Center's main web pages, the nurses on some units kept the web site available for their patients.

C - Chief chaplain Fitzgerald made allegations to the Army Reserve Chaplains' organization that chaplain Johnston was double-dipping, and sent confidential personnel records to the organization in hopes of proving his allegations. The Army found no discrepancy and no double-dipping. The Special Counsel and the DHHS Inspector General's office then conducted an investigation of chaplain Fitzgerald's illegal transfer of confidential personnel records. The Special Counsel recommended administrative discipline for this infraction.

D - In 2001 I requested additional contract chaplain support in addition to the ten hours a week support I had from the Roman Catholic Deacon William Emley. After I continued to request that the Roman Catholic chaplain support be restored to the level it had had from the 1970s to mid-1998, chief chaplain Fitzgerald terminated the contract with Deacon Emley and hired a non-Roman Catholic priest contracted to provide Catholic chaplaincy support. That non-Roman Catholic priest, however, was not allowed to cooperate with my chaplaincy work for Catholic patients, and instead was assigned to work under the direction of the chaplain Fitzgerald to provide generic chaplaincy services to non-Catholic patients and their family members.

E - In late 2001, Mr. Jones referred the disputes over Catholic staffing to the NIH Ombudsman for an impartial alternative dispute resolution process. In a series of meetings during the first half of 2002, the Ombudsman repeatedly sought from Mr. Jones and chaplain Fitzgerald their rationale for insisting on imposing on me their view of how Catholics should practice their religion. Mr. Jones and chaplain Fitzgerald, unable to respond to the Ombudsman's repeated questions on this issue, discontinued participation in the Ombudsman's dispute resolution process, and began requiring that I leave the Clinical Center several days a week in order to take a beginner's course in chaplaincy at some other area hospital's clinical pastoral education program. This demand of theirs was the principal charge in suspending and then removing me from employment at the Clinical Center in 2004, and was found by the EEOC and MSPB to have been the pretext for religious discrimination.

F - There were other reprisals that came to my attention, but I did not have direct

5

knowledge or experience with these other reprisals against other persons.

12 - One of the alleged reasons for my removal from my position as Catholic chaplain at the NIH Clinical Center in July of 2004 was that I did not follow the orders of the chief chaplain to document confidential spiritual assessments of Catholic patients in those patients' medical records. Chief chaplain Fitzgerald testified in the Merit Systems Protection Board Hearing that he had reviewed the medical records of several Catholic patients and found no documentation of my assessments of the confidential spiritual problems and concerns of those patients. The administrative law judge did not accept this allegation as proven because the testimony of chief chaplain Fitzgerald and Mr. Jones was contradictory, and the agency could not produce any evidence or testimony that there was any instruction or specification of what information these "spiritual assessments" were to contain. The substantive issues of the need for the informed consent of patients to undergo spiritual assessments by chaplains, and the Constitutional issue of Catholic priests being ordered to reveal information about the confidential spiritual concerns of Catholic patients communicated to the Catholic priest chaplain within the confidential pastoral relationship, were not addressed explicitly in the MSPB case. It is contrary to the professional ethics of chaplains and contrary to law for patients to be forced to reveal their spiritual concerns to a chaplain in a "spiritual assessment" interview. Spiritual assessments can be conducted ethically only if the patient freely chooses to discuss personal spiritual matters after giving informed consent for the spiritual assessment interview.

I have reviewed this statement, which consists of 6 pages, and affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record.

Henry G. Hefferman, S.J.                                              July 28, 2007

6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EDAR ROGLER                              :
Plaintiff *pro se*

v.                                       :

WILLIAM BIGLOW, *et al*          C.A. No.  1:07-cv-02308(RMC)

                                   :
                            ...oOo...

**EXHIBIT 4**

Bremer's and my activities. Specifically Fitilis wanted to know "how low" Bremer would get to give up his job and complaint." Because Jim Gallin, M.D. ("Dr. Gallin") clinical director of NIH CC, had reprimanded Ms. Fitilis for hanging up on me when I had called to discuss settlement of my case and that Dr. Gallin ordered Ms. Fitilis to settle Dr. Bremer's and my formal discrimination complaints and that was why he had fired her. Ms. Gallin explained to me that it was his opinion that Ms. Fitilis did not know how to settle a complaint and was telling his help to reach but how to settle a discrimination formal complaint and pressuring him to take adverse action against me. On information and belief Ms. Fitilis holds herself out to be an attorney, but is not licensed by the State of Maryland to practice law.

5. In June of 2006 I informed Dr. Bremer and his attorney regarding the above. It is my understanding from Attorney Irving Kator that he contacted Mr. Biglow to discuss settlement.

6. To date Mr. Biglow and Ms. Fitilis have never contacted me to discuss settlement negotiations of my discrimination complaint as Dr. Gallin had ordered.

7. The OEO DM took adverse action against me by not obtaining any interviews with witnesses or affidavits from witnesses to support a finding that I was a common law employee protected by Title VII, to wit that the EEOC had jurisdiction to decide my complaint on its merits. Plus for some reason the EEOC claims it never received my written complaint from the OEO DM.

8. On information and belief it is my understanding that Ms. Fitilis confronted Dr. Bremer in the NIH CC chapel near Yon Kippur and that Dr. Bremer was brought up on charges for dismissal based upon Ms. Fitilis' confrontation and insistence that Dr. Bremer be terminated.

9. I have filed a Title VII complaint and a Rule 27 Perpetuation of Evidence application in federal court. My application entitled, *Eder Regler v. Attorney William Biglow, et al.*, 1:2007-v-01106, names Mr. Biglow in his personal capacity.

2

10. On or about April 30, 2007 U.S. Assistant Attorney Neil White ("Mr. White") telephoned me. Mr. White stated to me that for my Title VII complaint Mr. White represents Mr. Bigelow as a federal employee of the Defendant, DHHS. Mr. White stated to me that I was prohibited from communicating with Mr. Bigelow except through Mr. White. Mr. White opposes discovery until after his motion for dismissal is decided.

11. In this same telephone conversation on or about April 30, 2007 White stated to me that Bigelow was threatening to report me to the State Bar and did not want to communicate with me, or have any communications from me. I take this threat seriously.

12. Prior to serving me with a subpoena (served May 15, 2007) the DHHS never contacted me about it desire to depose me as a non-party witness not employed by the federal government in the Merit System Protection Board ("MSPB") appeal entitled, Robye E. Bremer v. Department of Health and Human Service, docket number DC-0752-07-0414-1-1. According to MSPB regulations it was the Agency's duty to contact me as a non-party witness not employed by the federal government.

13. On May 16, 2007 a FedEx package was delivered to my residence. The FedEx tracking report states that said package was shipped on May 15, 2007, copy attached as Exhibit "2." The package contained Mr. Bigelow's May 1, 2007 letter to me with his original signature and DHHS's NOTICE TO TAKE THE DEPOSITION OF EDAR ROGLER. Mr. Bigelow signed the certificate of service dated May 1, 2007 that Mr. Bigelow personally served me by express mail on May 1, 2007. However according to FedEx the express mail package was not shipped until May 15, 2007.

14. In the Bremer MSPB matter DHHS submitted its AGENCY MOTION TO DEPOSE A NONPARTY, EDAR ROGLER, AND REQUEST FOR SUPOENA by and through Mr. Bigelow

on May 8, 2007, Mr. Biglow made several misrepresentations to the MSPB. Mr. Biglow stated "Management served a deposition notice on Ms. Foster by overnight mail." However, Mr. Biglow did not served said deposition notice upon me. According to FedEx, the package was not delivered to FedEx until May 11, 2007. Mr. Biglow had the tracking number and should have checked the delivery status of his alleged service of the package. His motion on behalf of DHHS does not reveal to the MSPB that Mr. Biglow has been well aware of my being a witness since no later than June of 2006 and that DHHS has had knowledge of me since no later than January of 2006. Further Mr. Biglow's certificate of service certifies that you express mailed me the motion on May 8, 2007, however, the FedEx tracking report states that you mailed me the package on May 9, 2007 at 7:45 p.m. (after DHHS had obtained a subpoena from the MSPB). See Exhibit "3" attached hereto.

15.  According the the MSPB, regulations if an administrative judge orders a subpoena for a deposition upon oral examination for a non-party witness who is not a federal employee, then the judge must limit the scope of the deposition to only matters relevant to the pertinent MSPB appeal. The subpoena issued by the MSPB was unlimited in scope, went day to day, and ordered me to appear in Washington, D.C. I live in Maryland and all underlying occurrences and transactions that are relevant to the Bannum MSPB appeal occurred in Maryland. I was served with the subpoena on Friday night, May 11, 2007 to appear at a deposition on May 14, 2007. This did not give me the required ten (10) days to quash the subpoena, prepare for a deposition or retain an attorney to represent me at the deposition. MSPB regulations give witnesses who are deposed the right to have an attorney present.

14. I believe that Biglow and Hillis have acted in concert and in conspiracy to violate Brenner's Title VII rights and unconstitutional rights if not Title VII rights in their official capacities under the color of federal law.

15. I am intimidated by Biglow's threats and activities, and that they have successfully terminated Brenner after asking around how he would go to give up his Title VII complaint and quit, and having a policy called Clean Sweep to fire Brenner before the Hillis case hearing.

16. I believe that subpoena for my deposition DHHS obtained by the above noted misrepresentations is objectionable and was achieved by misrepresentations to deprive me of my constitutional rights.

I swear that the above statement is true and accurate to the best of my knowledge and belief.

DATED: May 18, 2007

Elke Engler



**YAHOO! MAIL**

Print - Close Window

| | |
|---|---|
| **Subject:** | RE: letter to DOJ Civil Rights Division |
| **Date:** | Wed, 7 Jun 2006 12:42:30 -0400 |
| **From:** | "Fitilis, Hillary (NIH/CC/OD) [E]" <HFitilis@cc.nih.gov> |
| **To:** | "edar rogler" <edar_rogler@yahoo.com>, "Canino, Victor (NIH/OD) [E]" <CANINOV@od31em1.od.nih.gov> |
| **CC:** | "Biglow, William (OS)" <William.Biglow@HHS.GOV> |

Hi Bill.  Just keeping you in the loop on the most recent communication from Ms. Rogler.  I hope that you and Victor are able to touch base today to discuss and then we will follow up in our scheduled meeting tomorrow at 12:30.

**From:** edar rogler [mailto:edar_rogler@yahoo.com]
**Sent:** Wednesday, June 07, 2006 10:59 AM
**To:** Canino, Victor (NIH/OD) [E]; Fitilis, Hillary (NIH/CC/OD) [E]
**Cc:** Gallin, John (NIH/CC/OD) [E]
**Subject:** letter to DOJ Civil Rights Division

For your information.

Do You Yahoo!?
Tired of spam? Yahoo! Mail has the best spam protection around
http://mail.yahoo.com



Exhibit "2"

Track Shipments
## Detailed Results



Tracking number: 862105305722
Signed for by: [illegible]
Ship date: May 9, 2007
Delivery date: May 10, 2007 9:15 AM

Delivered to: Service type: [illegible]
Residence Priority Envelope

Status: Delivered

Signature image available: No

| Date/Time | Activity | Location | Details |
|---|---|---|---|
| May 10, 2007 | 9:15 AM Delivered | | Left at front door. Package delivered to recipient address - release authorized |
| | 8:33 AM On FedEx vehicle for delivery | CROFTON MD | |
| | 7:14 AM Arrived at FedEx location | CROFTON MD | |
| | 1:50 AM At local FedEx facility | BALTIMORE MD | |
| May 9, 2007 | 9:18 PM Left origin | WASHINGTON DC | |
| | 7:45 PM Picked up | WASHINGTON DC | |

Subscribe to e-mailing updates (optional)

Your Name: _____     Your E-mail Address: _____

| E-mail address | Language | Exception updates | Delivery updates |
|---|---|---|---|
| | English | | |
| | English | | |
| | English | | |
| | English | | |

Select format: HTML Text Wireless

Add personal message:
Not available for Wireless or non-English characters.

By selecting this check box and the Submit button, I agree to these Terms and Conditions.

*Exhibit "3"*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


**EDAR ROGLER**                          :
**Plaintiff** *pro se*

v.                                       :

**WILLIAM BIGLOW,** *et al*              **C.A. No.  1:07-cv-02308(RMC)**

                                         :
...oOo...


**EXHIBIT 5**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDAR Y. ROGLER,                          )
Plaintiff, *pro se*,                     )
                                         )                    2007 MAY -4  P 1: 30
Versus                                   )          Case No. 07-cv-0726
                                         )          Hon. William M. Nickerson
MIKE LEAVITT,                            )
Secretary, DHHS,                         )                    BY
Defendant.                               )

---

## AFFIDAVIT OF DR. REEVE ROBERT BRENNER
## IN SUPPORT OF PLAINTIFF'S COMPLAINT

NOW COMES Plaintiff Edar Y. Rogler, and hereby respectfully submits her

"AFFIDAVIT OF DR. REEVE ROBERT BRENNER IN SUPPORT OF PLAINTIFF'S

COMPLAINT." The true, original affidavit dated May 3, 2007 of Dr. Reeve Robert

Brenner is attached hereto.

Respectfully submitted by:

/S/

DATED:  May 3, 2007              EDAR ROGLER, plaintiff *pro se*
                                 915 Boucher Avenue
                                 Annapolis, Maryland  21403
                                 (443) 852-6553
                                 No fax number available

Proof of Service

Service should be performed electronically by the Clerk's Office.

/S/

EDAR ROGLER

## AFFIDAVIT OF RABBI REEVE ROBERT BRENNER

I, Dr. Reeve Robert Brenner, am a Jewish rabbi/chaplain. For approximately seven years I was a civil service staff chaplain in a part-time capacity for twenty hours a week in the Spiritual Ministry Department ("SMD") of the National Institutes of Health Clinical Center ("NIH CC") for the U.S. Department of Health and Human Services ("the Agency"). Previously I was a commissioned officer chaplain in the United States Army.

I have personal knowledge of the practices and policies of the SMD at NIH CC governing the responsibilities and duties of the chaplains serving NIH CC in both civil service and contractual capacities.

1. From December of 1999 to February 5, 2007 I was employed in a civil service position as a part time chaplain (Jewish rabbi), FA-0060-12, in the Spiritual Ministry Department at NIH CC.

2. My chaplaincy services were performed under the first-line supervision of Rev. Dr. O. Ray Fitzgerald, Chief of the Spiritual Ministry Department and second-line authority of Walter Jones.

3. Until I testified at the EEOC hearing for Rev. Henry Heffernan I had 100% acceptable ratings from the Agency and no disciplinary action taken against me.

4. Prior to my testimony my supervisor, Rev. Fitzgerald, had instructed me to state that I did not recall answers to questions posed to me by Rev. Heffernan's counsel when I was testifying under oath at the *Heffernan* hearing.

5. On or about December 21, 2005 Associate Chaplain Edar Rogler stated to me that Rev. Fitzgerald had told her that Dana Kelley and I were going to be terminated

1

for cooperating in the *Heffernan* matter in a plan called "Clean Sweep" that had been approved by NIH CC's top managerial officials.

6.  I chose to and did testify truthfully and fully at the *Heffernan* hearing.

7.  After testifying in the *Heffernan* matter I experienced more discrimination and retaliation by the Agency, which resulted in my filing my own pre-complaint on or about March 6, 2006 and formal complaint of discrimination (Jewish) and retaliation on or about June 5, 2006 with the Agency. Discriminatory acts included such things as Rev. Fitzgerald throwing a book at me, the disappearance of the Jewish prayer books, permitting another chaplain to conduct public prayers in the NIH CC chapel for the conversion of Jewish people to Christianity, and censoring and suppressing of distribution of literature to patients.

8.  The discrimination and retaliation against me intensified peaking with the Agency placing me precipitously on an administrative leave for many months, then bringing me up on spurious and false charges, and then dismissing me immediately after the *Heffernan* opinion was published by the EEOC.

9.  I was found to be a credible and material witness by the EEOC in the *Hefferan* matter. The EEOC found that the Agency had discriminated and retaliated against Rev. Heffernan and ordered Rev. Heffernan's re-instatement to his prior position as civil service chaplain for NIH CC. The EEOC also noted that my superiors harbored animosity towards Jewish people and the Jewish religion.

10. From December, 1999 to October 4, 2006 I personally observed the policies and practices in regards to the services of the civil service chaplains and the contractual chaplains:

2

a.) Both the civil service chaplains and the contractual chaplains performed the same duties and preformed the same obligations other than being on-call for the Protestant and generic patients and carrying the so-called "Protestant pager."

b.) Although chaplains of other religions, who were both civil service employees and contractors, carried the Protestant pager and were on-call for the Protestants patients, I as a Jewish Rabbi was never assigned to be on-call the Protestant patients.

c.) Both civil service and contractual chaplains were controlled in the same manner by Rev. Fitzgerald, except for religious discrimination and retaliation such as that was found by the EEOC and MSPB.

d.) Both civil service and contractual chaplains had their own offices, telephones, computers, and other such office equipment.

e.) Both civil service and contractual chaplains performed the same services for the patients.

f.) However, I did experience and observe disparate treatment of chaplains not based upon whether they were civil servants or contractors, but based upon their religion and their objecting to perceived violations by the Agency of Title VII.

11. I had many conversations with Rev. Fitzgerald during November and December of 2005. Never once did Rev. Fitzgerald complain about the work performance of Associate Chaplain Edar Rogler. Rev. Fitzgerald did complain a lot about another

3

employee's work performance, which appeared to me as an attempt by Rev.

Fitzgerald to camouflage his own mistakes.

I have reviewed this statement, which consists of 4 pages, and affirm that it is true

and complete to the best of my knowledge and belief.  I understand that the

information I have given will not be held confidential and may be mad a permanent

part of the record.

DATED:  May 3, 2007

DR. REEVE ROBERT BRENNER

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA


**EDAR ROGLER**
**Plaintiff** *pro se*                              :


**v.**                                              :


**WILLIAM BIGLOW,** *et al*          **C.A. No.  1:07-cv-02308(RMC)**

                                                    :
                                          ...oOo...


**EXHIBIT 6**

*Original*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DISTRICT)

AUG - 1 2007

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DEPOSIT BOX

| | |
|---|---|
| EDAR Y. ROGLER,<br>Plaintiff, *pro se*, | )<br>)<br>) |
| | ) Case No. 07-cv-00726<br>) Hon. William M. Nickerson |
| versus | )<br>) |
| MICHAEL O. LEAVITT,<br>Secretary, US DHHS,<br>Defendant. | )<br>)<br>)<br>)<br>) |

## SECOND AFFIDAVIT OF DR. REEVE ROBERT BRENNER
## IN SUPPORT OF PLAINTIFF'S AMENDED COMPLAINT (PAPER NO. 29),
## MOTION FOR PRELIMINARY INJUNCTION (PAPER NO. 13), AND IN
## RESPONSE TO DEFENDANT'S "MOTION TO DISMISS" (PAPER NO. 33)

I, Dr. Reeve Robert Brenner, am a Jewish rabbi/chaplain. For approximately

seven years I was a civil service staff chaplain in a part-time capacity for twenty hours a

week in the Spiritual Ministry Department ("SMD") of The National Institutes of Health

Clinical Center ("NIH CC") for the U.S. Department of Health and Human Services ("the

Agency"). Previously I was a commissioned officer chaplain in the United States Army.

I have personal knowledge of the practices and policies of the SMD at NIH CC

governing the responsibilities and duties of the chaplains serving NIH CC in both civil

service and contractual capacities. I have personal knowledge of Dr. O. Ray Fitzgerald,

Ann Berger, M.D., and the Pain and Palliative Care Clinic ("Pain and Palliative Care

Clinic").

1. From December of 1999 to February 5, 2007 I was employed in a civil service

position as a part-time chaplain (Jewish rabbi), FA-0060-12, in the SMD at NIH CC.

1

2. My chaplaincy services were performed under the first-line supervision of Rev. Dr. Owen Ray Fitzgerald ("Dr. Fitzgerald"), Chief of the SMD and second-line authority of Walter Jones, Deputy Director.

3. During the seven years that I worked for the NIH CC, Rev. Fitzgerald never assigned me to work in the Pain and Palliative Care Clinic and only assigned me to the hospital section of the Clinical Center.

4. Based upon my personal knowledge Associate Chaplain Edar Rogler, Rev. Father Henry Heffernan, and Rev. Gary Johnston also were not assigned to the Pain and Palliative Care Clinic, but were only assigned to the hospital section of the Clinical Center and are Hospital Chaplains.

5. I personally know Dr. Ann Berger. Although we had several conversations, Dr. Berger never complained to me about the ministry services performed by Associate Chaplain Edar Rogler.

6. On many occasions patients will not wish to engage the services of a chaplain, because of many reasons, such as they are tired, want to make a telephone call, do not need services, etc..

7. I have had " visits" with patients that are two minutes or less, when that was their wish.

8. I will only conduct a spiritual assessment on a patient if after a full disclosure the patient willingly consents to participate in said spiritual assessment.

9. My personal knowledge is that some religions and some religious persons do not want chaplaincy services. I will not and do not involuntarily impose my services upon them.

2

I have reviewed this statement, which consists of three (3) pages, and affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and will be filed in the instant Court.

DATED: August 1, 2007

_____
DR. REEVE ROBERT BRENNER

On August 1, 2007 this affidavit was submitted by:

Edar Rogler
Plaintiff, *pro se*
915 Boucher Avenue
Annapolis, Maryland 21403
No faxed number available

## Proof of Service

Service should be performed electronically by the Clerk's Office.

Edar Rogler

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**
**Plaintiff** *pro se*

:

**v.**

:

**WILLIAM BIGLOW,** *et al*          C.A. No.  1:07-cv-02308(RMC)

:

...oOo...

Declaration of Rabbi Reeve Robert Brenner

pg. 1 - 21

**EXHIBIT 72**

# DECLARATION OF RABBI REEVE ROBERT BRENNER

1. I am Rabbi Dr Reeve Robert Brenner, NIH Clinical Center Jewish staff Chaplain. My tour is half-time – twenty hours a week. I have been in this position from the autumn of 1999 to the present. As of this writing in December of 2006, I am the senior staff chaplain at the Clinical Center, now placed on administrative leave.

2. My previous experience in federal employment was as a commissioned officer chaplain in the United States Army.

3. During my seven years as the Jewish staff chaplain at the NIH Clinical Center, there has never been a single poor evaluation of my work as the Jewish staff chaplain at the CC. Furthermore, my CPE evaluation at the Shady Grove Hospital, that chief chaplain Ray Fitzgerald and Walter Jones required me to undertake for 437 additional hours, was also excellent. The patient representative Laura Cearnel and the Administrative Officers can speak of the many patients' positive feedback responsive to my chaplaincy rabbinate.

4. During this year, 2006, I have been in the crosshairs of many reprisal acts, small and large, and confined in an ever encompassing maze of newly invented and mutually inconsistent directives and restrictions which have expanded and enlarged the religious discriminatory actions against my rabbinate and the Jewish religious practices of CC patients. These acts of reprisal have followed directly from my truthful testimony in the EEOC Hearing twelve months ago on the firing of Father Henry Heffernan, the Roman Catholic staff chaplain.

5. On multiple occasions I frankly told Chaplain Fitzgerald and Mr. Jones that I understood what they were doing: they were imposing restrictions and obstacles to my ability to fulfill my rabbinic responsibilities in order to provoke me to violate their directives and thereby provide them with grounds for adverse personnel actions and my removal. They have followed this procedure with respect to other chaplains previously. They initiated comparable actions previously to almost *every* staff chaplain. The directives themselves had no real basis in federal policy or regulations, and made no contribution to the government's support for Jewish clinical research volunteer patients to freely exercise their religion in accordance with their

Exhibit 7 p. 1                    1

Constitutional rights. But they imposed needless time-consuming burdens and obstacles to the chaplains' ability to effectively fulfill their responsibilities towards patients.

6. The October 24, 2006 proposal to remove me came as no surprise, as can be seen from my many memos to the chief chaplain, Ray Fitzgerald. I made sure that he was aware that I knew of his intentions of terminating me, in reprisal for agreeing to testify truthfully when called upon in the matter of Father Heffernan, despite his instructions to me to claim that I could not recall or recollect facts and events when asked by the EEO judge.

7. When I was appointed Jewish staff chaplain late in 1999, Mr. Marvin Kahn, a clinical research volunteer patient who served on the Patients Advisory Committee at the NIH Clinical Center, gave me background information on the serious discrimination by my chief against Jewish patients that had been occurring at the Clinical Center previous to my arrival. He explained that the Jewish staff chaplain position had been eliminated, and had been restored only to avoid public exposure of the anti-Semitism of the Clinical Center officials. Rabbis Miller and Levine, who preceded my tenure, have spoken to me concerning their own experiences of religious discrimination by their chief and the Spiritual Ministry Department.

## Religious Discrimination

8. From the beginning of my employment at the Clinical Center in the fall of 1999, the chief chaplain and the deputy director were unwilling to provide the necessary accommodation and arrangements for effective religious service to the Jewish patients at the Clinical Center according to the Jewish religious calendar. It was necessary find ways to meet patients' religious needs (which I did - often off campus) despite the inflexible tour of duty schedule imposed on me and the inadequate budget with which to function.

9. For some seven years I have been conducting Sabbath services on Saturday on my own time because the chief chaplain refused to include hours for services on Saturdays in my half-time tour of duty. It would not have been difficult to rearrange my official tour of duty to enable me to provide Shabbat services for Jewish Clinical Center patients on Saturdays, as part of my official 20 hours a week schedule. But since 1999, I have been denied a tour of duty that would enable me to provide Shabbat services for

Exhibit 7 p. 2                    2

Jewish patients at the Clinical Center within my half-time official tour of duty, and I have been required to provide these services on my own time without compensation.

10. I have been denied the use of the Clinical Center Chapel Complex or other appropriate space for daily Jewish religious worship & week-end Shabbat services. In contrast, the other religions, including Muslim *employees* (as opposed to *patients*) of NIH, have been accorded dedicated space and schedules for the use of Spiritual Ministry space and facilities for religious worship services.

11. Dr. Fitzgerald consistently has refused to allow me and the Jewish minyan to have designated space for Jewish religious practices within the chapel and religious services space controlled by the Spiritual Ministry Department; Roman Catholics, Muslims and Protestants, by contrast each has devoted space whereas the largest cohort – the daily Jewish quorum/congregation has none.

12. Dr. Fitzgerald, as CPE supervisor, consistently intruded his CPE students into the Jewish pastoral care contrary to my position description as Jewish staff chaplain, which gave me the authority and responsibility to organize and provide religious services for the major faith group of Jewish patients in accord with the religious tradition and laws of Judaism. The chief chaplain has insisted on overriding this role of the Jewish staff chaplain and imposing his Protestant generic approach to spiritual care services on Jewish patients through the agency of many of his CPE Protestant seminarian students and adversely affecting patient care and the relationship between rabbi and Jewish patient.

13. In 2003, I was singled out, along with the Roman Catholic staff chaplain with the requirement to undertake a beginner's CPE training program in chaplaincy despite my over 40 years of experience as a rabbi and chaplain and despite my four years of successful performance evaluations as Jewish staff chaplain at the Clinical Center. The beginners' "clinical pastoral education" (CPE) training program requirement had been introduced by the chief chaplain as a way of demeaning the professionalism and competence of the 75 year old Roman Catholic staff chaplain and myself, in my seventies as well, as though we needed remedial education at the most elementary level. It also abruptly re-defined my position description and work-load. It also excluded my presence from important staff meetings and

Exhibit 7 p. 3

3

reduced my presence and time available for Jewish patients in the SMD and at the CC.

14. In 2005 I was required to undertake another beginner's CPE training program in chaplaincy, this time at a hospital different from the Clinical Center. The time spent caring for the Jewish patients at the Clinical Center, in accordance with my position description responsibilities, were not allowed to count toward the 400 hours required for a CPE training unit. This CPE training program was undertaken at the Shady Grove Hospital. This program that chief chaplain Ray Fitzgerald and Walter Jones required me to undertake required 437 additional hours beyond my half-time position. Mr. Jones at the time refused to provide me with compensation for this extra time. An issue in the requirement that I undertake the CPE program elsewhere and not at the Clinical Center was clearly an effort to remove the appearance that the Roman Catholic staff chaplain had been discriminated against with unequal treatment, since he had been required to undertake a CPE program outside of the Clinical Center even though all the other chaplains had been allowed to obtain CPE credit for their work at the Clinical Center. The CPE program requirement had been introduced in the fall of 2003 to target the Roman Catholic and Jewish staff chaplains for removal (later labeled "operation clean sweep.").

### Reprisal for Truthful Testimony in the EEOC Hearing

15. In December of 2005 the chief chaplain and deputy director became aware that I was being called to give testimony in the EEOC Hearing on the adverse personnel actions taken against the Roman Catholic staff chaplain in 2004. Before that hearing, Dr. Fitzgerald had advised me to respond to questions at the hearing with the statement that "I can't recall." But in good conscience, I could not. From that time on, a cascade of reprisal actions against me began during this year. Increasingly for the past eleven months, following my testimony in the EEOC Hearing, I have been encircled by an ever expanding maze of newly invented and mutually inconsistent directives, restrictions, obstacles, and false allegations. The directives themselves have no apparent basis in federal policy or regulations, and make no contribution to the efficacy or efficiency of government's provision of support for the free exercise of their religion by the Jewish clinical research volunteer patients at the NIH Clinical Center.

Exhibit 7 p. 7

16. Since January of this year (2006), I still have been denied a tour of duty that would enable me to provide Shabbat services for Jewish patients at the Clinical Center on Friday nights and Saturdays, and have been denied the use of the Clinical Center Chapel Complex for suitable daily & week-end Shabbat services. (Protestant supervisory chaplains should not use federal administrative authority to determine Jewish religious practices and the Jewish religious calendar.)

17. Since January 2006, I've been denied any budget support for my participation in professional activities and Jewish religious retreat attendance; in previous years I received expenses for covering my annual religious retreat as did other chaplains, but this year I was not allowed any resources for covering my expenses in attending my annual religious retreat and was therefore unable to attend.

18. In December 2005 through April 2006, I was subjected to derogatory comments by my supervisor, Dr. Fitzgerald, regarding my Jewish faith and practice; he gave out false information detrimental to my reputation.

19. In February 2006, I was not allowed to perform my duties as the Jewish Chaplain for a Jewish traditional funeral service for a Jewish patient at the Clinical Center Chapel.

20. Since February 2006, I was denied back-pay to cover all the extra hours I was required to work as a chaplain at another institution outside of the NIH Clinical Center (the Shady Grove Hospital) where I was sent to fulfill the requirements in the mandated Clinical Pastoral Education (CPE) training program policy.

21. I have been denied back/pay for being on-call 24 hours a day to provide spiritual services to patients at the Clinical Center, in contrast to at least one other Christian chaplain who has received pay for being in an "on-call" status when not actually called in to provide spiritual services to patients at the Clinical Center. (Being on-call 24 hours a day to provide spiritual services to patients at the Clinical Center greatly restrict what one can do and where one can go on days that are not included in one's official tour of duty, regardless of whether the chaplain is actually called in to provide spiritual services to patients at the Clinical Center).

Exhibit 7 p. 5

5

22. In March 2006, I was subjected to an abruptly heightened hostile working environment when my supervisor, the chief chaplain, in a fit of temper, threw a book at me during a meeting, barely missing me. Months later, he apologized to me for the book-throwing, but then lied to the EEO investigator and claimed that the book-throwing had never happened. He also admitted repeatedly calling me "the Jew" in a derogatory classic anti-Semitic manner (among which: "I don't want the Jew to get money" – as already reported and on the record.)

23. What was obviously designed especially to provoke was the new requirement imposed on me that I had to submit anything I wrote for patients, for example, on the Jewish festivals and worship liturgy that I intended to use at religious services, to be formally approved or censored by Dr. Fitzgerald and Mr. Jones and the Ethics office before use or distribution to Jewish patients. They, as Protestants, would now decide and determine what Jews could and could not read. The first submission I made in April 2006 was not allowed to be distributed to Jewish patients at the Clinical Center – a short background article on the history of the Passover holiday – because Walter Jones decided that it was "scholarly" and Ray Fitzgerald decided it contradicted the biblical account. In addition, the manuscript of a new book I have written on my own time on Jewish tradition and practice was also censored and disapproved by them before I could send it for publication. In several memos, Dr. Fitzgerald suppressed the distribution of religious literature to Jewish patients and appropriated the right to review and censor Jewish religious materials and worship services. (Censorship and suppression have no place at the Spiritual Ministry Department of the NIH CC.)

24. By directives in memoranda, I was required to purge my writings and all websites of truthful facts including that I was part-time a staff chaplain at the NIH Clinical Center and part-time serve as rabbi of the Bet Chesed quorum, as well as other functions.

25. In March 2006, I reported that the chaplain who replaced the Roman Catholic chaplain was introducing demeaning prayers for the conversion of Jews in public services at the Federal NIH Clinical Center, held at the Spiritual Ministry Center contrary to the official Roman Catholic acknowledgment of Judaism promulgated by the Vatican. Nothing has been done about it.

Exhibit 7 p. 6

26. In April I was informed by Dr. Fitzgerald and Mr. Jones that agency policy relating to who can arrange for religious services held at the Clinical Center was officially being changed by them to exclude NIH personnel, and thereby the *minyan* (quorum) of NIH Jewish staff could not continue to meet as previously. I have established two on-going *minyans*/congregations for the benefit of NIH Clinical Center Jewish patients, including several dozen regular *personnel* NIH Clinical Center staff members, and several dozen Jewish residents in the area who volunteer to help Jewish patients at the Clinical Center. These *minyans* (quorums) are required by Jewish law for worship services. The members of these quorums are fully aware of my rabbinate/chaplaincy work, and have been a great help to the many Jewish patients. They know me personally and have experienced my rabbinate services for Jewish patients for over the previous six years. This action by Mr. Jones and Dr. Fitzgerald was an effort to effectively prevent me from having the necessary quorum for Jewish religious services. This action was designed also to be a formal policy prohibiting the Jewish staff chaplain from having a role in counseling Jewish NIH staff personnel, despite being explicitly stated in the responsibilities of the Jewish chaplain's position description.

27. Mr. Jones and Dr Fitzgerald have excluded the Jewish daily *minyan* from the 7th floor chapel and confined its daily *minyan*/quorum service to the 14th floor of the old building. It now takes place in an unappealing, all but abandoned, hallway office. Concurrently space was provided in the new building's 7th floor chapel complex for the devotional services of Catholics, Protestants and Muslims; the Jews who constitute very likely the largest on-going daily prayer gathering at the CC were excluded from the chapel facilities.

28. Members of the Bet Chesed quorum, where I participate and serve as a part-time Rabbi, and the members/regulars of the "14th Floor *Minyan*" have been met with ongoing hostility and obstructions – and service cancellations – in their efforts to serve as volunteers to Jewish patients at the Clinical Center who need the spiritual support of a quorum for the daily, Sabbath and High Holyday worship services so that they meet their religious obligations. Mr. Jones and Dr. Fitzgerald enlisted the Ethics Office to change the Bet Chesed quorum from continued recognition as an official religious volunteer service for the Jewish patients in the Clinical Center to the status of an Outside Activity. This change imposed a series of restrictions upon my

Exhibit 7 p. 7

ability to provide religious services for Jewish patients at the Clinical Center.

29. Moreover, an altogether new edict required that I must secure authorization and permission from the chief chaplain, the deputy director, and the Clinical Center's ethics counselor in order to function as a rabbi for this *minyan* (religious worship quorum), despite the fact that my official position description gives me this role and responsibility. The position description authorizes my functioning as a rabbi – part time – and that the standard and routine functioning of my role at the Clinical Center should be consistent with the norms and traditions of the Jewish major faith group. Also according to the clear statement of the NIH ethics regulations, I am authorization to function as a rabbi off campus or on campus to Jews of the community who convene in support of Jewish patients.

30. I was required to remove all NIH CC references and personal identifiers, photographs and official NIH CC titles from documents, printed articles and the internet web sites: the National Association for Recreational Equality, the family recreational programs I have developed (the Bankshot Recreational Systems) despite the fact that these references and identifiers have been published in NIH publications such as the Clinical Center News (e.g., July/August 2002) which at this writing remains on the NIH CC website, and are ubiquitously copied on the internet. (And despite the Outside Activities rulings # 5, 6 and 7.)

31. All along I have asked and have been denied information on the DHHS or NIH regulations and policy which presumably were the basis for the imposed restrictions and requirements that were disruptive of my spiritual ministry services to patients at the Clinical Center.

32. After I initiated/filed an EEO complaint, I have been subjected to letters and memos from my supervisors which are threatening in character, clearly intended to intimidate and to provoke, creating an ever increasing atmosphere of hostility, and designed to create mounting physical and mental distress. Among the most discriminatory acts of reprisal – seemingly innocent in appearance but employed cynically to undermine the Jewish chaplain function – was the decision to declare the weekend Bikkur Cholim minyan, Bet Chesed, an "Outside Activity" and in that way – by that official devise - deprive Jewish patients of a weekend quorum/minyan and effectively withdraw my presence from the minyan and prevent my official

Exhibit 7 p. 8

8

functioning as NIH CC Jewish staff Chaplain. (This decision was imposed despite the Outside Activities norms and rules, particularly in the biomedical research-related activities of non-NIH organizations.)

33. While I was away on vacation in July 2006, Dr. Fitzgerald, as reported by several physicians, scientists and other staff, put in the trash the Jewish prayer books that were used daily by the quorum/minyan and were essential for Jewish religious worship; under his purview the High Holyday prayer books also disappeared suddenly (both of which acts were reported to the campus police).

34. Once again a continuous campaign has emerged to eliminate the Jewish staff chaplain position (which had been previously eliminated in 1999, and restored after major effort by Jewish patients); staff chaplain Dominick Ashkar is the most recent to advocate to others in a derogatory and hurtful manner that the Jewish chaplaincy should be eliminated. He also remarked insultingly and repeatedly that Jews do not need a rabbi and should pray to Christ because, after all, Christ means Messiah.

35. In August and September I was limited by arbitrary restrictions on my ability to arrange and provide appropriate opportunities for Jewish patients and their families to attend High Holy Day services, in accord with my official position description. Obstacles were put in the way of Jewish patients so that they could not attend Jewish synagogues of their choice and secure tickets for those services without charge as an official NIH function. *And I was instructed on the Day of Atonement, October 2nd, moments before the start of worship services which I was scheduled to conduct, to be a no-show at High Holyday services attended by NIH CC Jewish patients or take annual leave. I took annual leave rather than remain on campus.* This instruction was clearly intended as an anti-Semitic insult and to provoke anger on my part, because no rabbi would be a no-show at High Holyday services for the patients entrusted to his religious care.

36. The High Holy Day services that I planned and developed for the Clinical Center's Jewish patients off-campus, exactly as I had done in the previous six years with the full knowledge and approval of the chief chaplain and deputy director, were for the first time stated to be an "outside activity" subject to the biomedical scientific consulting policy and regulations of the National Institutes of Health. I was alleged to have been behaving unethically and improperly for the previous six years despite the


Exhibit 7 p. 9

9

approvals I had received throughout that time from the chief chaplain and deputy director.

## Reprisal for Communicating with Dr. Zerhouni

37.  After I sent a communication to Dr. Zerhouni concerning the obstacles I was experiencing in attempting to make arrangements for the Jewish High Holydays, and in which I requested an objective investigation of the deteriorating respect for Jewish religious traditions and the discriminatory anti-Semitism at the Clinical Center, the intensity of the reprisals increased. The deputy director, with the assistance of the Chief Operating Officer's assistant for employee terminations, Ms. Hilary Fitilis, precipitously undertook to invent pretexts for justifying removing me from employment at the NIH. *They even undertook schemes to intimidate patients and staff so that they would "change their minds" about events.*

38.  On October 2ⁿᵈ, as indicated, Mr. Jones told me that as the Clinical Center staff rabbi, I had to remain on campus and thereby not provide the Day of Atonement worship services I had organized for the benefit of Clinical Center Jewish patients and their family members. The Clinical center SWD had arranged taxis transportation to the service for Jewish patients so they have a place to worship with a rabbi they knew. But Mr. Jones required me to remain on the NIH campus. At Mr. Jones' insistence my only alternative was to take annual leave in order to provide the Jewish worship service for the NIH Clinical Center Jewish patients. I therefore under protest took annual leave to provide religious care for NIH patients, as would any rabbi facing such discrimination.

39.  I was isolated from other staff chaplains repeatedly; the latest incident was October 4th, 2006 where I was excluded from a staff meeting and instead *put on administrative leave in the midst of my Holidays when Jewish patients needed my ministration and attention most.*

40.  Disregarding Jewish patients' religious needs, Mr. Jones prevented me from conducting our Sukkoth festival service in October 2006 by barring me from campus over the eight day Holyday and over the festival of Simchat Torah, and brought in no rabbi replacement until after these Holydays were over. This action along with the accusation that I did not fulfill my rabbinic responsibilities to Jewish patients on the holiest Sabbath of the year, our

Exhibit 7 p. 10

10

Sabbath of Repentance, shows contempt for Jews, rabbis, and this rabbi in particular.

41. Clinical Center personnel and officials, under false pretenses and duplicity, showed up at the chapel at the most religiously sensitive occasions of the High Holyday services seeking some means to justify my entrapment By deliberate deception and provocation they created a threatening, intimidating and hostile environment for me and for any Jewish patients and family members that might be present at the services.

42. The Friday afternoon/evening service on September 29 was the Sabbath on which I was alleged to have been absent without leave (AWOL). Mr. Jones accused me of being AWOL (absent without leave) on the Sabbath of Repentance, September 29. This was the Sabbath in question in the allegation that I was absent without leave (AWOL) on that day. As a former US Army officer and military chaplain, I know the seriousness of being AWOL. I have never been AWOL, and as my legal counsel, Mr. Irving Kator clarified on November 20, multiple Clinical Center employees and Jewish patients saw me present at the Clinical Center on that Friday and interacted with me, some more than once over the hours of my rounds. In addition, the security control systems at the entrance to the NIH campus have a record of my entry. To be falsely accused of this dereliction and desertion of religious duty is a very serious accusation of unethical action. Rabbis are especially responsive and devoted on the holiest Sabbath of the year, our Sabbath of Repentance. No rabbi I know of in my over 45 years as a rabbi would fake attendance at services at any time -- the more so, on our most sacred Sabbath.

## The Final Act: the Proposal to Remove

43. In response to the arbitrary restrictions and directives that were impeding my services to Jewish patients at the Clinical Center during the first eight months of 2006, after my testimony to the EEOC, I requested of Dr. Zerhouni an objective and impartial investigation of the many discriminatory actions against my role as the Jewish staff chaplain at the NIH Clinical Center. I have been in the crosshairs of so many acts, small and large, of religious discrimination following my truthful testimony in the EEOC Hearing on the adverse personnel actions taken against Father Henry

Exhibit 7 p. 11

11

Heffernan in 2004. The proposal to remove was the Clinical Center's response to my request for an objective and impartial investigation.

44. As of the end of December, 2006, despite the law which requires disclosure of the basis for removal, the Clinical Center officials have not made available an important document relevant to the charge that I was AWOL: the record that proves I entered the NIH grounds on September 29. This has been withheld. The electronic data recorded at the entrance gate of the NIH proving my entering the campus on September 29th has been made available to the Clinical Center officials but withheld from me. They have failed to transmit that data to me as required by fairness to enable me to provide further evidence confirming my presence at the Clinical Center on that date, and refuting the charges against me. For these many weeks, this has kept me while I have been kept on administrative leave in a suspended condition of distress.

45. In addition, with the October 24 letter of proposed removal was an October 24, 2006 proposed "Memorandum of Understanding" (similar to the one that was attempted to be used with Father Heffernan in his removal), in which the NIH officially offered to falsify future employment references to conceal the fact that I was being fired from my position as staff chaplain at the NIH Clinical Center. This insulting and unethical offer was made that were I to voluntarily resign, then the record of my purported AWOL and the other false charges against me would be expunged from my personnel record so that other organizations – to which I might apply for employment – would be deceived into thinking that I had left with an unblemished record. Other federal agencies and other organizations would not be truthfully told that I had resigned under a cloud of charges and that I was accused of being derelict in my rabbinical responsibilities toward Jewish patients at the NIH Clinical Center, and that I had shamelessly used my NIH position to enrich myself in my outside activities. This deception, in addition to being unethical and corrupting of the integrity of NIH as a government agency, virtually compromises – perhaps, in certain situations requiring particularly heightened integrity, even destroys - the credibility of any NIH employee who might normally resign in the future in order to take another position. No other organization or federal agency could trust that the NIH would provide truthful information about the person's performance while employed at the NIH. It might be trite to add, but appropriate in this matter, that honesty must be the best policy at the NIH CC.

Exhibit 7 p. 12

12

46. As was discussed in the November 20, 2006 meeting with Ms. Maureen Gormley, Chief Operating Officer, Ms. Gwen Platt, NIH Employee Relations, Mr. Irving Kator, my legal counsel, and myself, I, Rabbi Reeve Robert Brenner, assiduously followed in all matters the directives given me as best as I could. I removed all references to my NIH chaplain's position from all the websites I had control over. I had no control over the many websites on the internet that had copied such information from the NIH web site, and I also had no control over the NIH news sites that contain this same information. I committed no infractions that I know of, despite the conflicting directives given me by the Clinical Center's deputy ethics counselor and Mr. Jones, and I was exactly where I was supposed to be at all times, contrary to the allegations made in the October 2006 proposal of Mr. Walter Jones that I be removed from my position as Jewish staff chaplain at the NIH Clinical Center. (Pre-judgments tend to overlook critical elements showing how baseless and empty are the allegations concerning the proposal that I be removed. Even as I am now in turn in the crosshairs of so many acts, small and large, of religious discrimination following my truthful testimony in the EEOC Hearing on the adverse personnel actions taken against Father Henry Heffernan in 2004.)

47. Discussed also in that November 20 meeting was the fact that there were multiple contradictions in the battery of directives which were issued to me during the past eleven months, which I sought to resolve in a number of meetings and email messages, but without success. With difficulty, I did navigate through the conflicting directives despite the multiple contradictions.

48. Concerning the conversations with the Clinical Center's Chief Operating Officer's employee termination assistant, my questions concerning her purported Jewish identity and name were consistent with standard rabbinical practice in the context of preparing for a Jewish religious worship service. Contrary to the allegations made in the October 24 proposal to remove, no Jewish person would take offense at being asked their Hebrew name, or being asked whether they could and would like to read Hebrew Torah blessings during the service. (But clearly, she did not come to the chapel to pray at services.)

49. After I communicated with Dr. Elias Zerhouni in September, I received a memorandum from the Chief Operating Officer stating that she had "looked into the matter," and concurred with the allegations of Chaplain Fitzgerald

Exhibit 7 p. 13     13

and Mr. Jones against me. After that, Mr. Jones went ahead and invented reasons to fire me from my position as Jewish staff chaplain at the NIH Clinical Center. Shortly thereafter I was put on administrative leave while he prepared a notice of proposed removal. The notice of proposed removal was dated October 24.

47. In the November 20, 2006 meeting with the Chief Operating Officer, who was the deciding official on my removal, Mr. Kator presented the evidence that refuted every one of the allegations in Mr. Jones' October 24 Notice of Proposed Removal. Essentially we showed that I had complied with every directive I received, and had done nothing improper. Quite the contrary! Concerning the charge of misrepresentation and being AWOL, the evidence showed that I had correctly represented facts and was not AWOL as claimed! The charge that I had not removed information from a website was false because the website in question does not and was never mine or belonged to me, and although I requested that the information be removed, the website owners decided otherwise. I had no control over it. Had the Chief Operating Officer truly "looked into the matter" when she had claimed she had, she would have spared herself and other CC authorities the embarrassment of the unjustifiable, blatant reprisals against me.

48. The sequence of directives, restrictions, and harassments during 2006 followed directly from my having testified truthfully before the EEOC in support of Father Henry Heffernan. The effort to remove me followed directly from having communicated about the matter of these reprisals with Dr. Zerhouni.

49. After the discussion in the November 20, 2006 meeting, it was clear to the Chief Operating Officer that there are no credible factual grounds for the allegations made against me in the proposal to remove. Every single charge against me was invented *after* my letter to Dr. Zerhouni. With those false and demeaning allegations all that was accomplished in this entire matter was to inflict more real hurt and injury upon me, as it had previously been inflicted on the several other capable and committed chaplains who also had their lives disrupted and their careers damaged by being fired for fabricated reasons. But of most importance, the restrictions have directly limited the access of Jewish clinical research volunteer patients to Jewish religious care and services. Hindering Jewish patients from practicing their religion is unethical, immoral, and against the law. Intimidating and coercing patients to change their telling/understanding of a truthful account of facts is

 Exhibit 7 p. 14

14

not receive compensation from Bet Chesed for the High Holidays just as Elaine Ayres directed - in keeping with the regulations, "Ethics, Outside Activities Rulings," paragraph 5, 6 and especially 7 and which, in this matter, Elaine Ayres and I followed.

### C – Deputy Director Mr. Jones' Directives

 WJ should therefore not have had me take annual leave while I was at worship services in my official capacity – as written in my position description; as in previous years; and precisely in accordance with the rulings of the Ethics department. And to be told, on that very morning, not to go to services on our Day of Atonement and cancel or undo the schedule retroactively! Such overt and unmistakable discrimination! That directive required me to remain at the CC or to put in for annual leave on Monday, October 2nd – on the Day of Atonement – moments before I was scheduled to conduct High Holyday services for NIH CC Jewish patients; when I was following Elaine Ayres' directives and I was in fact "working with them related to your official capacity as the Rabbi at the NIH"; and as according to my job/position description; and as I have been doing for all previous years with the full knowledge of the department! All this I previously pointed out to you. WJ required me to take leave when in fact I was working and functioning in my rabbinical capacity officially for the Clinical Center as I was instructed by Elaine Ayres and by RF and as my position description enjoins. Moreover CC Jewish patients were being sent to the services I was scheduled to conduct by arrangements with Debra Dozier Hall MSW at the CC SWD.

Fact A.  This October 2nd, on the Day of Atonement, the Clinical Center social work department sent patients to the Leland Center (where I was following Ethics Dept rulings in my official CC capacity as rabbi) and the patients were sent there by taxi, perhaps in ignorance of the Ethics directives not to be providing religious services to patients off campus.  Does this mean I was to send them back when they arrived at the Leland Center?  Or bar them from entering?  For the sake of the "clear distinction" that I'm not to provide religious services off campus?  But the Clinical Center sent patients to the very services forbidden them by the Ethics Department.  What would the Ethics Dept. have me do in that contradiction and dilemma?  I was placed in a Catch-22 - having to follow contradictory edicts from different offices at the Clinical Center.  Nevertheless, I followed my responsibilities to the letter.  The CC did not follow its own rulings.  These contradictory

Exhibit 7 p. 16

16

rulings arose from the ill-considered and arcane attempts to undercut my rabbinate and render me rabbinically ineffective.

Aggression and hostility drive these retaliatory discriminatory actions against me because I testified truthfully in the matter of Henry Heffernan and could not, in good conscience, follow the advise of my chief who told me to testify by saying "I have no recollection" when in truth I recollected very well. In the end, I did what any rabbi would: I acted in the best interest of the NIH, testified truthfully and also served the Jewish CC patients and everyone without distinction to meet their religious needs during the sacred time of the Jewish Holydays.

Fact B. Mr. Walter Jones (WJ) on that morning, when it was already too late to cancel services at the Leland Center and to remain at my post at the Clinical Center which he required of me - or take leave! – I was essentially told to be a no-show at the services to which the Clinical Center sent patients to observe the holiest day of the year. I could not in good conscience stay at the Clinical Center as WJ knew full well. Arrangements that Jewish patients were to observe the holiday at the Leland Center were already set in motion. By Monday morning, moments before services, obviously it was too late to get a replacement or make arrangements for the minyan to function without me so that I remain on campus. He surely knew I could not turn my back on Jewish patients and others moments before a scheduled "official" service as per instructions from the Ethics office. WJ was essentially requiring me to abandon the needs of Jewish patients by staying behind at the CC (where there were no Jewish Patients remaining there to offer a service). WJ knew I would not choose to stay behind at the Clinical Center on the Day of Atonement, a rabbi with no Jews to serve on the Day of Atonement. The patients were sent to the Leland Center but I was essentially told not to go there to meet their needs or if I were to go and fulfill my rabbinic responsibilities lose leave time. I also organized and attended all the additional holyday services as in previous years including Sunday night (Kol Nidre evening) and Monday night (Neilah Concluding services). WJ required that I had to put in for annual leave time or be AWOL (which I have never been) and I did as instructed. But that is not right! I followed directions throughout despite the difficulties I faced by contradictory directives.

Now, if there is a disconnection between the one clinical center office and another, sanctions against me should not be applied especially retroactively as in this matter. The instructions that I received from Walter Jones were

17

Exhibit 7 - 17

designed to put me in the Catch-22 situation. I have always been conducting High Holyday services off campus because it is much easier to move a few patients to the services than to arrange for up to fifty or so Jewish volunteers and others to find parking on the campus and get through the security checkpoint in time for the scheduled service. Dr. Fitzgerald was invited and attended these services off campus in previous years. With his approval I was compensated for these services by the CC by being given comp time, which was helpful in recovering from the High Holyday ordeal. In this matter, Mr. Jones' directives were contradictory to the previous instructions and approvals which I had followed. And therefore the leave I was required by Mr. Jones to take this year should be restored. I was following the ethics directives precisely – and that is why my annual leave time of 6.5 hours should be made right and cancelled. In past years, I was given comp/flex time within the pay period. Another solution should be determined instead in this instance which should include all the appropriate worship services of September and October in which I functioned as in the past.

When changes are made suddenly which contravene previous rulings and which are communicated after the event, why should the person following the previously approved guidelines be expected or required to know of rule changes in advance? Requiring me to take annual leave on the Day of Atonement when I am meeting the religious needs of Jewish CC patients as would any Jewish Chaplain and as has been the procedure for all previous years was unjust.

## THE OUTSIDE ACTIVITIES ALLEGATIONS

### *The Alleged Co-mingling of Outside Activities with Official Work*
The ethics policy and regulations that have been cited were formulated for biomedical research scientific activities, not for religious activities. There are no NIH regulations specifically dealing with religious activities, as far as anyone has been able to identify. I have repeatedly asked the Clinical Center's Ethics Counselor for whatever specific regulations apply to religious activities, but no reply has been forthcoming. My rabbinical interactions with the Bet Chesed congregation are concerned with Jewish religious tradition and services, not biomedical scientific activities. I do not consult with Bet Chesed on biomedical science or research. That is not my expertise. I follow my job/position description and the Jewish calendar as in

Exhibit 7 p. 18

18

the past. Any rabbi would do the same. Non Jewish chaplains with integrity would do the same within their religious traditions.

I am a half time chaplain but a full time rabbi. CC patients, staff, family and friends call me, meet with me and reach out to me on all days and all hours. I have for years been conducting religious services at the Clinical Center for the Jewish patients on the Sabbath (Saturdays) and holidays on my own time, in addition to the official tour of duty hours on Friday, because the Sabbaths and holidays do not conform with the duty hours assigned me by Dr. Fitzgerald. I have for years repeatedly pointed out this problem to Ray Fitzgerald. This has resulted in a co-mingling of my own time forced upon me by decisions of Dr. Fitzgerald to not allow me a tour of duty responsive to the needs of Jewish patients and to the requirements of the Jewish calendar. The co-mingling – which did not originate with me - has been entirely for the benefit of the Clinical Center's Jewish patients, and indeed there has been quite a bit of that. The NIH CC - and not I - has been forcing the co-mingling of my (recently defined) "outside activities" for years and continues to do so as of this writing. But I have not engaged in co-mingling. I have not ever sent a memo, an e-mail, or a made phone calls on Bet Chesed activities while at the CC. This can be checked readily in the IT system just as my whereabouts on September 29th can be checked at the gate.

### The References to the Clinical Center on Outside Websites.
In at least two issues of the CC Newsletter articles were written about me and all my activities including referring the reader to the Bankshot websites and to the Bankshot awards named for a deceased young CC patient, and recounting many of my outside interests. I did not write those articles or post them on the NIH website. Yet I was told - and did in fact - remove that very same information from the websites I could as I was directed to do.

At this moment anyone can go to the NIH CC website and read all the VERY SAME information about me that I had to remove from websites – three in all – that I could control. That leaves about 200 websites over which I have no control offering the very same information about me and the fact that I am the Jewish Chaplain at the NIH CC, the author of books, articles, humor and poetry; that I invent inclusionary sports for the wheel-chair users and the differently-abled played all over the world and have been named by Sports Illustrated as "The Rabbi of Roundball"; whose scholarship is referenced in university religious studies graduate university libraries, and that I serve as a rabbi - among my outside activities. I'm sure it was not

Exhibit 7 p. 19

19

illegal to direct me to remove truthful information from a website but when that same information is proudly posted on the NIH CC website then, legal or not, that suppression of information I feel to be hypocrisy and retaliatory animosity, intended to harass a subordinate. See the letter given to you from the webmaster Fabio Lacerda for his similar reaction to these allegations relative to the websites he voluntarily services (as his own unheralded contribution to NIH patients).

### The Allegations about the Independent Website

As for the Bet Chesed website which is the one cited in the allegations, it is not under my control. I have requested that the references be removed and the Bet Chesed president and board in their best judgment - according to their letter written to me and submitted to you - decided to not do so. You have his letter and telephone number. Indeed, Bet Chesed - as has been pointed out in memos and meetings - has been officially designated an outside activity and therefore not subject to NIH directives. By what right does anyone require they act in a certain way or other if classified as an outside activity? This matter is certainly not under my purview. I do not determine what is posted and what must be removed. Not being responsible for the contents of the website, I cannot be held in any way responsible for the independent decisions of the Bet Chesed Bikkur Cholim volunteers and officials. And in no way can their decisions be characterized as profiteering (there is no revenue involved or income gained) from the good name of NIH, or claiming NIH sponsorship or approval. NIH has no role in sponsoring religious organizations, as any normally intelligent citizen knows. Through retaliations against me this fine obliging humanitarian group of giving, generous-with-their-time, Jews has been and is being made to go through unnecessary distress and NIH CC volunteer patients' needs remain unmet.

In short the source and origin of the considerable mingling of my outside activities with the NIH CC function is entirely one-sided, caused by the CC, and not by me.

## THE ALLEGATION THAT I WAS AWOL

### My Presence at the Clinical Center

The Clinical Center officials have in their possession the security systems data providing further evidence that I entered the NIH campus on that Friday

Exhibit 7 p. 20                    20

September 29th, the Sabbath of Repentance. At the security checkpoint, my badge was swiped through the electronic identification system when I entered the campus, as on every single Friday/Sabbath and at the same time slot as every Friday. The guards at the gate know I enter the same way every Friday. But thus far the Clinical Center officials do not acknowledge the existence of this evidence and refuse to even share the fact with me, so as to relieve my anxieties, out of simple human kindness.

I spend much of my off duty hours on CC responsibilities and never once have I claimed time improperly; that is being accused of theft. Most egregious is that the most obvious facts in this matter were ignored. The inquiry - regarding the security guards' electronic entry of personnel onto the campus, which recorded my coming on campus - was undertaken *after* I was already charged with not being there. Minds were made up even before the matter was looked into.

Mr. Jones, before delivering to me his notice of proposed removal, did not ask me whether I was where I was supposed to be. Besides, never so much as asking me about my whereabouts (on the units, visiting patients, staff, others), WJ never asked to speak to the many individuals and staff, including non-psychiatric patients with whom I interacted on Friday Sabbath, Sept. 29th. Had he, I would have referred him to the two librarians and the patient's representative, three individuals who saw me with my secretary, Michelle Worthy several times that day/evening on my regular shift. WJ might have made a phone call to MW to learn she had been with me the entire time at the chapel, taking notes, and at the library and with the patient representative, Laura Cearnal. All he had to do was check out the CC security system at the NIH gates which recorded my entry into the campus to determine that I indeed was there. The guard swiped me in with my ID badge as always.

The Organizational Development orientation of Appreciative Inquiry (which I mentioned before in connection with an article I wrote on the subject – researched at the Shady Grove Hospital as part of my CPE training) should be considered for mandatory training of Clinical Center officials and staff's guidance to help in matters such as this. There is AI training available, I'm sure. Perhaps as a result fewer chaplains and others will be falsely charged with allegations in order to lose their positions, and fewer Clinical Center staff will have their lives so seriously disrupted.

Exhibit 7 p. 21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**EDAR ROGLER**                                    :
**Plaintiff** *pro se*


**v.**                                             :

**WILLIAM BIGLOW,** *et al*                    C.A. No.  1:07-cv-02308(RMC)

                                                   :
...oOo...


Declaration of Rabbi Reeve Robert Brenner
pgs 22-33

**EXHIBIT 7 16**

# SUPPRESSION OF EVIDENCE

***Intimidation of Patients***

What is particularly disgraceful was the intimidation, scare tactics "working on" the patient who reported seeing me on that September 29th afternoon in order to change the mind of the patient so that the patient would confuse his memory and suborn his potential testimony. Manipulating patients is so cynical; it is reprehensible and unethical. Any rabbi would suggest that the CC distance itself from individuals of whatever rank and standing who undertake such unethical conduct. The email records submitted in "discovery" show how this scurrilous scare tactics unfolded from the patient identifying one date of my visit to him and then later "helped" by staff — including nurses enlisted in this deceit - to change his mind.

Besides, RG — who was intimidated to change his mind - was not the only Jewish patient at the CC that day. MM (CRC-3SW-S-35636) was sedated when I prayed at his bedside (although he might remember) on Sept 29th, our holiest Sabbath of the year. To think a rabbi would disregard Jewish patients on such a holy day! A third patient, DR, was in his room (CRC-3NW-32636-B) and he also spent time with me that Friday/Shabbat. [We spent time getting to know each other and I invited him to the Day of Atonement services on Monday, Oct. 2nd, which he did attend as did RG. We enjoyed discussing things with each other on subjects we both care about-the Holocaust and Religious Identity. And on Sept. 29th, he wrote in his own handwriting! On my Sept. 29th worksheet! He wrote down his email and telephone number. Should WJ or HF care to try to change his mind as well, I'll be able to provide his telephone number for anyone who would like to speak with him. He was not on a psychiatric unit, unlike patient RG. He will be much more difficult to turn around. (I mean only to point out how wrong it is to use patients for ulterior motives. Patients are not "things" to be used in power games.)]

As to the allegation and charges against me, they are utterly baseless. I was exactly where I was supposed to be when I was at the Clinical Center chapel and was exactly where I was supposed to be off campus as in previous years, functioning as the rabbi for the Jewish patients at the Clinical Center, just as

Exhibit 7 p. 22

the ethical office directives and the Jewish chaplain's position/job description requires.

In the matter of the allegation that I was AWOL and not at my post on Sept. 29th, this is yet another instance among so many in which Mr. Jones (and Dr. Fitzgerald) made up their minds in prejudging an issue before determining the facts, resulting in a very serious error of judgment with severe and hurtful consequences. Mr. Jones claimed that he sat in his office after the service was scheduled to begin. Had he taken the elevator up to the chapel on the seventh floor as per the posted schedule he would have come upon both or either MW or me except when I was visiting patients in their units. Why would not the obvious place to get to the truth be sought so that this ordeal might have been avoided or at least some more believable reasons for my removal be manufactured by someone more creative – one who does not stoop to intimidating patients and to bullying staff so that they compromise truth.

First Mr. Jones made up his mind that I was AWOL, in looking for – or blinded by - a contrived justification to fire me as he and Dr. Fitzgerald have fired or forced out every chaplain over the last 6 years, such that I at present am the only one left standing, and such that I am now the senior staff chaplain of the department. But the facts and truth do not stand against pre-judgment – prejudice. Mr. Jones made up his mind to target me for reasons well known to all; how my dismissal was to be accomplished hardly mattered. Truth and honor have no place in that mind-set. Patients' needs are of little concern. To the detriment of patients' religious needs, I was put on administrative leave and required to stay away from the chapel and Jewish patients on our holiday, resulting in the canceling of the Bikkur Cholim festival – Sukkoth and Simchat Torah - visitations, as several individuals who planned to visit patients for the festival will attest.

I am waiting for an apology from WJ for accusing me of being AWOL on the Sabbath of Repentance! That accusation is so outrageously false, it is disrespectful, insulting and demeaning. The charges that I was AWOL are baseless. Judgments were made before the facts were gathered or the truth was ascertained. The charges against me were made before anyone looked into the matter. And I was terribly upset to have my integrity questioned. It hurt very deeply to be accused of deception. This accusation is clearly a ruse invented to have me removed from my position because I testified truthfully in the matter of Father Henry Heffernan.

Exhibit 7 p. 23

# FABRICATION OF FALSE ALLEGATIONS

## *On The Jewishness of Ms Fitilis*

What transpires in religious conversation/consultation/communion between clergy and visitor in a chapel is private and is not appropriate for public discussion -- unless there is a pretext to the chapel visit. A rabbi would certainly, as have I in this matter, seek above all to avoid calling on a person in attendance to read from the Hebrew text or pronounce Torah blessings in Hebrew if the person could not read Hebrew. A rabbi would not want to expose a person to embarrassment in a Jewish religious service. A rabbi would determine in advance whether the person knew Hebrew, and therefore would know whether or not to call upon her or him to pronounce torah blessings. We ask for a Hebrew name to help in matters determining identity for participation at services among other valid and important reasons.

As regarding Ms. Fitilis claim to me that she was Jewish, persons may call themselves whatever they like; there are no sanctions or penalties for calling oneself a tree. But if definitions have meaning the person calling himself or herself a tree will not be convincing unless rooted to the earth, covered with bark, producing leaves and whatever else trees have and do. Language must bear some relationship to truth. With this I am most certainly being judgmental; that's what rabbis do; that's why we get the big contracts; that's what the NIH CC IT CRIS records identify as a chaplain's responsibility, that is, to function as a rabbi precisely by being judgmental, particularly in matters of recording Religious Identity (the first entry item in CRIS Information System), just as a priest judges those eligible for communion and those not i.e., not Baptized.

## *Rabbinical Practice and Responsibilities*

Rabbis define the borders between faith communities for Jews, just as other clergy do for their religious communities and faith tradition requirements. That is the rabbis' role, to be judgmental in matters of Jewish law and tradition.

In the news recently two rabbis correctly pointed out to the comedian Michael Richards that he can call himself Jewish but he most certainly is not. As with Ms. Fitilis, he had none of the required identifiers. If I do not do

Exhibit 7 p. 24     24

what rabbis do in this matter, great embarrassment at worship services will not be easily avoided, for example to the person invited to participate by a call to the Torah. That is the reason why a rabbi asks for a Hebrew name. I was already projecting her being called up to the Torah by that name the following day. She said she would try to come. She took two prayer books with her intended for the next day's service she was to come to with family. I call all newcomers up to the Torah to recite the blessings.

My integrity as a rabbi requires that I do not evade being at times, and when necessary, judgmental. The recent book I wrote on the subject of identity has been forwarded to Ms Fitilis by email. I am judgmental all over the place in the book. A rabbi is a judge and is recognized as such; (I also act as justice of the peace). I hope the book helps her understand the issues of identity more realistically. I would be prepared of course to email or bring the book to you too to better understand the issues in question should you care to read it. Besides, the U.S. Constitution and Bill of Rights would have the government take a hands-off position in matters of religious faith and practice, as you know. Also to the point, Protestant Christians do not make up Jewish rules no matter what their position of authority happens to be.

### *In summary*

It is clearly wrong to seek my removal from my position for such baseless reasons. The allegations concerning my removal are a sham and entirely deceitful. Patients' needs -- not power and autocratic authority -- should guide our actions. Patients (and staff too) must not be bullied or used, manipulated and intimidated by those in authority for their own deceptive and calculated purposes. Jews should have dedicated religious service schedules and spiritual space as the other religious faith groups have. Jews who convene as a minyan for NIH CC Jewish patients to perform the Bikkur Cholim mitzvah should not be suppressed by false Outside Activity classifications and subjected to other restrictions. Rabbis serving as Jewish chaplains should not have their budget for retreats and conferences diverted for another, Christian, chaplain's purposes. Censorship should be discontinued and disavowed as standard policy. The Jewish Chaplain is to decide on the content of religious services and materials suitable for distribution to Jewish patients, not Protestant authorities. Conversionary prayers that Jews become Christians are not to be recited or distributed at the federal NIH institution. The Clinical Center leadership should not engage in repressive actions designed and intended to provoke and then dismiss SMD

Exhibit 7 p. 25                    25

chaplains. These chaplains whose lives were disrupted and injured should be returned to their CC positions and be compensated. Regardless how high in the NIH hierarchy they have reached, those authorities responsible for unethical and illegal retaliatory actions of religious discrimination should not be held blameless for the suffering and injury they inflicted upon others and for engaging in religious discrimination.

# Further Reflections & Background Information

### 1] THE CENSORING OF ALL MY WRITINGS AS A RABBI

Why is it important to take note of the specifics regarding the discrepancy between RF and WL concerning the censorship of an article I wrote? Because it shows that their intent to suppress preceded searching for and finding/fabricating a reason or justification or cause celebre for the suppression. *The grounds for their censorship were to be contrived and fabricated after the decision to suppress was made.* This can be recognized by the contradiction between the reason offered by WJ and the reason offered by RF for the censorship. The give-away word revealing that premeditated malice and discrimination was at play is WJ writing that he "concurred" with RF's decision that an article I wrote not be *distributed* to Jewish patients for the Jewish festival of Passover. WJ wrote he concurred that the article in question was "scholarly" and I have no business *writing* scholarly articles for the patients. (The issue was foolish from the outset because I wrote the articles I intended for distribution– and my books - on my own time and the decision to suppress concerned the *distribution* not the *writing* of articles. The writing of the article I submitted for distribution was already written.)   WJ did not decide that the scholarship was false or faulty or untrue or un-biblical or not faithful to religious doctrine (how would he know in any event?). He wrote it was a "scholarly" article and therefore (!) disallowed to Jewish patients. (As the Diversity Officer his determination was that diversity does not include Jewish individuals who read scholarly articles.) But RF gave an altogether antithetically contradictory reason – essentially the polar opposite or converse – an altogether different justification - for the censorship of the article intended for distribution– *showing collusion not concurrence!* Showing rather that they colluded to suppress regardless of the reasons or lack of reasons for censorship! It was not scholarly at all to RF but false and against the biblical account – as AK's



Exhibit 7 p. 26

26

notes on RF's stated reason reflect. What they concurred about was censorship and suppression. They did not even remember what reason they beforehand agreed to have made up. The one remembered it was to be that the article was true but too sophisticated for patients and the other that it was untrue subverting the biblical account. They "concurred" only to infuriate, intimidate and provoke a reaction from me which would then be grounds for my termination as they have terminated every single chaplain before me. The truth is that the article strongly and vigorously supports the biblical account with evidence from extra biblical sources. It says so in the very title. And of course because it has several footnotes it must be "scholarly" (and if it is scholarly it has to be kept out of the hands of Jewish patients to be sure) and therefore far too diverse for even the Diversity Officer.

## 2] CLASSIFYING THE MINYAN AS OUTSIDE ACTIVITY

The change in classification of the minyan by RF, WJ and the ethics office as officially an Outside Activity which had never before been seen that way presented other opportunities for sustaining their battery of directives, edicts and requirements - some serious some petty but all nevertheless intrusive and intimidating. These demands I always connected to RF's self revelatory insights about his own self image, namely when he said to Chaplain ER that he has – in *his* mind at least – "perfected the art of psychological manipulation" and that he can get whomever he wished to do whatever he wished by his cunning and mental powers. RF's own brother has said the same concerning his brother RF's Machiavellian view of himself and the great hurt that he has inflicted on so many – me, by overt blatant acts of religious discrimination and retaliation, others as he saw fit – his brother saying or confessing this to me, minister to minister, Reverend to Rabbi, in a church sanctuary, with tears in his eyes! Every chaplain subordinate to RF and other subordinate staff have very quickly picked up on this. Most would be eager to testify to experiences of psychological/Machiavellian manipulations they have experienced themselves and others they know about inflicted upon other subordinates.
All his subordinates, chaplains and staff, need only to be asked if they believed RF to be trustworthy or not.

## 3] THE WEBSITE INFORMATION

I was ordered by the Ethics office to make a clear distinction between my (newly categorized) Outside Activities and my NIH function as rabbi of the NIH CC. According to the Ethics office, WJ and RF that meant removing from my personal website a photograph of myself and Senator Mark

Exhibit 7 p. 27

Hatfield by calling such a photograph taken privately but on campus at the new Hatfield building "official" and therefore not to appear on my website. (The senator asked to take the picture with me because he said jokingly that he wanted the "credibility" of being photographed with the rabbi of the center bearing his name.) No regulations or written rulings were cited.

## 4] CENSORING ALL COMMUNICATION

Then the Outside Activity categorization was interpreted to mean removing from articles I had written, and posted website documents, reference to the fact that I am the rabbi of the NIH CC. I not only could not distribute written material as I see fit according to the needs of Jewish patients, but I must not use identifiers, however truthful and accurate, mentioning that I am the Jewish Chaplain at the CC. Here is where the pocket veto comes into play. In October 2006 I submitted to the Ethics Office as required several articles, sermons, poetry, a book of some 300 plus pages I had just completed, some humor I had previously published and other written materials I had composed for Jewish patients and others on my own time. I submitted this with the biographical background information required of me. Not a word have I heard from them. They had arrogated to themselves responsibilities about which they have no knowledge. I did wonder how on earth four Protestants would judge a rabbi's writings as appropriate for Jewish readers when they could not or would not deal with conversionary prayers for Jews to become Christians in the NIH Federal CC. In truth WJ and the Ethics office have no real interest in what Jewish patients read or what a rabbi would distribute according to needs Jews have about which the Protestant authorities have no expertise or experience. The Outside Activities relegation allowed for the playing out of a number of psychological but predictable and rather cynical, and immature, games – games openly discriminatory - intended to intimidate and provoke but with which I nevertheless fully complied to avoid providing justification for my removal which I saw as inevitable in any event and only a matter of time to come to it.

# ON THE METHODOLOGY OF
# RETALIATORY RELIGIOUS DISCRIMINATION

As required, on January 23rd 2006, I completed the required courses on Ethics assigned to all NIH CC employees and received a formal certificate/diploma for the course work. The course consisted of three parts:

Exhibit 7 p 28          28

Outside Activities, Awards from Outside Organizations and Prohibited
Financial Interests.

I took particular note of the section of the Ethics training information that
religious organizations and recreational organizations and activities are
*excluded* from outside activities requirements. I took it to mean that since
nearly everyone has some sort of religious affiliations and belongs to
recreational and sport organizations as outside activities the NIH would have
no interest in identifying the religious and recreational outside activities NIH
employees affiliate with and saw my own religious and recreational
affiliations as also not requiring special permission. And as my religious and
recreational affiliations were long standing going back twenty five to nearly
fifty years and fully noted all biographical recreational, sports and religious
publications; and as my affiliations were well known by all in the SMD
including RF and WJ throughout previous years from the time of my
application for the position; and as being only a part-time employee; and
because no revenue funds or income were involved only expenditures and
contributions to – that is, monies spent, not monies earned, profit or income
from – the many religious organization or recreational organization to which
I belonged, I said to myself, : "oh, oh!" and sensed a dark apprehension
when I was brought to the Ethics office by RF and informed I must register
and get permission for my outside activities relative to the recreation and
religious organizations to which I belonged.

Also the revenue from rabbinically officiated life cycle events from which I
do derive income (under $10,000 annually) as a part-time rabbi in the Jewish
community must also be considered an outside activity for which I needed
permission. I subsequently secured approval for my outside activities. I did
what I was told. But I intuited that a hidden agenda existed below the
surface and that in some way or other the classification "outside activity"
would be used in some malevolent way. But I also wondered why the Ethics
office would reach into religious matters and by what authority? My
understanding from newspaper accounts and discussion at the NIH was that
Ethics relates to bioethics not religious issues.

I soon realized how predicable all of this was and that having the minyan
classified falsely as an outside activity provided the well thought out but
obvious pre-planned justification for later "pulling the rug" from under the
minyan, banishing the minyan to an outside status and placed instead in an
exclusion classification and erecting a barrier between the minyan and the


Exhibit 7 p. 29

29

Jewish Chaplain as well as between the minyan and the CC. Terms such as clear distinction, overlap, mixing and merging and especially, "appearances of conflict of interest" in various expressions were invoked without any citations or references in any text of rulings they could provide. WJ then required me to turn my back on the "outside activity" quorum on the Day of Atonement! The holiest day of the year! Moments before services! And informed me that I am to remain on campus, that I should not be servicing the outside activity quorum on NIH CC time or I must take annual leave – despite his full knowledge that CC NIH Jewish patients were being sent by the social work department to the quorum at the Leland Center for religious services on the Day of Awe. He certainly knew that the weekend minyan, "Bet Chesed" and the "14th floor minyan" were both organized and established as a means to provide religious services – for which a quorum of 10 adults is required – for Jewish CC patients.

These minyans are NIH CC quorums by original design and by intent. Much of the time their services are offered on campus and when the patients' needs suggest, off-campus and underwritten financially by the quorum as a mitzvah, a pious charitable act. Neither group is an outside activity. They were classified as an outside activity with a hidden agenda to keep me from providing services to them and Jewish patients as rabbi.

The same disconnection among clinical center offices which WJ noted ruefully in a meeting among WJ, RF, RB and AK brought about a contradiction among the SMD department, WJ and the Ethics office. But religious discrimination was the tool set in place and employed to punish the rabbi and the quorum he established for Jewish patients

Thus far the lessons learned from this, in words borrowed from an astute observer in a similar matter, are: Lesson 1] Do not call attention to NIH officials and authorities of instances of mistreatment by religious discrimination and the abusive use of power. If you reject Lesson 1 out of a sense of duty and integrity "do not expect to emerge from the Kafka novel you\life will become." And therefore pay close attention to lesson 2 when considering lesson 1.

In the Jewish tradition there is an extremely important commandment known as "Thou shalt not stand idly by…" while others are in distress. The leadership of the Clinical Center has stood idly by while one chaplain after another chaplain, without exception, have been hired and then terminated,

Exhibit 7 p. 30    30

their lives disrupted, their careers put in shambles even though each one of eleven chaplains known to me was a dedicated and competent chaplain. Not a finger was lifted to stay the ongoing executions such that I am the only one left standing and have become the senior staff CC chaplain.

The charge of standing idly by is underscored by the fact that Chaplain Karen Morrow, former CPE supervisor at the CC wrote to Dr. John Gallin informing him of the distress I was experiencing and the ordeal of discriminatory acts I have been experiencing and suggested he meet with me. He never so much as acknowledged or acted upon the receipt or concerns of the letter. The forbidding and cave-like architecture of the administrative offices on the 6th floor is most revealing in this regard. By contrast the office of the president of the Shady Grove Hospital is on the main floor and the door of her office is almost always open such that anyone can drop in or wave hello to an accessible ever available chief who continuously interacts with staff and hospital employees. She also comes to department parties, get-togethers and worship services conducted for the various faith groups from time to time. Imagine John Gallin attending the minyan when needed as one of the ten for a quorum. Or attending High Holyday services to be among staff, patients and chaplain in his own faith community – not to speak of showing up for other faith groups as a sign of support.

---

## PREJUDICE AND OPPOSING DIVERSITY
## IN THE SPIRITUAL MINISTRY DEPARTMENT

On numerous occasions Chaplain Ray Fitzgerald, Department chief, revealed quite openly that he favored doing away with the Jewish Chaplaincy program and that he preferred not to have a rabbi on staff as chaplain. He made this clear long before hiring Rabbi Reeve Brenner, the undersigned, as Chaplain. The Jewish Chaplaincy and rabbi were in fact eliminated for a time before my tenure.

Chief Chaplain Ray Fitzgerald has said that had Marvin Kahn, who he names specifically in connection with this matter, not spoken out strongly in favor of reinstating the Jewish chaplaincy program which he, Ray Fitzgerald, had discontinued as a position in the department, there would be no rabbi on staff. He has said on numerous occasions that he tried to do away with the SMD Jewish Chaplaincy and more important, that he would

Exhibit 7 p. 31                    31

not have a rabbi on staff. This means no Jewish chaplain could be qualified in terms of ability. It means that in advance no Jewish Chaplain need apply for a chaplaincy position. He said on many occasions that against his better judgment, he was compelled to reinstate a rabbi on his staff.

The justification for the elimination of the rabbi and Jewish chaplaincy program was that the chief chaplain's generic spiritual care, as opposed to faith-specific based spiritual care for Jewish patients, along with the visitations by his clinical pastoral education (CPE) seminarian students, and the occasional ritual services of contracted Jewish rabbi from the local community would fully satisfy these Jewish patients' religious needs.

Exhibit 7 p 32

32

I have reviewed this statement, which consists of _____ pages, and hereby solemnly ✓ swear ✓ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

(Signature of Deponent) _____ (Date) Feb 14/07

Signed before me at
on this _____ day of _____ , 2007.

Investigator — Statement
— submitted to Investigation un
~~~~~~~~~~~~~~~ in Dec./Jan 07
but Complaint provided oath/signature
later. Anne King

Initials____

Exhibit 7 p. 33

Yahoo! Mail - edar_rogler@yahoo.com 
Case 1:07-cv-02308-RMC   Document 64-10   Filed 06/24/2008   Page 1 of 1
Page 1 of 1

# YAHOO! MAIL

Print - Close Window

| | |
|---|---|
| **From:** | ORayFitz@aol.com |
| **Date:** | Fri, 12 Aug 2005 17:32:04 EDT |
| **Subject:** | Re: Catching up 2 |
| **To:** | edar_rogler@yahoo.com |

Dear Deborah :

I congratulate you on getting the VA Chaplaincy Residency. I hope there is a stipend with it?

If you are in this area even late Sun 8/14/05 or Mon 8/15/05 I would be glad to talk with you. A person who was to work part time starting mid Aug '05 has some health problem which has arisen so these plans are indefinite.

I will need atleast a 1 page resume including your education and work experience. Especially your amount of theological education and your work experience in ministry would be important. This would be processed through our Human Resources.

Two things are essential: (1) A report within the past 6 months that you are free of TB, i.e. a "patch test" or a chest XRay. (2) Report of your present bank #. Here the pay is only done electronically.

Should you be in this area on Sun 8/14/05 I could meet you for dinner at 6pm or so at the Bethesda Marriott just inside I 494 on Wisconsin Ave (right at 1st traffic light- Pooks Hill Ave and then at the 2nd block turn right into the parking lot and meet at The American Grill).
The 2nd option would be to meet at NIH in

Bethesda about 11 am Mon 8/15/05. It would be for a couple hours. Then it might take a couple days to process through Human Resources.

At your convenience please call me on Cell 240 3501616.

Warmly and Shalom!

Ray Fitzgerald, PHD

AP 1